# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**BARBARA ALIOTTA, et al**     )
)
  **Plaintiffs,**       )
)
    **v.**        )  **Case No. 1:05-cv-02325-RMU**
)
**MARTIN J. GRUENBERG,**   )
**Acting Chairman,**      )
**Federal Deposit Insurance Corporation,** )
)
  **Defendant.**      )
_____)

## DEFENDANT'S RESPONSE AND BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

William S. Jones      Stephen J. Kessler
Georgia Bar No. 404288    D.C. Bar No. 382427
Counsel, Legal Division    Counsel, Legal Division
Federal Deposit Insurance Corporation Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)  3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226     Arlington, VA 22226
(703) 562-2362      (703) 562-2311
(703) 562-2482 (Fax)     (703) 562-2482 (Fax)

# TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................................1

II.  FACTUAL BACKGROUND..............................................................................3

III. ARGUMENT AND AUTHORITIES................................................................10

   A.  Certification Should Be Denied Because Plaintiffs Have Failed To Exhaust
       The EEOC Process By Providing Notice to the EEOC of Their Class Claims................11

   B.  Plaintiffs' Conclusory Allegations Are Insufficient as a Matter of Law..........................14

   C.  Plaintiffs' Claims Do Not Meet the Requirements of Rule 23(a)......................................15

       1.  Plaintiffs' Claims Lack Commonality and Typicality............................................15

           a.  The Claims of the "Buyout" Plaintiffs Are Not Common or
               Typical..........................................................................................................16

           b.  The Sole "Reduction in Grade" Plaintiff's Claims Are Not
               Common or Typical.......................................................................................19

           c.  The Claims of Plaintiffs Who Were Involuntarily Separated May
               Or May Not Be Common or Typical, Depending on the Scope of
               These Claims.................................................................................................20

       2.  Plaintiffs' Claims That May Have Commonality or Typicality
           Nevertheless Fail to Satisfy Rule 23(a)'s Numerosity Requirement.....................21

       3.  None of the Plaintiffs Is An Adequate Representative for Potential Class
           Members Who Received Lower-graded Positions During the RIF.......................22

   D.  Plaintiffs' Claims Do Not Meet the Requirements of Rule 23(b)(3)................................23

       1.  Common Questions of Law or Fact Do Not Predominate......................................23

       2.  A Class Action Is Not a Superior Method to Resolve Plaintiffs' Claims...............24

IV.  CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aguirre v. Bustos,*
    89 F.R.D. 645 (D. N.M. 1981) ......................................................................10

*Allison v. Citgo Petroleum Corp.,*
    151 F.3d 402 (5th Cir. 1988) .......................................................................25

*Amchem Prods., Inc., v. Windsor,*
    521 U.S. 591 (1997) ...............................................................................23, 25

*Armstrong v. Powell,*
    230 F.R.D. 661 (W.D. Okla. 2005) ...............................................................5

*Arnold v. Postmaster Gen.,*
    667 F. Supp. 6 (D.D.C. 1987), *rev'd on other grounds,*
    863 F.2d 994 (D.C. Cir. 1988) ....................................................................10

*Artis v. Greenspan,*
    158 F.3d 1301 (D.C. Cir. 1998) ...................................................................11

*Belhomme v. Widnall,*
    127 F.3d 1214 (10th Cir. 1997), *cert. denied,*
    523 U.S. 1100 (1998) ...................................................................................11

*Bynum v. District of Columbia,*
    214 F.R.D. 27 (D.D.C. 2003) .......................................................................22

*Coburn v. Pan Am. World Airways, Inc.,*
    711 F.2d 339 (D.C. Cir. 1983) .....................................................................19

*East Texas Motor Freight Sys., Inc. v. Rodriguez,*
    431 U.S. 395 (1977) .....................................................................................16

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) .....................................................................................10

*Gen. Tel. Co. v. Falcon,*
    457 U.S. 147 (1982) .........................................................................10, 14, 16

*Graefenhain v. Pabst Brewing Co.,*
    870 F.2d 1198 (7th Cir. 1989) .....................................................................24

*Greene v. Safeway Stores, Inc.,*
  210 F.3d 1237 (10th Cir. 2000) ........................................................24

*Gonzalez v. Brady,*
  136 F.R.D. 329 (D.D.C. 1991) ......................................................2, 15

*Gulley v. Orr,*
  905 F.2d 1383 (10th Cir. 1990) ......................................................12

*Hartman v. Duffey,*
  19 F.3d 1459 (D.C. Cir. 1994) ....................................................14, 15

*Henn v. Nat'l Geographic Soc'y,*
  819 F.2d 824 (7th Cir. 1987) ......................................................18, 19

*Hipp v. Liberty Nat'l Life Ins. Co.,*
  252 F.3d 1208 (11th Cir. 2001) ......................................................18

*James v. England,*
  332 F. Supp. 2d  239 (D.D.C. 2004), *mot. for recon. denied,*
  226 F.R.D. 2 (D.D.C. 2004).......................................................12, 13

*Owens v. Bethlehem Mines Corp.,*
  108 F.R.D. 207 (S.D. W.Va. 1985)....................................................10

*Rann v. Chao,*
  346 F.3d 192 (D.C. Cir. 2003), *cert. denied,*
  543 U.S. 809 (2004)...............................................................11, 14

*Reap v. Cont'l Casualty Co.,*
  199 F.R.D. 536 (D. N. J. 2001)......................................................25

*Silver v. Leavitt,*
  No. 05-0968, 2006 WL 626928 (D.D.C. Mar. 13, 2006), *appeal docketed,*
  No. 06-5104 (D.C. Cir. Apr. 18, 2006).............................................3, 11

*Smith v. City of Jackson,*
  544 U.S. 228 (2005).................................................................3

*Staats v. United States Postal Serv.,*
  99 F.3d 1120 (Fed. Cir. 1996)........................................................18

*Tran v. Trustees of State Coll.,*
  355 F.3d 1263 (10th Cir. 2004) ......................................................18

*Wagner v. Taylor*,
836 F.2d 578 (D.C. Cir. 1987) ...................................................................14, 15

*Walker v. Mountain States Tel. & Tel. Co.*,
No. 84-M-790, 1988 WL 1000060 (D. Colo. Sept. 26, 1988) ..........................18

## STATUTES

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq ...................... *passim*

5 U.S.C. § 105 ..........................................................................................................10

12 U.S.C. § 1811 ......................................................................................................10

12 U.S.C. §§ 1815, 1820-1821 ..................................................................................3

29 U.S.C. § 633a ......................................................................................................11

29 U.S.C. § 633a(c),(d) ............................................................................................11

29 U.S.C. § 633a(d) .................................................................................11, 14, 22, 25

## RULES and REGULATIONS

5 C.F.R. pt. 351 ...............................................................................................1, 16, 21

Fed. R. Civ. P. 23(a) .......................................................................................... *passim*

Fed. R. Civ. P. 23(a)(1) .............................................................................................22

Fed. R. Civ. P. 23(a)(4) .............................................................................................22

Fed. R. Civ. P. 23(b) ............................................................................................10, 15

Fed. R. Civ. P. 23(b)(3) ...........................................................................2, 23, 24, 25

## TABLE OF ABBREVIATIONS

ADEA          Age Discrimination in Employment Act

DIR           Division of Insurance and Research

DIRM          Division of Information Resources Management

DIT           Division of Information Technology

DOA           Division of Administration

DOF           Division of Finance

DRR           Division of Resolutions and Receiverships

DSC           Division of Supervision and Consumer Protection

EEOC          Equal Employment Opportunity Commission

FDIC          Federal Deposit Insurance Corporation

Legal         Legal Division

ODEO          Office of Diversity and Economic Opportunity

OERM          Office of Enterprise Risk Management

OIG           Office of Inspector General

OLA           Office of Legislative Affairs

OO            Office of the Ombudsman

OPA           Office of Public Affairs

RIF           Reduction in Force

RTC           Resolution Trust Corporation

SOI           Solicitation of Interest

## TABLE OF EXHIBITS

1       Excerpt from the FDIC News May 2005.

2       Memorandum from Deputy to the Chairman and Chief Operating Officer
        John F. Bovenzi to All Employees ("10/26/04 Bovenzi Memo").

3       Declaration of Joy Crosser ("Crosser Decl.").

        3-1     Buyout Notification E-mail to DRR Employees.

        3-2     Buyout Fact Sheets for Divisions and Offices.

        3-3     2004/2005 FDIC Buyout Handbook.

4       Potential Class Members Electing the Buyout.

5       Specific RIF Notice for Ann A. Bonner.

6       Potential Class Members Involuntarily Separated By RIF.

7       DIT 2005 Corporate IT Accomplishments.

8       Positions with Identified Surpluses.

9       E-mail Message from Acting General Counsel Douglas H. Jones to
        Legal Division Employees.

10      EEOC Notification Letters.

        10-1    EEOC Notification Letter dated October 31, 2005.

        10-2    EEOC Notification Letter dated November 10, 2005.

        10-3    EEOC Notification Letter dated December 6, 2005.

        10-4    EEOC Notification Letter dated December 15, 2005.

        10-5    EEOC Notification Letter dated December 22, 2005.

        10-6    EEOC Notification Letter dated December 28, 2005.

        10-7    EEOC Notification Letter dated January 20, 2006.

        10-8    EEOC Notification Letter dated February 2, 2006.

10-9     EEOC Notification Letter dated February 16, 2006.

10-10   EEOC Notification Letter dated February 21, 2006.

11       Excerpt from the FDIC News July 2005.

12       Notification of Personnel Action for Gregory Haag Effective 5/1/05 ("CLG Notice").

12-1     Notification of Personnel Action for Gregory Haag Effective 1/9/05.

12-2     Nationwide Solicitation of Interest dated February 1, 2005 ("SOI").

12-3     SOI Application Materials for Gregory Haag.

13       Corporate Reduction in Force Policy.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
**BARBARA ALIOTTA, et al**                       )
                                                      )
    **Plaintiffs,**                          )
                                                      )
        **v.**                                )      **Case No. 1:05-cv-02325-RMU**
                                                      )
**MARTIN J. GRUENBERG,**                     )
**Acting Chairman,**                             )
**Federal Deposit Insurance Corporation,**  )
                                                      )
    **Defendant.**                          )
_____)

## DEFENDANT'S RESPONSE AND BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I.  INTRODUCTION

Due to a declining workload and a need to reorganize, the Federal Deposit Insurance Corporation ("FDIC" or the "Corporation") conducted a reduction-in-force ("RIF") in 2005 within its Division of Resolutions and Receiverships ("DRR"), in accordance with OPM regulations found at Part 351 of Title 5, Code of Federal Regulations.  Forty-eight former employees and one current employee have filed suit in this action, alleging individual and class claims that the FDIC violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), in connection with the RIF.  The forty-eight former employees who are Plaintiffs include 32 individuals who resigned or retired prior to the RIF, after they had applied for and accepted buyouts equal to 50% of their salary, and who now apparently claim that they were constructively discharged despite their voluntary participation in the corporate-wide buyout program.  Another 16 of the Plaintiffs were involuntarily separated (or resigned in lieu of

1

separation) after they received RIF separation notices on June 30, 2005.  The sole remaining

Plaintiff who is still employed by the FDIC (Gregory Haag) applied for and accepted a transfer

from DRR to another FDIC division months before the RIF in DRR was conducted.[1]  In their

pending Motion for Class Certification, Plaintiffs state that they "intend to prove that the FDIC

targeted the Division of Resolutions and Receiverships for reductions because it was an 'old'

division."  Motion for Class Certification; Memorandum of Points and Declarations in Support

Thereof ("Pl. Mem.") at 3.[2]

Plaintiffs have requested certification of a class pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure, consisting of "[f]ormer or present employees of FDIC's Division of

Resolutions and Receiverships who were born on a date on or before September 30, 1955 who

were terminated from their positions in the DRR, or who were offered and accepted a buyout, as

a result of the 2005 RIF, or who accepted a reduction in grade to retain their employment."  Pl.

Mem. at 3.  However, Plaintiffs' class claims are fatally deficient because Plaintiffs failed to

exhaust their administrative remedies in accordance with ADEA requirements for federal

employees and because the proposed class fails to meet the requirements of Rule 23 of the

Federal Rules of Civil Procedure.[3]

---

[1] Plaintiffs also state that "[t]wo plaintiffs (James Connell and Kathy Frantum) accepted the
buyout and subsequently found new position [sic] within the agency, albeit, in lower-graded,
lower-paying positions.  Def.'s Answer, ¶ 75."  Pl. Mem. at 2.  However, as Defendant's Answer
clearly states, both of these individuals found positions with another federal agency (GSA) after
resigning with a buyout from the FDIC effective May 14, 2005.  Answer at ¶¶ 17, 29 and 75.
See also attached Exhibit 1, FDIC News May 2005, concerning Ms. Frantum's plans to take a
job at GSA (http://fdic01.prod.fdic.gov/division/OPA/publications/fdicnews/may05/dallas.html).
[2] No declarations were filed in support of the motion for class certification, despite the fact that
testimonial proof from named plaintiffs and/or potential class members has been deemed
"essential in a case such as this to provide specific proof to show that there are issues of fact and
law common to the potential class and that plaintiffs' claims are typical of the potential class."
Gonzalez v. Brady, 136 F.R.D. 329, 333 (D.D.C. 1991) (footnote omitted).
[3] To the extent that Plaintiffs seek to allege disparate impact claims in this case, see Pl. Mem. at

## II.  FACTUAL BACKGROUND

The FDIC is responsible for insuring deposits at virtually all banks and savings associations in the United States, for regulating state chartered banks that are not members of the Federal Reserve System, and (most germane to this case involving a reduction in force necessitated by a declining workload in DRR) for resolving failed financial institutions.  See 12 U.S.C. §§ 1815, 1820-21.  During the well-known bank and thrift crisis of the late 1980's and early 1990's, the FDIC experienced a significant increase in staffing, due in large part to its responsibility for disposing of billions of dollars of assets belonging to failed financial institutions that had been placed into receivership.  When the banking crisis eased, the FDIC began a lengthy era of nearly continuous downsizing of its workforce.  Specifically, the increasing health of the banking industry led to a dramatic drop in bank failures, with a corresponding shortage of work for employees, like those in DRR, who resolved failing and failed banks, ran the receiverships of failed banks, and liquidated their assets.  In addition, emerging technology enhanced the FDIC's productivity and efficiency, creating a further excess of staff and a need for the FDIC to reorganize, change the way it accomplished its mission, and reduce excess staff.

As far back as 1996, the FDIC's Annual Report acknowledged the Corporation's need to analyze its staffing levels and to begin to take steps to downsize:

> As part of the new budgeting process, each of our divisions and offices justifies its staffing levels by workload, and 1996 saw continued dramatic reductions in the overall workload of the FDIC. The book value of assets in liquidation at the FDIC

---

8 n.4, 11, precedent in this jurisdiction holds that such claims are not cognizable against federal agencies.  See Silver v. Leavitt, No. 05-0968, 2006 WL 626928, at *13 (D.D.C. March 13, 2006), appeal docketed, No. 06-5104 (D.C. Cir. Apr. 18, 2006), and cases cited therein.  Further, Plaintiffs' allegations could not even potentially constitute a predicate for the uniquely narrow disparate impact cause of action applicable to private sector age cases under Smith v. City of Jackson, 544 U.S. 228 (2005).

peaked in mid-1992 at $44.4 billion. As of year-end 1996, they stood at $8.7 billion—only one-fifth of the 1992 levels—despite $7.7 billion in Resolution Trust Corporation (RTC) assets transferred to the FDIC at the end of 1995, when the RTC sunset occurred. About $4.4 billion of the assets in liquidation on our books at year-end were those assets transferred from the RTC, with the remaining $4.3 billion representing assets from FDIC liquidations.

Staffing size correlates closely with expenses at the FDIC. In the aftermath of the banking crisis of the late 1980s and early 1990s, FDIC staffing peaked in mid-1993 at 15,611. It has been difficult, but necessary, to tell many employees who served the FDIC and this country well during the banking crisis that we no longer have jobs for them. We have sought to be as humane as possible in this process by offering generous cash buyouts, direct job placement assistance, and opportunities to compete for the limited number of jobs open in other parts of the Corporation. The FDIC has been and will continue to be exceedingly well served by the professionalism and dedication of its staff.

. . .

Most of the reduction since 1993 came from the Division of Resolutions and Receiverships (DRR), formerly the Division of Depositor and Asset Services (DAS) and the Division of Resolutions (DOR), before those two divisions were merged in December of 1996. The staff of those two divisions peaked at 6,966 in mid-1993, but their combined total declined to 1,819 as of year-end 1996.

1996 Annual Report, Chairman's Statement.[4]

The FDIC's protracted downsizing efforts have not been confined just to DRR, however.

As outlined in a recent judicial opinion denying class certification in another ADEA lawsuit

brought in 2003 against the FDIC as a result of corporate-wide downsizing:

Downsizing efforts continued in 1997. Based on updated analyses of core staffing requirements, the Board [of Directors of the FDIC] decided to close four field offices of the Division of Supervision and one of the Division of Consumer Affairs. Staff at those offices were reassigned or accepted a voluntary buyout through a Relocation Buyout Program. Employees in four divisions were offered

---

[4] Publicly available at http://www.fdic.gov/about/strategic/report/1996/chair.html#eduction. In recognition of the fact that Plaintiffs have not yet commenced discovery, to the greatest extent practicable Defendant has sought to utilize as exhibits to this response and opposition brief documents that are either publicly available on the FDIC's external website, fdic.gov (such as the FDIC's annual reports), or are available to all FDIC employees (including the sole Plaintiff currently employed by the Corporation) on the FDIC's internal website, fdic01.prod.fdic.gov.

a new buyout program.  Further, nearly all eligible employees were offered the opportunity to participate in an early retirement program.

Memos from 1998 through 2003 reflect further consolidation of departments, additional targeted buyout programs, early retirement programs, and RIFs. However, in a January 2003 memo, John Bovenzi, FDIC CEO, reported that the FDIC still had approximately 200 surplus employees.  The remaining surpluses were to be subject to RIFs in June 2003, hopefully ending nearly a decade of downsizing.  . . .

<u>Armstrong v. Powell</u>, 230 F.R.D. 661, 666-67 (W.D. Okla. 2005) (footnotes omitted).

Unfortunately (at least from the viewpoint of surplus FDIC employees), the hope for an end to downsizing remained unfulfilled as the FDIC's workload continued to decline due to industry consolidation and the robust health of the banking industry.  The FDIC's 2003 Annual Report summarized the state of the banking industry as follows:

Through the first three quarters of 2003, insured commercial banks and savings institutions were on a record earnings pace, as a recovering economy and favorable interest-rate environment created conditions conducive to strong performance. The 9,237 commercial banks and savings institutions insured by the FDIC earned $89.9 billion in the first three quarters of 2003, a $9.6 billion (12.0 percent) improvement over the same period of 2002.

2003 Annual Report, Overview of the Industry.[5]  The following year, the overall number of institutions insured by the FDIC decreased, and earnings remained strong.  2004 Annual Report, Overview of the Industry.[6]  These dual trends of industry consolidation and income growth continued in 2005.  2005 Annual Report, Overview of the Industry.[7]

---

[5] http://www.fdic.gov/about/strategic/report/2003annualreport/overview_industry.html.

[6] <u>See</u> http://www.fdic.gov/about/strategic/report/2004annualreport/overview_industry.html: "The 9,025 commercial banks and savings institutions insured by the FDIC reported total earnings of $91.8 billion for the first three quarters of 2004, an increase of $2.0 billion (2.3 percent) over the same period of 2003."

[7] <u>See</u> http://www.fdic.gov/about/strategic/report/2005annualreport/overview.pdf:  "The 8,856 FDIC-insured commercial banks and savings institutions filing financial reports for September 30 reported total net income of $102 billion for the first three quarters of 2005, an increase of $10.2 billion (11.1 percent) over the same period in 2004."

As explained in the FDIC's 2004 Annual Report, these industry trends had a corresponding effect on the Corporation's continuing need to manage its staffing levels:

> The FDIC's operating expenses are largely paid from the insurance funds, and the Corporation continuously seeks to improve its operational efficiency in fulfillment of its fiduciary responsibilities to the funds. To that end, the Corporation engages annually in a rigorous planning and budgeting process to ensure that budgeted resources are properly aligned with workload. That is particularly true with respect to staffing, since personnel costs constitute well over 60 percent of the Corporation's annual administrative expenses. In late 2004, the FDIC Board of Directors approved management recommendations to reduce authorized staffing by 674 positions, to 4,750, by year-end 2005.
>
> Authorized year-end 2005 staffing is substantially lower than previous authorized staffing levels for the resolutions and receivership business line as well as the IT and administrative support functions. Staffing reductions were approved for the Division of Resolutions and Receiverships and the Legal Division following a lengthy analysis of current and projected future workload in the resolutions and receivership management area and reflect the smaller number of financial institution failures for the past several years. Staffing reductions in the Division of Information Resources Management and the Division of Administration reflect improved business processes, savings from contract consolidation, and outsourcing of functions where cost effective.

2004 Annual Report, Reducing Costs and Improving Financial Management.[8]

Faced with this reality, FDIC management sent a global e-mail message to all FDIC employees (including all Plaintiffs) in October 2004, informing them that "the FDIC will need to become a smaller agency," and would attempt to reduce its staff first through buyouts and then through reductions in force. Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to All FDIC Employees ("10/26/04 Bovenzi Memo"), attached hereto as Exhibit 2, at 1. The memorandum specifically told employees that staffing analyses conducted by management had determined that various divisions and offices of the Corporation were overstaffed and that steps would be taken to reduce excess staff. Management described the overstaffed divisions as falling into two discrete groups for downsizing purposes:

---

[8] http://www.fdic.gov/about/strategic/report/2004annualreport/mgmt_dna4.html.

The first group includes divisions where staffing levels are not justified by current or projected workloads. These divisions are planning for substantial reductions in their workforces. DRR, DIRM [(Division of Information Resources Management, now the Division of Information Technology, or DIT)], DOA [(Division of Administration)], Legal, and DOF [(Division of Finance)] are included in this group. Buyouts are going to be offered to most employees in these divisions. Nevertheless, it appears likely that the necessary staffing reductions in these divisions cannot be accomplished entirely through voluntary departures. *Accordingly, we have begun active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in DOA, Legal, and DOF in 2006.*

The second group includes the remaining divisions and all of the offices [(Office of Diversity and Economic Opportunity, Office of Enterprise Risk Management, Office of Inspector General, Office of Legislative Affairs, Office of the Ombudsman, and Office of Public Affairs)]. Staffing levels in these organizations are for the most part justified by current workload. As a result, in DSC [(Division of Supervision and Consumer Protection)], DIR [(Division of Insurance and Research)], and the offices, there will be a more limited buyout program. There will not be a RIF in these organizations.

Corporate-wide we estimate a reduction of between 500 to 600 positions from our current on-board workforce of nearly 5,300. These reductions will occur by year-end 2006, with most of the reductions occurring by year-end 2005.

Id. (emphasis added). Thus, DRR was included with other divisions, including DIRM (now renamed DIT), DOA, Legal and DOF, that would need to downsize in 2005 or face RIFs in 2005 and 2006.

The 10/26/04 Bovenzi Memo also outlined the salient features of the corporate-wide buyout program that was designed to encourage voluntary downsizing: (i) a buyout period that would last from early November 2004 to mid-May 2005 (except for DSC employees, who were required to submit their applications by December 13 and depart by December 31, 2004); (ii) a cash payment equal to 50% of total salary; (iii) supplemental incentives; (iv) the ability to combine the buyout with either regular or early retirement; (v) a requirement to repay the gross amount of the buyout only upon re-employment by the FDIC within five years (with no

7

restriction on re-employment in other federal agencies) ; and (vi) management discretion to delay the departures of selected employees for workload reasons.  Id.  There were no age restrictions.

In November 2004, individual notification via e-mail was provided to all eligible FDIC employees in the various divisions and offices, to inform them of their eligibility to elect the buyout as well as the specific terms of the buyout program for their division or office.  See Declaration of Joy Crosser attached hereto as Exhibit 3 ("Crosser Decl."), at ¶ 7.  Notification was sent to DRR employees in the Dallas and Washington, D.C. offices on November 2, 2004. Id. at ¶ 8; see Buyout Notification e-mail dated November 2, 2004 from Joy Crosser to DRR employees in Dallas and Washington, D.C., attached to Crosser Decl. as Exhibit 3-1.  In addition, Fact Sheets containing the buyout information for each division and office were posted on the FDIC's internal website.  Crosser Decl. at ¶ 9; see Buyout Fact Sheets for Divisions and Offices (including DRR), attached to Crosser Decl. as Exhibit 3-2.  Subsequently, the 2004/2005 FDIC Buyout Handbook was posted on the FDIC's internal website, in order to provide detailed information about the terms and conditions of the buyout.  Crosser Decl. at ¶ 10; see Buyout Handbook attached to Crosser Decl. as Exhibit 3-3.  The last day to submit an application or to rescind an application for the buyout was May 2, 2005 (except for DSC and OIG employees, for whom the final buyout application/revocation dates were December 15, 2004 and March 21, 2005, respectively).  Crosser Decl. at ¶ 11.  There were no minimum age requirements for being eligible to elect the buyout.  Id. at ¶ 10.

Specifically as to DRR, the buyout was open to "[a]ll permanent DRR employees assigned to Washington and Dallas, except for employees occupying EM [(Executive Management)] positions."  Exhibit 3-1 at 1.  None of the Plaintiffs were Executive Management/EM employees, so all were eligible for the buyout.  In all, 120 DRR employees

born on or before September 30, 1955, including 32 of the 49 Plaintiffs, applied for and accepted the buyout.  See attached Exhibit 4, Potential Class Members Electing the Buyout.  Pursuant to the terms and conditions of the buyout program, their decision to elect the buyout and resign from the Corporation became irrevocable on May 2, 2005, and with one exception, Plaintiffs who elected to take the buyout were off the FDIC's employment rolls by the May 14, 2005, final departure date.[9]

The remaining DRR employees who had not elected to take the buyout only found out whether they would be affected by the RIF on June 30, 2005, when they received a "Specific Notice of Reduction in Force (RIF)" in accordance with OPM regulations, notifying them that they would be adversely affected by the RIF which was to be effective September 3, 2005. Sixteen of the Plaintiffs received specific RIF separation notices (similar to the notice delivered to Plaintiff Bonner which is attached hereto as Exhibit 5), notifying them that they would be separated from the federal service effective September 3, 2005, but would continue in their present positions until that date and would be notified if a position became available in the interim.  A total of 28 DRR employees over age 50 (the 16 named plaintiffs and 12 other potential class members born on or before September 30, 1955, who have not filed suit) were involuntarily separated (or resigned/retired in lieu of separation after receiving a specific RIF separation notice on June 30) in this manner.  See attached Exhibit 6, Potential Class Members Involuntarily Separated By RIF.

---

[9] Plaintiff Nancy Powers had a delayed departure approved by management in accordance with the terms and conditions of the buyout program, due to a continuing need for her services.  See Answer at ¶ 46.  Some of the Plaintiffs left substantially earlier (e.g., Peggy Henderson resigned effective November 30, 2004, and Carole Mann's resignation was effective February 25, 2005. See Answer at ¶¶ 31, 39).

As to other FDIC divisions placed on notice in October 2004 that they were subject to potential RIFs, the Division of Information Technology (formerly DIRM) voluntarily downsized by 119 employees in 2005 via buyouts or transfers to other divisions or agencies, and so was able to avoid a RIF,[10] but the Division of Administration (DOA), Division of Finance (DOF) and the Legal Division continue to have surplus positions,[11] and these divisions have continued to prepare for RIFs later in 2006 as necessary.[12]

### III.  ARGUMENT AND AUTHORITIES

The class action procedure is not a matter of right, but "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Gen. Tel. Co. v. Falcon, 457 U.S. 147, 155 (1982). The Court may not assume that Plaintiffs' discrimination allegations, even if true, support a class action. Id. at 156-59. Rather, the trial court must be satisfied, after a rigorous analysis, that the movant has satisfied all of the requirements of Rule 23(a) and at least one provision of Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 162, 163 (1974). These standards are applicable to the case at bar.[13] Moreover, since this is a lawsuit

---

[10] See attached Exhibit 7, Division of Information Technology 2005 Corporate IT Accomplishments (reprinted from http://fdic01.prod.fdic.gov/division/dit/accomplishments/2005/improving_info.html).
[11] See attached Exhibit 8, Positions with Identified Employee Surpluses, reprinted from http://fdic01.prod.fdic.gov/division/DOA/humanresources/surplus/ctop_positionswithsurpluses.html.
[12] See, e.g., global e-mail message from Acting General Counsel Douglas H. Jones to Legal Division Employees dated March 14, 2006, attached hereto as Exhibit 9.
[13] A private sector ADEA class action follows the collective action procedures of the Fair Labor Standards Act (FLSA). However, in an ADEA class action against the federal government, Rule 23 applies. Arnold v. Postmaster Gen., 667 F. Supp. 6, 15 (D.D.C. 1987), rev'd on other grounds, 863 F.2d 994 (D.C. Cir. 1988). Because the FDIC is a government corporation, 12 U.S.C. § 1811, and an "executive agency" for the purposes of 5 U.S.C. § 105, this suit is subject to the requirements of Rule 23. Moreover, the FLSA collective action procedures have been characterized as a "lesser standard" than Rule 23's requirements. Owens v. Bethlehem Mines Corp., 108 F.R.D. 207, 212 n.7 (S.D. W.Va. 1985) (quoting Aguirre v. Bustos, 89 F.R.D. 645, 647 n.2 (D. N.M. 1981)). Accordingly, non-federal sector ADEA cases have limited precedential value concerning the issue of class certification in this case.

brought pursuant to the provisions of the ADEA, Plaintiffs must satisfy the administrative

exhaustion and notice requirements found in 29 U.S.C. § 633a.

**A.      Certification Should Be Denied Because Plaintiffs Have Failed to Exhaust the EEOC Process By Providing Notice to the EEOC of Their Class Claims.**

"Exhaustion of administrative remedies is an indispensable requirement for ADEA

claims." Silver v. Leavitt, 2006 WL 626928, at *6.  "The exhaustion requirement is not a mere

legal pleasantry – rather, it is a natural outgrowth of fidelity to the principle of separation of

powers, and it constitutes an indispensable prerequisite to a lawsuit in federal court." Id. at *9.

Under the ADEA, federal employees alleging age discrimination may file a formal complaint

with the Equal Employment Opportunity Commission ("EEOC" or "Commission") and, if

denied relief in that forum, file a civil action.  29 U.S.C. § 633a(c), (d).  Plaintiffs have chosen

not to pursue their claims before the EEOC in this case.  Alternatively, federal employees may

proceed directly to district court (as in this case), but only if they have complied with the

provisions of 29 U.S.C. § 633a(d), which states:

> When the individual has not filed a complaint concerning age discrimination with
> the Commission, no civil action may be commenced by any individual under this
> section until the individual has given the Commission not less than thirty days'
> notice of an intent to file such action.  Such notice shall be filed within one
> hundred and eighty days after the alleged unlawful practice occurred.  . . .

29 U.S.C. § 633a(d).  Where a plaintiff fails to meet these requirements, his suit must be

dismissed.  See Rann v. Chao, 346 F.3d 192, 198 (D.C. Cir. 2003), cert. denied, 543 U.S. 809

(2004).

In the analogous context of Title VII, this Circuit has recognized that there is a distinct

administrative process for class action complaints and that separate exhaustion of class remedies

is required.  Artis v. Greenspan, 158 F.3d 1301, 1302-03 (D.C. Cir. 1998).  See also Belhomme

v. Widnall, 127 F.3d 1214, 1217 (10th Cir. 1997), cert. denied, 523 U.S. 1100 (1998) ("A federal

employee must exhaust his class action claim with the EEOC before raising it in federal court,

and exhaustion of an individual Title VII claim is not sufficient to exhaust a class action claim,"

citing Gulley v. Orr, 905 F.2d 1383, 1385 (10th Cir. 1990)).  A more recent Title VII case from

this district has explained:

> What is clear from all of these cases [(including Gulley v. Orr)] is that to preserve
> the ability to pursue a court action on either track [(class action or individual
> claim)], compliance with the exhaustion of the administrative remedy
> requirements for that particular track is required.  Thus, in this dual situation, for
> individual class members to pursue their individual claims in federal court, the
> complainants must exhaust their individual administrative remedies *and for the*
> *related class complaint also to be pursued in federal court, the class agent must*
> *exhaust the class' administrative remedies*.  However, as the Tenth and Eleventh
> Circuits have made clear, the failure to exhaust one's administrative remedies on
> one track does not impact a federal court's jurisdiction on the other and thus
> individuals may be part of a class even though they have not exhausted their
> individual remedies.

James v. England, 332 F. Supp. 2d 239, 249 (D.D.C. 2004) (citations omitted) (emphasis added);

mot. for reconsideration denied, 226 F.R.D. 2 (D.D.C. 2004).

     In the case at bar, Plaintiffs have failed to exhaust the EEOC administrative process by

providing appropriate notice to the EEOC of their class claims.  Each of the ten letters sent to the

EEOC on behalf of the Plaintiffs from October 31, 2005, through February 21, 2006, provided

notice of individual claims rather than class claims.  See attached Exhibits 10-1 through 10-10.

For example, the initial notification letter stated:

> This letter is written to notify the Commission that Barbara Aliotta and at least
> nineteen other former and current employees intend to file suit against the Federal
> Deposit Insurance Corporation ("FDIC") pursuant to Section 15 of the Age
> Discrimination in Employment Act (ADEA), 29 U.S.C. 633a, for its age
> discriminatory employment practice of discharging them from employment or
> reducing their grade, or compelling them to choose between retirement and
> discharge from employment, pursuant to a so called Reduction in Force effective
> in May and September, 2005; but they intend to file suit not earlier than thirty
> days from the date of this letter.

> A list showing the names and addresses of the twenty claimants and their dates of birth is enclosed herewith.
>
> This notice is filed pursuant to Section 15(c) and (d) of the ADEA, 29 U.S.C. 633a(c) and (d), and pursuant to the Regulations of the Commission, 29 C.F.R. 1614.201(a).

October 31, 2005 Notification Letter to the EEOC, attached hereto as <u>Exhibit 10-1</u>, at 1.[14]

Subsequent notification letters followed the same pattern, although after this lawsuit was filed on December 5, 2005, the text of the letters changed slightly:

> We have previously sent you Notices of Intent letter [sic] advising the Commission that Barbara Aliotta and twenty-three other employees or former employees intend to file suit . . . .
>
> Nineteen former employees filed suit on December 5, 2005 in the United States District Court for the District of Columbia, Aliotta et al. v. FDIC, No. 1:05cv0235 (RMU).
>
> Please take notice that Joan Fairfield, Jasamina George and Jackson Ware, all of them employees of FDIC over the age of 50 who were harmed by the FDIC's 2005 Reduction in Force, intend to file suit or join the existing suit no earlier than 30 days from this date.

December 15, 2005 Notification Letter to the EEOC, attached hereto as <u>Exhibit 10-4</u>, at 1.

Subsequent notification letters followed the same pattern, providing notice to the EEOC of additional individuals who "intend to file suit or join the existing suit," but none of these letters provided notice of intent to file a <u>class</u> action.  Accordingly, Plaintiffs' motion for class certification should be denied.  <u>See</u> <u>James v. England</u>, 332 F. Supp. 2d at 250 n. 5 ("Because this Court does not have jurisdiction to entertain the class complaint, the Court is compelled to deny the plaintiff's motion for class certification.").[15]

---

[14] Although the letter references "twenty claimants," only nineteen names were listed (there was no number 11 on the enclosed list).

[15] Moreover, the <u>individual</u> claims of 26 of the 32 Plaintiffs who applied for and accepted the buyout are subject to dismissal for their failure to provide <u>timely</u> notice to the EEOC within 180 days of the May 2, 2005, final acceptance date for the buyout.  The only Plaintiffs who resigned

**B.     Plaintiffs' Conclusory Allegations Are Insufficient as a Matter of Law.**

This Court is not obligated to certify Plaintiffs' proposed class simply because Plaintiffs allege systemic intentional discrimination.  Nor must this Court accept all of Plaintiffs' allegations as true.  The Supreme Court has made clear that courts are entitled, and sometimes required, to probe plaintiffs' allegations to determine whether Rule 23 has been satisfied.  See Falcon, 457 U.S. at 160 (stating that a district court must "evaluate carefully the legitimacy of the named plaintiff's plea" and "sometimes it may be necessary for the court to probe behind the pleadings" in order to determine certification questions.); Hartman v. Duffey, 19 F.3d 1459, 1469 (D.C. Cir. 1994) ("the Supreme Court established that class certification under Rule 23 – even in Title VII group discrimination cases – could only be granted after a rigorous analysis of whether adjudication of the named plaintiffs' claims and those of the class would indeed share common issues of fact and law.").  As the Court of Appeals for this Circuit has stated:

> It is readily apparent that a decision on class certification cannot be made in a vacuum.  While, of course, a court does not possess "any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action," it is evident that some inspection of the circumstances of the case is essential to determine whether the prerequisites of Federal Civil Rule 23 have been met.  Necessarily, the court must examine both the claims presented and the showing in support of class certification for their adherence to the requirements of Rule 23.

Wagner v. Taylor, 836 F.2d 578, 587 (D.C. Cir. 1987).

In the case at bar, Plaintiffs have made no showing in support of class certification other than "broad conclusory allegations" (e.g., "that the FDIC targeted the Division of Resolutions

---

and/or retired after taking the buyout and who provided timely notice as required by 29 U.S.C. § 633a(d) were those referenced in the first EEOC notification letter dated October 31, 2005, namely (i) Cain, (ii) Dupree-Ellis, (iii) Everett, (iv)  Glazener, (v) Parker, and (vi) Shute.  See attached Exhibit 4.  (The 16 Plaintiffs who were involuntarily separated pursuant to the RIF provided timely notice of their individual claims.  See attached Exhibit 6.)  Only those Plaintiffs providing timely notice can pursue their individual claims in federal court.  See Rann v. Chao, 346 F.3d at 195 ("§ 633a(d) provides express prerequisites to suit").

and Receiverships for reductions because it was an 'old' division," Pl. Mem. at 3, and "that the buyout was offered only to older employees, or in greater numbers than younger employees," id. at 15) of the type that were ultimately found insufficient in <u>Wagner</u>, 836 F.2d at 595.  <u>See also</u> <u>Gonzalez</u>, 136 F.R.D. at 332 (conclusory statements "will not suffice.").

**C.    Plaintiffs' Claims Do Not Meet the Requirements of Rule 23(a).**

In order to establish that they are entitled to certification of a class, Plaintiffs bear the burden of showing that a class exists, that all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure have been met and that the class falls within at least one of the three categories of Rule 23(b) of the Federal Rules of Civil Procedure.  <u>See</u>, <u>e.g.</u>, <u>Hartman</u>, 19 F.3d at 1468.  The four prerequisites of Rule 23(a) require Plaintiffs to demonstrate that (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Rule 23(a), Fed. R. Civ. P.  When measured against these standards, Plaintiffs' class claims do not pass muster.

**1.    Plaintiffs' Claims Lack Commonality and Typicality.**

The class that Plaintiffs wish to have certified consists of DRR employees born on or before September 30, 1955, who: (i) applied for and accepted buyouts (which occurred prior to the date when specific RIF notices were sent to employees on June 30, 2005); (ii) "accepted a reduction in grade to retain their employment" (which would include employees who were placed in lower-graded positions during the RIF); and (iii) were involuntarily separated pursuant to the RIF.  To show commonality, Plaintiffs must make a "specific presentation identifying the questions of law or fact" that are common to their claims and the claims of class members they

seek to represent.  <u>Falcon</u>, 457 U.S. at 158.  Typicality requires that the class representatives

"'possess the same interest and suffer the same injury' as the class members."  <u>Id</u>. at 156

(quoting <u>East Texas Motor Freight System, Inc. v. Rodriguez</u>, 431 U.S. 395, 403 (1977)).  Both

requirements are absent here.[16]

### a. The Claims of the "Buyout" Plaintiffs Are Not Common or Typical.

As an initial matter, there is no commonality between Plaintiffs who applied for and

accepted buyouts on or prior to the May 2, 2005 deadline (nearly two months prior to the date

that specific RIF notices were sent to employees on June 30, 2005) and Plaintiffs who were still

employed and were affected by the RIF on June 30, 2005.  On that date, pursuant to OPM

regulations found at Part 351 of Title 5, Code of Federal Regulations, affected DRR employees

received specific RIF notices stating that they were being "released from their competitive level"

and would "be separated from the Federal service effective September 3, 2005."  <u>See</u> Plaintiff

Bonner's representative specific RIF notice attached hereto as <u>Exhibit 5</u>.  In contrast, the

"buyout" Plaintiffs had made their election to take the buyout and that election had become

irrevocable on May 2; consequently, they were not affected by the RIF,[17] and their claims are not

common with Plaintiffs who were involuntarily separated pursuant to RIF procedures.

Indeed, there is no commonality even <u>among</u> the DRR employees who applied for and

accepted the buyout.  Plaintiffs allege that their own "acceptance of a buyout [was] to avoid

---

[16] The "commonality and typicality requirements of Rule 23(a) tend to merge," as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  <u>Falcon</u>, 457 U.S. at 158 n.13.

[17] As admitted by Plaintiffs, "[o]n June 30, 2005 each DRR employee affected by the RIF received a Specific Notice of Reduction in Force. . . ."  Pl. Mem. at 1-2.  It is undisputed that none of the 32 "buyout" Plaintiffs, nor Mr. Haag, who had previously transferred out of DRR, received a Specific Notice of Reduction in Force.

termination" in the subsequent RIF.  Pl. Mem. at 7.  But at the time the buyout closed on May 2, Plaintiffs could not have known whether they would be involuntarily separated in the RIF, because specific RIF notices were not sent to any employees until nearly two months later on June 30.  Moreover, any employee's decision to retire or resign with a buyout, regardless of age, was necessarily based on his or her own unique personal, career and financial circumstances (particularly in this case, in which the buyout offered a substantial cash incentive equal to 50% of salary and other significant benefits).

The assertion that all DRR employees over age 50 who took the buyout were compelled to do so because of the impending RIF is also belied by the fact that a total of 565 FDIC employees elected to take the buyout, only 132 of whom were from DRR.  Crosser Decl. (Exhibit 3) at ¶ 12.  In fact, 105 employees took the buyout in DSC, a division in which a RIF was not contemplated.  Crosser Decl. at ¶ 12; see 10/26/04 Bovenzi Memo (Exhibit 2) listing divisions and offices, including DSC, in which "[t]here will not be a RIF."  These employees resigned and/or retired for a multiplicity of reasons, both personal and financial.  See attached Exhibit 11, FDIC News July 2005 ("DSC Retirees Launch New Lives").[18]  Accordingly, there is no common question of fact or law which would serve as the basis to assert a class claim on behalf of all DRR employees over 50 years of age who took the buyout.

Moreover, class members who accepted buyouts and/or early retirement packages must overcome the legal presumption that a federal employee who accepts a buyout does so voluntarily.  The Federal Circuit has specifically held that, with respect to federal employees:

A decision to resign or retire is presumed to be voluntary. . . .

In order to establish involuntariness on the basis of coercion, an employee must show that the agency effectively imposed the terms of the employee's resignation

---

[18] Reprinted from http://fdic01.prod.fdic.gov/division/opa/publications/fdicnews/july05/retirees.html.

or retirement, that the employee had no realistic alternative but to resign or retire,
and that the employee's resignation or retirement was the result of improper acts
by the agency.

Staats v. United States Postal Service, 99 F.3d 1120, 1123-1124 (Fed. Cir. 1996) (rejecting

employee's claim that his retirement was involuntary and thus was legally equivalent to a

removal action).  Plaintiffs cannot overcome this presumption in a class action setting.  Because

each "buyout" Plaintiff must put on proof pertaining to his or her individual circumstances, there

is no commonality or typicality among class members who accepted a voluntary separation

package.

        In effect, the "buyout" Plaintiffs are alleging that they were constructively discharged

when they applied for and accepted a generous buyout in advance of the RIF.  Constructive

discharge occurs when an employee's working conditions are so intolerable that he has no choice

but to resign.  Tran v. Trustees of State Colls., 355 F.3d 1263, 1270 (10th Cir. 2004).  The

inquiry goes well beyond the employer's general conduct; it asks whether, under the particular

facts, a reasonable person would feel compelled to resign.  Due to the stated focus on an

individual's circumstances, courts have deemed the constructive discharge cause of action

"inherently ill-suited" to class-wide adjudication.  Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d

1208, 1229 n.29 (11th Cir. 2001); see also Walker v. Mountain States Tel. & Tel. Co., No. 84-M-

790, 1988 WL 1000060, at *2 (D. Colo. Sept. 26,1988) ("Determining whether each of the opt-in

plaintiffs was presented with a 'voluntary' choice or was constructively discharged requires an

individualized inquiry not suitable for class action litigation.").  The offering of an early

retirement plan in itself does not create a presumption of age discrimination; rather, "an offer of

incentives to retire early is a benefit to the recipient, not a sign of discrimination."  Henn v.

National Geographic Society, 819 F.2d 824, 828 (7th Cir. 1987).  As the Court of Appeals for

this Circuit has stated:

> [Plaintiff] finds suspicious [his employer's] attempt to induce managers aged 55-65 to retire early.  Early retirement is a common corporate practice utilized to prevent individual hardship.  It is a humane practice well accepted by both employers and employees, and is purely voluntary.  The evidence showed that [the employer] was justified in attempting to reduce its costs, and voluntary retirement was clearly a fair attempt to do so.  *It supports not a hint of age discrimination.*

Coburn v. Pan American World Airways, Inc., 711 F.2d 339, 344 (D.C. Cir. 1983)

(emphasis added).

### b. The Claims of the Sole "Reduction in Grade" Plaintiff Are Neither Common Nor Typical.

Unique among the 49 named plaintiffs (32 of whom took the buyout and 16 of whom

were involuntarily separated pursuant to the RIF), the sole remaining Plaintiff, Gregory Haag,

applied for and accepted a lower-graded position in another division (DSC) long before the RIF,

and currently remains employed by the FDIC.[19]  Mr. Haag was not affected by the DRR RIF,

having transferred to DSC effective May 1, 2005.[20]  His change to lower grade resulted from Mr.

Haag having voluntarily applied for a bank examination position pursuant to a nationwide

solicitation of interest dated February 1, 2005 ("SOI").[21]  The application period under the SOI

closed on February 28, 2005.  Id.  His application materials show that on February 18, 2005

---

[19] Notwithstanding the record evidence to the contrary cited herein and in the Answer at ¶ 28, Plaintiffs erroneously state that Mr. Haag "was terminated," Pl. Mem. at 2.

[20] See attached Exhibit 12, Notification of Personnel Action, showing a change to lower grade ("CLG") from CG-13 Resolutions & Receiverships Specialist, DRR, to CG-12 Associate Financial Institutions Specialist, DSC, effective May 1, 2005 (the "CLG Notice").  Despite the change to lower grade, he retained his base pay of $106,200.  See attached Exhibit 12-1, Notification of Personnel Action, which shows that his salary as a Resolutions & Receiverships Specialist, effective January 9, 2005, was the same salary later shown in the CLG Notice.

[21] See the "Remarks" section of the CLG Notice (Exhibit 12); see also attached Exhibit 12-2 (SOI) and Exhibit 12-3 (Mr. Haag's application materials for the SOI).

(over four months before DRR employees received specific RIF notices on June 30), Mr. Haag voluntarily applied for and accepted a transfer into a program that was open to all FDIC employees (regardless of age or division) who met the minimum requirements of the SOI.  Mr. Haag's reasons for applying for this program are his own and are not necessarily typical of those of other employees who responded to the SOI.  Because each potential "reduction in grade" class member must put on proof pertaining to his or her individual circumstances, there is no commonality or typicality among class members who, like Mr. Haag, may have applied for lower-graded positions in other divisions and offices prior to the RIF.

Moreover, since Mr. Haag was not subject to the RIF, his claims clearly have no commonality or typicality with the claims of any DRR employees who may have accepted lower-graded positions during the RIF, pursuant to the procedures set forth in the Corporate Reduction in Force Policy referenced below in section III.C.1.c.  In fact, none of the claims of any of the Plaintiffs are common or typical with respect to potential class members who may have been offered and accepted lower-graded positions in DRR during the RIF process after being released from their competitive levels on June 30, 2005.  The 16 Plaintiffs who were affected by the RIF were involuntarily separated or resigned in lieu of separation on or before September 3, 2005.  None of the Plaintiffs are currently DRR employees.

**c. The Claims of Plaintiffs Who Were Involuntarily Separated May or May Not Be Common or Typical, Depending on the Scope of These Claims.**

In a federal reduction-in-force, an employee in a competitive level in which some or all of the positions have been abolished may have the right to retain his job or to move to another position and avoid involuntary separation from employment, based on that individual's tenure, veteran's preference, length of creditable federal service augmented by performance rating credit, qualifications and positions previously held on a permanent basis in the federal service.

20

See OPM regulations found at Part 351 of Title 5, Code of Federal Regulations, and attached

Exhibit 13, FDIC's Corporate Reduction in Force Policy, Circular 2100.4, at Sections II-5 and II-

6 through II-10.  It is a fact-intensive, highly individualized process in which all DRR employees

were potential competitors.  Accordingly, if Plaintiffs are challenging the mechanics of the RIF

process itself, this would preclude the commonality and typicality required by Rule 23(a).

However, it is not entirely clear whether Plaintiffs are alleging that the manner in which

the RIF process was conducted was discriminatory or, alternatively, that the RIF's procedures

were non-discriminatory but the FDIC's motivation for conducting the RIF constituted unlawful

discrimination on the basis of age.[22]  If the former, there is no commonality or typicality, since

the RIF results were determined by individualized factors; if the latter, then conceptually all of

the 28 involuntarily separated class members might have common and typical claims, but only if

they can prove that the DRR RIF was initiated due to age-discriminatory motives.

> **2.**    **Plaintiffs' Claims That May Have Commonality and Typicality
>            Nevertheless Fail to Satisfy Rule 23(a)'s Numerosity Requirement.**

Plaintiffs have estimated "the size of the class to be approximately 100 to 130 members."

Pl. Mem. at 6.  However, 120 potential class members are former employees who took the

buyout and were not affected by the RIF.  Thus their claims lack commonality or typicality.  See

attached Exhibit 4 (listing 120 potential "buyout" class members) and discussion supra at Section

III.C.1.a.  There are 28 potential class members who were subject to the RIF and who were

involuntarily separated (or resigned in lieu of separation) as a result.  See attached Exhibit 6

(listing 28 potential class members in this category).

---

[22] E.g., compare Pl. Mem. at 3, second full paragraph ("Additionally, *during* the RIF, employees
in their 20's, 30's or 40's were not . . . terminated, or downgraded at the same rate as employees
in their 50's, 60's or 70's.") (emphasis added), with Pl. Mem. at 3, first full paragraph
("Plaintiffs intend to prove that the FDIC targeted the Division of Resolutions and Receiverships
because it was an 'old' division.").

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable." Generally speaking, 40 or more class members are considered adequate to satisfy Rule 23(a)(1)'s numerosity requirement and 21 or less are considered inadequate. See Bynum v. District of Columbia, 214 F.R.D. 27, 32 (D.D.C. 2003), and cases cited therein. Even assuming, for the sake of argument, that Rule 23(a)'s requirements as to commonality and typicality are satisfied for a putative class of 28 DRR employees over age 50[23] who were involuntarily separated pursuant to the RIF, and whose claims are limited to the allegation that the decision to implement a RIF in DRR was motivated by age discrimination (rather than that the RIF procedures that applied to individual plaintiffs were somehow discriminatory), this putative class nevertheless lacks the requisite numerosity to sustain a class action. In this case, the joinder of 28 plaintiffs in one action would be practicable.[24]

### 3.    None of the Plaintiffs Is An Adequate Representative for Potential Class Members Who Received Lower-graded Positions During the RIF.

Plaintiffs seek to include former or present DRR employees "who accepted a reduction in grade to retain their employment." Pl. Mem. at 3. Rule 23(a) requires Plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). None of the Plaintiffs is currently a DRR employee. Plaintiffs state that their "interest in this action is primarily to gain reinstatement with the agency and/or to receive an award of back pay for the loss of salary and loss of retirement and health benefits." Pl. Mem. at

---

[23] More specifically, who were born on or before September 30, 1955, as Plaintiffs have defined the putative class, see Pl. Mem. at 3.

[24] Moreover, in the absence of a certified class, only the individual claims of 16 involuntarily separated and 6 "buyout" Plaintiffs would be left for trial, since only these Plaintiffs provided timely notice to the EEOC pursuant to 29 U.S.C. § 633a(d), and thus are entitled to prosecute their individual claims in federal court. See attached Exhibits 4 and 6 identifying Plaintiffs who provided timely notice of their individual claims.

13. If Plaintiffs are successful in obtaining the relief they seek, they may potentially displace existing DRR employees, including those who received lower-graded positions during the RIF. Accordingly, Plaintiffs' interests are at odds with existing DRR employees, and they cannot adequately represent any employees who remained at DRR after receiving lower-graded positions during the RIF.

**D.     Plaintiffs' Claims Do Not Meet the Requirements of Rule 23(b)(3).**

Plaintiffs seek to have the putative class certified only pursuant to Rule 23(b)(3). Pl. Mem. at 14-21. A class may be certified under Rule 23(b)(3) if the Court finds that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The predominance criterion of Rule 23(b)(3) is "far more demanding" than Rule 23(a)'s commonality requirement. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623-24 (1997). The wholly individualized nature of Plaintiffs' claims violates the predominance requirement, and a class action is not a superior method to resolve Plaintiffs' claims in this case.

**1.     Common Questions of Law or Fact Do Not Predominate.**

As previously discussed infra at section III.C.1, Plaintiffs' claims do not meet Rule 23(a)'s commonality requirement, much less Rule 23(b)(3)'s "far more demanding" predominance standard. The individualized nature of the constructive discharge claims of Plaintiffs who took the voluntary buyout precludes any finding of predominance. The same applies to putative class members who, like Mr. Haag, applied for jobs in other FDIC divisions and offices so as to entirely avoid the DRR RIF. Each DRR employee (as well as employees in other divisions and offices) made his or her decision to apply for the FDIC-wide buyout (or to

apply for other job vacancies within the FDIC) based on their individual personal, career and financial circumstances at the time. Similarly, the claims of the Plaintiffs who were involuntarily separated will necessarily involve consideration of each individual's prior federal service and qualifications, since that is how an employee's placement into other positions is determined in a federal RIF. There is no common question that predominates over these individualized issues.

In addition to liability issues, Plaintiffs also seek individual remedies and will be obliged to prove their own unique damages. Plaintiffs seek back pay and reinstatement – in effect, to "undo" the RIF.[25] The back pay remedy would require intensive individualized inquiries into each plaintiff's situation, especially with regard to the employee's obligation to mitigate damages and how that duty impacts each individual award. The Court must also make individualized determinations to the extent that awards would be reduced by non-salary benefits already received by former employees, including buyout and/or retirement payments.

**2.    A Class Action Is Not a Superior Method to Resolve Plaintiffs' Claims.**

Plaintiffs must show that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). There is nothing

---

[25] Pl. Mem. at 13. Even if Plaintiffs were to substitute a request for front pay in lieu of the organizationally disruptive reinstatement remedy that they are expressly seeking, this would require an inquiry into the individual circumstances of each class member, a complex undertaking. See Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1246 (10th Cir. 2000) ("The possibilities of promotions, legitimate demotions, terminations, or death inject too many unknowns" into a front pay calculation.). In particular, a front pay award must take into account the future point in time when the employer would have lawfully discharged that individual. Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1209 (7th Cir. 1989). As the FDIC was and still is in the midst of downsizing, it is highly unlikely that every putative class member who might establish a discriminatory employment action will be entitled to indefinitely continue employment at the FDIC. Accordingly, even assuming Plaintiffs were able to establish liability for age discrimination, this Court will have to evaluate each front pay award by considering individual evidence that an employee's position may be eliminated for a legitimate business reason in the future, or that the employee may otherwise be lawfully separated, demoted or transferred.

superior about a class wide trial of this case.[26]   First, the individualized nature of the claims eliminates the desirability of a single forum.  Second, the significant money damages available under the ADEA gives (or should have given) all aggrieved class members an interest in individually prosecuting their own claims, and an incentive to do so.[27]   Third, Plaintiffs' proposed class action is unmanageable, as it will require the Court to preside over approximately 150 trials within a trial, the success or failure of which will ultimately will turn on the "special circumstances of each individual's case."  Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420 (5th Cir. 1998).

## IV.  CONCLUSION

This case does not meet the requirements of Rule 23(a) or 23(b)(3) for a class action.  Accordingly, Plaintiffs' Motion for Class Certification should be denied.  The parties should be directed to proceed with discovery on the individual claims of the 6 "buyout" Plaintiffs and the 16 "involuntarily separated" Plaintiffs who provided timely notice to the EEOC pursuant to 29 U.S.C. § 633a(d), and thus are entitled to pursue their individual claims in federal court.  Defendant believes that the claims of the "buyout" Plaintiffs will be subject to a dispositive motion prior to trial, and that the non-jury trial of the claims of the remaining 16 Plaintiffs can be managed without undue difficulty or complications.

---

[26] The factors relevant to this inquiry are "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).  None of these factors weigh in favor of certification.

[27] The "most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit."  Amchem Prods., Inc., 521 U.S. at 617.  A "class action is not warranted" in a case such as this "when proposed class members have both the incentive and the ability to protect their own interests."  Reap v. Cont'l Casualty Co., 199 F.R.D. 536, 550 (D.N.J. 2001).

Respectfully submitted,

/s/  William S. Jones

_____
William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Stephen J. Kessler
D.C. Bar No. 382427
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226
(703) 562-2311
(703) 562-2482 (Fax)


Attorneys for Defendant


Dated: May 25, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2006, I caused a true and correct copy of the foregoing

Defendant's Response and Brief in Opposition to Plaintiffs' Motion for Class Certification to be

served on Plaintiffs, through counsel, by first-class mail, postage prepaid, addressed as follows:

Terri N. Marcus, Esq.
David L. Rose, Esq.
Rose & Rose, P.C.
1320 19th Street, N.W.
Suite 601
Washington, DC 20036

/s/  William S. Jones
_____
William S. Jones
Counsel
Federal Deposit Insurance Corporation