## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**BARBARA ALIOTTA, et al**                )
                                          )
    **Plaintiffs,**                       )
                                          )
       **v.**                          )     **Case No. 1:05-cv-02325-RMU**
                                          )
**SHEILA C. BAIR,**                       )
**Chairman,**                             )
**Federal Deposit Insurance Corporation,**)
                                          )
    **Defendant.**                        )
_____)


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT THEREOF

Defendant Sheila C. Bair, in her official capacity as the Chairman of the Federal Deposit

Insurance Corporation ("FDIC"), hereby moves for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure. While the Complaint, filed on December 5, 2005, and the

Amended Complaint, filed on February 8, 2006, named as defendant Martin J. Gruenberg, in his

official capacity as Acting Chairman of the FDIC, Sheila C. Bair was sworn in as Chairman of

the FDIC on June 26, 2006, and in her official capacity should be substituted for Mr. Gruenberg

as the defendant in this case pursuant to Fed. R. Civ. P. 25(d).

In support of this motion, Defendant refers the Court to the supporting memorandum and

exhibits thereto, as well as Defendant's Statement of Material Facts as to Which There is No

Genuine Issue. An order granting the relief sought is attached hereto. Pursuant to the Court's

Standing Order for Civil Cases, ¶ 3, a courtesy copy of all filings will be provided to chambers.

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND ...................................................................................3

        A.      The FDIC's agency-wide downsizing began in the 1990's.....................................4

        B.      The FDIC's agency-wide downsizing continued in 2004-2005 .............................6

        C.      DRR had a need to reduce its staff and reorganize in 2005....................................9

        D.      The FDIC's crossover program addressed the Agency's continuing
                need for bank examiners and afforded staff in surplus positions the
                opportunity to remain employed by the FDIC .......................................................12

        E.      Voluntary, agency-wide buyouts were offered to mitigate the
                effects of downsizing ...........................................................................................13

        F.      The DRR RIF was conducted in accordance with U.S. OPM rules .....................15

        G.      Employees in DRR had choices as to whether to accept a buyout,
                apply for other available positions in other divisions of the FDIC,
                or participate in the RIF process and be considered for available
                positions in DRR...................................................................................................17

III.    APPLICABLE LEGAL STANDARDS ........................................................................20

        A.      Summary Judgment Standard ................................................................................20

        B.      Burdens of Production and Persuasion Under the ADEA .....................................22

                1.      Disparate Treatment Claims .......................................................................22

                2.      Disparate Impact Claims............................................................................23

IV.     ARGUMENT AND AUTHORITIES ..............................................................................24

        A.      Employees who applied for and accepted buyouts prior to the DRR
                RIF were not constructively discharged and have no viable claims.....................24

        B.      Plaintiffs who suffered adverse employment actions as a result of the RIF
                cannot establish a prima facie case of age discrimination ...................................28

1.     Age was not a factor in the design or implementation
       of the RIF ..................................................................................28

2.     Plaintiffs' proffered disparate impact evidence fails
       as a matter of law ......................................................................30

C.     The statistical evidence is antithetical to Plaintiffs' allegations
       of class-wide age discrimination.................................................33

1.     The legal significance of average age before and after
       the RIF .......................................................................................35

2.     The legal significance of percentage representation of
       older employees before and after the RIF..................................37

3.     The age distribution of employees involuntarily separated during
       the RIF was significantly younger than the class .......................38

4.     The statistics support the FDIC's argument that the health of the
       financial industry and accompanying reduced workload were
       the business reasons for the RIF in DRR...................................38

D.     Even assuming that Plaintiffs were able to establish a prima facie
       case of age discrimination, the Agency has articulated legitimate,
       non-discriminatory reasons, as well as reasonable factors other than
       age, for its employment decisions...........................................39

V.     CONCLUSION...................................................................................39

## TABLE OF ABBREVIATIONS

ADEA            Age Discrimination in Employment Act

DIR             Division of Insurance and Research

DIRM            Division of Information Resources Management

DIT             Division of Information Technology

DOA             Division of Administration

DOF             Division of Finance

DRR             Division of Resolutions and Receiverships

DSC             Division of Supervision and Consumer Protection

EEOC            Equal Employment Opportunity Commission

FDIC            Federal Deposit Insurance Corporation

Legal           Legal Division

ODEO            Office of Diversity and Economic Opportunity

OERM            Office of Enterprise Risk Management

OIG             Office of Inspector General

OLA             Office of Legislative Affairs

OO              Office of the Ombudsman

OPA             Office of Public Affairs

RIF             Reduction in Force

RTC             Resolution Trust Corporation

SOI             Solicitation of Interest

# TABLE OF EXHIBITS

| No. | Date | Description |
|-----|------|-------------|
| 1 | 8/6/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer John Bovenzi to all FDIC Employees concerning Workforce Planning for the Future ("8/6/04 Bovenzi Memo"). |
| 2 | 8/19/04 | E-mail Message from DRR Director Mitchell Glassman to DRR Employees concerning Workforce Planning for the Future ("8/19/04 Glassman Memo"). |
| 3 | 9/2/04 | E-mail messages from the General Counsel to Legal Division employees concerning workforce planning. |
| 4 | 10/19/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to all FDIC Employees concerning the Corporate Employee Program ("10/19/04 Bovenzi Memo"). |
| 5 | 10/25/04 | Proposed DRR reorganization. |
| 6 | 10/26/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to All Employees concerning Buyout Program and Reductions-in-Force ("10/26/04 Bovenzi Memo"). |
| 7 | 10/26/04 | E-mail message DRR Director Glassman to DRR Employees concerning DRR Workforce Planning for the Future ("10/26/04 Glassman Memo") |
| 8 | 11/8/04 | Buyout application materials for Plaintiff Peggy Henderson. |
| 9 | 11/16/04 | Approval of DRR reorganization by COO Bovenzi. |
| 10 | 11/23/04 | Intranet posting of DRR workforce planning and transition organization charts. |
| 11 | 1/24/05 | Global e-mail message to FDIC employees concerning Voluntary Early Retirement (VERA) for Buy-Out Eligible Employees. |
| 12 | 2/1/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to FDIC Permanent Employees Grade 12 & Above Nationwide concerning Nationwide Solicitation of Interest for Associate Financial Institution Specialist In-Service Placement Opportunity ("Crossover SOI"). |
| 13 | 2/18/05 | Application materials submitted by Plaintiff Gregory Haag for the |

crossover program and notification of personnel action.

| 14 | 2/29/05 | Buyout application materials for Plaintiff Donald Lett. |
| 15 | 3/2/05 | Update regarding DRR vacancies and position descriptions. |
| 16 | 3/14/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to all FDIC Employees concerning Implementation of the Corporate Employee Program ("3/14/05 Bovenzi Memo"). |
| 17 | 4/5/05 | Informational Notice of Reduction in Force for DRR. |
| 18 | 4/5/05 | Informational Notice of Reduction in Force for DIT. |
| 19 | 5/18/05 | DIT post-buyout RIF planning update. |
| 20 | 6/13/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to FDIC Employees concerning Corporate Employee Program Update Phase One Implementation ("6/13/05 Bovenzi Memo"). |
| 21 | 6/30/05 | Specific RIF Notice for Ann Bonner. |
| 22 | 2/15/06 | DIT 2005 Corporate IT Accomplishments (indicating no DIT RIF due to success of buyout program). |

<u>Declarations and Related Exhibits</u>

| 23 | | Declaration of Lester Bodian. |
| 24 | | Declaration of Joy Crosser. |
| »24-1 | | Buyout notification e-mail to DRR employees. |
| »24-2 | | Buyout Fact Sheets for Divisions and Offices. |
| »24-3 | | 2004/2005 FDIC Buyout Handbook. |
| 25 | | Declaration of Mitchell L. Glassman. |
| 26 | | Declaration of Pamela K. Mergen. |

<u>Expert Reports</u>

| 27 | 8/15/07 | Expert report of P. R. Jeanneret, Ph.D., for defendant Agency. |
| »27-1 | | Reply report of P. R. Jeanneret, Ph.D., for defendant Agency. |

| | | |
|---|---|---|
| 28 | 10/15/07 | Expert report of Lance Seberhagen, Ph.D., for Plaintiffs. |
| »28-1 | | Interim report of Lance Seberhagen, Ph.D., for Plaintiffs. |
| »28-2 | | Rebuttal report of Lance Seberhagen, Ph.D., for Plaintiffs. |

<u>Deposition Testimony</u>

| | |
|---|---|
| 29 | Deposition of Joy Crosser. |
| 30 | Deposition of Mitchell L. Glassman, Director, DRR. |
| 31 | Deposition of Pamela K. Mergen. |
| 32 | Deposition of Thomas E. Peddicord, III, Deputy Director, DOF. |
| 33 | Deposition of Lance W. Seberhagen, Ph.D. |
| 34 | Deposition of James R. Wigand, Deputy Director, DRR. |
| 35 | Deposition Errata Sheets. |

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986).............................................................................21

Armstrong v. Powell,
    230 F.R.D. 661 (W.D. Okla. 2005)...................................................6

Bender v. Hecht's Dep't Stores,
    455 F.3d 612 (6th Cir. 2006), cert. denied,
    127 S. Ct. 2100 (2007)......................................................................36

Bodnar v. Synpol, Inc
    843 F.2d 190 (5th Cir. 1988) ..................................................25, 26

Bourque v. Powell Elec. Mfg. Co.,
    617 F.2d 61 (5th Cir. 1980) ..............................................................25

Breen v. Peters,
    474 F. Supp.2d 1 (D.D.C. 2007) ......................................................23

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)...........................................................................21

Colbert v. Potter,
    471 F.3d 158 (D.C. Cir. 2006) .........................................................21

Dunaway v. Int'l Bhd. of Teamsters,
    310 F.3d 758 (D.C. Cir. 2002) .........................................................22

EEOC v. McDonnell Douglas Corp.,
    191 F.3d. 948 (8th Cir. 1999) ..........................................................37

Furr v. Seagate Tech., Inc.,
    82 F.3d 980 (10th Cir. 1996) ...........................................................31

Hall v. Giant Foods Inc.,
    175 F.3d 1074 (D.C. Cir. 1999) .......................................................22

Hanebrink v. Brown Shoe Co.,
    110 F.3d 644 (8th Cir. 1997) ...........................................................36

*Hazen Paper Co. v. Biggins,*
    507 U.S. 604 (1993)...................................................................................22, 23

*Holley v. Sanyo Mfg., Inc.,*
    771 F.2d 1161 (8th Cir. 1985) ...................................................................37

*Kizer v. Dep't of Navy,*
    87 M.S.P.R. 249 (2000) ..............................................................................29

*Lehman v. Nakshian,*
    453 U.S. 156 (1981)......................................................................................2

*Mallory v. Dep't of the Army,*
    2 M.S.P.R. 582 (1980) ................................................................................29

*Matsie v. Great Lakes Steel Corp.,*
    424 F. Supp. 1299 (E.D. Mich. 1976).........................................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)....................................................................................21

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)....................................................................................22

*Mitchell v. Mobil Oil Corp.,*
    896 F.2d 463 (10th Cir.), *cert. denied,*
    498 U.S. 898 (1990)....................................................................................26

*Morgan v. A.G. Edwards & Sons, Inc.,*
    486 F.3d 1034 (8th Cir. 2007) ...................................................................28

*Mullins v. Pfizer, Inc.,*
    828 F. Supp. 139 (D. Conn. 1993), *aff'd in part,*
    23 F.3d 663 (2nd Cir. 1994) .......................................................................26

*Muñoz v. Orr,*
    200 F.3d 291 (5th Cir. 2000) ......................................................................22

*Neal v. Kelly,*
    963 F.2d 453 (D.C. Cir. 1992).....................................................................21

*Pippin v. Burlington Resources Oil & Gas Co.,*
    440 F.3d 1186 (10th Cir. 2006) ............................................................24, 29

*Ridenour v. Lawson Co.,*
   791 F.2d 52 (6th Cir. 1986) ...................................................................36

*Rowell v. BellSouth Corp.,*
   443 F.3d 794 (11th Cir. 2005) ..............................................25, 26, 27, 28

*Silver v. Leavitt,*
   No. 05-0968, 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006),
   *appeal docketed*, No. 06-5104 (D.C. Cir. Apr. 18, 2006)...........................23

*Smith v. City of Jackson,*
   544 U.S. 228 (2005)..........................................................23, 24, 30, 32

*Smith v. Farah Mfg. Co.,*
   650 F.2d 64 (5th Cir. 1981) ...................................................................37

*Stidham v. Minnesota Mining and Mfg., Inc.,*
   399 F.3d 935 (8th Cir. 2005) ...........................................................36, 37

*Tao v. Freeh,*
   27 F.3d 635 (D.C. Cir. 1994) .................................................................21

*Teneyck v. Omni Shoreham Hotel,*
   365 F.3d 1139 (D.C. Cir. 2004) .............................................................22

*Terban v. Dep't of Energy,*
   216 F.3d 1021 (Fed. Cir. 2000) ...........................................24, 25, 26, 28

*Tex. Dep't of Cmty. Affairs v. Burdine,*
   450 U.S. 248 (1981)........................................................................22, 23

*United Mine Workers of America 1974 Pension v. Pittston Co.,*
   984 F.2d 469 (D.C. Cir. 1993) ...............................................................21

*Vega v. Kodak Caribbean, Ltd.,*
   3 F.3d 476 (1st Cir. 1993) ..............................................................26, 27, 28

## **Statutes**

12 U.S.C. § 1441a(b)(8)(2000) ....................................................................4

12 U.S.C. § 1441a(m)(2)-(3)(2000) ..............................................................4

12 U.S.C. § 1815 ............................................................................................................3

12 U.S.C. § 1820 ............................................................................................................3

12 U.S.C. § 1821 ............................................................................................................3

12 U.S.C. § 1821a(a)(1) ................................................................................................4

12 U.S.C. § 1821(c)(2)-(3) ...........................................................................................9

29 U.S.C. § 621 .............................................................................................................1

**Rules and Regulations**

5 C.F.R. Pt. 351 ........................................................................................1, 15, 18, 29

5 C.F.R. § 351.201(a)(2) ............................................................................................39

5 C.F.R. § 351.402 ......................................................................................................39

5 C.F.R. § 351.403 ......................................................................................................39

5 C.F.R. § 351.501 ......................................................................................................29

5 C.F.R. § 351.701 ................................................................................................20, 39

5 C.F.R. § 351.701(b) .................................................................................................39

5 C.F.R. § 351.701(c) .................................................................................................39

5 C.F.R. § 351.801(a) .................................................................................................39

Fed. R. Civ. P. 25(d) .................................................................................................... i

Fed. R. Civ. P. 56 .........................................................................................................3

Fed. R. Civ. P. 56(c) ...................................................................................................21

**Internet Sources**

*The Banking Crisis of the 1980s and Early 1990s:  Summary and Implications,*
http://www.fdic.gov/bank/historical/history/3_85.pdf. ...............................................................4

*Historical Statistics on Banking, Closings and Assistance Transactions*, 1994-2007,
http://www2.fdic.gov/hsob/HSOBSummaryRpt.asp?BegYear=1994&EndYear=1997&Stte=1
......................................................................................................................................5, 9

Managing the Crisis: The FDIC and RTC Experience, Chronological Overview:
Chapter Fourteen – 1991,
http://www.fdic.gov/bank/historical/managing/Chron/1991 ......................................................4

*Who Is The FDIC?,*
http://www.fdic.gov/about/learn/symbol. ............................................................................3, 5

1996 Annual Report, Chairman's Statement,
http://www.fdic.gov/about/strategic/report/1996/chair.html#eduction. ...............................5, 6

2004 Annual Report, Reducing Costs and Improving Financial Management,
http://www.fdic.gov/about/strategic/report/2004annualreport/mgmt_dna4.html.....................7

2004 Annual Report, Financial Statements and Notes - Overview of the Industry,
http://www.fdic.gov/about/strategic/report/2004annualreport/overview_industry.html ..........6

2005 Annual Report, Overview of the Industry,
http://www.fdic.gov/about/strategic/report/2005annualreport/overview.pdf ..........................6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                         )
**BARBARA ALIOTTA, et al**               )
                                         )
    **Plaintiffs,**                       )
                                         )
       **v.**                          )    **Case No. 1:05-cv-02325-RMU**
                                         )
**SHEILA C. BAIR,**                      )
**Chairman,**                            )
**Federal Deposit Insurance Corporation,** )
                                         )
    **Defendant.**                       )
_____)


## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Due to a declining workload, the Federal Deposit Insurance Corporation ("FDIC" or "Agency") conducted a reduction-in-force ("RIF") in 2005 within its Division of Resolutions and Receiverships ("DRR"), in accordance with OPM regulations found at Part 351 of Title 5, Code of Federal Regulations.

Plaintiffs filed this case as a class action in December of 2005, alleging that the Agency's design and implementation of the RIF harmed DRR employees age 50 and older.[1]  Plaintiffs allege both disparate treatment and disparate impact claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq*.  Specifically, Plaintiffs have alleged that "[t]he Defendant chose to conduct the 2005 RIF harming the older employees in DRR in whole or in substantial part because DRR's work force was significantly older than the work force of its

---

[1] Plaintiffs filed an amended complaint on February 8, 2006, which joined additional named

other Divisions" (Am. Compl., ¶ 89), and that the FDIC either intentionally discharged employees age 50 and older because of their age, or discharged a disproportionately high percentage of employees age 50 and older (*Id.*, ¶¶ 95-96).[2]

The Court granted Plaintiffs' motion for class certification on July 25, 2006, concluding that the case may proceed on behalf of a class defined as:

> Former or present employees of FDIC's Division of Resolution and Receiverships who were born on a date on or before September 30, 1955 and who, as a result of the 2005 RIF, either accepted a buyout or reduction in grade, or were terminated from their positions in the DRR.

The record evidence shows that no employee was compelled to accept a buyout as a result of the RIF.  Rather, all employees who accepted a buyout did so voluntarily <u>before</u> the RIF was actually conducted and <u>before</u> any employees received any specific RIF notices.  Moreover, the record evidence shows that age was not a factor in the FDIC's decisions to reorganize and downsize DRR, or in the design or implementation of the RIF.  The record also shows that the FDIC followed applicable federal law and regulations (as well as Agency RIF procedures) in conducting the RIF.

With regard to Plaintiffs' disparate treatment claims, the evidence shows that, contrary to Plaintiffs' allegations, FDIC did not treat employees age 50 and older less favorably than younger employees in designing or implementing the RIF.  Further, the record evidence shows that the FDIC had legitimate reasons, having nothing to do with age, for its design and implementation of the RIF.  Defendant, therefore, is entitled to summary judgment on those claims.

---

plaintiffs.  This is a non-jury case.  *See Lehman v. Nakshian*, 453 U.S. 156 (1981).
[2]  None of the Plaintiffs has asserted an individual claim for relief in addition to the class claims set forth in paragraphs 95 and 96 of the Amended Complaint.

With regard to Plaintiffs' disparate impact claims, the record evidence shows that the RIF had no disparate impact on employees age 50 and older.  In fact, the evidence shows that employees age 50 and older actually fared more favorably in the RIF than younger employees.  Further, the evidence shows that the Agency's employment decisions were based on reasonable factors other than age.  The FDIC, therefore, is entitled to summary judgment on Plaintiffs' disparate impact claims as well.

After full and ample discovery, Plaintiffs have marshaled no evidence to show that any of the actions taken by the Agency during the 2004-2005 downsizing and RIF in any way violated their rights under the ADEA.  As demonstrated below, and as demonstrated in the Rule 7(h) Statement of Undisputed Facts accompanying Defendant's Motion for Summary Judgment, there is no genuine issue as to any material fact on any of Plaintiffs' claims.  *See* Fed. R. Civ. P. 56.  Defendant therefore respectfully requests that judgment for Defendant be entered as a matter of law, and that this matter be dismissed with prejudice.

## II.  FACTUAL BACKGROUND

The FDIC is an independent agency of the federal government that provides deposit insurance for virtually all United States banks and savings and loan associations.  It also manages and safeguards the deposit insurance fund, in part by serving as the primary regulator of state chartered banks that are not members of the Federal Reserve System, and by resolving failed institutions whose deposits it insures.  Thus, it has three major program areas: (1) insurance; (2) supervision; and (3) receivership management.  *See* 12 U.S.C. §§ 1815, 1820-21.[3]

---

[3] *See also "Who is the FDIC?,"* publicly available at http://www.fdic.gov/about/learn/symbol; Deposition of DRR Deputy Director James Wigand, attached as Exhibit 34 ("Wigand Dep."), at 34-35.

During the well-known bank and thrift crisis of the late 1980's and early 1990's, the FDIC experienced a significant increase in staffing, due in large part to its responsibility for disposing of billions of dollars of assets belonging to failed financial institutions that had been placed into receivership. *See "Managing the Crisis: The FDIC and RTC Experience, Chronological Overview: Chapter Fourteen – 1991,"* publicly available on the internet at http://www.fdic.gov/bank/historical/managing/Chron/1991.  In 1989, Congress established the Resolution Trust Corporation ("RTC"), a temporary agency staffed by FDIC employees, to help deal with the crisis.  12 U.S.C. § 1441a(b)(8) (2000).  Together, the FDIC and RTC hired large numbers of permanent and temporary employees to accomplish their mission, so that at the height of the crisis in 1991, the total workforce of both agencies (including 8,614 RTC employees) equaled 22,586.  *"Managing the Crisis: The FDIC and RTC Experience, Chronological Overview: Chapter Fourteen – 1991,"* publicly available on the internet at http://www.fdic.gov/bank/historical/managing/Chron/1991.  Effective December 31, 1995 and pursuant to statute, the RTC was terminated, and its assets, liabilities and employees were transferred to the FDIC.  12 U.S.C. § 1821a(a)(1) and 12 U.S.C. § 1441a(m)(2)-(3) (2000).

## A.    The FDIC's agency-wide downsizing began in the 1990's.

As the bank and thrift crisis eased and the health of the industry improved, the workload of the FDIC, especially its liquidation work, dramatically declined.  Between 1980 and 1994 more than 1,600 banks insured by the FDIC were closed or received FDIC financial assistance, far more than in any other period since the advent of federal deposit insurance in the 1930s.[4] Beginning in 1994, however, the number of financial institution failures began to drastically

---

[4] *See "The Banking Crisis of the 1980s and Early 1990s:  Summary and Implications,"* found at http://www.fdic.gov/bank/historical/history/3_85.pdf.

decrease (*e.g.*, there were 15 failures in 1994, 8 in 1995, 6 in 1996, and 1 in 1997).[5]  Consistent with its duty as the fiduciary of the deposit insurance funds, the FDIC began to reduce its staff.[6]

The FDIC's need to downsize its workforce because of a declining workload (and in particular, due to the dramatic reduction of failed bank assets in liquidation, for which DRR was responsible) was discussed in the Agency's 1996 Annual Report:

> As part of the new budgeting process, each of our divisions and offices justifies its staffing levels by workload, and 1996 saw continued dramatic reductions in the overall workload of the FDIC. The book value of assets in liquidation at the FDIC peaked in mid-1992 at $44.4 billion. As of year-end 1996, they stood at $8.7 billion – only one-fifth of the 1992 levels – despite $7.7 billion in Resolution Trust Corporation (RTC) assets transferred to the FDIC at the end of 1995, when the RTC sunset occurred. About $4.4 billion of the assets in liquidation on our books at year-end were those assets transferred from the RTC, with the remaining $4.3 billion representing assets from FDIC liquidations.
>
> Staffing size correlates closely with expenses at the FDIC.  In the aftermath of the banking crisis of the late 1980s and early 1990s, FDIC staffing [[excluding RTC)] peaked in mid-1993 at 15,611. It has been difficult, but necessary, to tell many employees who served the FDIC and this country well during the banking crisis that we no longer have jobs for them. We have sought to be as humane as possible in this process by offering generous cash buyouts, direct job placement assistance, and opportunities to compete for the limited number of jobs open in other parts of the Corporation.  The FDIC has been and will continue to be exceedingly well served by the professionalism and dedication of its staff.
>
> . . .
>
> Most of the reduction since 1993 came from the Division of Resolutions and Receiverships (DRR), formerly the Division of Depositor and Asset Services (DAS) and the Division of Resolutions (DOR), before those two divisions were merged in December of 1996. The staff of those two divisions peaked at 6,966 in mid-1993, but their combined total declined to 1,819 as of year-end 1996.

---

[5]  *See "Historical Statistics on Banking, Closings and Assistance Transactions, 1994-2007,"* http://www2.fdic.gov/hsob/HSOBSummaryRpt.asp?BegYear=1994&EndYear=2007&Stte=1.

[6]  The FDIC pays the salaries of its staff from the deposit insurance fund, which is funded by premiums that financial institutions pay for deposit insurance coverage. *See "Who is the FDIC?,"* available at http://www.fdic.gov/about/learn/symbol.

1996 Annual Report, Chairman's Statement.[7]

The FDIC's downsizing efforts continued in 1997 and beyond.  In an ADEA lawsuit

brought in 2003 in connection with prior FDIC-wide downsizing, the Court observed:

> Downsizing efforts continued in 1997.  Based on updated analyses of core staffing
> requirements, the Board [of Directors of the FDIC] decided to close four field offices
> of the Division of Supervision and one of the Division of Consumer Affairs.  Staff at
> those offices were reassigned or accepted a voluntary buyout through a Relocation
> Buyout Program.  Employees in four divisions were offered a new buyout program.
> Further, nearly all eligible employees were offered the opportunity to participate in
> an early retirement program.
>
> Memos from 1998 through 2003 reflect further consolidation of departments,
> additional targeted buyout programs, early retirement programs, and RIFs.

*Armstrong v. Powell*, 230 F.R.D. 661, 666-67 (W.D. Okla. 2005) (denying class certification)

(footnotes omitted).

## B.    The FDIC's agency-wide downsizing continued in 2004-2005.

The FDIC's workload continued to decline in 2004-2005 due to industry consolidation

and the robust health of the banking industry.  In 2004, the overall number of institutions insured

by the FDIC decreased, and bank earnings increased.  2004 Annual Report, Financial Statements

and Notes – Overview of the Industry.[8]  These dual trends of industry consolidation and income

growth continued in 2005.  2005 Annual Report, Overview of the Industry.[9]

---

[7] Available at http://www.fdic.gov/about/strategic/report/1996/chair.html#eduction.

[8] *See* http://www.fdic.gov/about/strategic/report/2004annualreport/overview_industry.html:
"The 9,025 commercial banks and savings institutions insured by the FDIC reported total
earnings of $91.8 billion for the first three quarters of 2004, an increase of $2.0 billion (2.3
percent) over the same period of 2003."

[9] *See* http://www.fdic.gov/about/strategic/report/2005annualreport/overview.pdf:  "The 8,856
FDIC-insured commercial banks and savings institutions filing financial reports for September
30 reported total net income of $102 billion for the first three quarters of 2005, an increase of
$10.2 billion (11.1 percent) over the same period in 2004."

As explained in the FDIC's 2004 Annual Report, published in early 2005, these industry trends had a corresponding effect on the Agency's continuing need to manage its staffing levels:

> The FDIC's operating expenses are largely paid from the insurance funds, and the Corporation continuously seeks to improve its operational efficiency in fulfillment of its fiduciary responsibilities to the funds. To that end, the Corporation engages annually in a rigorous planning and budgeting process to ensure that budgeted resources are properly aligned with workload. That is particularly true with respect to staffing, since personnel costs constitute well over 60 percent of the Corporation's annual administrative expenses. In late 2004, the FDIC Board of Directors approved management recommendations to reduce authorized staffing by 674 positions, to 4,750, by year-end 2005.
>
> Authorized year-end 2005 staffing is substantially lower than previous authorized staffing levels for the resolutions and receivership business line as well as the IT and administrative support functions. Staffing reductions were approved for the Division of Resolutions and Receiverships and the Legal Division following a lengthy analysis of current and projected future workload in the resolutions and receivership management area and reflect the smaller number of financial institution failures for the past several years. Staffing reductions in the Division of Information Resources Management and the Division of Administration reflect improved business processes, savings from contract consolidation, and outsourcing of functions where cost effective.

2004 Annual Report, Reducing Costs and Improving Financial Management.[10]

During this time frame, Agency employees were initially informed by management that "[t]he FDIC of the future will be a smaller, more flexible agency" via a global e-mail message in early August 2004, which addressed "Workforce Planning for the Future."  Memorandum dated August 6, 2004, from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees ("8/6/04 Bovenzi Memo"), attached as Exhibit 1, at 1.  Employees were told that changes in the banking industry required the FDIC to change the way it did business, and that during the 2005 planning and budget formulation process then underway, the various divisions and offices would be reviewing their business processes and the skill sets required of

---

[10] Found at http://www.fdic.gov/about/strategic/report/2004annualreport/mgmt_dna4.html.

employees for the FDIC to accomplish its mission. *Id.* at 2.[11]  Employees were also told that

reorganizations and a smaller workforce were envisioned, and that additional information would

be provided as it became available. *Id.*

In October, Agency employees were told in more detail that the FDIC would attempt to

reduce its excess staff first through buyouts and then through reductions in force. Memorandum

dated October 26, 2004, from John F. Bovenzi, Deputy to the Chairman and Chief Operating

Officer, to All FDIC Employees ("10/26/04 Bovenzi Memo"), attached as Exhibit 6, at 1.  The

memorandum specifically told employees that staffing analyses conducted by management had

determined that various divisions and offices of the Agency were overstaffed and that steps

would be taken to reduce excess staff.  Management described the overstaffed divisions as

falling into two discrete groups for downsizing purposes:

> The first group includes divisions where staffing levels are not justified by current or
> projected workloads.  These divisions are planning for substantial reductions in their
> workforces.  DRR, DIRM [(Division of Information Resources Management, now
> the Division of Information Technology, or DIT)], DOA [(Division of
> Administration)], Legal, and DOF [(Division of Finance)] are included in this group.
> Buyouts are going to be offered to most employees in these divisions.  Nevertheless,
> it appears likely that the necessary staffing reductions in these divisions cannot be
> accomplished entirely through voluntary departures.  *Accordingly, we have begun*
> *active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in*
> *DOA, Legal, and DOF in 2006.*
>
> The second group includes the remaining divisions and all of the offices [(i.e., the
> Office of Diversity and Economic Opportunity, Office of Enterprise Risk
> Management, Office of Inspector General, Office of Legislative Affairs, Office of the
> Ombudsman, and Office of Public Affairs)].  Staffing levels in these organizations
> are for the most part justified by current workload.  As a result, in DSC [(Division of

---

[11] Specifically with respect to DRR, while the downsizing decision came about during the course
of the FDIC's annual planning and budget formulation process, the rationale for the downsizing
was "rooted in [DRR's] substantially diminished workload."  Deposition of Thomas E.
Peddicord III, Deputy Director, Division of Finance ("Peddicord Dep."), attached as Exhibit 32,
at 33-34, 53.

> Supervision and Consumer Protection)], DIR [(Division of Insurance and Research)], and the offices, there will be a more limited buyout program. There will not be a RIF in these organizations.
>
> Corporate-wide we estimate a reduction of between 500 to 600 positions from our current on-board workforce of nearly 5,300. These reductions will occur by year-end 2006, with most of the reductions occurring by year-end 2005.

*Id.* (emphasis added). Thus, in October 2004, it was anticipated that five major FDIC divisions – DRR, DIRM/DIT, DOA, Legal and DOF – would need to downsize substantially through voluntary employee departures or face involuntary reductions-in-force in 2005 and 2006.

**C.    DRR had a need to reduce its staff and reorganize in 2005.**

The Division of Resolutions and Receiverships administers one of the FDIC's mission critical functions – its receivership management program. When an FDIC-insured depository institution fails, the FDIC is appointed as its receiver, *see* 12 U.S.C. § 1821(c)(2)-(3). DRR manages receiverships, resolves troubled financial institutions and sells their assets in order to minimize costs and obtain the highest recovery for creditors and claimants. Declaration of DRR Director Mitchell Glassman ("Glassman Decl."), attached as Exhibit 25, at ¶ 3. DRR also pays deposit claims and responds to the inquiries of customers of failed institutions and the public. *Id.*

The workload of DRR had continued to decline since 2003 due to a variety of reasons, including the record profitability and capitalization in the banking industry, which substantially decreased the failures of FDIC-insured financial institutions.[12] As a result, on August 19, 2004, Mitchell Glassman, the Division Director of DRR, sent a workforce planning message to all DRR employees, which candidly informed them that:

> Economic analyses and projections for the health of the banking industry, coupled

---

[12] The number of bank failures remained very low – only three financial institutions failed in 2003 and four failed in 2004. There were no bank failures at all in 2005 and 2006. *See* *"Historical Statistics on Banking, Closings and Assistance Transactions, 1994-2007,"* available at http://www2.fdic.gov/hsob/HSOBSummaryRpt.asp?BegYear=1994&EndYear=2007&Stte=1.

> with technological advances and process improvements, require us to reevaluate our staffing needs.  Although our analysis is not yet complete, it is apparent that fewer problem institutions and our adoption of more efficient business processes have led to a declining workload and excess staff.  . . .  As a result, some difficult decisions must be made soon regarding the size and structure of our division . . . ."

Message from Director Glassman to all DRR employees in D.C. and Dallas, dated August 19, 2004 ("8/19/04 Glassman Memo"), attached as Exhibit 2, at 2.[13]  *See also* Deposition of Director Glassman ("Glassman Dep."), attached as Exhibit 30, at 48-49; Wigand Dep. (Ex. 34) at 82-83.

In October, Director Glassman sent a follow-up message to DRR employees, in which he confirmed that DRR had "a significant staffing imbalance between existing resources and our current workload," and that as a result, management planned to reorganize DRR and reduce its staff of 515 positions nationwide to approximately 240, retaining only 63 positions in Washington and 177 positions in Dallas.  Message from Director Glassman to DRR, dated October 26, 2004 ("10/26/04 Glassman Memo"), attached as Exhibit 7, at 1.  Although hope was expressed that this reduction might be accomplished through an Agency-wide buyout program and crossover opportunities to the Division of Supervision and Consumer Protection (DSC), it was projected that by the end of the third quarter 2005, "DRR will experience a Reduction-in-Force (RIF) in both Washington and Dallas to involuntarily separate any remaining surplus employees."  *Id*. at 1-2.

DRR's formal reorganization and downsizing proposal was finalized and submitted for approval toward the end of October 2004, and was approved in mid-November.  Memorandum from Director Glassman to Chief Operating Officer Bovenzi, dated October 25, 2004 ("Reorg. Memo"), attached as Exhibit 5; Approval memorandum, dated November 16, 2004, attached as

---

[13] Similar follow-up messages regarding staffing were sent to employees in other divisions as well.  *See, e.g.*, various memoranda from 9/2/04 through 3/14/06 that were sent to the Legal Division's employees by the General Counsel concerning workforce planning and likely

Exhibit 9. The approved reorganization proposal reduced DRR's Washington staff from 101 to 63, and its Dallas staff from 413 to 173, "represent[ing] a 54% reduction in total staff [that] will save an estimated $34 million in annual salary costs." Reorg. Memo (Ex. 5) at 1.

The factors underlying DRR management's conclusions regarding staffing were straightforward:

> Record profitability in the banking industry in recent years has led to a substantial decrease in the number of financial institution failures than were experienced in the 1980s and early 1990s. Industry consolidation continues to decrease the number of insured financial institutions. Emerging technology and improved business processes continue to enhance productivity and efficiency. These factors, along with the Corporate vision of a more collaborative and integrative workforce capable of responding to mission critical functions, impact the Division and its need for personnel to handle subsequent resolution and receivership activities. . . .
>
> As a result, the Division initiated a comprehensive strategic analysis of the way it projects itself doing business over the next 3-5 years and the impact this should have on current program activities, organizational structure, and overall cost. This review results in this recommendation to reorganize the Division and adopt a staffing strategy and revised business model that realizes operating efficiencies and ensures that critical mission responsibilities are met.

Reorg. Memo (Ex. 5) at 1-2. DRR's revised business model that was to be adopted in response to the substantial decrease in workload was based on a number of key elements, including the following:

- Division workload will continue to be irregular and will always be represented over time with peaks and valleys that could be dramatic at times.

- The Division will rely on Division of Supervision and Consumer Protection (DSC) personnel to supplement staff to accomplish mission requirements associated with financial institution failures.

- As needed, the Division will supplement many of its functional areas with contracting support in peak periods to manage and accomplish its workload in a cost efficient manner in lieu of carrying and maintaining staff resources associated with this function.

---

downsizing of the Legal Division, attached as Exhibit 3.

- The structure of the Division will be comprised of subject matter and technical experts capable of leading and resolving functional specific efforts and problems related to the resolution and closing of failed financial institutions.

*Id*. at 2-3. The desired staff reductions would be accomplished through DRR's participation in the Agency-wide buyout program, outplacement initiatives and a RIF in 2005 to separate any remaining surplus employees. *Id*. at 4.

Following the approval of DRR's reorganization, employees were informed about the details of the new organizational structure and that certain new positions were being established consistent with DRR's new business model, which would "focus[] on a smaller, more specialized workforce that leads, directs, and serves as an expert resource for resolution and closing activities for the FDIC." *See* Intranet posting of DRR organization charts with proposed staffing, dated November 23, 2004, attached as Exhibit 10, at 1. They were further informed that "[t]he new business model and its supporting organization structure addresses the Division's irregular and currently low workload in a cost effective and efficient manner." *Id*. at 2.

**D.     The FDIC's crossover program addressed the Agency's continuing need for bank examiners and afforded staff in surplus positions the opportunity to remain employed by the FDIC.**

On October 19, 2004, Chief Operating Officer Bovenzi sent his second memorandum related to workforce planning to all FDIC employees. Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees Corporate ("10/19/04 Bovenzi Memo"), attached as Exhibit 4. Of particular interest to DRR employees, the memo announced that the FDIC would implement a voluntary DRR-to-DSC crossover program that would allow DRR staff to apply for an "in-service" training program in DSC. *Id*. at 2. DSC is responsible for bank examinations and was one of the FDIC's divisions that was not threatened with a RIF due to overstaffing. *See* 10/26/04 Bovenzi Memo (Ex. 6), at 1.

12

Subsequently, on February 1, 2005, a formal solicitation of interest was issued that announced the opportunity for qualified FDIC employees, including those in DRR, to apply for Grade 12 Financial Institution Examiner positions in DSC.  Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees Grade 12 and above nationwide, dated February 1, 2004 ("Crossover SOI"), attached as Exhibit 12.  Prior bank examiner experience was not required in order to qualify for the solicitation of interest.  *Id*. at 1. In addition, employees selected for the program who were currently occupying surplus positions were entitled to saved pay, i.e., their pay would not decrease.  *Id*.[14]  Employees selected for the program were to be transferred to their new positions on June 27, 2005.  *See* Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to All FDIC Employees, dated June 13, 2005 ("6/13/05 Bovenzi Memo"), attached as Exhibit 20, at 1.  Prior to when specific RIF notices were issued in DRR on June 30, 2006, 51 DRR employees voluntarily transferred out of DRR to DSC under this program.  Glassman Decl. (Ex. 25) at ¶ 10.

**E.     Voluntary, agency-wide buyouts were offered to mitigate the effects of downsizing.**

The 10/26/04 Bovenzi Memo to all FDIC employees also outlined the salient features of a voluntary, Agency-wide buyout program that was designed to encourage voluntary downsizing: (i) a buyout period that would last from early November 2004 to mid-May 2005 (except for DSC employees, who were required to submit their applications by December 13 and depart by December 31, 2004); (ii) a cash payment equal to 50% of total salary; (iii) certain supplemental incentives; (iv) the ability to combine the buyout with either regular or early

---

[14] In addition to the DSC crossover opportunity for qualified employees who occupied positions at grade 12 and above, internal entry-level grade 5/7/9 Financial Institution Specialist positions in DSC were also available to lower-graded FDIC permanent employees, including those in DRR.  *See* Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees, dated March 14, 2005 ("3/14/05 Bovenzi Memo"), attached as

retirement; (v) no restriction on re-employment by another federal agency (with a requirement to repay the gross amount of the buyout only upon re-employment by the FDIC within five years); and (vi) management's discretion to delay the departures of selected employees based on workload considerations.  10/26/04 Bovenzi Memo (Ex. 6), at 1-2.  There were no age restrictions or differences in the buyout terms based on age.  *See id.*; Deposition of Joy Crosser ("Crosser Dep."), attached as Exhibit 29, at 26-27.

In November 2004, individual notification via e-mail was provided to all eligible FDIC employees in the various Divisions and Offices, to inform them of their eligibility to elect the buyout as well as the specific terms of the buyout program for their Division or Office.  *See* Declaration of Joy Crosser ("Crosser Decl."), attached as Exhibit 24, at ¶ 7.  Notification was sent to DRR employees in the Dallas and Washington, D.C. offices on November 2, 2004.  *Id*. at ¶ 8; *see* Buyout Notification e-mail dated November 2, 2004 from Joy Crosser to DRR employees in Dallas and Washington, D.C. ("DRR Buyout Notification"), attached to the Crosser Decl. as Exhibit 24-1.

In addition to the information provided via e-mail, Buyout Fact Sheets containing the buyout information for each division and office were posted on the FDIC's internal website.  Crosser Decl. (Ex. 24) at ¶ 9; *see* Buyout Fact Sheets for Divisions and Offices (including DRR), attached to the Crosser Decl. as Exhibit 24-2.  Subsequently, the 2004/2005 FDIC Buyout Handbook was posted on the FDIC's internal website, in order to provide more detailed information about the terms and conditions of the buyout.  Crosser Decl. (Ex. 24) at ¶ 10; *see* Buyout Handbook attached to the Crosser Decl. as Exhibit 24-3.  There were no minimum age requirements for being eligible to elect the buyout.  Crosser Decl. (Ex. 24) at ¶ 10.

---

Exhibit 16, at 3.

The last day to submit or rescind an application for the buyout was May 2, 2005 (although DSC employees, who were not facing a RIF, had a different schedule and their final buyout application/revocation date was December 15, 2004). *Id.* at ¶ 11. Except for delayed departures approved by management for business reasons, employees who elected to take the buyout were off the FDIC's employment rolls by May 14, 2005, the final departure date. *See* DRR Buyout Notification (Ex. 24-1) at 1; Buyout Fact Sheets (Ex. 24-2).

Specifically as to DRR, the buyout was open to "[a]ll permanent DRR employees assigned to Washington and Dallas, except for employees occupying EM [(Executive Management)] positions." DRR Buyout Notification (Ex. 24-1) at 1. Some DRR employees elected to take the buyout offer almost immediately. *See, e.g.,* Buyout application for Plaintiff Peggy Henderson, dated November 8, 2004, attached as Exhibit 8. Other DRR employees electing to take the buyout continued their employment until the final May 14, 2005, departure date. *See, e.g.*, Buyout application of Plaintiff Donald Lett, attached as Exhibit 14. In all, 132 DRR employees applied for and accepted the buyout. Crosser Decl. (Ex. 24) at ¶ 12. Employees who accepted a buyout were not considered for positions during the DRR RIF. Declaration of Pamela Mergen ("Mergen Decl."), attached as Exhibit 26, at ¶ 14.

**F.    The DRR RIF was conducted in accordance with U.S. OPM rules.**

In addition to the 132 DRR employees who applied for and accepted the buyout, an additional 73 DRR employees were placed in other FDIC positions outside DRR. *See* Declaration of Lester Bodian ("Bodian Decl."), attached as Exhibit 23, at Table A: "Transferred within FDIC" (employee nos. 198-270). Nevertheless, the FDIC found that a RIF was still needed to reduce remaining surplus staff in both the Washington and Dallas offices of DRR. Mergen Decl. (Ex. 26) at ¶¶ 4-6. The RIF was conducted in accordance with 5 C.F.R. Part 351

and the FDIC's RIF Circular, which was negotiated with the National Treasury Employees

Union (NTEU), the exclusive representative of bargaining unit employees of the FDIC.  *Id.* at ¶

8; *see* Corporate Reduction-in-Force Policy, Circular 2100.4 ("RIF Policy"), attached as Exhibit

A to the Mergen Decl.

The FDIC provided an informational notice of RIF to DRR staff members in Washington

and Dallas on April 5, 2005, informing them that the RIF would go forward and would be

effective in September 2005.  *See, e.g.*, Informational Notice of Reduction in Force to Dallas

DRR employees, attached as Exhibit 17.[15]  Along with this notice, FDIC provided each DRR

employee with his or her RIF essential information, and notified employees that this information

would be used in determining retention standing and assignment rights in the RIF.  *See id.*

Employees were told to review and verify this information, and to review and supplement their

Official Personnel Folders (OPFs) with updated resumes and any missing information by May 6,

2005.  *Id.*

On June 30, 2005, DRR employees occupying surplus positions who were being

displaced by the RIF received specific RIF notices, either notifying them that they had been

assigned to a new position within DRR or that they would be separated.  *See, e.g.*, Specific RIF

notice for Plaintiff Ann Bonner, attached as Exhibit 21.  Under the federal RIF rules and the RIF

Policy, there were two rounds of competition under which surplus employees could be placed in

other DRR positions.  Mergen Decl. (Ex. 26) at ¶¶ 9-10.  In addition, employees were also

placed into vacant positions during the RIF process.  *Id.* at ¶ 7.  These vacant positions were

filled based on the best match of skills among the qualified employees as compared to the

requirements of the vacant positions.  Mergen Decl. (Ex. 26) at ¶ 13; *see also* Deposition of

---

[15] Similar notice was provided to employees in DIT, the other division slated for a RIF in 2005.

Pamela Mergen ("Mergen Dep."), attached as Exhibit 31, at 31-33.

During the RIF, 233 DRR employees either remained in their current DRR positions or were placed in other positions in DRR. *See* Bodian Decl. (Ex. 23), at Table A: "Stayed in DRR" (employee nos. 271-503). Nevertheless, 53 DRR employees were involuntarily separated (46 of whom received severance pay), 7 DRR employees retired in lieu of separation, and 3 other employees resigned after receiving a specific RIF notice. *See* Bodian Decl. (Ex. 23), at ¶ 7. All RIF actions were effective on September 3, 2005. Mergen Decl. (Ex. 26) at ¶ 17. As discussed below in section IV.C.3, the adverse consequences of the RIF actually had less of an impact on DRR employees age 50 and older (the class represented by the Plaintiffs) than other DRR employees. In any event, age was not a factor in the FDIC's decisions to reorganize and downsize DRR.

**G.    Employees in DRR had choices as to whether to accept a buyout, apply for other available positions in other divisions of the FDIC, or participate in the RIF process and be considered for available positions in DRR.**

As a result of the offerings of the FDIC to its employees, employees in DRR were presented with choices as to whether to: (i) accept the buyout offer and resign or retire; (ii) apply for other available positions in other Divisions of the FDIC; or (iii) participate in the RIF process and be considered for positions in DRR (either vacant or encumbered). As the FDIC's expert, Dr. Jeanneret, an industrial and organizational (I/O) psychologist, has observed, FDIC employees, not the FDIC, made those decisions. Report of P. R. Jeanneret, Ph.D. ("Jeanneret Report"), attached as Exhibit 27, at 24-25; Reply Report of P. R. Jeanneret, Ph.D. ("Jeanneret Reply Report"), attached as Exhibit 27-1, at 9-11. Of those 184 employees age 50 and older who departed from DRR in 2005, 112 chose to either resign or retire. *See* Jeanneret Reply Report

---

*See* Informational Notice of Reduction in Force to DIT employees, attached as Exhibit 18.

(Ex. 27-1), at Table 1 (Age 50 and Older, Codes 301, 302, 303, 317).  An additional 42

employees age 50 and older transferred to other divisions and offices within the FDIC.  *See id.*

(Age 50 and Older, "Transfer from DRR").

      FDIC's policy has been to avoid or mitigate RIFs to the greatest extent possible.[16]

During a RIF, employees with higher retention standing may displace other employees at lower

grades and in different jobs through a process known as "reassignment," which includes

"bumping," "retreating," and other reassignment rights provided in the applicable regulations.

*See* 5 C.F.R. Part 351; RIF Policy attached as Exhibit A to Mergen Decl. (Ex. 26) at section II-8.

 For this reason, RIFs can be tremendously disruptive to the operations and productivity of the

Agency.

      The buyout and early retirement programs were completely voluntary.  The buyout was

offered to employees in all Divisions and Offices, not just those in DRR, and early retirement

was available to employees in nine Divisions and Offices, including DRR.  *See* Buyout Fact

Sheets (Ex. 24-2); Global e-mail message dated January 24, 2005, to FDIC employees

concerning Voluntary Early Retirement (VERA) for Buy-Out Eligible Employees, attached as

Exhibit 11.  Further, DRR employees had from November 2, 2004, until May 2, 2005 to decide

whether to apply for the buyout, and once an employee applied for it, he could change his mind

and withdraw his application at any time until May 2, 2005.  DRR Buyout Notification (Ex. 24-

1) at 1; Crosser Decl. (Ex. 24) at ¶¶ 7, 11.  An employee who did not volunteer to accept the

buyout could continue to work for the FDIC and was not penalized for failing to accept it – he

---

[16] The RIF Policy expressly provides that "[e]very feasible effort should be made to avoid or
mitigate a RIF."  RIF Policy attached as Exhibit A to Mergen Decl. (Ex. 26), at section I-4.  *See
also* Jeanneret Reply Report (Ex. 27-1) at p. 16 ("The Agency set out to achieve as much of the
downsizing as possible through employee choice rather than involuntary termination, and DRR
was largely successful in doing so (63 involuntary terminations out of a total reduction of nearly

would continue to receive the same pay and benefits.

The voluntariness of the buyout program is further demonstrated by the fact that the employees had other options. For example, they could have applied for a position in the FDIC's Division of Supervision and Consumer Protection (DSC) through the In-Service Placement Opportunity. Indeed, as noted, 51 DRR employees applied for and accepted positions as Financial Institution Specialists in DSC through the In-Service Placement Opportunity.

Employees who chose to accept the buyout (and receive a buyout payment and other benefits) did not participate in the RIF process. Mergen Decl. (Ex. 26) at ¶ 14. Thus, they did not make themselves available for consideration for vacant positions filled during the RIF. If the DRR employees who took the buyout had chosen to participate in the RIF, they may have been selected for one of the vacant positions that were filled as part of the RIF process. *Id.* at ¶ 13. All DRR employees had notice that positions were available long before the final May 2, 2005 buyout acceptance date. In November 2004, DRR had published its new DRR business model with new DRR organizational charts to show the employees how many positions would be available and at what grade levels under the Division's approved reorganization plan. *See* Intranet posting of DRR workforce planning and transition organization charts (Ex. 10); *see also* Update regarding DRR vacancies and positions descriptions (March 2, 2005), attached as Exhibit 15. Employees were selected for vacancies during the reduction in force in accordance with federal RIF regulations and the FDIC's RIF Policy. Mergen Decl. (Ex. 26) at ¶ 13.

Further, had DRR employees not taken the buyout but decided to participate in the RIF process, they may have been placed in an encumbered position. Pamela Mergen, the FDIC's Human Resources Specialist who was responsible for implementing the RIF, testified that the

---

270 individuals).").

FDIC followed the RIF regulations of the U. S. Office of Personnel Management (USOPM) in conducting the RIF.  Mergen Decl. (Ex. 26) at ¶ 5.  Under 5 C.F.R. § 351.701 and the FDIC's RIF Policy, employees were afforded assignment rights (including "bump" and "retreat") to occupied positions.  Mergen Decl. (Ex. 26) at ¶ 11; RIF Policy attached as Exhibit A to Mergen Decl. at section II-8.  Thus, DRR employees who took the buyout may have retained a position in DRR had they chosen to remain and participate in the RIF process.  In fact, as discussed above at section II.F, 233 DRR employees either retained their current DRR positions or were placed in other positions in DRR during the RIF.  *See* Bodian Decl. (Ex. 23), at Table A:  "Stayed in DRR" (employee nos. 271-503).

In sum, the evidence demonstrates that DRR employees made voluntarily decisions to take the buyout.  When they made this decision, they had at least four other options, including:

1.    applying for and obtaining another position at the FDIC;

2.    applying for a position in DSC through the FDIC's In-Service Placement Opportunity program or CEP;

3.    participating in the RIF process and competing for a vacant position; and

4.    participating in the RIF process and obtaining an encumbered position through "bump" or "retreat."

### III.  APPLICABLE LEGAL STANDARDS

**A.    Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings on file, together with the affidavits and other admissible evidence of record, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Material facts are those that

"might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). A genuine issue of material fact is one capable of affecting the outcome of the litigation that is supported by admissible evidence sufficient for a reasonable trier of fact to find in favor of the non-moving party. *Anderson*, 477 U.S. at 247-48.

In considering whether there is a triable issue of fact, the court must draw all reasonable inferences in favor of the non-moving party. Id. at 255. The party opposing a motion for summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 248. The non-moving party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Moreover, any factual assertions in the movant's affidavits will be accepted as being true unless the opposing party submits her own affidavits or other documentary evidence contradicting the assertion. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992). *See also*, *United Mine Workers of America 1974 Pension v. Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993) (when moving party demonstrates that no material factual issue remains, burden shifts to non-moving party to produce specific evidence that sufficiently undermines the movant's case to demonstrate a material factual dispute); *Colbert v. Potter*, 471 F.3d 158, 164 (D.C. Cir. 2006) (only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002) (affirming summary judgment on ADEA claim where plaintiff failed

to make showing sufficient to establish existence of element essential to plaintiff's case).

**B.    Burdens of Production and Persuasion Under the ADEA**

1.    <u>Disparate Treatment Claims</u>

Disparate treatment claims under the ADEA are analyzed under the burden-shifting framework for Title VII disparate treatment claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999). Under that framework, the plaintiffs have the burden of establishing by a preponderance of the evidence a *prima facie* case of disparate treatment discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. As the Court explained in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993), "In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." In other words, "Disparate treatment refers to deliberate discrimination in the terms or conditions of employment…." *Muñoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).

If the plaintiffs establish a *prima facie* case of disparate treatment, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision at issue. *McDonnell Douglas Corp.*, 411 U.S. at 802-803. As the Court explained in *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981), the employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."

If the employer successfully articulates a nondiscriminatory reason for its decision, then the burden shifts back to the plaintiffs to show that the employer's stated reason was a pretext for intentional discrimination. *Burdine*, 450 U.S. at 255-56.

2.    <u>Disparate Impact Claims</u>

To the extent that plaintiffs are alleging disparate impact claims in this case, precedent in this jurisdiction holds that such claims are not cognizable against federal employers. *See Silver v. Leavitt*, No. 05-0968, 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006), *appeal docketed*, No. 06-5104 (D.C. Cir. Apr. 18, 2006), and cases cited therein; *but see Breen v. Peters*, 474 F. Supp.2d 1, 6-7 (D.D.C. 2007) (denying defendant's Rule 12(b)(1) motion to dismiss plaintiffs' age discrimination claim based on disparate impact against the Secretary of Transportation).

Assuming that such claims are cognizable, disparate impact claims under the ADEA are analyzed differently from claims of disparate treatment. Unlike claims of disparate treatment, a disparate impact claim does not require proof of discriminatory motive. *Hazen Paper Co.*, 507 U.S. at 609. In *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005), the Court held that, to establish a *prima facie* case of disparate impact discrimination under the ADEA, plaintiffs must identify a specific employment practice allegedly responsible for any perceived statistical disparities; it is not enough for plaintiffs to simply show a disparate impact, or to point to a general policy that led to such an impact.

The Supreme Court in *City of Jackson* further held that if a plaintiff in a disparate impact case under the ADEA establishes a *prima facie* case of discrimination, the employer still would not be liable if the employment decision at issue was based on reasonable factors other than age. 544 U.S. at 242-43. The Court explained:

> Unlike the business necessity test [under Title VII], which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement.

544 U.S. at 243.

Following *City of Jackson*, the court in *Pippin v. Burlington Resources Oil & Gas Co.*,

440 F.3d 1186, 1200-1201 (10th Cir. 2006), held that in a disparate impact case under the

ADEA:

> [A]n employee must ultimately persuade the fact finder that the employer's asserted basis for the neutral policy is *unreasonable*. [Citation to *Smith* omitted; emphasis in original] The test is not whether there were other more narrowly tailored ways for the employer to achieve its legitimate business goals. [Citation omitted.] Instead, the employee must show that the method selected was unreasonable.

In language very relevant to the case at bar, the court in *Pippin* went on to conclude that the

employer's "determination of which employees have the skills most useful to the company going

forward are reasonable criteria" and, therefore, constituted reasonable factors other than age. *Id.*

 at 1201. To overcome the employer's defense of reasonable factors other than age, plaintiffs in

an ADEA case must show that the criteria utilized by the employer were unreasonable. *Id.* at

1200-01.

## IV. ARGUMENT AND AUTHORITIES

### A. Employees who applied for and accepted buyouts prior to the DRR RIF were not constructively discharged and have no viable claims.

Most of the class members in this case voluntarily applied for and accepted the buyout,

and were not even affected by the reduction-in-force because they left the Agency before the

FDIC issued specific RIF notices in DRR on June 30, 2005. None of these plaintiffs was

constructively discharged, and none of them has any viable claims of age discrimination.

As a threshold matter, a "buyout" is presumed to be voluntary. *Terban v. Dep't of*

*Energy*, 216 F.3d 1021 (Fed. Cir. 2000). Indeed, the plaintiffs who elected to take the buyout

expressly acknowledged on their buyout application forms that they submitted their applications

voluntarily. *See, e.g.*, "STATEMENT OF INTENT TO RETIRE WITH A BUYOUT FROM

THE FEDERAL DEPOSIT INSURANCE CORPORATION" of Plaintiff Peggy Henderson,

dated November 8, 2004 (Ex. 8).

Nevertheless, plaintiffs appear to argue that they were "forced" to take the buyout and retire, and therefore, suffered an adverse employment action by electing these benefits. In almost any other case, plaintiffs making such an argument would allege that they were constructively discharged. But, in their reply brief in support of their motion for class certification, plaintiffs expressly disavowed that they were alleging that they were constructively discharged in this case: "Plaintiffs are not pursuing a constructive discharge claim." Plaintiff's Reply Brief in Support of Motion for Class Certification, filed June 15, 2006 (ECF Docket # 17), at 10. In any event, plaintiffs cannot establish that they were constructively discharged in this case.

The constructive discharge doctrine is "rooted in the notion that the discharge is the product of intolerable conditions." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 803 (11th Cir. 2005); *see also Terban*, 216 F.3d at 1024. As the court explained in *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980), a plaintiff asserting constructive discharge must show that the employer deliberately made the plaintiff's working conditions so intolerable that the plaintiff was forced into an involuntary resignation. In *Bourque*, the court found that while the plaintiff's resignation resulted directly from her disappointment in not receiving a raise due to discrimination, that was not sufficient to support a finding of constructive discharge.

In the case at bar, the FDIC offered a buyout and early retirement benefits to its employees as one means to reduce excess staff. As the court observed in *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192-193 (5th Cir. 1988), an employer's offer of an early retirement plan does not create even a prima facie case of age discrimination, but rather, constitutes what may be "the fairest alternative available" to the employer and employees.

25

In a reduction-in-force situation, some employees will necessarily be released from their positions, and some of those employees may be assigned to other positions (possibly at a lower grade) or released from the federal service. But the fact that these possibilities exist does not make an offer of separation incentives and/or early retirement coercive. *See Terban*, 216 F.3d at 1023 ("'[T]he mere fact than an employee is faced with an inherently unpleasant situation or that his choices are limited to unpleasant alternatives does not make his decision involuntary.'" [quoting the Merit System Protection Board's order in that case]); *Bodnar*, 843 F.2d at 192-193.

Thus, an employee who accepts a severance package rather than wait to see if he can remain employed cannot later claim that he was constructively discharged. *Rowell,* 433 F.3d at 806. An offer of these types of benefits is coercive only if the employee shows that the employer used a "stick," or "the reduction or withholding of benefits to which the employee was entitled" to force an employee to accept a buyout or offer of early retirement. *Mullins v. Pfizer, Inc.*, 828 F. Supp. 139, 145 (D. Conn. 1993), *aff'd* (as to ADEA claim), 23 F.3d 663 (2d Cir. 1994), quoting *Mitchell v. Mobil Oil Corp.,* 896 F.2d 463, 469 n. 2 (10th Cir.), *cert. denied,* 498 U.S. 898 (1990). The employee must show that he was placed in the position of "quit or be fired," but an employee cannot establish this kind of coercion merely by showing that one of the <u>possible</u> outcomes would have been losing his job. *See Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993) (constructive discharge occurs "when the offer presented was, at rock bottom, a choice between early retirement with benefits or discharge without benefits, or, more starkly still, an impermissible take-it-or-leave-it choice between retirement or discharge.") This does not occur where all employees face a possible reduction-in-force and all employees are offered a voluntary separation incentive. *Rowell*, 433 F.3d at 805.

Similarly, proof that employees were told that they would face a reduction-in-force if an

insufficient number of them accepted the buyout is not enough to show coercion.  In *Vega*, 3 F.3d 476, the court rejected the claims of two employees who accepted a voluntary separation incentive but later claimed they were constructively discharged due to age discrimination.  The court found that employees were not forced to accept the buyout, but had a meaningful choice, because the employer told them that a sufficient number of buyout acceptances would obviate the need for a RIF, did not indicate which employees would be separated if that step was necessary, and did not threaten to treat harshly anyone selected for separation through a RIF. *Vega*, 3 F.3d at 480-481; *see also Rowell*, 433 F.3d at 805, *discussing Vega.*  In this case, because so many vacant positions were filled during the RIF, and because the RIF was conducted in accordance with regulations of the United States Office of Personnel Management (which afforded displaced employees "bump" and "retreat" rights) and the applicable negotiated RIF Policy, the FDIC could not possibly have known when the buyout was offered which employees would be separated by RIF.

As discussed above, FDIC's buyout and early retirement programs were completely voluntary.  Both were offered to all employees at the FDIC who occupied surplus positions, not just those in DRR.  The fact that FDIC offered these voluntary incentives does not support any claim of constructive discharge.  *See Rowell*, 433 F.3d at 804 (no employee may claim constructive discharge where all employees are subject to the same working conditions).

Further, as noted, the FDIC gave employees from November 2, 2004, until May 2, 2005 to decide whether to apply for the buyout, and once an employee applied for it he could change his mind and withdraw his application at any time until May 2, 2005.  These facts are totally inconsistent with plaintiffs' theory that they were "forced" to accept buyouts.  *See Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1040-41 (8th Cir. 2007) (voluntary separation

incentive program was truly "voluntary" where employees had 45 days to consider the offer, could revoke it within 7 days after accepting it, and would continue to receive the benefits of their employment if they did not accept it); *Terban*, 216 F.3d at 1024 ("the most probative evidence of involuntariness will usually be evidence in which there is a relatively short period of time between the employer's alleged coercive act and the employee's retirement").  Moreover, as discussed above, the fact that the FDIC truthfully told DRR employees that it was using these programs to attempt to avoid a RIF did not make them coercive.  *Vega*, 3 F.3d at 480; *Rowell*, 433 F.3d at 805; and *Morgan*, 486 F.3d at 1040-1041.

**B.**     **Plaintiffs who suffered adverse employment actions as a result of the RIF cannot establish a *prima facie* case of age discrimination.**

  1.     <u>Age was not a factor in the design or implementation of the RIF</u>.

  The FDIC is entitled to summary judgment on both the disparate treatment and the disparate impact claims in this case.  While Plaintiffs have alleged that "[t]he Defendant chose to conduct the 2005 RIF harming the older employees in DRR in whole or in substantial part because DRR's work force was significantly older than the work force of its other Divisions" (Am. Compl., ¶ 89), the uncontroverted evidence shows that age was not a factor in the FDIC's decisions to reorganize and downsize DRR or in the design or implementation of the RIF.   The record is very clear that, as the health of the bank and thrift industry improved, the workload of the FDIC, especially the liquidation work of DRR, dramatically declined.  As the workload of DRR continued to decline through 2005, the FDIC to determine that it needed to reduce staff and reorganize its DRR to accomplish its work more efficiently. In short, the FDIC's determinations of the "skills most useful" to DRR based on its business needs were based on reasonable factors other than age.  *Pippin*, 440 F.3d at 1201.

  Further, because the FDIC followed US OPM regulations in implementing the RIF, the

28

Agency could not possibly have used age as a factor in determining which employees would be separated as a result of the RIF.  As noted, under US OPM regulations governing reductions in force of federal agencies, employees with higher "retention standing" may take the positions of others at lower grades and in different jobs through a process known as "reassignment," which includes "bumping," "retreating," and other reassignment rights provided in applicable regulations.  *See* 5 C.F.R. Part 351.

Under 5 C.F.R. § 351.501, "retention standing" is determined in accordance with tenure of employment and veteran preference, not age.  As the Merit Systems Protection Board explained in *Mallory v. Dep't of the Army*, 2 M.S.P.R. 582, 584-585 (1980), "retention standing by groups" refers to the requirement that agencies classify competing employees by their retention standing in groups and subgroups on the basis of tenure of employment and veteran preference.  *See also*, *Kizer v. Dep't of Navy*, 87 M.S.P.R. 249, 252 (2000) ("retention standing" refers to tenure group and veteran preference under 5 C.F.R. § 351.501).  Because it is undisputed that the FDIC followed US OPM regulations in conducting the RIF in DRR, the FDIC is entitled to summary judgment on plaintiffs' claim that age was a factor in the RIF.[17] *See Pippin*, 440 F.3d at 1196-97 (affirming summary judgment for private employer where termination of employment was in accord with RIF criteria).

---

[17] Plaintiffs' disparate impact claims must fail also because plaintiffs have never identified a specific employment practice or policy that caused any disparate impact on employees age 50 and older.

29

2.    Plaintiffs' proffered disparate impact evidence fails as a matter of law.

Assuming *arguendo* that disparate impact claims against federal agencies are cognizable,[18] Plaintiffs' summary judgment evidence of impact does not meet the structural or statistical standards applicable to such claims.  Plaintiffs' disparate impact claim is based solely on the analysis of Dr. Seberhagen who, like Defendant's expert (Dr. Jeanneret), is an I/O psychologist.  Dr. Seberhagen's only analysis purports to study the "impact" of employee departures from DRR during the year of the RIF, regardless of whether such departures were involuntary terminations, voluntary retirements or voluntary resignations in order to accept the buyout incentive.[19]  This form of analysis is totally inadequate to create a *prima facie* inference of disparate impact under applicable Supreme Court authority.

In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court created a disparate impact cause of action uniquely formulated for age discrimination claims.  The stringent prerequisites for a *prima facie* case of disparate impact include the plaintiff's burden of "isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities."  *Id.* at 241 (emphasis in the original).

Here, Plaintiffs' expert has not isolated a particular practice and demonstrated its impact, as required by *City of Jackson*.  Rather, Plaintiffs' expert has conflated voluntary and involuntary departures as if they were the same for statistical purposes.  Dr. Seberhagen assumed, in effect, that an employee who applied for the buyout incentive or elected to retire before the RIF ever took place should be considered statistically identical to an employee involuntarily terminated in the RIF itself.  As Dr. Jeanneret notes, whatever else may be said of employees in those disparate

---

[18] *See* discussion above at section III.B.2.

[19] *See* Rebuttal Report of Lance Seberhagen, Ph.D. ("Seberhagen Rebuttal Report"), attached as Exhibit 28-2.

circumstances, it is not appropriate to compare them statistically. Jeanneret Reply Report (Ex. 27-1) at 9-11.[20]

Defendant anticipates that Plaintiffs will argue that some of the retirements and acceptances of buyouts were not voluntary because the employees knew that a substantial RIF was impending. As demonstrated in section IV.A above, this is inconsistent with applicable law on constructive discharge. But even if the law permitted comparing these obviously different situations, it would still not be appropriate statistical science to do so. To possess any validity, a statistical analysis must compare populations that are similarly situated except for the characteristic under study.[21] It is obvious that *even under Plaintiffs' theory*, *some* of the retirements and buyout applications had to have been totally voluntary, and it is equally obvious that not *all* of the employee choices to retire or apply for the buyout are the same thing as being involuntarily terminated. Plaintiffs' expert takes no statistical account of these indisputable facts; instead, he assumes them away. He justifies this assumption only by stating that he was instructed to make it by Plaintiffs' counsel. Seberhagen Dep. (Ex. 33) at 37-47, 91.

It is only through this statistical sleight of hand that Plaintiffs are able to conjure up any "impact," and even this is borderline. *Compare* Seberhagen Rebuttal Report (Ex. 28-2), p. 10, at Table 11 (finding an alleged difference of 2.67 standard deviations) *with id.* at p. 5, ¶ 13 (where Dr. Seberhagen notes that ". . . courts sometimes require a difference of two or three standard

---

[20] Another way of looking at this is the formulation of the "null hypothesis." Jeanneret Reply Report (Ex. 27-1) at 7. Dr. Seberhagen's syllogism was that if employees over 50 left DRR in greater percentages than those under 50, then that must prove disparate impact. But one would expect employees over 50 in *any* workforce to depart in greater proportion in the absence of discrimination; therefore, Dr. Seberhagen's analysis proves nothing.

[21] *See* Jeanneret Reply Report (Ex. 27-1) at 9-11; *see also, e.g., Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) ("plaintiff's statistical evidence must focus on . . . *comparable* individuals.") (citations omitted, emphasis in the original).

deviations to indicate adverse discriminatory impact.").[22]  And even putting aside the

disconnects between Plaintiffs' expert's statistical analysis and principles of disparate impact age

claims, there is nothing to connect Dr. Seberhagen's alleged impact with any specific policy or

practice.  *City of Jackson*, 544 U.S. at 241.

On top of all this, Dr. Seberhagen chooses to ignore the data demonstrating that age was

simply not a negative factor in the RIF.  *See* section IV.C below.  Most specifically regarding the

disparate impact claim, while Plaintiffs did not isolate a specific practice and study its effect,

Defendant did so and has shown without contravention that data from the actual RIF

terminations were statistically significant *in favor of older employees* (Jeanneret Reply Report

(Ex. 27-1) at 14-15 and Table 5.

Finally, even if Plaintiffs had fulfilled their various disparate impact burdens under *City*

*of Jackson*, their claim would still be insupportable because the practice they are attacking

cannot be shown to be irrational.  In contrast to race or sex discrimination cases brought under

Title VII, a defendant in an age discrimination disparate impact case need not show that the

practice at issue is a "business necessity," but only that it is reasonable.  544 U.S. at 242-43.

Since the RIF was conducted in accordance with procedures promulgated by the U.S. Office of

Personnel Management, and since the necessity for the RIF was based on and correlated with

activity in the banking industry, there can be no claim of unreasonableness as that term is used in

*City of Jackson*.  *Id.*

---

[22] Note also that this difference is further called into question by Dr. Seberhagen's use of an
arbitrary age variable; that is, some of the decisions for age 50 and older departures actually
occurred when those employees were 49.  Seberhagen Dep. (Ex. 33) at 20-21.  In a population
where many employees are in their late 40s or early 50s, the effect of this may be substantial (*see*
Jeanneret Reply Report (Ex. 27-1) at 9.

**C.    The statistical evidence is antithetical to Plaintiffs' allegations of class-wide age discrimination.**

As a threshold matter and as discussed in more detail below, in a case alleging age discrimination incident to a RIF, there must be a showing of a significant disparity in the relevant workforce population before and after the RIF.[23]  In many cases, the effect of a RIF may raise subtle questions of causation or statistical inference; however, in the case at bar, the summary judgment evidence is straightforward and compelling.

It is uncontroverted that the population of DRR was dynamically reduced in a short period of time from over 500 to less than 240 employees.  The common sense — and as shown below the legally critical — questions the Court may seek to answer under these circumstances include:

(1)    What happened to this population in terms of its age?

(2)    What happened to this population in terms of the representation of protected employees?

(3)    What was the direct and demonstrable effect of the employer's RIF decisions?

As to the first question, it might be said that an employer, bent upon age discrimination and with the opportunity presented by reducing a large division by more than half, would surely end up with a younger population.  That did not happen here.  The average age of the 200 plus employees remaining in DRR was statistically the same as that of the approximately 500 employees in DRR before the RIF.[24]  This result is remarkable in light of Plaintiffs' allegations, and it was achieved despite many normal retirements, early retirements and acceptances of

---

[23] Put another way, a necessary, but not a sufficient, condition for liability is some measurable effect on the class of older employees; otherwise there is no potential universe of discourse to even begin formulating a theory of liability.

[24] *See* Jeanneret Report (Ex. 27) at p. 18, and Jeanneret Reply Report (Ex. 27-1) at pp. 5 and 8.

buyouts by older employees.

Further, in terms of the second question above, this result was not achieved in some artificial way.  The chart shown on the following page depicts the percentage representation of older (as defined by Plaintiffs) versus younger employees for the period before, during and after the RIF.[25]  The percentages of employees 50 or older in DRR consistently increase while the representation of employees under 50 continually declines.

Under these circumstances, to claim, as Plaintiffs do, that the same managers who presided over these demographic results were actuated by an animus against older employees approaches the absurd.[26]

---

[25] This chart is found in Jeanneret Reply Report (Ex. 27-1) at Exhibit 1.  It is based on data contained in Dr. Jeanneret's original report (Ex. 27) at p. 17.

[26] Consider an analogous hypothetical situation involving allegations of, say, race discrimination in the context of a RIF.  If the employer's large workforce had been 59% African-American before the RIF and was 61% African-American after the RIF (and where the RIF was quite substantial), an hypothesis of class-wide race discrimination would be untenable.



**Age Distribution by Year of DRR Permanent Employees
(Years 2000 - 2005)**

Finally, as to question 3 above, the actual RIF selections were demonstrably nondiscriminatory. Dr. Janneret compared the ages and percentages of employees actually separated by RIF with the pool from which they were selected.[27] This time there *was a* statistically significant difference, but it was *in favor of the older employees.*[28]

1.  The legal significance of average age before and after the RIF.

Several courts have held that there can be no finding of discrimination where there were only slight differences in the average age of employees before and after an involuntary downsizing or reduction-in-force. In *Bender v. Hecht's Dep't Stores*, 455 F.3d 612 (6th Cir.

---

[27] *See* Jeanneret Reply Report (Ex. 27-1) at Table 5 and pp. 13-15.

[28] In other words, the disparity in favor of employees 50 and older could not be attributed to chance. While this does not mean that there was necessarily an intent to favor older employees,

2006), *cert. denied*, 127 S. Ct. 2100 (2007), the trial court granted summary judgment for the defendant in an age discrimination case arising out of an involuntary downsizing. The Sixth Circuit upheld the district court, finding that the slight difference in average ages in positions eliminated was not significant, and did not counter the obvious business reasons for the position eliminations. *See also Stidham v. Minnesota Mining and Mfg, Inc.*, 399 F.3d 935, 938 (8th Cir. 2005) (half-year decrease in the average age of the workforce after reduction-in-force is not statistically significant); *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 647 (8th Cir. 1997) (finding a half a year decline in the average age of the employee group was insufficient to raise an inference of age discrimination).

In the instant case, the average age of DRR employees before the RIF (as of 11/1/2004) was 51.96 years; the average age after the RIF (as of 9/17/2005) was 51.81. Bodian Decl. (Ex. 23) at Table D. This tiny difference is not statistically significant[29] and is inconsistent with the Plaintiffs' allegations of age discrimination. In fact, in this case, the average age of all DRR employees actually increased during the period from 2000 through 2005, from 49.84 years on 12/31/2000 to 52.10 years on 12/31/2005. *Id.* at ¶ 9 and Table D.

Dr. Jeanneret, an industrial organizational (I/O) psychologist, studied the demographics prepared by Dr. Bodian from the PERHIS database maintained by the FDIC's Division of Administration (and produced to Plaintiffs during discovery). Dr. Jeanneret noted that "under Plaintiff's theory of age discrimination, one would expect the DRR permanent workforce to

---

that was the direct result of the actual RIF selections.

[29] *See* Jeanneret Reply Report (Ex. 27-1) at 5. *Compare Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986) (no age discrimination in layoffs as a matter of law where workforce average age did not "decrease as would be expected if age discrimination were a factor") *with Mastie v. Great Lakes Steel Corp.*, 424 F. Supp. 1299, 1319-20 (E.D. Mich. 1976) (finding decrease of only 1.29 years in average age of retained employees during a RIF "does not establish even a *prima facie* case of age discrimination").

become younger over time. However that reduction in age did not occur." Jeanneret Report (Ex. 27) at p. 6, Conclusion #4. He found that the fact that the average age of employees remained virtually the same before and after the RIF "clearly demonstrates that there was not a systemic age discrimination practice at the FDIC." *Id.*

> 2.    The legal significance of percentage representation of older employees before and after the RIF.

Federal courts have held that there can be no inference of age discrimination where there was only a slight decline in the protected class after a reduction-in force. *See EEOC vs. McDonnell Douglas Corp.*, 191 F. 3d 948, 952 (8th Cir. 1999) (finding change in percentage of workforce fifty-five years and older from 14.7 % to 13.6% is insignificant and does not support inference of age discrimination)[30]; *Stidham* at 399 F.3d 938 (a 4% decline in the work force over age forty after reduction-in-force not statistically significant); *see also Smith v. Farah Mfg. Co.*, 650 F.2d 64, 66 (5th Cir. 1981) (affirming dismissal of ADEA claims where the percentages of persons terminated during a RIF "corresponded closely to the age distribution in the salaried employee class").

This principle is applicable, *a fortiori*, to the instant case, because the percentage of employees in DRR over age 50 actually increased after the RIF.[31] *See Holley v. Sanyo Mfg., Inc.*, 771 F. 2d 1161 (8th Cir. 1985) (where percentage of workers in protected class increased after layoff, there is no statistical evidence that protected employees were discriminated against during reduction-in-force). In fact, during the time period 2000 – 2005 (including the RIF), the percentage of DRR employees age 50 and over also increased from 48.4% to 61.3%. Jeanneret

---

[30] The Court of Appeals, in affirming summary judgment for the employer, stated that "an important statistic to consider in the RIF context is the difference in the percentage of older employees in the workforce before and after the RIF." *Id.* at 952.

Report (Ex. 27) at p. 6, Conclusion #6, and p. 17; Bodian Decl. (Ex. 23) at ¶ 10 and Table E.

> 3.    The age distribution of employees involuntarily separated during the RIF was significantly younger than the class.

An analysis of those DRR employees who were separated reveals that 53 DRR employees were involuntarily separated, and that 46 of those 53 received severance pay. Bodian Decl. (Ex. 23) at ¶ 7.  In addition, 7 employees retired in lieu of separation and 3 employees resigned after receiving a specific RIF notice.  The average age of those 63 separated employees was 48.28 years. *Id.* at ¶ 8.  As noted by Dr. Jeanneret, the involuntarily terminated group was not only younger, it was statistically significantly younger, than the rest of DRR.  Jeanneret Reply Report (Ex. 27-1) at pp. 14-15, 16 and Table 5.  This is entirely inconsistent with Plaintiffs' allegations of age discrimination and supports Defendant's case.

> 4.    The statistics support the FDIC's argument that the health of the financial industry and accompanying reduced workload were the business reasons for the RIF in DRR.

Dr. Jeanneret calculated the correlation between the number of FDIC insured institutions and the number of FDIC/RTC employees.  He found a very high correlation (.97 where 1.0 is perfect linearity) – that is, as the number of FDIC insured institutions declined, so too did the number of FDIC employees.  *See* Jeanneret Report (Ex. 27) at p. 6, Conclusion #2, pp. 9-10 and Exhibit 2, p. 12.  Dr. Jeanneret also studied the relationship between the value of assets the FDIC held in liquidation from failed banks and the number of DRR employees, and found an almost perfect correlation (.99 where 1.0 is perfect linearity).  *Id.* at p. 6, Conclusion #2, pp. 9-10 and Exhibit 3, p. 13.  His findings support FDIC's contention that the DRR RIF was conducted for legitimate business reasons.

---

[31] *See* Age Distribution chart above at p. 34 and Bodian Decl. (Ex. 23) at ¶ 6 and Table E.

**D.    Even assuming that Plaintiffs were able to establish a *prima facie* case of age discrimination, the Agency has articulated legitimate, non-discriminatory reasons, as well as reasonable factors other than age, for its employment decisions.**

As explained above, the Agency properly invoked RIF procedures based on a lack of work and the reorganization of DRR.[32]  Thereafter, the Agency properly implemented the RIF procedures, complying with all substantive and procedural requirements.[33]  The competitive areas that the FDIC drew for DRR were appropriate because they were based on the standards set forth in the governing regulations, and the competitive levels were properly drawn because they were based upon the regulations and the position descriptions of record.[34]  The FDIC correctly defined each employee's competitive level, correctly determined displaced employees' assignment rights (*e.g.*, their "bump" and "retreat" rights)[35] and complied with the regulations and negotiated procedures in determining reassignments to certain vacant positions.[36]  Accordingly, the Agency has articulated legitimate, non-discriminatory reasons, as well as reasonable factors other than age, for all of its employment decisions affecting DRR employees in this case.

## V.  CONCLUSION

Accordingly, for the reasons set forth above, defendant Sheila C. Bair respectfully requests that the Court grant this Motion for Summary Judgment in its entirety, and dismiss this matter with prejudice.  A proposed order granting the relief requested is attached.

---

[32] *See* 5 C.F.R. § 351.201(a)(2).

[33] *E.g.*, 5 C.F.R. § 351.801(a) (written RIF notice at least 60 days prior to the RIF effective date).

[34] *See* 5 C.F.R. § 351.402 (competitive areas), 5 C.F.R. §351.403 (competitive levels).

[35] *See* 5 C.F.R. § 351.701(b) ("bump"), 5 C.F.R. § 351.701(c) ("retreat").

[36] *See* 5 C.F.R. § 351.701; *see also* Mergen Dep. (Ex. 31) at 31-33.

Respectfully submitted,

/s/ *William S. Jones*

_____

William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Stephen J. Kessler
D.C. Bar No. 382427
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226
(703) 562-2311
(703) 562-2482 (Fax)

Attorneys for Defendant

Dated: February 25, 2008