### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
**BARBARA ALIOTTA, et al**                  )
                                                            )
    **Plaintiffs,**                          )
                                                            )
    **v.**                                       )    **Case No. 1:05-cv-02325-RMU**
                                                            )
**SHEILA C. BAIR,**                           )
**Chairman,**                                   )
**Federal Deposit Insurance Corporation,**  )
                                                            )
    **Defendant.**                         )
_____)


### DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE IS NO GENUINE ISSUE

       Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 7(h), Defendant Shelia C. Bair, in her

official capacity as Chairman of the Federal Deposit Insurance Corporation ("FDIC"), hereby

respectfully submits the following Statement of Material Facts Not in Dispute in connection with

Defendant's Motion for Summary Judgment and Memorandum in Support Thereof.

1.     The FDIC is an independent agency of the federal government that provides deposit

insurance for virtually all United States banks and savings and loan associations.  It also manages

and safeguards the deposit insurance fund, in part by serving as the primary regulator of state

chartered banks that are not members of the Federal Reserve System, and by resolving failed

institutions whose deposits it insures.  Thus, it has three major program areas: (1) insurance; (2)

supervision; and (3) receivership management.  See 12 U.S.C. §§ 1815, 1820-21; *see also "Who*

*is the FDIC?,"* publicly available at http://www.fdic.gov/about/learn/symbol; Deposition of

DRR Deputy Director James Wigand, attached as Exhibit 34[1] ("Wigand Dep."), at 34-35.

2.      During the well-known bank and thrift crisis of the late 1980's and early 1990's, the

FDIC experienced a significant increase in staffing, due in large part to its responsibility for

disposing of billions of dollars of assets belonging to failed financial institutions that had been

placed into receivership.  *See "Managing the Crisis: The FDIC and RTC Experience,*

*Chronological Overview: Chapter Fourteen – 1991,"* publicly available on the internet at

http://www.fdic.gov/bank/historical/managing/Chron/1991.

3.      In 1989, Congress established the Resolution Trust Corporation ("RTC"), a temporary

agency staffed by FDIC employees, to help deal with the crisis.  12 U.S.C. § 1441a(b)(8) (2000).

4.      Together, the FDIC and RTC hired large numbers of permanent and temporary

employees to accomplish their mission, so that at the height of the crisis in 1991, the total

workforce of both agencies (including 8,614 RTC employees) equaled 22,586.  *"Managing the*

*Crisis: The FDIC and RTC Experience, Chronological Overview: Chapter Fourteen – 1991,"*

publicly available on the internet at http://www.fdic.gov/bank/historical/managing/Chron/1991.

5.      Effective December 31, 1995 and pursuant to statute, the RTC was terminated, and its

assets, liabilities and employees were transferred to the FDIC.  12 U.S.C. § 1821a(a)(1) and 12

U.S.C. § 1441a(m)(2)-(3) (2000).

6.      As the bank and thrift crisis eased and the health of the industry improved, the workload

of the FDIC, especially its liquidation work, dramatically declined.  Between 1980 and 1994

more than 1,600 banks insured by the FDIC were closed or received FDIC financial assistance,

far more than in any other period since the advent of federal deposit insurance in the 1930s.  *See*

---

[1] The exhibit numbers for documents cited herein correspond to those set forth in the Table of
Exhibits found in Defendant's Memorandum, at v-vii.

*"The Banking Crisis of the 1980s and Early 1990s:  Summary and Implications,"* found at

http://www.fdic.gov/bank/historical/history/3_85.pdf.

7.      Beginning in 1994, however, the number of financial institution failures began to

drastically decrease (*e.g.*, there were 15 failures in 1994, 8 in 1995, 6 in 1996, and 1 in 1997).

*See "Historical Statistics on Banking, Closings and Assistance Transactions, 1994-2007,"*

http://www2.fdic.gov/hsob/HSOBSummaryRpt.asp?BegYear=1994&EndYear=2007&Stte=1.

8.      Consistent with its duty as the fiduciary of the deposit insurance funds, the FDIC began

to reduce its staff.  The FDIC pays the salaries of its staff from the deposit insurance fund, which

is funded by premiums that financial institutions pay for deposit insurance coverage.  *See "Who*

*is the FDIC?,"* available at http://www.fdic.gov/about/learn/symbol.

9.      The FDIC's need to downsize its workforce because of a declining workload (and in

particular, due to the dramatic reduction of failed bank assets in liquidation, for which DRR was

responsible) was discussed in the Agency's 1996 Annual Report:

> As part of the new budgeting process, each of our divisions and offices justifies
> its staffing levels by workload, and 1996 saw continued dramatic reductions in the
> overall workload of the FDIC. The book value of assets in liquidation at the FDIC
> peaked in mid-1992 at $44.4 billion. As of year-end 1996, they stood at $8.7
> billion – only one-fifth of the 1992 levels – despite $7.7 billion in Resolution
> Trust Corporation (RTC) assets transferred to the FDIC at the end of 1995, when
> the RTC sunset occurred. About $4.4 billion of the assets in liquidation on our
> books at year-end were those assets transferred from the RTC, with the remaining
> $4.3 billion representing assets from FDIC liquidations.
>
> Staffing size correlates closely with expenses at the FDIC.  In the aftermath of the
> banking crisis of the late 1980s and early 1990s, FDIC staffing [(excluding RTC)]
> peaked in mid-1993 at 15,611. It has been difficult, but necessary, to tell many
> employees who served the FDIC and this country well during the banking crisis
> that we no longer have jobs for them. We have sought to be as humane as possible
> in this process by offering generous cash buyouts, direct job placement assistance,
> and opportunities to compete for the limited number of jobs open in other parts of
> the Corporation.  The FDIC has been and will continue to be exceedingly well
> served by the professionalism and dedication of its staff.

. . .

> Most of the reduction since 1993 came from the Division of Resolutions and Receiverships (DRR), formerly the Division of Depositor and Asset Services (DAS) and the Division of Resolutions (DOR), before those two divisions were merged in December of 1996. The staff of those two divisions peaked at 6,966 in mid-1993, but their combined total declined to 1,819 as of year-end 1996.

1996 Annual Report, Chairman's Statement, publicly available on the internet at

http://www.fdic.gov/about/strategic/report/1996/chair.html#eduction.

10.      The FDIC's downsizing efforts continued in 1997 and beyond.  *See Armstrong v. Powell*, 230 F.R.D. 661, 666-67 (W.D. Okla. 2005) (denying class certification).

11.      The FDIC's workload continued to decline in 2004-2005 due to industry consolidation and the robust health of the banking industry.  In 2004, the overall number of institutions insured by the FDIC decreased, and bank earnings increased.  2004 Annual Report, Financial Statements and Notes – Overview of the Industry, available at

http://www.fdic.gov/about/strategic/report/2004annualreport/overview_industry.html: "The 9,025 commercial banks and savings institutions insured by the FDIC reported total earnings of $91.8 billion for the first three quarters of 2004, an increase of $2.0 billion (2.3 percent) over the same period of 2003."

12.      These dual trends of industry consolidation and income growth continued in 2005. 2005 Annual Report, Overview of the Industry, available to the public at

http://www.fdic.gov/about/strategic/report/2005annualreport/overview.pdf:  "The 8,856 FDIC-insured commercial banks and savings institutions filing financial reports for September 30 reported total net income of $102 billion for the first three quarters of 2005, an increase of $10.2 billion (11.1 percent) over the same period in 2004."

13.     As explained in the FDIC's 2004 Annual Report, published in early 2005, these industry

trends had a corresponding effect on the Agency's continuing need to manage its staffing levels:

> The FDIC's operating expenses are largely paid from the insurance funds, and the
> Corporation continuously seeks to improve its operational efficiency in
> fulfillment of its fiduciary responsibilities to the funds. To that end, the
> Corporation engages annually in a rigorous planning and budgeting process to
> ensure that budgeted resources are properly aligned with workload. That is
> particularly true with respect to staffing, since personnel costs constitute well over
> 60 percent of the Corporation's annual administrative expenses. In late 2004, the
> FDIC Board of Directors approved management recommendations to reduce
> authorized staffing by 674 positions, to 4,750, by year-end 2005.
>
> Authorized year-end 2005 staffing is substantially lower than previous authorized
> staffing levels for the resolutions and receivership business line as well as the IT
> and administrative support functions. Staffing reductions were approved for the
> Division of Resolutions and Receiverships and the Legal Division following a
> lengthy analysis of current and projected future workload in the resolutions and
> receivership management area and reflect the smaller number of financial
> institution failures for the past several years. Staffing reductions in the Division of
> Information Resources Management and the Division of Administration reflect
> improved business processes, savings from contract consolidation, and
> outsourcing of functions where cost effective.

2004 Annual Report, Reducing Costs and Improving Financial Management, found at

http://www.fdic.gov/about/strategic/report/2004annualreport/mgmt_dna4.html.

14.     During this time frame, Agency employees were initially informed by management that

"[t]he FDIC of the future will be a smaller, more flexible agency" via a global e-mail message in

early August 2004, which addressed "Workforce Planning for the Future."  Memorandum dated

August 6, 2004, from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to

FDIC Employees ("8/6/04 Bovenzi Memo"), attached as Exhibit 1, at 1.

15.     Employees were told that changes in the banking industry required the FDIC to change

the way it did business, and that during the 2005 planning and budget formulation process then

underway, the various divisions and offices would be reviewing their business processes and the

skill sets required of employees for the FDIC to accomplish its mission.  *Id*. at 2.

5

16.     Specifically with respect to the Division of Resolutions and Receiverships ("DRR"), while the downsizing decision came about during the course of the FDIC's annual planning and budget formulation process, the rationale for the downsizing was "rooted in [DRR's] substantially diminished workload."  Deposition of Thomas E. Peddicord III, Deputy Director, Division of Finance ("Peddicord Dep."), attached as Exhibit 32, at 33-34, 53.

17.     Employees were also told that reorganizations and a smaller workforce were envisioned, and that additional information would be provided as it became available.  8/6/04 Bovenzi Memo (Ex.1), at 2.

18.     In October 2004, Agency employees were told in more detail that the FDIC would attempt to reduce its excess staff first through buyouts and then through reductions in force. Memorandum dated October 26, 2004, from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to All FDIC Employees ("10/26/04 Bovenzi Memo"), attached as Exhibit 6, at 1.

19.     The memorandum specifically told employees that staffing analyses conducted by management had determined that various divisions and offices of the Agency were overstaffed and that steps would be taken to reduce excess staff.  Management described the overstaffed divisions as falling into two discrete groups for downsizing purposes:

> The first group includes divisions where staffing levels are not justified by current or projected workloads.  These divisions are planning for substantial reductions in their workforces.     DRR, DIRM [(Division of Information Resources Management, now the Division of Information Technology, or DIT)], DOA [(Division of Administration)], Legal, and DOF [(Division of Finance)] are included in this group. Buyouts are going to be offered to most employees in these divisions.   Nevertheless, it appears likely that the necessary staffing reductions in these divisions cannot be accomplished entirely through voluntary departures.  *Accordingly, we have begun active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in DOA, Legal, and DOF in 2006.*

> The second group includes the remaining divisions and all of the offices [(i.e., the Office of Diversity and Economic Opportunity, Office of Enterprise Risk Management, Office of Inspector General, Office of Legislative Affairs, Office of the Ombudsman, and Office of Public Affairs)]. Staffing levels in these organizations are for the most part justified by current workload. As a result, in DSC [(Division of Supervision and Consumer Protection)], DIR [(Division of Insurance and Research)], and the offices, there will be a more limited buyout program. There will not be a RIF in these organizations.
>
> Corporate-wide we estimate a reduction of between 500 to 600 positions from our current on-board workforce of nearly 5,300. These reductions will occur by year-end 2006, with most of the reductions occurring by year-end 2005.

*Id.* (emphasis added). Thus, in October 2004, it was anticipated that five major FDIC divisions – DRR, DIRM/DIT, DOA, Legal and DOF – would need to downsize substantially through voluntary employee departures or face involuntary reductions-in-force in 2005 and 2006.

20.     DRR administers one of the FDIC's mission critical functions – its receivership management program. When an FDIC-insured depository institution fails, the FDIC is appointed as its receiver, *see* 12 U.S.C. § 1821(c)(2)-(3). DRR manages receiverships, resolves troubled financial institutions and sells their assets in order to minimize costs and obtain the highest recovery for creditors and claimants. Declaration of DRR Director Mitchell Glassman ("Glassman Decl."), attached as Exhibit 25, at ¶ 3.

21.     DRR also pays deposit claims and responds to the inquiries of customers of failed institutions and the public. *Id.*

22.     The workload of DRR had continued to decline since 2003 due to a variety of reasons, including the record profitability and capitalization in the banking industry, which substantially decreased the failures of FDIC-insured financial institutions. During this time frame, the number of bank failures remained very low – only three financial institutions failed in 2003 and four failed in 2004. There were no bank failures at all in 2005 and 2006. *See "Historical Statistics*

*on Banking, Closings and Assistance Transactions, 1994-2007,"* available at

http://www2.fdic.gov/hsob/HSOBSummaryRpt.asp?BegYear=1994&EndYear=2007&Stte=1.

23.    As a result, on August 19, 2004, Mitchell Glassman, the Division Director of DRR, sent a

workforce planning message to all DRR employees, which candidly informed them that:

> Economic analyses and projections for the health of the banking industry, coupled
> with technological advances and process improvements, require us to reevaluate
> our staffing needs.  Although our analysis is not yet complete, it is apparent that
> fewer problem institutions and our adoption of more efficient business processes
> have led to a declining workload and excess staff.  . . .  As a result, some difficult
> decisions must be made soon regarding the size and structure of our division . . .
> ."

Message from Director Glassman to all DRR employees in D.C. and Dallas, dated August 19,

2004 ("8/19/04 Glassman Memo"), attached as Exhibit 2, at 2.  *See also* Deposition of Director

Glassman ("Glassman Dep."), attached as Exhibit 30, at 48-49; Wigand Dep. (Ex. 34) at 82-83.

24.    Similar follow-up messages regarding staffing were sent to employees in other divisions

as well.  *See, e.g.*, various memoranda from 9/2/04 through 3/14/06 that were sent to the Legal

Division's employees by the General Counsel concerning workforce planning and likely

downsizing of the Legal Division, attached as Exhibit 3.

25.    In October, Director Glassman sent a follow-up message to DRR employees, in which he

confirmed that DRR had "a significant staffing imbalance between existing resources and our

current workload," and that as a result, management planned to reorganize DRR and reduce its

staff of 515 positions nationwide to approximately 240, retaining only 63 positions in

Washington and 177 positions in Dallas.  Message from Director Glassman to DRR, dated

October 26, 2004 ("10/26/04 Glassman Memo"), attached as Exhibit 7, at 1.

26.    Although hope was expressed that this reduction might be accomplished through an

Agency-wide buyout program and crossover opportunities to the Division of Supervision and

Consumer Protection (DSC), it was projected that by the end of the third quarter 2005, "DRR will experience a Reduction-in-Force (RIF) in both Washington and Dallas to involuntarily separate any remaining surplus employees."  *Id*. at 1-2.

27.     DRR's formal reorganization and downsizing proposal was finalized and submitted for approval toward the end of October 2004, and was approved in mid-November.  Memorandum from Director Glassman to Chief Operating Officer Bovenzi, dated October 25, 2004 ("Reorg. Memo"), attached as Exhibit 5; Approval memorandum, dated November 16, 2004, attached as Exhibit 9.

28.     The approved reorganization proposal reduced DRR's Washington staff from 101 to 63, and its Dallas staff from 413 to 173, "represent[ing] a 54% reduction in total staff [that] will save an estimated $34 million in annual salary costs."  Reorg. Memo (Ex. 5) at 1.

29.     The factors underlying DRR management's conclusions regarding staffing were straightforward:

> Record profitability in the banking industry in recent years has led to a substantial decrease in the number of financial institution failures than were experienced in the 1980s and early 1990s.  Industry consolidation continues to decrease the number of insured financial institutions.  Emerging technology and improved business processes continue to enhance productivity and efficiency.  These factors, along with the Corporate vision of a more collaborative and integrative workforce capable of responding to mission critical functions, impact the Division and its need for personnel to handle subsequent resolution and receivership activities. . . .

> As a result, the Division initiated a comprehensive strategic analysis of the way it projects itself doing business over the next 3-5 years and the impact this should have on current program activities, organizational structure, and overall cost. This review results in this recommendation to reorganize the Division and adopt a staffing strategy and revised business model that realizes operating efficiencies and ensures that critical mission responsibilities are met.

Reorg. Memo (Ex. 5) at 1-2.

30.     DRR's revised business model that was to be adopted in response to the substantial

decrease in workload was based on a number of key elements, including the following:

- Division workload will continue to be irregular and will always be represented over time with peaks and valleys that could be dramatic at times.

- The Division will rely on Division of Supervision and Consumer Protection (DSC) personnel to supplement staff to accomplish mission requirements associated with financial institution failures.

- As needed, the Division will supplement many of its functional areas with contracting support in peak periods to manage and accomplish its workload in a cost efficient manner in lieu of carrying and maintaining staff resources associated with this function.

- The structure of the Division will be comprised of subject matter and technical experts capable of leading and resolving functional specific efforts and problems related to the resolution and closing of failed financial institutions.

*Id*. at 2-3.

31.     The desired staff reductions would be accomplished through DRR's participation in the

Agency-wide buyout program, outplacement initiatives and a RIF in 2005 to separate any

remaining surplus employees.  *Id*. at 4.

32.     Following the approval of DRR's reorganization, employees were informed about the

details of the new organizational structure and that certain new positions were being established

consistent with DRR's new business model, which would "focus[] on a smaller, more specialized

workforce that leads, directs, and serves as an expert resource for resolution and closing

activities for the FDIC."  *See* Intranet posting of DRR organization charts with proposed staffing,

dated November 23, 2004, attached as Exhibit 10, at 1.

33.    They were further informed that "[t]he new business model and its supporting organization structure addresses the Division's irregular and currently low workload in a cost effective and efficient manner." *Id.* at 2.

34.    On October 19, 2004, Chief Operating Officer Bovenzi sent his second memorandum related to workforce planning to all FDIC employees. Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees Corporate ("10/19/04 Bovenzi Memo"), attached as Exhibit 4.

35.    Of particular interest to DRR employees, the memo announced that the FDIC would implement a voluntary DRR-to-DSC crossover program that would allow DRR staff to apply for an "in-service" training program in DSC. *Id.* at 2.

36.    DSC is responsible for bank examinations and was one of the FDIC's divisions that was not threatened with a RIF due to overstaffing. *See* 10/26/04 Bovenzi Memo (Ex. 6), at 1.

37.    Subsequently, on February 1, 2005, a formal solicitation of interest was issued that announced the opportunity for qualified FDIC employees, including those in DRR, to apply for Grade 12 Financial Institution Examiner positions in DSC. Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer, to FDIC Employees Grade 12 and above nationwide, dated February 1, 2004 ("Crossover SOI"), attached as Exhibit 12.

38.    Prior bank examiner experience was not required in order to qualify for the solicitation of interest. *Id*. at 1. In addition, employees selected for the program who were currently occupying surplus positions were entitled to saved pay, i.e., their pay would not decrease. *Id*.

39.    In addition to the DSC crossover opportunity for qualified employees who occupied positions at grade 12 and above, internal entry-level grade 5/7/9 Financial Institution Specialist positions in DSC were also available to lower-graded FDIC permanent employees, including

those in DRR.  *See* Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief

Operating Officer, to FDIC Employees, dated March 14, 2005 ("3/14/05 Bovenzi Memo"),

attached as Exhibit 16, at 3.

40.     Employees selected for the program were to be transferred to their new positions on June

27, 2005.  *See* Memorandum from John F. Bovenzi, Deputy to the Chairman and Chief

Operating Officer, to All FDIC Employees, dated June 13, 2005 ("6/13/05 Bovenzi Memo"),

attached as Exhibit 20, at 1.

41.     Prior to when specific RIF notices were issued in DRR on June 30, 2006, 51 DRR

employees voluntarily transferred out of DRR to DSC under this program.  Glassman Decl. (Ex.

25) at ¶ 10.

42.     The 10/26/04 Bovenzi Memo to all FDIC employees also outlined the salient features of

a voluntary, Agency-wide buyout program that was designed to encourage voluntary

downsizing: (i) a buyout period that would last from early November 2004 to mid-May 2005

(except for DSC employees, who were required to submit their applications by December 13 and

depart by December 31, 2004); (ii) a cash payment equal to 50% of total salary; (iii) certain

supplemental incentives; (iv) the ability to combine the buyout with either regular or early

retirement; (v) no restriction on re-employment by another federal agency (with a requirement to

repay the gross amount of the buyout only upon re-employment by the FDIC within five years);

and (vi) management's discretion to delay the departures of selected employees based on

workload considerations.  10/26/04 Bovenzi Memo (Ex. 6), at 1-2.

43.     There were no age restrictions or differences in the buyout terms based on age.  *See id.*;

Deposition of Joy Crosser ("Crosser Dep."), attached as Exhibit 29, at 26-27.

44.    In November 2004, individual notification via e-mail was provided to all eligible FDIC employees in the various Divisions and Offices, to inform them of their eligibility to elect the buyout as well as the specific terms of the buyout program for their Division or Office.  *See* Declaration of Joy Crosser ("Crosser Decl."), attached as Exhibit 24, at ¶ 7.

45.    Notification was sent to DRR employees in the Dallas and Washington, D.C. offices on November 2, 2004.  *Id.* at ¶ 8; *see* Buyout Notification e-mail dated November 2, 2004 from Joy Crosser to DRR employees in Dallas and Washington, D.C. ("DRR Buyout Notification"), attached to the Crosser Decl. as Exhibit 24-1.

46.    In addition to the information provided via e-mail, Buyout Fact Sheets containing the buyout information for each division and office were posted on the FDIC's internal website. Crosser Decl. (Ex. 24) at ¶ 9; *see* Buyout Fact Sheets for Divisions and Offices (including DRR), attached to the Crosser Decl. as Exhibit 24-2.

47.    Subsequently, the 2004/2005 FDIC Buyout Handbook was posted on the FDIC's internal website, in order to provide more detailed information about the terms and conditions of the buyout.  Crosser Decl. (Ex. 24) at ¶ 10; *see* Buyout Handbook attached to the Crosser Decl. as Exhibit 24-3.

48.    There were no minimum age requirements for being eligible to elect the buyout.  Crosser Decl. (Ex. 24) at ¶ 10.

49.    The last day to submit or rescind an application for the buyout was May 2, 2005 (although DSC employees, who were not facing a RIF, had a different schedule and their final buyout application/revocation date was December 15, 2004).  *Id.* at ¶ 11.

50.    Except for delayed departures approved by management for business reasons, employees who elected to take the buyout were off the FDIC's employment rolls by May 14, 2005, the final departure date.  See DRR Buyout Notification (Ex. 24-1) at 1; Buyout Fact Sheets (Ex. 24-2).

51.    Specifically as to DRR, the buyout was open to "[a]ll permanent DRR employees assigned to Washington and Dallas, except for employees occupying EM [(Executive Management)] positions."  DRR Buyout Notification (Ex. 24-1) at 1.

52.    Some DRR employees elected to take the buyout offer almost immediately.  *See, e.g.,* Buyout application for Plaintiff Peggy Henderson, dated November 8, 2004, attached as Exhibit 8.

53.    Other DRR employees electing to take the buyout continued their employment until the final May 14, 2005, departure date.  *See, e.g.*, Buyout application of Plaintiff Donald Lett, attached as Exhibit 14.

54.    In all, 132 DRR employees applied for and accepted the buyout.  Crosser Decl. (Ex. 24) at ¶ 12.

55.    Employees who accepted a buyout were not considered for positions during the DRR RIF.  Declaration of Pamela Mergen ("Mergen Decl."), attached as Exhibit 26, at ¶ 14.

56.    In addition to the 132 DRR employees who applied for and accepted the buyout, an additional 73 DRR employees were placed in other FDIC positions outside DRR.  *See* Declaration of Lester Bodian ("Bodian Decl."), attached as Exhibit 23, at Table A:  "Transferred within FDIC" (employee nos. 198-270).

57.    Nevertheless, the FDIC found that a RIF was still needed to reduce remaining surplus staff in both the Washington and Dallas offices of DRR.  Mergen Decl. (Ex. 26) at ¶¶ 4-6.

58.     The RIF was conducted in accordance with 5 C.F.R. Part 351 and the FDIC's RIF

Circular, which was negotiated with the National Treasury Employees Union (NTEU), the

exclusive representative of bargaining unit employees of the FDIC.  *Id*. at ¶ 8; *see* Corporate

Reduction-in-Force Policy, Circular 2100.4 ("RIF Policy"), attached as Exhibit A to the Mergen

Decl.

59.     The FDIC provided an informational notice of RIF to DRR staff members in Washington

and Dallas on April 5, 2005, informing them that the RIF would go forward and would be

effective in September 2005.  *See, e.g.*, Informational Notice of Reduction in Force to Dallas

DRR employees, attached as Exhibit 17.

60.     Along with this notice, FDIC provided each DRR employee with his or her RIF essential

information, and notified employees that this information would be used in determining retention

standing and assignment rights in the RIF.  *See id*.

61.     Employees were told to review and verify this information, and to review and supplement

their Official Personnel Folders (OPFs) with updated resumes and any missing information by

May 6, 2005.  *Id*.

62.     Similar notice was provided to employees in DIT, the other division slated for a RIF in

2005.  *See* Informational Notice of Reduction in Force to DIT employees, attached as Exhibit 18.

63.     On June 30, 2005, DRR employees occupying surplus positions who were being

displaced by the RIF received specific RIF notices, either notifying them that they had been

assigned to a new position within DRR or that they would be separated.  *See, e.g.*, Specific RIF

notice for Plaintiff Ann Bonner, attached as Exhibit 21.

64.    Under the federal RIF rules and the RIF Policy, there were two rounds of competition under which surplus employees could be placed in other DRR positions.  Mergen Decl. (Ex. 26) at ¶¶ 9-10.

65.    In addition, employees were also placed into vacant positions during the RIF process.  *Id.* at ¶ 7.

66.    These vacant positions were filled based on the best match of skills among the qualified employees as compared to the requirements of the vacant positions.  Mergen Decl. (Ex. 26) at ¶ 13; *see also* Deposition of Pamela Mergen ("Mergen Dep."), attached as Exhibit 31, at 31-33.

67.    During the RIF, 233 DRR employees either remained in their current DRR positions or were placed in other positions in DRR.  *See* Bodian Decl. (Ex. 23), at Table A:  "Stayed in DRR" (employee nos. 271-503).

68.    Nevertheless, 53 DRR employees were involuntarily separated (46 of whom received severance pay), 7 DRR employees retired in lieu of separation, and 3 other employees resigned after receiving a specific RIF notice.  *See* Bodian Decl. (Ex. 23), at ¶ 7.

69.    All RIF actions were effective on September 3, 2005.  Mergen Decl. (Ex. 26) at ¶ 17.

70.    As a result of the offerings of the FDIC to its employees, employees in DRR were presented with choices as to whether to: (i) accept the buyout offer and resign or retire; (ii) apply for other available positions in other Divisions of the FDIC; or (iii) participate in the RIF process and be considered for positions in DRR (either vacant or encumbered).  FDIC employees, not the FDIC, made those decisions.  Report of P. R. Jeanneret, Ph.D. ("Jeanneret Report"), attached as Exhibit 27, at 24-25; Reply Report of P. R. Jeanneret, Ph.D. ("Jeanneret Reply Report"), attached as Exhibit 27-1, at 9-11.

71.     Of those 184 employees age 50 and older who departed from DRR in 2005, 112 chose to either resign or retire.  *See* Jeanneret Reply Report (Ex. 27-1), at Table 1 (Age 50 and Older, Codes 301, 302, 303, 317).

72.     An additional 42 employees age 50 and older transferred to other divisions and offices within the FDIC.  *See id.* (Age 50 and Older, "Transfer from DRR").

73.     FDIC's policy has been to avoid or mitigate RIFs to the greatest extent possible.  The RIF Policy expressly provides that "[e]very feasible effort should be made to avoid or mitigate a RIF."  RIF Policy attached as Exhibit A to Mergen Decl. (Ex. 26), at section I-4.  *See also* Jeanneret Reply Report (Ex. 27-1) at p. 16 ("The Agency set out to achieve as much of the downsizing as possible through employee choice rather than involuntary termination, and DRR was largely successful in doing so (63 involuntary terminations out of a total reduction of nearly 270 individuals).").

74.     During a RIF, employees with higher retention standing may displace other employees at lower grades and in different jobs through a process known as "reassignment," which includes "bumping," "retreating," and other reassignment rights provided in the applicable regulations. *See* 5 C.F.R. Part 351; RIF Policy attached as Exhibit A to Mergen Decl. (Ex. 26) at section II-8. For this reason, RIFs can be tremendously disruptive to the operations and productivity of the Agency.

75.     The buyout and early retirement programs were completely voluntary.  The buyout was offered to employees in all Divisions and Offices, not just those in DRR, and early retirement was available to employees in nine Divisions and Offices, including DRR.  *See* Buyout Fact Sheets (Ex. 24-2); Global e-mail message dated January 24, 2005, to FDIC employees

concerning Voluntary Early Retirement (VERA) for Buy-Out Eligible Employees, attached as Exhibit 11.

76.     Further, DRR employees had from November 2, 2004, until May 2, 2005 to decide whether to apply for the buyout, and once an employee applied for it, he could change his mind and withdraw his application at any time until May 2, 2005.  DRR Buyout Notification (Ex. 24-1) at 1; Crosser Decl. (Ex. 24) at ¶¶ 7, 11.

77.     Employees who chose to accept the buyout (and receive a buyout payment and other benefits) did not participate in the RIF process.  Mergen Decl. (Ex. 26) at ¶ 14.  Thus, they did not make themselves available for consideration for vacant positions filled during the RIF.

78.     If the DRR employees who took the buyout had chosen to participate in the RIF, they may have been selected for one of the vacant positions that were filled as part of the RIF process.  *Id*. at ¶ 13.

79.     All DRR employees had notice that positions were available long before the final May 2, 2005 buyout acceptance date.  In November 2004, DRR had published its new DRR business model with new DRR organizational charts to show the employees how many positions would be available and at what grade levels under the Division's approved reorganization plan.  *See* Intranet posting of DRR workforce planning and transition organization charts (Ex. 10); *see also* Update regarding DRR vacancies and positions descriptions (March 2, 2005), attached as Exhibit 15.

80.     Employees were selected for vacancies during the reduction in force in accordance with federal RIF regulations and the FDIC's RIF Policy.  Mergen Decl. (Ex. 26) at ¶ 13.

81.     Further, had DRR employees not taken the buyout but decided to participate in the RIF process, they may have been placed in an encumbered position.  Pamela Mergen, the FDIC's

Human Resources Specialist who was responsible for implementing the RIF, testified that the FDIC followed the RIF regulations of the U. S. Office of Personnel Management (USOPM) in conducting the RIF.  Mergen Decl. (Ex. 26) at ¶ 5.

82.     Under 5 C.F.R. § 351.701 and the FDIC's RIF Policy, employees were afforded assignment rights (including "bump" and "retreat") to occupied positions.  Mergen Decl. (Ex. 26) at ¶ 11; RIF Policy attached as Exhibit A to Mergen Decl. at section II-8.

83.     Thus, DRR employees who took the buyout may have retained a position in DRR had they chosen to remain and participate in the RIF process.  In fact, 233 DRR employees either retained their current DRR positions or were placed in other positions in DRR during the RIF. *See* Bodian Decl. (Ex. 23), at Table A:  "Stayed in DRR" (employee nos. 271-503).

84.     Based on PERHIS records produced to Plaintiffs in this case, the 503 permanent employees who were in DRR on January 1, 2005 are identified by employee ID number, appointment type and date of birth (DOB) in Table A of the Bodian Decl. (Ex. 23).

85.     Based on PERHIS records produced to Plaintiffs in this case, the status of each of these 503 permanent employees after the completion of DRR's 2005 downsizing is also shown in Table A of the Bodian Decl. (Ex. 23), in accordance with the nature of action (NOA) code, description of action and effective date for each employee (except for employees who remained in DRR or who transferred to other non-DRR positions within FDIC, for whom NOA codes and effective dates are not listed).

86.     Based on PERHIS records produced to Plaintiffs in this case, the 312 permanent employees in DRR who were subject to RIF as of June 30, 2005, are identified by employee ID ("EMPLAID") and date of birth (DOB) in Table B of the Bodian Decl. (Ex. 23).

87.    Based on PERHIS records produced to Plaintiffs in this case, the 63 DRR employees who were involuntarily separated due to RIF (NOA codes 304, 312 and 356) are shown in Table C of the Bodian Decl. (Ex. 23).

88.    Based on PERHIS records produced to Plaintiffs in this case, the average ages of permanent DRR employees from 2000 – 2005 on the dates indicated are shown in Table D of the Bodian Decl. (Ex. 23).

89.    Based on PERHIS records produced to Plaintiffs in this case, the "under age 50" vs. "age 50 and older" age distributions of permanent DRR employees from 2000 – 2005 on the dates indicated are shown in Table E of the Bodian Decl. (Ex. 23).

Respectfully submitted,

*/s/ William S. Jones*

_____
William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)


Stephen J. Kessler
D.C. Bar No. 382427
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226
(703) 562-2311
(703) 562-2482 (Fax)

Attorneys for Defendant

Dated: February 25, 2008