# EXHIBIT 25

**(Declaration of Mitchell L. Glassman)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BARBARA ALIOTTA, et al., )
    Plaintiffs, )
     )
v. ) Case No. 1:05-cv-02325-RMU
     )
SHEILA C. BAIR, )
Chairman, )
Federal Deposit Insurance Corporation, )
     )
    Defendant. )
_____)

## DECLARATON OF MITCHELL L. GLASSMAN

I, Mitchell L. Glassman, declare as follows:

1. My name is Mitchell L. Glassman. I have personal knowledge of the facts contained herein, and I am competent to testify to the same.

2. I am the Director of the Division of Resolutions and Receiverships (DRR) of the Federal Deposit Insurance Corporation (FDIC) in Washington, D.C. I have held that position since 2000.

3. When an FDIC-insured depository institution fails, the FDIC is appointed as its receiver. DRR manages receiverships of the FDIC, resolves troubled financial institutions, and sells their assets in order to minimize costs and obtain the highest recovery for creditors and claimants. It also pays deposit claims and responds to the inquiries of customers of failed institutions and the public.

4. DRR had staffed up in the late 1980's and early 1990's in order to resolve the crisis in the banking and thrift industry. As the health of the bank and thrift industry improved, the liquidation workload of DRR declined.

5. The workload of DRR continued to decline through 2005 due to record profitability in the banking industry, which substantially decreased the failures or near failures of FDIC-insured financial institutions; industry consolidation, which decreased the number of financial institutions insured by the FDIC; and emerging technology, which improved business processes and enhanced the productivity and efficiency of DRR.

6. The resolutions and receivership workload of DRR was declining, and it was apparent that we could no longer support the size and cost of the DRR workforce. Management in DRR began discussing a possible reorganization of DRR in early 2004 based on a reduced staff. I asked my senior managers at that time to think about how DRR conducts its business and to consider new ways of accomplishing its work and mission responsibilities that would lead to staffing efficiencies. We had several meetings in 2004 that resulted in a new business model being developed based on the declining workload and a reduced staff.

7. The new business model we developed changed the way DRR would approach bank closing activities in light of the declining workload and reduced staff. The resolutions and receivership process would go from being the sole responsibility of DRR to an FDIC-wide responsibility. Simply put, the new business model projected the use of staff from other FDIC divisions and offices to assist DRR in its bank closing activity. This meant that DRR could reduce its staff and reorganize itself into a workforce of subject matter experts at upper grade levels that would lead the FDIC in accomplishing its mission activities.

8. The plan to reorganize DRR was approved by John Bovenzi, the Chief Operating Officer of the FDIC. We announced the reorganization plan in the fall of 2004 to all DRR employees and communicated to them that this would lead to sizable staff reductions.

9. To help eliminate the surplus of staff on a voluntary basis and to minimize the need for involuntary staff reductions through a reduction in force, the Corporation announced that it would offer a buyout program in which employees could separate voluntarily from the FDIC with 50% of their total salary. The opportunity to separate voluntarily with a buyout was offered to all DRR employees. The buyout period ran from approximately November 1, 2004, to approximately May 14, 2005.

10. In early 2005, another program, commonly referred to as the "crossover program," was offered to DRR employees. This was an opportunity for qualified DRR employees to be reassigned into vacant positions within the Division of Supervision and Consumer Protection (DSC), which examines and supervises federally insured financial institutions to ensure that they operate in a safe and sound manner, that consumer's rights are protected, and that the institutions invest in their communities. The 51 DRR employees who applied for and accepted positions under this program were placed in their DSC positions before the RIF was run in DRR on June 30, 2005.

11. Most of the necessary staff reductions in DRR were accomplished through the voluntary programs offered by the FDIC. Unfortunately, a surplus remained in June of 2005, and a reduction in force was still necessary.

12. The RIF was conducted in DRR by human resources personnel in the Division of Administration in June of 2005. Specific RIF notices were provided to employees on or

about June 30, 2005. Separations resulting from the RIF were effective in early September of 2005.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: February 20, 2008

Mitchell L. Glassman
Mitchell Glassman