# EXHIBIT 27

**(Expert Report of P. R. Jeanneret)**

United States District Court

District of Columbia


Report in the Matter of

Barbara Aliotta, et al.

vs.

Sheila C. Blair, Chairman of the Federal Deposit Insurance Corporation

CIV – 05 – 2325 (RMU)


Submitted by:

P.R. Jeanneret, Ph.D.

August 15, 2007

# INTRODUCTION

I have been retained by the Federal Deposit Insurance Corporation (FDIC), the Defendant in the matter of Aliotta et al., vs. Sheila Blair, Chairman of the FDIC. Specifically, I have been asked to review and respond to Plaintiffs' Complaint utilizing my expertise as an Industrial and Organizational Psychologist.

I have relied upon the following education and professional experience in reaching my conclusions:

## Education

I obtained a Bachelor of Arts degree, with a major in Psychology, from the University of Virginia in 1962. I received a Masters of Arts degree from the University of Florida in 1963, with a major in Psychology and a minor in Sociology. In 1969, I obtained a Ph.D. from Purdue University, where I majored in Industrial and Organizational Psychology and minored in Measurement and Industrial Sociology.

## Awards and Publications

I was awarded the Distinguished Professional Contributions Award from the Society of Industrial and Organizational Psychology (SIOP) in 1990, and I am a Fellow of the American Psychological Association and SIOP. In 2002, I was one of the recipients of SIOP's M. Scott Meyers Award for Applied Research in the Workplace. I was the Chair of the SIOP Committee charged with revising the SIOP Principles for the Validation and Use of Personnel Selection Procedures (published in September, 2003), which is one of the two sets of professional standards in industrial psychology. In 2005 I received SIOP's Distinguished Service Contributions Award.

I am internationally recognized for my research in job analysis, and my doctoral dissertation included the development of the Position Analysis Questionnaire (PAQ) – a structured worker-oriented job analysis process. I was a principal investigator and co-author on the U.S. Department of Labor's project to replace the Dictionary of Occupational Titles with a new work analysis system known as An Occupational Information System for the 21st Century: The Development of O*NET.

I have authored numerous articles, and have given many symposia and presentations on issues relating to employment, and in several instances, on the topics of selection/promotion procedures, organizational functioning and performance management. I am an adjunct faculty member of the Rice University and University of Houston Psychology Departments. A copy of my resume is presented in Appendix A, and it

includes a history of litigation testimony for the past 5 years. My professional fee is billed at the rate of $500.00 per hour.

## License/Certification

I am licensed and certified by the Texas State Board of Examiners of Psychologists (Certificate Number 503).

## Consulting Experience

From 1964 through 1967, prior to obtaining my Ph.D., I was an Aviation Psychologist in the United States Navy, where I achieved the rank of Lieutenant. Since leaving Purdue University in 1969, I have worked as an Industrial and Organizational Psychologist performing consulting services for businesses and other organizations. My areas of practice and expertise include, but are not limited to organizational analysis, design and implementation of various human resource management programs, and assisting organizations with matters associated with the various equal employment opportunity statutes and guidelines including those concerned with selection/promotion and downsizing practices.

## Expert Services

I have served as a consulting expert and/or testifying expert in more than 200 lawsuits. In about 40 cases the matter involved a promotion process; approximately 30 of the cases involved reductions-in-force complaints. I have provided testimony (at trial, by deposition or affidavit) on more than 100 occasions. I have been qualified as an expert in industrial and organizational psychology and the statistical analyses used in the field by more than 30 state and federal courts, beginning in 1974. I have provided expert testimony in the third, fourth, fifth, sixth, seventh, eighth, ninth, and eleventh circuits. I have never been disqualified as an expert.

## Sources for Opinions

All of the informational sources cited in this report plus my education and years of experience have been relied upon in forming the opinions and conclusions expressed in this report. The sources of FDIC information that have been used to formulate the opinions and conclusions expressed in this report are contained in Appendix B. This report summarizes my findings, conclusions, and opinions to date. However, it is possible that I might do further work relevant to this matter and reserve the right to amend this report.

## Expert Perspective

My perspective for reviewing Plaintiffs' Complaint and the report of their expert is one that considers how the alleged systemic age discriminatory actions could occur, given the documented organizational functioning of the FDIC and specifically the Division of Resolutions and Receiverships (DRR). In other words, is it reasonable and likely that Plaintiffs' allegation of systemic age discrimination in DRR could take place during the 2004-2005 time period, when DRR designed and implemented a comprehensive program to accomplish the required downsizing? I should not be understood as providing findings or rendering opinions on the motivation of any one individual. Rather, when I discuss the DRR processes and outcomes, I am considering them as an I/O psychologist viewing the behavior of the organization. Furthermore, all of my observations and opinions are considered in the context of the Plaintiffs' specific allegations, and the organizational dynamics implied by those allegations.

# PLAINTIFFS' COMPLAINT

Plaintiffs' Amended Complaint filed February 28, 2006 as a Class Action alleges "a pattern and practice of purposeful discrimination against employees over 50 years old in violation of the Age Discrimination in Employment Act (ADEA)." The Complaint specifically states that, "The 2005 RIF was designed and intended by Defendant Agency to have a disparate impact against its employees over age 50." (Amended Complaint at 85) The Amended Complaint further alleges that DRR's reduction in force (RIF) procedures were not based on reasonable factors other than age, and that DRR did not have a business reason or justification for reducing its workforce. (See Amended Complaint at 87; 94)

Plaintiffs' Amended Complaint appears to acknowledge a business need for downsizing at the FDIC and within DRR that had been initiated many years earlier. More specifically, Plaintiffs acknowledge that, "In the mid-1990s, members of the Board of Directors of the FDIC discussed their desire to reduce the number of employees in the Agency because the extraordinary work load caused by the savings and loan and bank crisis in the 1980s was shrinking." (Amended Complaint at 57)

Plaintiffs have alleged that the 2005 RIF was the mechanism that DRR used to have a disparate impact against older[1] employees, and that the Plaintiffs were not selected for termination for their levels of performance or other reasonable factors. (Amended Complaint at 87; 91)

On July 25, 2006 Plaintiff's Motion for Class Certification was granted and the class was defined at follows:

> "Former or present employees of FDIC's Division of Resolutions and Receiverships who were born on a date on or before September 30, 1955 and who, as a result of the 2005 RIF, either accepted a buyout or reduction in grade, or were terminated from their positions in DRR."

---

[1] My use of the term "older" in this report will mean employees over the age of 50.

## SUMMARY OF CONCLUSIONS AND OPINIONS

1. FDIC's core values and policies clearly prohibit age discrimination.

2. The health of the financial industry and the accompanying reduced workload for the FDIC and particularly the Division of Resolutions and Receiverships (DRR) was the primary reason for the downsizing that occurred at the FDIC during the relevant time period. The correlations between financial health indicators and FDIC workforce size are almost perfectly linear (i.e., correlations equal to .97 to .99 on a scale where 1.0 is exact linearity).

3. Examination of the average ages of FDIC employees from 2000 to 2005 in DRR indicates that the average age actually increased, in direct contradiction to Plaintiffs' theory.

4. Under Plaintiffs' theory of age discrimination one would expect the permanent workforce to become younger over time. However, that reduction in age did not occur. In 2004 (pre RIF), the average age of permanent employees was 51.96 years; in 2005 (post RIF) it was 51.81 years. This clearly demonstrates that there was not a systemic age discrimination practice at the FDIC.

5. The average age of DRR employees pre and post the 2005 RIF remained the same (i.e., almost 52 years) which directly contradicts Plaintiffs' theory of age discrimination against employees over 50 years of age.

6. The distributions of permanent employee ages in 2000 and 2005 again confirms the absence of systemic age discrimination. The percent under age 50 declines from about 52 to 39 percent, while the percentage 50 and older increases from about 32 to 61 percent.

7. The average age of the 63 DRR employees "separated" as of September 17, 2005 was 48.28 years. This age is obviously lower than age 50 – the age Plaintiffs allege was targeted by the FDIC.

8. Prior to the RIF in 2005 the FDIC completed a number of structural changes that led to various workforce realignments. These structural changes were not related to the age of the workforce and did not support a practice of systemic age discrimination.

9. The FDIC implemented several productivity/efficiency improvements which influenced job and staffing requirements and the number of employees needed to perform the work of DRR. However, these improvements were not based on employee age or designed to implement a systemic program of age discrimination.

10. Downsizing at the FDIC and within DRR was based on comprehensive staffing analyses conducted at the local level. These analyses did not consider the ages of employees.

11. Prior to and during the downsizing efforts that occurred in 2005 there were comprehensive communications to all employees concerning DRR's plans, and options available to employees who would be subject to downsizing.

12. The buyout program offered by the FDIC to all DRR employees was voluntary, job-centered, and not employee-centered. Accordingly, there was no basis for this program to support or cause systemic age discrimination.

13. The efforts of DRR management to minimize the negative effects of the necessary downsizing are evident by the fact that while the organization declined by about 275 employees, only 53 employees were actually terminated. Also, seven individuals took retirements in lieu of separation and three individuals resigned in lieu of separation.

14. There have been several checks and balances in place throughout the downsizing process that would prevent purposeful systemic age discrimination. These protections included: the establishment of several downsizing policies and practices prior to any placement decisions, localization of the planning for and execution of the downsizing, the involvement of numerous decision makers, inclusion of the National Treasury Employees Union (NTEU) in designing programs, providing observers to selection processes, and offering several avenues for employee appeals.

## THE FEDERAL DEPOSIT INSURANCE CORPORATION

The FDIC was created by Congress in 1933 in response to thousands of bank failures that occurred in the 1920's and early 1930's. The mission of the FDIC has always been to preserve and promote public confidence in U.S. financial institutions, insure deposits, identify and monitor risks to deposit insurance funds, and limit the effect on the economy if a financial institution failed. The FDIC is an independent agency of the federal government and is funded by premiums paid by financial institutions to insure their deposits and by the earnings from those premiums invested in U.S. Treasury securities.

The FDIC directly examines and supervises banks and savings institutions that are chartered by the states and do not join the Federal Reserve System. In the event of a failure the FDIC immediately responds, and typically liquidates the assets to resolve the failure without any financial loss to the insured depositors.

The FDIC has defined six core values that guide its operations. Two of these core values directly address the allegation of age discrimination and are instructive to understanding the intentions of the organization.[2]

"Fairness – The FDIC treats everyone with whom it deals fairly and equitably. It exercises its responsibilities with care and impartiality; promotes a work environment that is free of discrimination and values diversity; and adheres to equal opportunity standards."[3]

"Integrity – The FDIC performs its work with the highest sense of integrity, which requires the agency to be, among other things, honest and fair. The FDIC can accommodate the honest difference of opinion; it cannot accommodate the compromise of principle. Integrity is measured in terms of what is right and just, standards to which the FDIC is committed."

Activities of the FDIC's workforce are influenced by performance of the economy, changes in business cycles and the consequential lending and funding strategies of financial institutions. Further, banking

---

[2] The two core values are quoted directly from the FDIC's Strategic Plan 1998-2003, and they also appear in FDIC's 2004 Annual Report.

[3] The FDIC also has a policy on Equal Opportunity which prohibits all discriminatory practices (including age discrimination) in the workplace and in any of its programs or activities.

and savings organizations are changing in response to privacy issues, industry consolidations, lending trends, competitive pressures, globalization, and emerging technology. In response, the FDIC itself has had to re-organize its structure, re-align its workforce, and create its own productivity and efficiency improvements.

The dynamic changes that have occurred at the FDIC over the last decade, and particularly the downsizing of the workforce, have been influenced by numerous variables. Listed below are a few of the most important considerations, which I will briefly address in subsequent sections of this report:

- Banking and Savings Institutional Health
- Structural Changes at the FDIC to Accomplish its Mission
- Productivity/Efficiency Improvements

## Banking and Savings Institutional Health

In a memorandum to the FDIC Board of Directors dated September 25, 1995, Deputy Chairs Geer and Longbrake succinctly described the continually improving health of financial institutions and the resulting impact on the workloads of the FDIC and Resolution Trust Corporation (RTC)[4] from 1989 forward. This healthy condition has continued until the present day, and is repeatedly documented in the FDIC's annual reports and strategic plans. Ten years later the FDIC Annual Report (2005) noted that conditions in the banking industry have never been better and estimated losses by insured financial institutions are at or near historical low levels. Thus, while insured deposits grew by more that $1 billion over the ten years (1995-2005) and the FDIC had responded to the effects of hurricanes Katrina and Rita, there still was not sufficient work for the Agency's work force. While the FDIC's focus shifted from resolving and liquidating assets of failed institutions, to monitoring and assessing risk to prevent future problems, that did not lessen the over staffing experienced by DRR. A discussion of the relationship between the improved and sustained health of the financial industry on the one hand, and the employment needs of the FDIC and DRR in particular on the other hand, follows:

## FDIC Insured Institutions and Employment Needs

There are several clear business indicators that support the management decisions of the FDIC that a consequential and prolonged downsizing effort that really began in 1993 was absolutely necessary.

---

[4] The Resolution Trust Corporation was created by law in 1989 to handle failed savings and loan institutions. It sunset in 1995, one year earlier than scheduled.

Exhibit 1 documents several indices regarding both commercial banks and savings institutions that were insured by the FDIC from 1995 through 2005. Several observations are pertinent:

- the number of insured institutions continued a steady decline from 1995 to 2005;
- the number of institutional failures was minimal across the entire time period and reached 0 for both banks and savings institutions in 2005;
- the number of problem institutions continued to generally decline from 1995 to 2005.

As the number of insured institutions, financial failures and problem entities declined, so did the need for FDIC employees. Exhibit 2 documents for the years 1991 through 2005 the number of institutions and the number of FDIC/RTC employees. The correlation between these two sets of numbers is .97.[5] This correlation indicates an extremely strong relationship between the number of employees and the number of institutions as would be expected if the FDIC was a well-managed organization.

To the extent that institutional failures had declined dramatically during the late 1990's, so had the assets in liquidation. Exhibit 3 sets forth the total assets in liquidation from 1995 through 2005. There has been a steady decline in the assets in liquidation (with the exception of the slight upturn that occurred in 2002 – 2003) and in 2005 reached an all time low. Also reported in Exhibit 3 are the employment data for the Division of Depositor and Asset Services (DAS), which was merged with the Division of Resolutions (DOR) in 1996 and became the Division of Resolutions and Receiverships (DRR). These employees deal directly with the liquidation of assets and the correlation between the number of employees and amount of assets in liquidation is .99.

In summary, it is clear that the business demands faced by the FDIC necessitated the downsizing that occurred from 1996 to 2005. It is also clear that a significant component of the downsizing would need to occur in the division that directly managed the liquidation of assets of failed financial institutions, namely DRR. The dramatic change that occurred in the health of financial institutions, and consequently in the work performed by the FDIC, clearly explains why factors other than age were responsible for the downsizing that took place in DRR.

---

[5] A perfect relationship would be 1.0.

**Exhibit 1**
**NUMBER OF FDIC INSURED INSTITUTIONS**
**(YEAR END 1995 – 2005)**

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| # Commercial Banks | 9,940 | 9,528 | 9,403 | 9,031 | 8,832 | 8,572 | 8,326 | 8,171 | 8,043 | 7,875 | 7,748 |
| # BK Failures | 6 | 5 | 1 | 3 | 7 | 6 | 3 | 10 | 3 | 3 | 0 |
| # Problem Banks | 144 | 82 | 73 | 68 | 66 | 74 | 90 | 124 | 103 | 86 | 58 |
| # Savings[1] | 2,030 | 1,924 | 1,519 | 1,430 | 1,388 | 1,333 | 1,287 | 1,244 | 1,194 | 1,150 | 1,106 |
| # Savings Failures[1] | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 0 |
| # Problem Savings[1] | 49 | 35 | 19 | 16 | 13 | 20 | 24 | 24 | 13 | 9 | 10 |
| Total Insured Institutions | 11,970 | 11,452 | 10,922 | 10,461 | 10,220 | 9,905 | 9,613 | 9,415 | 9,237 | 9,025 | 8,854 |

[1] Upon the RTC sunset on December 31, 1995 all of the savings institutions were transferred to the FDIC, Division of Resolutions and Receiverships.

Source:  FDIC Annual Reports

11

## EXHIBIT 2

## COMPARISON OF NUMBER OF INSURED INSTITUTIONS AND NUMBER OF FDIC / RTC EMPLOYEES

### Year End 1991 – 2005

|  | Number of Insured Institutions | Number of FDIC / RTC Employees |
|---|---|---|
| 1991 | 14,612 | 25,586 |
| 1992 | 13,973 | 22,459 |
| 1993 | 13,324 | 20,994 |
| 1994 | 12,656 | 17,526 |
| 1995 | 11,970 | 11,856 |
| 1996 | 11,452 | 9,151 |
| 1997 | 10,922 | 7,793 |
| 1998 | 10,461 | 7,359 |
| 1999 | 10,220 | 7,266 |
| 2000 | 9,905 | 6,452 |
| 2001 | 9,613 | 6,167 |
| 2002 | 9,415 | 5,430 |
| 2003 | 9,237 | 5,311 |
| 2004 | 9,025 | 5,078 |
| 2005 | 8,854 | 4,514 |

Correlation between number of insured institutions and number of FDIC employees = .97

Source:  FDIC Annual Reports

## EXHIBIT 3

## COMPARISON OF ASSETS IN LIQUIDATION
## WITH DAS/DRR EMPLOYMENT DATA
## 1995 – 2005

| Year | Total Assets ($) in Liquidation (Billions) | Number Employees in DAS/ DRR |
|------|-------------------------------------------|------------------------------|
| 1995 | 18.0 | 2,856 |
| 1996 | 8.7 | 1,819 |
| 1997 | 4.12 | 1,093 |
| 1998 | 2.38 | 753 |
| 1999 | 1.98 | 795 |
| 2000 | .54 | 468 |
| 2001 | .57 | 454 |
| 2002 | 1.24 | 522 |
| 2003 | .81 | 520 |
| 2004 | .61 | 504 |
| 2005 | .44 | 235 |
| Correlation with Total Assets in Liquidation = | | .99 |

Source: FDIC Annual Reports

**The Downsizing Effort**

During the time period 1996 through 2005 the FDIC reduced its total staff by over 50 percent. Within DRR the net decline amounted to 1,584 employees

Under a program of systemic discrimination as alleged by Plaintiffs, one would expect the average age in DRR to become younger over time and perhaps be below age 50. However, the data indicate just the opposite. Exhibit 4 presents the average age of the employees in DRR from 2000 to 2005. Contradictory to Plaintiffs' theory, the average age increases over time until the 2004/2005 time period when it remains constant. The data are even more compelling as to discrediting Plaintiffs' theory when the age distributions are examined. As reported in Exhibit 5 the percentage of younger employees decline, and the proportion of employees in the older groupings grow. For example, in 2000 the percentage of younger (under 50) employees in DRR was 51.6 percent; in 2005 the percentage of younger employees was reduced to 38.7 percent. Conversely, the percentage of employees over age 50 in DRR grew from 48.4 to 61.3 percent over the same period. In addition, the percentage of age 50 and older grew from 59.1 to 61.3 percent between 2004 and 2005 as presented in Exhibit 5. These data are in direct contradiction to what one would expect if age discrimination was taking place as part of DRR's downsizing effort.

To directly address the impact the 2005 RIF on older workers, I requested that the FDIC calculate the average age of DRR total and permanent employees for two points in time. The first date was November 1, 2004 when the buyout was announced and DRR employees could begin to sign up for the buyout; the second date was September 17, 2005 when the RIF was completed. If DRR had discriminated against employees over 50, a necessary but not sufficient requirement would be for the average age of employees to have become substantially lower. As reported in Exhibit 6, the average age remained essentially the same for both the total and permanent groups of employees in DRR in direct contradiction to Plaintiffs' allegation of age discrimination.

I also requested the average age of those DRR employees who "separated" as of September 17, 2005. If the FDIC and DRR was targeting older (i.e., over age 50) employees for

termination, one would expect the average age of those "separated" to be at least 50 years old. However, the average age of those 63 "separated" employees[6] was 48.28 years.

In summary, these data all point to a conclusion that is the direct opposite of Plaintiffs' theory. That is, DRR's downsizing efforts in 2004-2005 resulted in a workforce that remained essentially the same in terms of the average age of the incumbents.

---

[6] "Separated" employees included 53 terminations, seven retirements in lieu of separation, and three resignations in lieu of separation

## EXHIBIT 4

### AVERAGE AGE BY YEAR
### DRR DIVISION PERMANENT EMPLOYEES
### (YEARS 2000 – 2005)

| | DRR Division | |
|---|---|---|
| Date | Total Number of Employees | Average Age |
| 12/31/2000 | 477 | 49.84 |
| 12/31/2001 | 441 | 50.25 |
| 12/31/2002 | 546 | 51.00 |
| 12/31/2003 | 525 | 51.25 |
| 11/01/2004 | 509 | 51.96 |
| 12/31/2004 | 504 | 52.10 |
| 9/17/2005 | 235 | 51.81 |
| 12/31/2005 | 235 | 52.10 |

# EXHIBIT 5
# AGE DISTRIBUTION BY YEAR OF
# DRR PERMANENT EMPLOYEES
# (YEARS 2000 – 2005)

| Date | Age Group | Number of Employees | Percent of Total Employees |
|------|-----------|---------------------|----------------------------|
| 12/31/2000 | Under age 50 | 246 | 51.6 |
| | Age 50 and older | 231 | 48.4 |
| 12/31/2001 | Under age 50 | 220 | 49.6 |
| | Age 50 and older | 221 | 50.1 |
| 12/31/2002 | Under age 50 | 253 | 46.3 |
| | Age 50 and older | 293 | 53.7 |
| 12/31/2003 | Under age 50 | 233 | 44.4 |
| | Age 50 and older | 292 | 55.6 |
| 11/01/2004 | Under age 50 | 212 | 41.7 |
| | Age 50 and older | 297 | 58.3 |
| 12/31/2004 | Under age 50 | 206 | 40.9 |
| | Age 50 and older | 298 | 59.1 |
| 09/17/2005 | Under age 50 | 95 | 40.4 |
| | Age 50 and older | 140 | 59.6 |
| 12/31/2005 | Under age 50 | 91 | 38.7 |
| | Age 50 and older | 144 | 61.3 |

# EXHIBIT 6
# THE AVERAGE AGE OF DRR
# TOTAL AND PERMANENT EMPLOYEES
# PRE- AND POST- REDUCTION IN FORCE
# (2004-2005)

| Date | Total Number of Employees | Average Age | Number of Permanent Employees | Average Age |
|---|---|---|---|---|
| 11/1/2004 | 511 | 51.88 | 509 | 51.96 |
| 9/17/2005 | 236 | 51.70 | 235 | 51.81 |

## Structural Changes in DRR to Accomplish Its Mission

From 1995 through 2005 there were a number of structural changes in DRR that, in turn, had considerable influence on the size and capabilities of the DRR workforce. It is not my intent to describe in detail each of these structural changes; rather it is my purpose to list certain of these changes so that the reader may gain some appreciation for the workforce realignments required to staff the reorganized DRR structure.

- On December 31, 1995 the RTC sunset and was transferred by law to the FDIC. The RTC employees were absorbed by DRR.

- In December 1996 the Division of Depositor and Assets Services was merged with the Division of Resolutions to become the Division of Resolutions and Receiverships (DRR). In its 1996 Annual Report the FDIC announced that by the end of 1999 the DRR and related legal and other support activities in nine regional and field offices would be consolidated into the Dallas office.

- In 1997, DRR closed three service centers and reassigned the work to either Dallas or Washington DC.

- In 2000 the DRR Northeast Service Center was closed.

- In 2002, the receiverships accounting functions of DOF were transferred to DRR.

- On October 25, 2004 the Director of DRR, Mitchell L. Glassman, submitted to John F. Bovenzi, Chief Operating Officer and Deputy to the Chairman, a plan to reorganize DRR. The reorganization plan resulted from a comprehensive study of DRR's business practices, workload, readiness requirements, and skill and staffing needs. The plan called for a 2005 downsizing of 278 employees or 54 percent of the total staff and a salary cost savings of $34 million. The plan was approved by Mr. Bovenzi on November 16, 2004.

- Associated with DRR's reorganization plan for 2005 were a number of changes that affected staffing. These included the creation of 26 new positions in Headquarters and 58 new positions in Dallas.[7] These new positions set forth skill sets that required higher levels of specialty and the ability to manage new technologies and supervise/monitor employees/contractors in the future. This new workforce structure was predicated on the business strategy of less "division-based" and more "function-based" staffing. Interestingly, of the 60 vacancies identified in

---

[7] The revised position descriptions and their competitive levels were submitted to the NTEU in early 2005. There were no comments from NTEU.

Dallas during the RIF process, 56 of those vacancies that were filled occurred for newly created positions. Similarly, in headquarters there were 42 vacancies and 36 of the ones that were filled were for newly created positions.

The above structural changes lead to several workforce reconfigurations, including the 2004-2005 downsizing, but they were not related to the age of the workforce and they did not support a practice of systemic age discrimination.

## Productivity/Efficiency Improvements

Similar to structural changes, the FDIC and DRR implemented many productivity/efficiency improvements, which influenced staffing requirements and numbers. For example, in 1995 the FDIC began to electronically invoice and collect insurance premiums. Also, the FDIC for the first time approved a five-year strategic plan. This plan reinforced the FDIC's focus from resolving bank failures to actively working to keep institutions open and operating on a sound financial basis.

In 2000, DRR developed a website to sell assets undergoing liquidation. This technology allowed investors to perform their due diligence on-line and to electronically interact with DRR representatives. Instead of retaining assets in receivership, DRR began to actively market them, thus speeding up the liquidation process and reducing the time of stewardship. This marketing effort also took advantage of the latest advances in communications technology. Apart from developing internal technological products, it should also be recognized that the banking industry is becoming much more technologically sophisticated and complex. Thus as the mega banks emerge, DRR will need the skill sets to understand and interact with the technological changes that they will encounter as employees perform their various service functions.

In summary, while the above improvements have influenced (and will continue to influence) the staffing needs of the FDIC, these improvements were not related to employee age or designed to implement a systemic program of age discrimination.

## SUMMARY OF BUSINESS BASED ACTIVITIES LEADING TO THE DRR DOWNSIZING

There were several interactive events driven by the continued good health of the financial marketplace that led to significant changes within DRR. Organizationally, these changes included DRR's revised business strategy, re-organization and functional changes to the work

effort, and implementation of several productivity and efficiency improvements. All of these changes were consistent with sound management practices and where not intended to discriminate against employees over age 50.

# SPECIFIC DOWNSIZING INITIATIVES

The FDIC implemented a number of different initiatives to accomplish the required downsizing of its workforce, while continuing to provide service to its customers in a productive and efficient manner. My review of documents and my interviews with subject matter experts revealed a very thoughtful and analytical set of strategies that were followed in order to reduce the staffing levels of DRR in the 2004-2005 time frame in as fair a manner as possible. Of particular note is the fact that the FDIC was very open about the need to reduce its workforce and consolidate its facilities. DRR wanted to provide *voluntary* options to employees so that individuals could make choices that best fit their personal situations. Additionally, whenever possible the FDIC and DRR wanted to provide individuals opportunities to relocate or gain training so that they could retain their employment. Only as a last resort did the FDIC or DRR want to simply terminate employees using a RIF process. This section of my report discusses the following:

- Staffing Projections
- Communications
- Voluntary Buyout Program
- Early Retirement Initiative
- RIFs

## Staffing Projections

Beginning in the second quarter of 1995 the FDIC undertook a core staffing analysis. Such an analysis asked the question of each organizational unit or function, what numbers, occupations, and levels of staff were required for a specified period of time? In the following years the forecasting became more sophisticated under the guidance of Tom Peddicord (Associate Director, Corporate Planning) (see for example the FDIC Staffing Estimates 1997 – 2001), but it always confirmed the need to reduce staff, and in many instances close facilities or consolidate functions. The staffing studies considered historical workload and staffing both pre – and post the financial industry crises in the 1980's. Projections and forecasts were made by heads of divisions and offices throughout the FDIC. They considered certain workload assumptions and made staffing projections across a five-year timeframe. Results were consolidated by Mr. Peddicord and issues were flagged as necessary.

As previously mentioned, DRR conducted several staffing analyses that were predicated on certain business models. Prior to 2000, the staffing model in place was based on the "firehouse"

plan. In essence DRR would retain a sufficient staff in readiness in the event the next "fire" (defined as financial institutional failures) occurred.[8] Subsequently, in the early 2000's DRR developed plans on the bases of accomplishing known work and relying on shared resources (primarily from DSC) in the event of a "fire".[9] This is the model that spurred the need for the 2004-2005 downsizing, and is the model under which DRR operates today. (At the 2006 year end, DRR had 231 employees or 4 less than year end, 2005).

## Communications

Many communications beginning on August 6, 2004 with a memo from John Bovenzi were delivered to employees that described the planned corporate downsizing and related initiatives. A follow-up memo specifically regarding DRR's workforce planning initiative was released by Director Glassman on August 19, 2004. This memo reiterated the concepts introduced by Mr. Bovenzi and confirmed the efforts of a working group that was analyzing DRR's business functions, work load assumptions, organizational structure and staffing needs. On October 26, 2004 Mr. Bovenzi sent another memo to all FDIC employees and noted that DRR was one division that was over-staffed. He further stated that buyouts would be offered as one means of reducing staff, but that RIFs would still likely be required. (The buyout for DRR is described in another section of this report).

Director Glassman issued still another memo on October 28, 2004. He announced that a buyout program would be available to all employees (except EM level) through mid-May 2005. Also employees could apply for a crossover opportunity or Corporate University jobs as part of the Corporate Employee Program (CEP) undergoing development. Finally, he announced the availability of out placement and a variety of advisory services, as well as a DRR job fair to be held in early 2005.

An informational notice regarding the RIF was issued on April 5, 2005 by Mr. Glassman. The expected date of the RIF was announced as September 3, 2005 with notice to employees expected to be terminated at least 60 days in advance[10]. Employees were advised to update their personal records (i.e. official personnel folder, OPF) for the DOA's Human Resources Branch (HRB) which in turn would be determining each person's retention standing in accord

---

[8] The Firehouse plan assumed 10 to 12 bank failures.

[9] According to Mr. Seegers testimony (deposition, pp. 20-22, dated 4/30/07) 13 DRR employees from both the headquarters and Dallas locations developed the new staffing plan.

[10] Actual RIF notices were sent on June 30, 2005.

with the Career Transition Assistance Program (CTAP). The memo also requested employees update the federal resume and complete an Employee Occupational Preference form and submit it to HRB for use in the RIF process. Finally, employees were again reminded of the various career assistance services offered by the FDIC. The notice was accompanied by a Q & A.

## Voluntary Buyout Programs

A strategy adopted by the FDIC that was eminently fair to all DRR employees was the offer of a voluntary buyout program.   The program allowed employees who accepted the buyout to receive a substantial incentive payment, continuation of certain benefits for stated periods of time, immediate vesting in their savings plan, and outplacement assistance.  An announcement to all DRR employees regarding the buyout program was distributed on November 2, 2004. For employees who were also eligible for either regular or early retirement, there were opportunities to combine the buyout offer with the retirement package.   The DRR buyout program had the following features:

- The buyout period started November 2, 2004 and ended May 15, 2005.
- There was a cash payment equal to 50 percent of total annual salary.
- There was no minimum FDIC service requirement.
- There were certain supplemental incentives including an option to take the buyout as a lump sum or in installments.
- The opportunity to combine the buyout with regular or early retirement.
- The requirement to repay the buyout if a person was reemployed by the FDIC within 5 years. (Most buyouts required a pay back if the person was employed by any Federal agency.)
- There was a 2004 buyout website and a 2004/2005 FDIC Buyout Handbook that provided comprehensive information about the program.

It is understood that 132 DRR employees selected the buyout option by May 2, 2005.

Given the design of the buyout program, its voluntary nature, and the lack of limitations placed on eligibility, there was no basis for such programs to support or cause systemic age discrimination within DRR.

## Early Retirement Initiative

Apart from relying upon other downsizing strategies, the FDIC and DRR also offered an early retirement program as a means to accomplish some of the required downsizing. The program required prior approval from USOPM.

The early retirement program was limited to permanent employees who were in overstaffed positions; consequently the program was voluntary. Because early retirement programs are by definition age-related (i.e., you must be a certain age and/or have completed a specified number of years of service) they are usually available to employees who are older (i.e., age 50 and older). However, not all older FDIC employees were eligible (i.e., those with short tenure). In DRR, the requirements were age 50 with 20 years of service or age 55 and any number of years of service. Hence, given the fact that the programs were voluntary and the other restrictions placed on eligibility, there was no basis for DRR's early retirement program to support or cause systemic age discrimination.

## Reductions in Force

As previously mentioned, a reduction in force (RIF) effort was the process utilized the least by DRR to accomplish the necessary downsizing. The organizational reasons for the RIF were articulated by management and further supported by many analyses that compared cost savings associated with voluntary downsizing programs versus a RIF. During my interviews with subject matter experts it was estimated that there were only 50 persons riffed, even though there were 275 surplus positions, during the 2004-2005 downsizing process.

For the FDIC, the Reduction In Force policy of OPM delineates how a RIF will be conducted, although the FDIC did develop its own policy (Circular 2100.4) as negotiated with the NTEU in December, 1996. The most recent modification to the Corporate RIF Policy was issued on February 24, 2003. The change addressed the treatment of performance ratings when there are different summary rating patterns. The FDIC's RIF policy only applies to permanent staff. There are several important stipulations to the policy that encompass applying RIF procedures in a manner that ensures fairness, uniformity and consistency. Management of the RIF process is carried out by HRB staff. The HRB staff is responsible for ensuring that performance ratings have been completed, while the employees subject to the RIF are responsible for submitting updated qualifications statements so they can be considered for available positions.

25

RIF competition areas are defined by the HRB in terms of organizational units, classification levels and geographic locations. Employees in a competitive level are considered fungible from one position to the next. The bump and retreat rights of an employee released from his/her competitive level are expected to result in the least possible loss of grade or pay. Grievances and appeal processes were established as part of the RIF policy. The policy provides a means for submitting a complaint in the event someone believed his/her separation was based on age. FDIC employees subject to a RIF are eligible to register on the Reemployment Priority List (RPL). Also, competitive service employees in permanent positions at grades 15 and below separated by a RIF are eligible for selection priority under the terms of the Interagency Career Transition Assistance Plan (ICTAP) and FDIC's Career Transition Assistance Plan (CTAP). Finally, RIF employees may qualify for training under the Job Training Partnership Act (JTPA).

On June 29, 2005 the FDIC finalized and published changes to the policy regarding the filling of vacancies during a RIF. The policy specifically addressed the matter of using subgroup order versus master retention order for employees displaced after round one of the RIF process. The subgroup order process was adopted by DRR with the counsel of Ms. Pamela Mergen, a specialist in RIF processes in federal agencies[11].

The DRR RIF process is not simply one that seeks to identify persons for termination. To the contrary, it is first and foremost a process that seeks to keep individuals employed. The RIF itself is a matter of: (a) competing to retain one's current position; (b) being reassigned to a position identical to the one occupied; (c) being placed in another position for which one is qualified; or (d) being identified as surplus because after exhausting all possibilities there is not a position opening available for which the person is qualified.

DRR's competitive areas for the RIF were the Washington, DC and Dallas, Texas offices. Thus, for each location, round one was completed with individuals competing for jobs within the same competitive level. Subsequently, round two of the RIF was conducted with individuals competing for jobs in other competitive levels.

---

[11] On November 4, 2004 the NETU provided relief from the provision of FDIC Circular 2110.2 Merit Promotion Plan to several FDIC divisions including DRR. In essence, this relief exempted DRR from posting in order to maximize placement opportunities for the division's employees.

## PROGRAMS TO SUPPORT CHANGE

The FDIC instituted a number of programs to support the changes that were occurring because of the downsizing requirements. Most of these initiatives were focused on permanent employees with the intent that it would provide them with a means to retain their employment with the FDIC. Programs available to DRR employees were as follows:

### Examiner Training Program (The Crossover Program)

A crossover program was developed so that selected candidates could be trained to become Commissioned Bank Examiners. The program was restricted to permanent FDIC employees in the competitive service at or above grade 12. No recruits from outside the FDIC were to be considered. It was estimated that about 100 FDIC employees would be selected for this new program, although it is my understanding that even more employees actually completed the program. In my experience it is very unique for an organization to create such a program (which is no doubt expensive) in an attempt to provide for the continued employment of surplus individuals. Furthermore, since the crossover program was available to grade 12 and above employees, it favored more tenured employees who were more likely to be over the age of 50.

### Career Transition Assistance Program (ICTAP)

Under this program FDIC employees who declined reassignment and/or were noticed for a RIF were immediately eligible for priority selection for any Federal vacancy of 90 days or more at their permanent or lower grade within their local commuting area. The program did not apply to employees who accepted a buyout under the Relocation Buyout Program. Individuals had to apply for the vacancies and be deemed well-qualified.

### FDIC's Career Transition Assistance Plan (CTAP)

This plan was negotiated with the NTEU and implemented on February 4, 1999. It provides for special selection priority for FDIC surplus and displaced employees at the grade 15 level and below who are competing for other posted FDIC vacancies in their local commuting areas. In order to be selected, individuals needed to be deemed well-qualified for the vacancies. The FDIC established the Office of Career Transition and Employee Services Staff, DOA, to implement the program.

# CHECKS AND BALANCES

There were a number of direct checks and balances in place that served to prevent any systemic age discrimination in the event that such a practice was intended or even ordered by persons in authority.

**Policies** – The establishment of several downsizing policies and practices under the guidance of an expert (Pamela Mergen) in downsizing in federal agencies prior to any placement or selection decisions.

**Localization** – Decisions regarding staffing needs, assignments and selections were typically made by managers in the Headquarters and the Dallas offices. A number of on-site managers were the decision makers and they were focused on local situations. It would not be reasonable from an organizational perspective for them to have such staffing authority and then expect them to carry out a practice of age discrimination.

**Verification** – After initial placements for a particular competitive group of employees were made by the management team, they were reviewed in detail before moving on to the next subgroup.

**Observers** – During selection decision making meetings, observers from Human Resources were present. In particular, Ms. Pamela Mergen from HRB participated in all the downsizing meetings and ensured that all decisions were in accord with published policies. These individuals were not only available to provide facilitation and guidance, but also would be a deterrent to actions that would be discriminatory from any perspective.

**Appeals** – There have always been appeal channels open to FDIC employees who believe they have experienced any form of discrimination. The appeal, including one based on age, could be delivered up the chain of command, to Human Resources, to ODEO or the MSPB.

# APPENDIX A

## Education

Ph.D., 1969, Major in Industrial and Organizational
Psychology, Minors in Measurement and Industrial
Sociology, Purdue University, West Lafayette, Indiana

M.A., 1963, Major in Psychology, Minor in Sociology,
University of Florida, Gainesville, Florida

B.A., 1962, Major in Psychology, University of Virginia,
Charlottesville, Virginia

## Consulting Experience

President, Valtera Corporation 2006 – present

Managing Principal, Jeanneret & Associates, Inc., Houston,
Texas, 1982-2006

President (1990-2004), Vice President (1972-1990), PAQ
Services, Inc.

Managing Principal, Lifson, Wilson, Ferguson & Winick
(LWFW), Inc., Houston, Texas, 1977-1981

Principal, LWFW, Inc., Houston, Texas, 1974-1976

Consultant/Senior Consultant, LWFW, Inc., Houston, Texas,
1969-1973

## Certification and Licensure

Certified and Licensed Psychologist in the State of Texas   (No.
503)

Certificate of Professional Qualification in Psychology
(CPQ) by ASPPB

| AREAS OF PRACTICE |
| --- |
| • Organizational Analysis |
| • Executive and Employee Assessment |
| • Validation Research (Selection, Training, and Promotion Systems) |
| • Development of Job Requirements/Selection Instruments |
| • Performance Appraisal and Review |
| • Job Analysis and Task Analysis (PAQ, PMPQ, O*NET) |
| • Equal Employment Opportunity Issues |
| • Job Evaluation, Classification, and Compensation (Exempt/Non-Exempt) |
| • Management Development Programs |
| • Job Design and Job Enrichment |
| • Training Needs Analysis; Training Program Design and Administration |
| • Human Resource Management/Employee Relationships |

## Military Experience

Aviation Psychologist, Lieutenant, U.S. Navy, 1964-1967.  Primary duty station: Staff,
Atlantic Fleet Commander of Patrol Aviation, Norfolk, Virginia.  Development and
implementation of a "personnel subsystem" for antisubmarine warfare patrol aviation.
Conducted several research studies on human factors and problems associated with
airborne antisubmarine warfare operations.  In addition, was active in proficiency test
construction and validation, criteria development, selection and placement, performance
evaluation, training, operations research, and system performance optimization.  Initial
Duty Station: Aerospace Medical Center, Pensacola, Florida.  Completed primary pilot
training syllabus.  Conducted studies on the selection and training of Navy pilots and
navigators.  Participated in studies of zero "g" and rotating environments.

## Academic and Research Experience

Graduate Research Assistant, Purdue University, 1967-1969. Collaborated with Dr. Ernest J. McCormick in the development of a job analysis instrument known as the Position Analysis Questionnaire (PAQ). Also completed a study of job dimensions and job requirements with major focus on deriving "systems" for synthetic test validation. Special emphasis on the analyses of jobs in behavioral terms and determining the aptitudinal requirements for successful job performance. Also designed procedures and analytical techniques to utilize the PAQ in job evaluation and job classification.

Instructor, Old Dominion College, Norfolk, Virginia, 1965-1967. Duties: Instructor in physiological and introductory psychology. (Part-time while serving in U.S. Navy.)

Graduate Research Assistant, University of Florida, 1962-1963. Duties: Collaborated with Dr. Wilse B. Webb in the investigation of sleep and arousal from sleep. Responsibilities included EEG and polygraphic preparation of subjects, monitoring laboratory equipment, and data analysis.

Adjunct Professor, Department of Psychology, University of Houston

Adjunct Professor, Department of Psychology, Rice University

## Honorary and Professional Organizations

Society for Industrial and Organizational Psychology (Executive Committee 1995-1998; Chair, *Committee for the Revision of the Principles for the Validation and Use of Personnel Selection Procedures*, 2000-2003)

American Psychological Association, Division of Industrial/Organizational Psychology; Division of Consulting Psychology

Texas Industrial/Organizational Psychologists / Texas Psychological Association

Houston Area Industrial/Organizational Psychologists (past Executive Committee member)

The Society of Sigma Xi

American Compensation Association

The Institute for Job and Occupational Analysis (Advisory Panel member)

The Society for Organizational Behavior

Academy of Management

## Awards/Honors

Fellow, Society for Industrial/Organizational Psychology; American Psychological Association, 1992

Distinguished Professional Contributions Award, Society for Industrial and Organizational Psychology, 1990

31

M. Scott Myers Award for Applied Research in the Workplace, Society for Industrial and Organizational Psychology, 2002

Distinguished Service Contributions Award, Society for Industrial and Organizational Psychology, 2005.

## Editorship

Consulting Editor, *Journal of Applied Psychology*, 1988-1994

Panel Editor, *Personnel Psychology – Innovations in Research-Based Practice*, 1994-1998

Editorial Board Member, *Ergometrika*, 1999-2002

## Reviewer

*Standards for Educational and Psychological Testing*, 1999

National Research Council, National Academy of Sciences. *The Changing Nature of Work/Occupational Analyses*, 1999

*Personnel Psychology*, 1999-present

*Journal of Applied Psychology*, 2002-present

*Human Performance*, 2004

## Publications

Jeanneret, P.R. (2006). Individual Psychological Assessment. In Rogelberg, S. G. (Ed.) *Encyclopedia of Industrial and Organizational Psychology.* Thousand Oaks, CA. Sage Publications.

Jeanneret, P.R. (2005). Professional/technical authorities and guidelines. In Landy, F. J., (Ed.) *Employment Discrimination: Behavioral, Quantitative and Legal Perspectives.* San Francisco, CA. Jossey-Bass

Jeanneret, P.R. (1999). Report to the Committee on Assessment and Teacher Quality. The National Academies, National Academy of Science, Washington, D.C.

Jeanneret, P.R. (1998). Ethical, legal and professional issues for individual psychological assessment. In Jeanneret, P.R. & Silzer, R.S., (Eds.) *Individual Psychological Assessment: Predicting Behavior in Organizational Settings.* San Francisco, CA: Jossey-Bass

Jeanneret, P.R. (1992). Applications of job component/synthetic validity to construct validity. *Human Performance, 5,* 81-96.

Jeanneret, P.R. (1992, December). Potential application of generalized work behaviors in the development of a revised *Dictionary of Occupational Titles*. Houston, TX: Jeanneret & Associates, Inc. [Prepared for Utah Department of Employment Security under Contract No. 92-466.]

Jeanneret, P.R. (1991). Analyzing nonmanagement jobs: An overview. In Jones, Steffy, & Bray (Eds.). *Applying Psychology in Business*. Lexington, MA: D.C. Heath & Co.

Jeanneret, P.R. (1990). Can an assessment center and individual assessments co-exist in the same organization? *Proceedings of the 1989 National Assessment Conference*. Minneapolis, MN: Personnel Decisions, Inc.

Jeanneret, P.R. (1989). Assessment for promotion and development. *Proceedings of the 1988 National Assessment Conference*. Minneapolis, MN: Personnel Decisions, Inc.

Jeanneret, P.R. (1989). Are psychological assessments legal and ethical in the selection and hiring process? *Proceedings of the 1988 National Assessment Conference*. Minneapolis, MN: Personnel Decisions, Inc.

Jeanneret, P.R. (1988). Computer logic chip production operators. In S. Gael (Ed.). *The job analysis handbook for business, industry, and government*. NY: John Wiley & Sons.

Jeanneret, P.R. (1980, January). Equitable job evaluation and classification with the Position Analysis Questionnaire. *Compensation Review*.

Jeanneret, P.R. (1969, August). A study of the job dimensions of "worker-oriented" job variables and of their attribute profiles. Ph.D. thesis, Purdue University. *Dissertation Abstracts International, 30* (11-13), 5273-5274.

Jeanneret, P.R., Borman, W.C., Kubisiak, U.C., & Hanson, M.H. (1999) Generalized work activities. In N.G. Peterson, M.D. Mumford, W.E. Borman, P.R. Jeanneret & E.A. Fleishman (Eds.), *O*NET: An organizational information network*. Washington, DC: American Psychological Association.

Jeanneret, P.R., & Borman, W.C. (1995). Generalized work activities: Development of prototype Occupational Information Network (O*NET) content model. Salt Lake City, UT: Utah Department of Employment Security.

Jeanneret, P.R., D'Egidio, E.L., & Hansen, M.A., (2004). Assessment and development opportunities using the Occupational Information Network (O*NET). In Hersen and Thomas, (Eds.) *Comprehensive Handbook of Psychological Assessment*, Vol. 4, *Industrial and Organizational Assessment*. NJ: John Wiley and Sons.

Jeanneret, P.R. & McCormick, E.J. (1969, June). *The job dimensions of "worker-oriented" job variables and of their attribute profiles as based on data from the Position Analysis Questionnaire*. Purdue University, Occupational Research Center. [Prepared for Office of Naval Research under contract Nor-1100(28), Report No. 2].

Jeanneret, P.R. & Silzer, R.S., (Eds.), (1998). *Individual Psychological Assessment: Predicting Behavior in Organizational Settings*. San Francisco, CA: Jossey-Bass.

Jeanneret, P.R. & Silzer, R.S. (1998). An overview of individual psychological assessment. In Jeanneret, P.R. & Silzer. R.S. (Eds.) *Individual Psychological Assessment: Predicting Behavior in Organizational Settings*. San Francisco, CA Jossey-Bass.

Jeanneret, P.R. & Strong, M.H. (2003). Linking O*Net job analysis information to job requirement predictors. An O*NET application. *Personnel Psychology, 56*.

Jeanneret, P.R. & Strong, M.H. (1997). Linking O*NET job analysis information to the assessment of job requirements. In Peterson N.G., Borman, W.C., Jeanneret, P..R., Fleishman, E. A., & Levin, K.Y. (Eds.) Occupational Information Network (O*NET) Research and Development. Salt Lake City: Utah Development of Employment Security.

Gutenberg, R.L., Arvey, R.D., Osburn, H.G., & Jeanneret, P.R. (1983). Moderating effects of decision making/information processing job dimensions on test validities. *Journal of Applied Psychology, 68,* 602-608.

Finley, D.M., Osburn, H.G., Dubin, J.A., & Jeanneret, P.R. (1977). Behaviorally based rating scales: Effects of specific anchors and disguised scale continua. *Personnel Psychology, 30*, 659-669.

McPhail, S.M., Blakley, B.R., Strong, M.H., Collings, T.J., Jeanneret, P.R., & Galarza, L. (1995). Work context: Development of prototype Occupational Information Network (O*NET) content model. Salt Lake City, UT: Utah Department of Employment Security.

McPhail, S.M., Jeanneret, P.R., McCormick, E.J., & Mecham, R.C. (1991). *Job Analysis Manual* (Revised Edition). Palo Alto, CA: Consulting Psychologists Press, Inc.

McCormick, E.J., Mecham, R.C., & Jeanneret, P.R. (1989). *Technical Manual for the Position Analysis Questionnaire* (Second Edition). West Lafayette, IN: PAQ Services, Inc.

McCormick, E.J., & Jeanneret, P.R. (1988). Position Analysis Questionnaire (PAQ). In S. Gael (Ed.). *The job analysis handbook for business, industry, and government.* NY: John Wiley & Sons.

McCormick, E.J., Jeanneret, P.R., & Mecham, R.C. (1977). *Job Analysis Manual for the Position Analysis Questionnaire.* West Lafayette, IN: PAQ Services, Inc.

McCormick, E.J., Mecham, R.C., & Jeanneret, P.R. (1977). *Technical Manual for the Position Analysis Questionnaire--System II.* West Lafayette, IN: PAQ Services, Inc.

McCormick, E.J., Mecham, R.C., & Jeanneret, P.R. (1973). *User's Manual for the Position Analysis Questionnaire--System I.* West Lafayette, IN: PAQ Services, Inc.

McCormick, E.J., Jeanneret, P.R., & Mecham, R.C. (1972). A study of job characteristics and job dimensions as based on the Position Analysis Questionnaire (PAQ). *Journal of Applied Psychology Monograph, 56,* 347-368.

McCormick, E.J., Mecham, R.C., & Jeanneret, P.R. (1972). *Technical Manual for the Position Analysis Questionnaire.* West Lafayette, IN: PAQ Services, Inc.

McCormick, E.J., Jeanneret, P.R., & Mecham. R.C. (1971). Application of a structured job analysis technique. *Proceedings, 79th Annual Convention, American Psychological Association*, 501-502.

McCormick, E.J., Jeanneret, P.R., & Mecham. R.C. (1970). A study of job dimensions. *Indian Journal of Industrial Relations, 6,* 23-39.

McCormick, E.J., Jeanneret, P.R., & Mecham, R.C. (1969, June). *The Position Analysis Questionnaire (PAQ).* Purdue University, Occupational Research Center.

McCormick, E.J., Jeanneret, P.R., & Mecham, R.C. (1969, June). *The development and background of the Position Analysis Questionnaire.* Purdue University, Occupational Research Center. [Prepared for Office of Naval Research under contract Nor-1100(28), Report No. 5].

McCormick, E.J., Jeanneret, P.R., & Mecham, R.C. (1969, June). *A study of job characteristics and job dimensions as based on the Position Analysis Questionnaire.* Purdue University, Occupational Research Center. [Prepared for Office of Naval Research under contract Nor-1100(28), Report No. 6]

Peterson, N.G., Mumford, M.D., Borman, W.C., Jeanneret, P.R., Fleishman, E.A., Campion, M.A., Levin, K.Y., Mayfield, M.S., Morgeson, F.P., Pearlman, K., Gowing, M.K., Lancaster, A., & Dye, D. (2001). Understanding work using the occupational information network (O*NET): Implications for practice and research. *Personnel Psychology,* 54, 451-492.

Peterson, N.G., Mumford, M.D., Borman, W.C., Jeanneret, P.R., & Fleishman, E.A. (1999). An Occupational Information System for the 21st Century: The Development of O*Net. Washington, DC: American Psychological Association.

Peterson, N.G., & Jeanneret, P.R. (1997). Job analysis: Overview and description of deductive methods. In D.L. Whetzel and G.R. Wheaton (Eds.) *Applied Measurement Methods in Industrial Psychology.* Palo Alto, CA: Consulting Psychologists Press, Inc.

Peterson, N.G., Mumford, M.D., Borman, W.C., Jeanneret, P.R., & Fleishman, E.A. (1995). Development of prototype Occupational Information Network (O*NET) content model, Vols. I and II. Salt Lake City, UT: Utah Department of Employment Security.

Rock, D., Latham, A., Jeanneret, P.R. (1996). Estimating prose, document, and quantitative literacy scores from *Position Analysis Questionnaire* dimensions: An empirical linkage between adult literary skills and job analysis information. Princeton, NJ: Educational Testing Service.

Strong, M.H., Jeanneret, P.R., McPhail, S.M., Blakley, B.R., & D'Egidio, E.L. (1999) Work context. In N.G Peterson, M.D. Mumford, W.E. Borman, P.R. Jeanneret, & E.A. Fleishman (Eds.), *O*NET: An organizational information network.* Washington, DC: American Psychological Association.

## Symposia/Presentations/Workshops

Jeanneret, P.R. (2007, April). Facilitator, Executive Assessment: The role of assessment "tools" in E.A. Twenty Second Annual Conference of the Society for I/O Psychology. New York.

Jeanneret, P.R. (2007, April). Panelist. Panel Discussion: Individual Assessment today: what works, and what doesn't work! Twenty Second Annual Conference of the Society for I/O Psychology: New York.

Jeanneret, P.R. (2006, May ). Presenter, Debate. Resolved: The APA ethics code is inadequate for I-O psychology. Twenty First Annual Conference of the Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P.R.(2006, May). Facilitator, Community of Interest. Executive

Assessment and Selection. Twenty First Annual Conference of the Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P. R. (2006, May). Panelist, Panel Discussion: Recent Trends in Adverse Impact Litigation. Twenty First Annual Conference of the Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P.R. (2005, April). Co-chair, Practitioner Forum. Hiring Safe Workers: Improving Job Safety Through Better Selection. Twentieth Annual Conference of the Society for Industrial and Organizational Psychology, Los Angeles.

Jeanneret, P.R. (2005, April). Panelist, Panel Discussion: Technology Use in Selection: Past, Present, and Future. Twentieth Annual Conference of the Society for Industrial and Organizations Psychology, Los Angeles.

Jeanneret, P.R. (2005, April). Discussant, Symposium: The Changing Nature of Work: Longitudinal Analyses With the PAQ. Twentieth Annual Conference of the Society for Industrial and Organizations Psychology, Los Angeles.

Jeanneret, P.R. (2005, April). Presenter, Reflections on the Delaware Case. Authorities and Reverse Regression. Twentieth Annual Conference of the Society for Industrial and Organizations Psychology, Los Angeles.

Jeanneret, P.R. (2004, April) Panelist, The Values of Industrial-Organizational Psychology: Who Are We? Nineteenth Annual Conference of the Society for Industrial and Organizational Psychology, Chicago.

Jeanneret, P.R. (2004, April). Panelist, Job Analysis: New Innovations for an Old Topic. Nineteenth Annual Conference of the Society for Industrial and Organizational Psychology, Chicago.

Jeanneret, P.R. & Stelly, D.J. (2003, April). Presenter, Master Tutorial: Setting Cutoff Scores Using Regression: Are you Doing It Backwards? Eighteenth Annual Conference of the Society for Industrial and Organizational Psychology, Orlando.

Jeanneret, P.R., Campbell, W.J., Dugan, B.A., McPhail, S.M., & Wheeler, J.K. (2003, April). Panel Discussion: How to Maintain Your Integrity and Your Job. Eighteenth Annual Conference of the Society for Industrial and Organizational Psychology, Orlando.

Jeanneret, P.R., Kralj, M.M., Maranto, D.B., Schmit, M.J. & Scott, J.C. (2003, April). Conversation Hour: Psychologists Consulting in Organizations: Can I-O and Clinical Work Together? Eighteenth Annual Conference of the Society for Industrial and Organizational Psychology, Orlando.

Peterson, N.G., Borman, W.C., Mumford, M.D., Jeanneret, P.R. & Fleishman, E.H. (2003, April). Scott Myers Award for Applied Research in the Workplace: O*NET Perspectives: The Midwife's Views. Eighteenth Annual Conference of the Society for Industrial and Organizational Psychology, Orlando.

Jeanneret, P.R. (2002, April). Chair, Special Event, Revision of SIOP's Principles: Process, Outcomes, Q&A's. Seventeenth Annual Conference of the Society for Industrial and Organizational Psychology, Toronto.

Jeanneret, P.R. (2002, April). Co-Chair, Panel Discussion: Legal and Professional Guidelines: What They Do Not Tell Us. Seventeenth Annual Conference of the Society for Industrial and Organizational Psychology, Toronto.

Jeanneret, P.R. (2001, April). Discussant, Symposium: Advances in the Application of Synthetic Validation. Sixteenth Annual Conference of The Society for Industrial and Organizational Psychology, San Diego.

Jeanneret, P.R. (2001, April). Panelist, Everything You Wanted to Know About Being an Expert Witness. Sixteenth Annual Conference of The Society for Industrial and Organizational Psychology, San Diego.

Jeanneret, P.R. (2001, April). Panelist, The Value of Licensure for I-O Psychologists: Skeptics and Converts Unite; Sixteenth Annual Conference of The Society for Industrial and Organizational Psychology, San Diego.

Jeanneret, P.R. (2000, April). Discussant, Symposium: Practical Applications and Advances of the O*Net database. Fifteenth Annual Conference of The Society for Industrial and Organizational Psychology, New Orleans.

Jeanneret, P.R. (1999, April). Contributor, SIOP's Guidelines for Education and Training: Developing Competent I/O Psychologists. Workshop presented to the Fourteenth Annual Conference of The Society for Industrial and Organizational Psychology, Atlanta.

Jeanneret, P.R. (1999, April). Discussant, Innovations in Management Assessment. Workshop presented to the Fourteenth Annual Conference of The Society for Industrial and Organizational Psychology, Atlanta.

Jeanneret, P.R. (1999, April). Discussant, Partnerships in Strategic Organizational Change and Cultural Transformation. Workshop presented to the Fourteenth Annual Conference of The Society for Industrial and Organizational Psychology, Atlanta.

Jeanneret, P.R. (1998, April). Workshop Leader, Leveraging Psychological Assessments to Accomplish Business Strategies. Workshop presented to the Thirteenth Annual Conference of The Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P.R. (1998, April). Discussant, Symposium: Planning for Work in the 21st Century: What Does it Mean for I-O Psychologists. Thirteenth Annual Conference of The Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P.R. (1998, April). Discussant, Practitioner Forum: Partnerships in Leading Strategic Organizational Change. Thirteenth Annual Conference of The Society for Industrial and Organizational Psychology, Dallas.

Jeanneret, P.R. (1997, June). Development of the O*NET: Approach and Summary of Results. Invited Address. Tenth International Occupational Analyst Workshop. San Antonio, TX.

Jeanneret, P.R. (1997, April). Discussant, Symposium: Faking Matters. 12th Annual Conference of the Society for Industrial and Organizational Psychology, St. Louis, MO.

Jeanneret, P.R. (1997, April). Chair, Practitioner Forum: Strategic Initiatives in the Development of Executive Talent. 12th Annual Conference of the Society for Industrial and Organizational Psychology, St. Louis, MO.

Borman, W.C., & Jeanneret, P.R. (1996, April). Analysis of occupational performance requirements: More progress toward knowing the structure of work. Symposium: The Occupational Information Network: Reinventing the *Dictionary of Occupational Titles*. 11th Annual Conference of the Society for Industrial and Organizational Psychology, San Diego, CA.

Jeanneret, P.R. (1996, April). Discussant, Practitioner Forum: Personality, Measurement, and Employment Decisions: Questions and Answers. 11th Annual Conference of the Society for Industrial and Organizational Psychology, San Diego, CA.

Jeanneret, P.R. (1995, May). Discussant, Symposium: Testing and Accommodations under ADA: Practices, Problems, and Prospects. Tenth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Orlando, FL.

Jeanneret, P.R. (1995, May). Participant, Panel Discussion: Personality and Personnel Selection: Views from Personality and I-O Psychology. Tenth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Orlando, FL.

Jeanneret, P.R. (1995, May). Discussant, Symposium: Innovations in PAQ-Based Research and Applications. Tenth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Orlando, FL.

Jeanneret, P.R. (1994, July). Invited Address, Accommodation - State of the Research and Practice when Complying with the Americans with Disabilities Act. Sixth Annual Convention of the American Psychological Society, Washington, DC.

Jeanneret, P.R. (1994, April). Presenter, SIOP Fellowship Issues and Criterion. Symposium: I/O Practitioners: Is SIOP Fully Recognizing Their Needs and Contributions? Ninth Annual Conference of The Society for Industrial and Organizational Psychology, Inc., Nashville.

Jeanneret, P.R. (1994, April). Workshop Leader, Building A Successful Consulting Practice. Ninth Annual Conference of The Society for Industrial and Organizational Psychology, Inc., Nashville.

Jeanneret, P.R. (1993, October). The Expert Role of An I/O Psychologist. Wickliff & Hall Labor and Employment Law Seminar, Houston.

Jeanneret, P.R. (1993, February). Selecting Tomorrow's Workforce. Houston Human Resource Management Association Symposium, Houston.

Jeanneret, P.R. (1992, August). Participant, Discussion: Industrial/Organizational Psychology Practice Through Time. The Study of Work (Job Analysis). Centennial Convention of the American Psychological Association, Washington, DC.

Jeanneret, P.R. (1992, August). Participant, Education Miniconvention, The Relationship of Industrial/Organizational Science and Practice: Challenges and Strategies. Centennial Convention of the American Psychological Association, Washington, DC.

Jeanneret, P.R. (1992, June). The Value of Individual Psychological Assessment in Personnel Selection. Presentation to IPMAAC Annual Convention, Baltimore.

Jeanneret, P.R. (1992, May). What is an Essential Function and How Will you Know When You See One? Presentation to the University of Texas School of Law ADA Conference, Houston.

Jeanneret, P.R. (1992, May). Chair, Panel Discussion: I/O Internships: Are They Meeting Expectations? Seventh Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Montreal.

Jeanneret, P.R. (1992, May). Discussant, Symposium: Career Development: Programs Designed to Enhance Individual/Organizational Effectiveness. Seventh Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Montreal.

Jeanneret, P.R. (1992, May). Essential Functions and Preemployment Testing Under ADA. Invited Address, Houston Society of Healthcare Human Resource Administration, Houston.

Jeanneret, P.R. (1992, May). Practical Steps for Compliance with the Americans With Disabilities Act. Texas Association of Business, Dallas.

Jeanneret, P.R. (1992, March). Complying with the ADA; Job Analysis and Preemployment Testing Seminar sponsored by Memorial Hospital Southwest, Houston.

Jeanneret, P.R. (1991, November). Comments Regarding Education and Literacy in Today's Workforce. Industrial Relations Research Association Conference, Houston.

Jeanneret, P.R. (1991, April). Invited address, The PAQs of I/O Psychology. Sixth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., St. Louis.

Jeanneret, P.R. (1991, March). The Americans With Disabilities Act; Essential Job Functions. Baker & Botts Employment Law Seminar, Houston.

Jeanneret, P.R. (1990, October). Applications of Job Component/Synthetic Validity to Construct Validity. Annual Conference, Personnel Testing Council of Southern California, Newport Beach.

Jeanneret, P.R. (1990, September). Job Analysis and the Americans With Disabilities Act. Symposium sponsored by Clark, West, Keller, Butler & Ellis, Dallas.

Jeanneret, P.R. (1990, August). Workshop Leader, Assessment of Personality for Selection and Development. Industrial and Organizational Psychology Workshop presented at the 98th Convention of the American Psychological Association, Boston.

Jeanneret, P.R. (1990, August). Presenter, The Position Analysis Questionnaire: Recent Applications Based on Quantified Job Profiles. Symposium: Quantitative Job Description and Classification: Nomothetic Approaches and Applications. 98th Convention of the American Psychological Association, Boston.

Jeanneret, P.R. (1990, August). Presenter, The Changing Nature of the Work Climate--Implications for Human Resource Management Consulting. Symposium: Consulting Management Psychology's Role in the 21st Century. 98th Convention of the American Psychological Association, Boston.

Jeanneret, P.R. (1990, April). Presenter, Master Tutorial: Individual Psychological Assessment for Personnel Decisions. Fifth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Miami Beach.

Jeanneret, P.R. (1990, April). Panel Member, Expert Panel With Discussant: Fair Alternatives to Local Validation--Job Component (Synthetic) Validity. Fifth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Miami Beach.

Jeanneret, P.R. (1990, April). Presenter, Professional and Ethical Conflicts in Industrial/Organizational Psychology. Fifth Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Miami Beach.

Jeanneret, P.R. (1989, October). Panel Discussion: Employment Law and Its Implications for Industrial/Organizational Psychology. Houston Area Industrial/Organizational Psychologists.

Jeanneret, P.R. (1988, August). Workshop Leader, Individual Assessment: Getting at Job- Related Skills and Abilities. Industrial and Organizational Psychology workshop presented at the 96th Convention of the American Psychological Association, Atlanta.

Jeanneret, P.R. (1988, April). Presenter, Individual Assessment for Personnel Selection - Marketing and Planning. Third Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Dallas.

Jeanneret, P.R. (1987, August). Workshop Leader, Psychological Assessment: Getting at Job-Related Skills and Abilities. Industrial and Organizational Psychology Workshop presented at the 95th Convention of the American Psychological Association, New York.

Jeanneret, P.R. (1987, April). Presenter, Future Directions in the Application of Job Analysis Data. Symposium: The Dimensionality of Work: Future Directions, Applications, and Instrumentation. Second Annual Conference of the Society for Industrial and Organizational Psychology, Inc., Atlanta.

Jeanneret, P.R. (1985, August). Chair and Discussant, Symposium: Job Component Validity: Job Requirements Estimates and Validity Generalization Comparisons. American Psychological Association, Los Angeles.

Jeanneret, P.R. (1984, August). Panel Discussion: Criteria and Measurement Issues Underlying Comparable Worth. American Psychological Association, Society for Industrial and Organizational Psychology, Toronto.

Jeanneret, P.R. (1972, September). Presenter, Investigations of a worker-oriented approach to position analysis. American Psychological Association, Division of Industrial and Organizational Psychology Symposium, Directions in Work Analysis.

| Law Firm | Client | Cause | Cause No. | Location | Date | Subject | Consultant | Comments |
|---|---|---|---|---|---|---|---|---|
| Baker & Botts | Conoco | Bendig et al. v. Conoco | H-00-1150 | Houston | 2001 | National orgin, age and race discrimination in RIF | PRJ | Deposition Report |
| Baker & Botts | NaviSite | Capece v. Ibenhard et al. | GN-001958 | Austin, TX | 2001 | Sexual Harassment | PRJ | Deposition Report |
| Vinson & Elkins | Pasadena Paper | Holden et al. v. Pasadena Paper Company | H-00-1363 | Houston, TX | 2001 | Race/Age Discrimination | PRJ | Deposition |
| City of Houston Legal Dept. | City of Houston Police Department | HPO Union et al. v. City of Houston Police Department | H-00-2184 | Houston | 2001 | Compensatory Time | PRJ | Deposition Report |
| Vinson & Elkins | Pasadena Paper | Humphrey v. Pasadena Paper Co. | H-01-0032 | Houston, TX | 2001 | Sex and Race Discrimination | PRJ | Affidavit |
| Ford & Harrison | City of Memphis | Johnson et al. v. City of Memphis | 00-2608 | Memphis, TN | 2001 | Unfair Promotional Process | PRJ | Testimony |
| Atlas & Hall | Zenith | Judt et al. v. Zenith | C-2408-96-G | Hidalgo City, TX | 2001 | Age Discrimination in RIF | PRJ | Deposition Report |
| Elizey & Brooks | Willamette | McCoy et al. v. Willamette Industries | CV-401-75 | Savannah, South Carolina | 2001 | Race Discrimination in Selection | PRJ | Deposition |
| Baker & Botts | Stevens Transport | Love v. Stevens Transport | CA-3-01-CV-1176-2 | Dallas | 2002 | Sexual Harassment, Negligent Hiring | PRJ | Deposition Report |
| Latham & Watkins | State of Delaware | USA v. State of Delaware | CA-01-020-RRM | Wilmington, Delaware | 2002 | Race Discrimination in Selection | PRJ | Deposition Testimony Report |
| Latham & Watkins | Mitsubishi | Greenway et al., vs. Mitsubishi | 01C 1317 | Chicago, IL | 2003 | Age Discrimination in RIF | PRJ | Deposition |
| Vinson & Elkins | Lufkin Industries | McClain et al., V. Lufkin Industries | CA 9.97CV063 | Lufkin, TX | 2003 | Race Discrimination; Stereotyping | PRJ | Report; Testimony Deposition |
| Paul Hastings | Boeing Co. | Beck v. Boeing | C00-0301P | Seattle, WA | 2004 | Gender Discrimination; Stereotyping | PRJ | Deposition |
| Baker & Botts | Marathon | Blankenship Hilliard v. Marathon | 2002-31565 | Harris County | 2004 | Race Discrimination Class Action | PRJ | Deposition Testimony |
| Paul Hastings | Kelsey Seybold | White et al. v. Kelsey Seybold | 2002-60427 | Harris County | 2004 | Race Discrimination; RIF | PRJ | Testimony |
| Boone Smith | Boeing Co. | Zuniga v. Boeing | 02CV807K(J) | Tulsa, OK | 2004 | Adverse impact in RIF | PRJ | Affidavit |
| FDIC | FDIC | Armstrong et al. v. Powell | CIV-03-0255C | Washington; Oklahoma | 2004 | Age Discrimination:RIF Class Action | PRJ | Affidavit Deposition |
| Miller, Hamilton, Snider & Odom | Stanley Collins | Collins v. UAB | CV04-CO00303W | Birmingham | 2005 | Race Discrimination - Promotion | PRJ | Deposition |
| Ford & Harrison | City of Memphis | Johnson et al. v. City of Memphis | 00-2608 | Memphis, TN | 2005 | Race Discrimination - Sgt. Promo Exam | PRJ | Deposition; Testimony |

41

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Davis Wright Tremaine and Paul Hastings | Boeing | Williams et al., v. Boeing | CA 98-761P | Seattle, WA | 2005 | Race Discrimination in performance appraisal, promotion, and compensation-Class Action | PRJ | Deposition |
| Paul Hastings | EMC | Remien & Fletcher et al v. EMC Corporation | 04-C-3727 | Chicago, IL | 2005 | Gender Discrimination; Stereotyping – Class Action | PRJ | Deposition |
| Alaniz & Schraeder | Nucor Steel | Brown v. Nucor Steel | 2:04-220005-12BG | Charleston, SC | 2005 | Race Discrimination in Promotions Class Action | PRJ | Consulting Deposition |
| Alaniz & Schraeder | Nucor Steel | Bennett et al. v. Nucor | 04 CV 00291SWW | Blytheville Ark | 2006 | Race Disc. Class Action | PRJ | Deposition |
| FDIC | FDIC | FDIC and National Treasury Employees Union | – | Washington, DC | 2006 | Discrimination in Corporate Success Awards | PRJ | Testimony |
| O'Melveny & Meyers | Fed Exp- grnd | Fed Ex Ground Empl. Practce Litigation | 3:05 MD-527-RM | Chicago IL | 2007 | Driver Contractor Status | PRJ | Deposition |
| FAA/ Paul Hastings | FAA | Powers, et al. Dept. of Transp. | Eeoc 210-2002-6091 x,etc | Chicago, Il | 2007 | Compensation Discrimination | PRJ | Deposition; Testimony |

42

# APPENDIX B

# LIST OF INFORMATION SOURCES

## Interviews

| | |
|---|---|
| June DeRousse | (06/14/07) |
| Mitchell Glassman | (06/14/07) |
| Pamela Mergen | (06/14/07) |
| Jim Seegers | (03/22/07; 6/14/07) |

## Documents

FDIC Annual Reports (1995 through 2006)

FDIC Strategic Plans (1997 – 2002; 1998 – 2003; 2001 – 2006)

FDIC Voluntary Buyout Documents

FDIC Early Retirement Program Documents

FDIC RIF Documents – RIF 2005 (March – April 2005)

FDIC Revisions to the Career Transition Assistance Plan dated 02/04/99

Barbara Aliotta, et. al. vs. Martin Gruenbug, Acting Chairman, FDIC, Amended Complaint, Class Action, 02/08/06

5CFR351 – Reduction in Force

FDIC RIF policy, Circular 2100.4, CH-3 dated 02/24/03

Defendant's Responses and Objections to Plaintiffs' Discovery Requests, Set One

Defendant's Responses and Objections to Plaintiffs' Discovery Requests, Set Two

FDIC RIF policy, Circular 2100.4 dated 12/23/96

Bovenzi/Patelunas memo dated 11/20/96 re Division of Resolutions and Receiverships

FDIC Revisions to Career Transition Assistance Plan, Circular 2800.5 date 02/04/99

Memorandum to Board of Directors from Dennis Geer: 09/14/95; 10/24/96; 11/10/97; 11/12/97

Motion for Class Certification; Memorandum of Points and Declarations in Support Thereof, 03/26/06

Firehouse Planning Analysis (DRR, 09/07/99)

Defendant's Response and Brief in Opposition to Plaintiffs' Motion for Class Certification with Exhibits (05/25/06)

Amendment 2 to HRB's Operating Policy for FDIC's Reduction in Force in 2005 – Filling Vacancies (06/29/05)

Order granting the Plaintiffs' Motion for Class Certification (07/25/06)

Global Message from John Bovenzi dated 08/06/04.

Global Message from John Bovenzi dated 10/26/04.

Global Message from Director Glassman dated 08/19/04.

Global Message from Director Glassman dated 10/28/04.

Global Message from John Bovenzi dated 10/26/04.

Informational Notice from Director Glassman dated 04/05/05.

Declaration of Joy R. Crosser dated 05/23/06.

Deposition of James W. Seegers dated 04/30/07.

Deposition of Gail Patelunas dated 05/01/07.

Deposition of Pamela K. Mergen dated 05/23/07.

Deposition of Thomas E. Peddicord, III dated 05/25/07.

DRR Buyout Message dated 11/02/04.

2004/2005 FDIC Buyout Handbook dated 03/11/05.

Moffett memos of 2/9/05 and 3/21/05 re NTEU review of new position competitive levels

DRR Reorganization Plan submitted by M. Glassman to J. Bovenzi dated 10/25/04 and Approval dated 11/16/04

Memorandum of Understanding with NTEU dated 11/4/04

FDIC Memoranda from Sylvia Dry dated 6/20/07, 6/26/07, 7/24/07, 8/7/07 and 8/9/07