1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF COLUMBIA

2    _____

3    BARBARA ALLIOTA, et al.,      x

                                   :

4                   Plaintiffs,    :

          vs.                      :   Civil No.

5                                  :   05-2325 (RMU)

     SHEILA C. BAIR, Chairman,     :

6    FEDERAL DEPOSIT INSURANCE      :

     CORPORATION,                  :

7                   Defendant.     x

     _____

8

9                           Thursday, August 9, 2007

10                          Arlington, Virginia

11   DEPOSITION OF:

12                    JOY CROSSER,

13   a witness, was called for examination by counsel

14   for the plaintiffs, pursuant to Notice and agreement

15   of the parties as to time and date, beginning at

16   approximately 10:19 o'clock, a.m., taken at the

17   Federal Deposit Insurance Corporation, 3501 Fairfax

18   Drive, 7th Floor Conference Room, Arlington,

19   Virginia 22226, before Ronnie C. Palmer, a court

20   reporter and Notary Public in and for the

21   Commonwealth of Virginia, when were present on behalf

22   of the respective parties:

```
1    APPEARANCE OF COUNSEL

2         For the Plaintiffs:

3              ROSE & ROSE, ESQUIRES

               BY:  DAVID ROSE, ESQUIRE

4                   DOTIE JOSEPH, ESQUIRE

               1320 19th Street, N.W., Suite 601

5              Washington, D.C.  20036

               202-331-8555

6

          For the Defendant:

7

               FEDERAL DEPOSIT INSURANCE CORPORATION

8              BY:  WILLIAM S. JONES, ESQUIRE

                    KATHERINE NORCROSS, ESQUIRE

9              3501 Fairfax Drive, Room E-6006

               Arlington, Virginia  22226

10             703-562-2362

11                       -  0  -

12                     I-N-D-E-X

13   Witness:                            Page:

14   Joy Crosser

15             Examination by Mr. Rose         3

16             Examination by Mr. Jones        35

17                       -  0  -

18   Exhibits:      (Retained by counsel)      Page:

19   Plaintiffs' Exhibit No. 1

20   to the Crosser deposition                 31

21                       -  0  -

22
```

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1    WHEREUPON,

2                        JOY CROSSER,

3    a witness, was called for examination by counsel

4    for the plaintiffs, and after having been duly sworn

5    by the Notary Public, was examined and testified as

6    follows:

7                   EXAMINATION BY COUNSEL FOR PLAINTIFFS

8                   BY MR. ROSE:

9         Q    Ms. Crosser, would you please state your

10   full name for record?

11        A    Joy Robinette Crosser.

12        Q    And where do you reside?

13        A    In Arlington, Virginia.

14        Q    And this is an age discrimination case.

15   I generally ask people for their dates of birth.

16   Would you give us your date of birth?

17        A    September 15th, 1955.

18        Q    Thank you.  Roughly where did you grow

19   up?

20        A    In Bethesda, Maryland.

21        Q    Really?  Did you go to BCC High School?

22        A    No.  I went to Walter Johnson.

4

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      And that's in Montgomery County?

2      A      Correct.

3      Q      And did you -- what happened?  Did you go

4   to college?

5      A      Yes.  I went to American University.

6      Q      Did you get a degree?

7      A      Yes, I did.

8      Q      What year was that?

9      A      That was in 1978.

10     Q      And would you tell us what your first

11   full-time employment after that was?

12     A      I was employed as a clerk typist at the

13   State Department in the Federal Government.

14     Q      Were you employed working downtown?

15     A      Yes.

16     Q      All right.  And have you since that time

17   have you had any graduate education?

18     A      I had just a course or two at George

19   Washington University.

20     Q      So, why don't you track your career,

21   please, first at the State Department and if

22   obviously at some point you moved.

5

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1          A          Yes.  I work at the State Department as a

2     clerk typist.  I became a writer editor in the

3     document section within about 18 months.  I left the

4     State Department in October of 1980 to move to

5     Charlottesville, Virginia.

6                    I was a research assistant to the faculty

7     of the Federal Executive Institute for three years in

8     Charlottesville, Virginia which was part of the

9     Office of Personnel Management.

10         Q          I am sorry.  What grade were you?

11         A          I was a 5 in Charlottesville, Virginia.

12         Q          Go ahead.

13         A          Then I returned to the Washington D.C.

14    area in September of 1980, and I became employed by

15    the Office of Personnel Management in their

16    Washington area examining office as a staffing

17    specialist in December of 1983.

18                   And I was with Office of Personnel

19    Management for -- until May as a staffing specialist

20    examining for outside hires.  Started as a --

21    continued as a 5 one pay period, and then I became a

22    7.

6

**EXHIBIT 29**
**ALIOTTA v. BAIR**

1          And I was promoted up to the 11 and left**No. 05-2325-RMU**

2    the Office of Personnel Management for Voice of

3    America's Radio Marty Program in May of 1986.

4          In May of 1986, I basically became a

5    generalist in the personnel classification.  I did

6    labour relations in addition to staffing.  Staffing

7    was my primary responsibility.

8          And I continued with Radio Marty until

9    October of 1991.  That's when I started work with the

10   FDIC.  I believe I became a 12 while at Radio Marty

11   in -- I think that was '87 I became a 12 and

12   transferred over to FDIC.  Focused exclusively on

13   outside recruitment in October of '90 I believe it

14   was.  And worked on recruitment for the RTC,

15   Resolution Trust Corporation, primarily in staffing.

16   And then moved to the policy section in May of 1993.

17   Became -- Focused on staffing policy.

18       Q      Okay.

19       A      And I've been doing staffing policy since

20   then.  I was promoted to the 13, and I'd have to

21   check my records to see when I got the 13.  But I got

22   the 14 in I think it was 2000.

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q    That was as a staffing specialist?

2    A    I was a staffing specialist in OPM.   And

3    I became a generalist here in Radio Marty.  I became

4    a staffing specialist here in FDIC for those periods

5    when I was working in operations, but my

6    classification was as generalist when I went into

7    policy.  But my focus was staffing policy.

8    Q    Okay.  While you were in engaged in --

9    doing recruiting for FDIC, what sorts of positions

10   were -- was FDIC seeking to fill?  What kinds of jobs

11   were available?

12   A    When I was in Operations?

13   Q    Yes.

14   A    It was a pretty wide range of positions

15   mainly focused in RTC in managing assets, capital

16   markets issues.  We did a lot of people who could

17   evaluate and market the assets they were picking up

18   from banks.

19        In FDIC, it was comparable.  I was

20   staffing nationwide the positions that were involved

21   primarily with the liquidation of the bank's assets.

22   But there were a lot of support positions, as well,

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    focusing on IT positions, accounting positions,

2    administrative generalist.

3            But the focus was primarily on the

4    liquidation professionals.  Yes.

5       Q    And that part of the -- within FDIC, the

6    liquidation specialists, were they at the time within

7    the what's now the division of DRR?

8       A    Right.  Right.

9       Q    And has the name of the division been the

10   same?

11      A    No.  It was the Division of Liquidation

12   back then.  And it's been changed to the Division of

13   Resolutions and Receivership sometime around 1997, I

14   believe, but I'd have to check.

15      Q    Slightly less formidable name,

16   liquidation.

17      A    Right.

18      Q    So, what kind of skills does somebody who

19   seeks to market the assets of a bank that's had

20   problems?  What sorts of skills do the professionals

21   in that line of work need to have?

22      A    Well, there's a wide range of

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    responsibility.  A lot of different duties were

2    involved.  Managing the assets to make sure they

3    didn't degrade.  They were assessing the value of

4    them.  Finding buyers.  A number of different things.

5         Q        Okay.  And when you came to the FDIC, do

6    you have any sense as to what the size of it was?

7         A        It was -- At the height in 1992, it was

8    23,000 including all the temporary employees.  The

9    RTC and the FDIC together.

10        Q        It had a change for the smaller?

11        A        That's right.

12        Q        Are you aware of any decisions by the

13   board of FDIC to conduct a RIF in the years since

14   1997?

15        A        Yes.

16        Q        Do you recall what authorization was

17   given and approximately when?

18        A        There was a RIF in 2005.  The most recent

19   one.  And there was a RIF in 2003.  There were a lot

20   of office closures throughout the mid, well, early to

21   late '90s where whole regional offices that were

22   primarily devoted to liquidation were closed.

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

10

```
 1              And those were technically RIFs although

 2   because they -- I mean they just affected one

 3   commuting area.  They didn't spread beyond that

 4   office.  I know that Hartford was closed and Irvine

 5   was closed.  We had an office in Denver that was

 6   closed quite a while ago.

 7              And these actions would have been

 8   approved by the board.

 9       Q      And both the 2003 and 2005 RIF was

10   approved by the board, as far as you know?

11       A      As far as I know.

12       Q      Have you ever seen any minutes?  How do

13   you know it I guess is the better way to ask the

14   question?

15       A      It would have been reported to me by my

16   superiors in HR.

17       Q      Who were your superiors in HR?

18       A      Let's see.

19       Q      Let's focus on 2003.

20       A      In 2003, I was working for Randy

21   Mendelson, I believe.  We have re-configured a fair

22   number of times.  But in my policy capacity, I would
```

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

11

1   have heard from the operations chief who at that time

2   I believe was Shirley Purnell.  She was responsible

3   for overseeing operations in Washington, and they had

4   a liaison role with the regional HR offices, as well.

5         Q       And how about in 2005?

6         A       It would have been the same.  I was

7   reporting to Eugene Bell at that time, but my

8   involvement with the RIF would have been supporting

9   operations in an advisory capacity.  Again, it would

10  have been Shirley Purnell at that point.

11        Q       Now, is Ms. Purnell still with the

12  agency?

13        A       No.  She retired the beginning of January

14  of this year.

15        Q       And is she from this part of the world?

16        A       Uh-huh.  She lives in Maryland, but I

17  don't know her address.

18        Q       In the 2005 RIF, were there both

19  incentives to leave early and then terminations?

20  What was the 2003?

21               MR. JONES:  2005?

22               MR. ROSE:  No.  I'm asking about 2003

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    first.

2              THE WITNESS:  In 2003, we offered

3    incentives to leave before the RIF.  It's always

4    essential to get the staffing table settled down in

5    order to determine the RIF rights.  So, there was no

6    separation incentive by our buyout program during

7    2003.

8              We offered a buyout in -- to the general

9    FDIC population in April of 2002 which closed in

10   September of 2002.

11             There were some people who were allowed

12   to elect the buyout, but they were retained by

13   management because they had essential functions that

14   needed to continue.  But they were committed to

15   separating with the buyout.

16        Q    They agreed to leave?

17        A    Yes.

18        Q    And in the 2002?

19        A    April of 2002 it was announced, and it

20   closed September 30th of 2002.

21        Q    Do you have any idea how many people left

22   the agency in connection with that buyout?

EXHIBIT 29     13
ALIOTTA v. BAIR
No. 05-2325-RMU

```
1        A       It was about 700.

2        Q       And were they spread --

3        A       They were nationwide.

4        Q       They were nationwide?

5        A       Yes.

6        Q       They were also from each of the divisions

7   and offices?

8        A       Most, yes.

9        Q       And let's talk about the 2003 reduction

10  in force.  Was there a buyout there or the buyout has

11  already occurred in 2002?

12       A       The buyout has occurred in 2002.  Yes.

13       Q       So, how many people lost their positions

14  in 2003?

15       A       I'm afraid I don't know.

16       Q       Was it a large number?

17       A       No.  It was a fairly small number.

18       Q       What role did you have in or let me ask

19  you a background question so we can talk about this

20  in relative numbers.

21               I have a prior exhibit that's call Mergen

22  Number 1 that has two pages, but I would like you to
```

EXHIBIT 29     14
ALIOTTA v. BAIR
No. 05-2325-RMU

1  look at both pages, but the first couple of questions

2  have to do with the relative size of the divisions or

3  offices.  Okay?  Mr. Jones I think has got a copy or

4  at least has seen one.

5          That's the first quarter of '04, I

6  believe.  Is that correct?

7      A     It looks like it's describing it that

8  way.  Yes.

9      Q     Do the relative sizes of the divisions

10  square with your information?  That is do they look

11  right to you?

12      A     I'm guessing.

13      Q     Nobody carries that number around.  Is

14  there anything that looks wrong with the numbers?

15      A     I couldn't say off the top of my head.  I

16  guess it looks okay.

17      Q     I know the Division of Supervision and

18  Consumer Protection is by far the biggest.

19      A     Yes.  Right.

20      Q     And the page two of this exhibit which is

21  ALDRR1228, I direct your attention to the square that

22  says Q1, 2004 additions.  I do read that correctly as

**EXHIBIT 29**
**ALIOTTA v. BAIR**
Or **No. 05-2325-RMU**

15

1    saying that there were 35 hires in that quarter?

2    in that year?  I think it's quarter.

3         A      That's what it seems to be saying.

4         Q      Now, I think there's a reference to

5    students there.  Conversion of students to regular

6    positions?

7         A      Uh-huh.

8         Q      Were those students students in the

9    Corporate University or are they some other kind of

10   students?

11        A      Those would have been -- It looks like

12   they were DSC step hires which are student career

13   experience program appointees who had conversion

14   authority.

15        Q      So, tell me what they are.  Tell me what

16   that means in language I can understand or try to

17   understand.

18        A      Right.  The Office of Personnel

19   Management has -- they have had coops and student

20   hires for decades in government.  A few years ago,

21   about 15 years ago now, they revised and consolidated

22   the student hiring authorities to two different

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    types.

2            One is called student temporary

3    employment program and one is called student career

4    experience program.  If an employee is under the step

5    student career experience program, they have a

6    working agreement with the agency and their school.

7            They have to be in a degree program, and

8    they need to meet certain conditions like 640 hours

9    of work prior to receiving their degree.  And if they

10   perform satisfactorily, they meet that number of

11   hours, they can be converted to a permanent

12   appointment following graduation.

13       Q    Okay.  So, can you tell me then what the

14   so-called Corporate University is and how that works?

15       A    Well, Corporate University is a training

16   organization.  It basically used to be the Office of

17   Training and Consulting Services.  But it just was

18   renamed the Corporate University to give it a new

19   outlook as they were revising the program into

20   channels of leadership development and the focus on

21   these different areas of training employees.

22            Right now I'm probably not the best one

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    to --

2        Q       Give us what you can, and I may ask you

3    who knows more about it.

4        A       They have deans of Corporate University

5    that focus on these various areas of training.  But

6    Corporate University does not have a particular role

7    in identifying student hires or anything like that

8    for the FDIC.

9        Q       Well, there is some sort of a program

10   that I have heard of.  I will ask you about it in

11   which people get hired.  They come in as a 7 or 9.

12   Then there is a line of progression.  If they get

13   their so-called commission, they get after four years

14   is my memory they get a commission and presumably can

15   do audits and other kinds of things.  Is that

16   correct?

17       A       It sounds like you're describing the

18   corporate employee program which is -- it's the new

19   process that started in 2005 for hiring examiners

20   basically into the FDIC.

21               And they are selected by the Division of

22   Supervision and Compliance.  And they come in right

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1    now primarily at the 7 level.  They are assigned for

2    their first year in Corporate University because they

3    rotate through training in various functions of

4    Division and Supervision and Compliance both of risk

5    management and compliance which is more of a focus on

6    community reinvestment, consumer protection and civil

7    rights.  Those two areas.

8              Plus they do a 13-week training in DRR in

9    Dallas because the focus of the corporate employee

10   program was to create well-rounded employees who

11   would be able to address issues that came up in a

12   more efficient manner that might involve resolutions

13   of problem banks as well as the examination of

14   ongoing risks or compliance examinations.

15             So, they decided that since DSC was not

16   structured to manage this first-year program or where

17   the people were rotating through the various areas

18   they would have a program manager for their first

19   year only, NCU.

20             Once they complete that first year, they

21   are assigned out of CU and into the DSC field office

22   where they will continue to work.

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Q       So, how many people were hired in '04 in

2    that program?  Can you tell?

3      A       I think in '04 was before the program

4    started.  They were still hiring just straight

5    examiners.  A lot of them they hired as students.

6      Q       How about in '05?

7      A       In '05, I'd have to look at the numbers.

8    They just started the program.  They were feeling

9    their way, and I think it took them a while to figure

10   out how they wanted to do the recruitment.

11             I know that their current target is about

12   a hundred and twenty.  But in '05, I don't know how

13   many they picked up.  It was below that I'm sure.

14     Q       Do you think it was in the 50 to a

15   hundred range?

16     A       It could have been, but I don't know how

17   high it was.

18     Q       Do you recall that there was in September

19   of '05 a request for employees to participate in

20   recruiting programs?

21     A       In September of '05?  I believe so.

22     Q       I direct your attention to something

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

20

1    called Powell Deposition 1.  That is my copy of it.

2    I don't think I have the originals.  I think the

3    court reporter still has it.

4              MR. ROSE:  I will show it to Mr. Jones

5    first.

6              BY MR. ROSE:

7        Q    If you look at the box in the left-hand

8    bottom quadrant, you will see it says a new

9    initiative or initiative.  I am not sure how it

10   describes it.  I will come over and look over your

11   shoulder.  I can point it out.

12             You see the left-hand quadrant?  A new

13   corporate employee program to encourage and reward

14   cross-divisional mobility in pursuit of experience

15   and multiple disciplines.

16       A    Yes.

17       Q    And then participants will over time

18   become the base of a smaller and more flexible

19   permanent workforce.

20       A    Yes.

21       Q    Does that describe the program you were

22   just discussing?

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      A      Right.  That's where they are describing

2   the corporate employee program.

3      Q      And do you think in '06 they may have

4   employed on the order of a hundred and twenty people?

5      A      It could have been.

6      Q      Something in that ballpark?

7      A      Right.

8      Q      Do you know if there was a similar goal

9   -- is a similar goal for '07?

10      A      Yes.

11      Q      Approximately the same?

12      A      Approximately the same.

13      Q      And are most of these people recent

14   college graduates?

15      A      No.  Not all of them.

16      Q      I didn't ask for all.

17      A      I know that in -- Let's see.  In 2006,

18   part of the corporate employee program was reaching

19   out to what we call mid career hires.  We were

20   looking for experienced state examiners and other

21   federal examiners hiring at the 11 level.  These

22   would be people who --

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

22

1    Q    Had a fair amount of experience?

2    A    Yes.

3    Q    So, they were both kinds of people.

4    People coming more or less right out of school?

5    A    Right.

6    Q    And people in what you described as mid

7    career?

8    A    But the intake at the 7 level wasn't just

9    for people coming right out of school.  There were

10   extensive recruitment among professional

11   organizations and diversity outreach.  Basically

12   looking for -- I mean there have been a lot of career

13   changers, as well.

14   Q    Sure.  Thank you.  So, the program really

15   was established in '04 but got under way primarily in

16   '05 and '06?  Is that a fair statement or primarily

17   in '05?

18   A    It started in '05.  Yes.  I think it was

19   just a concept in '04.

20   Q    In determining or let's talk about the

21   '05.  I'll call it the '04-'05 downsizing because we

22   referred mostly to '05, but much of the planning and

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

23

1   so forth and offers were made in '04.  Is that

2   consistent?  The buyout.

3       A       The buyout was first offered in November

4   of '04.  Yes.

5       Q       Exactly.  Right.

6       A       And the people had to commit by the

7   beginning of May of '05.  Right.

8       Q       And most of those people that accepted

9   the buyout most of them left in May but some of them

10  were allowed to continue with their special needs?

11      A       The ones who were not in organizations

12  that were subject to RIF.  If there was a need.

13  Especially in the Division of Administration, for

14  example.  I mean we needed a lot of those people to

15  continue in the functions that were supporting these

16  HR initiatives.  Yes.

17      Q       So, how wide was the buyout program offer

18  made to people in all the divisions and offices or

19  was it limited to a few?

20      A       It was to most.  Most of them.  There

21  were a few carve outs.  I don't believe that -- I'd

22  have to double-check my documents again, but I don't

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1   believe the executive office participated.  I don't

2   believe Corporate University participated, but it was

3   most of the organizations.

4        Q      Okay.  Did you play any role in deciding

5   what the goal for DRR -- I mean the goal for

6   reduction in DRR?

7        A      No.

8        Q      Who participated or who made those

9   decisions?

10       A      It would have been the DRR management

11  together with the senior corporate managers, but it

12  would have been primarily --

13       Q      DRR, and Mr. Bovenzi, and Mr. Paul?

14       A      Yes.

15       Q      Do you have a copy of your declaration?

16       A      Yes.

17       Q      I'm sorry.  I don't have the signature

18  page here.  Do you have it?

19       A      Uh-huh.

20       Q      I'll borrow it and give it right back.  I

21  am not sure what I'm missing and what I'm not

22  missing.

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1              So, your signature under oath is on the

2    third page?

3        A      Yes.

4        Q      The language of the declaration is on

5    pages one and two?  Is that correct?

6        A      Yes.

7        Q      Directing your attention to seven and

8    eight at the top of page two, if you will.  I do

9    understand that from what you've said and the

10   language in seven and eight that the notification was

11   the same to all the units that participated?

12       A      Uh-huh.  Yes, it was.

13       Q      And then the example is given of those

14   under DRR.  But it was the same kind of notification

15   to everybody else?

16       A      Yes.

17       Q      Thank you.  Do you have any knowledge as

18   to when you learned the buyout of the target for

19   reduction of DRR was a reduction of more than 200

20   people?

21              MR. JONES:  I object to the form.

22              BY MR. ROSE:

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

26

1      Q      Do you understand the question?  Would

2  you like me to rephrase it?

3      A      Maybe, yes.  That would be helpful.

4      Q      Let me try again.  Do your best.  If

5  we're missing each other, I'll try again.

6             To your knowledge now, was the goal for

7  reduction of DRR for more than half of its

8  approximately 500 employees?

9      A      I actually was never apprised of what the

10  reduction goals were.

11      Q      Thanks.  That's an answer to the

12  question.  That's fine.  And the buyout facts and so

13  forth were essentially the same for not only DRR but

14  the other divisions that are mentioned in paragraph

15  nine?

16      A      Yes.

17      Q      And if I understand it, the buyout for

18  people who were less than 50 was simply a buyout for

19  a payment in order to leave, to resign?

20      A      That's incorrect.

21      Q      Okay.  Tell me.

22      A      There was no difference based on age in

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   the buyout program as far as what was offered.  The

2   buyout program, the voluntary separation incentive

3   program was equal to 50 percent of total pay

4   regardless of age or position.

5        Q      But it's true that people could not who

6   were less than 50 couldn't elect to an early

7   retirement?

8        A      Yes they could, if they met the

9   conditions for early retirement.  Early retirement

10  which is separate from the buyout program was offered

11  at this time, as well.  The voluntary early

12  retirement program was open to people who were buyout

13  eligible, as well.

14              And the early retirement program requires

15  that you have 25 years of federal service regardless

16  of age in order to separate.  So, somebody who had

17  started very early as a student could have retired.

18       Q      Regardless of age?

19       A      Yes.

20       Q      Do you know anybody that was -- that fit

21  into that category?

22       A      I couldn't off the top of my head, but I

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

```
 1    know there were people who had right tired under age
      50.

 2    50.

 3         Q       Because they had 25 years?

 4         A       Yes.  Yes.

 5         Q       And then needed 25 years of total

 6    service?

 7         A       Twenty-five years of service.

 8         Q       It was my impression that a number of the

 9    people who took the early retirement had less than

10    that amount of service and they received a smaller

11    retirement package?

12         A       Under VERA, the one condition is 25 years

13    of service at any age.  The other condition is if you

14    have 20 years of service and you are over age 50.

15    But then a lot of other retirement provisions that

16    are not related to VERA at all kick in.

17               They are standard voluntary that don't

18    require the special early retirement such as in

19    the -- if you are in age 60.  Again, you need to

20    contact a retirement specialist to get all the facts.

21               But I believe if you are 60, I believe

22    you need --
```

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1        Q        Only ten years?

2        A        Yes.  And if you're 62, you only need

3    five years.  Under FURS if you are the minimum

4    retirement age which varies based on the year you

5    were born, I think up to 56 or something like that

6    you only need ten years of service to get the

7    minimum, this reduced annuity.

8        Q        What does that stand for?

9        A        Voluntary early retirement authority.

10    And that is the special optional retirement that we

11    have to get a specific authority from U.S. OPM to

12    offer.

13            The other ones that I mentioned, the

14    minimum retirement age plus ten years, or the 60 with

15    the ten, or the 62 with five, those are standard at

16    the discretion of an employee at any time.

17            But the VERA, the voluntary early

18    retirement authority although called special

19    optional, is governed tightly by the U.S. OPM.

20        Q        Okay.  Let me ask you a couple of

21    questions about the people who accepted the voluntary

22    early retirement.

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          It used to be and may still be that

2    somebody was on the old Civil Service program.  If

3    they worked for the Federal Government, they had to

4    deduct -- I am sorry -- there were limits on

5    reemployment I believe is the term.  Are you familiar

6    with that?

7          A     Uh-huh.

8          Q     Would you tell us what those are or were?

9    Just roughly.

10         A     If you are a federal annuitant and you

11   come back to federal employment, your salary is

12   offset by all the annuity that you get.  So, any

13   annuity dollars basically are a wash unless the

14   agency has gotten special authority to waive that.

15         Q     Under what kinds of circumstances would

16   the agency have authority to waive that?

17         A     If OPM had authorized it for a special

18   urgent need.

19         Q     And is VERA a statute?

20         A     Yes.

21         Q     Any idea when it was adopted?

22         A     VERA, no.  I can't say.  It's been around

EXHIBIT 29    31
ALIOTTA v. BAIR
No. 05-2325-RMU

1  for a long time.

2      Q      I'll have to look.

3      A      I know that they have recently modified

4  it about five years ago to allow OPM to authorize

5  VERAs to last for more than one fiscal year.  But

6  that's the only change that happened recently.

7      Q      That's fine.  We're going on an hour.  I

8  would like to take a break at this time.

9              (Off the record.)

10             MR. ROSE:  I am going to ask you to mark

11  this notice in NTEU.  And I didn't mark it the other

12  day.

13                  (Crosser Exhibit No. 1 was

14                    marked for identification.)

15             BY MR. ROSE:

16      Q      Would you look at Crosser Number 1.  It's

17  the letterhead of the NTEU.  Without reading the

18  whole thing, I could ask you first if you are aware

19  of the grievance that the NTEU concerning the DRR

20  downsizing?

21      A      No.

22      Q      I wont ask you any questions about it.

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Do you have any idea of any people in HR who might

2    know where this came?

3         A       There would be people in --

4         Q       Labour relations?

5         A       Labour and employee relations section

6    headed by Randy Mendelson.

7         Q       Okay.  All right.  That's fine.  I have a

8    FDIC directory from 2005, and that directory shows

9    Julia Goodall as the associate director of the human

10   resources branch, acting.  Is Ms. Goodall still

11   employed by the agency?

12        A       Yes.  She is the regional director in New

13   York for DOA.

14        Q       Division of Administration.  Is there a

15   director of the branch of the human resources branch

16   of the Division of Administration now?

17        A       Currently yes.  It's Christopher Aiello.

18        Q       A-I?

19        A       A-I-E-L-L-O.

20        Q       Is he a long-term FDIC person, from

21   outside?

22        A       He's not from outside.  He's been with

EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU

1    FDIC for I'm sure it's been at least ten years.

2         Q      As part of your duties with FDIC, have

3    you had occasion to testify in other cases?

4         A      Yes.

5         Q      And have you testified about any other

6    cases involving any downsizing?

7         A      I have testified on issues related to

8    voluntary early retirement before and also on facts

9    about career transition assistance program which is a

10   program that's involved with downsizing.

11        Q      And the first one that you, not the

12   career assistance.

13        A      Voluntary retirement?

14        Q      Yes.  Do you recall what case that was?

15        A      No.  It's been a while.

16        Q      Several years?

17        A      Yes.

18        Q      Directing your attention back to your

19   affidavit, declaration, excuse me, on page two, the

20   total number of employees electing to buyout was five

21   sixty-five?  Do you recall whether that was above or

22   below expectations or pretty close to expectations?

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  A  They never defined a precise expectation

2 but they seemed to be happy with the participation

3 rate they got.

4  Q  They being management?

5  A  Right.

6  Q  Did you have any interaction with Mr.

7 Bovenzi or Mr. or let me ask you with respect to this

8 2005.

9  A  I supplied reports weekly to Jim Collins

10 who worked for Mr. Bovenzi on activity.

11  Q  And Mr. Collins is what, a part of Mr.

12 Bovenzi's staff?

13  A  He's an assistant to Mr. Bovenzi.  Yes.

14  Q  Was there anything about the 2005 RIF

15 that was notably different from earlier RIFs from

16 your point of view?

17  A  The one thing I would notice it included

18 more higher graded employees than the earlier RIF.

19  Q  Okay.  Did you understand that there were

20 a number of new job descriptions provided at least in

21 DRR in the people and the people had a chance to bid

22 on the new positions rather than their existing

1    positions?

2        A       I wasn't directly involved with that.

3                MR. ROSE:  I don't have anything else.

4                MR. JONES:  I have just got one or two

5    clarifying questions.

6                EXAMINATION BY MR. JONES:

7        Q       Let me direct your attention to Crosser

8    Exhibit 1.  In the first paragraph under the

9    background section, it talks about a global message

10   from DRR Director Glassman, and it talks about

11   reduction in staffing left.  It's actually got

12   numbers there.

13               Do you know if Mr. Powell had anything to

14   do with determining the amount of DRR downsizing?

15       A       No, I don't.

16       Q       Do you know whether Mr. Bovenzi had

17   anything to do with determining the extent of the DRR

18   downsizing?

19       A       No.  I don't know.

20               MR. JONES:  That's really all I've got.

21               MR. ROSE:  Okay.  Thank you very much.

22               MR. JONES:  We will read and sign.

**EXHIBIT 29**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          (Whereupon, at approximately 11:30

2          o'clock, a.m., the above deposition was

3          ended and signature was Not waived.)

4     *          *          *          *          *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**EXHIBIT 29**  37
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1              E-R-R-A-T-A  S-H-E-E-T

2   IN RE:    BARBARA ALLIOTA, et al. vs. SHEILA C.

3             BAIR, Chairman, FEDERAL DEPOSIT

4             INSURANCE CORPORATION

5   DEPOSITION OF:  JOY CROSSER

6   DATE OF DEPOSITION:  THURSDAY, AUGUST 9, 2007

7   At the time the above-named deponent read and

8   signed this deposition, the deponent desired to

9   make the following changes:

10  PAGE: LINE: AS TRANSCRIBED:   CHANGE TO:   REASON:

11

12

13

14

15

16

17

18

19

20

21  DATED:            _____

22                         SIGNATURE OF DEPONENT
```

**EXHIBIT 29
ALIOTTA v. BAIR
No. 05-2325-RMU**

```
1                    CERTIFICATE OF THE DEPONENT

2         I have read the foregoing pages 3 through 36

3    inclusive, and find the answers to the questions

4    therein contained to be true and correct, with the

5    exception of changes, if any, as per the errata

6    sheet following herewith.

7              _____

8                         JOY CROSSER

9              DATED:_____

10

11    - - - - - - - - - - - - - - - - - - - - - - - - -

12              CERTIFICATE OF THE NOTARY PUBLIC

13         SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

14    DAY OF _____, 2007

15
                   _____

16
                     (PRINT NAME OF NOTARY)

17
                   NOTARY PUBLIC IN AND FOR
18                        THE STATE OF
19                 _____

20

21    MY COMMISSION EXPIRES:

22    _____
```

EXHIBIT 29    39
ALIOTTA v. BAIR
No. 05-2325-RMU

```
1              CERTIFICATE OF NOTARY PUBLIC

2          I, Ronnie C. Palmer, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that the foregoing transcript is a true and

5    correct record of the proceedings; that said

6    proceedings were taken by me stenographically and

7    thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to

10   this case and have no interest, financial or

11   otherwise, in its outcome.

12

13   My commission expires:

14   February 29, 2008

15

16

17   _____

18   NOTARY PUBLIC IN AND FOR THE

19   COMMONWEALTH OF VIRGINIA

20

21

22
```