1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF COLUMBIA

2     _____

3     BARBARA ALLIOTA, et al.,       x

                                     :

4                      Plaintiffs,   :

            vs.                      :   Civil No.

5                                    :   05-2325 (RMU)

      SHEILA C. BAIR, Chairman,      :

6     FEDERAL DEPOSIT INSURANCE      :

      CORPORATION,                   :

7                                    :

                       Defendant.    x

8     _____

9                               Thursday, July 26, 2007

10                              Washington, D.C.

11

12    DEPOSITION OF:

13              MITCHELL L. GLASSMAN,

14    the witness, was called for examination by counsel

15    for the plaintiffs, pursuant to Notice and agreement

16    of the parties as to time and date, beginning at

17    approximately 10:00 o'clock, a.m., taken at the

18    Federal Deposit Insurance Corporation, 1776 F Street,

19    N.W., Conference Room F, Washington, D.C., before

20    Ronnie C. Palmer, a court reporter and Notary Public

21    in and for the District of Columbia, when were

22    present on behalf of the respective parties:

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    APPEARANCE OF COUNSEL:

2        For the Plaintiffs:

3            ROSE & ROSE, ESQUIRES

4            BY:  DAVID ROSE, ESQUIRE

5            1320 19th Street, N.W., Suite 601

6            Washington, D.C.  20036

7            202-331-8555

8        For the Defendant:

9            FEDERAL DEPOSIT INSURANCE CORPORATION

10           BY:  WILLIAM S. JONES, ESQUIRE

11               KATHERINE NORCROSS, ESQUIRE

12           3501 Fairfax Drive, Room E-6006

13           Arlington, Virginia  22226

14           703-562-2362

15                    -  0  -

16                  I-N-D-E-X

17   Witness:                              Page:

18   Mitchell Glassman

19           Examination by Mr. Rose           3

20           Examination by Mr. Jones          59

21           Further examination by Mr. Rose   59

22                    -  0  -

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     WHEREUPON,

2                         MITCHELL L. GLASSMAN,

3     a witness, was called for examination by counsel

4     for the plaintiffs, and after having been duly sworn

5     by the Notary Public, was examined and testified as

6     follows:

7                         EXAMINATION BY COUNSEL FOR PLAINTIFFS

8                         BY MR. ROSE:

9          Q     Mr. Glassman, would you kindly state your

10    full name for the record.

11         A     It's Mitchell L. Glassman.

12         Q     And you're currently employed by the

13    FDIC?

14         A     Yes.

15         Q     And your position?

16         A     I'm director of our Division of

17    Resolutions and Receiverships.

18         Q     How long have you been director of DRR?

19         A     Since 2000.  The year 2000.

20         Q     And this is an age case, as you know.

21    So, let me have your date of birth.

22         A     August 15, 1953.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Q          Would you tell me where you grew up and

2     went to high school.

3          A          I was born in Dallas, Texas but raised in

4     Kansas City, Missouri.  And I went to Southwest High

5     School in Kansas City.

6          Q          And what year did you graduate?

7          A          1971.

8          Q          Did you go to college?

9          A          Yes.

10          Q          What college?

11          A          University of Missouri.

12          Q          And where is that located?

13          A          This was the University of Missouri in

14     Kansas City.  I'm sorry.

15          Q          And did you get a degree?

16          A          Yes.  I got a BBA.

17          Q          In what year?

18          A          That would be 1975.

19          Q          What's the first B stand for?

20          A          Bachelor of business administration.

21          Q          Have you had further formal training?

22          A          Yes.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q    And tell me where and when.

2    A    I obtained a graduate degree from the

3    University of Delaware.  It's Graduate School of

4    Banking.

5    Q    And what year was that?

6    A    I'd --

7    Q    Roughly.

8    A    1971, '72.  No.  Excuse me.  1991 maybe.

9    Q    After you started to work?

10    A    After I started work.  I would have to

11    look at my diploma.

12    Q    You have not looked at it for a while.

13    My goodness.

14         (Laughter)

15    A    It was after I started work.

16    Q    So, when did you start work?

17    A    I started working in 1975.

18    Q    And who was your first employer?

19    A    Well, my first employer during school

20    that I worked for a small community bank.  Right out

21    of school I started working for the Federal Deposit

22    Insurance Corporation.

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Q      And in what city?

2      A      In Kansas City, Missouri.

3      Q      And what was your grade when you first

4  started?

5      A      Started as a rookie.  Grade 5.

6      Q      And I assume you got a promotion in a

7  year or so?

8      A      The way it operated if your performance

9  was good.  We were in a progressive range up until a

10  certain point to a grade 12 I think.

11      Q      So, you went from 5 to 7?

12      A      Right.

13      Q      And then 7 to 9?

14      A      That's correct.

15      Q      And then 9 to 11?

16      A      Yes.

17      Q      And was it one year before you became a

18  7?

19      A      I don't remember.

20      Q      And do you remember if it was one year or

21  two years?

22      A      I am not familiar.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1        Q        Whatever the step ladder was in the line

2    you followed, you followed more or less timely?  Is

3    that right?

4        A        Yes.

5        Q        So, 7, 9, 11.  Were you in Kansas City?

6        A        No.

7        Q        When did you move from Kansas City?

8        A        Probably in 1975 I moved to Chicago,

9    Illinois.

10       Q        Did you move to an FDIC office?

11       A        Yes.

12       Q        Was that in Chicago?

13       A        Yes, it was.

14       Q        Do you recall what your grade was?

15       A        Well, I was still a grade 5.

16       Q        And how long did you stay in Chicago?

17       A        Eight weeks.

18       Q        That's not very long.  Was this part of a

19    training program?

20       A        No.  I was in a Division of Liquidation

21    which was responsible for failed banks.  So, I was at

22    a failed bank in Chicago and then got transferred

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    shortly thereafter.  Probably 1976 to Milwaukee,

2    Wisconsin.

3        Q       Was that another failed bank?

4        A       Yes, it was.

5        Q       Okay.  And the next move?

6        A       From Milwaukee actually moved back to

7    Kansas City, Missouri.  From Kansas City, Missouri

8    moved to San Diego, California.

9        Q       What year was that?  Can you recall?

10       A       I would have to go back.  I was in Kansas

11   City for possible two, three years.  That would make

12   it 1979 or '8O was in San Diego for another three

13   years.  That put it up to '83.  Got transferred to

14   Tampa, Florida later.  In the '80s.

15       Q       Any idea when you left San Diego what

16   grade you were at at that time?

17       A       I probably was a grade 11.

18       Q       Any idea what your title was?

19       A       I was the assistant -- I have to think of

20   the titles.  I was an assistant -- I have to think

21   what we called it.  I was the second in command in

22   the office.  I am not sure what they called the

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    person in charge.  They called it assistant

2    liquidators in charge.

3         Q      How large was that office?

4         A      It was very large.  It was over a billion

5    dollars.

6         Q      How about in number of employees?

7         A      Probably 200.

8         Q      You moved from San Diego to Tampa?

9         A      Correct.

10        Q      What position did you hold in Tampa?

11        A      A similar position.  I was assistant to

12   the liquidator in charge.

13        Q      And how long were you there?

14        A      I'd say two, two and a half years.

15        Q      So, that is '85 or '86?

16        A      Yes.

17        Q      What next?  Where and what level?

18        A      Then moved to Dallas, Texas.  It was

19   probably '86, '87.

20        Q      And was that a regional office at that

21   time?

22        A      They didn't call it regional office.  It

**EXHIBIT 30** 10
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    was what they called an area office.

2         Q        And that was of the FDIC?

3         A        That's correct.

4         Q        And this is all DRR in those days?

5         A        No.  It was called Division of

6    Liquidation.

7         Q        That has a pretty ominous sound to it, by

8    the way.  And when you got to Dallas, what was your

9    title?

10        A        I was assistant -- No.  It was a

11   supervisory liquidation specialist.

12        Q        And that was a 12, 11?

13        A        No, no.  I had been promoted in Tampa to

14   a 13.

15        Q        So, you were a 13 when you moved to

16   Dallas?

17        A        Yes.

18        Q        How long were you in Dallas?

19        A        Probably I'd say two years.  Possibly

20   three years.

21        Q        Did you get promoted while you were in

22   Dallas?

**EXHIBIT 30** 11
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     A     Yes.  To a 14.

2     Q     And you know what year that was?

3     A     No.  Not without looking at my official

4     records.

5     Q     Let's continue the chronology.

6     A     From there, I got moved back to Kansas

7     City to open up a regional office in Kansas City,

8     Missouri.  And that was by that time would have been

9     the late '80s.

10     Q     Okay.

11     A     From Kansas City, I went back to Dallas.

12     Q     When you left Kansas City, were you

13     still --

14     A     No.  I probably was at that point a 15.

15     Q     Okay.  So, where did you move to?

16     A     I was asked to move back to Dallas,

17     Texas.

18     Q     Any idea of the year?

19     A     You know, my inkling it was probably

20     1988-89 period.

21     Q     And what position in Dallas?

22     A     I had two positions, but I was sent back

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   to be the associate director of what they call the

2   assistance transaction branch.  It was still part of

3   at the time the Division of Liquidation.

4        Q        And were you still a 15?

5        A        I don't think to.  I think at that point

6   I might have received another promotion at that

7   point.

8        Q        Was that a C something or different

9   terminology?

10       A        No.  Not C.  Didn't call them EMs.

11       Q        Was it the equivalent of a SES position?

12       A        Equivalent but not quite.  The next step.

13       Q        We will call it an ES position.

14       A        It was an executive position.

15       Q        And that would have been?

16       A        I think '87, '88.

17       Q        And did you set up the assistance

18   transaction branch?

19       A        Yes.

20       Q        And how large an organization was that?

21       A        I think we had, the most, 60 people, and

22   it was a national operation.

EXHIBIT 30      13
ALIOTTA v. BAIR
No. 05-2325-RMU

1        Q        When you say 60 people, professionals or

2   total staff?

3        A        Professionals.  We had an administrative

4   staff.

5        Q        So, about 60 professionals plus

6   assistants?

7        A        That's correct.

8        Q        How long did you remain in Dallas in that

9   position?

10       A        I think probably until 1991.

11       Q        What happened in 1991?

12       A        I came to Washington D.C.

13       Q        In what position?

14       A        It was the -- We changed names of

15  positions.  I was under the regional director.  So, I

16  believe it was a deputy director.

17       Q        Of what?

18       A        Of Division of Liquidation.

19       Q        Let me pause in your own chronology and

20  tell me, if you can, FDIC absorbed a number or at

21  least some other organizations.  The one that comes

22  to my mind is Office of Thrift Supervision?  Is that

EXHIBIT 30    14
ALIOTTA v. BAIR
No. 05-2325-RMU

1    correct?

2        A      No.

3        Q      No?

4        A      There was absorption of certain

5    organizations.  The one I think you're probably

6    thinking of was FSLIC.

7        Q      Federal savings?

8        A      Right.  One of their organizations

9    similar in the work we got.  It wasn't a large

10   operation.

11       Q      It's Federal Insurance Savings Insurance

12   Corporation probably or something like that?

13       A      Right.

14       Q      Great names.

15       A      Right.

16       Q      Okay.  So, no other?  There hadn't been

17   any other mergers or melding of --

18              MR. JONES:  You are talking about 1991?

19              MR. ROSE:  Yes.

20              THE WITNESS:  Yes.  I think that was the

21   organization.  It was a like organization.  I was

22   tied to the SL issues before the preliminary

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    organization before the RDC.  So, it was a small

2    group that was incorporated in Dallas.  It may have

3    been another name for it.  But same issue.

4             BY MR. ROSE:

5        Q       How long did you remain in Dallas as

6    deputy director of Liquidation?

7             MR. JONES:  Were we up to Washington?

8             THE WITNESS:  Yes.  I'm confused.

9             BY MR. ROSE:

10       Q       I am terribly sorry.  In D.C.

11       A       Well, I was deputy up until the point of

12   the year 2000.

13       Q       Can you give me an idea of the size of

14   Liquidation in terms of number of employees back in

15   1991?  Rough estimate.

16       A       Well, division-wide we probably had at

17   that point nearly 22 offices.  I bet we were close to

18   5 or 6,000 employees nationwide.

19       Q       And when you -- had that been reduced by

20   the year 2000?

21       A       Yes.

22       Q       Any idea what it was?  As close an

1    approximation as you can.

2        A      By the year 2000 because we had done a

3    series of contractions, I would say we were somewhere

4    between a thousand to 500.  Five hundred to a

5    thousand.

6        Q      That's close enough.  I don't need

7    precision but just a general idea what's going on.

8    When you were deputy director Division of

9    Liquidation, to whom did you report?  Name and title

10   or title and name.

11       A      I guess John Bovenzi at that point was

12   director.

13              MR. JONES:  Are we speaking in 1991?

14              MR. ROSE:  Yes.

15              THE WITNESS:  I am sorry.  I gave you an

16   inaccurate response.

17              BY MR. ROSE:

18       Q      Let's go back to 1991.

19       A      It was Steven Selig was director of the

20   division.

21       Q      And was Mr. Bovenzi in that division at

22   that time?

1       A       No.

2       Q       Do you know where he was at that time?

3       A       He was a special assistant to one of the

4   board members.

5       Q       Do you know which one?

6       A       He was either C.C. Hope.  And he also

7   worked for William Seidman, the chairman.

8       Q       Do you know if Mr. Seidman was ever

9   related to a small accounting firm called Seidman and

10  Seidman from Massachusetts?

11      A       Yes.  Whether it's Seidman and Seidman of

12  Massachusetts but there is an accounting firm that

13  was part of his family.

14      Q       That's a matter of personal interest to

15  me than otherwise, but I thought it was probably the

16  same.

17      A       He's an accountant.

18      Q       So, Mr. Bovenzi had worked for Mr. Hope

19  and Mr. Seidman?  Is that correct?

20      A       That's correct.

21      Q       And as a special assistant?

22      A       I think it was a special assistant.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1        Q       And what was Mr. Hope was --

2        A       A director.

3        Q       Director of?

4        A       FDIC.

5        Q       And Mr. Seidman was also assumed that

6   position at some time?

7        A       He was chairman.

8        Q       And your title is director now?

9        A       Yes.

10       Q       So as of 2000, who was the director of

11  what is now DRR?

12       A       I didn't understand the question.

13       Q       Did the Division of Resolutions, did DRR

14  exist in the year 2000?

15       A       Yes.

16       Q       And who was the director?

17       A       I was named director.

18       Q       Who was the director immediately

19  preceding you, if you can recall?

20       A       It was John Bovenzi.

21       Q       And who was the chairman of FDIC in the

22  year 2000?
```

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     A     Donna Tanoue, T-A-N-O-U-E.

2     Q     All one name?

3     A     No.  Two.  Donna and Tanoue.

4     Q     T-A-N-U?

5     A     T-A-N-O-U-E.

6     Q     And did Mr. Powell become chairman at

7   some point around the year 2000?  Donald Powell?

8     A     Probably mid.  Probably three or four

9   years ago.  So, sometime mid-2000.  It wasn't in

10  2000, though.

11    Q     Do you think it might have been 2002?

12    A     It may have been 2002, 2003.  It usually

13  occurs around the change in administration.

14    Q     Not entirely a coincidence.  Had you

15  worked with Mr. Powell before he became chairman?

16    A     No.

17    Q     Had you met him at all?

18    A     No.

19    Q     Do you know whether Mr. Bovenzi had been

20  employed by FDIC in some position other than special

21  assistant before he was a special assistant to

22  Mr. Hope?

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    A    Yes.

2    Q    Do you know what position?

3    A    I don't know the exact title, but he was

4    in our research, Division of Research.

5    Q    Let me ask you you became the director --

6    I am sorry.  You became the director of DRR in 2000?

7    Is that right?

8    A    Right.

9    Q    Could you tell me about when in 2000?

10    A    January of 2000.

11    Q    And who was the chairman at that time?

12    A    Donna Tanoue.

13    Q    And she remained as chair until when,

14    2002?

15    A    Shortly before the new administration

16    came in.

17    Q    Can you give me an idea of how big DRR

18    was in terms of employees in 2000 when you became

19    director?

20    A    I would say -- and I'd have -- depending

21    on what offices we had at the time, but I think it

22    was between 700 and 500.

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q    There had been at one point a

2  consolidation of regional offices from other points

3  to Dallas?

4    A    That's correct.

5    Q    At one point Dallas was one of several

6  area offices?

7    A    Dallas was a regional office at the time

8  of the consolidations.  And Dallas was a place where

9  other work and assets of the remaining receiverships

10  flowed to Dallas.

11    Q    So in fact effect Dallas became a, as far

12  as it's functions were concerned, a national office?

13    A    The concept is, yes, they would handle a

14  national program responsibilities.

15    Q    Historically.  I'm not talking about the

16  depression when the FDIC started.  But in more modern

17  times, have there been a series of actual failures of

18  savings and loans institutions and/or banks?

19        Have there been sort of a rash of such

20  events, uneven points in history?

21    A    Historically that's an accurate

22  statement.  I would not call them rashes, but there

1    are cycles where there's down turns in the economy

2    that effect insured financial institutions.

3         Q       Thank you.  And was there such a down

4    turn in the economy in the '70s to your knowledge?

5         A       There was always some kind of a down

6    turn.

7         Q       One that caused failures or threatened

8    failures of bank institutions.

9         A       There were failures but not to the

10   extent -- there were very few in number.

11        Q       In the '70s.  How about the '80s?  In

12   particularly, savings and loans institutions.

13        A       FDIC didn't handle the savings and loans.

14   So, I can't comment on that particular issue.

15        Q       So, were the '80s sort of uneventful in

16   terms of FDIC's --

17        A       No.  In the late '80s, you know, workload

18   went up.  The same economic conditions affecting S&Ls

19   were effecting institutions throughout the country.

20        Q       Banks?

21        A       Banks.

22        Q       And since then, the number of bank

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    failures has been sharply reduced or almost entirely

2    eliminated?

3        A    Just about eliminated.

4        Q    So, have there been any bank failures in

5    the and I mean FDIC insured?

6        A    We only had one this year.  Very small

7    one.

8        Q    A small bank?

9        A    That's right.

10        Q    Where was the bank?

11        A    In Pittsburgh, Pennsylvania.

12        Q    And have there been other banks that were

13    saved from failure?  Were there sort of threatened

14    failures or poor management of other banks that

15    required some guidance from FDIC to straighten out?

16        A    Well, you described.

17        Q    Use your terminology.

18        A    That is what our division of bank

19    supervision does is make sure banks maintain a

20    certain amount of capital in order to maintain their

21    ability to operate.

22        Q    When does DRR get involved?  Does it get

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    involved at all before a failure?

2        A       Only an insured financial institution,

3    one we insure.  If it is imminent that a failure may

4    take place, then on occasion we're invited to come in

5    before the actual failure by the chartering entity to

6    start the process of gathering information and

7    getting prepared to sell, market the bank.  Also

8    prepared to open up a receivership.

9        Q       Have there been any of those in the last

10   two or three years?

11       A       We've had I believe two or three last

12   year.  Very few.  Very small.

13       Q       I'd like to direct the witness' attention

14   to something previously marked as Mergen,

15   M-E-R-G-E-N, Exhibit Number 2.  And that's

16   ALDRR02351.

17              MR. ROSE:  Do you have that?

18              MR. JONES:  No, but I can look on.

19              THE WITNESS:  Okay.

20              BY MR. ROSE:

21       Q       So as of September 9th, 2004, you

22   recommended to the Division of Finance that DRR have

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    --

2              MR. JONES:  Would it be helpful if we

3    made a copy so the witness could have a copy?

4              MR. ROSE:  Yes.  That would be excellent

5    if you would.

6              (Off the record.)

7              BY MR. ROSE:

8       Q     Have you had a chance to read this memo

9    and the attachments?

10      A     Yes.

11      Q     I understand this proposal to -- this was

12   your proposed budget as I understand it?

13      A     No.  This is a preliminary document that

14   our Division of Finance puts out that eventually they

15   submit to us for us to look at as far as the budget

16   for the company coming year.

17              When you see proposed, eventually this

18   document would have been returned back to me.  This

19   was their proposed budget.  They let us look at the

20   preliminary data to see if there are any inaccuracies

21   or if there's any coding issues involved.

22              This is just a preliminary document that

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    the Division of Finance uses during the budget

2    process.

3        Q      It's got your initials or signature on

4    the front page.

5        A      Yes.  That's my signature.

6        Q      It says --

7        A      We reviewed the proposed 2000.  This was

8    not mine.  Proposed 2000 operating budget submitted

9    by the budget.  Financing.  We made changes to their

10   document to show the numbers we had for 2004.

11       Q      Budgeting staff is endorsed by your

12   signature was to increase by one to 502 at the end of

13   2005.  Is that what this document says?

14       A      It is showing our current accuracy.

15   Obviously they must have been one employee on detail.

16   We were commenting on the actual number of people we

17   had employed was 502.  If you note, it says who was

18   on detail during 2004.

19       Q      And looking at the last two, three, five,

20   six, the budgeting staff as of January 2005 was 517?

21   Plus one student?

22       A      I'm not sure what you are looking.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q    The last page, 202356.

2    A    This was an attachment to the Division of

3    Finance planning document.  But there is 517 plus

4    one.

5    Q    Right.  And then the end of the year the

6    plan was to reduce the number of employees to 501

7    excluding students?  Is that correct?

8    A    I can't comment on it.  This is just a

9    preliminary planning document that they produced as

10    far as what the anticipated number of people on the

11    payroll.  This is strictly their numbers based on our

12    current numbers.

13    Q    Had you done anything at that time to

14    indicate to anyone that you thought at that time in

15    September 9th, 2004, did you think it would be

16    appropriate to have a reduction in force in part of

17    the year 2005 within DRR.

18    A    You were facing down when you started

19    your question.

20    MR. ROSE:  Would you try to read it back.

21    (The record was read by the reporter.)

22    BY MR. ROSE:

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1          Q        Let me rephrase it.  Did you have a

2     personal view at that time as to whether the DRR work

3     force should be reduced for the budget -- in the

4     budget for 2005?

5          A        We started thinking about our workload

6     and the number of potential institutions we may have

7     to be involved in really starting in the summer of

8     2004.

9                   But whether or not I indicated it to

10    anybody, I do not believe I did.  The issue was

11    working with my management staff to be able to

12    determine exactly what our requirements we're going

13    to need based on workload for 2005.

14                  At this point, it was strictly an

15    internal management which is similar to the same

16    process we used year after year.

17         Q        Okay.  Had you ever participated in any

18    task force that studied the question of the size of

19    DRR?  Was there such a task force at any time in

20    2004?

21         A        I don't recall a task force, but, you

22    know, I did  -- I have always been involved in

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    strategic planning and review on a long-term basis as

2    to what our needs were going to be based on workload

3    and based on the current economic climate.

4             That goes on perpetually but intensifies

5    as we get closer to the, you know, coming budget.

6        Q    Had anybody suggested to you the need to

7    cut DRR by a factor of more than 50 percent?

8        A    No.

9        Q    I need to look for something.  Do you

10   know what the American Productivity and Quality

11   Center is?  That seems to be the name of some

12   organization.

13       A    Go to the name again.

14       Q    American Productivity and Quality Center.

15       A    I have never referred to any -- I don't

16   know what that name represents.  I can only guess

17   possibly what the acronym of their name would

18   represent.

19       Q    I think it's going to be useful -- sorry

20   to interrupt -- to have this document reproduced

21   also.  So, bear with me.  We will go off the record.

22             (Off the record.)

1                BY MR. ROSE:

2        Q      This has been previously marked.  I'm

3    going to direct your attention to --

4                MR. JONES:  Our copy we have Seegers 1,

5    2, and Seegers 3.

6                BY MR. ROSE:

7        Q      Looking at Seegers 1, do you remember

8    being part of any study group in the spring of 2005

9    that submitted a report in September?

10       A      There was no study group in 2005.

11       Q      There was not?  Okay.  Looking at the

12   second page of this document marked as Seegers or

13   let's look at the cover sheet.  Do you know who James

14   Seegers is?

15       A      Yes.

16       Q      And is he an employee in DRR?

17       A      Yes.

18       Q      And was he an employee in DRR in

19   September 2004?

20       A      Yes.

21       Q      And do you remember seeing a summary of

22   this kind in 2004, or sometime on or after September

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

31

1    6th?

2        A       Well, it's obviously these are

3    preliminary documents.  But whether or not I got them

4    in September.

5        Q       The e-mail suggests that you did.

6        A       The only reason I am not certain whether

7    this attachment unless --

8        Q       Executive summary it says.

9        A       I have to assume this was the attachment.

10   But there are two attachments to this.

11       Q       I believe Mr. Seegers thought it was.

12       A       Then it's a preliminary document.  It

13   looks like he sent for review.

14       Q       I think that's probably right.  My

15   question is do you recall seeing something like this

16   in September of 2004.

17       A       It appears to be a document that is

18   similar in language and pattern that we ultimately

19   use.  Yes.

20       Q       And do you see the suggested numbers on

21   the second full page of -- disregarding the cover

22   sheet -- the second full page of the document under

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    conclusions?

2        A      Yes.

3        Q      Do you know whether you had any view at

4    the time as to whether a reduction in force of

5    approximately a hundred and seventy-five employees

6    would be appropriate?

7        A      Well, there were preliminary indicators

8    at the time that going into the 2005 budget year we

9    were going to have to make some adjustments both to

10   the way we do business and also to human resources we

11   deployed for the new business model we were trying to

12   figure out.

13       Q      And so I come back to the question of

14   whether the hundred seventy-five reduction was

15   something that you believed -- did you have a view as

16   --

17       A      No.  I did not have a view at that point.

18   It was preliminary summaries staff were producing.

19       Q      Was there a final document of this kind

20   that went to --

21       A      Eventually, yes.  I would have -- John

22   Bovenzi was the chief operating officer and deputy to

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    the chairman.  He is my first-line supervisor in

2    leadership.

3            So with any -- any major business change

4    or any change in what we were needing for budget, you

5    know, he would be my first stop in order to make any

6    of these recommendations.

7      Q    Okay.  Do you think that a document of

8    this kind was or let me look at Number 3, Seegers

9    Number 3.

10            Did you send a memo of this kind to Mr.

11   Bovenzi at any time in 2004?

12     A    Well, most likely I would have, and it

13   would have had my signature on it and been dated.

14   And it would have been something that he would have

15   received as my role as division director in giving

16   him what I think is, you know, our needs and

17   requirements.

18     Q    Okay.

19            MR. ROSE:  Mr. Jones, this is the only

20   version that we've received, that I recall receiving

21   of this document.  I would appreciate your checking

22   and seeing if there is a dated.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          MR. JONES:  There definitely is.

2          MR. ROSE:  Would you be kind enough to

3    produce it for us?

4          MR. JONES:  Yes.

5          MR. ROSE:  Do you have any idea what the

6    date is?

7          MR. JONES:  No, but it was among the

8    documents in our war room produced for examination,

9    but I will locate it and copy.

10          MS. NORCROSS:  I think you have it.

11          MR. ROSE:  Well, we have a lot of stuff

12   electronically.

13          MR. JONES:  This would not be electronic.

14   It would be a paper package.

15          MR. ROSE:  If you can find it and send it

16   to me, I would appreciate it.

17          MR. JONES:  We will.

18          MR. ROSE:  So, what was the last question

19   and answer, if you would?

20          (The record was read by the reporter.)

21          BY MR. ROSE:

22      Q    Do you have any memory or thought as to

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   when the final of this document would have been done

2        A      Not without looking at the original

3   document.  It was probably sometime in the fourth

4   quarter.  I have to assume of 2004.

5        Q      Sometime between October 1st and December

6   31st.

7        A      Yes.  It might have slipped into January,

8   but this was again tied to the budget.  A lot of

9   these decisions had to be made before the 2005 budget

10  was approved.

11            MR. ROSE:  And, Mr. Jones, do you know

12  whether there was this document of any kind got sent

13  in the final version?

14            MR. JONES:  That I don't know.

15            MR. ROSE:  Would you be kind enough to

16  inquire?  This is Number 1.

17            MR. JONES:  What we will do is give you

18  the complete package that was sent to Mr. Bovenzi.

19            BY MR. ROSE:

20       Q      Looking at Number 3, the draft

21  memorandum, Mr. Bovenzi, there's an asterisk besides

22  the 228.  It says does not include nine positions for

EXHIBIT 30    36
ALIOTTA v. BAIR
No. 05-2325-RMU

1   the deposit compliance audit section of DOF.  And it

2   does not include the 25 rotational training

3   positions.

4           Tell me about the nine positions for the

5   deposit compliance audit section of DOF.  Why is --

6   Did you call it to the attention of Mr. Bovenzi to

7   those nine positions?

8       A       Those individuals had a separate

9   function, separate and apart from our division.  They

10  were involved -- are involved with the Division of

11  Finance.  And they basically do audit work for

12  assessment audits of banks.  In other words, the

13  amount of premiums they pay.

14          The Division of Finance was no longer in

15  Dallas, but the nine individuals needed day-to-day

16  supervision for administrative purposes.  But they

17  took their program -- their program leadership and

18  management came from Washington Division of Finance.

19          We wanted to be certain they were

20  cooperating with us in our offices.  I think the

21  asterisk was to make sure people understood they were

22  separate and apart from the Division of Resolution.

EXHIBIT 30    37
ALIOTTA v. BAIR
No. 05-2325-RMU

```
1        Q        They were physically in Dallas, and you

2   had some administrative responsibilities.

3        A        Right.  Making sure the payroll got

4   through and travel expenses, but we never directed

5   them and they were never part of our mission.

6        Q        Did that change from year to year or was

7   that something that had been in place before and has

8   remained since then?

9        A        The Division of Finance had their own

10  restructuring and change and it no longer became

11  feasible to maintain the management structure for the

12  few people that were there doing it.

13               Somewhere along the line we agreed when

14  we took over accounting for receivership that we

15  would also administratively just take care of these

16  individuals.

17       Q        So, they remained employed by --

18       A        They were on the organizational chart of

19  the Division of Finance.  But for day-to-day process,

20  for day-to-day administration of what it takes for an

21  employee to be within the FDIC system we took

22  responsible for that.
```

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                    We had administrative responsibility for

2    not strategic or management.

3         Q       And the 25 rotational training positions

4    are those people who are in the -- hired out of

5    college and who are in leadership?

6         A       I think that was probably the preliminary

7    footprint of that process.

8         Q       So, are those 25 people, the training

9    positions, are they occupied for most of the year?

10        A       I don't know.  I can't answer that.

11   Usually those positions do not belong to the

12   division, for the Division of Resolution.  They

13   usually are corporate positions.

14                   Our corporate university or whoever the

15   sponsoring organization.  If they are training

16   positions, they are rotational.  Strictly there for

17   educational purposes.

18        Q       Their salaries would be paid --

19        A       Separately and apart from ours.

20        Q       But you would have some -- I say you to

21   include you in leadership of DRR -- would have some

22   responsibility to make sure that they were given the

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      training opportunities and that sort of thing?

2          A      Well if that was what their training was

3      designed for, we also had a Division of Supervision

4      also in Dallas.  Part of that rotational training may

5      also have included examination training.

6          Q      But the answer is yes with the condition

7      that you just added?  Is that right?

8          A      There were rotational training positions.

9      But depending on what the program at that time which

10     I'm not aware of, they were required to learn.  And

11     what they needed to be involved in, I don't have the

12     details of that.

13             For me when it says rotational, that

14     means they were not on my chart and that they were

15     designed for people to come in and out mostly for job

16     education.

17         Q      On-the-job training essentially?

18         A      On-the-job training of the functions

19     within the division.  But they may not have been --

20     were not part of my organization.

21         Q      I understand.

22         A      That's -- The answer would be yes to that

1   part.

2       Q       So, the number may be slightly different,

3   but is that -- does DRR still have some

4   responsibility for 20 or more training positions from

5   year to year?  Is that concept -- training program

6   still going on?

7       A       Yes.

8       Q       So, every year does DRR hire 25 people

9   from that program a year?  One or --

10      A       No.

11      Q       Some?

12      A       We've not hired anybody from the

13  corporate employee program.

14      Q       For how long?

15      A       We haven't hired anybody since 1994.

16      Q       In DRR?

17      A       Yes.

18      Q       And what is the current size of DRR?

19      A       Approximately 217.

20      Q       That's very close to a little smaller

21  than what it was in 2005.

22      A       Well, we have vacancies.

41

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       Q       And do you still have an authorized staff

2   of something like 228?

3       A       It's approximately in that area.

4       Q       As far as you know, what is the number of

5   employees of FDIC altogether?  Is it in the range of

6   forty-five hundred people?

7       A       I don't know the specifics.

8       Q       Why couldn't you give me about five or

9   ten minutes and let me look at my stuff and see if I

10  can't get us out by 12:00 o'clock or a few minutes

11  before.

12              (Off the record.)

13              BY MR. ROSE:

14      Q       Mr. Glassman, could you look at Number 3,

15  Seegers Number 3, in front of you.

16      A       Yes.

17      Q       Do you believe that you signed a or

18  endorsed a memorandum of this kind at some point in

19  2004 and sent it to Mr. Bovenzi?

20      A       It would probably be some document

21  similar in nature, in content, that I would have sent

22  to John Bovenzi as the chief operating officer.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      Now between September 9th and whatever

2  time you sent him the memorandum that is akin to

3  Seegers Number 3, did you discuss with him at any

4  time the appropriate size of the budget, or the

5  budget cut, or anything of that kind?

6      A      I don't believe we would have gotten into

7  the kind of details with numbers.  What mostly the

8  chief operating officer would have been discussing

9  with me or what I would have been discussing with him

10  was the need to reorganize because of the change in

11  the nature of our business, and the way we were

12  operating, and the workload that we currently got

13  versus what we anticipated that may be coming, and

14  how we were going to react to it.

15      Q      But you had no discussions with him about

16  the size?  Well, there would be implications I would

17  assume from decisions you made?

18      A      If there was discussions, it would have

19  been after I would have submitted to him a proposal

20  for the reorganization and then what the impact of

21  that reorganization would have had on the number of

22  FTEs that I was going to need, and the type of FTEs I

EXHIBIT 30     43
ALIOTTA v. BAIR
No. 05-2325-RMU

1    was going to be required to have for the coming year

2    and thereafter.

3         Q      So, did you make a specific proposal for

4    reorganization in 2004?

5         A      Yes.

6         Q      And --

7                MR. ROSE:  Counsel, we may have that, but

8    --

9                MR. JONES:  We will get you another copy.

10               MR. ROSE:  If I can find it, we will

11   print it out.

12               BY MR. ROSE:

13        Q      Did you have any discussions with Mr.

14   Bovenzi after that about size?  Do you remember,

15   about the number of people that full-time employees

16   that you needed?

17        A      Well, if we submitted -- once I submitted

18   my recommendations, I would have got a briefing in a

19   meeting with John Bovenzi as the chief operating

20   officer as to what not only what I was proposing but

21   also how I was going to anticipate how we would be

22   handling our budget and any particular differences

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    between 2004 and 2005 and come up with management

2    strategies that we thought would be appropriate for

3    what we were anticipating.

4        Q        Was there discussion of a -- of seeking

5    so called voluntary retirements and a RIF at that

6    time?

7        A        We discussed about getting buyouts.  We

8    discussed about getting crossovers.  We discussed

9    about doing aggressive job fairs.  The RIF was always

10   considered to be the last resort in our discussions.

11              But ultimately we knew for budget

12   purposes that was always the mechanics of what we

13   would have to do if we weren't successful in helping

14   employees migrate to other positions or on to provide

15   them with incentives to leave the FDIC employment.

16       Q        Did you consider the possibility of

17   having employees of FDIC free to bid on any vacancy

18   within FDIC for a position if they were qualified for

19   it?

20       A        I can't respond to that.  I followed

21   whatever the regulations and the rules for the

22   movement of employees not only within the division

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    but throughout the corporation.

2         So, I did not -- it was not within my

3    power or authority.  But there are certain

4    regulations that we have to follow and geographic

5    locations.  So, I am not the proper party.  It would

6    be in a technical HR issue handled by our Division of

7    Administration.

8    Q    Are you aware that the only bidding that

9    was permitted or am I correct, if you know the

10   answer, am I correct in believing that only bids to

11   different DOS were permitted at this time?

12   A    Ultimately DOS was where the crossover

13   occurred.  But I would tell you I was highly

14   motivated to try to find anyplace anywhere that I

15   would be able to find based on our skill sets into

16   our part of the organization.

17        But the only thing that was available at

18   this point in time was the Division of Supervision

19   who had a need and was able to use our crossover

20   skill sets at the time.

21   Q    Many of the DRR people had experiences as

22   bank examiners.  Is that a fair statement?

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

46

1       A       Not necessarily.  They may have been

2    former bankers.  Just the experience they would have

3    had within the division of operating in banks and

4    working on loan files.  We had a very diverse group

5    of individuals that were capable of learning the new

6    jobs and programming that for our Division of

7    Supervision at the time.

8       Q       Is it true to the best of your knowledge

9    that there were a whole series of new job

10   descriptions made for potential transfers from DRR at

11   this period of time with the job descriptions that

12   were open were new job descriptions?

13      A       I'm sorry.  The question I don't

14   understand.  Maybe you can rephrase it.  I am not

15   trying to not respond.  It didn't make sense to me

16   the way you were asking it.

17      Q       I may have asked it wrong.  I am asking

18   you are you aware that I'm not sure these were DOS

19   but there were a number of new position descriptions

20   crafted in this time frame so that by 2005 the new

21   position descriptions were in place?

22      A       You're talking about DOS?

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      Yes.

2      A      I am not aware of any new job

3   descriptions in DOS.

4      Q      How about within DRR?

5      A      Part of our recommendation for

6   reorganization and to match up with what we were

7   going to need strategically some of these positions

8   were going to require the individuals to not only

9   have the proper skill sets, but also a lot of these

10  positions were going to be supervisory in nature

11  because of the way we were going to operate in the

12  sense that workload was down.

13          But the fact is we had to be ready in the

14  event the workload goes up and we were going to

15  manage our business much differently.

16          So, the new reorganization did require us

17  to rethink some of our key functional positions, how

18  we were going to operate.

19      Q      This is within DRR?

20      A      Yes.

21      Q      And the people that so called crossover,

22  are they people that crossed over to DOS or crossed

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   over to some positions in DRR?

2        A      Well, DOS would have had the positions,

3   and they were around the country geographically to --

4   based on their workload and there needs.  So, the

5   individual would have applied to those positions.  I

6   think there were choices made again.

7                I don't have all the specifics, but

8   geographic locations that people may have desired

9   that they would be able to post for or apply for.

10  DOS would have made the decision on the individual

11  based upon background and geographic preference.

12       Q      Let me ask you a question.  In your mind,

13  was a reduction of the magnitude made by FDIC in

14  2005 -- and I am talking about the reduction in the

15  size of DRR -- was that necessary in some sense?

16       A      Yes.

17       Q      In what sense was it necessary?

18       A      Well, our workload was down.  I'm talking

19  about the workload in our current receivership

20  portfolio had been working itself down.  The

21  anticipation that the economy was doing well and

22  banks had capital sort of foreshadowed the number of

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1   failures that we were going to have were going to be

2   few.

3           The other issue is the fact that we had

4   too many people for too few assets, too few potential

5   closings.  And it was the cost to the corporation

6   that was quite high going into 2005.

7           So, part of our responsibility was to

8   recognize we had changed the way we had done business

9   but also for financial stewardship the fact is that

10  there was not enough work for the existing work force

11  nor did it anticipate any additional work was going

12  to become necessary in order to maintain the amount

13  of work force we had.

14      Q       Did you consider and I use you personally

15  or if you know about FDIC, that is part of you also.

16      A       Right.

17      Q       Do you know whether FDIC ever considered

18  making DRR a part of another division and thereby

19  eliminating some of the need for supervisory

20  personnel and possibly the need for your position?

21      A       That's not even possible.

22      Q       Why?

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       A       Our star sheet says this corporation will

2   have a group or unit to be both claim agents and

3   operate as the receiver.  There's a separation

4   between which of these supervision versus are close

5   bank activities and as deposit insurer.

6       Q       That you think would preclude a

7   reorganization?

8       A       Well, an internal reorganization in the

9   division, but it's not -- the corporation is

10  responsible by statute for having the ability to

11  handle closed banks and to pay insurers but also to

12  efficiently operate the closed bank receiverships for

13  the benefit of the creditors.

14      Q       That does not matter whether it's the

15  division or doesn't mean does it that the agency

16  could not have made what is now DRR as a small

17  fraction of the size it used to be into another part

18  of retaining the same people?

19      A       I can't respond on what other folks may

20  think or not think.  The fact is legally it would

21  have been very difficult.  Two, from a budgetary

22  standpoint taking FTEs from one organization and

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    moving it over does not take care of the overall

2    corporate budget.

3              It still is an expense to the FDIC.  So,

4    I am not certain from financial stewardship and

5    legally whether or not that's even possible.

6        Q      Well --

7        A      It was not a consideration.

8        Q      As a matter of fact, the higher ranking

9    folks did pretty well, did they not?  That is the

10   supervisors in DRR.  Very few of them were -- few of

11   the supervisory positions were eliminated?  Is that

12   correct?

13       A      Well, I'm not certain.  I don't

14   understand what you mean by lucky.

15       Q      I didn't use the word lucky.

16       A      The issue is we went to a reorganization.

17   We went to a new organizational structure.  And we

18   filled those positions based on our needs going out

19   into the future.  So, our organization changed based

20   on our needs.

21              So, how we migrated to that new

22   organization was based on our requirements and the

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1    way we were operating as a business.

2        Q        The corporate grade is CM1, 2, and so

3    forth?

4        A        Yes.   Those were part of the grades.

5    CM1, CM2.

6        Q        Are there other supervisors or are there

7    other supervisors below those that are not called CM

8    something?

9        A        Well, I think corporately there are

10   probably descriptions of team leaders or other unit

11   supervisors that may not be at that grade.   Unless I

12   look at the actual organization chart --

13       Q        I am asking the question about DRR.

14       A        Right.

15       Q        Are there any DRR supervisors to your

16   knowledge who did not have a CM grade level?

17       A        Without looking at the chart we had in

18   2004, I would have to assume there probably was.

19             MR. JONES:  Isn't that the one we made

20   copies of already?

21             MR. ROSE:  Yes.

22             MR. JONES:  This is not a document we

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    produced to you.

2                MR. ROSE:  I don't know where it came

3    from.

4                MR. JONES:  I think we saw this in

5    Patelunas' deposition for the first time.

6                THE WITNESS:  I don't know what this is.

7                BY MR. ROSE:

8        Q       I direct your attention to page four of

9    11.

10       A       Okay.

11       Q       And there is a group of people who

12   crossed over.  That includes two CM1s and I'm not

13   sure.  If you look at page five, there is a small

14   group of people listed as liaison including one CM1.

15   Do you know whether Cheryl Bates left the

16   organization?

17               MR. JONES:  I will make sort of a blanket

18   objection.  When you're saying something happened,

19   your questions are based on what this document says?

20               MR. ROSE:  Right.  I understand if this

21   document is not accurate --

22               THE WITNESS:  It is not a FDIC document.

1   I am not certain where it came from.

2           BY MR. ROSE:

3      Q      You certainly recognize a number of

4   names.

5      A      Yes.  I do recognize the names.

6      Q      Let me ask you about some of those

7   people.  Directing your attention to number seven

8   starting with Andrew Basel, B-A-S-E-L, through the

9   next page Doug Woodward?

10          MR. JONES:  I am sorry.  I am lost.

11          MR. ROSE:  Page seven of 11 going over to

12   page eight.

13          MR. JONES:  Okay.

14          BY MR. ROSE:

15     Q      Do you have those names?

16     A      Yes.

17     Q      Do you know Mr. Stan Ivie?

18     A      Yes.

19     Q      Is he still employed?

20     A      Yes.

21     Q      He's an EM?

22     A      Yes.

1      Q      What is that?

2      A      Executive manager.

3      Q      And Mr. Jim --

4      A      Lapierre, L-A-P-I-E-R-R-E.

5      Q      And he's an executive of manager who is

6    still employed?  Is that correct?

7      A      That's correct.

8      Q      And Mr. William Ostermiller?

9      A      O-S-T-E-R-M-I-L-L-E-R.

10      Q      Is he still employed?

11      A      Yes.

12      Q      And then the group of CM2s below that:

13    Basel, Blinko, Brown, and Walker.  Are they still

14    employed?

15      A      I'm lost.

16      Q      Page seven still.

17      A      Starting with who?

18      Q      Basel, Andrew.

19      A      Basel, Blinko, Brown, Walker are still

20    employed with us.

21      Q      And how about the next group?  Plant,

22    Allen, Donald Allen, Sharon?

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

56

1      A      Yes.

2      Q      Mr. Bocum?

3      A      Yes.

4      Q      Frank Compania still employed?

5      A      Yes.

6      Q      Jan Dileo still employed?

7      A      Yes.

8      Q      Deborah Foster still employed?

9      A      Yes.

10      Q      Would you look at the CM1s on page eight

11   and tell me if you know if any of them are no longer

12   employed?  Foster through Doug Woodward?

13      A      Well, some may have left.  I would have

14   to go back and do a cross-check.  George Fritz may no

15   longer be here.  Some names also appear to be part of

16   the DOF group I mentioned to you.

17      Q      Which?

18      A      Compliance.  They have the compliance

19   people in here.  I don't know all their names.  I

20   recognize David Wozinski and some others.  I do

21   recognize the names.

22      Q      Is it your understanding that these

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  people remained employed after the RIF?

2      A      It looks like the majority of them.  Yes.

3      Q      Directing your attention to the people

4  RIFed on page five, six and seven --

5      A      Well --

6      Q      I have not asked you a question.

7      A      Go ahead.

8      Q      Is it fair to say that there were no

9  people who were RIFed in 2005 who were at the CM

10  level?

11      A      I can't answer that.  I think what's

12  missing here is some may not have ended up in a CM

13  job.  They may have taken downgrades.  The issue

14  whether they are employed or not employed that would

15  be something I would have to ask our Division of

16  Administration to provide what the final -- the final

17  register where people ultimately ended up.

18              Whether they took the buyout, crossed

19  over.  Whether they were actually RIFed at the time.

20  I would have to depend on that document.

21      Q      And this chart at least the crossover are

22  shown on four and five and they include four CM

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    people not including Ms. Bates.  Is it your

2    understanding that Mr. Koonfield is still employed?

3        A      He is no longer in our organization.  So,

4    I don't know if he is employed with the FDIC or not.

5        Q      Did he remain in the organization after

6    the summer of '05?

7        A      If indeed this document is accurate, he

8    did crossover.  I'd have to assume crossover meant he

9    when went to DSC.

10            MR. ROSE:  I would ask if it's feasible

11   for counsel to determine based on official records if

12   there are errors or omissions on this chart.  You

13   don't have to do that, but it would be useful.  You

14   could probably do it electronically.

15            MR. JONES:  That information would

16   probably be recorded in the previous data we produced

17   to you.

18            MR. ROSE:  We will try to look at it and

19   we can agree on anything that needs to be amended.  I

20   think I am done.

21            MR. JONES:  I have a couple of clarifying

22   questions.

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

59

```
 1              EXAMINATION BY MR. JONES:

 2      Q     Mr. Glassman, to your knowledge were DRR

 3 employees during this time period, this 2004 to 2005

 4 time period, employees prevented from applying for

 5 any job in the FDIC for -- by which they were

 6 otherwise qualified?

 7      A     Never.  They were required to seek other

 8 employment within the FDIC.

 9      Q     And in response to something -- a

10 question from Mr. Rose, you had testified that in DRR

11 there have been no hiring since 1994.  When you

12 testified to that, were you talking about permanent

13 employees?

14      A     Right.

15      Q     You were not talking about interns and

16 things of that nature?

17      A     Permanent employees.

18              FURTHER EXAMINATION BY MR. ROSE:

19      Q     Let me ask this.  Have you hired or

20 rehired people on a part-time basis or for a period

21 of time?  By you, I mean DRR in the last two or three

22 years?
```

**EXHIBIT 30**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1      A      Not through my authority.

2             MR. ROSE:  Thank you.

3             MR. JONES:  We will read and sign.

4             (Whereupon, at approximately 12:03

5             o'clock, p.m., the above deposition

6             ended and signature was Not waived.)

7      *        *         *         *          *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

**EXHIBIT 30**  61
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1               E-R-R-A-T-A  S-H-E-E-T

2   IN RE:   BARBARA ALLIOTA, et al. vs. SHEILA C. BAIR,

3           Chairman, FEDERAL DEPOSIT INSURANCE

4           CORPORATION

5   DEPOSITION OF:  MITCHELL L. GLASSMAN

6   DATE OF DEPOSITION:  THURSDAY, JULY 26, 2007

7   At the time the above-named deponent read and

8   signed this deposition, the deponent desired to

9   make the following changes:

10  PAGE: LINE: AS TRANSCRIBED:    CHANGE TO:    REASON:

11

12

13

14

15

16

17

18

19

20

21  DATED:              _____

22                          SIGNATURE OF DEPONENT

**EXHIBIT 30** 62
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                    CERTIFICATE OF THE DEPONENT

2         I have read the foregoing pages 3 through 60

3    inclusive, and find the answers to the questions

4    therein contained to be true and correct, with the

5    exception of changes, if any, as per the errata

6    sheet following herewith.

7              _____

8                    MITCHELL L. GLASSMAN

9                    DATED:_____

10

11   - - - - - - - - - - - - - - - - - - - - - - - -

12            CERTIFICATE OF THE NOTARY PUBLIC

13        SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

14   DAY OF _____, 2007

15              _____

16                  (PRINT NAME OF NOTARY)

17                 NOTARY PUBLIC IN AND FOR

18                       THE STATE OF

19              _____

20

21   MY COMMISSION EXPIRES:

22   _____

EXHIBIT 30
ALIOTTA v. BAIR
No. 05-2325-RMU

1                CERTIFICATE OF NOTARY PUBLIC

2          I, Ronnie C. Palmer, the officer before whom

3     the foregoing proceedings were taken, do hereby

4     certify that the foregoing transcript is a true and

5     correct record of the proceedings; that said

6     proceedings were taken by me stenographically and

7     thereafter reduced to typewriting under my

8     supervision; and that I am neither counsel for,

9     related to, nor employed by any of the parties to

10    this case and have no interest, financial or

11    otherwise, in its outcome.

12

13    My commission expires:

14    April 29, 2009

15

16

17    _____

18    NOTARY PUBLIC IN AND FOR THE

19    DISTRICT OF COLUMBIA

20

21

22