**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                     UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF COLUMBIA

2    _____

3    BARBARA ALLIOTA, et al.,        x

                                     :

4                     Plaintiffs,    :

          vs.                        : Civil Action

5                                    :

     MARTIN GRUENBERG,               : No. 05-2325

6    ACTING CHAIRMAN, FDIC,          :

                                     :

7                     Defendant.     x

     _____

8

9                          Arlington, Virginia

10                         Wednesday, May 23, 2007

11

12   VIDEOTAPED DEPOSITION OF:

13                     PAMELA K. MERGEN,

14   a witness, called for examination by counsel for

15   the plaintiffs in the above-entitled matter,

16   pursuant to Notice and agreement of the parties

17   as to time and date, taken at the FDIC, 3501

18   Fairfax Drive, Arlington, Virginia, convened at

19   approximately 10:16 o'clock, a.m., before Cathy

20   Jardim, a court reporter and notary public in

21   and for the Commonwealth of Virginia, when were

22   present on behalf of the respective parties:

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    APPEARANCE OF COUNSEL:

2        On behalf of the Plaintiffs:

3            ROSE & ROSE, ESQUIRES

4            BY:  DAVID ROSE, ESQUIRE

5                 DOTIE JOSEPH, ESQUIRE

6            1320 19th Street, N.W., Suite 601

7            Washington, D.C.  20036

8            (202) 331-8555

9        On behalf of the Defendant:

10           Federal Deposit Insurance Corporation

11           BY:  WILLIAM S. JONES, ESQUIRE

12                KATHRYN R. NORCROSS, ESQUIRE

13           3501 Fairfax Drive, Room E-6006

14           Arlington, Virginia  22226

15           (703) 562-2362

16   Also present:

17           SCOTT PRESTON, the video specialist

18

19                   -  0  -

20

21

22

3

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                          I-N-D-E-X

2       Witness:                                    Page:

3       Pamela Mergen

4              Examination by Mr. Rose           5

5                       -  0  -

6       Exhibits:     (Included in transcript)   Page:

7       No. 1                                    20

8       No. 2                                    22

9       No. 3                                    24

10      No. 4                                    31

11      No. 5                                    35

12      No. 6                                    36

13      No. 7                                    37

14                       -  0  -

15

16

17

18

19

20

21

22

1                    P-R-O-C-E-E-D-I-N-G-S

2          VIDEOGRAPHER:  Good morning.  This is the

3    video deposition of Pamela Mergen taken by counsel

4    for the plaintiff in the matter of Barbara Alliota et

5    al. versus Martin Gruenberg, held in the United

6    States District Court for the District of Columbia

7    Civil Action 05-2325, held in the offices of the FDIC

8    at 3501 Fairfax Drive, Arlington, Virginia, on this

9    date, May 23, 2007, at approximately 10:16 a.m.  My

10   name is Scott Preston.  I am the video specialist.

11   The court reporter is Cathy Jardim from the firm of

12   Carol Thomas Reporting.  Counsel will now introduce

13   themselves.

14          MR. ROSE:  My name is David Rose.  I am the

15   attorney for the plaintiffs.

16          MR. JONES:  William Jones for the FDIC.

17   Whereupon,

18               PAMELA K. MERGEN,

19   a witness, was called for examination by counsel for

20   plaintiffs, and after having been first duly sworn by

21   the Notary Public, was examined and testified as follows:

22          EXAMINATION BY COUNSEL FOR PLAINTIFFS

1           BY MR. ROSE:

2      Q.    Ms. Mergen, would you be kind enough to

3    state your full name for the record?

4      A.    Pamela K. Mergen.

5      Q.    Tell us what your current employment is.

6      A.    I currently work for the Federal Deposit

7    Insurance Corporation.

8      Q.    And what is your position and title?

9      A.    I am a senior -- I am a lead HR specialist

10   in the human resources department at FDIC.

11     Q.    As you probably know, this is an age-

12   discrimination case.  I need to ask you the date of

13   your birth.

14     A.    7/20/1950.

15     Q.    Would you, Ms. Mergen -- have you had your

16   deposition taken in the past?

17     A.    On other matters, yes.

18     Q.    Okay, fine.  Well, the procedures are

19   generally the same.  You have probably heard this

20   before, but I will try to avoid interrupting you

21   before you answer, and please wait until you hear all

22   of my question.  I may pause in the middle.  Just be

1    patient.  Do the best we can.  It is harder to do --

2    it is much easier to say than to do.

3            And the other thing you have probably heard

4    before, if you think -- if you don't understand the

5    question or think it is too complex or it has several

6    parts and should be broken up, just ask me, and I may

7    try to rephrase the question so it can be a little

8    clearer.

9            As you probably know, any time you need to

10   take a break, you may do that, but you should answer

11   the question that is pending before you take the

12   break.  Okay?

13      A.   Sure.

14      Q.   Would you tell us where you reside now,

15   please.

16      A.   I reside in Frisco, Texas.

17      Q.   So, are you just up here for this deposition

18   or do you work in Washington part of the time?

19      A.   I work in Washington part of the time.  My

20   official duty station is in Dallas, Texas, with FDIC,

21   but I belong to headquarters, HR department, so I am

22   back here for quite a bit of my time.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q.    Would you tell us where you went to high

2    school and when you graduated, please.

3    A.    I went to Dubuque Senior High School and I

4    graduated in 1968.  This was Dubuque, Iowa.

5    Q.    Did you go on to school after that?

6    A.    Yes.  I graduated with both a bachelor's and

7    master's degrees.

8    Q.    From?

9    A.    Bachelor's degree was from the University of

10    Wisconsin at Plattville, Plattville, Wisconsin.

11    Q.    I am sorry.  Plattville?

12    A.    Plattville.  And my master's degree was from

13    the University of San Francisco, in San Francisco,

14    California.

15    Q.    What year did you get your BA?

16    A.    In '71.

17    Q.    And how about your master's degree?

18    A.    In '99, 1999.

19    Q.    So tell us what you did after you graduated

20    from college in '71, your employment history

21    essentially.

22    A.    My employment history, initially when I

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1   first graduated from college I stayed and was on the

2   faculty of the University of Wisconsin at Plattville,

3   and I worked in the residence hall system.  I was

4   assistant director of student housing, and I was also

5   a resident director in a women's dormitory.  Then

6   from there, I think I had a couple of temporary

7   positions until about '73, I guess it was, '74, when

8   I first entered Civil Service.

9       Q.   What was your first position and where was

10  it?

11      A.   It was in Adac, Alaska, which is about 500

12  miles from Siberia, out in the Aleutian Islands.  My

13  husband was in the Navy, okay, and I became a supply

14  clerk.

15      Q.   And tell me the name of the station again?

16  I have never heard of it.

17      A.   It was Adac Naval Station.

18      Q.   A-D-A-C.

19      A.   Which is now closed.

20      Q.   Where is that in relation to Juneau, is it

21  north of Juneau?

22      A.   It is 1200 miles from Anchorage.

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Q.    In which direction?

2      A.    Well, it is west, because we are 500 miles

3  from Siberia.  We are pretty far out there in the

4  Aleutian chain.

5      Q.    Fairly chilly?

6      A.    Adac was the warmest place in Alaska in the

7  winter and the coolest place in the summer.  We

8  averaged about 40 degrees year round.

9      Q.    Was that an acronym for a military thing or

10  is that a location, Adac?

11      A.    That is a location.  That is an island.

12      Q.    And you said the University of Wisconsin at

13  Plattville, P-L-A-T-V-I-L-L-E?

14      A.    Two T's, P-L-A-T-T-V-I-L-L-E.

15      Q.    So you were -- did you say a supply clerk?

16      A.    Yes.

17      Q.    Was that a five?

18      A.    That was a three, and I was quickly promoted

19  to a four.  There aren't a lot of employment

20  opportunities when you are living next to Siberia.

21      Q.    I assume that is correct.  What was your

22  next duty station?

EXHIBIT 31    10
ALIOTTA v. BAIR
No. 05-2325-RMU

1    A.    From there we moved to the San Francisco Bay

2    area, and there I was accepted as a Navy personnel

3    intern for the Department of Navy, so that is where I

4    began my professional career in the human resources

5    field, and this was like in 1975.

6    Q.    So you were Civil Service by then --

7    A.    I was Civil Service in Alaska.

8    Q.    Tell us roughly what your -- when your

9    promotions happened and what grade you were, roughly?

10    A.    I started there in '75.  By '78, '79, I was

11    a grade 11.  I became a grade 12 around 1982 or '83.

12    That is when I moved from northern California to

13    southern California, still working for the Department

14    of the Navy, and I worked in two different locations

15    when I was down in southern California.  I worked for

16    the Naval Ship Weapons Systems Engineering Station at

17    one location where I was a staffing specialist, and

18    then I was head of staffing and recruitment for

19    Construction Battalion Center in Port Wanemi,

20    California.

21    Q.    Is that close to San Diego?

22    A.    It is north.  It is by Ventura, south of

EXHIBIT 31    11
ALIOTTA v. BAIR
No. 05-2325-RMU

1   Santa Barbara, north of LA.

2       Q.    And were you still a 12 as the head of

3   staffing?

4       A.    That is correct.

5       Q.    Go ahead.  Tell me what is next.

6       A.    Then I took a sabbatical because we moved to

7   Japan, and we were in Japan for four years at which

8   time I taught English in Japanese high schools and

9   also did a lot of private English classes and worked

10  for companies, American companies over there teaching

11  English to their work force.

12      Q.    Roughly what year -- are we in the '80s?

13      A.    We are in the late '80s.  We came back to

14  the states in 1990.  1991, I went to work briefly for

15  the Department of Navy in just a temporary position

16  hiring people to pick up bombs off the desert in

17  Saudi Arabia and Kuwait.  Then from there I went to

18  work for U.S. Office of Personnel Management.  I was

19  still a grade 12 at that time.

20      Q.    And that was in '91 or '92?

21      A.    Yes.  I am guessing '92.  Then at that point

22  in time, when I went to work for the U.S. Office of

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   Personnel Management, I started to become more

2   involved in reductions in force because the Navy was

3   downsizing in the bay area and they were anticipating

4   losing about 50,000 Civil Service positions, and

5   working for the personnel office for the federal

6   government, we felt like we had a leadership role in

7   helping them with their downsizing operations, so

8   that is how I started getting involved with doing a

9   lot of RIFs and restructuring.  Sometime, I would

10  say, I am trying to think -- I was probably at OPM

11  for about four or five years when I was promoted to a

12  grade 13.

13       Q.   Okay.

14       A.   At that point in time, my primary job was

15  dealing with -- doing reimbursable services on behalf

16  of OPM with other federal agencies and helping them

17  with their downsizing and restructuring needs.

18       Q.   Were you still in --

19       A.   San Francisco.  I stayed in San Francisco

20  and worked out of -- I stayed in San Francisco until

21  2001.  Then I moved to Dallas, or Frisco, where I

22  currently reside.  I continued to work for the San

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Francisco office of OPM for about two years after

2    that move, and during that time is also when I

3    started my relationship with FDIC because they were

4    going through some reductions in force in 2002 and

5    2003, and as a consultant, an OPM employee, I

6    consulted with FDIC to assist them with their

7    reductions in force.

8         Q.    You said 2000 and 2003?

9         A.    2002 and 2003.

10        Q.    Go ahead.

11        A.    I was going to say, in 2003, November 2003,

12   I was offered a position by FDIC to become an

13   employee, which I subsequently accepted and have been

14   here since.

15        Q.    What is your grade?

16        A.    My current grade is a 15.  I was promoted in

17   January of 2005 to a grade 15, and I was promoted

18   when I came to FDIC.

19        Q.    So when you moved to FDIC, you moved as a

20   14, you became a 14?

21        A.    Correct, I became a 14.

22        Q.    And so, now you are with the FDIC and you

EXHIBIT 31    14
ALIOTTA v. BAIR
No. 05-2325-RMU

1    are a grade 15?

2        A.    That is correct.

3        Q.    Thank you for all of that background.

4            Tell me, just in concept, about the 2002

5    downsizing.  Could you tell me what parts of FDIC

6    were affected and what the magnitude of it was?  Or

7    if you want to answer separately, that is fine.

8        A.    The area of focus on the 2002 downsizing was

9    legal division and in specific, attorneys within the

10    legal division.  There had been identified a surplus

11    of staff.

12        Q.    And how about 2003, was that also legal?

13        A.    2003, I believe there was a small legal

14    presence.  It was of the non-attorney staff, but

15    there also were relatively small RIFs occurring in

16    many of the divisions in FDIC throughout the country.

17        Q.    By small, give me an order of magnitude.

18        A.    I am trying to remember how many people --

19        Q.    Less than a 100?

20        A.    Less than 100, nationwide, yes.

21        Q.    Do you recall whether there was a downsizing

22    for DRR, division of -- tell me what DRR is first?

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    A.    Division of Resolution and Receivership.

2    Q.    Yes.

3    A.    I know there was some planning for a very

4    small downsizing in DRR.  I don't recall the exact

5    number of people that may have been impacted by it,

6    but I know it was very small, as I recall.

7    Q.    Do you think that it may have been

8    unnecessary actually to RIF people, or don't you

9    recall one way or the other?

10    A.    It is the corporation's call.  They can RIF

11    a person or run a RIF if they have one surplus

12    person, and that has been done in other areas within

13    FDIC.

14    Q.    At FDIC, what is the -- is there any

15    standing authority to -- well, let me go backwards.

16    I know that the possibility -- my understanding is,

17    at least, and I will ask you to confirm it, that

18    there had been RIFs -- let me rephrase it.

19        To your knowledge, had there been RIFs at

20    the FDIC in the '90s?

21    A.    My understanding is there were some RIFs in

22    the '90s, but I believe they were largely office

EXHIBIT 31    16
ALIOTTA v. BAIR
No. 05-2325-RMU

1    closures.

2        Q.    And then those were the field offices --

3    Dallas was still open, obviously, and still is, but

4    the others were the closures of the field offices, as

5    far as you can recall?

6        A.    To my knowledge.  I was not involved in any

7    way with any of those.  More hearsay, that I am aware

8    of that.

9        Q.    To your knowledge is all we can ask of you,

10    so that is fine, just answer to the extent you can,

11    as you just did.  That is just fine.

12            Do you know of any reason why -- let me go

13    on.

14            Let me ask you first, when you were asked

15    to -- let's see.  You were hired in 2003.  When did

16    you first hear of the possibility or learn of the

17    possibility of a RIF occurring in 2004 or 2005?  And

18    again, as best you can.

19        A.    I know it wasn't mentioned when I was hired.

20    It was sometime after that.  I know that I first

21    became involved in planning -- in discussing

22    restructuring activities about December of 2004.

EXHIBIT 31    17
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q.    Wasn't there some sort of letter that went

2    out in the fall of 2004 about the possible RIFs in

3    DRR and other parts of the agency, other divisions?

4    A.    I recall a letter going out from the COO

5    talking about workforce planning.  I don't recall if

6    there were specific divisions mentioned in it, more

7    the exact timing of that letter.

8          (Pause.)

9          BY MR. ROSE:

10    Q.    Were you aware of a vision strategic

11    planning meeting at which Director Glassman made some

12    opening remarks and -- are you aware of the vision

13    strategic planning group or meeting beginning in May

14    of 2004?

15    A.    Who was the audience?

16    Q.    Well, I am not entirely sure, and as

17    Mr. Jones will tell you, even if we could answer

18    questions, we are not supposed to.

19    A.    The reason I ask is because I do recall

20    attending a meeting in Washington and one in Dallas

21    which was held with the entire population of DRR,

22    everybody was invited to come, and I know Director

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     Glassman spoke at both of those meetings and

2     described the current state of affairs in DRR and the

3     changing environment.

4         Q.    Let me hand you what has been marked as DRR

5     01201 through 1205, and these all start with the

6     letters AL.

7             Counsel, if you would be kind enough to look

8     at it and see if you can ask the witness to look at

9     it.

10        A.    This doesn't look like a meeting I attended.

11        Q.    Okay.  Thank you.

12            Tell me what your recollection is -- you

13    started to tell me that there was a meeting that

14    included, at least all of DRR was invited to attend.

15    Can you give us a rough estimate of when that might

16    have occurred?

17        A.    That is what I was trying to think of when

18    you were examining the documents.  My guess is that

19    it must have been in early 2005, because I don't

20    recall things gelling completely for DRR until

21    probably early 2005.

22        Q.    Who was the chairman -- who was the head of

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1    the agency in the beginning of 2005?

2         A.    I believe Paul.

3         Q.    Do you recall the -- do you recall a meeting

4    at which he spoke?  Was he at this meeting, do you

5    recall?

6         A.    No, not any meeting that I was present at.

7         Q.    So, tell me roughly whatever the date of

8    that meeting was, roughly what issues were discussed

9    and who -- I think you told me Mr. Glassman spoke,

10   among other people?

11        A.    I remember Mr. Glassman speaking.  I

12   remember in the Dallas meeting, I believe -- I

13   remember there being union representation there, and

14   the union may have had some minor role in the

15   meeting.  I believe Jim Seagers may have spoke

16   briefly in the meeting.  That is the only

17   recollection I have --

18        Q.    Was Mr. Bovenzi at any meeting that you are

19   aware of, any group meeting --

20        A.    I don't recall.

21        Q.    Are you likely -- if he spoke, would you be

22   likely to remember that?

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     A.   Well, I have been at a number of meetings in

2     various organizations where he has spoke, so

3     sometimes they run together.

4     Q.   Sure.  That is fine.

5          (Pause.)

6          THE WITNESS:  I feel he may have been at

7     those meetings, but I can't say with absolute

8     certainty.

9          BY MR. ROSE:

10    Q.   Just give us your best belief.  That is

11    fine.  I am going to ask the court reporter to mark

12    this as a three -- this is a two-page document, pages

13    AL DRR 1227 and 1228.

14         MR. ROSE:  Would you mark it, please.

15              (Mergen Exhibit No. 1

16              was marked for identification.)

17         BY MR. ROSE:

18    Q.   I just give you these documents to ask you

19    if you had heard -- if anybody at this period of

20    time, which I assume is the -- well, let me ask you,

21    what is the Q-1004 chairman's staffing report, what

22    does Q-1004 mean in terms of the ordinary calendar?

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Is FDI's fiscal year the same as the calendar year?

2           A.     Theirs is calendar year, yes.

3           Q.     So I assume if it is Q-1 2004, it is

4      referring to people on staff as of March 31, '04; is

5      that reasonable?

6           A.     Yes.

7           Q.     During this period, in early 2004, had you

8      ever heard anybody at headquarters say that DRR was

9      overstaffed with 520 employees?

10          A.     I can't recall any specific comments about

11     that.  I knew at some point in time during 2004, I

12     became aware that there had been discussions going on

13     in the corporation about the staffing levels of DRR.

14     I was not brought into those discussions until very

15     late in 2004.

16          Q.     When you were brought in in late 2004, had

17     the magnitude of the -- had there been any kind of

18     decision made tentatively as to the size of the

19     downsizing that would be imposed on DRR?

20          A.     I am not aware that there was, because to do

21     that you would have to have determined your new

22     organizational structure and then that would kind of

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    drive the amount of downsizing that would need to be

2    done, and that had not been finalized, to my

3    knowledge.

4        Q.   In 2000 --

5        A.   And four.

6        Q.   Why don't we take a 10-minute break.  I will

7    organize myself better.

8             VIDEOGRAPHER:  We are going off the record

9    at 10:53:33.

10            (Discussion off the record.)

11            (Brief recess.)

12            VIDEOGRAPHER:  We are back on the record at

13   11:20:53.

14            MR. ROSE:  Thank you.

15            Madam reporter, would you mark as the next

16   exhibit pages 02351 through 02356.

17                (Mergen Exhibit No. 2

18                was marked for identification.)

19            BY MR. ROSE:

20        Q.   Had you ever seen the first page of that

21   document, the memo from Mr. Glassman?

22        A.   No, I have not.

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1        Q.   Is that September --

2        A.   September 9, 2004.

3        Q.   Were you aware in September 9, 2004, of any

4   discussion of downsizing DRR?

5        A.   I don't recall.

6        Q.   You think you did not or you don't recall

7   one way or the other?

8        A.   I don't recall the timeframe that I became

9   aware of the potential downsizing in DRR.

10       Q.   Mr. Glassman's recommendation essentially

11  was that the '05 budget for DRR would remain

12  approximately the same level -- I am sorry, the same

13  number of employees as it had been the year before,

14  based on your reading of that one document?

15       A.   It appears that it would be slightly lower

16  at the end of 2005 than what it was estimated to be

17  at the beginning of 2005.

18       Q.   So what was the number at the beginning?

19       A.   The number was 518.  The number at the end

20  was 502.

21            MR. ROSE:  Would you mark this as 3.  It is

22  pages 229 through 232.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1              (Mergen Exhibit No. 3

 2              was marked for identification.)

 3         BY MR. ROSE:

 4    Q.   Do you know what, if anything -- why Mr.

 5    Glassman is now recommending a cut of more than half

 6    of the size of DRR, whereas in the prior memorandum

 7    he was recommending keeping it at approximately the

 8    same size it had been before?

 9    A.   I was not involved in any of the

10    discussions.

11    Q.   You had no role at all in deciding the size

12    of the cut?

13    A.   No.

14    Q.   Had you, prior to 2000 -- to the 2005

15    reduction, had you ever participated in a reduction

16    in force where more than half of the employees were

17    to be eliminated -- or more than half of the jobs

18    were to be eliminated?

19    A.   Yes, I have.

20    Q.   Where was that and what was --

21    A.   Military sea-lift command, belonged to the

22    Department of the Navy.  They were going through a
```

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    major reduction in force as well as a transfer of --

2    several transfers of function and relocation, and

3    they downsized their workforce by over 50 percent.

4        Q.    And what year was that?  Just roughly.

5        A.    Mid-'90s, probably.

6        Q.    And were the long-term employees allowed to

7    bid on other jobs with bumping rights and so forth,

8    in that reduction in force?

9        A.    There was a limited reduction in force, but

10   it was combined with a transfer of function.  So

11   there were a number of things that were going on.  In

12   some cases there were functions that were no longer

13   going to be performed by that command and they were

14   going to other parts of the Navy.

15            In other cases there were functions that the

16   command was going to keep, but it was going to move

17   from San Francisco to San Diego, and there had the

18   potential, if there were more people that wanted to

19   go to San Diego than what there were positions

20   available, then we would have had to have done a

21   reduction in force, in order to place everybody that

22   wanted to go to San Diego.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q.   Did that actually occur?

2    A.   I am trying to recall, because they had gone

3    through several evolutions of downsizing, and I know

4    that we had conducted a RIF, but I -- I am having a

5    hard time remembering -- I don't think we have had to

6    conduct one for the slots in San Diego.  I think we

7    had to deal with some of the people that did not want

8    to do a transfer of function.

9    Q.   If they didn't want to do a transfer of

10    function, did they have bidding rights or anything --

11    what happened to them, they lost their jobs?

12    A.   They basically lost their jobs, yes.

13    Q.   So basically, they could keep the job if

14    they were prepared to move to San Diego?

15    A.   They might be able to, and we worked very

16    hard to place everyone we could in jobs in San Diego.

17    In some cases, we restructured jobs in order to

18    accommodate employees.

19    Q.   Okay.  So maybe I should proceed the other

20    way.  What part of the RIF did you -- I am sorry.

21    What part of the downsizing did you play a role in

22    formulating?

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1      A.   For whom?

2      Q.   I am sorry.  Back to DRR and FDIC.  Sorry

3  about that.

4      A.   My role in the downsizing largely came into

5  place once it was determined that a reduction in

6  force would be likely, would be likely necessary.  I

7  was not involved at all in deciding how many

8  positions needed to go forward into the new

9  organization or any of those types of negotiations.

10  That is outside of the purview of my

11  responsibilities.

12           Basically once management has identified the

13  fact that they have surplus employees, and the

14  likelihood of these surplus employees either facing a

15  downgrade or an involuntary separation exists, then

16  we are required to use RIF procedures.

17      Q.   Now, FDIC is not subject to most Civil

18  Service procedures; is that correct?

19      A.   There is a number of personnel areas that

20  FDIC is not subject to Title V regulations.  RIF is

21  not one of those.  We are subject to Title V.

22      Q.   Is it not the normal procedure under Title V

EXHIBIT 31     28
ALIOTTA v. BAIR
No. 05-2325-RMU

1  to have people use their length of service to bid for

2  jobs, other jobs in the organization or the agency?

3      A.   It depends upon what vehicle you are talking

4  about, when you say bidding for jobs.  There are a

5  number of ways that people can go into different

6  positions in a Civil Service type organization.

7      Q.   Well, the familiar government -- the RIFs

8  that I am familiar with, at least, were -- involved

9  Civil Service employees at grade level similar to the

10 grade levels at FDIC, and they typically could bid

11 for remaining jobs and they could bump employees

12 based on their length of service if they needed to in

13 order to preserve their position.

14     A.   You are talking about filling positions

15 through the RIF process.  There are very strict rules

16 and regulations that we must follow in doing that.

17          You are correct inasmuch as their length of

18 service has some factor, but it is only one of four

19 factors that are considered in determining their

20 seniority or their retention standing in a reduction

21 in force, and it is not an absolute factor.  It

22 doesn't trump, like, veterans' preference.

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1        Q.    I understand that, if they are veterans they

2    go first -- I mean they go last, essentially.  They

3    have the best bidding.  The agency is not allowed to

4    terminate their employment, but among those who are

5    not veterans, seniority is a factor, and you said

6    there are other factors as well.  What are they

7    typically?

8        A.    The factors are, first whether or not you

9    are a veteran.  You have veterans' preferences.

10   There are two kinds of veterans' preference, and then

11   for the third category, are the non-veterans.

12            Then in addition to that, we look at whether

13   they are career tenure or if they are career

14   conditional or if they are non-permanent,

15   non-temporary employees.  Beyond that we also look at

16   their performance over the last three years

17   basically.

18            So those are all things that are factored

19   into determining their retention standing.

20       Q.    As I understand what happened in this case

21   is that people were ranked in their order of -- so

22   that the people who had the highest scores among the

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1    non-veterans were listed in order, but that the

2    selecting official could choose any one of a large

3    number of people if he only had -- he or she only had

4    one vacancy; is that right?

5        A.   When you say scores, I guess I am not sure

6    exactly what you mean by scores.

7        Q.   I meant -- you indicated that given the

8    factors that you mentioned, length of service and

9    performance, essentially, the selecting official was

10   essentially allowed to disregard that in deciding who

11   to select for positions?

12       A.   No, no.  There is a very strict process that

13   we go through when filling positions through the

14   reduction in force, and this process involves

15   retention standing, it involves bump and retreat

16   rights, it involves qualifications of individuals; so

17   there are a number of things that we have to look at

18   as we go forward to fill positions, and it is a

19   little bit different whether the position is an

20   occupied position or a vacant position.

21       Q.   I would like to show you pages 5 and 6,

22   which appears to be -- well, I will show it to you

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1    and I will ask the court reporter to number it and

2    give it to Mr. Jones, and then we will do what we did

3    before.

4                    (Mergen Exhibit No. 4

5                    was marked for identification.)

6            BY MR. ROSE:

7        Q.    So, the top person in terms of retention

8    standing order was Dennis Harootunian; is that

9    correct?

10       A.    If you are talking about master retention

11   standing order, yes.

12       Q.    And approximately, or maybe you could count

13   for me how many names there were there?

14       A.    Fifteen, approximately 15 names on the total

15   list.

16       Q.    And who was the person selected?

17       A.    Belinda Davis.

18       Q.    And what number was she?

19       A.    She was number 15 on the list.

20       Q.    So Mr. Glassman decided to select her even

21   though she had the least retention standing?

22       A.    There was not a requirement for filling

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    vacancies to select people with the greatest master

2    retention standing.  The requirement is that you may

3    select someone for a vacancy when everybody is in the

4    same subgroup, and the subgroup here is 1(b), you may

5    select anyone within that subgroup unless someone

6    has previously -- in that list, has previously held

7    the job before, which means they would have a retreat

8    right to that job.

9            In that case, you could select that

10   person or -- in this case, if it was Timothy Doyle,

11   let's say he had a retreat right to that job.  That

12   means he basically had it before.  You could select

13   Timothy or you could select anybody with greater

14   retention standing than him, but as you can see from

15   the middle column, no one had retreat rights, which

16   means no one held the job before, and everyone is a

17   1(b), which means they are a career non-veteran.  So

18   everyone has equal rights to that job.

19       Q.   Are you aware of the fact that FDIC changed

20   job descriptions for substantially all the

21   professional employees at the time of the RIF?

22       A.   That was part of the reorganization.  They

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  were going from a generalist to a specialist

2  environment, so that involved a number of new

3  positions that needed to be established, and they

4  needed to fill them through -- and they chose to fill

5  them through the RIF process.

6  Q.  So since they were all new positions, that

7  avoided anybody having retreat rights; is that right?

8  A.  Unless they had held a specialist position

9  in their previous life.

10  Q.  Because it was called a specialist position;

11  is that right?

12  A.  We have to look at the duties and

13  responsibilities and qualification requirements of

14  the position, and we look at what the employees tell

15  us they have done in their past, based upon their

16  work history.  They were allowed to provide us an

17  with updated resume, and we also went and went

18  through their official personnel folder to look and

19  see, to verify what positions they may have held in

20  the past that might be essentially identical to

21  positions that are in the new organization.

22  Q.  Are you aware that a few years earlier than

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    this, FDIC had gone to great lengths to give people

2    the same kind of title so that they would all be

3    generalists rather than specialists?

4         A.   That was prior, I think, to my coming to

5    FDIC, so I am not aware of any specifics in that

6    regard.

7         Q.   Do you know of any instance in which, in the

8    2005 downsizing, the agency determined that any

9    job -- any of their new job descriptions was -- had

10   the same duties as the prior people, people who held

11   the prior positions?

12        A.   I am not clear about your question.  Are you

13   referring to --

14        Q.   I am referring to DRR and to this RIF and

15   this reduction in force, and do you know of any

16   instance in which the FDIC determined that somebody's

17   prior experience was substantially identical to the

18   job description duties?

19        A.   Are you referring to their previous work at

20   FDIC?

21        Q.   Yes.

22        A.   There were instances, I believe, where there

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1    were some retreat rights that were identified, yes.

2        Q.    Any idea of how many?

3        A.    I would really hesitate to speculate.

4        Q.    Were the OPM guidelines for RIFs modified in

5    the last five or ten years, do you know, changed

6    substantially?

7        A.    Not changed substantially, no.

8        Q.    What is the title of that job?

9        A.    This is a Claims Systems Analyst 1101-13,

10    PDF 65S-162.

11        Q.    Let me show you two other bids from the same

12    time period.

13            MR. ROSE:   Would you mark this first one,

14    which is 07 and 08.

15                (Mergen Exhibit No. 5

16                was marked for identification.)

17            BY MR. ROSE:

18        Q.    Who was the person selected on that list?   I

19    am sorry.   What number do you have in front of you?

20        A.    Franchise asset marketing specialist CG

21    1101-13, PD 65S-163, and the person selected appears

22    to be was Sharon Yore, Y-O-R-E.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1        Q.    I am going to give you a third one, and this

 2   is numbers 9 and 10.

 3                    (Mergen Exhibit No. 6

 4                    was marked for identification.)

 5        BY MR. ROSE:

 6        Q.    Who was selected on the list in front of

 7   you?

 8        A.    Edward Thomas.

 9        Q.    And Mr. Harootunian was the top-listed

10   person again?

11        A.    Within his subgroup.  He was listed in a

12   subgroup, but again, everyone in a subgroup is

13   considered equal in terms of filling positions

14   through the RIF process when we are talking about

15   vacancies.

16        Q.    Do you know any of the people on those

17   lists?

18        A.    No, none of the names are familiar to me,

19   none of the people are.

20             MR. JONES:  You are referring to Exhibit 6

21   in particular?

22             MR. ROSE:  I was referring to 6, but many of
```

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    the names are the same.

2         MR. JONES:  Do you want her to look at the

3    other ones?

4         MR. ROSE:  Yes.

5         BY MR. ROSE:

6    Q.   Why don't you look at the others?

7    A.   Exhibit 5, I am not familiar with any of the

8    names.  Nor Exhibit 4.

9         MR. ROSE:  I will give you one more of

10   these.  Please give it a number.

11             (Mergen Exhibit No. 7

12              was marked for identification.)

13        BY MR. ROSE:

14   Q.   And just identify that position, please.

15   A.   Special Assistant CG 1101-13, position

16   number 65W131.

17   Q.   Are you familiar with any of the people on

18   that list?

19   A.   No, I am not.

20   Q.   Was there a reduction in size in 2006

21   involving the possibility of a RIF?  I am talking

22   about FDIC.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    A.    We had RIFs in 2006.

2    Q.    And what divisions were affected?

3    A.    I think the only division that ultimately

4    had a RIF was the Division of Administration.

5    Q.    And what was the order -- how many people --

6    was Division of Administration reduced in size?

7    A.    Yes, it was.

8    Q.    Any idea what the reduction was in

9    proportion to the number of positions?

10    A.    Are you talking about the actual number of

11    separations or are you talking about the number of

12    positions reduced?  We had involuntary separations

13    and we had a lot of voluntary movement.

14    Q.    Well, let's talk about both.  Any idea of

15    how many positions were eliminated?

16    A.    I would like to step back a little bit.

17    Q.    Sure.

18    A.    Within Division of Administration since I

19    became involved with them around 2003, they have

20    reduced in size 50 percent, and it was through two

21    series of reductions in force coupled with a lot of

22    incentives and voluntary actions on employees' parts

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    such as seeking employment elsewhere, getting another

2    job within FDIC.  We also had placement priority for

3    surplus employees so that they could receive

4    consideration for jobs outside of their current

5    organization within FDIC.  So we went through a lot

6    of things just like we did with the DRR folks and

7    others in a similar situation.

8        Q.    So were there -- was there an incentive plan

9    for DOA this year similar in concept to the one with

10   DRR?

11       A.    There had been buy-out incentives that were

12   previously authorized for DOA, like they had been for

13   DRR.  We also had early retirement.  We allowed

14   people to go out early, sooner than what they would

15   be eligible under regular retirement.  We did the

16   same for DRR as we did for DOA.

17       Q.    Is that age 50 and above?

18       A.    Fifty and 20 years, or 55 and any number of

19   years, yes.

20       Q.    Were there any differences between the -- in

21   procedures in the downsizing from 2006 as compared to

22   the DRR downsizing in 2005?

EXHIBIT 31
ALIOTTA v. BAIR
No. 05-2325-RMU

1     A.   Differences in what way?  I guess I am not

2   sure.

3     Q.   Well, I had heard from the grapevine, which

4   is not necessarily the most authoritative source,

5   that very few people actually got RIF'd.  Most of the

6   people were placed, I was told all of them.  Were

7   there some actual RIFs in 2000 --

8     A.   There were a few RIFs.  I believe in

9   Dallas -- I know we had RIFs here, but I don't

10   believe anybody was separated here.  They ended up

11   being changed to a lower grade, but we also had a lot

12   of success with voluntary placement of individuals

13   who went to other places within FDIC or found jobs

14   elsewhere or elected to voluntary separate with a

15   separation incentive or in some cases even without a

16   separation incentive.

17     Q.   And so, for DOA, was the downsizing both in

18   Dallas and here at headquarters in Washington?

19     A.   And other parts of the country as well.

20     Q.   I thought Dallas was the only field office

21   left?

22     A.   No, no, we have them scattered all over, San

EXHIBIT 31    41
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Francisco, New York, Boston, Atlanta -- Chicago and

2    Dallas are kind of combined now, but, yes, we have

3    them scattered around.

4        Q.    DRR was not scattered around, it was just

5    Dallas and here?

6        A.    Washington.

7        Q.    Is DOA a lot larger than DRR?  Do you know

8    the numbers?

9            MR. JONES:  Object as to vagueness as to

10    time.

11            MR. ROSE:  Yes.  Well, before the 2006 -- I

12    guess we have numbers for all of them.

13            BY MR. ROSE:

14        Q.    I see that as of the beginning of 2004,

15    Division of Administration had approximately 424

16    onboard staff.  Any idea what the onboard staff is

17    after the 2006 downsizing?

18        A.    I believe it is around 300.

19        Q.    Do you know whether there has been a

20    significant increase in having contractors do the

21    work that DRR used to perform?

22        A.    I would have no knowledge of that.

**EXHIBIT 31**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1              MR. ROSE:  Okay.  Give me a few minutes and

 2    I --

 3              THE WITNESS:  I would like to --

 4              MR. ROSE:  Please, go ahead.

 5              THE WITNESS:  Across the board, I have no

 6    knowledge of DRR using contractors.  I am acquainted

 7    with one instance because of new work requirements

 8    having to do with training a lot of folks, that they

 9    are using contractors or considering using

10    contractors in some capacity for that brand-new scope

11    of work.

12              BY MR. ROSE:

13       Q.    DRR is?

14       A.    Yes.

15       Q.    Has there been new work assigned to DRR in

16    the last 18 --

17       A.    New corporate taskings due to our corporate

18    employee program, and the rotations that we have, all

19    the new employees go through.  There is a component

20    where they do go to DRR.

21       Q.    And these are the people typically hired

22    after they complete college; is that right?
```

**EXHIBIT 31** 43
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      A.    Correct.

2      Q.    Do you know what -- how many people are

3   hired each year or -- let's take this year -- let's

4   take '06.  Do you have any idea how many people were

5   hired under the corporate -- I am sorry.  Let me go

6   back.

7           Is that still a four-year program

8   essentially?

9      A.    I can't say it is a four-year program.

10  There is a first year of very intensive training that

11  occurs, and that is where I believe DRR is using

12  contractors to help with that first year of

13  training -- a component of that first year of

14  training.

15     Q.    So it is not being given by contractors

16  instead of having -- had it previously been staffed

17  from within DRR, that training?

18     A.    The training program is relatively new, so I

19  don't know if they initially had done it and then

20  have gone to use contractors for that.  This is --

21  the program is new.  It has only been around for --

22  it is maybe in its second year.

1    Q.    There had been a corporate program which

2    people got trained and then they got different

3    assignments within the agency so they would be

4    exposed to different divisions and units; is that

5    correct, that has been in force for some years?

6    A.    I am not aware of something where they are

7    going to different divisions, other than maybe some

8    development programs, leadership developmental

9    programs.  There is no commissioning program for

10   examiners.

11   Q.    Yes, and the examiners typically need

12   several years of experience before they get their

13   commission, do they not?

14   A.    That is correct.

15        MR. ROSE:  I don't have any further

16   questions for Ms. Mergen.

17        MR. JONES:  Why don't we take a quick break.

18   I will make copies of this and we can confer and see

19   if we have follow-up questions.

20        MR. ROSE:  Sure.

21        MR. JONES:  I made copies of that.  You have

22   got yours and I have got mine.  That was before the

EXHIBIT 31    45
ALIOTTA v. BAIR
No. 05-2325-RMU

1   break.

2           VIDEOGRAPHER:  We are going off the record

3   at 12:04, and this will end tape 1.

4           (Discussion off the record.)

5           (Brief recess.)

6           MR. JONES:  No questions.

7           (Whereupon, at approximately 12:16 o'clock,

8           p.m., the taking of the above deposition

9           was concluded and signature was Not waived.)

10          *         *         *         *         *

11

12

13

14

15

16

17

18

19

20

21

22

EXHIBIT 31    46
ALIOTTA v. BAIR
No. 05-2325-RMU

```
 1              E-R-R-A-T-A  S-H-E-E-T

 2

 3    IN RE:    BARBARA ALLIOTA, et al. vs. MARTIN

 4              GRUENBERG, ACTING CHAIRMAN, FDIC

 5    DEPOSITION OF:  PAMELA MERGEN

 6    DATE OF DEPOSITION:  WEDNESDAY, MAY 23, 2007

 7    At the time the above-named deponent read and

 8    signed this deposition, the deponent desired to

 9    make the following changes:

10    PAGE: LINE: AS TRANSCRIBED:   CHANGE TO:   REASON:

11

12

13

14

15

16

17

18

19

20

21    DATED:            _____

22                          SIGNATURE OF DEPONENT
```

**EXHIBIT 31**    47
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          CERTIFICATE OF THE DEPONENT

2       I have read the foregoing pages 5 through 45

3   inclusive, and find the answers to the questions

4   therein contained to be true and correct, with the

5   exception of changes, if any, as per the errata

6   sheet following herewith.

7          _____

8              PAMELA MERGEN

9          DATED:_____

10

11   - - - - - - - - - - - - - - - - - - - - - - - - -

12         CERTIFICATE OF THE NOTARY PUBLIC

13      SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

14   DAY OF _____, 2007

15

           _____

16

             (PRINT NAME OF NOTARY)

17

           NOTARY PUBLIC IN AND FOR

18                THE STATE OF

19          _____

20

21   MY COMMISSION EXPIRES:

22   _____

**EXHIBIT 31** 48
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                      CERTIFICATE OF NOTARY PUBLIC

2

3     I, CATHY JARDIM, the officer before whom the

4   foregoing deposition was taken, do hereby testify

5   that the witness whose testimony appears in the

6   foregoing deposition was duly sworn by me;  that the

7   testimony of said witness was taken by me

8   stenographically and thereafter reduced to a

9   transcript under my direction; that said deposition

10   is a true record of the testimony given by the

11   witness; that I am neither counsel for, nor related

12   to, nor employed by any of the parties to the action

13   in which this deposition was taken; and further, that

14   I am not a relative or employee of any attorney or

15   counsel employed by the parties hereto nor

16   financially or otherwise interested in the outcome of

17   the action.

18                       _____

19                            Cathy Jardim

20   Notary Public in and for the

21   Commonwealth of Virginia

22   My commission expires: July 31, 2010