1                 UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF COLUMBIA

2    _____

3    BARBARA ALLIOTA, et al.,          x

                                       :

4                    Plaintiffs,       :

        vs.                            : Civil Action

5                                      : No. 05-2325

     MARTIN GRUENBERG, Acting Chairman,:

6    Federal Deposit Insurance         :

     Corporation,                      :

7                                      :

                     Defendant.        x

8    _____

9                            Arlington, Virginia

10                           Friday, May 25, 2007

11

12   VIDEOTAPED DEPOSITION OF:

13              THOMAS E. PEDDICORD III,

14   a witness, was called for examination by counsel for

15   the plaintiffs in the above-entitled matter,

16   pursuant to notice and agreement of the parties as

17   to time and date, taken at 3501 Fairfax Drive,

18   Arlington, Virginia, convened at approximately 10:15

19   a.m., before Catherine B. Crump, a court reporter

20   and Notary Public in and for the Commonwealth of

21   Virginia, when were present on behalf of the

22   parties:

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1    APPEARANCE OF COUNSEL:

 2         On behalf of the Plaintiffs:

 3              ROSE & ROSE, ESQUIRES

 4              BY:  DAVID L. ROSE, ESQUIRE

 5              1320 19th Street, N.W., Suite 601

 6              Washington, D.C.  20036

 7              (202) 331-8555

 8         On behalf of the Defendant:

 9              FEDERAL DEPOSIT INSURANCE CORPORATION

10              BY:  WILLIAM S. JONES, ESQUIRE

11                   KATHRYN R. NORCROSS, ESQUIRE

12              3501 Fairfax Drive

13              Arlington, Virginia  22226

14              (703) 562-2362

15      Also Present:

16              DAVID VOIGTSBERGER, the video specialist

17                        -  0  -

18

19

20

21

22
```

EXHIBIT 32    3
ALIOTTA v. BAIR
No. 05-2325-RMU

```
 1                    I-N-D-E-X

 2    Witness:                              Page:

 3    Thomas E. Peddicord III

 4             Examination by Mr. Rose           5

 5                    -  0  -

 6    Exhibits:     (Included in transcript)   Page:

 7    Exhibit number 8 marked for identification

 8    to the Peddicord deposition              29

 9    (Budget Documentation)

10                    -  0  -

11

12

13

14

15

16

17

18

19

20

21

22
```

1               P-R-O-C-E-E-D-I-N-G-S

2               VIDEOGRAPHER:  Good morning.  This is

3     the video deposition of Tom Peddicord taken by

4     counsel for the plaintiff in the matter of Alliota

5     v. FDIC in the Federal District Court for the

6     District of Columbia, Case No. 05-2325 RMU, held in

7     the offices of FDIC, 3501 Fairfax Drive, Arlington,

8     Virginia on this date, May 25, 2007, and at the time

9     indicated on my video screen, which is 10:15 a.m.

10              My name is David Voigtsberger.  I'm the

11    video specialist.  The court reporter today is

12    Catherine Crump from the firm of Carol Thomas

13    Reporting.

14              Counsel, please introduce yourselves and

15    who you represent.

16              MR. ROSE:  My name is David Rose.  I'm

17    the attorney for the plaintiffs in this case.

18              MR. JONES:  And William Jones for

19    defendant.

20              VIDEOGRAPHER:  Will the court reporter

21    please swear in the witness.

22    Whereupon,

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

5

1              THOMAS E. PEDDICORD III,

2    was called to testify and having first been duly

3    sworn by the Notary Public, was examined and

4    testified as follows:

5              EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

6              BY MR. ROSE:

7         Q.   Mr. Peddicord, would you state your full

8    name for the record, please?

9         A.   Thomas E. Peddicord, III.

10        Q.   Okay.  And where do you reside?

11        A.   Personal residence?

12        Q.   Yeah, if you don't mind.

13        A.   I reside at 8010 Ellingson Drive, Chevy

14   Chase, Maryland.

15        Q.   Okay.  And what is your current position

16   with the FDIC?

17        A.   I'm a deputy director in the Division of

18   Finance.

19        Q.   Thank you.  I just want to -- have you

20   had your deposition taken at some earlier date?

21        A.   Yes.

22        Q.   All right.  General rules are probably

1    very much the same.  I just want to say that I

2    sometimes jump in before the witness has answered.

3    I'm not supposed to do that, and, similarly, if you

4    would try to wait until the question is completed.

5    I sometimes pause in the middle and it's not quite

6    completed yet.  I'd appreciate it if the question

7    is -- if you don't fully understand the question or

8    if it's something that will be easier for you to

9    answer in parts, you can just tell me that.

10                Obviously, you are under oath, but if --

11    you're still allowed to testify about what you

12    believe to be true, and if you can do that, that

13    would be helpful, because sometimes I will then ask

14    you how I would find out for sure and that sort of

15    thing.

16                So unless you have any other questions,

17    I'm prepared to -- unless you have some questions,

18    I'm prepared to go forward.

19            A.   Let's start.

20            Q.   Okay.  Mr. Peddicord, as you probably

21    know, this is an age discrimination case.  So I need

22    your date of birth.

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1      A.    May 15, 1946.

2      Q.    And tell us where you were brought up

3    and where you went to high school.

4      A.    I was born in Washington, D.C., raised

5    in Washington and Rockville, Maryland.  I graduated

6    from high school in Rockville at Richard Montgomery

7    High School.

8      Q.    What year was that?

9      A.    1964.

10     Q.    What did you do after that?

11     A.    I went to college.

12     Q.    Where did you go to college?

13     A.    Davidson College in Davidson, North

14   Carolina.

15     Q.    Okay.  And did you get a degree from

16   Davidson?

17     A.    Yes.

18     Q.    Okay.  What year and what degree?

19     A.    Bachelor of Arts, 1968.

20     Q.    Okay.  What did you do next?  Did you --

21     A.    I went to graduate school.

22     Q.    Went to graduate school, okay.  And

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    where?

2            A.    University of North Carolina at Chapel

3    Hill.

4            Q.    Okay.  And what field were you --

5            A.    Political science.

6            Q.    Political science, okay.  Did you get a

7    degree?

8            A.    No.

9            Q.    Okay.  How long were you at graduate

10   school, approximately?

11           A.    About eight years.

12           Q.    Oh, my goodness.  Okay.  Okay.  So tell

13   me what your -- any employment you had, beginning in

14   '68.

15           A.    I was employed by the State of North

16   Carolina for about a year.

17           Q.    Okay.

18           A.    From mid-1972 to mid-1973.  I spent my

19   -- I finished that position.  I spent 90 days on

20   active duty for training with the U.S. Army, and I

21   worked off and on over the next several years as a

22   project director in the Center for Urban and

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   Regional Studies in Chapel Hill.

2              I paused to let you write.  Do you want

3   me to keep going?

4        Q.   No.  Please go on.

5        A.   Okay.

6        Q.   I'm sorry.  She's getting it down.

7        A.   You seem to be way behind in taking

8   notes.

9        Q.   I am.  If you waited for me, we wouldn't

10  get done.

11       A.   In 1980, I went to work for the

12  Department of Housing and Urban Development.  In

13  1991, I moved to the Resolution Trust Corporation,

14  although I guess, technically, that was the time I

15  joined the FDIC.  I was a FDIC employee assigned to

16  the RTC.

17       Q.   Okay.

18       A.   And I returned to the FDIC sometime

19  during 1995, early 1995.

20       Q.   What sort of position did you hold at --

21  well, let me ask you what you did while you were

22  working for the Urban Regional Studies organization.

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1          A.    I directed research projects.

2          Q.    Okay.  And what sort of research

3   projects?

4          A.    They tended to be on urban studies

5   topics with an emphasis on public administration.

6   So I looked -- one of the projects that I worked on

7   was a study of State environmental programs and how

8   they were organized and how they could be better

9   integrated.

10         Q.    Okay.  And when you were hired by HUD,

11  what was your grade and what was your position?

12         A.    I was a management analyst, initially

13  hired at the Grade 12 level, eventually becoming a

14  14.

15         Q.    Okay.  Did you -- approximately when did

16  you become a 13?

17         A.    In one year.

18         Q.    Okay.  And how long after that before

19  you became a 14?

20         A.    About a year and a half.

21         Q.    What was your position as a 14?

22         A.    I was a management analyst.

EXHIBIT 32    11
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q.    Still?    Okay.    And you came back to the

2    FDIC itself in '95; is that correct?

3    A.    Yes.

4    Q.    Or at least that's --

5    A.    Remember, I was at the RTC, but I was

6    technically a FDIC employee.

7    Q.    I understand.    Right.

8    A.    Okay.

9    Q.    And so did you keep the same title?    Did

10   you get a different title or did anything change

11   when you came back?

12   A.    Yes.

13   Q.    Okay.

14   A.    I became -- I initially served as the

15   manager of the FDIC RTC Transition Task Force staff,

16   which was a component of the chief operating

17   officer's staff at FDIC.

18   Q.    So this was a study that tried to --

19   well, tell me what the study was about.

20   A.    This wasn't a study.

21   Q.    I'm sorry.    Project.    Excuse me.

22   A.    I was in charge of managing the process

EXHIBIT 32     12
ALIOTTA v. BAIR
No. 05-2325-RMU

1     for moving FDIC employees and residual workload from

2     the RTC back to the FDIC when the RTC reached its

3     statutory sunset on December 31, 1995.

4          Q.   What sorts of issues and problems did

5     you deal with?

6          A.   How to place a couple thousand RTC

7     employees in a FDIC that was already overstaffed and

8     in the midst of downsizing.

9          Q.   Okay.  What sorts of -- tell me what the

10    procedure followed for -- or that you used or you

11    and the agency used, I guess is a better way to say

12    it, in deciding how to do what you just tried to --

13         A.   There were a set of statutes that

14    provided some guidelines on the employment rights of

15    RTC employees and the process by which they would be

16    returned to the FDIC, but beyond that, the statute

17    established a task force comprised of officials,

18    senior officials, from both agencies, and those

19    officials developed proposed policies which were put

20    in place by the heads of the two agencies or

21    approved by the heads of the two agencies, and over

22    the course of 19 months, they established policies

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

13

1    and procedures for the return of RTC employees in

2    what turned out to be a phased process, and I

3    oversaw the execution of those policies and

4    procedures.

5         Q.    Okay.  Were you still a 14 or had you

6    been promoted?

7         A.    I was in an executive level position by

8    then.

9         Q.    You were SES?

10        A.    Actually, let me take you back.

11        Q.    Thank you.

12        A.    You had asked how far I progressed as a

13   management analyst.  I moved as a management analyst

14   to a 14.  I became -- in 1986, at HUD, I became a

15   section chief, I believe.  I've forgotten the exact

16   title, but I became a section chief in the IT

17   organization, the Information Technology

18   organization.

19        Q.    Right.

20        A.    I became a 15 in that position

21   eventually, came to the RTC as a 15, and in May of

22   1994 was promoted to an executive position, our own

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    grading system called an E-1.

2        Q.   Okay.  That's like the SES -- is that

3    SES-1?

4        A.   It's kind of like the first level of

5    SES.

6        Q.   Right.  Okay.

7        A.   Similar, but not the same.

8        Q.   No.  I understand.  Okay.  So that helps

9    me.  And what's your grade now?

10        A.   I am an executive manager.  There are no

11    grades within that designation.

12        Q.   Okay.  Who was the chief operating

13    officer of FDIC at that time?

14        A.   At which time?

15        Q.   Well, we're talking about the period

16    around the merger, I guess is -- is that '95 or is

17    that --

18        A.   I worked as the manager of the task

19    force staff from June of '94 to December of '95.

20    Initially, the chief operating officer was Harrison

21    Young, and he left soon into that period of time and

22    was succeeded by Dennis Gere.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q.  Okay.  And that's of FDIC.  Right?

2      A.  Yes.

3      Q.  Okay.  And who was the COO, if any, of

4  RTC, if you can recall?

5      A.  There was not really a chief operating

6  officer.  There was a chief executive officer, which

7  was more equivalent to the FDIC chairman, and his

8  name was Jack Ryan.  Right?  Jack Ryan?

9      MR. JONES:  You have a better memory

10  than I do, and I'm not allowed to help.

11      THE WITNESS:  It's a long time ago.

12      MR. ROSE:  Well, that's fine.

13      THE WITNESS:  I think it's Jack Ryan.

14      BY MR. ROSE:  You're doing fine.  Just

15  the best you can is all we can ask for, and that's

16  fine.  Do you know what Mr. Gere did after he left?

17      A.  After he left the FDIC?

18      Q.  Yeah.

19      A.  Yes.  He became an executive with GMAC

20  Mortgage in Philadelphia.

21      Q.  Okay.

22      A.  After he left the FDIC, that's what

**EXHIBIT 32** 16
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   you're asking?

2        Q.   Yes, exactly.  Okay.  And who succeeded

3   him as the COO of FDIC?

4        A.   John Bevenzie.

5        Q.   And that was '95 or '96?

6        A.   No, no, no.  Mr. Gere left in the late

7   1990s.

8        Q.   Late 1990s.  I'm sorry.  That's fine.

9   So this was in the late 1990s?

10       A.   [Gestures.]

11       Q.   Okay.  Would you tell us what -- I'm

12   going to use the word "downsizing".  You may have

13   used that a few minutes ago, but downsizing or RIFs

14   that you have worked on.  Well, I want to try to

15   restrict it to FDIC.

16       A.   Okay.

17       Q.   If there were some at other agencies,

18   that would be interesting, but just tell me about

19   FDIC, at least, first.

20       A.   Sure.  When we put RTC and FDIC back

21   together, January 1, 1996, we had just shy of 12,000

22   employees.  Once that transition was finished, I was

EXHIBIT 32                    17
ALIOTTA v. BAIR
No. 05-2325-RMU

1    reassigned to a position as associate director in

2    the Division of Administration, and one of the

3    responsibilities that I had in that position was to

4    oversee or administer a process of workload and

5    staffing analysis to determine how many people we

6    needed and to develop strategies to reduce our

7    staffing to those levels.

8              Through 1996, we went through the first

9    of those processes in which I was involved,

10   culminating in October 1996 in a communication to

11   all employees outlining a downsizing program or a

12   downsizing plan that was phased through the

13   beginning of the Year 2000.

14        Q.   Okay.  And if you can just tell me what

15   the order of magnitude was in the reduction.   I

16   gather you were starting at something like 12,000

17   employees.

18        A.   We had started at the beginning of 1996

19   with about 12,000 employees.  The target -- we

20   developed in that year a five-year -- a set of

21   five-year staffing targets that culminated with a

22   number around 6700.  I can't remember the exact

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    number, but it was around 6700 to be reached by

2    December 31, 2000.

3          Q.    Okay.  Who was the chairman of the FDIC

4    in this period from --  if there was more than one,

5    tell me that, but '96 to 2000.

6          A.    Initially, the chairman was Ricki

7    Helfer.

8          Q.    Okay.

9          A.    When she left, Skip Hove became the

10   acting chairman for a year, and eventually Donna

11   Tenoy was confirmed as the chairman.

12         Q.    And were there actual layoffs during

13   that time or was it mostly -- tell us what the --

14   how the split went.  Were there some incentives and

15   both layoffs, both?

16         A.    Sure.

17         Q.    Okay.

18         A.    It was a very comprehensive program, and

19   we did in that period of time achieve the staffing

20   target that we set out initially.

21         Q.    Okay.

22         A.    So we did reduce from about 12,000 to

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1   about 6700 or thereabouts, and we pretty much

2   followed with some minor adjustments as we went

3   along.  This process got reviewed once a year and

4   updated once a year.

5          Q.   Sure.

6          A.   So we had a plan update each year.  But,

7   essentially, we followed the outlines of the plan

8   that was adopted in October of 1996.  That involved

9   the phased closure of all of the field offices

10  dealing with the resolutions function and the asset

11  liquidation function except for the Dallas office,

12  and I believe that there were eight locations, eight

13  or nine locations, that were closed during that

14  period from -- the first of the closures, I think

15  occurred at the end of the first quarter in 1997,

16  and that continued all the way until June 30th of

17  2000.  Originally, we had targeted that last closure

18  to happen by the end of 1999, but by June 30th of

19  2000, we closed the Hartford office, and that was

20  the last closure.

21          All of those -- so we had announced a

22  set of plans to close offices.  The technical

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    procedure that was used for closing those offices

2    was a RIF.

3              Q.    Okay.

4              A.    But there were put in place a large

5    number of other programs to try to reduce staffing,

6    to the extent possible, voluntarily and to reduce

7    the number of people who would be impacted by

8    involuntary separations, and they included

9    opportunities to apply for positions, vacant

10   positions, that existed elsewhere within the FDIC.

11   Remember, it was the liquidation function that was

12   downsizing and not necessarily all of the other

13   functions of the corporation.

14             Q.    Right.

15             A.    So there were opportunities, really

16   preferred placement opportunities, in vacant

17   positions in the FDIC.  There were outplacement

18   services offered to provide assistance to people in

19   finding employment outside the FDIC voluntarily.

20   There were buyout programs used extensively to try

21   to provide financial incentives for people to leave,

22   and there were -- in constituting this single

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    location in Dallas for the liquidation function,

2    there were a large number of positions created in

3    that office when we decided to consolidate to one

4    site.  We needed more positions in that site than

5    were then in the Dallas office, but far fewer than

6    were in the total field operation, and employees

7    were given the opportunity to compete for those --

8    employees in the closing offices --

9         Q.   Correct.

10        A.   -- only in the closing offices, were

11   given the opportunity to compete for jobs in the

12   surviving Dallas office.  As I recall, all clerical

13   employees were also given -- were told that they

14   would receive directed reassignments, so they were

15   guaranteed positions if they could move.  Now, not

16   all of them could move, but technically, those

17   employees were not subject to a RIF.

18        Q.   They were -- yeah.  Okay.  So the

19   clerical people --

20        A.   Simply because they didn't move.

21        Q.   Right.  Okay.

22        A.   So we did a lot of -- I mean, if you

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    think about each of those offices being a separate

2    RIF, there were a bunch of RIFs.

3         Q.   What was the rationale for moving

4    everything to Dallas?

5         A.   In the 1996 analysis, we explored

6    different options:  Maintaining what was then the

7    five regional sites, going to two sites, and going

8    to one site.  And we did a lot of analysis of that

9    and decided that the most efficient approach was to

10   consolidate in a single site because of the

11   projections of a tremendously reduced workload.

12            The base rationale underlying all the

13   downsizing is that we needed to match our staffing

14   to plummeting workload.

15        Q.   I guess the question is why Dallas?

16        A.   Dallas was selected because of its

17   location in the center of the country.  You could

18   get to different parts of the country with airlines.

19   There was an actual site selection process that we

20   went through.

21        Q.   So of the people -- well, let me just

22   ask it this way:  Can you give me your best estimate

**EXHIBIT 32** 23
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    of the number of persons who actually were RIFed,

2    that is involuntarily terminated out of the several

3    thousand positions that had been essentially

4    eliminated?

5         A.    I don't know that.

6         Q.    Okay.

7         A.    That would be something that Personnel

8    people could provide.

9         Q.    Okay.

10        A.    I guess I would tell you that I think it

11   was a relatively small percentage.  We succeeded in

12   our basic strategy, which was to accomplish as much

13   of the downsizing as we could or a substantial

14   portion of the downsizing voluntarily.

15        Q.    You referred to "Personnel", which is a

16   term I use, but I'm not sure --

17        A.    Today, you would call it Human

18   Resources.

19        Q.    H.R., okay.  Sorry about that, but I use

20   them interchangeably, and I think the -- well, maybe

21   just because I'm used to it.  I'm not sure.

22              But in any event, anybody at FDIC

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

24

1    Personnel who -- H.R.  Excuse me -- any current

2    employees who would know the statistics on that or

3    would be able to find them, I assume is the other --

4         A.   I don't believe any of the management

5    structure that was in place at the time is still

6    there, but they would clearly have records.

7         Q.   So you were into June of 2000, I think,

8    in terms of downsizing.  Was there any further plan

9    to downsize from approximately 67 [sic] as of --

10   when did you -- when was the next downsizing, if

11   there was?

12        A.   We reached the target, the overall

13   target, but I would not tell you that we reached the

14   overall target in every subpart of the organization.

15        Q.   Sure.

16        A.   There were still places where downsizing

17   had not been completed, including the Legal

18   Division, primarily, which ultimately resulted in a,

19   I guess, relatively small reduction in force in the

20   Legal Division in --

21        Q.   Was that 2002?

22        A.   200 --

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q.    '2 or '3, I think, but I'm not sure.

2    A.    2002, I believe, but I'm not positive

3    about that.

4    Q.    Okay.  But that's your best --

5    A.    Yes.  It was roughly the May timeframe

6    in one of those two years.

7    Q.    Okay.  That's fine.

8    A.    So we did have a reduction in force in

9    Legal.  Beyond that, we continued each of those

10   years to repeat the update of the staffing and

11   workload analysis process, and as we did that, the

12   target staffing numbers fell below where they were

13   initially set in that initial 1996 plan.  So by the

14   time we arrived at the Legal RIF, and probably that

15   was May of 2002, we had already begun to focus on

16   the fact that we needed further reductions.  And so

17   there was kind of a second wave of downsizing

18   throughout the corporation as we came to grips with

19   the fact that our workload had continued to decline,

20   and that was not as much limited to the liquidation

21   function.  That was a more general reduction within

22   the corporation --

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       Q.    Okay.

2       A.    -- driven by factors like the

3  consolidation in the industry, the tremendous

4  reduction in the number of supervised and insured

5  institutions as much as the very healthy banking

6  climate and the virtual disappearance of bank

7  failures and the fact that a lot of our work in the

8  early part of the period after the RTC came back was

9  finishing up the overhang of work in the -- from the

10  crisis, the work that had come to both the RTC and

11  the FDIC.

12             So, for example, in Legal, we were later

13  than we originally projected meeting those staffing

14  reduction targets because the litigation took longer

15  to complete than we figured.

16       Q.    Litigation frequently takes longer.

17       A.    So --

18       Q.    Not always.

19       A.    But we ended up -- by the time we

20  reached kind of our low point and came to the point

21  where we felt like staffing and workload were at

22  equilibrium, the authorized staffing level was at

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    about 4600.  So we went through another, you know,

2    25 to 30 percent reduction in the succeeding five

3    years.

4           Q.   You said it was 4500?

5           A.   4600.

6           Q.   4600.  Okay.  Now, was there any

7    significant downsizing in the period of -- assuming

8    May 2002 is when the Legal RIF, the RIF in the Legal

9    Department occurred, do you recall any discussions

10   or targets about further reductions in force?  Were

11   they going to work primarily by attrition, or did

12   you -- were further steps taken to encourage or

13   result in further reductions?

14          A.   In -- I'm trying to get the years

15   straight.  We did use additional buyout programs.

16   We had one more reduction in force that was, again,

17   relatively small that covered most of the

18   corporation in Washington except the attorneys in

19   the Legal Division.  The attorneys in the Legal

20   Division were kind of the first Headquarters RIF,

21   and then there was a second Headquarters RIF a year

22   or two later.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       Q.   So it could have been 2003 or

2   possibly --

3       A.   I'm trying to remember when this RIF

4   took place.

5       Q.   Well, I'm going to have a document to

6   show you in a minute.  It may help you.

7       A.   I don't know.  I can't tell precisely.

8       Q.   Sure.

9       A.   It took place in the middle of the year.

10  I can remember it was the summer.

11          But again, virtually all of the required

12  reduction was accomplished through means other than

13  RIF.  RIF has been an important part of the overall

14  strategy, but it has been used in limited ways.  It

15  has not been the factor that has been the primary

16  mechanism for downsizing.

17          MR. ROSE:  Okay.  Do you have a

18  recollection as to what the last Plaintiff's number

19  was?

20          MR. JONES:  The last?

21          MR. ROSE:  Exhibit number.

22          MR. JONES:  Oh.  For Pam Mergen's?

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                    MR. ROSES:  Yeah.

2                    MR. JONES:  Do you want to just start

3     over with one for Mr. Peddicord?

4                    MR. ROSE:  No.  We've got seven here.

5     If it's all right with you, I'll just go to -- I

6     think it's seven.

7                    MR. JONES:  Okay.

8                    MR. ROSE:  Let's just go to eight, and

9     if we've got a mistake, it's a mistake.

10                   MR. JONES:  So you're going to use those

11    here too?

12                   MR. ROSE:  Yeah.  I may want to show

13    them to the witness.

14                   MR. JONES:  Okay.

15                   MR. ROSE:  But this has not been -- the

16    document -- I'm going to ask you to mark this as --

17    I think I said eight, didn't I?  Yeah.

18                        [Deposition Exhibit No. 8 was

19                         marked for identification.]

20                   [Witness peruses exhibit.]

21                   BY MR. ROSE:

22         Q.   Now, have you had a chance to look at

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    that document or are you looking at it?

2         A.   Yes.

3         Q.   Okay.  Well, let me ask you to turn to

4    page 2 and --

5              MR. JONES:  David, let me just make a

6    note for the record here that this document, up at

7    the top right, it has page 1 of 3.

8              MR. ROSE:  Right.

9              MR. JONES:  But we've only got two pages

10   of that.  So we've got page 1 of 3 and 2 of 3.

11             MR. ROSE:  Right.

12             MR. JONES:  Which is fine.

13             MR. ROSE:  That's an excellent

14   observation, and I don't recall -- I think I thought

15   that the third page of 3 was -- I may have it

16   somewhere, but I thought it was not pertinent.

17             MR. JONES:  Okay.

18             MR. ROSE:  But, obviously, you may have

19   a different view, which is fine.

20             BY MR. ROSE:

21        Q.   I notice on page 2, there's a block

22   there in the center called "Resources", and it says

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1   annual budget and expenditures, but it says on-board

2   staff.  It's about -- it's there in the middle of

3   the page.  Do you see it?

4        A.   Yes.

5        Q.   One says Q4 and the other says Target

6   Year-End '04.  Just to make sure we're on the same

7   page, my assumption is that Q4 means the end of the

8   fourth quarter.  Is that a fair --

9        A.   That's correct.

10        Q.   Okay.  And then target for year-end

11   2004, it says 5,329; is that correct?

12        A.   Yes.  That's the target that was adopted

13   by the Board of Directors.

14        Q.   Right.

15        A.   And when it approved the 2004 budget.

16        Q.   Right.  Okay.  So, actually, the 200 and

17   -- it's about -- the staff is about 250 less than

18   the target.  Is that it?

19        A.   Yes, and that's not atypical at any

20   point in time.  We --

21        Q.   Frequently come in under?

22        A.   A couple of hundred vacancies.  What

EXHIBIT 32     32
ALIOTTA v. BAIR
No. 05-2325-RMU

1   that reflects is that we always have vacancies.

2        Q.   Right.  Had the -- we've been using the

3   phrase "DRR", the abbreviation, Division of -- I'm

4   sorry.  I keep losing the "R" and "R", the

5   Resolutions and --

6        A.   Receivership?

7        Q.   Receiverships, right.  Thank you.  Had

8   there been any discussions that you were aware of

9   about downsizing DRR in 2005?

10       A.   Yes.

11       Q.   Okay.  What do you recall?

12       A.   Well, if you'll notice on the document

13  you provided me, under stewardship, it says:

14  "Adopted a 2005 operating budget of $1.1 billion,

15  essentially unchanged.  The new budget reduces

16  authorized staffing by 674 positions by year-end

17  2005."  What that means, if you --

18       Q.   I'm sorry.

19       A.   Do you see the sentence?

20       Q.   I see it.

21       A.   Okay.  What that means, if you relate

22  that information to the chart, the chart reflects

EXHIBIT 32    33
ALIOTTA v. BAIR
No. 05-2325-RMU

1   the target year-end 2004 staffing as approved by the

2   Board of Directors in the 2004 budget.  When the

3   Board of Directors approved the 2005 budget, they

4   updated the target year-end 2004 number to a

5   slightly lower number, and they further reduced the

6   number by year-end 2005, and many of those

7   reductions, not all of them, were targeted to take

8   place in the Division of Resolutions and

9   Receiverships because of a decision made in the 2005

10  planning and budget process that we had too many

11  people in DRR to support the workload.  We didn't

12  have enough workload to support the people we

13  previously had authorized.

14          Q.   Did you have any role in deciding how to

15  address that issue or problem or whatever you want

16  to call it?

17          A.   I wouldn't characterize my role as a

18  decision-maker.

19          Q.   I understand, but I just want to know

20  what kind of a role --

21          A.   The role that I play as deputy director

22  in the Division of Finance is to preside over the

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    annual process for planning and budget formulation,

2    and the decision to downsize DRR came about in the

3    course of that process, and I guess I should say to

4    further downsize DRR.

5         Q.    So how did that -- who decided what, I

6    guess?  How was that decided?  And then I'll try to

7    ask you about timing also, but go ahead.

8         A.    To help you understand the process, to

9    help you understand that, I think I have to explain.

10        Q.    That's fine.  I'd appreciate your

11   explaining the process, because it will be helpful

12   to -- it will certainly be helpful to me and it may

13   be helpful to the Court.  I can't tell you that.

14        A.    The corporation in the 2005 year-end and

15   to this date formulates its -- does its basic

16   planning for the upcoming year and its budget

17   formulation in the third year of the -- the third

18   quarter of the calendar year.  Every division and

19   office has the opportunity at the front end of that

20   process to identify significant changes to their

21   baseline of staffing and budget, and then we convene

22   in July.  In the late July timeframe, we convene all

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    of the division and office directors under the

2    leadership of the chief operating officer and the

3    chief financial officer to set some guidelines, to

4    identify the issues and the objectives we have for

5    the year, and to establish some guidance for staff

6    in the development of plans and budgets in the

7    coming year.

8              Then we proceed to the development of

9    budgets at the staff level, budgets and proposed

10   planning objectives at the staff level.  We complete

11   that by the late part of September, and then in

12   early October, again the same senior management

13   group, division and officer directors chaired by the

14   COO and the CFO, convene to go over the materials

15   that have been consolidated and to make final

16   decisions on a budget that they want to recommend to

17   the chairman and the Board and for performance

18   objectives for the coming year.

19              So that's how that process works in

20   general.  In 2004, at the beginning of the process,

21   we were having discussions about whether we needed

22   to adjust what we refer to as the platform level of

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    staffing in DRR.  To put that in context, in the

2    initial downsizing, we had -- at the end of 1996, we

3    had somewhere between 28 and 29 hundred employees in

4    DRR, and we had decided that in that early part of

5    that process and in the annual discussions we went

6    through that there was probably a level at which we

7    shouldn't reduce regardless of workload.  That was

8    known as the platform staffing level or the

9    firehouse.

10         Q.   I saw the term.  I've seen the term

11    "firehouse."

12         A.   We stopped using the term "firehouse"

13    because it connoted sitting around and playing

14    cards, washing the fire truck.  So we use platform

15    staffing, but the platform staffing that was agreed

16    on as we approached the end of the initial phase of

17    the liquidation downsizing was around 500, a little

18    bit less, but around 50; and we had agreed that we

19    needed to hold that level so that we had a capacity

20    to perform our responsibilities, to close banks when

21    they failed, kind of like a firehouse.  You know,

22    you don't know when the fires are going to come, but

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    you needed a level.

2        Q.    Sure.

3            MR. JONES:   David, could I just jump in

4    here?

5            MR. ROSE:   Yes.

6            MR. JONES:   I think you said when you

7    completed the initial phase of downsizing in 1996.

8            THE WITNESS:   No.   When we completed the

9    initial phase of downsizing in the Year 2000.   We

10   reached --

11           MR. JONES:   I didn't want to put words

12   in the witness' mouth, but I knew that's what he

13   meant.

14           THE WITNESS:   I think what I meant was

15   that we made the initial -- we had the initial

16   discussions about there been some level, and we

17   didn't know what it was, as early as 1996, and we

18   continue to talk about that every year.

19           We actually reached the platform, what

20   became the platform level, around the end of 2000,

21   and we held that.  If you look at our authorized

22   staffing numbers after that, all the way until

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    through 2004, you see that we kept a number around

2    500 in the DRR organization.  We did that because we

3    had a commitment to figure out.  We knew we needed

4    to maintain some level of staffing to maintain our

5    capability to respond, and it was a readiness kind

6    of a capacity, and we thought that was about the

7    right number given what we had projected as

8    workload, and the workload we had projected was

9    somewhere in the vicinity of 10 to 12 failures a

10   year, and when you have 10 to 12 failures a year,

11   you usually have twice that many near failures,

12   banks that we actually do a substantial part of the

13   work for closing, but never actually reach the point

14   of closing; but you can do as much as 90 percent or

15   more of the work and then, particularly in a good

16   economic environment, they get re-capitalized and

17   they avoid closure.

18          So we thought we would have work

19   involving maybe as many as a dozen failures and

20   twice that many near failures when we reached bottom

21   and that a staff of 500 would be able to handle

22   that.  What we were confronting as we entered 2005,

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    and we had been talking about this the previous year

2    as well, what we confronted as we moved into the

3    2005 process was that we didn't have anywhere near

4    10 to 12 failures a year.  We didn't have any

5    failures and we were getting very few near failures,

6    and the question was whether we could prudently, in

7    fulfillment of our stewardship responsibilities for

8    the insurance fund, whether we could prudently

9    justify a staff that had no -- a staff of 500 that

10   had no work or no significant amount of work.  And

11   we struggled with that through the 2005 process.

12             The way the process works, the

13   development of the proposal actually came from the

14   DRR management itself.  DRR management looked at

15   what we were doing and said, you know, we don't

16   think that we see 10 to 12 failures a year and twice

17   that many near failures anywhere in our future and

18   we don't think we can reasonably justify the cost of

19   this size of a platform; and so during that process,

20   they developed a proposal for a new business model

21   for how we handled bank failures, and that new

22   business model entailed kind of a fundamental shift

**EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU**

1    in the role that DRR would play.   Instead of DRR

2    staff providing virtually all of the staffing

3    support for failures, if our still failure level

4    started to rise significantly, the DRR people would

5    become kind of like the officer corps and we would

6    -- and they would kind of direct the activities at

7    failures and we would call on bank examiners who

8    were cross-trained to assist with bank failures

9    during the period of the immediate pre-closing and

10   closing activities and that we would rely on a --

11   largely on a contractor solution to handle the

12   receivership, asset disposition activities after the

13   failure.

14                So maybe for the first couple of months

15   and the couple of months preceding a failure, we

16   would deploy bank examiners to assist, but once we

17   had done the initial disposition of the institution,

18   usually a sale of the institution and most of its

19   assets, then working the residual assets would occur

20   in our normal through contractors and through the

21   work of the base DRR staff.  So through that

22   process, in the 2005 budget formulation process, we

EXHIBIT 32    41
ALIOTTA v. BAIR
No. 05-2325-RMU

1    talked about this in our July meeting.  No decisions

2    were made, but it was clear that DRR was developing

3    a proposal that they would bring forth.  So as we

4    came through the process, DRR actually brought that

5    proposal forth at the October meeting of the senior

6    management group, and I'm sure by the time that we

7    talked about it in that meeting, the DRR director

8    had discussed this with the COO who is his immediate

9    supervisor, and we talked about what the impacts

10   would be throughout the corporation.  There's

11   obviously an impact on the Division of Supervision

12   and Consumer Protection because the question was

13   whether examiners could be made available to provide

14   short-term support.  There was discussion about

15   that.  There was potential impact on the Legal

16   Division and the Division of Administration if we

17   went to this model.

18        Q.   Sure.

19        A.   Out of that meeting, there was consensus

20   that it was prudent to recommend a reduction of the

21   staffing in DRR, and the target set for that was to

22   reduce the staffing by around the beginning of

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    September of 2005 to offer buyouts and incentives.

2         Q.   Excuse me.

3         A.   Sure.  To offer buyouts and incentives

4    as we had done in the past to try to get the numbers

5    down voluntarily to the extent possible, but to

6    conduct a reduction in force to accomplish whatever

7    remained of the required downsizing.

8         Q.   And that was the reduction -- going to

9    be a reduction of more than 50 percent?

10        A.   It was about 500 down to about 240.

11        Q.   Okay.

12        A.   Or maybe 493 to 240, but, yes, a little

13   bit more than half.

14             MR. ROSE:  Okay.  I think this might be

15   a good time to take a break, maybe 10 minutes or so,

16   15 if you like.

17             VIDEOGRAPHER:  Off the record at 11:11.

18             [Recess.]

19             VIDEOGRAPHER:  We're back on the record

20   at 11:25.

21             MR. ROSE:  I'm going to hand you a Xerox

22   of a document that's been marked as Mergen Exhibit

EXHIBIT 32    43
ALIOTTA v. BAIR
No. 05-2325-RMU

1    2.  I'm going to hand it to Mr. Jones just so he can

2    see what it is first, and then I'd ask him to give

3    it to you.

4              BY MR. ROSE:

5         Q.   Okay.  I ask you if you can tell me

6    whether you saw -- what is the date of this

7    document, No. 2?

8         A.   September 9, 2004.

9         Q.   And do you recognize the signature is

10   that of Mr. Glassman?

11        A.   I do.

12        Q.   Okay.  Would you have received that

13   memorandum shortly after it was written?

14        A.   Yes.

15        Q.   And do you recall receiving it?

16        A.   Yes.

17        Q.   Okay.  So Mr. Glassman recommended that

18   the workforce remain essentially the same size; is

19   that correct?

20        A.   Not exactly.

21        Q.   Okay.

22        A.   Not exactly.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1        Q.    All right.  Tell me --

2        A.    I need to explain a little bit more

3    about the process --

4        Q.    Okay.  Fine.

5        A.    -- that runs.  I had told you that we

6    had a senior management meeting at which we produced

7    guidance for staff at the beginning of the process

8    in late July.  The way our budget process works,

9    divisions and offices don't request staff any

10   longer.  Once upon a time, we used to do that more

11   traditional process, but instead, what my staff does

12   is calculate a baseline budget and staffing assuming

13   no changes, and then after we've calculated that, we

14   make whatever adjustments have been agreed to by

15   management at the late July meeting.  We send to

16   divisions and office a proposed budget.  That

17   normally happens by mid-August.  They have until

18   mid-September to come back to me and tell me whether

19   that's acceptable.

20           I mentioned to you that we were starting

21   to have conversations through the -- really, through

22   the spring, but certainly in the context of the

1    beginning of the budget process, about whether we

2    could sustain a continued platform of staff of 500

3    in DRR.  No decision was made on that at the July

4    meeting, and so as a result of that, staff had no

5    guidance to change it; however -- and so we sent out

6    the budget calculating the baseline of as-is.  They

7    sent back something that affirmed that it was

8    correctly calculated, or actually they asked for

9    some minor modifications, if you read this.

10        Q.    Right.

11        A.    But simultaneously, they were continuing

12    to work on the problem and developing a proposal.

13    What is significant, I think, is that by the time

14    you get to the first week in October when you have

15    the planning and budget conference, if you were to

16    look at the agenda for that conference, you would

17    see that one of the significant discussion items is

18    a proposal from Mr. Glassman which was actually the

19    proposal that he put forth to reduce the staffing

20    level to around 240.

21            So they were -- they went through

22    mechanics of the budget process, and that's what

**EXHIBIT 32** 46
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   this document represents.  It's an interim product,

2   and they were simultaneously developing a proposal,

3   but not sure that the proposal would work.  There

4   were still discussions that needed to occur between

5   Mr. Glassman and his counterparts in the Division of

6   Supervision and Consumer Protection.  As I mentioned

7   earlier, the new business model relies substantially

8   on the ability of the Division of Supervision and

9   Consumer Protection, DSC, to provide examiners on a

10  short-term basis if the workload were to increase

11  unexpectedly and overwhelm the reduced platform

12  level, and Mr. Glassman was extremely careful, as I

13  recall, to make sure that he had -- that this

14  proposal was really viable and that he had the full

15  commitment of the management structure, that they

16  would commit their resources to this new model.  And

17  that was all occurring kind of as the mechanics of

18  budget process running at the staff level were

19  occurring.

20          So I would tell you that this document

21  is kind of an intermediate product and that it in no

22  way reflects either the final proposal from Mr.

EXHIBIT 32                47
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Glassman or the final disposition of the proposed

2    budget that year.

3              MR. ROSE:  Well, I have, I think, what

4    the final proposal from Mr. Glassman is, but it's a

5    little later, I think, than perhaps you suggested.

6              This is No. 3, Mr. Jones.

7              THE WITNESS:  This is the formal

8    reorganization proposal that Mr. Glassman submitted

9    and it is the memorialization of the decision, but

10   the decision was clearly made in the first week in

11   October, because -- I can be reasonably sure of this

12   because by the time, by the date of this memorandum,

13   I have always begun briefing the chairman, and my

14   briefing to the chairman that year certainly

15   included as a major element the proposed reduction

16   and the platform staffing level in DRR.

17             MR. ROSE:  Okay.

18             THE WITNESS:  So I would tell you that

19   the decision was made in the course of the two-day

20   management retreat, senior management retreat, in

21   early October and that what this is is the first

22   steps in the formal process we have for establishing

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

48

1    a reorganization.  This is the first step in that

2    process, but simultaneously -- that was kind of

3    running simultaneously or concurrently with the

4    budget process, and I was moving forward already

5    with the same decision.  He was moving forward to

6    submit a formal reorganization proposal.  I was

7    moving forward to submitting a budget that was

8    consistent with this.

9             MR. ROSE:  Okay.

10            THE WITNESS:  So we were implementing,

11   both implementing, the decision made.

12            BY MR. ROSE:

13       Q.   So who was the chairman at the time?

14       A.   Don Powell.

15       Q.   Are there documents indicating -- well,

16   you indicated there was an agenda that I don't think

17   I have, but I may, and were there other -- there had

18   been a task force that had come up with a somewhat

19   different recommendation.  Do you recall that at

20   all, for DRR?

21       A.   Internal to DRR?

22       Q.   It may have been internal.  I'm not

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   sure.

2        A.   I would not have participated in that.

3   As I said, this was a proposal that emerged out of

4   DRR.

5        Q.   All right.

6        A.   So a task force, speculatively, would

7   have been an internal group.

8        Q.   Okay.  Did you play any role in deciding

9   what the bidding -- what the rights of people and

10  whose jobs who were eliminated would be?

11       A.   No.  That would have been entirely H.R.,

12  if you want to use H.R.  That would have been

13  entirely driven by H.R. guidance to the division.

14  We follow, we scrupulously follow, reduction in

15  force regulations, and we are always -- we bend over

16  backwards, I think, to make sure that we adhere to

17  those regulations when we conduct a RIF.

18       Q.   You don't know who at H.R. might have

19  been involved?

20       A.   Ironically, I suspect she wasn't in

21  H.R., was she?  Was Pam Mergen here yet?

22       Q.   She was --

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    A.    She may have been contracted from OPM

2    when we were doing this.  At some point, she was

3    advising us as an OPM consultant, and at some point,

4    we hired her ourselves, and I'm not sure when.

5    Q.    Well, we have her deposition.  So we

6    have the dates for that.

7    A.    Good.  I think she would have been the

8    lead technical expert in H.R., and I'm sure she

9    would have had legal support as well in that

10   process.  We're always careful to --

11   Q.    I thought she was not in H.R.  Am I

12   wrong?

13        MR. JONES:  No.  She is.

14        MR. ROSE:  She is in H.R.?  Okay.

15        MR. JONES:  I think she testified she

16   started in OPM and then she was hired in H.R.

17        MR. ROSE:  Okay.  Fine.

18        MR. JONES:  Which is part of DOA,

19   Division of Administration.

20        MR. ROSE:  Okay.

21        BY MR. ROSE:

22   Q.    Do you recall who the head of H.R. was

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    at this period of time in the fall of -- I guess

2    it's the fall of '05.  Of '04.  Excuse me.

3         A.   Miguel Torado.  In the fall of '04,

4    Miguel Torado.

5         Q.   Do you know if he ever expressed any

6    views on this downsizing or the way it was

7    administered?

8         A.   No.

9         Q.   You don't know?

10        A.   No.  The reason I hesitated, I sit on

11   something called a Human Resources Committee, which

12   is an interdivisional body, kind of think tank for

13   H.R., forwarding-looking H.R. issues.  So I spend a

14   lot of time with Mr. Torado, but I don't have any

15   recollection of talking about specifically any

16   concerns he might have had about the RIF.

17        Q.   Okay.  And, similarly, as to who should

18   be retained or who should not be retained, did you

19   play any role in how DRR or somebody should -- you

20   know, did you play any role at all in making that

21   kind of decision or a decision as to how those

22   decisions would be made?

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          A.    No.   My role was limited to making the

2     high-level corporate decisions about staffing and,

3     you know, accompanying -- taking workload and

4     matching it to resources, and once that decision was

5     made, then it becomes much more of an H.R. function.

6          Q.    Do you recall when Mr. Powell left this

7     agency?

8          A.    Sure.

9          Q.    Okay.  I assumed you did.

10          A.    In November of 2005.

11          Q.    Okay.  Do you know whether the Board was

12     ever approved -- who had to approve the budget?  The

13     Board?

14          A.    The Board of Directors approves the

15     budget.  The 2005 budget with the staffing reduction

16     target as part of the Board's action was approved in

17     December of 2004.

18          Q.    Was there -- do you know if the Board

19     expressly dealt with question of whether there would

20     be a RIF, or do you think it --

21          A.    I briefed the budget to the Board, and

22     I'm not going to be able to remember everything I

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    told them.  I brief each member individually, and

2    then I make the formal presentation to the Board as

3    well.  I'm not going to remember accurately

4    individual things I said.

5         Q.    Give us the best of your --

6         A.    In general, we would have talked about

7    the fact that this was a significant component of

8    the budget proposal, a reduction in DRR; the

9    rationale for that, which is rooted in substantially

10   diminished workload; and the plan for carrying out

11   the downsizing, which included a RIF, and I would

12   have certainly mentioned that we were targeting a

13   reduction in force by the beginning of September of

14   '05, but the plan involved more elements than that.

15   As with all the downsizing we've done, we have gone

16   to great lengths to try to mitigate the adverse

17   impact on employees, and so with this downsizing, we

18   had another buyout opportunity that was instituted.

19   Buyouts could be approved by the chairman.  It

20   didn't require the Board's approval.

21              So by the time we got to December of

22   2004, the buyout program was already underway.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Q.    Right.

2          A.    We had an announced program for

3    employees in DRR who were concerned about their

4    ability to get negatively impacted by the RIF to

5    apply for positions elsewhere in the corporation,

6    and the principal opportunity that was created was

7    the opportunity to move into an in-service training

8    program to become a bank or compliance examiner.  We

9    continue always -- throughout the time we have been

10   downsizing, we have always had examiner vacancies,

11   and we have offered again and again the opportunity

12   for displaced employees in DRR to move to examiner

13   positions.  It's not something all of them can take

14   advantage of for personal reasons, I suppose, but

15   many employees in DRR, in the liquidation area, have

16   availed themselves of the opportunity to re-train as

17   examiners.  There are ways that we mitigate the

18   adverse impact by saving pay and they get to train

19   as a Grade 12 instead of an entry-level Grade 7.

20              For employees who couldn't qualify for

21   the in-service training program, we advertised

22   entry-level opportunities that would have allowed

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    them to substantially retain their pay.  We offered

2    outplacement services, again.  We gave them

3    preferences for positions elsewhere in the

4    corporation throughout that period once they had

5    been identified as potentially affected by the RIF.

6    So all the employees in Dallas were certainly on

7    that list of people who had the priority placement

8    opportunity.

9            So we did a lot of things, and I would

10   have briefed all of that.

11       Q.   All right.  So the priority placement

12   would have been -- is that sometimes called bumping,

13   or is that just for vacancies?

14       A.   No, no, no.  Priority placement isn't

15   something conducted in a RIF.  This is pre-RIF.

16       Q.   Pre-RIF?

17       A.   Priority placement means if you have a

18   vacancy and I can identify a person who has priority

19   placement -- priority consideration would be a

20   better way to put it -- rights that applies for your

21   job, before you get a roster of any other eligibles,

22   you have to the roster loss of the referred person

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

56

1    on the surplus list and you have to select that

2    person unless you can make the case that they're not

3    qualified for the position.

4              And we place a lot of people that way.

5    I don't know what the final numbers were on the RIF,

6    but it certainly wasn't 260 people.

7        Q.   No.  A number of people were called

8    cross-overs.  They were the -- were they the ones

9    that got priority consideration?

10       A.   No.

11       Q.   Okay.

12       A.   They did get priority consideration, but

13   the cross-over program was the specific program

14   which ran under the in-service training authority

15   that we have from OPM.  We ran an in-service

16   training program specifically for DRR people to

17   become -- to train as bank examiners.  It was a two-

18   or three-year training program which would culminate

19   in their being commissioned as bank examiners.  They

20   would be placed in vacant bank examiner positions at

21   one of our 89 field locations nationwide, and they

22   would belong to a different division.  They would

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1    get out of harm's way.

2              The surplus placement process extended

3    to all other vacancies in the corporation as well.

4    So within the Division of Finance, I had a position

5    that I wanted to advertise a vacancy.  I wanted to

6    advertise, and there was a qualified DRR person who

7    applied for that job.  I would have been required to

8    have considered that person before considering any

9    others.  So that was a -- it's a similar concept,

10   but somewhat different.  The other is an actual

11   training program, a re-training program almost.

12        Q.   Do you have any recollection as to if --

13   well, give us your best recollection as to who was

14   eligible for such re-training, what kind of

15   employees.

16        A.   All DRR employees at the Grade 12 and

17   above could have considered.  There are certain

18   positive educational requirements for the position,

19   and I wouldn't be the right person to ask about how

20   you figure out whether somebody can qualify.  There

21   are some educational requirements, but there's also,

22   as with all personnel rules, there's an ability to

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    substitute experience for education, and I'm not the

2    right person to ask on how that decision gets made.

3          Q.    Sure.  You were not involved in the

4    actual -- if I understand your testimony correctly,

5    and please correct me if I misunderstand it, you

6    were not involved with any of the --

7              Mr. Jones, let me ask you a question if

8    I may.  Do we have any information as to people who

9    were -- who did enroll for training as examiners?

10   Because that's --

11             MR. JONES:  The cross-over program?

12             MR. ROSE:  No.  He said, I believe --

13             THE WITNESS:  It's called the cross-over

14   program.

15             MR. ROSE:  Oh, it is called the

16   cross-over program?  Well, most of the cross-overs I

17   know took jobs sometimes, frequently, in other

18   places, but they took jobs within FDIC without a

19   training program as far as I know.

20             MR. JONES:  I think we're talking about

21   the same thing, but when they -- but I think you

22   misunderstand that when they actually did take these

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   jobs in DSC as part of the cross-over program, they

2   weren't commissioned examiners so they did have a

3   training.  They were going into a training program.

4   They were doing bank examination work, but DSC is

5   kind of on-the-job training to become a bank

6   examiner.

7               THE WITNESS:  To become a

8   journeyman-level bank examiner, which is a Grade 12,

9   you must have earned a commission.

10              MR. ROSE:  Right.

11              THE WITNESS:  That's a training

12  requirement.  We provide the training.  We do the

13  testing or the examination, and anybody who had a

14  commission in DRR could have just laterally moved.

15  Anyone who didn't have a commission who went through

16  the cross-over program was entering a training

17  program, and there was training agreement as part of

18  that employment.  They had to agree to complete the

19  commission, the training and commission by "X" time.

20  Much of it is on-the-job training, but there is some

21  formal classroom training involved as well.

22                  You may think of it as just moving over,

EXHIBIT 32    60
ALIOTTA v. BAIR
No. 05-2325-RMU

1    and if you looked at the practical impact, people go

2    to a different office and a different division and

3    they start working, but they are working as

4    trainees.

5                    MR. ROSE:  Okay.  That is something that

6    --

7                    THE WITNESS:  And they are going to be

8    sent to four classes over the course of two or three

9    years.

10                   MR. ROSE:  Sure.

11                   THE WITNESS:  They're going to take

12   tests.  They're going to get evaluated, and they

13   ultimately must get commissioned.

14                   MR. JONES:  I think your client, Mr.

15   Haag, H-A-A-G --

16                   MR. ROSE:  I talked to him, yeah.  I

17   wasn't aware that he had, but that's okay.

18                   All right.

19                   THE WITNESS:  Greg Haag?

20                   MR. ROSE:  Yes.

21                   THE WITNESS:  Oh, I know Greg.

22                   MR. ROSE:  Yeah.  He's in Kentucky now.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          THE WITNESS:  He would be a wonderful

2    bank examiner.  He is a perfect example of how this

3    program worked well from our point of view.  He

4    managed to continue his career with the FDIC and

5    didn't have to be involuntarily separated.  That's a

6    good thing.  For him, obviously, he had to move to

7    Kentucky.

8          MR. ROSE:  Right.

9          THE WITNESS:  And he might not have

10   liked that, but, you know, our jobs are where the

11   work is.

12         MR. ROSE:  Sure.

13         THE WITNESS:  And that's the difficulty

14   we've had.  We haven't had liquidation work anymore

15   like we used to have.  You know, we used to be --

16   before the crisis, we used to be mostly examiners.

17   In the crisis, the liquidation function grew to be

18   as big as the examination or supervision staff.

19   Today, we're back into a more normal pattern where

20   the examination staff greatly dwarfs all the risk of

21   the corporation, and that's where our work is.

22         BY MR. ROSE:

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q.   All right.  And is it fair to say the

2   examinations are designed to ensure insofar as

3   possible that the banks are not taking undue risks

4   and are going to remain solvent?

5      A.   There are two kinds of examinations.

6      Q.   Thank you.

7      A.   One is a safety and soundness

8   examination, safe and sound operations.  The other

9   is a compliance examination for compliance with

10  Consumer Protection, Fair Lending, and Community

11  Reinvestment Act laws and regulations.

12           MR. ROSE:  Okay.  I think we may be able

13  to end earlier than I had anticipated, but give me

14  five or ten minutes, Bill.

15           MR. JONES:  Okay.

16           MR. ROSE:  We will reconvene briefly

17  either to say I have few more questions or that it's

18  over.

19           MR. JONES:  Okay.

20           VIDEOGRAPHER:  We're off the record at

21  11:52.

22           [Recess.]

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1          VIDEOGRAPHER:  Back on the record at

2     12:07.

3          MR. ROSE:  All right.  I just have, I

4     think, one question.  Well, I'm going to ask you to

5     look at another document.  I have a few questions

6     about it.  I guess that's more accurate.

7          Bill, this is a copy of Exhibit 1.  I'm

8     pretty sure you have it.

9          [Mr. Jones peruses document.]

10          MR. JONES:  Is this from Segar's

11     deposition?

12          MR. ROSE:  Yes.

13          MR. JONES:  Okay.

14          MR. ROSE:  I'm pretty sure it was

15     Segar's.

16          [Mr. Jones further peruses document.]

17          MR. JONES:  This must have been one I

18     sent to you electronically with the attachment.

19          MR. ROSE:  Probably, yeah.

20          MR. JONES:  You don't have a spare copy

21     of it?

22          MR. ROSE:  Yes, I do.  Yeah.

EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU

1                    [Mr. Rose presents document.]

2               MR. ROSE:  We also marked this

3     Cataluna's 2 for some reason.

4               MR. JONES:  Oh, okay.

5               MR. ROSE:  At least I have it marked

6     Cataluna's 2.

7                    [Witness peruses document.]

8               BY MR. ROSE:

9          Q.   My first question is do you think you've

10    seen this document before?

11         A.   I don't have any specific recollection

12    of seeing this particular document.

13         Q.   Is it fair to -- well, do you think that

14    it was discussed at either the July or October

15    meetings of the group that you mentioned, this

16    document?

17         A.   Certainly the content was developed in

18    -- was discussed in the October meeting and in

19    subsequent implementation meetings.

20         Q.   Okay.  Do you have any idea of why the

21    apparent recommendation, I guess I would say --

22    sorry these pages are not numbered, but this is the

EXHIBIT 32    65
ALIOTTA v. BAIR
No. 05-2325-RMU

1    third page after the E-mail.  The reduction there is

2    a 34 percent reduction, mainly eliminating or

3    setting the target as 342 employees rather than the

4    lower number that was ultimately --

5            A.   I don't.

6            Q.   Okay.

7            A.   I don't.  I can tell you that we -- the

8    number we used when we presented the budget was the

9    lower number.

10           Q.   Right.

11           A.   And the number we used, we got from DRR.

12           Q.   Right, and I think that's confirmed by

13   the October document that's already been identified.

14           A.   I don't -- when I read the document, I

15   noticed this difference too.

16           Q.   So you don't think --

17           A.   That wasn't the final number.

18           Q.   No, no.  I understand.  You don't think

19   there was a discussion of the relative merits of the

20   lower cut as distinct from the final cut?

21           A.   There was not such a discussion in my

22   presence.

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1           MR. ROSE:  Okay.  That's what I needed

2    to know.  Thank you very much.

3                That's all, Mr. Jones.

4           MR. JONES:  Okay.  We'll read and sign.

5           MR. ROSE:  I would like to spend about

6    two or three minutes with the two of you.

7           VIDEOGRAPHER:  The deposition is

8    concluded.  We're off the record at 12:13.]

9                [Whereupon, at 12:13 p.m., the

10   deposition concluded.]

11                          [Signature not waived.]

12

13

14

15

16

17

18

19

20

21

22

**EXHIBIT 32**   67
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1                    E-R-R-A-T-A  S-H-E-E-T

2      IN RE:    BARBARA ALLIOTA, et al. vs. MARTIN

3                GRUENBERG, Acting Chairman, Federal

4                Deposit Insurance Corporation

5      DEPOSITION OF:  THOMAS E. PEDDICORD III

6      DATE OF DEPOSITION:  FRIDAY, MAY 25, 2007

7      At the time the above-named deponent read and

8      signed this deposition, the deponent desired to

9      make the following changes:

10     PAGE: LINE: AS TRANSCRIBED:    CHANGE TO:    REASON:

11

12

13

14

15

16

17

18

19

20

21     DATED:              _____

22                              SIGNATURE OF DEPONENT
```

**EXHIBIT 32
ALIOTTA v. BAIR
No. 05-2325-RMU**

1    CERTIFICATE OF THE DEPONENT

2       I have read the foregoing pages 5 through 66

3    inclusive, and find the answers to the questions

4    therein contained to be true and correct, with the

5    exception of changes, if any, as per the errata

6    sheet following herewith.

7       _____

8       THOMAS E. PEDDICORD III

9       DATED:_____

10

11    - - - - - - - - - - - - - - - - - - - - - - - - -

12       CERTIFICATE OF THE NOTARY PUBLIC

13       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

14    DAY OF _____, 2007

15

       _____

16

       (PRINT NAME OF NOTARY)

17

       NOTARY PUBLIC IN AND FOR

18       THE STATE OF

19       _____

20

21    MY COMMISSION EXPIRES:

22    _____

**EXHIBIT 32**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1                 CERTIFICATE OF NOTARY PUBLIC

 2

 3              I, CATHERINE B. CRUMP, the officer

 4      before whom the foregoing deposition was taken, do

 5      hereby testify that the witness whose testimony

 6      appears in the foregoing deposition was duly sworn

 7      by me; that the testimony of said witness was taken

 8      by me stenographically and thereafter reduced to

 9      typewriting under my direction; that said deposition

10      is a true record of the testimony given by said

11      witness; that I am neither counsel for, related to,

12      nor employed by any of the parties to the action in

13      which this deposition was taken; and further, that I

14      am not a relative or employee of any attorney or

15      counsel employed by the parties hereto nor

16      financially or otherwise interested in the outcome

17      of the action.

18                          _____

19                          CATHERINE B. CRUMP

20                          Notary Public in and for the

21                          Commonwealth of Virginia

22      My Commission Expires:  May 31, 2009
```