EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 1

IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - x
                             :
BARBARA ALIOTTA, et al.,     :
                             :
          Plaintiffs,        :
                             :
     v.                      :    Civil Action No.
                             :    1:05-cv-02325-RMU
SHEILA C. BAIR,              :
                             :
          Defendant.         :
                             :
- - - - - - - - - - - - - - x


                    Arlington, Virginia.

                    Wednesday, January 16, 2008


Deposition of


          LANCE W. SEBERHAGEN, PH.D.


a witness of lawful age, taken on behalf of the FDIC in

the above-entitled action, before Pete Shonerd, Notary

Public in and for the Commonwealth of Virginia, at 3501

Fairfax Drive, commencing at 10:09 a.m.


                Diversified Reporting Services, Inc.

                    (202) 467-9200

EXHIBIT 33
ALIOTTA v. BAIR                                                              Page 2
No. 05-2325-RMU

APPEARANCES:


On Behalf of the Plaintiffs:

DAVID L. ROSE, ESQ.

Rose & Rose, P.C.

1320 19th Street, N.W.

Suite 601

Washington, D.C.  20036


On Behalf of the Defendant:

WILLIAM S. JONES, ESQ.

STEPHEN J. KESSLER, COUNSEL FDIC

Federal Deposit Insurance Corporation

3501 North Fairfax Drive

Arlington, Virginia  22226


Also Present:


P. Richard Jeanneret, Ph.D.,

President of Valtera Corporation

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 3
No. 05-2325-RMU

1   - Interim Report                                      14

2   - Appendix                                            16

3   - Impact Analysis                                     26

4   - List of Permanent Employees                         30

5   - Spreadsheet                                         38

6   - Average Age Analysis                                51

7   - E-mails to Dr. Rose, Sent January 4th              56

8   - Original Roster                                     74

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 4

                         P R O C E E D I N G S

2          Whereupon,

3                    LANCE W. SEBERHAGEN, PH.D.

4          was called as a witness and, having been first

5     duly sworn, was examined and testified as follows:

6                              EXAMINATION

7          BY MR. JONES:

8          Q    Dr. Seberhagen, my name is Bill Jones.   I'm

9     the attorney for the agency FDIC at this deposition;

10    with me I have Steve Kessler who is co-counsel.   I take

11    it that you've been deposed before, correct?

12         A    Yes.

13         Q    So consistent with your other depositions, if

14    any of the questions that I ask you are unclear in any

15    way I will ask that you let me know and I'll try to

16    restate them and make them as clear as possible.   If

17    you need to take a break at any time that's fine too

18    just let me know.   The only thing I ask is that if

19    there's a pending question at that time you answer that

20    question before we take a break.   Dr. Seberhagen, when

21    were you retained in this case?

22         A    Mr. Rose first contacted me in late August of

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 5

1    2007 and I think we reached a formal agreement in early

2    September.

3         Q    Okay and what was your assignment?

4         A    Well initially Mr. Rose asked me to look at

5    Dr. Jeanneret's report and just do an informal review

6    of it and then he later on asked me to analyze some

7    data from the FDIC.

8         Q    Okay, was it always part of your assignment

9    that you would be doing your own expert report?

10        A    Initially, Mr. Rose wasn't sure if he wanted

11   me to write an expert report.  I just did an informal

12   review of Dr. Jeanneret's report and then after we had

13   a little discussion then he said he wanted to have me

14   write a report.

15        Q    Okay and you mentioned that in addition to Dr.

16   Jeanneret's report, you reviewed some data as well?

17        A    Yes.

18        Q    What data was that?

19        A    This was a data file containing FDIC employees

20   in 2005.

21        Q    Okay and what format did you receive that in,

22   yeah, I guess what format?  Was it a disc?  Was it

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 6
No. 05-2325-RMU

1    electronically sent to you?

2         A    Actually I believe it was sent to me in e-mail

3    by an electronic file.  It's an Excel format, a Excel

4    type of program, spreadsheet type program.

5         **Q    Okay, did you recognize that as PERHIS data,**

6    **is that what's referred to in your report as PERHIS**

7    **data?**

8         A    Now PERHIS is a term that they use within the

9    FDIC.  I don't really recognize that name.  I'm not

10   familiar with the nuts and bolts of the FDIC.  The name

11   or the acronym PERHIS was on the file or somewhere in

12   the file.  I think I may have seen that term but I

13   don't know what it referred to.

14        **Q    Okay.  So you had had no exposure to PERHIS**

15   **prior to that time?**

16        A    No.

17        **Q    To when you received these files.  Do you**

18   **recall what years of employee, FDIC employee data of**

19   **the file contained?**

20        A    These were all of the employees that worked at

21   the FDIC in 2005.

22        **Q    So it was only 2005 data, nothing prior to**

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 7
No. 05-2325-RMU

1          2005?

2          A    No.

3          Q    Okay.  Did you receive any information; well

4     let me ask a more general question.  Besides reviewing

5     the employee data for 2005 and Dr. Jeanneret's report,

6     did you talk to anyone about the assignment that you

7     had from Mr. Rose?

8          A    Yes.

9          Q    Who was that?

10         A    David Friedman.

11         Q    And who is Mr. Friedman?

12         A    He's a subcontractor of mine.

13         Q    He's someone you've worked with before?

14         A    Yes.

15         Q    And when you were performing the assignment

16    what was Mr. Friedman's role?

17         A    He --

18         Q    When the company was performing the

19    assignment, what was Mr. Friedman's role?

20         A    He assisted in analyzing some of the data.

21         Q    And what documents and/or data did you give to

22    him?

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 8
No. 05-2325-RMU

1       A    I gave him a copy of the employees in 2005.

2       Q    **Did you give him a copy of Dr. Jeanneret's**

3       **report as well?**

4       A    No.

5       Q    **Okay.  Besides Mr. Friedman, I assume you**

6       **talked to Mr. Rose?**

7       A    Oh yes.

8       Q    **Besides Mr. Friedman and Mr. Rose, did you**

9       **discuss the assignment with anybody else?**

10      A    No, I haven't.  I don't know if I even

11      mentioned to anybody, that I got a project involving

12      the FDIC.  I may have made a passing comment like that.

13      I don't think I even said that to anybody.

14      Q    **Okay.  Were you told any details about the,**

15      **and I guess it would have been by Mr. Rose since he's**

16      **the only other person you talked to, were you told any**

17      **details about the buyout that was offered to FDIC**

18      **employees during 2005?**

19      A    Mr. Rose mentioned that briefly to me.  I did

20      not get involved in the details of that.

21      Q    **Okay.  What's your understanding of the terms**

22      **of the buyout?**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    A    I never looked at any specific documents

2    detailing, the buyout details.  Mr. Rose just briefly

3    discussed it and that wasn't really part of my

4    assignment.

5    **Q    Okay.  Did you discuss with Mr. Rose any**

6    **specifics regarding the actual reduction in force, the**

7    **formal, let me call it the formal reduction in force**

8    **that occurred in DRR in 2005?**

9    A    Well of course I read Dr. Jeanneret's report

10    so I had that information.  I did not review any

11    documents describing the RIF.

12    **Q    From you discussions with Mr. Rose, what's**

13    **your understanding of how the RIF was conducted in**

14    **2005?**

15    A    Well my understanding was --

16    **Q    And from Dr. Jeanneret's report?**

17    A    And from Dr. Jeanneret's report, the agency

18    felt that it had more staff then it needed to do the

19    work that it had to do and there was a, some type of

20    retention assessment of each employee that Dr.

21    Jeanneret referred to in his report involving a

22    performance appraisal type process of some kind and you

EXHIBIT 33
ALIOTTA v. BAIR                                                    Page 10
No. 05-2325-RMU

1    know, I don't know the details of that but some type of

2    assessment was made of each individual employee and the

3    FDIC decided certain people, there was a buyout

4    offered, a voluntary buyout and then there was an

5    involuntary RIF.  Some people transferred to other

6    divisions, had to find another position to go to and

7    the focus of the downsizing was in the DRR division.

8         Q    Okay.  Is it your understanding that the

9    buyout preceded the RIF?

10        A    Yes.

11        Q    Did you interview any of the plaintiffs in the

12   case?

13        A    No.

14        Q    Did you review any affidavits or documents

15   relating to the plaintiffs, individual plaintiffs?

16        A    No.

17        Q    Your company is Seberhagen and Associates,

18   correct?

19        A    Yes sir.

20        Q    How many employees does your company have?

21        A    One.

22        Q    Yourself?

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 11
No. 05-2325-RMU

1          A    That's myself.

2          **Q    But you do use subcontractors, at least Mr.**

3     **Friedman as necessary?**

4          A    My associates as subcontractors, that's my

5     business model.  When I need extra help I hire

6     subcontractors.

7          **Q    Did Mr. Friedman participate writing any part**

8     **of the report?**

9          A    No.

10         **Q    Do you intend to do anymore work on this case**

11    **at this point in time, other than appearing as a**

12    **witness if it goes to trial?**

13         A    Yes.

14         **Q    And what additional work do you intend to do?**

15         A    I plan to write a revised and updated report

16    of the various tables involving employees in the whole

17    FDIC.  I have revised my DRR adverse impact analysis

18    and I have a report today to offer to you and that's an

19    interim report.  When I received, I may not be

20    responsive to your question, I'm planning, I have an

21    interim report where I'm revising the DRR adverse

22    impact analysis and I am going to do a full report to

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 12
No. 05-2325-RMU

1          revise the impact analysis for the total FDIC.  And I

2          had in my earlier report, I had a series of tables,

3          about 22 different tables and I found after looking at

4          the Jeanneret sample that you sent to Mr. Rose, and I

5          found that I had undercounted some of the employees in

6          the data set.  I had some difficulties figuring out how

7          to interpret the data in the data set.  I undercounted

8          in a random way, not related to age, but there was some

9          peculiarities with the, so I went to correct that and

10         having a more precise set of numbers and my plan is to

11         have that revised report by the end of next week.

12         **Q    Okay.  So is it accurate to say that, I**

13         **believe table nine in your original report is the**

14         **impact analysis for DRR.  Is that correct?**

15         A    I believe so.

16         **Q    And table ten was for the entire FDIC?**

17         A    There was one for DRR and one for the total

18         FDIC.

19         **Q    Okay is it accurate to say that your new final**

20         **report will incorporate your, and you have a stand**

21         **alone impact analysis as well at this point that was**

22         **done after you submitted your report?**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 13

1    A    Yes, that stand alone was a one page or so

2    document with a couple tables on it and I have put some

3    narrative to that table and that's my interim report

4    which I have available today and that same type of

5    approach that I was going to use for the total FDIC

6    adverse impact analysis, soon as I get some precise

7    numbers to correct the earlier tables that I have.

8    **Q    As far as the other tables go regarding the**

9    **other divisions, those will change just because of the**

10   **counts of the employees to be consistent with the**

11   **methodology that you used in your impact analysis?**

12   A    That's correct.  I expect that the findings

13   will be very similar but I undercounted a little bit

14   some of the employees and I believe it's randomly

15   distributed by age so the relative proportions of

16   people over fifty and under fifty, under forty, forty

17   to forty-nine, over fifty, those proportions will stay

18   the same but I would like to make sure that I have

19   precise numbers.

20   **Q    Okay well I'll be glad to accept your interim**

21   **report at this point if you've got a copy for me?**

22   A    Thank you.

EXHIBIT 33
ALIOTTA v. BAIR                                             Page 14
No. 05-2325-RMU

1            MR. ROSE:  I saw something yesterday, but --

2            MR. JONES:  I'll go ahead and have the court

3     reporter just mark this exhibit one, deposition exhibit

4     one.  And actually --

5            THE WITNESS:  I have an extra copy if you want

6     to make some photo copies?

7            MR. JONES:  Yeah, if you give me this and I'll

8     just get you to identify this for the record, that you

9     know, what's now been marked as exhibit one is your

10    interim report that you just referred to.

11                            (Deposition Exhibit No. 1 was

12                             marked for identification.)

13           THE WITNESS:  Yes, this is my interim report.

14           MR. JONES:  Why don't you keep a hold of that

15    and I see on page six we have table one which concerns

16    DRR employees as of 1/1/05.  It shows a total of 503,

17    correct?

18           THE WITNESS:  Yes.

19           BY MR. JONES:

20        Q    Then on page seven we have a table two which

21    is an impact analysis of career appoints, correct?

22        A    Yes.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q    A new table three impact analysis career, for

2    DRR, career and accepted permanent appointments?

3    A    That is correct.  That covers all of the

4    employees in Dr. Jeanneret's sample.

5    Q    The difference between table two, table two

6    has a total of 487 employees and table three has the

7    full 503?

8    A    Yes sir.

9    Q    Let me make sure I understand correctly.  The

10   final report which you hope to get to us by the end of

11   next week, will also have revisions to the other tables

12   in your original October report which are not reflected

13   in this interim report?

14   A    Yes.  That's correct.

15   Q    And I guess we will also have the appendix

16   that has your CV?

17   A    Yes, I have a copy of that with me here today.

18   I didn't attach it.

19   Q    Did that change at all from the, is that

20   updated from the October version?

21   A    It may be slightly updated.

22   Q    Okay.  We'll just mark this as exhibit two for

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 16
No. 05-2325-RMU

1       identification.  Is that the only copy that you have?

2                                    (Deposition Exhibit No. 2 was

3                                    marked for identification.)

4           A    That's the only copy that I brought today.

5           Q    We'll make a copy of this to give it back to

6       you and we'll make a copy for me cause the court

7       reporter will keep this official copy here.  Aside from

8       this particular case have you done other impact

9       analysis, analyses, related to age?

10          A    Yes.

11          Q    Under what purposes have you done those?

12      Litigation?

13          A    For litigation purposes and also in the course

14      of my management consulting work.  When I developed a

15      test for an employer or do other work for employers,

16      sometimes we'll take a look at page breakdowns and do

17      an adverse impact analysis.

18          Q    In these prior ones, for what age categories

19      did you do analyses, do you recall?

20          A    Well, whichever attorney has retained me will

21      usually tell me I'd like you to analyze it this way or

22      that way, it can be sometimes under forty verses over

EXHIBIT 33
ALIOTTA v. BAIR                                                    Page 17
No. 05-2325-RMU

1          forty, sometimes under forty-five, over forty-five,

2          under fifty, over fifty, usually it's in increments of

3          that type.

4              **Q    Okay in those analyses how did you determine**

5          **someone's age at a particular point in time?**

6              A    I look at their birth date.

7              **Q    Okay --**

8              A    Compared to a comparison date.

9              **Q    I believe in your impact analysis and I'm**

10         **going to speak in terms of you impact analysis that was**

11         **the stand alone impact analysis since I really haven't**

12         **had the time to look at your interim report, I believe**

13         **you determined age as of year end based on date of**

14         **birth, but age as of year end, is that correct?**

15             A    Yes I may have done age as of January 1st and

16         as of December 31st.

17             **Q    Okay and is that, have you done that in the**

18         **past in other reports as well?**

19             A    I don't know if I based it on that particular

20         date, usually there is a decision date or a target date

21         of some kind that will be relevant to a particular

22         situation and we'll use, it could be any date of the

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 18
No. 05-2325-RMU

1        year, and we'll use that target date for purposes of

2        calculating ages.

3            Q    Does that produce a more accurate analysis if

4        you use the age as of a particular target date?

5            A    Well, compared to what?

6            Q    Well compared to either using January 1st or

7        December 31st?

8            A    You try to pick a relevant date and I suppose

9        that if the date were to be farther and farther away

10       from the relevant date it might not be as accurate.  It

11       might affect the interpretation of the data.

12           Q    Okay, in this case your assignment was to do

13       an impact analysis of separations from the FDIC

14       correct?  Age impact analysis of separations so

15       wouldn't in that case, wouldn't the target date be the

16       date that an employee separated from the FDIC for

17       whatever reason?  Or couldn't you have used, let me

18       rephrase the question.  Couldn't you have used the

19       separation date as the target date for determining each

20       employees age?

21           A    Well, that wouldn't necessarily be a better

22       way to do it.

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                                Page 19
**No. 05-2325-RMU**

1          Q      Why not?

2          A      The agency announced it was going to have a

3    downsizing and it took the downsizing process took a

4    year or more to complete.  I believe it was announced

5    in 2004 that there was going to be some downsizing and

6    this continued, the process continued throughout 2005

7    and the date that somebody leaves is not necessary the

8    date in the mind of the decision makers and if we're

9    trying to put ourselves in the shoes of decision

10   makers, you know in this case of alleged age

11   discrimination, so the decision makers are thinking you

12   know, if there was age discrimination they might be

13   thinking in terms of downsizing older employees by the

14   end of the year or during the course of the year.  They

15   are not thinking of individual separation dates of

16   individual employees.  So there were, I felt as a

17   reasonable estimate of the age impact of the

18   downsizing, I used December 31st of 2005 as my target

19   date for determining age, and there might be other ways

20   somebody might do it but I felt that that date might

21   reflect the age impact of the RIF process.

22          Q      Okay so your fifty and over group would

EXHIBIT 33
ALIOTTA v. BAIR                                      Page 20
No. 05-2325-RMU

1     actually include anyone who turned fifty during 2005?

2          A    Yes.

3          Q    Did you try to do analysis any other way?  Did

4     you try using target dates as far as separation dates,

5     see how that would affect your analysis?

6          A    Initially I tried another approach.  Mr. Rose

7     suggest to me using January 1st, look at January 1st

8     2005, look at peoples ages as of that date, and then

9     look at everybody who was employed in FDIC as of

10    December 31st, and the age as of that date --

11         Q    When you say December 31st, 05?

12         A    05, and look at the number of separations

13    during the course of the year, and I felt that by

14    having two different anchor points for determining ages

15    would confuse the analysis and I felt it was a cleaner,

16    more interpretable analysis to use just the one anchor

17    date of December 31st.

18         Q    Okay.  So just to be clear, if an employee had

19    a date of birth of December 7th, 1955 and they took the

20    buyout and left May 14th of 2005, they would be counted

21    in your fifty and over, even though they were forty

22    nine at the time?

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 21

1       A    Correct.

2       Q    And similarly if an employee, same birthday,

3   if that same employee or someone else who had that same

4   birth date was involuntarily separated effective

5   September 3rd of 2005 they'd be counted in your fifty

6   and over group, in your analysis even though they were

7   forty-nine at that point in time?

8       A    Forty-nine and a half, forty-nine and two

9   thirds, yes.

10      Q    Okay, well I think that's pretty clear.  And

11  in your interim analysis and your final analyses you

12  don't intend to change that methodology?

13      A    No.  I was planning to use December 31st as my

14  anchor date.

15      Q    And that methodology applies with equal first

16  to determinate, your break down of over, under fifty

17  and fifty and over in the other divisions as well,

18  that's not going to change?

19      A    Yes, that's correct.

20      Q    And in fact that's consistent throughout the

21  tables in your report, but that's how --

22      A    That was my plan.

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 22
No. 05-2325-RMU

1      Q    Age was determined.

2      A    Excuse me, if I could just --

3      Q    Yes?

4      A    In my earlier report, if I, what I said in my

5   earlier reports may be different from putting the,

6   using the December 31st as the anchor point.  The ages

7   in some of the other, in my earlier reports, may have

8   been based on another date.  I would have to --

9      Q    I think there is language in your other report

10  that talks about determining the dates as of January

11  1st and as of December 31st.  My understanding is that

12  your interim report and your final report are going to

13  use the December 31st date consistently throughout?

14     A    Yes.

15     Q    Which is consistent with your stand alone

16  analysis that you did at the end of November?

17     A    Yes.

18     Q    Okay.  Are you in agreement at this point with

19  the, it appears you are from looking at your impact,

20  your interim report analysis, but are you in agreement

21  at this point that the 503 employee figure for DRR is

22  the population of DRR as of January 1st 05?

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 23

1          MR. ROSE:  I think I object cause I think it

2     depends on how you interpret the word population but --

3          MR. JONES:  Well that's fine and if not, if

4     you can explain what the difference is.  Actually

5     first, why don't we define, in your field how do you

6     define population?

7          THE WITNESS:  Well, the fact of the matter is,

8     in the FDIC there are different kinds of appointments,

9     and my initial analysis I was trying to look at career

10    employees --

11         BY MR. JONES:

12    **Q    And those are appointment codes one and two?**

13    A    One and two.  These are competitive career and

14    competitive conditional and the competitive conditional

15    are, career conditional are people on probation period

16    and after they satisfy the probation period they will

17    go into appointment code one, which is permanent career

18    position.  There are various other kinds of

19    appointments in the 503 total, you have the appointment

20    codes one and two which I had labeled as career

21    appointments.  Then there are two categories that Dr.

22    Jeanneret included in his group.  These are accepted

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 24
No. 05-2325-RMU

1    appointments.  There's accepted permanent and accepted

2    conditional and --

3         Q    And those are appointment codes six and seven?

4         A    Six and seven.  And I found a one person in I

5    believe it's code three and one in code nine, they were

6    temporary or term appointments that we could argue,

7    these are definitely not career appointments.  In Dr.

8    Jeanneret's sample, if he felt that the or if the FDIC

9    felt that the accepted permanent appointments should be

10   included within the career definition of, you know

11   that's another way of looking at it and for purpose of

12   my interim report I included those people in the

13   adverse impact analysis.

14        Q    But not the accepted conditional?

15        A    Well the accepted conditional, those would be

16   probationary employees who would become accepted

17   permanent, but the kinds of appointments that marked

18   down two more people which would create a total of 505,

19   were some, one person had a term appointment, which a

20   limited length of time where they would be leaving

21   anyway, and somebody in a temporary appointment, I

22   believe they were student intern.  So --

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1        Q    So would 505 be the population that you would,

2        would the 500, would the total 505 including these two

3        individuals, would that be the population of the DRR

4        employees as of January 1st?

5        A    Well I think the 503, if we're looking at

6        layoffs, and who would be a career or permanent

7        employee.  I think that would be probably the best

8        group to look at.  You could add the other, you could

9        add temporary appointments in too if you wanted to look

10       at one hundred percent of the employees just to see

11       what it would look like but --

12       Q    Well isn't' that the definition of population?

13       The population is a hundred percent?

14       A    Well population would be a hundred percent.

15       Q    And anything, a smaller subset is a sample

16       from that population.  Not necessarily a random sample

17       but?

18       A    Well I guess you could call it that.  It would

19       be a subset of the total.

20       Q    Okay, because in your stand alone impact

21       analysis you call it degenerate sample but then the

22       group that you used to do your impact analysis was

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    actually smaller, it's a subset of that sample, is that

2    accurate to say that?

3        A    Yes.

4        Q    But I guess my original question is, at this

5    point, you are comfortable that you can replicate how

6    to come up with the 503 employees, irregardless of the

7    argument of who should be included in an impact

8    analysis, your in agreement that those 503 employees

9    that were listed on the spreadsheet, we'll put this in

10   the record and make an exhibit of it, that those were

11   DRR employees as of January 1st?

12                           (Deposition Exhibit No. 3 was

13                            marked for identification.)

14       A    Yes.

15       Q    2005?

16       A    Yes.

17       Q    Okay.  And the methodology that you used to

18   replicate that, that's what your going to do with

19   respect to the other divisions?

20       A    Yes

21       Q    To update your charts.  Alrighty.  Let's just

22   pass, let's mark this as, what are we up to, exhibit

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 27
No. 05-2325-RMU

1          three?  I'll hand that to Mr. Rose.  Could you take a

2          look at that?  And the first three pages are actually a

3          string of e-mails, some from you, the final one is from

4          Mr. Rose to me sending two files and I will state for

5          the record that these are the print outs of the

6          attachments.  The fourth page in the group is your

7          impact analysis that you did on November 29th, or

8          finalized on November 29th, '07, correct?

9              A    Yes.

10             Q    Okay and that showed the 503 employees.  And,

11         starting on the next page, there's a spreadsheet, that

12         actually if you look at the attachment was in Excel

13         format, and do you recognize this as your breakdown of

14         the 503 employees into the various categories that you

15         used in your impact analysis?

16             A    Yes.

17             Q    Okay.  I guess this is a good time to get into

18         what you mean by the terminology RIF-related separation

19         which is a large group of the spreadsheet.  I'm going

20         to call this the PERHIS spreadsheet since it says

21         PERHIS spreadsheet 2005 at the top if that's

22         understandable.  What did you define as RIF-related

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 28

1    separation?  Or how did you determine to group certain

2    of those employees under the RIF-related separation

3    group?

4         A    Well, I looked at all the separation codes and

5    there were certain codes that, you know, by the general

6    definitions and used by the federal government these

7    codes, would definitely not be a RIF-related depth.  We

8    can eliminate that as RIF-related, there was no code

9    for RIF by the way, and that was part of the reason I

10   had to make a reasonable approximation of who, how

11   could I identify who, the people were who were actually

12   RIF'ed.  And --

13        Q    And when you say there was no code for RIF,

14   were these codes that were included in the data that

15   was sent to you?  We talked about look up tables that

16   were included in the data sent to you?

17        A    There was various action codes when there

18   would be a personnel transaction, there would be a code

19   for the kind of transaction and the office of personnel

20   management has a codebook where they define what these

21   codes are.

22        Q    Is that what you used?  Did you use the OPM

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 29
No. 05-2325-RMU

1      manual?

2           A    I was giving FDIC codebook and I found that

3      there were a few codes that were listed on my FDIC data

4      file that were not listed in the FDIC codebook so I had

5      to go back to the OPM codebook and look up some of

6      these other code numbers.

7           **Q    Do you recall any specifics that you had to do**

8      **that for?**

9           A    Yes.  I brought the codebook with me.  For the

10     type of appointments, the FDIC codebook only listed, at

11     least in the copy that I received, only list one, two,

12     six, and seven.

13          **Q    Okay.**

14          A    And some of the employees in the date set that

15     I was given, have codes three, four, eight, and nine,

16     as well as one, two, six, and seven.  So I had to go

17     look up three, four, eight, and nine in the OPM

18     codebook.

19          **Q    Okay and were you able to find them?**

20          A    Yes.  So with --

21          **Q    What about separation codes, or nature of**

22     **action codes?  Were there any that were missing that**

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 30
No. 05-2325-RMU

1       you had to go look up?  Missing from the FDIC?

2              A    No.  All the ones in the data file that I had

3       were listed in the FDIC codebook.

4              Q    Okay so I had to go to the OPM for the

5       appointment --

6              A    Appointment codes.

7              Q    Codes but not the nature of action or I think

8       you refer to those as serpation codes in your report?

9              A    Yes.

10             Q    Okay and do you recall what formats you

11      received that FDIC codebook in?  Was it a hard copy?

12      Was it --

13             A    I think it was a hard copy.  It may have been

14      faxed to me.

15             Q    Okay.  We'll give you back that copy but I'd

16      like to mark that as an exhibit as well.

17                              (Deposition Exhibit No. 4 was

18                              marked for identification.)

19             A    Okay I created a cover page for the fax just

20      so that I know what it was and then at the end of that

21      document, I had the OPM, couple pages from --

22             Q    This is the National Finance Center manual, I

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 31
No. 05-2325-RMU

1    see.

2         A    And I'm calling that the OPM codebook, the uh,

3    National Finance Center.

4         **Q    Actually the National Finance Center is within**

5    **the Department of Agriculture.  They're the ones who**

6    **make sure we get paid.**

7         A    Okay.

8         **Q    So they are very important to us.**

9         A    I found this on the OPM website under the

10   compensation area or under the personnel area so I

11   thought that was part of OPM.

12        **Q    When you were looking at this NFC procedures**

13   **that you found on the OPM website did you have the**

14   **occasion to look at any of the nature of action codes**

15   **and compare the FDIC version to the NFC version?**

16        A    I might have.  I don't recall specifically

17   doing that.  I generally felt that I had what I needed.

18        **Q    Okay do you recall any differences between the**

19   **FDIC nature of action codes and anything you saw on**

20   **NFC?  I see that the pages that you have here don't**

21   **include nature of action codes, they have the type of**

22   **appointments code.**

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 32
No. 05-2325-RMU

1          A    That's right.  I downloaded the entire NFC

2     manual to refer to for purposes of today I just brought

3     the appointment codes because those are the ones that

4     specifically needed to be supplemented.  During the

5     past few months I may have looked at the separation

6     codes and some other codes.  Sometimes there are

7     abbreviations given in the FDIC codes that I may have

8     looked to see if I could find a fuller explanation in

9     the agriculture departments codebook.

10         **Q    Okay as you sit here today do you recall any**

11    **differences in the FDIC nature of action codes and the**

12    **NFC?**

13         A    No I don't recall any differences.

14         **Q    Okay.  The cover page is something you made**

15    **up?**

16         A    I created that.

17         **Q    It's got your name on it, so.  Okay.  I guess**

18    **this is, at the time, so RIF-related separation, your**

19    **definition of RIF-related separation is based on**

20    **particular separation codes, is that correct?**

21         A    Yes.

22         **Q    Before we digress, you said that there were**

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 33
No. 05-2325-RMU

1    some codes that you didn't consider to be a RIF-related

2    separation such as death.  Any other ones?  Disability?

3    How about disability retirement, is that a RIF-related

4    separation in your analysis?

5        A    Well the ones that I felt were not RIF-related

6    was retirement mandatory, retirement disability, let me

7    give you the code number, code 300.

8        Q    And your looking at your interim report?

9        A    I'm looking at my interim report.  I've got it

10   spelled out there.

11       Q    Okay, and that's page four?

12       A    Page four.

13       Q    Okay.

14       A    And it would be code 300 retirement mandatory,

15   code 301 retirement disability, code 330 would be

16   removal, this would be removal for cause, so I felt

17   that that was not RIF-related, death, termination 357,

18   I interpreted it as being removal, 385 termination

19   during probation trial period, I felt that was not

20   necessarily RIF-related.

21       Q    Okay.  You know as long as we're looking at

22   your interim report, it's been marked as exhibit, what

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 34
No. 05-2325-RMU

1      exhibit are we?

2           A    Exhibit one.

3           Q    Let's look at page five and let's see here.

4      That's probably actually page five.  Page three,

5      subsection six.  Paragraph six, and I think this is the

6      same as in your original report.  You say there was no

7      personnel action code for reduction of force RIF,

8      therefore I identified the separation codes that were

9      most likely to include employees directly affected by

10     the 2005 RIF, including separation codes that had a

11     relatively high frequency on or about May 5th, 2005,

12     the buyout date for September 3rd, 2005, the RIF date.

13     Now, if you were able to identify a high frequency of

14     separations on September 3rd, 2005, which was the RIF

15     effective date, and as accurately reflected in your

16     report, couldn't you of effectively used that personnel

17     action code that was associated with those separations

18     as the separation code indicating separating via RIF?

19          A    Do you mean any codes that occurred on that

20     specific date?

21          Q    Yes.

22          A    That might be one way to do it.  It looked to

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                           Page 35
**No. 05-2325-RMU**

1       me that there were a lot of separations around that

2       date, more so than would typically occur during the

3       course of the year, and so looking at the data I felt

4       that all the people who were RIF'ed were not likely to

5       of been, had an action date specifically on September

6       3rd, you know the, that might have been the official

7       date of the RIF but the, and the day to day course of

8       the management of the agency, there may have been some

9       slippage one way or the other to ones side of that date

10      or the other for various practical reasons.  So I've

11      used a broader spread around those dates and I found

12      you know, a variety of codes around those dates that

13      appear to be RIF-related.  I'm making an estimate, if

14      you will.

15          **Q     Okay and when you say RIF-related you're not**

16      **specifically saying that all of these are involuntary**

17      **separations pursuant to federal RIF procedures, is that**

18      **correct?  All of these actions that are coded as you**

19      **indicate that you consider to be RIF-related**

20      **separations, you are not expressing an opinion as to**

21      **cause, are you?**

22          A     Well, I felt these separations would give a

EXHIBIT 33
ALIOTTA v. BAIR                                            Page 36
No. 05-2325-RMU

1        reasonable assessment of the RIF process.  Probably not

2        every separation is that I'm calling a RIF-related

3        separation.  Some of the separations might have

4        occurred even if there was no RIF.  But the, I cant

5        tell precisely so I'm making an approximation and I

6        think a reasonable approximation.  There was a general

7        management goal to reduce the size of the agency

8        through a variety of methods during the course of 2005,

9        and some of these buyouts, there was a formal RIF, and

10       there may have been people nudged out the door.

11              People may have felt pressured to leave and in

12       the absence of any specific identifier of who was

13       affected by the RIF, I used all these separation codes.

14       I felt there may be various reasons why you could have

15       two people under similar circumstances and whoever it

16       is who assigned these action codes had some discretion.

17       There's some judgment, there's maybe some unreliability

18       in the process in which they assign action codes and

19       you may have people under similar circumstances and one

20       person codes it one way and another person codes it

21       another way.  So we get a variety of codes here that

22       around the buyout date and the RIF date, so I used all

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 37
No. 05-2325-RMU

1     those codes that seemed to be in the ballpark and for

2     purposes of my reasonable estimate.

3          **Q    Okay and for the purposes of your impact**

4     **analysis you treated all of the employees separating**

5     **under all of these codes as aquiver, is that a fair**

6     **statement?**

7          A    Yes.

8          **Q    So that would include code 302, which is**

9     **retirement voluntary as well as 356 which is**

10    **termination involuntary?  Those employees separating**

11    **under those two separation codes are treated**

12    **equivalently, or grouped together for the purpose of**

13    **your impact?**

14         A    I felt that the people affected by the RIF

15    were coded under these codes.  And these codes seem to

16    occur at the time of the RIF date and the buyout date

17    and so these were the kinds of codes that people were

18    assigned who were affected by the RIF.  That's the way

19    I interpreted this.

20         **Q    Okay.  And then, well let's mark this as the**

21    **next exhibit.**

22              **What are we up to now?  Five?**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1                    (Deposition Exhibit No. 5 was

2                    marked for identification.)

3              Exhibit five is actually an e-mail from myself

4       dated December 10th to Mr. Rose, but what I'm really

5       going to ask you about is the attachment which is again

6       an Excel spreadsheet and as I indicated in the text of

7       the e-mail, this is your previous spreadsheet with some

8       additional columns added for appointment type, date of

9       birth, nature of action code and effective date.  Have

10      you seen this before?  Did Mr. Rose forward this to

11      you?

12          A    I don't think he did.  I'm not sure.  He may

13      have.

14          Q    Okay cause my next question was going to be

15      whether you have had the occasion or whether you looked

16      at this to determine whether the fill in information

17      was accurate?

18          A    I don't remember looking at this to verify the

19      accuracy.  I don't remember seeing this.

20          Q    Okay.  The purpose of sending this to Mr. Rose

21      was to reach an agreement that this was an expanded

22      version of your categorization of the 503 DRR

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    **employees.  If you look at the RIF-related separations**

2    **having an effective date of September 3rd will you**

3    **agree with me that just by inspection without making a**

4    **major study of it, that those are coded, what appear to**

5    **be coded as number 350, nature of action 356?**

6        A    Where are you looking now?

7            MR. ROSE:  On pages --

8            MR. JONES:  I'm looking at the effective date

9    and just kind of scanning down that most of these

10   September 3rd 05's are coded 356.  I see right off the

11   back that there are some that are not.

12           THE WITNESS:  September 3rd, the first one I

13   see is 304.

14           MR. ROSE:  I'm sorry, the first one on?

15           THE WITNESS:  The first September 9, 305,

16   there are two that are 304 and then the next one day is

17   356.

18           MR. JONES:  And code 304 is retirement in lieu

19   of involuntary action, correct?

20           THE WITNESS:  Yes.

21           BY MR. JONES:

22       Q    **When you were doing your analysis, did you ask**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 40

1          Mr. Rose whether there were any, whether there was a

2          particular code that was associated with the RIF?

3          A    I might have asked him that.  I'm sorry, I'm

4          looking at the data.  It didn't appear that there was

5          any one particular code.

6          Q    But you are aware that September 3rd was the

7          RIF effective date?

8          A    Yes.

9          Q    And that was from Mr., from Dr. Jeanneret's

10         report?

11         A    Well Mr. Rose told me.

12         Q    Okay.

13              MR. ROSE:  Excuse me, I wouldn't mind taking a

14         break either now or --

15              MR. JONES:  Okay yeah.  Why don't we take a --

16              MR. ROSE:  I like to have regular short

17         breaks.

18              MR. JONES:  Why don't we go ahead and take a

19         break, 10?

20              MR. ROSE:  Sure.

21              (Off the record from 11:23 to 11:39 a.m.)

22              MR. JONES:  We are back on the record.  We

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU
Page 41

1    were talking about exhibit number five, and you had

2    mentioned that one of the reasons you, or perhaps it

3    was the reason that you had grouped these different

4    codes under the term of RIF-related separation, was

5    because they occurred at or about the same time as the

6    RIF.  Will you agree with me that there are some of

7    these under the RIF-related separation that occur

8    considerably earlier than the RIF or the buyout?  For

9    example, on page one of the PERHIS spreadsheet, about

10   five lines up from the bottom, there's a 302 which is a

11   voluntary retirement code dated, and the effective date

12   is January 22, 05.  Is that right?

13             THE WITNESS:  Yes.

14             BY MR. JONES:

15        **Q    And then over on page two, at about the same**

16   **place, well that's a 317, let's see, what is a 317?**

17   **Resignation.  And that too was in January of 05.**

18             MR. ROSE:  The first one is 1/20?

19             MR. JONES:  The first one is 1/22/05 and the

20   other one is the same date, on page two, that one is

21   three, six, seven lines up from the bottom.  So is it a

22   fair statement to say that for these particular codes

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 42
No. 05-2325-RMU

 1              that you decided to use, as long as they occurred

 2              during the 2005 year, you included them in your

 3              RIF-related separation group?

 4                     THE WITNESS:  Yes.

 5                     BY MR. JONES:

 6              **Q     And I think I had asked you before about**

 7              **considering, when you group the 302 voluntary**

 8              **retirements with the 356 which is involuntary**

 9              **terminations, did you consider the employees of those**

10              **two groups to be similarly situated for the purpose of**

11              **your analysis as a statistician?**

12                     MR. ROSE:  I'm sorry, I don't think he gave

13              his report because it says he's a statistician.  He

14              knows statistics but he's specialty is industrial

15              organization psychology.

16                     MR. JONES:  Okay, well I'll slightly rephrase

17              that.  Did you group your 302, the nature of action

18              code 302 employees with the nature of action code 356

19              employees as, did you consider them to be similarly

20              situated for the purpose of your statistical analysis

21              that's in your report?

22                     THE WITNESS:  Yes.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 43

1          BY MR. JONES:

2          Q    And your analysis really assumes that there

3     was no miscoding.  You've done your analysis based on

4     the data as you received it, correct?

5          A    Well you asked two different questions there.

6     I'll answer the second question.

7          Q    That's good.

8          A    Could you repeat the second question?

9          Q    I think the second question was that you based

10    your analysis on the data as you received it?

11         A    Yes.

12         Q    And the codes as they were in the data, do you

13    have any reason to believe that the data was miscoded?

14         A    I'm not sure what you mean by miscodes, but I,

15    I think, I took the codes as they were.  But I got the

16    impression that more than one code might be relevant to

17    the RIF.  So the codes weren't necessarily miscoded but

18    I felt that there was more than one code relevant to

19    the RIF.

20         Q    Okay so your analysis group codes that were in

21    some way relevant to the RIF?

22         A    Yes.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 44

```
 1          Q    And this, is it fair to say that the relevance

 2     was based partly on the fact that these occurred in

 3     2005?

 4               MR. ROSE:  Counsel, I'm sorry.  He used the

 5     term related.  He didn't, I mean you used the term

 6     relevantly accepted but I think his term was --

 7               MR. JONES:  Related to the RIF.

 8               MR. ROSE:  Yeah, and I think you avoid

 9     problems of lawyer decisions versus statisticians

10     decisions if you say, use his terminology.

11               MR. JONES:  I appreciate that.  So one of, so

12     as far as the timing goes, you determined that they

13     were related to the RIF because they occurred in 2005,

14     is that a fair statement?

15               THE WITNESS:  Yes.

16               BY MR. JONES:

17          Q    Now when we were talking about using the

18     December 31st, 2005 date for determining a break point

19     for employees considered to be fifty and over and under

20     fifty, you indicated that one of the reasons you

21     thought that that was a reasonable assumption to make

22     was based on the decisions of the, based on the actions
```

EXHIBIT 33
ALIOTTA v. BAIR                                      Page 45
No. 05-2325-RMU

1    of the decision makers, I think you called them.  I'm a

2    little unclear as to who you meant by the decision

3    makers.  I mean what occurred in 2005.  Could you

4    clarify that for me?

5         A    Well, those would be the FDIC officials.

6         Q    Now as far as the employees who voluntarily

7    retired and coded 302 and the employees who resigned,

8    weren't the decision makers actually the employees

9    themselves?

10        A    Not necessarily.

11        Q    And why do you say that?

12        A    Well because some of these people had

13   involuntary separations and somebody else told them

14   they had to go.

15        Q    Well those wouldn't have been coded 302,

16   voluntary retirement, would they?

17        A    I'm not sure if that was your, was that your

18   original question?  I must have misunderstood.

19        Q    My original question was, with respect to

20   those employees who retired of resigned, weren't they

21   the decisions makers, weren't they actually the

22   decisions makers who decided to retire or resign?

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 46
No. 05-2325-RMU

1          A     Well, I think these people were nudged out the

2     door, you know, somebody accepted a buyout.  Are they

3     the decision maker or is it the person who offered the

4     buyout the decision maker?  I think there is, you know

5     part of the decision is the employee and part of the

6     decision is the one who offered the buyout and the one

7     who announced there is going to be a lay off, the one

8     who announced there is going to be a downsizing, and

9     were going to reduce the numbers one way or the other.

10         **Q     Okay and do you understand that the buyout was**

11    **offered to essentially all of the employees in DRR?**

12         A     That's my understanding.

13         **Q     So there had to be a second step for the**

14    **people who actually retired.  They had to make a**

15    **subsequent decision to actually accept the buyout and**

16    **leave before the RIF?**

17         A     Yes.

18         **Q     Now, when you were doing your analysis, why**

19    **did you think that the code 302's and the codes 356's**

20    **were similarly situated given your earlier distinction**

21    **between voluntary buyouts and involuntary situations?**

22         A     Well Mr. Rose told me that the people affected

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 47
No. 05-2325-RMU

1          by the buyout and the people affected by the

2          involuntary RIF were all affected by the RIF, and to

3          consider all of those people as being affected, and so

4          I relied on that guidance.

5              Q    So that was an assumption you were told to

6          make?

7              A    Yes.

8              Q    I wanted to ask you about using the year end

9          date for determining employee age, where you can

10         actually determine the effective date as in this case.

11         Have you ever done that in a previous case before, even

12         when the specific, I think you called it the target

13         dates, were available you used a year end date?  Have

14         you ever done that in a different report?

15             A    I always used a date that I felt was a

16         relevant target date.  I didn't use an arbitrary date

17         even though I knew it was different from the relevant

18         target date and I felt that December 31st was a

19         relevant target date.

20             Q    Okay but my question, I understand that's what

21         you did in this case, but my question is, have you ever

22         done that in the past, in other analyses that you've

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 48
No. 05-2325-RMU

1    done?

2         A    In the past I've always used a relevant target

3    date.

4         **Q    A specific target relevant date?**

5         A    Yes.

6         **Q    As opposed to a general target date as in this**

7    **case?**

8         A    Well I felt that December 31st was a relevant

9    specific target date and you know, I've made my

10   assumptions clear on what date did I use.  If someone

11   wants to pick another date and recalculate ages they

12   can do that but partly based on guidance from Mr. Rose,

13   initially he asked me to look at January 1st and

14   December 31st cause that was the relevant time period

15   and in my revised analysis I felt to use one target

16   date, the end of the year would be the right one to use

17   to capture the process.

18        **Q    Okay.  Let me ask you about in any previous**

19   **analyses that you've done outside this case, have you**

20   **used the year end date to determine age?**

21        A    I can't remember any.  In every case I would

22   be using a relevant target date and December 31st may

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 49
No. 05-2325-RMU

1      or may not have been relevant in the other cases.  I

2      don't recall any and things aren't always done on a

3      calendar year basis.

4          **Q    Okay and other than Mr. Rose asking you to use**

5      **beginning of the year or the end of the year, is there**

6      **any relevance in the December 31st date in the**

7      **circumstances of this case?**

8          MR. ROSE:  I think he's answered that already,

9      but go ahead.

10         MR. JONES:  Well, I think he said that he

11     thinks it's relevant, but I'm asking what is the

12     relevance of the 12/31 date.  Did anything happen on

13     12/31 via these employees?

14         THE WITNESS:  Well, I was asked to evaluate

15     the adverse impact during the year 2005 and the process

16     occurred during the course of the year and so that was

17     the end of the process and that's the relevance of that

18     date.

19         BY MR. JONES:

20         **Q    We scanned down the effective dates in exhibit**

21     **number five for the RIF-related separations.  Do you**

22     **see anything that occurred after September 3rd of 05?**

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 50
No. 05-2325-RMU

1          A    In scanning down the list I don't see any

2    right now.  I don't know if I missed any or not but I

3    don't see any.

4          Q    I don't think you missed any.  So is it more

5    accurate to say that as far as those employees who

6    you've grouped in the RIF-related separation category,

7    the process ended by September 3rd?

8          A    As far as the effective dates, yes.

9          Q    Okay, one thing I wanted to ask you about, you

10   know you mentioned Mr. Friedman doing some of the

11   calculations, is that what your testimony was, that he

12   did some of the, for one of a better word I'll say

13   number crunching?

14         A    He did some tabulation for me.

15         Q    And what is his education and training?

16         A    He has a PhD in educational psychology.

17         Q    And how long has he worked for you as a

18   subcontractor?

19         A    I've known him twenty, twenty-five years, and

20   we've worked together every once in a while.  I think

21   we've probably worked on maybe three or four projects

22   over the last twenty years.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 51

1       Q    Okay.  Is he the one who will be doing the

2       tabulations for your final report?

3       A    No.

4       Q    Is there any reason for the change?  Are you

5       going to be doing them yourself?

6       A    I will be doing them personally, yes.

7       Q    Okay, let's mark this as the next exhibit,

8       this is six.

9                        (Deposition Exhibit No. 6 was

10                       marked for identification.)

11           Have you seen this OPM guide before?

12      A    Okay yes I have.

13      Q    And I'll tell you it's a very long document in

14      its entirety.

15           MR. ROSE:  I believe he believes you.

16           MR. JONES:  I do not have the entire document

17      here but I do have the page that talks about nature of

18      action codes and that's the, I included the cover page

19      and the nature of action codes.  Will you look down and

20      read what the OPM guide says as far as code 356 goes?

21           THE WITNESS:  This says separation RIF.

22           BY MR. JONES:

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                         Page 52
**No. 05-2325-RMU**

1          Q     Have you ever seen that before?

2          A     No.  I was relying on the FDIC.

3                MR. ROSE:  That's what you get.

4                MR. JONES:  That's what we all get.

5                MR. ROSE:  For insurance up to a hundred

6          thousand dollars, that's funny.

7                MR. JONES:  But when you weren't able to

8          determine a specific code for RIF, because you were

9          relying on the FDIC guide, did you make any further

10         inquiries to try to determine what the appropriate code

11         would be for separation by RIF?  Enquiries or research?

12                THE WITESS:  I may have talked about it to Mr.

13         Rose, but I did an internet search and I came up with

14         that other manual --

15                BY MR. JONES:

16         Q     And the other manual you're talking about the

17         NFC?

18         A     The NFC manual and I had seen this OPM guide

19         before but I didn't turn to it because I, as I said I

20         was relying on the FDIC codes and even if OPM had a

21         designation in their standards, you know, I looked at

22         the FDIC codes and relied on what they said and so in

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 53
No. 05-2325-RMU

1          this case I didn't feel I needed to turn somewhere

2          else.  I turned somewhere else when I found a code

3          number that was not listed in the FDIC codebook.  Or if

4          there was an abbreviation that was difficult to

5          interpret I might try to look up that abbreviation but

6          I felt that what the codebook said, the FDIC codebook

7          said for 356 was involuntary termination and I didn't

8          interpret that as specifically being RIF only.  I

9          thought that might refer to other things and that there

10         was no one code that was my interpretation was that

11         there was no one code.

12              **Q    Okay if you had known that the FDIC coded all**

13         **of the involuntary separations via RIF, as 356, would**

14         **that have changed the way you did you impact analysis?**

15              A    I would have talked to Mr. Rose about it and

16         see what he thought about it as far as relevance to the

17         case?

18              **Q    Okay would he have questioned whether it was**

19         **appropriate to include 302's and 356 employees as being**

20         **similarly situated in that case?**

21              A    I might have, yes.

22              **Q    Do you plan to take this knowledge into**

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 54
No. 05-2325-RMU

1        account before you do your next report?

2              A    Well I'll confer with Mr. Rose and confirm

3        what it is he wants me to do.

4              Q    Okay, you know at this point I'm ready to get

5        into the actual impact analysis to go through what was

6        done and I'm going to use the December 17th version

7        just because I really haven't had an opportunity to

8        look at the interim report, but I was thinking.  It's

9        12:05, it might be a good time to break for lunch and

10       then start fresh at you know, a few minutes before one

11       I would guess.  I mean our cafeteria is right

12       downstairs.  There is a Cosi on the corner if you

13       prefer, of our building.  So would now be a good time

14       to take a lunch break?  I do have quite a bit more.

15             MR. ROSE:  No, I think that's fine.

16             THE WITNESS:  Let me just say, I'm parked on

17       the street at a meter that goes for four hours.

18             Dr. JEANNERET:  I have change.

19             THE WITNESS:  I'll go down; I think I have

20       enough change to go for another four hours.

21             MR. ROSE:  I've got seventy-five cents if

22       it'll help you?

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 55

1                THE WITNESS:  Thank you.  I will accept a

2        parking permit in your garage.

3                Dr. JEANNERET:  Seriously, would quarters

4        help?

5                THE WITNESS:  I might use one.

6                Dr. JEANNERET:  I can't go through the airport

7        with them.

8                THE WITNESS:  I'll do you a favor.

9                MR. JONES:  We can go off the record at this

10       point.

11               (Recess was taken at 12:06 p.m.)

12

13

14

15

16

17

18

19

20

21

22

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 56

1              A F T E R N O O N   S E S S I O N

2                 (On the record at 1:12 p.m.)

3              MR. JONES:  We'll go back on the record at

4         1:12.  I will give to you a document that the court

5         reporter's already marked as exhibit number seven and

6         the first page is e-mails from you, Dr. Seberhagen to

7         Dr. Rose, sent January 4th, and the top of the first

8         page is Mr. Rose's e-mail to me, attaching this PDF

9         document which is the second page.

10                           (Deposition Exhibit No. 7 was

11                           marked for identification.)

12                 THE WITNESS:  Okay.

13                           EXAMINATION (RESUMED)

14                 BY MR. JONES:

15            Q    And I was going to ask you first of all, are

16       you familiar with this document, and I'm speaking of

17       page two specifically.

18            A    Yes.

19            Q    And I was going to ask you initially until we

20       got the interim report whether this was the latest

21       version of your impact analysis, I'll phrase is

22       slightly differently.  Until you did your interim

EXHIBIT 33
ALIOTTA v. BAIR                                      Page 57
No. 05-2325-RMU

1    report, was this the latest version of you impact

2    analysis?

3         A    Yes.

4         Q    And this analysis is, and the only difference

5    between this analysis and your November 29th version,

6    which was I think the first version, the only

7    difference I was able to see was that there was a

8    difference in the standard deviation calculation down

9    in the bottom.  Do you recall whether there were any

10   other differences?

11        A    Yes, I had a typo on that, that was corrected.

12   I think that was the only change.

13        Q    Okay.  I think it was 3.39.

14        A    Yes.

15             MR. ROSE:  That's the 2.69.

16             MR. JONES:  No instead of the 3.19.

17             MR. ROSE:  Oh, this is the 3.19

18             MR. JONES:  You're looking at the interim

19   report.

20             THE WITNESS:  There was an earlier report that

21   said 3.39.

22             MR. ROSE:  Oh, this is the same as number two.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 58

1                    THE WITNESS:  Right, yeah this is the same.

2                    MR. ROSE:  Sorry.

3                    MR. JONES:  That's a good thing to point out.

4          So your table two impact analysis in exhibit number

5          seven, which is before you, is essentially the same

6          thing as the new table two in your interim report?

7                    THE WITNESS:  Yes.

8                    BY MR. JONES:

9          **Q    And since you've got it in front of you, tell**

10         **me again what the exhibit number is to this interim**

11         **report.**

12              A    Exhibit one.

13         **Q    Exhibit one, okay.  Okay I'm going to ask you**

14         **about exhibit number seven because it's a little bit**

15         **more detailed in the steps that you went through to get**

16         **to table two.  Well actually I see table one in your**

17         **12/17 version, looks to be, except for a slight**

18         **reordering of the numbers is pretty much repeated in**

19         **table one of your interim report.  Is that right?**

20              A    Yes, that's correct.

21         **Q    I guess you've got a different, you've got**

22         **some additional information where you've totaled career**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 59

1    and accepted appointments, that's not in the 12/17

2    version.

3        A   Yes it is.

4        Q   It looks to be a formatting change.

5        A   Yeah, it's just formatted a little bit

6    differently, it's essentially the same numbers.

7        Q   Alright, I'm a little bit more familiar with

8    your 12/17/07 version as you might expect so I think

9    I'll ask you questions related to this with the

10   understanding that you know, most of the answers will

11   be applicable to the parts of your interim report that

12   are taken from this.  So this data is again, this is

13   based on the PERHIS spreadsheet that we looked before

14   that has the 503 DRR employees, correct?

15       A   Yes.

16       Q   And in the top chart, which is table one, you

17   first analyzed employees having competitive career and

18   competitive career conditional appointments at the top

19   of table one?

20       A   Yes.

21       Q   And that's, there 487 in number?

22       A   Yes.

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 60
No. 05-2325-RMU

1       Q    And these employees that your dealing with,

2       these 487 employees there that you're dealing with,

3       those are employees that have appointment codes one and

4       two?

5       A    Yes.

6       Q    Correct.  And then you divide them into age

7       under fifty and age fifty and up as of year end

8       12/31/05?

9       A    Yes.

10      Q    Okay, then the next thing is, actually within

11      that section of the chart, you show employees, the

12      employees who stayed in DRR, and then the next two rows

13      are counts of the employee, the DRR employees who

14      transferred to other divisions and you break that up

15      into two groups:  those who transferred to other

16      divisions and kept a career appointment and those who

17      transferred to other divisions and took an accepted

18      appointment.  Is there any particular reason that you

19      divided them, the transferees into those two groups?

20      A    Well because their different.

21      Q    Okay but does it affect your subsequent

22      analysis at all?

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU                                           Page 61

1          A    Not the adverse impact analysis, no.

2          Q    Okay, any other analysis, does the fact that

3     some went to accept it and some took the career

4     appointment, any other analysis in your report?

5          A    Not in my report.  I dealt only with the

6     RIF-related separations for my impact analysis.

7          Q    Okay and we talked about what your definition

8     of what a RIF-related separation is and in fact you

9     explicitly say that the RIF-related separations are

10    those with the separation codes listed under that

11    footnote A right under the table, is that correct?

12         A    Yes.

13         Q    Okay, and again these are the separation,

14    these are the same separation codes that we looked at

15    before that were listed in your report?

16         A    Yes.

17         Q    In your original report.  Now, in the next

18    section of table one, you identity the number of

19    employees that have accepted permanent and accepted

20    conditional appointments as of the beginning of the

21    year and then you have a footnote B which is the small

22    chart between the big charts and that sort of breaks

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 62
No. 05-2325-RMU

1    that 16, number 16 employees down further, is that

2    correct?

3         A    Yes, that's right.

4         Q    Now when you originally did this why did you

5    break out the accepted, the employees having accepted

6    appointments?

7         A    Well, initially I analyzed only career

8    employees in appointment codes one and two.  In the DRR

9    list of employees that I call the Jeanneret Sample, or

10   the FDIC Sample, is included.  Some people with

11   appointment codes six and seven, and so this is what

12   corresponded to Dr. Jeanneret's report, was my

13   understanding, so that's why I call it the Jeanerette

14   Sample.

15        Q    Okay in your 12/17 impact analysis which is

16   down on table two, you didn't include any of these

17   accepted appointment employees correct?

18        A    No, I did not.

19        Q    In fact in your table two in the interim

20   report, again they are not included?

21        A    They are not included.

22        Q    In that analysis.  Now in table three of your

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 63
No. 05-2325-RMU

1    interim report, which is on page seven,

2         A    That's number one.

3              MR. ROSE:  Exhibit one?

4              THE WITNESS:  Exhibit one, yes.

5              MR. JONES:  You've actually added in some of

6         these accepted employees.  You've added in the ones

7         that had appointments that are accepted permanent, is

8         that right?

9              THE WITNESS:  That's right.

10             BY MR. JONES:

11        Q    **Why did you decide to do that in your new**

12        **interim report?**

13        A    Well, just to see what if we analyze the

14        impact of the entire Jeanerette Sample, what would you

15        get and then so I did it just to show what the result

16        would be.  So I got it presented both ways and no

17        matter which way you do it you end up with a

18        significant finding of adverse impact.

19        Q    **Okay now I'm a little puzzled here because I'm**

20        **looking at table three and okay so the new table three**

21        **actually includes everybody, it includes the entire**

22        **530?**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 64

1          A     That's right, that's the difference between

2     table two and table three as I added in those sixteen

3     additional people.

4          **Q     Okay and even adding in those additional**

5     **people you still reached the same conclusion that these**

6     **are the adverse discriminatory impact?**

7          A     Yes.

8               MR. ROSE:  Same conclusion but with slightly

9     different numbers for all of the, about 125 percent

10    exact and the difference in standard deviations.

11              MR. JONES:  Right when you include these

12    accepted appointment individuals, the standard

13    deviation actually goes down by what, point five?

14              THE WITNESS:  Approximately, there's somewhat

15    less adverse impact if you include those additional

16    possessions.

17              BY MR. JONES:

18         **Q     I think you're saying in your report that**

19    **courts considered two to three standard deviations to**

20    **be significant, is that correct?**

21         A     Well the courts accept the five percent level

22    of statistical significance and some also look to the

EXHIBIT 33
ALIOTTA v. BAIR                                      Page 65
No. 05-2325-RMU

1    standard deviations.  I've always interpreted that two

2    to three standard deviations to mean two, anything over

3    two.  That leaves two.

4        Q    Okay, let's see.  So table three actually

5    includes appointment codes one, two, six and seven?

6        A    Correct.  For the DRR employees.

7        Q    Okay, because based on your previous analysis

8    it excluded these people I was going to ask you whether

9    employees who have accepted appointments are treated

10   differently for federal RIF purposes.  Do you have any

11   knowledge of that?

12       A    I don't know.  When I did my original analysis

13   Mr. Rose asked me to focus just on career employees and

14   we agreed on codes one and two.  Represented those

15   career employees.

16       Q    Did you independently think that was the right

17   thing to do?

18       A    I accepted Mr. Rose's guidance.  He felt that

19   those were the codes that were relevant to the case.

20       Q    And who's idea was it to do new table three

21   which includes the accepted appointments, was that Mr.

22   Roses or yours?

EXHIBIT 33
ALIOTTA v. BAIR                                           Page 66
No. 05-2325-RMU

      A    I believe it was Mr. Rose or we jointly agree

2    and I think Mr. Rose gave me some guidance to do it

3    that way just to see what we would get.

4         **Q    So through today you haven't done a separate**

5    **impact analysis of just the employees who were**

6    **involuntarily separated by RIF who were coded 356, is**

7    **that correct?**

8         A    That's right.

9         **Q    And now that you know that the involuntarily**

10   **separated employees were coded 356 do you have any**

11   **intention of doing a separate impact analysis as to**

12   **them?**

13        A    I'm going to confer with Mr. Rose.  I haven't

14   made a final decision yet.

15        **Q    If it was just up to you in your capacity of**

16   **an industrial, I'm trying to remember your license**

17   **plate now.**

18        A    Psychologist.

19        **Q    Organizational?**

20        A    Industrial organizational psychologist.

21        **Q    Would you do such an analysis?**

22        A    I mean you could do it to see what you would

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 67

1    get but I agree that there are mre people affected by

2    the right than just the 356 code people so I think it

3    should be broader than that.

4        **Q    Okay, although it's your understanding that**

5    **we're talking about people who were adversely affected**

6    **by the RIF and who took some action allegedly because**

7    **of the RIF, correct?**

8            MR. ROSE:  Some of it.

9            MR. JONES:  That's what the case is all about,

10   about people not just being affected by the RIF but

11   because there was some kind of discriminatory impact.

12           THE WITNESS:  Right.

13           BY MR. JONES:

14       **Q    And as far as we know from the data, some of**

15   **the 302 coded people, the RIF may or may not of had any**

16   **effect on their decision to retire or resign, is that a**

17   **fair statement as far as the data shows?**

18       A    If there was no RIF at all there will probably

19   still be a few separations and so some of these

20   separations might have occurred even though there

21   wasn't a RIF, but for purposes of my analysis, I used

22   all of these RIF-related separations because this was a

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 68
No. 05-2325-RMU

1       major event happening in the agency and the division

2       and people were under pressure to consider leaving.

3                  **Q                     So your analysis really**

4       **assumes that all of what you call RIF-related**

5       **separations were as a result of the RIF?**

6       A    Yes.

7       **Q    Okay, in the documents that you reviewed or**

8       **you conversations with Mr. Rose, did you learn when**

9       **specific RIF notices were issued to employees?**

10      A    I don't, Mr. Rose may have mentioned that.  It

11      wasn't something that stuck in my mind.  I believe that

12      it was shortly after the buyout that RIF notices went

13      out.  It was months ahead of the actual date that, of

14      September 3rd, 2005.

15      **Q    Okay and do you have an understanding of what**

16      **the significance was of sending those specific RIF**

17      **notices was or what effect that had?**

18      A    Well it puts people on notice that they are

19      going to be involuntarily terminated.

20      **Q    Is it your understanding that puts them on**

21      **notice that they are definitely going to be**

22      **involuntarily terminated?**

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 69
No. 05-2325-RMU

1          A    Well I have not seen the actual notice.  I

2          don't believe, I'm not sure precisely if their name was

3          on the list that you will be terminated or that this is

4          a group of employees that will be involuntarily

5          terminated.  I didn't get into the details of that.

6          **Q    Okay is it a fair statement to say that the**

7          **fact of the issuance of specific RIF notices to**

8          **particular employees didn't really affect your analysis**

9          **one way or another?**

10         MR. ROSE:  The date doesn't affect it, is that

11         what you mean or?

12         MR. JONES:  The fact that they were issued or

13         the date for that matter.

14         MR. ROSE:  Okay, thank you for clarifying.

15         MR. JONES:  Had any effect on the way you

16         perform your analysis?

17         THE WITNESS:  Well that was part of the reason

18         why I considered a broader range of dates for relevance

19         separation data that there were notices going out,

20         people were under pressure to leave, and this had been

21         announced in 2004 and people knew that this was coming

22         down the road and so things happened during the course

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 70
No. 05-2325-RMU

1    of 2005 that were relevant to the RIF.

2            BY MR. JONES:

3        **Q    When you say this had been announced in 2004,**

4    **what are you referring to?**

5        A    I believe there was an announcement in

6    November of 2004 about the RIF and some people may even

7    have left the agency in 2004 as a result of the RIF but

8    I didn't have any data for 2004 so I just looked at

9    2005.

10       **Q    Okay, did you know that Mr. Rose actually had**

11   **PERHIS data from 2000 to 2005 for that, I guess it's a**

12   **six year period?**

13       A    I don't know what he had or didn't have.

14       **Q    Okay cause you only got the 2005 data?**

15       A    I just know what he gave me.

16           MR. ROSE:  We'll try to repair.

17           MR. JONES:  Do you know whether any individual

18   employees knew that they would be separated before

19   receiving a specific RIF notice?

20           THE WITNESS:  I do not know what each employee

21   knew or didn't know.  There is no way I can answer

22   that.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 71

1          BY MR. JONES:

2          Q    Okay, I think what I'd like to do is, I was

3     going to look at your write-up in your original report,

4     but now that I have your interim report I think I may

5     try using that using exhibit one.  You know, other than

6     adding the tables to this report do you anticipate the

7     narrative changing or being amended in your interim

8     report and your final report that you said, you quote

9     to be ready next week, end of next week?

10         A    The narrative will be essentially the same.

11    You know, I'll be conferring with Mr. Rose, we may make

12    some adjustments on some things, I don't know.

13         Q    Okay, well let's try to even though my

14    questions really were based on your October version,

15    let's try to use the interim report language and look

16    at exhibit one instead.

17              MR. ROSE:  Do you have an extra copy?

18              THE WITNESS:  I have an extra one.

19              MR. ROSE:  Oh, Dr. Seberhagen has one.  I'm

20    fine, thank you.

21              MR. JONES:  Okay well let's see I guess I'm

22    going to have to look at --

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 72

1              MR. ROSE:  Well, this is the interim one, I

2        think he wants this.

3              MR. JONES:  Yeah, I'm going to try to use the

4        interim one.

5              MR. ROSE:  Oh okay.

6              MR. JONES:  My questions --

7              MR. ROSE:  I'm sorry, I misunderstood you.

8              MR. JONES:  My questions are actually based on

9        the original one and the language might have changed

10       so.

11             MR. ROSE:  Why don't you just go on ahead.

12             MR. JONES:  Bare with me.  Okay this, actually

13       this is, this is something that puzzled me a little bit

14       that I just want to make sure I understand.  Under

15       objective on page one, the interim report says Mr. Rose

16       also asks for you to expand my adverse impact analysis

17       to include employees with accepted permanent types of

18       appointments and then that is what's captured in your

19       new table three, correct?

20             THE WITNESS:  Yes, that's right.

21             BY MR. JONES:

22        Q    Okay then at the end you say you will submit a

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 73

1    revised final report next week to provide a complete

2    analysis for the entire FDIC as well as to update all

3    tables as needed.  So you're going to go back and

4    recount and see whether --

5         A    Yes.

6         Q    Any kind of a similar amendment that needs to

7    be made.  Okay.  And your critique of Dr. Jeanneret's

8    report, I wanted to make sure that we're all talking

9    about the same report here cause there was a little bit

10   of a confusion about this during Dr. Jeanneret's

11   deposition.  When did you receive Dr. Jeanneret's

12   report first?

13        A    It was late August 2007.

14             Q              Okay, now some of the pages of

15   that report were subsequently revised because there had

16   been inconsistencies.  Did you ever receive any of

17   those revised pages?

18        A    I don't believe I did.  I know there was one

19   point in the Jeanneret's Sample, there was one employee

20   who retired in 2005 that was actually separated in

21   2004, something like that so the number changed from

22   504 to 503 at your request so I got that but I didn't

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 74
No. 05-2325-RMU

1        get anything regarding the narrative of Dr. Jeanneret's

2        report.

3            Q    Okay, well there were actually a couple of, a

4        few pages that were revised and the pages were sent to

5        Mr. Rose but it wasn't actually until November 20th

6        after Dr. Jeanneret was, we talked about this during

7        his deposition and we looked at the right pages but

8        let's make this an exhibit, what are we up to eight?

9                                (Deposition Exhibit No. 8 was

10                               marked for identification.)

11            This one's for you.  I don't know that this

12       really will make a difference as to your critique but I

13       wanted to make sure that you had got the final version

14       that included the revisions.  Exhibit eight is an

15       e-mail from myself to Mr. Rose that incorporates the

16       corrected pages which I understand you may not have

17       received and it also has the roster, the original

18       roster of the 503 employees in DRR and their birthdates

19       so there's actually two attachments here.  And I'm

20       making it an exhibit more for you to have a copy of it

21       than for anything else at this point.  The court

22       reporter can have that one and that's a copy for you to

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 75
No. 05-2325-RMU

 1    keep.

 2            A    Oh I can keep it, thank you.

 3            Q    Now, let's see.  This looks like the same

 4    language on page two in your critique about Dr.

 5    Jeanneret's report.  You say that your primary

 6    criticism of Dr. Jeanneret's report is that he did not

 7    conduct an adverse impact analysis to see if the 2000

 8    RIF, 2005 RIF had an adverse impact against the class

 9    of permanent employees who are age fifty and up.  Now,

10    did Mr. Rose tell you that originally under the courts

11    scheduling order the plaintiffs report was actually

12    supposed to, we were supposed to actually get the

13    plaintiffs report first?

14            A    Yes, I believe so.

15            Q    Okay so there are some things that might be

16    omitted from Dr. Jeanneret's report but if he was

17    actually submitting a rebuttal report and they were in

18    your report he would address so, you understand that

19    right?

20            A    Yes.

21            Q    Now, if Dr. Jeanneret had conducted an adverse

22    impact analysis which was limited to those DRR

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 76

1      **employees who were involuntarily separated on September**

2      **3rd, 2005 and assuming he did it right, would you have**

3      **considered that to be adequate?  An adequate impact**

4      **analysis?**

5           A    Well that would have changed my criticism that

6      he hadn't done any impact analysis and then he would be

7      able to say and I would be able to say that at least he

8      did one analysis of, but I would say that it wasn't

9      broad enough if you are referring just to the 356 code

10     numbers.

11          **Q    How about the 356 are the ones who are coded**

12     **as RIF, there are some other individuals who were coded**

13     **as retirement resignation in lieu of involuntary**

14     **action.  Assuming you included those as well would you**

15     **have considered that to of been an adequate impact**

16     **analysis?**

17          A    Well I'd want to think a little bit about it.

18     I have not had a chance to look at the revisions that

19     you are referring to and I think the code numbers that

20     I use were appropriate and if Dr. Jeanneret used a

21     smaller number of code numbers I might think that that

22     was deficient.

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 77
No. 05-2325-RMU

1          Q     Well he actually, you won't find an impact

2          analysis even in his revised report because his

3          revisions were made before we received your report.

4          I'm asking a more broader, hypothetical sense that if

5          he did an impact analysis that included the employees

6          separated by RIF, the employees who resigned or retired

7          in lieu of some kind of involuntary action, in other

8          words, they would have lost their jobs if they hadn't

9          of resigned or retired, would you have considered that

10         to of been an adequate impact analysis?

11                 MR. ROSE:  So far as the scope, I think

12         that --

13                 MR. JONES:  Yes, assuming that it was done

14         properly and consistent with the methodology not

15         necessarily the sample, but would you consider that,

16         the scope of that to of been adequate?

17                 THE WITNESS:  I'd want to see how he defined

18         those terms, you know, the people that you are

19         describing, you are describing them in a rough way, I

20         would like to see what the operational definition was

21         of each of those people that he included and what his

22         narrative was to explain why he felt those people

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 78

1        should be included and why other people maybe shouldn't

2        be included.

3                BY MR. JONES:

4            Q    Okay, well --

5            A    You are giving me a hypothetical about what he

6        would do, I'm giving a hypothetical about what my

7        response would be.

8            Q    Right, which is entirely what I am asking for.

9        Just to pin down the, as far as you know who we would

10       be talking about, we would be talking about code 356

11       which was defined by the PERHIS as termination

12       involuntary in the OPM guide as separation for the RIF

13       and the other two codes would be 304 retirement in lieu

14       of involuntary action and 312 resignation in lieu of

15       involuntary action.  So if those three codes --

16           A    So 304, 312 --

17           Q    And 356?

18           A    So the people that took the voluntary buyout

19       you wouldn't include.

20           Q    That's right, that's my hypothetical that you

21       know if Dr. Jeanneret did an impact analysis that only

22       including those three, because it is a report he does

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 79
No. 05-2325-RMU

1    reference 63 employees who quote unquote lost their

2    jobs and those are the 63 if you look back on the

3    PERHIS spreadsheet the ones that are coded in math

4    matter.  So I guess I am asking because if the reports

5    had been, you know, perhaps given in the right order,

6    unfortunately we are not in that situation but what I

7    am saying is if he had down an impact analysis limited

8    to those three codes, employees, those 63 employees

9    were separated pursuant to those codes, would you

10   consider that to be adequate or would you still

11   critique them?

12        A    Well the people that took the buyouts lost

13   their jobs too and you know the guidance that Mr. Rose

14   gave me was that Mr. Rose felt that the people that

15   took the buyouts were harmed and that they were part of

16   the separation process of the RIF and so they should be

17   included in the RIF adverse impact analysis.

18        Q    Okay but based on the information that you had

19   you made no independent determination of that, correct?

20        A    That's right I relied on Mr. Rose to define

21   broadly the scope of the impact analysis.

22        Q    Okay, and you, based on, well now you do, or

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 80

1          based on the PERHIS information you would be able to

2          determine the ages of the employees who took the

3          buyouts?  The 302's?

4              A    Yes.

5              Q    Let me se if this is the same.  Again I am

6          looking at the critique section on page two of the,

7          number page two of your interim report, second

8          paragraph second sentence, Dr. Jeanneret looked at the

9          average age of DRR employees before and after the 2005

10         RIF but did not define his sample of employees

11         precisely enough to permit replication of his study.

12         Let's stop right there and you now have Dr. Jeanneret's

13         report and I would ask you to take a look at tables

14         four, five and six in his report which are the average,

15         the DRR, the number of DRR employees exhibit four as

16         the number of employees DRR permanent employees that

17         you have added and then their average age and then

18         exhibit five divides them into age under fifty and age

19         fifty and over.  And then exhibit six has snapshots at

20         November 1st 2004 and September 17, 2005, and I ask you

21         that given the fact that he has the precise dates for

22         this data and precise numbers of employees, what do you

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 81

1     mean when you say he did not define his sample of

2     employees precisely enough to permit replication of his

3     study?  What is not defined precisely enough?  This is

4     what your critique says.

5          A    Right, well he did not define the appointment

6     codes of the specific employees that were included.  I

7     mean I did not have the same data set that he did.  I

8     mean he starts in November and --

9          Q    Now which table are you, you are looking at

10    table six?

11         A    In table six has November 2004.

12         Q    And you had no data prior to 2005?

13         A    That is right.

14         Q    So you couldn't replicate it because you did

15    not have the data?

16         A    Right.

17         Q    Even though Mr. Rose did have the data, did

18    you ask for this data for 2004 and previous years?

19         A    No.

20         Q    Okay.  Now, there seems to be, in my mind

21    there is a conceptual difference in not having and not

22    being able to replicate it because you don't have the

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 82

1      data and not being replicate, not being able to

2      replicate it because even if you did have the data you

3      don't know, it is not specific enough to be able to

4      replicate the data?

5          A    Well, he did not define the sample in terms of

6      the appointment codes and you know it, he says total

7      number of employees --

8          Q    Which table are you looking at now?

9          A    His --

10             MR. ROSE:  Tables?

11             THE WITNESS:  His tables four, five and six.

12             MR. JONES:  Okay let's look at four first.

13     Four says total number of employees.

14             MR. ROSE:  Total says average age of current

15     employees.

16             MR. JONES:  Exhibit five talks about DRR

17     permanent employees and six talks about total permanent

18     employees.

19             THE WITNESS:  I do not know how he defined the

20     word permanent, you know, that refers to certain

21     appointment codes, it does not give an operational

22     definition what he meant by that term and also you

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 83

1       know, the term total employee might imply different

2       things and if he confirmed which appointment codes were

3       covered under total employees as well, so those two

4       things --

5               MR. JONES:  Would that have addressed your

6       criticism?

7               THE WITNESS:  That would address my criticism.

8               BY MR. JONES:

9           Q    Let me direct your attention to exhibit four

10      which is the permanent employees and three rows up from

11      the bottom as of 12/31/2004 there are 504 employees

12      and --

13              MR. ROSE:  I'm sorry?

14              MR. JONES:  504.

15              MR. ROSE:  As of a beginning?

16              MR. JONES:  As of the end of 04 based on, you

17      know, the subsequent back and forth and the

18      spreadsheet, you understand what his definition is now?

19              THE WITNESS:  Now I do, yes.

20              MR. JONES:  It is one, two, six and seven, are

21      the employment codes that are --

22              THE WITNESS:  Yes.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 84

BY MR. JONES:

2      Q    Okay so knowing what you know now, are you

3      inclined to change your critique as to this particular

4      issue about not being able to replicate it?

5      A    That is correct.  This could be replicated

6      now.  I can gather 2004 data.

7      Q    Right and well actually there is data back to

8      2000, let me just say that in plaintiffs possession and

9      assuming that the same data is back, is available back

10     to 2000, couldn't all of, as far as you could tell

11     couldn't all of them be replicated?

12     A    Yes.

13     Q    And because you don't have, did not have the

14     data at the time, you really have no reason to dispute

15     the mathematical computations here, as we sit here

16     today?

17     A    No.

18     Q    Okay, the second part of that critique says

19     that he preformed no test of statistical significance

20     to evaluate the observed differences in average ages

21     and I'll direct your attention to exhibit six which is

22     the pre, exhibit six of Dr. Jeanneret's report, which

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 85

1    is the average age analysis pre and post RIF.  I think

2    you mentioned before that the RIF and the buyout were

3    actually announced in around November 2004, which

4    explains that date, looking at these numbers, where we

5    went from total number of employees 511 to 236 and

6    permanent employees describing less 509 to 235, in fact

7    I think you mentioned before that you had determined

8    there were two employees who, I think you said one was

9    a term and one was a intern or something like that

10   which may explain the different between the 511 and the

11   509 in November.  But being that as it may, looking at

12   the change in the average age and let's just look at

13   the permanent employees who went from 509 down to 235

14   and the average age went from 51.96 years to 51.81

15   years, is that a fair statement of what his chart says

16   with regard to permanent employees?

17        A    Yes.

18        Q    Based on your experience and familiarity with

19   statistical method, just looking at the sample sizes

20   and change in average ages, would you say there was any

21   statistical, statistically significant change?

22        A    You know probably not, but as I say, no

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 86
No. 05-2325-RMU

1    statistical test was referenced here.

2         Q    Okay did you do a statistical test of his

3    figures?

4         A    I could not because I did not have the 04

5    data.  Well not just that I would have needed to have

6    the actual sample of employees.

7         Q    But based on what you know now do you think

8    you could if you wanted to do a statistical

9    significance test could you?

10        A    Well if I wanted to I could for the year 2005.

11        Q    Well this is the difference between 04 and 05.

12   If you had the data from the 04, if Mr. Rose gave you

13   the data could you do the test?

14        A    Yes.

15        Q    Okay, let's see here.  Again going back to

16   your interim report page two, the last sentence of the

17   second paragraph says " Dr. Jeanneret should have

18   analyzed the 2005 RIF separation rates of permanent

19   employees who were age under fifty versus age fifty and

20   up to see if there is a substantially different rate of

21   selection as shown by the appropriate, by the

22   appropriate statistical tests".  Now when you say he

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 87

1          should have analyzed the 2005 RIF separation rates,

2          that sounds to me you are talking about people who are

3          separated by the RIF, per the RIF, is that what you are

4          saying here?  Well it says 2005 RIF separation rates.

5              A    Well what I meant was that the RIF-related

6          separation rates, I did not mean specifically the 356

7          code number.

8              Q    Okay so you are not, you, even though it can

9          be construed that way, you are not, well it sounds like

10         that at least to me, you are not talking about just

11         involuntarily, being involuntarily separated pursuant

12         to federal RIF procedures?

13             A    Yes.

14             Q    But then in the same sentence you say " to see

15         if there was a substantially different rate of

16         selection", we talked about this a little bit before,

17         when you talk about rate of selection are you, are you

18         talking about selection of people to be involuntarily

19         terminated?

20             A    Selection per RIF.

21             Q    That is what I would understand when you say

22         selection for RIF.  Selection to be involuntarily

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 88
No. 05-2325-RMU

1       terminated pursuant to the RIF procedures.  Is that

2       what you are referring to here?

3           A    Well the point I am getting at is that Dr.

4       Jeanneret looked at average age as opposed to

5       frequencies of people and you know, how many people

6       were there in each age category and of those people how

7       many of them were selected for RIF and how many were

8       selected to stay and average age, if you had one person

9       who was 85 years old who stayed, that wouldn't make up

10      for you know, ten people who were fifty years old who

11      got laid off.  You know, just average those ages, you

12      look at frequencies of people and so I felt that

13      looking at average age was not the proper way to

14      analyze the adverse impact.

15          Q    Well I understand that cause that's the

16      previous sentence where you say in any event a

17      comparison of average ages is not a proper adverse

18      impact analysis, but the sentence that I am focusing in

19      on is the next one where you say what he should have

20      done and you say he should have analyzed the 2005 RIF

21      separation rates to see if there was a substantially

22      different rate of selection.  Now is that what you are

EXHIBIT 33
ALIOTTA v. BAIR                                    Page 89
No. 05-2325-RMU

1    claiming you did in your report?

2        A    Yes.

3        Q    Okay and when you talked about a substantially

4    different rate of selection, what are you referring to?

5    Selection by whom?

6        A    Selection by the agency for lay off and we are

7    talking now about the agency announces that there is

8    going to be a downsizing and there is a variety of ways

9    to downsize.  There's some buyouts, there's mandatory

10   separation, involuntary separation, and other pressures

11   on people to leave.  Some people transfer to other

12   departments and so forth so there were pressures on

13   people to leave and what I try to do is look at, if I

14   looked at all the what I call RIF-related separations,

15   tried to capture the, you know the total picture of

16   downsizing in the year 2005.

17       Q    Okay but when you lump together people who

18   left before the actual RIF with people who left because

19   they were selected as part of the RIF process that they

20   had to leave, isn't that kind of mixing apples and

21   oranges?  I mean the people who left prior to the RIF

22   weren't selected by management to leave were they?

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 90
No. 05-2325-RMU

A     Well this is what we talked about earlier

today.  We got these voluntary buyouts that are not so

voluntary.  People know that the agency is downsizing

and some people chose to take a buyout other people got

an involuntary termination but all these people were

affected by the downsizing program.

**Q     Okay but since the buyout was offered to**

**effectively all the employees in DRR are you saying all**

**of the employees in DRR were selected?**

A     Well that's the sense I am using that term and

I mean it in a broad sense of people who had to leave

the agency due to the downsizing.  When you look at

average age you are not looking at people who were

affected.  Some people stayed, some people left and

it's looking at the frequencies of people who stay and

frequencies of people who go and that's what I am

talking about selection or if you will retention rates,

might have been a better word than selection rates.

But there were retentions, there were separations.

**Q     Okay but as far as the people who left prior**

**to June, and you know you referenced the buyout date, I**

**think it is slightly wrong cause you referenced the**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    buyout date as May 5th and I think it was actually May

2    14th and if you look at the spreadsheet I think you

3    will see the clustering around the 14th but as far as

4    the people who left May 14th or before, I mean isn't it

5    true that the only thing management selected them for

6    was to receive the offer of a buyout the same as all of

7    the other DRR employees some of whom didn't leave?

8         A    I guess what I would have to say is that Mr.

9    Rose asked me to include those people and I accepted

10   that as a given so Mr. Rose has seen all of the

11   evidence and I have not and so I did my analysis within

12   the framework of what Mr. Rose asked me to do.

13        Q    Okay and if Mr. Rose hadn't in fact asked you

14   to make that assumption, if you were just, you know, as

15   an independent industrial and organizational

16   psychologist, would you have considered employees who

17   took the buyouts to be similarly situated to employees

18   who actually involuntarily lost their jobs after the

19   RIF?

20        A    Well I think there is a legitimate argument to

21   include those people.  It depends what the objectives

22   of your analysis are and the, if you feel that a

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 92

1          broader, you know the people that took buyouts are

2          negatively affected by the RIF, then and that's the

3          basis of and including them in the analysis.  If you

4          feel that those people are not negatively affected by

5          the RIF then you might not include them and maybe you

6          are not analyzing it both ways to see what you would

7          get but I think that there is a legitimate argument

8          that the buyout people were negatively affected by the

9          RIF.

10              **Q     Okay but that Mr. Rose in telling you to make**

11         **that assumption, you didn't have any independent**

12         **information to reach that conclusion on your own, did**

13         **you?**

14              A     Well I think it's a reasonable one.  I have

15         not as far as this case, I have not looked at all of

16         the evidence in the case, I'd talk with the plaintiff's

17         for example to see what, how they felt, you know, the

18         ones who took the buyouts, what they were feeling at

19         the time.

20              **Q     Well isn't it a matter of fact that no matter**

21         **how the plaintiff's felt, management did not make a**

22         **selection of, except for the RIF, except for the actual**

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 93
No. 05-2325-RMU

1      RIF, management didn't make a selection of who actually

2      had to go and who actually could have stayed?

3              MR. ROSE:  I'm sorry, say that again.  Could

4      you read that back?

5              MR. JONES:  I'll say it again.  Absent,

6      putting aside the issue of those employees who actually

7      participated in the federal RIF process and at the end

8      of the day had to, you know, were involuntarily

9      separated, did management make any selections of any

10     employees who they told had to leave?

11             MR. ROSE:  I object.  There is an underlying

12     assumption that the state actually, that the RIF

13     process does not include the entire process that

14     statement is contrary to the regulations of the EEOC

15     which are binding on this agency, the FDIC.

16             MR. KESSLER:  What regulations are you talking

17     about?

18             MR. ROSE:  I am talking about 29CFR.

19             MR. KESSLER:  About RIFs?

20             MR. ROSE:  I am talking about, yes, they are

21     RIF regulations.

22             MR. KESSLER:  The EEOC does RIF regulations?

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                                                    Page 94
**No. 05-2325-RMU**

1          MR. JONES:  That's okay let's just hear the

2     objection for the record.

3          MR. ROSE:  I said I believe I've given a

4     citation to Mr. Jones but I am not sure but I will give

5     it to you again.  The RIF, the reductions in force is

6     program is governed by the regulations of the EEOC and

7     the regulations of the EEOC states specifically that

8     the entire process is the bench mark that should be

9     used in determining whether the program is

10    discriminatory.  So I would argue that your statement

11    of law that RIF-related process did not include the

12    retirement and is essentially erroneous.  You can

13    answer the question as best you can but that is my

14    objection.

15          MR. JONES:  Okay I am going to rephrase the

16    question slightly because I am not trying to make any

17    arguments about the law.  What I am saying is putting

18    aside the issue of the 63 employees who involuntarily

19    lost their job or resigned in lieu of involuntarily

20    losing their job, or retired in lieu of voluntarily

21    losing their jobs.

22          Aside from that selection, I think you call it

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                          Page 95
**No. 05-2325-RMU**

1          a negative selection, when you lose your job, aside

2          from that selection, did management, is it your

3          understanding that management made any selections of

4          any other employees or the selections caused those

5          employees, those employees were selected to

6          involuntarily lose their jobs.

7                    MR. ROSE:  Well, same objection that I made

8          earlier, that involuntary --

9                    MR. JONES:  As opposed to pressure, as opposed

10         to the feeling that they had to make the best of a bad

11         situation, as opposed to feeling that they were

12         threatened, that they may lose their jobs, did

13         management select any of those employees who took the

14         buyout prior to the middle of May.  Did management

15         select any of those employees for termination?

16                    THE WITNESS:  Well, management offers the

17         buyout to certain people or groups of people and so

18         they decide who is eligible for the buyout.  So to that

19         extent they are making a selection decision But I would

20         look at it as selection for retention and if somebody

21         says I am thinking about leaving and management says oh

22         we really want you to stay, it could affect the

EXHIBIT 33
ALIOTTA v. BAIR                                           Page 96
No. 05-2325-RMU

1      employees decision.

2              BY MR. JONES:

3          **Q      Do you have any independent basis for knowing**

4      **that that happened in any case here?**

5          A     I have no independent basis of knowing if

6      management specifically picked each employee who was

7      negatively affected.

8          **Q      Well then let's go on to another criticism**

9      **that you have that and again this is on page two of the**

10     **interim report, that Dr. Jeanneret also failed to**

11     **describe and evaluate the FDIC method for determining**

12     **each employees retention standing.  Then the next**

13     **sentence goes on to say Dr. Jeanneret did not analyze**

14     **these ratings to see if they had an adverse impact on**

15     **the basis of age nor did Dr. Jeanneret review FDIC**

16     **documents to see if these rating procedures provided**

17     **reliable and valid ratings of an employees actual**

18     **retention value to the organization.  When you refer to**

19     **retention standards, what were you referring to here?**

20         A     Well this, I picked up something, statement

21     that Dr. Jeanneret made in his report, I don't know if

22     I could point to the actual sentence, right here, but

EXHIBIT 33
ALIOTTA v. BAIR                                        Page 97
No. 05-2325-RMU

1        somewhere in his report he made a reference to this and

2        a reference to people's performance ratings and Dr.

3        Jeanneret said that he looked at a lot of different

4        documents and he couldn't find anything anywhere that

5        looked suspicious to him but he didn't get into this

6        area of this rating process that people did.  I made a

7        very brief allusion to it and I wish that he had had

8        more discussion of that and I thought would have been a

9        relevant thing for him to get into.

10          **Q    Okay are you aware that the term retention**

11       **standing is actually, I guess what I call, a term or**

12       **art in the federal RIF statutes?  RIF-related**

13       **regulations, retention standing?**

14          A    No I think I got that term from Dr.

15       Jeanneret's report and the context of his report.  I

16       don't know precisely what he was referring to.

17          **Q    Okay and aside from not being familiar with**

18       **and with appreciated more information about retention**

19       **standing and how performance ratings affected retention**

20       **standing, do you have any reason to believe that the**

21       **DRR RIF was conducted in any matter other than in**

22       **accordance with federal RIF rules and regulations?**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 98

A    No, I am just saying that was an area of Dr.

2    Jeanneret's report that I wish he would have discussed

3    more.  If he had discussed it more then maybe they

4    would have been A okay.

5        **Q    Do you have any knowledge of the effect that**

6    **rating procedures have on the RIF process?  Federal RIF**

7    **process?  Annual performance rating?**

8        A    No.  Dr. Jeanneret made an allusion to it.

9        **Q    I think we ought to, I am going down to the**

10   **adverse impact analysis part of your interim report and**

11   **I think we covered a lot of this.  Under employee**

12   **sample 2005 data, it says he provided an electronic**

13   **file to me containing PERHIS 2005 data for the FDIC**

14   **employees.  This file contained all employees who were**

15   **employed by the FDIC during 2005.  Now you understand**

16   **that the data from 2000 to 2004 is also available to**

17   **you if you so desire, correct?**

18       A    Yes.

19       **Q    You do understand that okay?  You have to say**

20   **yes for the court reporter.**

21       A    Yes.

22       **Q    Okay thank you.**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU                                           Page 99

1        A    Sorry.

2        Q    And you didn't ask for any additional data

3    other than the 2005 data?

4        A    Correct.

5        Q    Under method on page three, let's see I think

6    this differs a little bit.  Yeah in your original

7    report you said you only selected codes one and two and

8    now you say you define career employees as having one

9    and two, codes one or two and you define non career

10   employees as those employees having code six or code

11   seven appointments.  What is your basis for defining

12   the code six and code seven employees as non career?

13       A    Well because codes one and two use the word

14   career and codes six and seven do not use the word

15   career.

16       Q    Okay.

17       A    I mean if you look at the official code

18   definitions that's what it says.

19       Q    So career doesn't necessarily accord with

20   permanence because there can be permanent employees who

21   are in the acceptance?

22       A    Apparently so, yes.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q    You are looking at one?  The attorneys are all

2    accepted service employees.

3         MR. ROSE:  That was true even many years ago.

4         MR. JONES:  Probably industrial psychologists

5    too.

6         THE WITNESS:  Those people are usually career

7    appointments.

8         MR. JONES:  I can only speak for attorneys.

9         MR. ROSE:  I think the industrial

10   psychologists are not accepted.

11        MR. JONES:  Let's see.  This does change quite

12   a bit.  So this clarifies that the age, ages were

13   calculated as of 12/31/05 as opposed to the old report

14   that says I calculated their ages of 1/1/05.

15        THE WITNESS:  I used two dates.  1/1/05 and

16   12/31/05 and this time around I just used the --

17        BY MR. JONES:

18   Q    Stuck with the 12/31?  Okay.  We discussed

19   number six that there was no personal action code for

20   reduction in force and now is it your understanding

21   that 356 was used for the separation via RIF?

22   A    Well I understand that's what it says in the

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 101
No. 05-2325-RMU

1        OPM manual but I still understand that the FDIC manual

2        says something else.

3            **Q    Okay maybe we can clarify that to Mr. Rose**

4        **formally in writing that everyone who was separated**

5        **formally by, I can tell you that for a fact that**

6        **everyone who was separated via the RIF involuntarily**

7        **separated via the RIF was covered 356 but we'll accept.**

8                    MR. ROSE:  Or the person who was voluntarily,

9        who was separated --

10                   MR. JONES:  There were a few others who

11       retire, who were allowed to retire in lieu of being

12       separated, if they had not retired they would have been

13       separated.  They would have gotten a 356 or resigned.

14       Those are the code 304's and 312's.  Number eight,

15       RIF-related separations did not occur on one or two

16       specific dates but were likely to occur throughout the

17       year.  I understand that based on your definition of

18       RIF-related separations, but do you have an

19       understanding now, at least as far as the subset of

20       employees who were involuntarily terminated that

21       occurred on September 3rd?

22                   THE WITNESS:  Yes.

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 102
No. 05-2325-RMU

1              BY MR. JONES:

2                   **Q     I just have a conceptual question about number**

3              **nine on page four.   About the uniform guidelines and**

4              **employee selection procedures.**

5                        MR. ROSE:  I'm sorry, we're on page four now?

6                        MR. JONES:  Page four, section nine about the

7              uniform guidelines which talks about selection for

8              termination.

9                        MR. ROSE:  Yes.

10                       MR. JONES:  Again, if you go to use this are

11             you still convinced it is proper to include employees

12             who were not per say selected for termination but who

13             were selected to receive an offer of a buyout and then

14             chose to for whatever reason, chose to retire or

15             resign?  Is that something that is embraced or covered

16             by these uniformed guidelines?

17                       THE WITNESS:  Well, conceptually it is if you

18             are saying we want to investigate the adverse impact of

19             RIF-related separations.  If you change your objective

20             to say let's see what the adverse impact is of 356

21             separations, then you'd have a different analysis but

22             conceptually it's the same and you know, you define the

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 103

1          group in which you are assessing adverse impact and if

2          you define the group that's negatively affected to

3          include buyout people you will have a larger group and

4          conceptually it fits the uniform guidelines.

5                    BY MR. JONES:

6          **Q     Okay but again you'll agree that the**

7          **management decision with respect to the people who took**

8          **the buyout and left, the management decision was**

9          **limited to offering the buyout.  Management didn't and**

10         **it took a subsequent decision by that employee to**

11         **actually terminate the employer?**

12         A    Okay yeah they took the offer and left,

13         correct.

14         **Q     Do you know whether the uniform guidelines**

15         **include age as a protected category?**

16         A    It does not.

17                   MR. ROSE:  Look at this.

18                   MR. JONES:  Oh, you have that in footnote one.

19         Did you, are you expressing an opinion in your report

20         as to the cause of anyone leaving the FDIC during the

21         2005 time period or are you just analyzing the data?

22                   THE WITNESS:  I guess I would say I am

EXHIBIT 33
ALIOTTA v. BAIR                                           Page 104
No. 05-2325-RMU

1          essentially just analyzing the data because Mr. Rose

2          has given me certain guidance that you know, these

3          separations are RIF-related and so I'm not really, I

4          use some judgment in looking through the separations

5          and picking out ones I thought were RIF-related you

6          know within the guidelines that Mr. Rose gave to me.

7               BY MR. JONES:

8          **Q    Okay and from your knowledge of statistics, a**

9     **correlation doesn't necessarily imply causation?**

10         A    Correct.

11              MR. ROSE:  I am sorry.  I missed the last?

12              MR. JONES:  Correlation doesn't necessarily

13    imply causation is that correct?

14              THE WITNESS:  That's correct.

15              MR. JONES:  Why don't we take a ten minute

16    break and then we may be close to finishing up.

17              MR. ROSE:  Okay I would like to as long as I,

18    16, 25, 22, then you go into F little 3 which refers to

19    two types of programs exit incentive programs and other

20    employment programs and it defines both of those and it

21    also talks about the decisional unit in which is F3 and

22    reason being is the hardest thing to remember.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1          MR. JONES:  Why don't I say this, this is the

2     pink book?

3          MR. ROSE:  Yes.

4          MR. JONES:  The pink addition.  What page

5     number is that?

6          MR. ROSE:  It starts, it is as of July 04 and

7     I am pretty sure it is the same.

8          MR. JONES:  I think I may have that one.

9          MR. ROSE:  335 is the page number that it

10    starts on and then on E under this is 236 if an

11    employer analyzes and considers the focus its worth

12    reduction of a particular facility than the nature of

13    the employers decision making process is to be taking

14    into account.  It's in several parts confirming but it

15    runs from 336 of this edition to 338 and it really goes

16    on to, it also discusses the kind of notice that was

17    given which was consistent with those that this agency

18    gave.

19          MR. JONES:  These are EEOC rights?

20          MR. ROSE:  Yes and I found out that an

21    executive order the EEOC won in 1978 -- I believe it

22    was the responsibility for administering Federal EEOC

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 106

1          programs to EEOC to relate its findings to the Agency,

2          and the guidelines and other things are not necessarily

3          (inaudible), but by executive order are defining the

4          agency so I'll give you in more detail --

5               MR. KESSLER:  You raised these in connection

6          with the discussion about whether it is appropriate to

7          include employees who took a buyout in the dispersant

8          analysis?

9               MR. ROSE:  Yes.

10              MR. KESSLER:  Is everything else besides these

11         regulations that you are reminding and directing your

12         expert to include the buyout employees?

13              MR. ROSE:  Well, common sense is the fact that

14         yes, I mean I think that's what the statute

15         contemplates but the regulations and how they are

16         referred is the statute.

17              MR. JONES:  Okay why don't we go off the

18         record at 2:40.

19              (Off the record from 2:40 to 2:54 p.m.)

20              MR. JONES:  Back on the record at 2:55 or

21         2:54, let's see.  Dr. Seberhagen, in your report are

22         you identifying any employer practice as being, any

**EXHIBIT 33**
**ALIOTTA v. BAIR**                                              Page 107
**No. 05-2325-RMU**

 1          FDIC management practices being discriminatory or what

 2          FDIC employment practice or practices are you

 3          identifying as being discriminatory?

 4                    THE WITNESS:  It's the RIF.

 5                    MR. ROSE:  I think you need to be a little

 6          more precise than that because RIF has been used in two

 7          different ways here.

 8                    THE WITNESS:  Okay well the, I guess I'm

 9          talking about the downsizing process in 2005 and

10          looking at all of the different elements of that

11          including the buyout as well as the involuntary

12          separations.

13                    MR. JONES:  Okay are you, do you have any

14          information that the extent of the downsizing was

15          discriminatory?  The extent of the downsizing in DRR

16          was for the purpose of discriminatory, discriminating

17          as to age?

18                    THE WITNESS:  No, I don't have any information

19          about the motives of management if that's what you are

20          asking.

21                    BY MR. JONES:

22               **Q     Okay do you have any information that age was**

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 108

1    a factor in offering the buyout to all DRR employees?

2        A    No.

3        Q    Do you have any information that age was a

4    factor in determining which employees would be

5    involuntarily separated?

6        A    No.

7        Q    Okay let me ask you some easy questions that

8    usually get asked at the beginning of most depositions

9    but could you outline your educational background for

10   us please?

11       A    I have a bachelor's degree in psychology from

12   Brown University.

13       Q    When did you receive that?

14       A    1966.

15       Q    Okay, after that?

16       A    I have a master's degree in industrial

17   psychology from Southern Methodist University in 1968

18   and I have a PhD from the University of Minnesota in

19   industrial psychology, industrial and organizational

20   psychology, the degree officially arrived in 1979.

21       Q    Okay and does that mean, was that a part time

22   program or full time?

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

1    A    Well I started the Minnesota program in 1968.

2    I was on campus there until 1973 and then I was all but

3    dissertation at that point.  I came to Washington took

4    a full time consulting job and didn't have time to

5    write up my dissertation so it sat on the back burner

6    for a while.  I was continuously registered at the

7    University of Minnesota until 1978.  I finished all of

8    the final events or what have you and just missed the

9    deadline for graduation so I had to wait until March of

10   79 to officially get the degree.

11       Q    Okay and in the interim you were employed in

12   Washington?

13       A    I was in Washington.

14       Q    Okay and what was your first employment, I

15   guess it was starting in 1973?

16       A    Well in 1973 I was a senior associate with

17   Planning Research Corporation.

18       Q    And what did you do there?

19       A    Basically I was a management consultant

20   specializing in industrial and organizational

21   psychology.  My clients included government and private

22   industry.

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 110

1      Q     Okay and what was your next position and when

2   was that?

3      A     In 1976 I left Planning Research Corporation

4   and formed my own independent consultant practice as

5   Seberhagen and Associates.

6      Q     In 1976?

7      A     1976 and I have done that ever since.

8      Q     Well that makes it easy.

9      A     That's the end of my resume.  Till present.

10     Q     And I think you said before not only

11  litigation matters but you also provide management

12  consulting services?

13     A     Yes.

14     Q     And between the two of those areas, what

15  percentage would you say is involved in employment type

16  matters?

17     A     Well it is varied over the course of my career

18  for most of my career it's been at least 75 percent

19  management consulting work and maybe 25 percent

20  litigation work.  In the last few years it's been more

21  heavily on the litigation end.

22     Q     Okay and as far as the litigation employment

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 111
No. 05-2325-RMU

1      discrimination type matters?

2           A    Most of it is, every once in a while I get

3      crazy call from somebody to you know, general

4      employment, you know a non discrimination type thing.

5      Not crazy but not discrimination.  A general labor type

6      complaint possibly and a few miscellaneous things on my

7      resume.

8           Q    Okay and of the discrimination matters could

9      you approximate the percentage that involves age

10     discrimination?

11          A    Probably not more than ten percent.

12          Q    Okay and you've worked with or for Mr. Rose

13     before I understand?

14          A    Yes.

15          Q    In about how many cases have you worked with

16     Mr. Rose?

17          A    Mr. Rose used to be with the Department of

18     Justice and I did, I worked on some cases for the

19     Department of Justice not specifically for Mr. Rose but

20     he was head of the employment litigation section so he

21     probably had something to do with it.  So I had, let's

22     see on my resume there is at least five to ten cases

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 112

1    with the Department of Justice and then since Mr. Rose

2    retired from the Justice Department I have worked with

3    me on maybe another five to ten cases.  I'd have to

4    count them up.

5        **Q    Okay have you ever been retained by defendants**

6    **in employment cases?**

7        A    Yes.

8        **Q    And who are some of those representative**

9    **defendants?**

10       A    The federal government is one.  I currently am

11   working on a case with the Veterans Administration, the

12   U.S.  Attorneys office over the years have hired me for

13   three or four cases and private or employers, private

14   employers and some government agencies, state and

15   local, the city of Miami, Florida hired me to assist in

16   defending a case this past year.  So I have worked on

17   defense cases from time to time.

18       **Q    Okay and in your role as an industrial and**

19   **organizational psychologist, what expertise have you**

20   **brought to this report?**

21       MR. ROSE:  I think that's okay, I'm sorry

22   would you read back?  I think it's fine, I'm sorry I

EXHIBIT 33
ALIOTTA v. BAIR                                              Page 113
No. 05-2325-RMU

1        don't understand.

2                    MR. JONES:  In your role as an organizational

3        and industrial psychologist what expertise have you

4        brought to this report?

5                    THE WITNESS:  Well, the areas that I special

6        in would be employee selection, job analysis, position

7        classification, compensation, job evaluation in

8        particular, and equal employment opportunity as a

9        general category.  Industrial psychologists are social

10       scientists who are trained in statistical analysis as

11       part of their training so I have that as an area of

12       expertise as well.

13                   BY MR. JONES:

14            Q     Okay and as to employee selection does that

15       refer to employee selection by management for you know,

16       selections for vacant positions or?

17            A     It could be selection for hiring's, for

18       promotion or for layoff or for selection for training,

19       selection for a number of things.  In the past I worked

20       on a management consulting project where I designed a

21       system to lay off half of the employees at an oil

22       refinery.  So I have been involved with selection for

EXHIBIT 33
ALIOTTA v. BAIR                                          Page 114
No. 05-2325-RMU

1       lay off.

2           **Q      When you undertook that project did you**

3       **recommend incentives for voluntary separation prior to**

4       **layoff?**

5           A    I didn't have to recommend it, they were

6       already doing it.  They had already decided that they

7       were going to have a severance package for people who

8       were laid off and I was not involved in that aspect of

9       it.

10          **Q      Okay did they have a severance package for**

11      **people who were actually laid off, did they have any**

12      **kind of a incentive program to incenticize people to**

13      **leave before they had to go through the lay off**

14      **process?**

15          A    Well, they didn't have, the severance package

16      included an offer to give two years of seniority to

17      people or credit for two years of work experience so

18      they were two years away from retirement that would

19      bridge them over to the retirement point.  So I guess

20      you can call that an early retirement type offer.  What

21      they really did, they gave salary compensation for, if

22      I recall right, a one month pay for every year they had

EXHIBIT 33
ALIOTTA v. BAIR                                                    Page 115
No. 05-2325-RMU

1          worked and most of these employees had been at the

2          refinery for thirty years but they were laying off so

3          that there was, a lot of these people would be on the

4          payroll or the equivalent of being on the payroll for

5          two more years and they allowed those people to qualify

6          for retirement.

7               **Q     Cause we have severance in the federal**

8          **government too, you are aware of?**

9               A     There is a buyout program and there is an

10         early retirement program that are two different types

11         of incentives.

12              **Q     Right but do you understand there is also a**

13         **severance benefit for people who are involuntarily**

14         **terminated in the federal government, are you familiar**

15         **with that?**

16              A     I am not aware about the nuts and bolts of

17         that.

18              **Q     I am going to terminate the deposition now at**

19         **3:10 but I am going to reserve the right if I need to**

20         **to continue to depose Dr. Seberhagen based on what we**

21         **receive in his final report next week.**

22                    MR. ROSE:  I don't have any problem with that.

EXHIBIT 33
ALIOTTA v. BAIR                                                    Page 116
No. 05-2325-RMU

1        I would like to just ask a couple questions.

2                    MR. JONES:  Sure.

3                    MR. ROSE:  You are adjourning the, I wouldn't

4        say you are terminating the deposition.  You are

5        adjourning it at least; you are concluding your part of

6        this deposition.

7                    MR. JONES:  Yes.

8                    MR. ROSE:  I just want you to focus a little

9        bit on your, what you believe Dr. Jeanneret, did you

10       think that Dr. Jeanneret focused on the wrong group of

11       employees, is that a fair question in determining in

12       making his report?

13                   THE WITNESS:  Well if he looked at the people

14       who stayed as opposed to the people who left.

15                   BY MR. JONES:

16       Q    Okay and your understanding of uniform

17       guidelines to provide what your are supposed to be

18       looking at, the impact, if there is any adverse impact

19       on the people who are selected either for good or for

20       bad is that correct?

21       A    Yes.

22       Q    So people, you focused on the people who were

EXHIBIT 33
ALIOTTA v. BAIR
No. 05-2325-RMU

Page 117

1    selected for, now did you understand prior to today

2         that the buyout for people under the age of fifty or at

3         least the people who both under the age of fifty and

4         had less than twenty five years experience, the buyout

5         did not include a retirement element or a half years

6         pay that the people who were fifty and above were

7         offered an early retirement plus the half years pay.

8         Did you understand that before today?

9         A    Yes, I did.  So their was an incentive for

10    older people to accept the buyouts, an extra incentive.

11         Q    An extra incentive, okay, that's all.

12

13

14

15              (Concluded on following page.)

16

17

18

19

20

21

22

**EXHIBIT 33**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

Page 118

1              MR. JONES:  I think we are done for today.

2              MR. ROSE:  Yes.

3              MR. JONES:  Thank you, Dr. Seberhagen.

4              THE WITNESS:  Yeah.

5              MR. ROSE:  Before we all go home --

6              MR. JONES:  Shall we go off the record?

7              MR. ROSE:  Yes, off the record, we can go off

8      the record.

9              MR. JONES:  Off the record at 3:12.

10             (Whereupon, at 3:12 p.m., the deposition of

11     LANCE W. SEBERHAGEN was adjourned.)

12                           *   *   *   *   *

13

14             I have read the foregoing pages, which are a

15     correct transcript of the answers given by me to the

16     questions therein recorded.

17

18

19     Deponent_____

20

21     Date_____

22