**EXHIBIT 34**  1
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1              UNITED STATES DISTRICT COURT

                   DISTRICT OF COLUMBIA

2    _____

3    BARBARA ALLIOTA, et al.,     x

                                  :

4                Plaintiffs,      :

         vs.                      : Civil Action

5                                 : No.: 05-2325 (RMU)

     SHEILA C. BAIR, Chairman,    :

6    FEDERAL DEPOSIT INSURANCE     :

     CORPORATION,                 :

7                                 :

                 Defendant.    x

8    _____

9                         Monday, January 14, 2008

10                        Washington, D.C.

11

12   DEPOSITION OF:

13                   JAMES R. WIGAND,

14   a witness, was called for examination by counsel

15   for the plaintiffs, pursuant to Notice and agreement

16   of the parties as to time and date, beginning at

17   approximately 10:20 o'clock, a.m., taken at the

18   office of the FDIC, 550 17th Street, Northwest,

19   3rd Floor Conference Room, Washington, D.C., before

20   Ronnie C. Palmer, a court reporter and Notary Public

21   in and for the District of Columbia, when were

22   present on behalf of the respective parties:

2

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    APPEARANCE OF COUNSEL:

2        For the Plaintiffs:

3            ROSE & ROSE, ESQUIRES

             BY:  DAVID ROSE, ESQUIRE

4            1320 19th Street, N.W., Suite 601

             Washington, D.C.  20036

5            202-331-8555

6        For the Defendant:

7            FEDERAL DEPOSIT INSURANCE CORPORATION

             BY:  WILLIAM S. JONES, ESQUIRE

8                STEPHEN J. KESSLER, ESQUIRE

             3501 Fairfax Drive, Room E-6006

9            Arlington, Virginia  22226

             703-562-2362

10

11   ALSO PRESENT:  Brigitte Foster

12                        - 0 -

13                    I-N-D-E-X

14   Witness:                              Page:

15   James Wigand

16           Examination by Mr. Rose          3

17                        - 0 -

18   Exhibits:     (Included in transcript)   Page:

19   Plaintiffs' Exhibit No. 1

20   to the Wigand deposition                 71

21                        - 0 -

22

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    WHEREUPON,

2                        JAMES R. WIGAND,

3    a witness, was called for examination by counsel

4    for the plaintiffs, and after having been duly sworn

5    by the Notary Public, was examined and testified as

6    follows:

7                   EXAMINATION BY COUNSEL FOR PLAINTIFFS

8                   BY MR. ROSE:

9        Q        Mr. Witness, would you be kind enough to

10   state your full name?

11       A        James Robert Wigand.

12       Q        Where do you reside?

13       A        3719 Chesapeake Street, Northwest,

14   Washington D.C.

15       Q        And you are employed by the defendant in

16   the case, Federal Deposit Insurance Corporation?  Is

17   that correct?

18       A        That is correct.

19       Q        I would like to take a few minutes and go

20   back and explore your background a little bit, and I

21   will try to ask questions that are more directly

22   related to the case.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

4

1                  Could you tell us where you where you

2    were born?

3       A       I was born in Staten Island, New York.

4       Q       Where did you grow up and go to high

5    school?

6       A       I moved to Maryland.  My family moved to

7    Maryland when I was in elementary school, and I went

8    to high school at High Point High School in

9    Beltsville, Maryland which is suburb of Washington

10   D.C.

11      Q       Right.  And did you go to college after

12   the high school?

13      A       After high school, I went to the

14   University of Maryland, College Park.

15      Q       I have heard of it.

16              (Laughter)

17              And what course of study did you take

18   there?  What was your field of concentration?

19      A       Yes.  I majored in zoology and I had

20   minors in biochemistry, Spanish, and business.

21      Q       Wow.  That's quite a few minors.

22      A       I attended there for five years.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Q    Did you come away with the Master's

2    degree as well as the Bachelor's degree?

3    A    I then worked after attending school

4    there.  I worked for the U.S. General Accounting

5    Office for over a period of time two years but

6    intermittent.  That was not full-time employment

7    because I was also a graduate assistant out at the

8    University of Maryland.  Then I went to the

9    University of Chicago Graduate School of Business and

10   got an MBA in finance.

11   Q    What year?

12   A    1984 is when I graduated from Chicago.

13   Q    What was your first employment after

14   getting your MBA?

15   A    I was with the Federal Savings and Loan

16   Insurance Corporation.

17   Q    That merged into the FDIC at some point?

18   A    In 1989.

19   Q    Tell us your history before 1989 with the

20   government.

21   A    At the FSLIC, I held a variety of

22   positions all of which were in the resolution of

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    failing savings and loan institutions.  Particularly

2    the sales and liquidation of assets and management of

3    those assets from the failed thrifts.

4              The division names changed with the

5    FSLIC, RTC, and FDIC.  The names of the entities

6    divisions responsible for handling failed

7    institutions and failing institutions fro the

8    resolution work changed over the years.  The

9    functions stayed basically the same.

10             And at the FSLIC, I stayed in that

11   functional area.  I went from Division of Marketing

12   which actually dealt with selling failed assets to

13   the Division of -- the Operational Liquidation

14   Division because it's O-L-D.

15        Q     Sounds very threatening actually?

16             (Laughter)

17        A     Operational Liquidation Division, and

18   that was merged into the FDIC in 1989.  From August

19   of '89 until December I believe actually it was

20   called the division of FSLIC I think or something to

21   that effect for that period of time.  And then

22   starting in January I went to the RTC, Resolution and

1  Trust Corporation.

2           Once again, I held a number of positions

3  at RTC until its completion in December of '95.  I

4  had I guess in July of 1990 I became the assistant

5  director for Loans and Other Assets, and I continued

6  to hold executive positions from July 1990 until RTC

7  went out of business, as I indicated, in December of

8  '95, and then moved back to the FDIC.

9           And as you probably know at this point,

10 all of the RTC employees were actually FDIC

11 employees.  That is a separately chartered

12 corporation.  All the staff were actually FDIC

13 employees.  So, we moved back to FDIC in January 1st

14 of '96.

15          I have held a number -- several positions

16 here.  Once again, dealing with failed institutions,

17 the resolution of their assets.

18          And in December of '96, I was appointed

19 to the position I currently hold which is the deputy

20 director for Franchise and Asset Marketing in the

21 Division of Resolutions and Receiverships although at

22 the time --

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Well, no.  We did change the division

2  name at that time.

3      Q     As long as we're getting to DRR, we're in

4  the right ballpark.  Tell me a bit about your grade

5  levels when you first came in.  Take your time and

6  give us a sense of how long you came in as 5, or 7,

7  or 9, and how long?

8      A     I'm I actually one of the few people who

9  probably you'll ever meet that started the government

10  career rear as a GS-2.  I don't think there are too

11  many people can say that.  My first job I was a park

12  interpreter for the National Capitol Parks, U.S. Park

13  Service here in Washington.  It was a summer job as a

14  GS-2.

15      Q     Were you interpreting for people speaking

16  Spanish?

17      A     No, no.  I was interpreting history

18  associated with the sites.

19      Q     Sorry.  Interpreter.  There are other

20  kinds of interpretations.

21      A     That is all right.  This one is about

22  history.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Q      Lawyers know all about different

2  interpretations.  Go ahead.

3      A      When I started at FSLIC, I was grade 9,

4  and when I finished at the FSLIC I was a grade 15.

5  They may have changed from a GS to a corporate grade.

6  I think it was called a CG or something else at the

7  time when I moved to the FDIC.

8           Then in July of '90, six months later,

9  several months later, I became an executive.  That

10  was an E1 position which was an E1 slash E2.  I

11  became an E2 the following year.

12           Then in I'm going to think it must have

13  been '94 I became an E3.  I think it was '94.  I may

14  not be right about that.  Sometime around there.  At

15  some point, I believe it was maybe the year 2001, 2,

16  somewhere around there when we got away from those

17  designations and people became EMs.

18      Q   And the level three for clarity's sake, I

19  think I know but I don't think I have asked anybody

20  this on the record before.  E1 is a lower grade in

21  pay than E2 and 3 is?

22      A      Correct.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     Q     Those are similar to Senior Executive

2     Service which the --

3     A     I would say analogous.

4     Q     That's fine.  And I believe I've heard

5     this before, but tell me if this is your

6     understanding also that the grades at FDIC the

7     employees receive something of 20 percent more than

8     similar grades than the Federal Government.  Have you

9     ever heard that before?

10    A     That is an over-simplification by far,

11    and it really is dependent on grade bands, and

12    locations, and a variety of other factors.

13          What happened during the banking crisis

14    in 1989 the FDIC board of directors gave at that

15    point in time basically across the board ten percent

16    increase in what had been the GS pay rates.

17          But over time, from that point forward,

18    that has become very muddled because of what has

19    occurred with respect to pay increases both in the

20    Federal Government as well as what the FDIC board has

21    approved, as well as locality pay differentials and

22    the like.

EXHIBIT 34    11
ALIOTTA v. BAIR
No. 05-2325-RMU

1          In some pay bands -- I sit on the human

2     resources committee.  I am very familiar with this.

3          Q     That is fine.

4          A     In some pay bands, actually the FDIC pay

5     is lower than what it is in the rest of the Federal

6     Government.

7          Q     Is it lower or higher or more similar for

8     the executive management and other executive

9     positions?  Let's focus on the EM positions right

10    now.  If you can.

11         A     It depends on whether or not the federal

12    agency has a pay for performance plan in place

13    approved by OPM or not.

14               If it is in place, it can be similar.  If

15    it's not in place, then the FDIC is higher because it

16    does have a pay for performance plan in place.  For

17    certain executives, a very small number of executives

18    at the FDIC, the pay does go beyond what any SES

19    employee would make in another agency.

20         Q     Okay.  That's fine.  I just wanted to get

21    a general idea.

22               So, let's focus on the period '84 to '89

EXHIBIT 34  12
ALIOTTA v. BAIR
No. 05-2325-RMU

1    first.  It's easier for me to do things by years in

2    order to understand things.  You were working your

3    way up a series of grades within the 15 -- the 1 to

4    15 or the 2 to 15 I suppose level?

5         A     Yes.  I started out the one summer job as

6    a grade 2.  And then my --

7         Q     And then you got hired.

8         A     Well, at the General Accounting Office

9    and I don't recall if they were called GS but that

10   was a 5, possibly a 7 over there.  Then my first job

11   at FSLIC was a 9.

12        Q     Thank you.  That helps.

13        A     From that point on basically again as you

14   certainly are familiar, a career ladder series,

15   professional, you don't go to a 10.  You go from a 9

16   to 11.

17        Q     That is true at the Justice and almost

18   everywhere.  There are some 10s, but they are

19   frequently --

20        A     It is unusual for a career ladder

21   position to include a 10.

22        Q     Okay.  That's fine.  Thank you.  So for

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    the first few years, were you primarily involved in

2    liquidation of assets or were there other kinds of

3    things --

4          A        Liquidation of assets.  At the time FSLIC

5    in 1984, the agency had been hit with two sizable

6    thrift failures that year.  One was -- forgot one.

7    One was San Moreno.

8          Q        Both in Texas?

9          A        No.  One in Texas and one in California.

10         Q        Which was the one in California?

11         A        San Moreno Savings.  That's the one I

12    worked -- concentrated on.  That is the reason I

13    temporarily forgot the other name.  San Moreno was

14    the one I spent the vast majority of time working on.

15         Q        Was there a lot of travel involved?

16         A        Yes.

17         Q        Whereabouts in California was San Moreno?

18         A        No.  Ostensibly the thrift was

19    headquartered in San Moreno, a suburb of Los Angeles,

20    the operational facility was in located in Tustin,

21    California which is in Orange County.

22         Q        And then from the '89 to sort of the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    '95-'96 area, were you still involved primarily in

2    the liquidation of assets?

3         A        Management and liquidation of assets.

4    And the first two positions I had at the RTC dealt

5    with the management of either repossessed real estate

6    or what we call ORE, owned real estate.  Sometimes we

7    call it R-E-O for real estate owned.  In either case,

8    it's repossessed real estate.

9         Q        Okay.

10        A        And then the management of that.  And

11   then the management of loans whether they were

12   performing or in the case of an agency dealing with

13   failed banks more typically non-performing loans.  If

14   they were thrifts, they were almost all mortgage

15   loans.  Both residential, multifamily, and commercial

16   real estate related credits.

17        Q        Okay.  Thank you.  We have your date of

18   birth, but why don't you give it to us.

19        A        June 27th, 1956.

20        Q        And tell me how long -- you probably told

21   me it was '96 but let me confirm.  You have been a

22   deputy in DRR since '96?  Is that correct?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          A          December of '96 is when the Division of

2     Resolutions and the Division of Deposits and Asset

3     Services merged together.  I don't specifically

4     recall if it was a 12-31 event or 1-1-97 events.

5     Right at the end of the year is when we switched

6     because I had been the assistant director for Capital

7     Markets up until that point from the time I merged --

8     we merged into FDIC which was January 1st of '96

9     until the DOR -- DD or DAS merger occurred then I

10    was -- it was the capital market.

11          Q          It was '97?

12          A          Yes.  Since the end of '96.

13          Q          Since the beginning of '97?

14          A          1-1-97.  That's fine.

15          Q          Tell me, if you can.  I have a general

16    idea of the larger downsizing by the agency, FDIC,

17    but could you tell me when any significant number, if

18    there were, how the downsizing in 2002 and 2003

19    affected DRR?  You can take them separate perhaps or

20    whatever way you want to.

21          A          There have been so many downsizing --

22    April '92 was when a freeze was placed on hiring new

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    permanent employees.  I am going back there because

2    frankly there has been so much downsizing from that

3    point forward that they all sort of flow together.

4              As far as keeping specific dates go

5    somebody, if somebody mentioned in this downsizing is

6    when these field offices were consolidated and this

7    did not include, then I can start maybe thinking

8    about it.

9              As far as dates go, it's blurred

10   together.  It started in April '02 with the freeze on

11   hiring permanent employees, and from that point

12   employees at the RTC were FDIC employees.

13             We started as the term employees.  Terms

14   ran out.  They were no longer extended.  So,

15   basically, there started to be a run-off first with

16   the term or temporary help.  At that point, and then

17   at the end of '96 -- '95 there was a significant

18   downsizing from the release of all of the RTC

19   employees that were nonpermanent.

20             So, it was a very with respect to the

21   staff here in Washington significant downsizing that

22   occurred at that point in time with the release of

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    those employees.

2             Then moving forward, it was a

3    consolidation and closing offices throughout the

4    country that had been obviously put into place to

5    deal with the banking and thrift crisis both from

6    FDIC as well as the RTC side.

7             That basically continued up until 2005.

8    That was just 2005 was hopefully the last of the

9    downsizing of that whole series.

10        Q    We'll find out.  Let me ask you how long

11   both you and Gail -- I know her name Lapatnus?

12        A    Gail Patelunas.

13        Q    I'm sorry.  How long have you both been

14   deputies?  Can you give me an idea?

15        A    Since the merger of the two divisions.

16        Q    So, that's since at least --

17        A    1-1-97, 12-31-96, whatever.

18        Q    Okay.  That's fine.  Have there always

19   been three deputies to the or tell me how many

20   deputies there were in 2003, if you can.

21        A    I don't know whether it's been constant.

22        Q    Some of the deputies are in Dallas and

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    some are here?  Is that correct?

2        A       Yes.  Maybe from 2003 I think there were

3    three.  One in Dallas and Gail and myself here in

4    Washington.

5        Q       Who was the one in Dallas?

6        A       Stan Ivie.  First A.J. Felton and then

7    Stan Ivie.

8        Q       Let me ask you about James LaPierre.  Is

9    that how you pronounce it?

10       A       That is correct, LaPierre.

11       Q       How long have you known him roughly?

12       A       Would you --

13       Q       If it's before January '97, that is fine.

14       A       No.  I don't think I met him before

15   January '97.  Sometime between '97 and 2000 is when I

16   first met Jim.

17       Q       What is his current position?

18       A       Currently, he is a regional director for

19   the Kansas City Region, in DSC.

20       Q       And he was at least 60 days an assistant

21   or deputy in DRR?

22       A       He was assistant director in DRR Dallas

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    for Franchise Marketing I believe.  I may not be

2    getting the title 100 percent correct because once

3    again those titles have changed over the years.

4        Q      Okay.  You mentioned performances awards,

5    a program of pay for performance that the FDIC has.

6    Can you tell me how that works.

7            At some point if there is a difference

8    between executive level employees and other

9    employees, I would like to know that, too.  Do one at

10   a time.  Tell me how the plan works, if you can.  Pay

11   for performance as best you can.

12            If you are on the committee, you probably

13   know more than a lot of other people do.

14       A      A pay for performance plan obviously

15   attempts to do exactly what it's title states, and

16   that is to regard more highly performing individuals

17   in an organization vis-a-vis those that are not

18   performing as highly.

19            And the FDIC for executives started a pay

20   for performance plan prior to the nonexecutive

21   population.  And my memory if my memory's correct on

22   this, it did roll out to other managers prior to

EXHIBIT 34    20
ALIOTTA v. BAIR
No. 05-2325-RMU

1    general employees and other supervisors and managers

2                Then it rolled out to all employees.  And

3    the executive plan started I would say about 2003.

4    Once again, after working here for 20 some odd years,

5    all these dates flow together.  I can tell you it

6    wasn't '87 and it wasn't 2006, but it could have been

7    2002, 2003.

8        Q      We'll take all your dates as your best

9    estimate, and that's just fine.  Don't worry about

10   it.

11       A      Basically the plan is based around the

12   contributions to meeting corporate objectives that

13   the employee makes.  Actually, that concept holds

14   through both -- at all levels.  The nonexecutive

15   supervisor managers as well as other employees.

16               And the concept of contributions for

17   achieving corporate objectives is one which is

18   somewhat subjective because there certainly are

19   mission responsibilities which one can assert are

20   objectives associated with the corporation.

21               Then there are actually specific

22   performance goals and objectives that are established

**EXHIBIT 34**  21
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  during the budget cycle every year.  Initially the

2  program started out with the achievement of what are

3  characterized as more specific objectives that are

4  established during the budget planning process, the

5  annual budget planning process.  And over time more

6  of -- evolved into meeting the more general

7  objectives and mission responsibilities of the

8  corporation.

9        So, every year employees, executives,

10  supervisor, as well as staff employees have

11  opportunity to review or provide input as to what

12  their achievements were, contributions during the

13  year.  And the supervisor will write those up and

14  then do an evaluation.

15        In all cases, executives, nonexecutive

16  managers as well as general employees are -- and that

17  has changed a little over time but basically are

18  forced into what I characterize as distribution.

19        For example, for executives no more than

20  one half of the executives can receive a bonus, for

21  example.  And then there are limitations set on the

22  amount of adjustments to schedule pay that executives

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   would have, and that's determined guy chairman.

2        Q      Is that on a percentage and pay basis?

3        A      Correct.  And then the policies allow for

4   perhaps certain exceptions to be made outside of

5   those.  One can think of those type of circumstances

6   where someone has moved jobs and has during that

7   year, that performance cycle, has moved jobs and

8   moved into a different position.  So, somebody who

9   changed their job in March versus December, for

10  example, you factor that.  You have to have the

11  ability to factor that difference in there.   There

12  are those kind of exceptions that play into it.

13           Then on and basically the program is

14  similar but has to be negotiated with the NTU

15  National Treasury Employee Union for bargaining union

16  employees.

17           So, that has taken what I characterize as

18  a negotiated program for how pay for performance is

19  implemented for the staff and the board typically

20  will adopt what is applicable for the bargaining to

21  do bargaining unit non-bargaining unit, not managers.

22           So, generally what is occurring for

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  bargaining unit will occur for the bargaining unit,

2  non-management, nonexecutive employees.

3      Q      Just tell me what kinds of grade levels

4  are within the collective bargaining unit.  Does

5  it --

6      A      I believe it runs all the way up to grade

7  15.

8      Q      And the 15 and -- some of the 15s who are

9  managers are not within the collective bargaining

10  unit?  If there are any 15s who are managers, who are

11  primarily managers?

12      A      I do not believe we have any 15s that are

13  managers.  I believe they would be in the CM grade

14  series.  I may be mistaken on that.  There may be

15  some legacy ones out there still.  But correct.  If

16  it's a supervisory or managerial position that would

17  not be in the bargaining unit.

18      Q      In CM or ultimately in EM, correct?

19      A      Correct.

20      Q      That's fine.  Thank you.  And is the --

21  for the below EM level, are the awards up to 50

22  percent also or is there a lower percent?

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    A    Up to 50 percent of the population.

2    Q    Yes.

3    A    It's changed over time.

4    Q    Has that changed for executive managers?

5    A    I do not believe so.  Would you have to

6    check with human resources.

7    Q    I do not believe so is a good answer.

8    And is there a limit on the percentage of the

9    salaries compared to annual income or annual general

10    salary?

11    A    Each year the chairman approves what that

12    range will be of the bonus amount as a percent of pay

13    as well as, as I indicated earlier, approve what the

14    percentage increase would be allowed, the range of

15    increase that would be allowed.

16    Q    So, would -- what kind of levels might be

17    expected for somebody who is a grade 13 or some other

18    grade I don't really care.  Would it be up to

19    $30,000?  Does that sound too high?

20    A    Once again for the bargaining unit

21    employees, if that's a bargaining unit employee

22    versus a non-bargaining unit employee actually it

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    does not make a difference in this case.

2              It's a percent of annual pay.  It's not a

3    strict dollar amount.

4        Q    Okay.  So if it were depending on

5    person's pay, it may be something a 13 could achieve?

6        A    Depending on what a person's pay is

7    30,000, though, would be too high after number.  I

8    don't believe the pay -- the increase goes up nearly

9    that high.

10       Q    Would 30,000 be within the range for your

11   level, executive manager level?

12       A    I'm not aware of anybody who has received

13   one.

14             (Laughter)

15       Q    That's a good answer.  So, it's probably

16   high even at your level?

17       A    Correct.

18       Q    That is fine.  I wanted to get a feel for

19   the sizes we're talking about.  I am going to start

20   asking you questions -- Let's go to the year 2003.

21             Do you recall some large meeting of DRR

22   people which Mr. Glassman announced that there would

EXHIBIT 34     26
ALIOTTA v. BAIR
No. 05-2325-RMU

1    be consideration at least of further downsizing in

2    late 2003?

3        A       I don't specifically recall.  Doesn't

4    mean it didn't happen.

5        Q       That's fine.  Do you recall working on a

6    study committee of some kind in the year 2004 to

7    study the need for I think it was called strategic

8    planning, human resources capital, or something of

9    that kind?

10       A       Yes.  Although we do that periodically.

11   Every few years we go through the exercise of what I

12   characterize of taking a strategic vision of looking

13   out three, five, ten years and saying where do we

14   want to be.

15               Yes.  We do that periodically.  That's

16   one reason why I said 2003.  When you go to these

17   things half a dozen times, they all sort of melt

18   together.

19       Q       Okay.  I fully understand that.  So,

20   that's fine.  I have a document previously marked as

21   Exhibit 2 to the LaPierre deposition, and I am going

22   to hand this to the witness.  And also to counsel.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

27

1          This appears to be an agenda and is

2  called a deputies meeting July 28th, 2004, and

3  somebody, probably Mr. LaPierre, took some notes.  Do

4  you have any knowledge of what his handwriting looks

5  like?

6       A     No.  I couldn't possibly identify that.

7       Q     Do you recall there was some discussion

8  of the 2005 budget at the deputies meeting?  If you

9  think it likely --

10      A     It's certainly possible because the

11  budget cycle -- it is a process that occurs every

12  year, and the timing of the budget cycle is pretty

13  consistent from year to year.

14          In July, the budget cycle has really kick

15  into full swing.  It starts before that and continues

16  up until the board approves the following year's

17  budget typically in November or December.

18          But July is really when it kicks in.

19  There is a series of meetings that occur in July

20  typically.  So, it would not surprise me at all.

21      Q     I didn't make copies of this, but take a

22  look at the Patelunas Number 1 attached to the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    deposition of Ms. Patelunas and see if the meeting

2    July 28th is of the same group that appears to have

3    met again in July, if you would.

4        A    I am sorry.  Can you reask your question?

5        Q    Yes.  There are notes of the meeting of

6    July 28th, and I'm asking you is this the same or

7    similar group of people that met on that subject in I

8    think it was May.  It lists the next meeting as July

9    28 somewhere on that page, I believe.

10       A    I have just quickly skimmed this.  What's

11   listed at Patelunas Number 1 I do not see a July 28th

12   date on here.  And this one reference as meeting held

13   on May 13th, 14th.

14            I would conclude by looking at the

15   document they are two different meetings.

16       Q    I know they are different meetings but

17   are the people in attendance the same or similar.

18       A    I would believe not.  This meeting in May

19   would have more attendees than the deputies -- A

20   deputies meeting typically has fewer employees than a

21   strategic meeting.

22       Q    Okay.  So, it says deputies listed as the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    attendees.  Is it your assumption you were one of the

2    people?

3        A       Yes.  It would be my assumption that I

4    would have been invited to that meeting.  Whether or

5    not I attended, I don't recall.

6        Q       And so do you have any recollection of

7    what -- of there being discussions of alternatives to

8    a RIF, for example, at that time?

9               MR. JONES:  Talking about the July

10   meeting?

11              MR. ROSE:  Yes.  Thank you.

12              BY MR. ROSE:

13       Q       Don't remember?

14       A       We had many meetings as we typically do

15   have many meetings.  Many times we would talk about

16   strategic alternatives period.

17       Q       Sure.  Was it the general philosophy of

18   the agency at that time that RIFs were to be avoided

19   if possible?

20       A       Yes.  I would definitely say that for

21   virtually everybody that I have spoken with at the

22   agency there is a strong consensus that RIFs are a

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    mechanism of last resort for relocating and

2    downsizing staff.

3         Q     Okay.  And Ms. Patelunas would have been

4    one of the other deputies attending such a meeting,

5    and who would be the other one?  Would there have

6    been a third one you think?

7         A     I believe Stan Ivie would have been to

8    that meeting.

9         Q     Okay.  We're talking about July.  Had

10   Corporate U been announced by Chairman Powell at that

11   time?

12        A     I believe so.

13        Q     Was it a concept as in 2004 rather than a

14   part of the agency being in place is what I mean?

15        A     I believe it was -- got started in 2004

16   if not already up and running.  At least it got

17   started.  Might be off again.  My time frame might

18   not be correct.  Might have been 2005.

19              I do remember attending a meeting where

20   we kicked it off, and it was late summer.  Certainly

21   short sleeve weather.  Maybe early fall, and I would

22   suspect it would have been in '04, but I may be off.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Yes.  I'm almost positive it was '04.

2   May have been '03, though.

3      Q      Well, I'll show you the reason.  I'm

4   going to make reference to the deposition of Mr.

5   Powell.

6          This is a letter on stakeholders in which

7   he talked about a -- the announcement of a new

8   corporate employee program.  This is on Exhibit 1,

9   page two of the Powell deposition.  You want to look

10  at that again?

11          MR. JONES:  Is there a pending question?

12          BY MR. ROSE:

13      Q      Mr. Powell appears to have been saying at

14  the beginning of '05 or the end of '04 that he was in

15  the process or would announce a new corporate

16  program.

17          I am asking about the word new and if you

18  think it was really new or whether it was already

19  partially in place.

20      A      Well, Corporate University and the

21  corporate employee program are two totally separate

22  concepts.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Q          Okay.

2          A          Programs.  However one wishes to

3    characterize.  Corporate University took over for

4    the -- all training responsibilities.  This has been

5    over a period of time.

6          Q          Right.

7          A          That used to be handled by basically

8    training branch of our Human Resources Department.

9          Q          I see.

10          A          One of the initiatives that Corporate

11    University undertook for training was the corporate

12    employee program.

13          Q          Okay.  It was an already existing

14    program?

15          A          Corporate University was already

16    existing.  The corporate employee program, however,

17    was a new concept, a new program.  And the objective

18    was to provide a more well-rounded background for

19    FDIC employees so that employees could get a better

20    appreciation of what we used to call the stovepiped

21    organization.

22                    That an employee who always was an

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    examiner couldn't appreciate the difficulties that

2    the FDIC would run into in dealing with a failed bank

3    if their only exposure had always been examining

4    banks.  So, they didn't understand, for example, that

5    when a bank fails you have the bank, you have the

6    holding company maybe, and affiliates.

7            The business line treatment that bank

8    executives, managers, and perhaps reporting done at

9    the bank will treat a business line all as one

10   because that's the focus.  Of course, when the bank

11   fails, the legal entity distinction becomes critical.

12           So, one of the objectives that we were

13   trying to instill on examination workforce was a

14   better appreciation of what was entailed in the

15   mission responsibilities of basically the FDIC as an

16   insurer and also as a receiver for failed banks.

17           That also holds true for the Division of

18   Insurance and Resource Employees that once again in

19   making the calculations for what an insurance premium

20   will be.

21           This is more new, but going back a few

22   years it would be just taking a look at the risk

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    being posed to the insurance fund by certain types of

2    banking activities.  Knowing what happens to those

3    bank activities in a receivership or when the bank

4    fails and what the cost would be would be very

5    helpful in them completing their work and having that

6    exposure.

7          We were looking at trying get a broader

8    knowledge base among all the employees so there's a

9    better understanding and allowing them to do their

10   jobs of what the effects are on other parts of the

11   FDIC because one of the terms that had been used

12   extensively about the organization was we were very

13   stovepiped.  That is basically people could spend

14   their entire careers working in one division.

15          And as you probably know at this point

16   the FDIC has several mission responsibilities.  It is

17   a regulator and supervisor for banks.  It is an

18   insurer of deposits, and also it is a receiver for

19   all national banks that fail.

20          And almost every state will appoint the

21   FDIC for a receiver for a state-chartered bank that

22   fails.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1           Those three principal lines of business

2    are ones in which people could spend their entire

3    careers, as I have as indicated by looking at my own

4    background.  I have always been working and dealing

5    with failed banks.

6           Many employees would have a career path

7    that is only that.  What we're trying to do is

8    actually allow that exposure to take place and break

9    that up a little bit.

10    Q    That's fine.  And that's very helpful.  I

11   think I would like to take a break now for ten

12   minutes.  And I would like you, if you don't mind,

13   think about my first line of questions when I come

14   back which will be essentially what part of what you

15   just described were new and what part like perhaps

16   the training program but how they fit together.

17           I think your statement program is very

18   important and helpful to me and helpful to my

19   understanding of what's going on.  All right.  Thank

20   you very much.

21           (Off the record.)

22           BY MR. ROSE:

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Q          Mr. Wigand, I would like to direct your

2    attention to a document previously identified as

3    Seegers Exhibit 1.  I would just like you to look at

4    the document and determine whether you believe that

5    you saw this before it was sent to or shortly after

6    it was sent to you.  It appears to have been sent to

7    you on the 6th of September 2004?

8          A          Could you repeat the question?

9          Q          This document appears to have been sent

10   to you on the 6th of September of '04.  I am

11   wondering whether you looked at it and read it at the

12   time.

13         A          I don't have a specific recollection.  I

14   probably read it, but I just don't specifically

15   recall.

16         Q          Okay.  Give it back to me.  I have one

17   specific provision.  Do you have any recollection of

18   something called an activity based costing, ABC

19   Study, performed by the American Productivity and

20   Quality Center?

21         A          Activity based costing is one of a long,

22   long term initiative to better cost the work of the

1    corporation in executing its receivership

2    responsibilities.

3               And the importance of that goes to the

4    fact that as you would probably recognize the

5    receivership estate has a number of claimants

6    associated with it of which the FDIC holds typically

7    the largest claim because it steps into the shoes of

8    the insured depositor's claim for assets against that

9    estate.

10              When the corporation performs work, we

11   view that receivership estate as a separate, as we

12   should, a separate legal entity.  As a result, we

13   want to be sure that the expenses and charges that we

14   bill the receiver for our services are appropriate

15   and accurate.

16              So, particularly with the resolution of

17   the bank crisis when, of course, you had so many

18   large numbers of failures occurring on I will call it

19   a regular basis over a period of years.  We are not

20   talking only half a dozen banks failing or two or

21   three.  We're talking that many perhaps in a week.

22   We were dealing with a hundred, 200 every year.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

38

1          You could sort of pool all of those costs

2    a little more easily.  As time passed and you were

3    dealing with so few, the accuracy had to become more

4    precise.

5          Actually I believe sometime I guess in

6    the '97, '98 time frame we started an effort to try

7    to better assess what those costs are and how more

8    appropriately to make that billing.  The activity

9    based costing is just one of a series of initiatives

10   that, like I say, started sometime in the late '90s

11   in order to have more appropriate cost billed to

12   receivership estates.

13       Q     Do you remember any specific contract or

14   anything of that kind with the American --

15       A     APQC.  Yes.  They were brought in at some

16   point.  I couldn't precisely tell you when in order

17   to assist in the developing cost data.

18       Q     Okay.  And looking back at this same page

19   of this same document, there are conclusions set

20   forth on this page as to the extent of the downsizing

21   that appears to have been recommended by ABC.  Would

22   you take a look at that?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1              MR. JONES:  Just to identify on the

2    record, that is the page with a heading called

3    Conclusions on it.

4              MR. ROSE:  Yes.  That's fine.

5              THE WITNESS:  Could you restate your

6    question, please.

7              MR. ROSE:  Could you read it back.

8              (The record was read by the reporter.)

9              BY MR. ROSE:

10    Q    That was the question.  It was a request

11    that you look at it.  The first question I have for

12    you is do you have any recollection as to whether the

13    ABC Study made any -- made a recommendation of this

14    kind.

15    A    My recollection is that we never received

16    a recommendation from APQC regarding any type of

17    staffing levels.

18    Q    Okay.  And would you have received some

19    sort of report from APQC in 2004 do you think?

20    A    Very possible.  As I indicated, they were

21    engaged in quite some time in looking at better ways

22    of arriving at cost data for performing work for

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    receivership.  They have been, were issuing reports

2    for quite sometime.

3              MR. ROSE:  Mr. Jones, I don't know

4    whether we have that or whether you it, but could you

5    conduct a search and see if there was a report from

6    that entity to the FDIC?

7              MR. JONES:  Yes.  I will do that.

8              MR. ROSE:  Thank you very much.

9              BY MR. ROSE:

10    Q         These recommendations, do you think the

11    recommendations are of the task force working on this

12    project?  September of '04.

13              The members of the task force are on the

14    preceding page in the e-mail.  A couple of pages

15    preceding.  It is an e-mail from Mr. Seegers.  Right

16    there.  I think you can see the group.

17    A         As I indicated in my earlier statement

18    that when a group is pulled together for looking at a

19    strategic vision plan it's a larger group than what

20    would be for a deputies meeting.  This would be the

21    equivalent group for a deputies meeting on this

22    e-mail.

EXHIBIT 34    41
ALIOTTA v. BAIR
No. 05-2325-RMU

1              A larger group had been pulled together

2    for the strategic vision plan as they are every year.

3    In fact, we went through one this year where we

4    pulled basically all assistant directors, corporate

5    managers, CM2s from Dallas, and we meet and we go

6    over what are we going to be like three years from

7    now.

8              I am certain back in 2004 we also had a

9    very large group meaning somewhere around 20 people,

10   not four or five, that were together and discussed

11   this.

12   Q      Do you recall that there was some sort of

13   consensus by the larger group or smaller group to

14   which this e-mail was addressed?

15   A      Yes.  Well, my recollection was that

16   whole process was one of discussion and consensus

17   building among all the participants.  Whether or not

18   there was unanimity --

19   Q      I didn't ask that.  Some form of

20   consensus if you don't mind my using those words?

21   A      Yes.

22   Q      Okay.  Do you know whether this

EXHIBIT 34     42
ALIOTTA v. BAIR
No. 05-2325-RMU

1  recommendation ever was sent to chief operating

2  officer of the entity?

3      A     I do not know whether the recommendation

4  that was attached to the executive summary referred

5  to the e-mail.  I assume that's what exec summar

6  means, whether or not that was ever sent.

7          As I indicated this was an iterative

8  process.  There were a number of meetings going back

9  and forth and discussions.  One of the key

10  differences with this strategic planning exercise

11  vis-a-vis the prior ones we had undertaken.  We go

12  through this every three, four years.  Sometimes the

13  name changed a little bit, but substantively it's the

14  same thing.  What are we going to be like a few years

15  from now.  How do we need to reorganize ourselves.

16          In this exercise, there was a significant

17  shift in the way we were looking at utilization of

18  DRR staff and corporate staff.  Historically as I

19  mentioned earlier, the organization had been very

20  stovepiped, and we and I certainly was a huge

21  advocate of this, attributed that that stovepiped

22  orientation of the organization decreased the

EXHIBIT 34     43
ALIOTTA v. BAIR
No. 05-2325-RMU

1    flexibility of the corporation to deal with

2    situations as they arise.

3              For example, there are compliance exam

4    cycles that occur where the supervisory regulatory

5    perspective, mission responsibilities of the

6    corporation on a periodic basis these compliance

7    exams have to be completed.  It causes a resource

8    spike in that examination work.

9              The inability to have our people, folks

10   in DRR go out and satisfy that resource requirement,

11   if in fact we weren't dealing with failings banks

12   presented an issue because if they could go out and

13   do that they could be productively contributing to a

14   requirement, mission responsibility of the

15   corporation.  They could be actively in an

16   institution perhaps learning other over things, and

17   just reviewing the compliance work because as we all

18   know there is the coffee and water cooler talk,

19   seeing what the business practices are like.

20             We would be better prepared to deal with

21   failing bank situations.  So having that cost ability

22   was very important, to me, objective.  In this

EXHIBIT 34    44
ALIOTTA v. BAIR
No. 05-2325-RMU

1    planning session, we finally were working under

2    assumption that we were going to be able to break

3    down some those stovepipes, and it would become what

4    I characterize as a two-way process that in times

5    where we had low failure activity the DRR folks would

6    be able to go out and assist the corporation meeting

7    it's other mission responsibilities whether or not

8    it's in DSC, principally in DSC because that is the

9    largest division employee-wise within the corporation

10   and has the I will call it overall highest resource

11   need.  If you look at the budget, they take up most

12   of the budget at this time.

13          In times of where we have in DRR a spike

14   in activity, we would be able to draw on those

15   resources in DSC to assist in the resolution process.

16          Once again, the benefit of that is we are

17   able to teach those folks in DSC that may have been

18   stovepiped there their entire lives about some of the

19   issues we run into when we are working as receiver.

20          We are not necessarily going to have them

21   for a long period of time, but we would need them.

22   For instance, closing weekend is typically a huge

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    spike in the resolution process.  The weekend the

2    bank actually closes because typically we work with

3    the regulator in order to have the charter revoked on

4    Friday close of business because that allows a

5    Saturday and Sunday for us to do our work so that

6    hopefully we can either start sending checks which is

7    actually a not positive outcome but sometimes we have

8    to do it but hopefully have the deposit franchise

9    reopen under the name of a new bank or another bank

10   an acquirer on Monday.

11            In order to do that work, there is a

12   spike of activity that needs to be done over the

13   weekend.  Bring in DSC folks to help us during that

14   spike of activity.

15            During the following week, they go back

16   off doing their exams again.  That was something

17   which we had not done before.  At least in recent

18   history.

19            Now if you go back to the '70s, okay,

20   sometimes these things go around in a big circle.  If

21   you go back prior to actually the interest rate

22   induced when interest rates you may recall were

EXHIBIT 34    46
ALIOTTA v. BAIR
No. 05-2325-RMU

1    released from regulation and banks were able to offer

2    higher rates of interest on deposit accounts back in

3    '79 or '80 when the law changed all that, if you go

4    back prior to that, there was not much in the way of

5    failed bank activity.

6              It was starting in the early '80s

7    actually that you ran into a few different.  You had

8    an add cycle.  Interest rates with saving banks, and

9    then you hit the middle '80s with the full blown

10   banking crisis.  Prior to that in the '70s and '60s,

11   we had a few bank failures per year.

12             Some of the resolution work was done by

13   what had been the Division of Supervision or whatever

14   it was called at the time.  The name probably changed

15   a few times over the decades even then.  Basically

16   the same type thing.  They handled a lot of the

17   resolution work.

18             Right now where DRR handles prior to bank

19   failure we offer the deposit franchise or attempt to

20   offer it if we have sufficient time to prospective

21   acquirers.  We offer that deposit franchise.  Hope

22   somebody bids for it, and over closing weekend that

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    transfer can take place and the insured depositor

2    will have access to their insured funds immediately

3    the following business day.

4            It's least disruptive for us, and we are

5    able to get value for those relationships instead of

6    having the payout where we don't get value for that.

7            Wearing the receiver hat, if I am a

8    creditor of the receivership estate, I would like to

9    think that that branch network has value to it and

10   those relationships have some value.

11           What we attempt to do is realize that

12   value.  But that causes a spike in work for us over

13   that weekend in order to do that.

14           This is the first time with this exercise

15   we looked at having that type of mobility to draw on.

16   As you can imagine if the cycle of how the workload

17   demands fluctuate over a resolution process, how

18   prior to the bank failure workload demands are in

19   preparation and contingency planning, collecting

20   information.

21           And then particularly over the weekend in

22   which the bank fails in order to get those accounts

**EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU**

1    transferred, do the necessary work in order to

2    establish the receivership, take inventories, to then

3    actually get a better assessment of the assets that

4    are left.

5        What type of management responsibilities

6    are going to be entailed and up to what period of

7    time.  Start looking at the type of marketing

8    programs in order to dispose of assets.  You can see

9    how there's sort of a cycle.  If you sell a lot of

10   assets at the time of resolution or shortly

11   thereafter, then the workload drops off quickly

12   again.

13       We try to even things out by saying we

14   have this, we are going to pull in to level off that

15   spike, pull in resources to level off that spike.  At

16   times when you dip below a point where actually the

17   DRR folks are no longer actively working on that,

18   then they can go out and work on exams, and

19   compliance exams, or go details even over to DRR.

20       That was the first time we were looking

21   at that type of concept.  Because of that, there was

22   uncertainty among everybody as to, well, all right,

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    if we're going to be working that way what are the

2    resource needs we're going to need within DRR.

3          How much of that is going to be pulled in

4    from outside of DRR because all prior to that people

5    are always thinking these are just internal.

6          If I'm look at six bank failures a year,

7    I am only using DRR people and this all happens over

8    the course of two months, how many people in DRR do I

9    need.

10          Now we are saying, all right, step back.

11    Just look at if this happens, what are the total

12    human resources that we need, but let's talk about

13    how much of that can be filled in just over this

14    closing weekend.

15          Let's say if we get agreement from DSC

16    we can use people for two weeks what does that do to

17    the numbers.

18          There was an iterative process with this.

19    We went back and forth, and I think we're still

20    finding it to be candid with you.  I don't think to

21    this day we really have a good feel.  I believe

22    better than we did three and a half, four years ago,

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    but I think we are still finding it.

2        Q        Right.  How long have you been working

3    with the director, Mr. Glassman?  Just roughly.

4        A        I've been working with Mitch Glassman

5    since the end of '96, January of '97.

6        Q        And does he talk or do you hear about or

7    does he meet where Mr. Bovenzi or talk to him on a

8    regular basis?

9        A        I believe so.

10        Q        So if he received this document, I

11    believe he's listed as one of the recipients; is he

12    not?

13        A        I do not see his name on this e-mail.

14        Q        Okay.  Fine.

15                MR. JONES:  I think he's in the fold.

16                MR. ROSE:  I thought he was.

17                THE WITNESS:  I thought you said Mr.

18    Bovenzi.

19                BY MR. ROSE:

20        Q        No.  I asked the prior question was --

21    does he talk to Bovenzi.  I was still referring to

22    Mr. --

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

51

```
 1        A        Mr. Glassman.  He is on the e-mail.  Yes

 2   I am sorry.  I misunderstood the question.

 3        Q        That is fine.  Do you know whether it's

 4   likely having received this he would have talked to

 5   Mr. Bovenzi about it?

 6        A        I do not know.

 7        Q        Do you have any recollection or do you

 8   recall his ever telling you, or the deputies

 9   assembled, or you separately, or of any discussions

10   that he had with Mr. Bovenzi in the September-October

11   time frame for the next year's budget?

12        A        I don't recall.  I know he does meet with

13   Mr. Bovenzi on a regular basis.  What's in those

14   discussions, I don't know.

15        Q        So, you don't normally get a feedback

16   from him as to anything?  Does he sometimes come back

17   and say I talked to John?

18        A        Yes.  Absolutely.  Sometimes he will come

19   back and say we met with John.  We talked about X, Y,

20   and Z.

21        Q        Don't have a memory of this subject?

22        A        Not specifically.  No.
```

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      Okay.  Do you recall Mr. Glassman ever

2   expressing any views on the size of the recommended

3   downsizing contained in that Exhibit Number 1?

4      A      I don't have any specific recollections

5   about this set of numbers and the discussion around

6   them.  I have a general recollection of an iterative

7   process of going back and forth on a number of times

8   looking at and discussions about what is an

9   appropriate staffing level in all the functional

10   areas.

11          I say we were trying -- The difficulty in

12   that was trying to get a grip on exactly what it is

13   we need given this I'll characterize this as mobility

14   of staff because we didn't have a historical

15   experience to base it on.

16      Q      There is a major difference between this

17   recommendation as a recommended cut of slightly over

18   a third?  Is that right?  In terms of staff size.  I

19   think it says 34 percent somewhere.

20      A      Yes.  This recommendation is a difference

21   of one seventy-five divided by five seventeen.

22   That's a little over a third.

EXHIBIT 34    53
ALIOTTA v. BAIR
No. 05-2325-RMU

1       Q        And the actual reduction in force that is

2   adopted by the agency by first I assume presumably we

3   know Mr. Bovenzi approved it was for 54 percent

4   reduction?  Does that sound right to you?

5            MR. JONES:  I object to the use of the

6   term of art reduction in force.

7            BY MR. ROSE:

8       Q        All right.  A downsizing.  I will call it

9   a downsizing for this purpose.

10      A        Well, I know the final staffing number

11  was somewhere around the two forty range.  I'm not a

12  hundred percent sure exactly what it was.  If the

13  current staffing was 517 and we ended up with 240,

14  that is over 50 percent.

15      Q        Yes.  The cut was 240.  So, the reduction

16  was from five --

17      A        I think our staffing ended up being two

18  forty or thereabouts.  I might be wrong about that.

19  I defer to --

20      Q        I think you will find actually if you

21  look at that.  May I come around there for a second?

22  Here is the memo.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

54

1          A        This memo as a staffing number projected

2    about two thirty.  I don't think it ended up being

3    that low.  I think it ended up being around two

4    forty, but I don't recall specifically.

5          Q        All right.  Did you get any sense as to

6    why there was such a major increase in the reduction

7    recommended?

8          A        My recollection it was due to two

9    factors.  One going, once again, the iterative

10   process getting consensus, and thinking about exactly

11   what it is in the functional areas.  The dealing with

12   these peaks and valleys of workload and how broken,

13   not division, but by functional area.

14                  Whether it dealt with franchise

15   marketing, resolution processing, asset management

16   process, the claims review process, the asset

17   marketing process.  We looked at the component

18   pieces.

19                  There was a lot of going back and forth

20   as to if in fact we are able to bring in folks from

21   DSC for closing weekend, for example, how many claim

22   agents do we have to have in DRR versus using claim

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  agents from DSC and the like.

2          So, there was that kind of give or take

3  that certainly played a big role in that.  Very

4  candidly I think there was a feeling collectively by

5  everybody let's put this behind us.

6          So if our estimates are going to be off,

7  in other words, if we're going to be uncertain

8  because we have no historical experience, let's not

9  put ourselves in having to go through another

10 downsizing again.

11         So, the thinking was let's try to get to

12 a point where we could finally get the years

13 obviously going from '92, the years and years of

14 downsizing organization behind us so that at least we

15 have stability and we won't have to do another

16 downsizing.

17    Q    So, there was a desire to have more pain

18 now than less in the future?

19    A    There was a desire to let's avoid future

20 pain if we can.  I am not saying to have more pain

21 now, but let's avoid pain in the future.  Let's look

22 at the staffing level we can reach where we feel we

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   have stability.

2        Q    Was it fairly well or do you have a sense

3   or let me go back in history a little bit.

4             By the time of 2002 and 2003, the agency

5   had used both buyout and frequently coupled with

6   early retirement or resignation for some time; had it

7   not?

8        A    Yes.  Buyouts had been used I believe

9   since the mid-'90s.

10       Q    Right.  I think that's probably exactly

11  right.  And so was it your assumption that the

12  downsizing would be both buyouts and if necessary a

13  reduction in force?

14       A    As I indicated in an earlier statement, I

15  think everybody I've ever spoken to about a reduction

16  in force it is a least desirable method to use for

17  reallocating staff and the downsizing.

18       Q    Was there any discussion at the time

19  and -- I am now talking about this general time

20  period in September of '04 -- that if you went with

21  the larger number you would -- that even with these

22  numbers there would be some significant danger of a

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     need for a reduction in force but with a larger

2     number would it be much more likely?

3          A     I'm sorry.  Restate the question.

4          Q     I am sorry.  If you're going to have a

5     reduction in force of 56 or 54 percent, you're going

6     to increase the likelihood of some part of that

7     reduction in size resulting in a RIF, involuntary

8     terminations, that you would have more likelihood of

9     involuntary terminations with a 54 percent reduction

10    than you would with a 34 percent reduction?

11         A     I think it was reasonable to assume then

12    as it is now that the larger the reduction as a

13    percent of your employment base the more likely it is

14    that you will result in having to use multiple

15    methods for the reallocation of staff and downsizing.

16         Q     Sure.

17         A     Whether or not there was a feeling by

18    staff and I don't specifically recall.  We all wanted

19    to avoid a RIF.  I don't specifically recall ever

20    having a discussion, though, where there was some

21    threshold level.

22              It could be somebody did say something

EXHIBIT 34    58
ALIOTTA v. BAIR
No. 05-2325-RMU

1    like that, but I just don't recall, well, we expect

2    number only from buyout and retirements, and then if

3    you go beyond this we're going to definitely have to

4    --

5            We had a number of programs for moving

6    staff around within the organization, too.  And, of

7    course, we encourage people to post for positions

8    outside of the division in other areas in the

9    corporation.

10           So as fr as a feeling as to what point it

11   was where we would actually hit that point of

12   absolutely having to have, I don't recall ever

13   hearing a number attributed to it.

14           But clearly the larger the need to

15   reallocate and downsize, the more tools -- it's

16   reasonable to assume the more tools you're going to

17   have to use.

18       Q    Sure.  I may be able to point it out to

19   you, but I think there's language in the first of the

20   recommendations, that is Exhibit 1, about the

21   desirability of avoiding a RIF.  I'm not sure that we

22   discussed that.  Do you recall seeing that in our

1   discussing it today.  It's in the same book.

2        A       Exhibit 1 of -- Yes.

3        Q       Let's see if I can find it for you.  Here

4   it is.  The first paragraph of numbered

5   recommendation one.  Compare it with the language of

6   any similar.  Why not read that first, and then we

7   will see if we can find anything --

8               I want you to focus on the paragraph that

9   says many of the retirement eligible employees may

10  separate from service voluntarily with the proper

11  financial incentives preventing a more destructive

12  involuntary separation scenario.

13              That's the paragraph.  Immediately after

14  recommendation number one separation.

15              I'm asking you to look at Exhibit 3 there

16  under the recommendation and see if there's anything

17  comparable to that in the recommendation that was

18  finally adopted by Mr. Bovenzi and the agency.

19              MR. JONES:  Did you say something about

20  Exhibit 3?

21              MR. ROSE:  Yes.  That is the one that has

22  the higher numbers.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

60

 1              MR. JONES:  I will object to that as it

 2    misstates his previous testimony.

 3              MR. ROSE:  Whose testimony?

 4              MR. JONES:  His testimony that he didn't

 5    -- he couldn't identify this as being the final

 6    recommendation.  You can ask him to compare between

 7    the two.

 8              MR. ROSE:  Sure.  Or compare whether it

 9    was the final one or not.

10              THE WITNESS:  You're asking me to read

11    Exhibit 3 now?

12              BY MR. ROSE:

13        Q     Please.  If you want, it may be desirable

14    to take a break and you could read it during the

15    break.  That might be the smart thing to do.

16              Why don't you leave for a minute and --

17              (Off the record.)

18              BY MR. ROSE:

19        Q     Did you answer now?

20        A     Restate the question, please.

21              MR. ROSE:  Reporter, if you could go back

22    and read the question I would appreciate it.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

61

1                    (The record was read by the reporter.)

2               BY MR. ROSE:

3        Q       Did you find any comparable language in

4    the document which is called Exhibit 3?

5        A       Yes.  I did.

6        Q       Would you read it to us?

7        A       Many employees may separate from service

8    voluntarily with the proper financial incentives

9    preventing a more destructive involuntary separation

10   scenario that could produce damaging skill gaps and

11   potential front-line leadership issues.

12       Q       Would you read the next sentence, please,

13   also?  Or let me look at it?

14               MR. JONES:  This for the record is the

15   last page under number two.  The last page of Exhibit

16   3?

17               MR. ROSE:  Under the reorganization plan.

18               MR. JONES:  Next page over in paragraph

19   two.

20               BY MR. ROSE:

21       Q       So, the first sentence is similar.  It's

22   not anticipated the separations.  I am sorry.  Would

**EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU**

1    you compare the third paragraph of number one with

2    the material at the top of number two?  It says only

3    as a last resort.  Could you read that sentence for

4    us?

5        A    The third paragraph under recommendation

6    one separation on Exhibit 1.  Read that?

7        Q    Right.

8        A    Only as a last resort a RIF should be

9    administered in late 2005 to separate any remaining

10    surplus employees.  Consideration of this action

11    should be discussed thoroughly after the results and

12    impact of any voluntary separations is known.

13        Q    Then compare that with what's anything

14    comparable on the Exhibit 3 which I think --

15        A    On Exhibit 3, last page, number four

16    paragraph, reads a RIF should be administered in 2005

17    to separate any remaining surplus employees.

18    Consideration of this action should be discussed

19    thoroughly after the results and impact of any

20    voluntary separations is known.

21        Q    Okay.  So, do you recall whether there

22    was any intense discussion after the results of the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    buyout were known?

2        A    I don't specifically recall any one

3    discussion.  I know over the time frame there were

4    discussions about the progress being made with

5    respect to monitoring, or analyzing, evaluating the

6    success of the buyout program and folks taking

7    advantage of opportunities to post and move to other

8    jobs within the corporation.

9            So, I would characterize it as a series

10   of discussions of taking a look and saying X number

11   of people have signed up for the buyout and some have

12   gotten jobs over at DSC, and that continued on a

13   regular basis.

14       Q    Let me suggest.  Do you know that people

15   had to accept the buyout as finally offered by the

16   end -- before I think it was --

17       A    There was a time period in which there

18   was a buyout termination.

19       Q    It terminated at the end of November; did

20   it not?

21       A    I don't recall, but there was a time.

22   Yes.

64

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q       And my recollection is that HR reported

2   that there were 565 people accepted the buyout?  Does

3   that sound right to you?

4      A       I don't recall a number.

5      Q       Do you recall any discussions from

6   November through July about whether there should be a

7   RIF and if so who participated in the discussions and

8   so forth?

9              I will use the term involuntary

10  separations of -- being the same as RIF.  RIF means

11  involuntary separations.

12     A       As I stated earlier, I recall a series of

13  discussions on a regular basis regarding the success

14  of the programs for the buyout and having people post

15  and get jobs elsewhere within the corporation.

16             And I would suspect that during some of

17  those although I have no specific recollection that

18  during some of those that there would be discussions

19  about the likelihood of RIFs and if so whether or not

20  DR would need to participate.

21     Q       Do you remember Mr. Bovenzi or Mr. Powell

22  either of them set a goal for 2005 which was between

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    a reduction between five and 600 employees for the

2    agency?

3        A    I don't specifically recall.

4        Q    And you don't recall that 565 or more

5    than or any number like five sixty-five was the

6    number?

7        A    I --

8        Q    All right.  Do you have any specific or

9    let me suggest to you that the bids for crossover

10   program I believe were done in July of '05?  Does

11   that sound right to you?

12       A    I don't recall.  This was a time frame in

13   which that process occurred.  One of these processes

14   ran concurrently, and I don't recall which one

15   finished first, or second, or third.

16       Q    Do you have any recollection of any

17   specific discussion arising about do you recall Mr.

18   Bovenzi or Mr. Glassman either asking you or other

19   deputies about your views as to whether it was

20   necessary to have involuntary separations in '05?  At

21   any time.

22       A    I don't recall specifically.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       Q       Do you recall any kind of meetings that

2    were held about whether either of the two

3    participated or even heard about that were addressed

4    to the question of whether there should be

5    involuntary terminations in 2005?

6       A       As I indicated earlier in the discussions

7    of viewing the success of or reviewing the success,

8    evaluating the success of the buyout program and the

9    out placement initiatives, I can't imagine a

10   discussion of what is likely to happen looking down

11   the road didn't take place at some of those

12   discussions because typically when we're looking at

13   that data I would talk about well this seems to be

14   working, if it doesn't, what's going to be the next

15   steps.

16              Also looking at how different functional

17   areas are getting impacted by the attrition.  So, you

18   might have more people leaving out of franchise

19   marketing, for example, and having imbalances with

20   your asset management group as an example.

21              As you look at these things as they hit

22   division-wide each functional area, you ask yourself

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    and we were asking ourselves what is it we're likely

2    to look at at the end of day and what are we going to

3    have to do to get an organization that works here.

4         Q    So, as I understand you don't have any

5    specific recollection?

6         A    I could not tell you to a meeting or a

7    specific discussion, but we had quite a few meetings

8    and quite a few discussions over this period of time.

9         Q    Do you remember any discussions with Mr.

10   Glassman about whether the five sixty-five or the

11   generic question of whether the voluntary reductions

12   were sufficient to meet the agency's target?

13        A    No.

14        Q    Okay.  Do you have any recall of Mr.

15   Bovenzi ever saying anything about this subject to

16   you or to Mr. Glassman, either that you heard or that

17   Mr. Glassman talked to you about?

18        A    I don't recall.

19        Q    So, you can't recall anything?

20        A    Right.  But my concern, my focus was on

21   the DRR organization, and I was less focused on the

22   corporation's initiatives.  So, I was much more --

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   myself more focused and attentive to the DRR

2   organization.

3        Q        Do you remember the number, do you know

4   there were a hundred and thirty-two people permanent,

5   as far as I know employees, but certainly a hundred

6   and thirty-two employees of DRR who accepted the

7   buyout?

8        A        I don't recall a specific number, but

9   that sounds to be about my recollection would have

10  been if you hadn't tossed it out there.

11       Q        All right.  And was there any discussion

12  about that number with Mr. Glassman as being enough

13  to avoid the involuntary terminations of the DRR

14  personnel?

15       A        I suspect once again there were many

16  discussions over this period of time, and in taking a

17  look at, you know, on a periodic basis the success of

18  the buyout program and out placement initiatives that

19  I'm sure we were looking at those numbers and

20  thinking, as I say, what the next steps would be.

21       Q        We have agendas for the meetings with

22  deputies in May and in September I believe of '04.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Are minutes normally kept of the meetings of

2    deputies?

3         A      No.

4         Q      They're not?

5         A      Correct.

6         Q      Any idea why they were kept in 2004?

7         A      I'm not aware of that.

8         Q      I am not sure they were minutes.

9         A      There were minutes, I haven't seen any

10   minutes.

11        Q      I thought the number -- the first

12   document I had.

13        A      The first document you passed me was an

14   agenda with handwriting on it from Mr. LaPierre.

15        Q      I think there was one before that.  Let

16   me find it for you.  I'm sorry.

17               MR. JONES:  That's the first one I have

18   notes of.

19               BY MR. ROSE:

20        Q      This was Patelunas Number 1 I think we

21   discussed before I handed you anything.  That's the

22   meeting of May 14th in which you noted there were

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    quite a -- were those meetings only in the strategic

2    planning group only in '04?  Did that group continue

3    into '05?

4         A     Well, what this document is Patelunas

5    Number 1 is a summary of the strategic vision

6    planning meeting held on May 13th, 14th.

7               Many times for a strategic planning

8    meetings summaries are put together of the

9    discussions of the meeting particularly if there's

10   going to be a series of them because typically those

11   strategic planning initiatives have multiple meetings

12   associated with them.

13              So people can recall for the next

14   meeting, there is a summary of the prior meeting.

15        Q     Were there any such meetings in '05 as

16   far as you know?

17        A     I think that by the end of '04 that

18   strategic initiative had been completed.

19        Q     Right.  So, there wouldn't be any formal

20   forum for discussion of whether the voluntary -- the

21   acceptance of the buyout was sufficient to meet the

22   goal?  Is that right?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       A       I'm not aware of one.

2                MR. ROSE:   Excuse me.   Let's go off the

3       record.

4                (Off the record.)

5                MR. ROSE:   Mr. Reporter, I am going to

6       hand you a document which is two pages, and I'm going

7       to ask you to give it to the witness and I'm giving a

8       copy to the counsel.

9                          (Wigand Exhibit No. 1 was

10                          marked for identification.)

11               BY MR. ROSE:

12      Q       This has -- was an exhibit to the

13      LaPierre depo.   That's the attachment to Number two.

14      We made them separate exhibits because they're

15      functionally separate.   So, this is DRR1063, and this

16      is Exhibit 3 which will be DRR1064 and 1065.

17               Do you have it there in front of you,

18      sir?

19      A       I have this document in front of me.

20      Yes.

21      Q       It says that's Number 1 for today.   This

22      appears to be a staffing analysis in 2004.   And this

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Dallas office is reported on 1064, and the Washington

2    office is reported on 2005.

3              MR. JONES:  You said this was 2004?

4              MR. ROSE:  I believe it's 2004.  I just

5    want to make sure when we're starting we have the

6    same pieces of paper.

7              BY MR. ROSE:

8         Q    Do you have 1064 and 1065 there,

9    Mr. Witness?

10        A    Correct.  I have papers identified in the

11   lower left-hand corner as ALDRR01064 and ALDRR01056.

12        Q    Exactly.  And does this staffing pattern

13   look like the staffing pattern for the Dallas office

14   and then for the Washington office in 2004?

15             I'm sorry.  The one column is presumably

16   the actual -- one column listed authorized staffing.

17   That is the one I'm asking you to look at right now.

18        A    I have no ability to determine what year

19   this is for, but they would appear to match or be

20   similar to what I would recall as the approximate

21   number of employees if you go down the column that

22   says number of employees.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          It would be approximate to what I would

2    expect the Dallas office staffing to have been prior

3    to the downsizing initiatives of 2005.

4          Q     Thank you.  And the next page is the same

5    kind of analysis for the Washington office?  Is that

6    correct?

7          A     Once again without knowing the date of

8    this, it would appear that these would be the

9    approximate to the number of employees on board in

10   DRR in Washington prior to the downsizing initiatives

11   of 2005.

12         Q     Now when it says authorized, does that

13   mean that or does this budget or table appear to

14   reflect any employees who are not career or long-time

15   employees, if you can tell?

16         A     I cannot make that determination from the

17   table.

18         Q     Is staffing usually for permanent

19   employees or are there staffing slots in the budget

20   for other kinds of employees?

21         A     Depends on time frame.

22         Q     Well, how about 2004?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      A       If this is from 2004, I would expect

2   there were no temporary employees.

3      Q       Okay.  Thank you.

4      A       Let me amend that.  Very few.  Very few.

5   Depending on time frame.  Actually there may have

6   been perhaps in 2004.

7      Q       All right.  You don't have to be

8   definitive.  That's fine.  Let's turn to the

9   Washington office which is the last page, the second

10  page, and I see three EM employees listed.  And I

11  assume you're one of them, if this is 2004?  Were you

12  one of the three?

13     A       If this is for DRR, I will make the

14  assumption it is, then yes I would be.

15     Q       Okay.  And who would the other two be who

16  were EMs?  Would it be Mr. Glassman?

17     A       Correct and Ms. Patelunas.

18     Q       Okay.  Thank you very much.  Now, the

19  note says that the salaries are averages rather than

20  those for individuals.  Taking that into account, is

21  the hundred and sixty-seven thousand five hundred

22  approximately correct from the point of view of your

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    annual salary at that time?

2              MR. JONES:  I'll just object to the

3    extent that the document seems to use the term

4    mid-range rather than average.

5              MR. ROSE:  All right.  You're quite

6    right.

7              BY MR. ROSE:

8       Q      Well, averaging is synonymous and means

9    mid-range.  Well, mid-range is mean.  I'm sorry. .

10   You are quite right.  I agree with you.

11             With Mr. Jones' correction, please.

12      A      Well, I would actually have a different

13   take.  I think that may have been a mid-range -- I'm

14   not sure what it is frankly.

15      Q      Okay.  You don't have to.  Was your

16   income approximately a hundred and sixty-seven

17   thousand in 2004?

18      A      I don't remember.

19      Q      What's your salary as of '07?  Do you

20   remember that?

21      A      In '07 including locality pay, it's

22   $216,000 approximately.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      And any pay for performance would be

2    above that?

3      A      Yes.

4      Q      Did you get a bonus for 2007 or don't you

5    know yet?  I assume you do know, don't you?

6      A      Did I receive a bonus in 2007 for 2006 or

7    did I -- am I going to receive a bonus for work

8    performed in 2007?

9      Q      I was really asking the second question,

10   but both would be of interest.

11     A      I do not know if I will be receiving a

12   bonus for work performed in 2007.  And I did receive

13   a bonus in 2007 for work performed in 2006.

14     Q      And do you have any recollection as to

15   what the size of the bonus was then?

16     A      I believe it was approximately $8,000.

17     Q      Okay.  Thank you.  Did anybody in

18   executive management position or any of the three of

19   you -- I assume none of the three of you resigned in

20   that year in 2004?  Is that correct?

21     A      That is correct.

22     Q      There appears to be something on the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1     right called a revised core.  Is this some sort of

2     recommendation for the future rather than a

3     reflection of reality?

4          A     I don't know the context of the document.

5          Q     You don't know why it's like that?

6          A     I don't know the document at all.

7          Q     That's fine.  I'm not suggesting you

8     should.  I had no idea.

9               Let me turn to something else in this

10    document.  I believe it was prepared by somebody in

11    DRR, and I think it may have been Mr. LaPierre but

12    I'm not sure.

13              In any event, benefits are listed as

14    33.98 percent, essentially 34 percent.  Does that

15    sound like a reasonable adjustment for benefits if

16    benefits are included in the cost to the employer?

17         A     As a general number, that sounds like

18    it's probably, as a general number, within the

19    ballpark from what I understand benefits to be.

20         Q     Benefits include health care, pension,

21    and other things of that kind?

22         A     Correct.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1        Q        Possibly life insurance?  You need to say

2    yes.  Nodding doesn't get it.

3        A        Correct.  I thought I said correct.

4        Q        First time today.  That's very good.  In

5    the downsizing that occurred in 2004 by the FDIC and

6    the downsizing we're talking about in DRR is what

7    we're talking about, are you aware of anyone who --

8    any EM -- I am sorry.

9              The first three lines there.  EM, E2, and

10   E1.  Are you aware of any of the people that occupied

11   those three job classifications who left the agency

12   because of the downsizing?

13             I mean by the agency, I mean FDIC.  Who

14   left FDIC because of the downsizing, left the

15   employment of FDIC because of the downsizing?

16       A        Well, I am aware of people who left the

17   agency's employ during the period of time in which

18   either the buyout was offered or the RIF occurred.

19       Q        Okay.  But are any of them or were any of

20   them at the EM level or the E1 or 2 level?

21       A        Yes.  I'm aware of people who left.  I'm

22   aware of people who were in the pay bands E1, E2 that

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   left the agency, employ of the agency during the

2   period of 2004-2005.

3       Q      Okay.  And you don't know whether they

4   took the buyout or not?  Do you know whether they

5   took the buyout?

6       A      I believe yes.  My recollection is some

7   did take a buyout.

8       Q      Are you aware of any of them that did not

9   take the buyout and lost his job anyhow or her job?

10      A      I cannot recall any.

11      Q      Okay.  Same questions for the CM1s of

12  whom there appear to be eight according to this

13  document.  Do you know anybody in Washington CM1 who

14  left the agency in 2004 during the buyout period or

15  in that rough period of time, roughly in that period

16  of time?

17      A      I don't specifically recall.

18      Q      Okay.  Do you recall anybody in either EM

19  or CM grades who was involuntarily terminated from

20  employment by FDIC?  I mean anybody in DRR.

21      A      Can you reask the question, please.

22      Q      Sure.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

80

1              MR. ROSE:  Let me ask the reporter --

2              THE WITNESS:  I'm actually looking for

3       clarification.

4              BY MR. ROSE:

5       Q      Go ahead.  Please explain.

6       A      You said involuntarily terminated.  For

7       cause or as a result of the RIF?

8       Q      No, no.  Not cause.  I mean as a result,

9       as the people who got RIFed on September 2 or 3.

10      A      I don't recall.

11      Q      Okay.  Do you recall whether the RIF

12      involved the termination of management personnel?

13      Was there ever any threat that the people at the --

14      in those grades was going to lose his position

15      because the position was abolished?

16      A      At the EM level?

17      Q      EM or E1, E2.  Any of those.

18      A      I don't specifically recall.

19      Q      Do you recall anyone in the CM jobs or

20      classifications I guess whose employment was

21      terminated as involuntarily as part of the downsizing

22      of the agency in 2005?

EXHIBIT 34     81
ALIOTTA v. BAIR
No. 05-2325-RMU

1          A       I think you asked the question earlier,

2    and I said I don't recall any CMs -- any personnel

3    occupying CM positions who --

4          Q       Okay.

5          A       -- left.  I don't recall for that period

6    of time.

7          Q       Does that apply to Dallas as well as to

8    Washington?

9          A       Yes.

10         Q       Okay.  Thank you.  Do you understand why

11   the agency decided to adopt the downsizing program it

12   adopted in -- that it carried out at least in late

13   2004 and 2005?  Can you give me your own sense of

14   what the agency's view was?

15         A       As I stated earlier this morning, my

16   focus was on the DRR --

17         Q       All right.

18         A       -- reorganization and the agency

19   corporate level initiatives.  I really did not focus

20   on --

21         Q       Let's focus on DRR then.  What was the

22   purpose of the downsizing in DRR?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          A          Well, I believe earlier once again, I

2     stated that we were going to a new business model

3     which would be hopefully the model in which the

4     function could be performed without having swings in

5     staffing.

6               The downsizing process, as I mentioned

7     earlier, started back in April of '92 as far as

8     freezing new hires.  And terms were released and

9     ongoing as I indicated all the way up through the,

10    well, actually through 2005 as a result of change in

11    workload.

12              Of course, '92 changed because once again

13    the banking crisis was over.

14         Q          Sure.

15         A          As we adjusted to less and less workload,

16    by 2004 we were looking at actually very few, if any,

17    bank failures occurring over the immediate time

18    horizon.

19              In fact from June of 2004 until March of

20    last year, there were no bank failures in this

21    country.

22         Q          Last year being '07?

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1     A      Correct.

2     Q      How many were there in '07?

3     A      There were three in '07.  But for that

4  period of time, there were actually none.

5     Q      Right.  I understand that.  Are you aware

6  that there were a limited number of slots available

7  for the first -- for the so-called crossover program

8  and the slots were in DOS?

9     A      I am aware that there were discussions

10  about the number of positions that DSC needed.

11    Q      I am sorry, DSC.  Thank you.

12    A      The examination workforce and their

13  discussion about how many at the appropriate grade

14  level.  Yes.  It did result in a number.  I don't

15  recall what that number was.

16    Q      Okay.  Do you know why the number of such

17  slots was not set high enough to accommodate all of

18  the personnel?  I am sorry.  Let me go back.

19            Do you have any recollection as to how

20  many people actually were RIFed by the agency in DRR

21  in 2005?

22    A      I don't recall a specific number.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Q    Less than a hundred?  Does that sound

2    right?

3    A    Yes.

4    Q    Somewhere in the 70s.  Something like 71?

5    Does that sound right, 71 or 72?

6    A    And by that number, you are indicating

7    either received a change of grade or was released

8    from the employ of the agency?

9    Q    No.  The latter.  Putting aside the

10   people who crossed over and did get employment with

11   DOC.  If you think it's --

12   A    Offhand, I would have said the number was

13   lower but I might be wrong.

14   Q    Do you have any sense of what the number

15   was?

16   A    I think it was closer to 50.  As far as

17   released.

18   Q    You may be correct because I'm not

19   positive of the numbers as I sit here now.

20        Then you were aware, I think, that the

21   people who took jobs in DSC crossed over?

22   A    I do not recall.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      Q      Do you recall that many if not most of

2   the people at the least ones who were not veterans,

3   though, crossed over had to accept a lower grade?

4      A      Yes.  I am.  I do recall that the

5   majority of employees who crossed over did take

6   appointments at a lower grade but were able to

7   preserve their salaries.

8      Q      For the first two years as federal

9   employees are, preserving --

10      A      I don't recall the specifics.  I know

11   they preserved their salaries for a period of time.

12      Q      Yes.  Do you know whether people who

13   crossed over were -- whether there was any

14   prohibition made by the agency at large as to their

15   getting a performance -- a monetary performance

16   award?

17      A      I have no knowledge.  I don't recall.

18      Q      Tell me what HR committee that you sit on

19   you mentioned earlier.  I am not sure I got a

20   description.  If you gave it to me, I don't remember.

21      A      Human resources committee established by

22   the chief operating officer to address and make

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    recommendations on human resource policy-related

2    issues that go before it.

3              And depending on what we're presented

4    with, a lot of training issues, communication issues,

5    issues associated with employee morale, and

6    recruitment in particular.

7        Q    Okay.  As far as employee recruitment,

8    can we put on one side the recruitment for the

9    corporate employee program?

10             I'm going to preface my question by

11   saying I am not asking you about those now although I

12   plan to later.  What recruitment does FDIC do for

13   positions other than those in the corporate employee

14   program?

15       A    Particularly in the division in insurance

16   and research, economist positions had been the focus

17   of attention for recruitment because of the

18   difficulty particularly of hiring economists at the

19   pay bands.

20       Q    I was going to say, and paying for them.

21             (Laughter)

22       A    That has been a big issue of hiring of

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    economists.

2        Q       How many economists -- just give me a

3    ballpark -- is FDIC likely to hire in a particular

4    year?

5        A       It's not actually a large number.  My

6    recollection in our discussions the recruitment of --

7    I don't know if I would say 2007, maybe 2006 or 2005.

8    Sometime in that time frame I think they were looking

9    at maybe three or four.

10       Q       It's a small number.

11       A       Small number but very difficult to get.

12       Q       Is the agency typically looking for

13   people who have had experience after getting their

14   degree?

15       A       Some of those positions would require a

16   doctorate and publication as well.

17       Q       And some of them would not?  Some of them

18   do not?

19       A       What I don't recall is that whether or

20   not there had been an adjustment of expectations when

21   it was a recognition of the difficulty of getting

22   what initially was sought.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Q         Okay.  That's fine.  I'd like to get back

2    to this chart that's now called number one that you

3    have in front of you still, I think.

4                    Are you aware of -- that the 2005 buyout,

5    reduction in force was particularly the number of

6    grade 12 employees was dramatically reduced?  Reduced

7    by more than 50 percent.

8          A         I am sorry.  I am not understanding the

9    question.  Could you clarify the question, please.

10         Q         Let me ask it in a simpler way.  This

11   shows that in Dallas there were a hundred and

12   thirty-six grade 12 employees in the summer of '04.

13   Do you have any idea of how many such grade 12

14   employees there are now?

15         A         I would expect the number to be

16   significantly lower.

17         Q         Is it less than 50 do you think, or do

18   you know at all?

19         A         It might be.  I'm not certain, but it

20   might be significantly lower.  And that was, if you

21   may recall my earlier discussion talking about the

22   change of the business model and the bringing in the

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    folks from DSC.  In order to achieve that, what we

2    had to do was have the core DRR staff serve as

3    experts in order to provide guidance.

4          We were trying to get your more senior

5    expert people that would be the residual base, if you

6    will, of the DRR staff so that as you bring in people

7    on a temporary basis they are filling in basically at

8    the lower grades, less expert.

9          What you have preserved are basically

10   your experts within DRR to provide the guidance and

11   supervision so they could execute their work.

12          That was certainly one of the levels

13   within DRR that we expected with a new business model

14   to be significantly impacted because what we're doing

15   is basically preserving those individuals who

16   basically are experts in the claims area or have

17   significant experience dealing with the marketing of

18   assets so they can provide guidance to those who

19   don't who come in.

20      Q    Is it a fact that some of the people who

21   had been -- positions that had been 12s became 13s

22   and some of the people who had held the 12s became

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1   13s?

2      A    I don't specifically recall one way or

3   the other.

4      Q    Okay.  Is it fair to say this downsizing

5   of DRR was not motivated primarily by financial

6   considerations, by how much it cost?

7      A    I can't speculate as to what the decision

8   makers who approved it were thinking.

9      Q    Okay.  So, who do you think the decisions

10   makers who approved it were?

11      A    Our board of directors.

12      Q    Well, do you think the board of directors

13   would have done it if Mr. Bovenzi and Mr. Powell or

14   at least one of them hadn't recommended it?

15      A    I would think that certainly there were

16   discussions.  But once again, they were the ones.

17   The board was making the decisions.  And I believe

18   the question --

19           I might be wrong.  I thought the question

20   was what was the reason.

21      Q    No.  That's right.

22      A    The deciding official who is making that

**EXHIBIT 34** 91
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1  decision.

2       Q       Whoever it was it wasn't you I

3  understand?

4       A       No.  Wasn't mean.

5               (Laughter)

6       Q       I understand that very well.  Are you

7  aware there was a delegation of authority to Mr.

8  Bovenzi with respect to downsizing?

9       A       No.  I'm not aware of that.  Don't

10  recall.

11      Q       If the agency did not wish to

12  involuntarily separate a number of employees in DRR,

13  well, let me strike that again.

14              Do you think it's feasible for the

15  agency, I mean the FDIC, to have given anybody -- any

16  employee who had expertise as a grade 12, 13, or 14,

17  have them get priority to transfer to DOS or any

18  other division in which a vacancy did exist or would

19  be likely to exist?

20              MR. ROSE:  Would you read that back,

21  please.

22              (Laughter)

```
 1                  (The question was read back)

 2            BY MR. ROSE:

 3       Q      Is that clear enough or would you want me

 4   to start over again?

 5       A      Would you clarify it.

 6       Q      Yes.  Would it have been in your

 7   judgment.  I understand this is not your everyday

 8   duty.  So, just give us your best estimate.

 9            But in your judgment, would it have been

10   feasible for the FDIC to say we have got too many

11   people in DRR, let's move them all to other positions

12   within the FDIC?

13            And essentially to transfer them either

14   probably in lieu of hiring as many people in the

15   corporate employee program as is hired.

16       A      I don't think it's feasible to make a

17   blanket statement like that because everybody --

18   within every organization there are skills and

19   requirements to fill certain jobs, and you have to

20   match up the qualifications of individuals with the

21   requirements of the job.

22            And it would be purely luck if -- only
```

EXHIBIT 34     93
ALIOTTA v. BAIR
No. 05-2325-RMU

1    luck if you were able to get a 100 percent match in

2    reorganization in which people that were recruited

3    and filled one set of positions were 100 percent

4    qualified across the board to then move to a

5    different job description and all of them would

6    qualify for that.  I just don't think it's possible.

7        Q     Well, put aside whether all of them did

8    for a moment or focusing, if you will, on what I

9    would consider to be probably the clerical level

10   employees and particularly the 7s of whom there were

11   83.

12            Wouldn't it have been feasible to take

13   the 7s most of whom are very experienced and could do

14   a number of different things and give them a shot at

15   clerical positions in the rest of the agency?

16            Even if you didn't get a hundred percent,

17   if you get 90 percent, you would reduce the pain

18   significantly.

19       A     The extent that there is a much

20   associated with the position and the individuals that

21   probably would be something if there are positions

22   across the board.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          Of course the issues you run into are

2     things such as location.  That you might have a

3     clerical position in Washington and a clerical

4     position in New York, and a clerical position in

5     Dallas and you have a surplus, and those are the

6     vacancies you have a surplus of.  Surplus in Kansas

7     City moving them around gets to be problematic.

8          Q     The surplus I'm talking about were in

9     Dallas and in D.C.  Those are the two offices we're

10    talking about here.  There are numerous clerical

11    vacancies each year in Washington, are there not, for

12    the agency?

13         A     There are vacancies in many of the

14    positions in Washington every year.  Different

15    vacancies at different positions.

16         Q     Sure.  And if all the positions are in

17    Kansas City, or Washington, or Dallas, at least if

18    somebody got priority if they wanted to move, they'd

19    have their job, they'd have a job.

20         A     Is that a question?

21         Q     Yes.  Let me strike that.  I think you're

22    right.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1            (Laughter).

2            Do you visualize any problem with giving

3    priority to the people in Dallas and Washington not

4    only for jobs in those locations but to the extent

5    that they wanted to bid on other jobs in other cities

6    they could do so with priority also?

7        A     I think depending on the position, the

8    expected level of vacancies, it may or may not make

9    sense to provide that kind of priority.

10       Q     Okay.  All right.  Is it a matter of fact

11   that federal employees as they get older tend to be

12   more costly partly because of health insurance and

13   partly because they've accumulated higher grades?

14       A     I don't know the answer to that.  I

15   cannot say I've seen any statistics one way or the

16   other.

17       Q     So, you don't know whether they become --

18       A     I haven't seen any data.

19       Q     I think you've moved into the group that

20   we now consider although some us don't consider us to

21   be very old.  But you're over 50 now?

22       A     The statement I would feel comfortable

**EXHIBIT 34**
**ALIOTTA v. BAIR**

1   making is that typically older employees, typically, **No. 05-2325-RMU**

2   typically have more work experience.

3        Q        Right.  And typically have health

4   insurance more expensive for older employees than

5   younger employees, isn't it?  It may or may not be

6   for --

7        A        I don't know.

8        Q        All right.

9        A        I would think it's function of the policy

10  that gets negotiated between the employer and the

11  health insurance providers as to how that's done.

12  That would be my speculation on that.

13            MR. KESSLER:  Are you asking if older

14  FDIC employees pay more than for their insurance than

15  the younger employees?

16            MR. ROSE:  No.  I'm asking whether the

17  agency pays more to provide the health insurance for

18  this portion.

19            THE WITNESS:  I don't know.  I could make

20  the argument or see the argument being made that

21  younger employees have more dependents and have

22  families which require more coverage.

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1          So, the fact probably in the 30 to 40 age

2    group that actually the amount of subsidy being paid

3    to that employee because of having family coverage

4    might be larger.  So, I don't know the answer.

5          BY MR. ROSE:

6      Q    Do you know whether the federal employee

7    plans to provide for family coverage are more costly

8    than the ones that don't provide for family coverage?

9      A    I know as a co-pay an individual pays

10   less than with getting family coverage.  Yes.

11         (Laughter)

12     Q    Okay.  But let's put the family coverage

13   aside.  And as far as the individual is concerned, do

14   you have any belief as to people being more costly as

15   they get older in terms of use of demand on the,

16   well, the need for medical assistance or guidance?

17     A    As an individual, I would expect -- As an

18   individual excluding any type of employment, I would

19   expect that I would have to pay more now for health

20   insurance, life insurance than I did when I was 20,

21   or 30, or 40.  That would be my expectation as an

22   individual if I were to go out and get that now.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1          As employer, I honestly do not know

2    because I think that is something that gets

3    negotiated between the employer and the insurance

4    company that is providing the coverage or the

5    insurance companies.

6          Q     Okay.  Tell me which -- what kind of

7    retirement plan you are on?  Are you Civil Service

8    retirement first?

9          A     FERS.

10         Q     Do you know who pays for the -- pays for

11   FERS coverage?  Does the employer pay, or you, or

12   both.  Does FDIC and the employee pay for FERS or is

13   it all one or the other?

14         A     The FERS program has three components to

15   it.  It has Social Security component.  It has a

16   defined pension associated with it, and it has a

17   defined or contribution plan associated with it.  The

18   contribution plan is called the thrift savings plan.

19         Q     Right.

20         A     And the government provides an automatic

21   one percent contribution of a employee's annual pay

22   to that.  And then employees can contribute up to an

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    IRS set limitation or ten percent, I believe.

2        Q        Right.

3        A        And then there is a matching for a

4    component of up to five percent of total pay.

5                The Social Security employees pay up

6    until they have their max out cap, if they hit it.

7    And then, of course, the employer pays, I believe, a

8    Social Security component that matches that into the

9    Social Security funds.

10       Q        Right.

11       A        And then as far as the defined

12   contribution --

13       Q        Defined benefit.

14       A        -- defined benefit annuity, employees do

15   pay into that.  A certain amount is withheld.  A

16   contribution to that is made to that plan.  But I

17   believe it also -- there is an employer contribution

18   to that plan as well.

19       Q        Okay.  That is a very full answer, and

20   thank you.  That's good.  That will save us some

21   time.  Speaking of which, why don't we take a ten

22   break or so.

**EXHIBIT 34** 100
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1              (Off the record.

2              BY MR. ROSE:

3        Q      I would like to go back and talk about

4    two other kinds of topics.  One is the corporate

5    employee program, and the other is the job position

6    descriptions and changes that were made in 2005, but

7    let's do -- look at the corporate employee program.

8              Is it your recollection that the program

9    had actually started significantly before 2005?

10       A      No, it had not.  As far as conceptual.

11       Q      Conceptually it was being formulated but

12   it had not started until 2005?

13       A      No.  Yes.  In fact, my recollection is

14   that it probably really didn't get into full swing

15   until 2006.

16       Q      That I think you're probably exactly

17   right.  Do you have an estimate?  And if you have

18   one, I will ask what it's based upon, have you

19   answer.

20             But do you have an estimate as to the

21   number of people who were hired as corporate

22   employees or hired for the program in 2005 who

EXHIBIT 34   101
ALIOTTA v. BAIR
No. 05-2325-RMU

1     actually started working in 2005?

2          A      No.  I don't recall.

3          Q      Okay.  And who would have knowledge as to

4     the history of the program?  I think you may have

5     mentioned a person who is in charge of corporate, but

6     I don't remember his name, if you did identify him.

7          A      The current head of Corporate University

8     is Tom Terwilliger.

9          Q      Who is the first?

10         A      The first head of Corporate University

11    was David Cooke.  That is C-O-O-K-E.

12         Q      And was he there in '05 and '06?

13         A      Yes, he was.

14         Q      And Tom, how do you spell his last name?

15         A      I am not certain of this.  But it is

16    approximately T-E-R-W-I-L-L-I-G-E-R.

17         Q      Okay.  Thank you.  Mr. Cooke has a good

18    first name which I appreciate.

19                (Laughter)

20                Is he still with the agency?

21         A      No, he is not.

22         Q      Is he retired?

**EXHIBIT 34** 102
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1      A      Yes, he is.

2      Q      What were the size of the incoming

3   classes in '06 and '07, if you have any idea?   A

4   range if you don't have anything precise.

5      A      Maybe in the 2 to 300 range.   I feel very

6   uncomfortable with those numbers.   We're talking

7   somewhere maybe --

8      Q      Two fifty?

9      A      Scale we're talking 300 versus 50 versus

10   700.   We're talking --

11      Q      My sense is it was 200 plus, but not plus

12   a lot.   But that's a guess.

13      A      Well, I'm not doing much better.   Mine's

14   just a sort of a recollection as to what the numbers

15   are, a range.   It could have been as high as 400.   I

16   don't think it was any lower than one fifty.

17      Q      Okay.   So, a range of 1, 2, 3, 400.

18      A      More like the 2 to 3, yes.   2 to 300.

19   Somewhere in there.

20      Q      Thank you.   Do you have any idea of how

21   many of the people who came in are still with FDIC,

22   how many of the so-called student or trainees?

EXHIBIT 34    103
ALIOTTA v. BAIR
No. 05-2325-RMU

1      A      I know it's the vast majority of them,

2   but I don't recall the specific percent of the

3   attrition although I think once again looking at

4   ranges we're talking five to ten percent attrition

5   out of that group versus something like 50 percent or

6   40 percent.

7      Q      So, you think it's -- for that group, for

8   most of them it's probably pretty young.  That is

9   pretty good retention rate, 90 percent or 95?

10     A      My recollection, yes.  It's around there.

11     Q      And the program is a four-year program?

12  I'm talking when I say program I'm talking about the

13  corporate employee program.  It's a four-year

14  program?

15     A      That's my understanding.  Correct.  For

16  commissioning.  To meet the commissioning

17  requirements to come out of certification.  It's a

18  combination of -- of training and work.

19     Q      I understand that.  It's paid training

20  which is the best kind.

21     A      Correct.

22     Q      Which may explain the high retention

EXHIBIT 34    104
ALIOTTA v. BAIR
No. 05-2325-RMU

1    rate.  And the organization, as such, I mean the

2    agency FDIC, will begin to benefit from Corporate

3    University in '09 or '010?

4        A      We're talking about the corporate

5    employee program?  You want to talk about the

6    corporate employee program or the --

7        Q      The corporate program?

8               MR. JONES:  I object to the part of the

9    question as beginning to benefit being vague.

10              MR. ROSE:  I think that's a perfectly

11   good objection since you haven't made any terrible

12   ones.

13              (Laughter)

14              It doesn't have to be perfect.

15              BY MR. ROSE:

16       Q      Would you agree that when the people in

17   the corporate employee program get their commissions

18   they will be able to -- they will be able to provide

19   a direct benefit to the agency that they cannot

20   perform now?  Is that clear enough?

21       A      No.  I am sorry.  Need clarification.

22              MR. ROSE:  Ronnie, could you help me out?

EXHIBIT 34    105
ALIOTTA v. BAIR
No. 05-2325-RMU

1            (The record was read by the reporter.)

2            BY MR. ROSE:

3      Q      Still want some clarification?

4      A      Yes.

5      Q      Certainly they can't -- the people in

6    this program can't sign a --

7      A      Exam report as a commissioned examiner

8    but afterwards they can.  That is correct.

9      Q      Okay.  And so what do -- the employees

10    are in the field and helping in the examination of

11    the bank, what sort of work do they do?  I'm talking

12    about these corporate employees who are in training

13    now.

14      A      That question really is much better posed

15    to somebody in DSC.  I don't work in that area.  I

16    don't know what the day-to-day activities.  I would

17    suspect obviously they are assisting the completion

18    of either safety and sound exams or compliance exams.

19            But exactly how a supervisor uses them, I

20    think that's best addressed to somebody in DSC.

21      Q      Do questions like they are given annual

22    exams do you have any knowledge about what the

**EXHIBIT 34**  106
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    curriculum is?

2        A       That is curriculum.  There is course

3    work.  There are tests involved with the classroom

4    training.  That much I am familiar with.  I know the

5    training is modular.

6                But if you have specific questions

7    regarding as to precisely what course work there is

8    and the allocation of time between classroom time

9    versus computer-based training versus on-the-job

10   training, you best ask those questions to somebody in

11   DSC or Corporate University.

12       Q       Do you have any understanding as to what

13   the range or either the exact amount or the pay?  I

14   want to know about the amount of pay for a GS-12

15   employee of FDIC.  Just give be a ballpark if you

16   don't know the precise number.

17       A       Once again, it depends on localities.

18       Q       Either Dallas or Washington.

19       A       Probably somewhere in the neighborhood of

20   maybe $80,000 a year.

21       Q       And --

22       A       A little more in Washington.  A little

EXHIBIT 34   107
ALIOTTA v. BAIR
No. 05-2325-RMU

1    less in Dallas.

2          Q      Sure.  Do you know where Mr. Cooke lives?

3          A      Selbyville, Delaware.

4          Q      What part of Delaware is that?

5          A      Lower Delaware.  Sussex County.

6          Q      Okay.  Thank you.  Selbyville is a town

7    or village I think.

8          A      Yes.

9          Q      Do you know who Bruce Brown is?

10         A      Yes, I do.

11         Q      Did you ever work with him?

12         A      Yes, I did.

13         Q      What sort of work did you do when you

14   were working together?

15         A      I first met Bruce when I was at RTC and

16   he was at FDIC, and he was located in Dallas and I

17   was here in the Washington office of RTC.

18                We were talking about management

19   contracts for distressed assets.  And that probably

20   was sometime around 1989 or 1990.  And when I said

21   RTC, I may have been in that transition period where

22   actually I was still at FDIC technically actually

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    because during the time of that banking crisis there

2    were reassignments being made.

3              So, technically you were still part of

4    the division of FSLIC or whatever it was called but

5    your boss was assigned to RTC and you were working on

6    RTC stuff.

7              But sometime late '89, '90 time period

8    was when I first met Bruce.  Didn't have much

9    interaction with him except for periodic discussions

10   on I will call them asset management related issues

11   until I started -- until RTC was terminated, and we

12   were folded back into the FDIC.

13             In '96, we were all in the same division.

14   So, I would see him much more directly although I was

15   in the capital markets area.  Then in '97 --

16             (Phone rings)

17             THE WITNESS:  In '97 when I moved from

18   capital markets to the deputy job, I started

19   interacting with him more although I don't

20   specifically recall if he was in my chain of command.

21             We sort of worked as a matrix, worked as

22   a matrix organization in that the Dallas office

EXHIBIT 34    109
ALIOTTA v. BAIR
No. 05-2325-RMU

1    functional areas administratively report to the head

2    of the Dallas office but as far as taking policy and

3    I will call it business direction that comes from the

4    Washington office.

5              So, it was kind of administratively

6    Dallas.  But as far as policies and business

7    decisions, it gets put up to the Washington deputies.

8              So, sometime I am guessing maybe around

9    '99 or 2000 Bruce ended up working as my assistant

10   director down in Dallas.  Directly.  I don't recall,

11   like I say, if he had been in that chain or not

12   beforehand.  I know he was working directly in that.

13   Sometime around 2006.

14   Q        Did he have or what was his level at that

15   point?  Do you recall?

16   A        Executive.  E2 I believe.

17   Q        Okay.  And do you know what happened to

18   his position in 2002?  Let me go backward.  In the

19   plan that was submitted to Mr. Bovenzi and approved

20   by him --

21   A        I'm sorry.  Which plan?

22   Q        I'll tell you in a moment.  All right.  I

**EXHIBIT 34** 110
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1   will find he plan for you in a moment.  Let's find i

2   now.

3                  MR. ROSE:  Exhibit 4 of the Bovenzi depo

4   which is a one-page approval document.  It is also

5   DRR228.

6                  BY MR. ROSE:

7        Q      The reorganization is the one that is --

8   starts on 229?  Then it -- we can talk about the

9   staffing proposals after we look at those.  Okay?

10  Why don't you take a couple of minutes and

11  familiarize yourself.

12                 The text should seem familiar to you, I

13  believe.  Not the text of Mr. Bovenzi's but the text

14  of the memorandum.

15                 (Off the record.)

16                 MR. JONES:  I want to clarify for the

17  record.  I think I did this during Mr. Bovenzi's

18  deposition as well.  There is one page of this that's

19  out of order.  It's Bates stamped ALDRR00233 called

20  attachment A.

21                 That actually is attachment A to Mr.

22  Bovenzi's approval memo which is ALDRR00228, and it's

EXHIBIT 34    111
ALIOTTA v. BAIR
No. 05-2325-RMU

1    not part of the DRR reorganization.

2              MR. ROSE:  Okay.

3              MR. JONES:  That should actually be the

4    second page of this exhibit.

5              MR. ROSE:  I understand.  That is exactly

6    the same point you made before.  That's fine.  I

7    appreciate it again.

8              BY MR. ROSE:

9        Q    So for a period of years or let me show

10   you this organization chart for the period 2002, the

11   third quarter.  I see Bruce Brown listed as an

12   assistant director.  Would you take a look at that.

13             MR. JONES:  Let me identify this for the

14   record.

15             MR. ROSE:  Exhibit 2 to --

16             MR. JONES:  Meyer Exhibit 1, M-E-Y-E-R.

17             BY MR. ROSE:

18       Q    Bruce Brown it looks like he reports

19   directly to you.  Is that correct, or is that

20   misleading, or is that incorrect?  The assistant

21   director.

22       A    Well as I indicated, we operate under a

EXHIBIT 34   112
ALIOTTA v. BAIR
No. 05-2325-RMU

1   matrix organization.  So for functional

2   responsibility, Bruce did report to me.

3   Administratively he reported to the deputy in the

4   Dallas office.

5        Q      That's fine.  That is consistent with

6   what you said.  That clarifies it in my mind.

7              Did you have occasion to evaluate his

8   performance?

9        A      Yes.

10       Q      And did you generally give him good

11  reviews?  Did you find he was a good employee?

12       A      My recollection is that his performance

13  was always satisfactory or better is my recollection.

14       Q      And how does his -- he's born in what

15  year?  I should have his date of birth there.

16       A      According to this table under column date

17  of birth, that entry 1 slash 26 slash 51.  For the

18  row, Bruce Brown.

19       Q      So, he's a little bit older than you?

20       A      He would be five years older than I am.

21  Five and a half years older than I am.

22       Q      Do you know whether he was listed in the

EXHIBIT 34    113
ALIOTTA v. BAIR
No. 05-2325-RMU

1    Dallas -- he would have been listed in the Dallas

2    organizational chart?

3         A       Dallas organizational chart.

4         Q       Okay.  And do you know whether in the --

5    what was his position called in 2002 or 2003, or

6    2004?  Was he an executive assistant to someone?

7         A       In 2004, I believe he was an executive

8    assistant to the director.

9         Q       To Mr. Glassman?

10        A       To Mr. Glassman.

11        Q       Before that, do you have any recollection

12   as to what his title was?

13        A       He was an assistant director.

14        Q       Of DRR?

15        A       Of I believe for Franchise and Asset

16   Marketing in the Dallas office.

17        Q       Thank you.  And was that -- what happened

18   to that position in the Dallas office?  Do you know,

19   that he had occupied?

20        A       We reorganized the Dallas office sometime

21   in maybe 2003.  Once again, my recollection may not

22   be good about the years.

EXHIBIT 34  114
ALIOTTA v. BAIR
No. 05-2325-RMU

1      Q      That's good enough.

2      A      Sometime around that time frame.  Maybe

3      2002, 2003.  And that reorganization of all of the

4      assistant director jobs in Dallas were reposted

5      because they had been rewritten.  Basically all of

6      them had to -- all of them were posted.

7      Q      Did the incumbents except for Mr. Brown

8      retain their positions or the different positions

9      that were posted?

10     A      I don't recall.

11     Q      Okay.

12     A      No.  Yes.  I don't recall.

13     Q      In 2004, had the position as -- Not '04.

14     He had become an assistant to the director?

15     A      DRR.

16     Q      Did that position description appear

17     prior to -- in 2002 or prior to that?  Do you know?

18     A      They certainly have been assistants to

19     the director.  I don't know if that position -- the

20     same PD was the same prior post.  That I don't know.

21     Q      In some years, there wasn't such a

22     position.  Is that right?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1       A       Well, not that I can recall.

2       Q       Okay.

3       A       There was always some assistant to the DR

4   director.

5       Q       Okay.  What was Mr. LaPierre's position?

6   At some point, he was in the -- was he in the

7   director's office at some point before he came to

8   DRR?

9       A       Prior to coming to DRR, he was actually

10   the deputy executive secretary is my recollection in

11   the Office of Executive Secretary which was prior to

12   reorganization, not part of the legal division but

13   was a part of a separate office.

14              Before being the executive deputy

15   secretary, I believe he was an assistant to the then

16   chief operating officer Dennis Geer.

17      Q       Right.  That sounds exactly right.  Had

18   he worked with Mr. Bovenzi when he was an assistant

19   to Mr. Geer do you know?

20      A       I'm sure he had some interaction with him

21   because I had interaction with him.  When you

22   assistant the operating officer you interact with a
```

EXHIBIT 34    116
ALIOTTA v. BAIR
No. 05-2325-RMU

1    lot of people.

2        Q      Do you know what project Mr. Brown was

3    working on in late 2004 or early 2005?

4        A      Well for a period of time, Bruce was on a

5    detail to the General Services Administration working

6    on an e-gov initiative with GSA, and then he was

7    working on a project at Corporate University for a

8    training venue that would address the issues of not

9    having any bank failures.

10              And the venue or program has gone under

11   several different programs called virtual bank or

12   bank simulation center and the like.  Basically a

13   training venue that in the periods where we have no

14   bank failures of trying to simulate a bank

15   environment and what type of issues employees would

16   encounter in resolving a failed institute, failing,

17   failed institution, and also honoring the insurance

18   guarantee of the corporation.

19              For instance, one example of that is

20   simulating a meeting with an uninsured depositor --

21              (Laughter)

22              -- and giving them the news you have good

EXHIBIT 34    117
ALIOTTA v. BAIR
No. 05-2325-RMU

1    news, your insurance coverage is over hundred

2    thousand dollars and the bad news is you have an

3    uninsured portion, that you may have to wait some

4    time to get the proportionate share of that.

5         Q      Just for clarifications, the E

6    designations means electronic?

7         A      Yes.

8         Q      Some type of machine, computer friendly

9    kind of communications?  Is that correct?

10        A      Electronic.  Right.

11        Q      And so was it approximately a year or so

12   that he got extended for a period of time because he

13   proposed the training module and then got extended a

14   few times?

15        A      I don't recall the length of the

16   appointment in detail, sir.

17        Q      And he significantly is older than Mr.

18   LaPierre I assume?  We've got their dates, and Mr.

19   LaPierre's I think younger than both of you by quite

20   a bit.  Is that right?

21        A      I don't know.

22        Q      All right.  We can track that down.  We

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    are getting close to the end.  I would proposal a

2    five- or ten-minute break and see if I have the

3    things I need to do.

4              (Off the record.)

5              MR. ROSE:  Back on the record.

6              BY MR. ROSE:

7         Q    Do you have any ideas as to how many

8    employees of the agency are assigned to Corporate U

9    other than I would call the students, interns, or

10   trainees who were attending it?

11        A    A staff has been increasing I believe --

12   Well, I don't recall specifically.  Once again giving

13   ranges or numbers I think it's about somewhere in the

14   neighborhood of 80 to a hundred.  I might be off.

15   It's been changing.

16        Q    No.  That is fine.  I wanted an estimate.

17   You think that is in addition to whatever students?

18        A    Not including students.  Correct.

19        Q    Thank you very much.  And do they have a

20   number -- does the faculty consist of some highly

21   experienced employees?  That is as part of -- some of

22   those employees are they people who have expertise in

**EXHIBIT 34** 119
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    certain kinds of activities that the agency performs

2        A     Some of the employees are.  Most of the

3    courses are taught by actual practitioners.

4        Q     From the division?

5        A     From the respective divisions.  Most but

6    not all.

7        Q     And some them are taught by the faculty?

8        A     Well, I'm not sure there is a term

9    faculty being used over there nowadays.  Most of the

10   course of instructors are actually from the

11   divisions.

12             Some are brought in from the outside.

13   And there are different positions at Corporate

14   University responsible for specific development of

15   training programs.  Those tend to be people who do

16   have expertise.  They have I believe the term is ISD,

17   instructional system designer or something along

18   that.

19       Q     I get the concept at least.

20       A     That person specializes in, of course,

21   techniques for instruction gets matched up with

22   somebody who has program area expertise.  So, you

**EXHIBIT 34** 120
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    have both types of positions and other different

2    areas.

3        Q     Have you ever seen any documents

4    indicating that what the budget for Corporate U is

5    for 2006 or 2007?

6        A     I did.

7        Q     Any idea what's in it?

8        A     No.

9        (Laughter)

10        Q     But is it in the budget presentation that

11    was provided presumably to Congress at some point?

12        A     It would be in the FDIC budget.  That is

13    correct.

14        Q     Okay.  That's fine.  That may help cut a

15    few questions.  I see two -- in the testimony of Mr.

16    Powell or Chairman Powell reference to David Cooke

17    and a Debbie Cook both in connection with Corporate

18    University.  Are there two separate people?

19        A     I am only aware of David Cooke being one

20    of the same.  I am not familiar with a Debbie.

21        Q     It may be just a miss.  That's not

22    exactly the same name.  And there is a person named

EXHIBIT 34    121
ALIOTTA v. BAIR
No. 05-2325-RMU

1    B.J. Desponde?

2         A       VJ.

3         Q       VJ?

4         A       V-I-J-A-Y.

5         Q       And that is a male person?

6         A       Yes.

7         Q       And is he associated with Corporate U?

8         A       Yes, he is.

9         Q       What's his field?  Do you know?

10        A       I don't specifically recall what his

11   title was now.

12        Q       That is okay.  Mr. Powell seems to think

13   that he at one time was the acting director or

14   director of IT which I guess is what used to be

15   information technology?

16        A       At one time period Vijay held a senior

17   position over there.  It may have been acting

18   director for a period of time.  I don't specifically

19   recall.

20        Q       Okay.  And then there is some reference

21   to a Chris.  Do you know anybody with a nickname like

22   Chris associated with Corporate U?

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1       A       The only person I can think of that was

2   involved with Corporate University work over there

3   for a while is Chris Aiello.

4       Q       In DRR or for DRR there were written a

5   group job descriptions for -- in DRR.  Is that

6   correct in 2004 or 2005?

7       A       With every reorganization we put together

8   a new job description.  So if it was preparation for

9   the reorganization in 2005, then at some period prior

10  to the event then we would have put together a new

11  position descriptions.

12      Q       Are you familiar with those position

13  descriptions?

14      A       In a general sense, I am.

15      Q       Not in detail?

16      A       No.  I couldn't tell you my own position

17  description.

18      Q       Well, I have a similar recollection of

19  attending a meeting of the Assistant Attorney General

20  in which he asked the sections chiefs who knew what

21  was in their job description, and I think none of us

22  was the answer.

EXHIBIT 34    123
ALIOTTA v. BAIR
No. 05-2325-RMU

1                    (Laughter)

2                    So, I am not shocked or surprised.

3        However, who was in charge of formulating the

4        position descriptions for DRR in 2004 or 5?

5        A        Jim Seegers for the Washington office and

6        I believe Leslie Plant in the Dallas office.

7        Q        Okay.

8        A        And that's from the DRR perspective.

9        There was somebody in the division administration

10       resource branch.

11       Q        We used to call personnel.

12       A        Yes.  That also was overseeing that

13       process.

14       Q        Let's clear one of the purposes for

15       Corporate U and the corporate training program.  The

16       corporate employee program -- excuse me -- is to

17       provide employees who have knowledge of and some

18       understanding of in a working sense of the different

19       kinds of -- the widely different kinds of work that

20       the agency is involved with.  Is that a fair

21       statement?

22       A        I am sorry.  Could you put that in the

EXHIBIT 34  124
ALIOTTA v. BAIR
No. 05-2325-RMU

1     form of a question?

2          Q     Is it fair to state that corporate -- one

3     of the purposes of Corporate U is to provide the

4     employee trainee with information and experience in

5     different kinds of duties that are performed by

6     different kinds of employees within DRR?  I am sorry.

7     Within FDIC.

8          A     That's a fair statement.

9          Q     Did you know whether the new job

10    descriptions that were generated in 2005 called for

11    specific experience in very limited kinds of job

12    duties as a prerequisite or a factor in winning a

13    bid, if that's clear?

14         A     Winning?  I'm sorry.  I don't know what

15    you mean by winning a bid.

16         Q     Well, the position is posted, and then

17    people have to compete for it or try to compete for

18    it?

19         A     To determine the most qualified

20    individual?

21         Q     Yes.

22         A     As I mentioned earlier, the unique aspect

EXHIBIT 34     125
ALIOTTA v. BAIR
No. 05-2325-RMU

1   of the planning process, the vision of I started --

2   think it was 2004, maybe started actually earlier in

3   2003 and gestated in 2004, but certainly the unique

4   fashion it was changing our business model from where

5   we had been a very stovepiped organization to one

6   where we were going to try to export the skills and

7   knowledge of our FDIC people to be applied elsewhere

8   on an interim temporary basis and then conversely

9   import when we had those spikes in our resource

10  requirements from elsewhere in the corporation

11  resources that would be under the guidance to

12  leverage the small base staff for period of time when

13  we have the uptakes and peaks in workload.

14          One facet of that, as I indicated to you

15  earlier when I believe we were talking about the

16  grade level 12 issue is that we were looking to have

17  a more expert workforce within DRR that could provide

18  the direction and guidance to those employees who

19  come in on those -- in those periods of time in which

20  we are directing them and supervising them to get

21  work completed.

22          Then when they go back they return to

EXHIBIT 34  126
ALIOTTA v. BAIR
No. 05-2325-RMU

1    their divisions.  What's left during our quote quiet

2    times they either work on assisting other work units

3    within the corporation or develop the policies,

4    procedures, all the types of maintenance things you

5    need to do in order to keep your organization ready

6    for performing its mission responsibilities.

7            So, I would expect that if one were to

8    take and like I say I don't recall the specific job

9    descriptions, the PDs, but I would expect if you took

10   them you would find that there are more what I

11   characterize as concentrations of expertise, more

12   expert-related requirements in each one of those PDs

13   that was established in the '04, '05 time frame than

14   what was there prior to that.

15       Q     Does that mean experience?  Expertise and

16   experience don't always go together.

17       A     Correct.  Typically there is a

18   relationship, but it's not necessarily hand in hand.

19   A lot depends on the nature of the job.

20       Q     The allegation that I have heard

21   repeatedly from my clients who are people who

22   suffered from the downsizing is that the jobs were

EXHIBIT 34    127
ALIOTTA v. BAIR
No. 05-2325-RMU

1    tailored for essentially some specific people and

2    tailored particularly for younger on the whole,

3    younger people.  Do you have any way of figuring out

4    whether a job was tailored for somebody?

5        A    That's not a question for me to answer in

6    that I have absolutely no idea how one would go about

7    that process.  That's something I am not familiar

8    with.

9        Q    Neither do I.

10       A    What I am certain of, as I said, was

11   unique about this new strategic direction we

12   undertook is in thinking about how best to insure

13   that the corporation would have the ability to still

14   perform it's mission responsibilities that the core

15   workforce in DRR that would be leveraged with non-

16   DRR but other corporate employees during these

17   workload spikes that they needed to be basically

18   expert.

19           They had to be able to supervise and

20   provide guidance and particular guidance to other

21   non-DRR employees in order to insure that we would

22   get whatever the work, the functional work, done.

EXHIBIT 34    128
ALIOTTA v. BAIR
No. 05-2325-RMU

1          So, like I say, I would expect if you

2     compared the PDs prior to that change in strategic

3     direction and post that on average you would find

4     more rigorous qualification requirements in

5     particular areas in the post 2004 organization.

6          Q     For somebody at the executive level such

7     as Mr. Brown, Bruce Brown, having conceptualized and

8     then formulated functions for an electronic -- I am

9     sorry.  Can't think of the noun.

10          He's talking about an electronic unit in

11     the -- to be taught in the -- in Corporate U.  He's

12     got that kind of insight and ability to project

13     himself into the future.  Wouldn't he seem to be a

14     likely candidate that you would prefer to have around

15     rather than having lost his job?  You I mean FDIC, of

16     course.

17          MR. JONES:  Objection to the part about

18     lost his job.

19          BY MR. ROSE:

20          Q     Okay.  Give me an answer.

21          A     Over the period of time in which we were

22     downsizing, this goes back to '92, but certainly it

EXHIBIT 34    129
ALIOTTA v. BAIR
No. 05-2325-RMU

1    holds true for 2005 as well.  There were many

2    qualified, very capable people who left the

3    corporation either involuntarily or voluntarily.

4              That's a fact.  And actually it's going

5    to be a continued fact.  In fact, it's going to be a

6    bigger problem for the corporation because if you

7    think about all the expertise that was collected over

8    those years, that is individuals leave and left and

9    will leave in the future, that expertise disappeared

10   or goes away and gets replaced.  Sometimes that is a

11   good thing.  Some times it's bad thing.

12             The reality is that loss of expertise

13   cannot be that experience and experience in

14   particular is extraordinarily difficult to replace

15   when you deal with failed banks because that's not

16   something, as I indicated in my earlier statement,

17   can be readily replaced.

18             We've attempted to establish a program at

19   Corporate University, and Bruce did work on them,

20   bank simulation.  Virtual bank.  It's gone under

21   several names.  The reality is I don't care when that

22   gets up and running if it ever does it will never be

EXHIBIT 34    130
ALIOTTA v. BAIR
No. 05-2325-RMU

1    a substitution for the real thing.

2              I think a statement that can be made and

3    I feel comfortable making is that yes from '92 even

4    all the way up to 2005 included there were a number

5    of people, quite a few very capable, experienced

6    people who left.

7       Q     And there were some people who were

8    retained who were not as capable as some of the

9    people who left.  Is that correct?

10      A     As a statement, I believe that is a true

11   statement that there are people that are not as

12   experienced and have the expertise.  Some people

13   compared to if you look at the resume of some of the

14   people who left.

15      Q     I have about two more questions.  You are

16   going to have to bear with me for a second to find

17   the right document.

18      A     And I just want to emphasize the point

19   with respect to the employees that left vis-a-vis

20   those that retained are retained that of course when

21   one thinks about and this is what I was getting at

22   and I want to be sure the record is clear if you have

EXHIBIT 34
ALIOTTA v. BAIR
No. 05-2325-RMU

1    a grade 15 that leaves and you have a grade 9 that is

2    remaining one would expect that a grade 15 has more

3    experience and expertise than a grade 9.

4              Conversely, one would expect that one who

5    has experience in a certain functional area would be

6    very competent in that functional area vis-a-vis

7    someone who was retained but has no experience in

8    that particular functional area.

9              So, it becomes a very apples and oranges

10   comparison.

11      Q     There was some discussion in either

12   Seegers 1 or 3, the memos, about the fact that a

13   number of employees were reaching retirement age.  Do

14   you recall reading that?

15      A     I recall reading something about

16   succession management in one of those.

17      Q     Do you remember seeing any printout of

18   personnel who were within a certain period of

19   retirement age?

20      A     Ever or --

21      Q     While you were employed in --

22      A     Yes.  Actually we get those every year.

**EXHIBIT 34**
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1    Every year.  That's produced by Tom Petticort

2    produces an analysis.

3         Q      There should be one for '04, one for '05.

4         A      Yes.  I would think so.  Sure.

5                MR. ROSE:  Mr. Jones, I would greatly

6    appreciate if you could get --

7                MR. JONES:  I will see what I can find

8    out about that.

9                MR. ROSE:  It's entirely possible it's

10   somewhere in the disk you gave me, but I don't think

11   it is.  In any event, I couldn't find it.

12               THE WITNESS:  In fact, that might be a

13   U.S. OPM requirement for federal agencies to look at

14   that for succession management.

15               BY MR. ROSE:

16        Q      I didn't know OPM talked about succession

17   management.

18        A      In the government that's a big issue

19   right now.

20        Q      I understand that.

21               MR. ROSE:  Thank you.  Mr. Jones, I think

22   I'm done.

**EXHIBIT 34** 133
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1              MR. JONES:  If you're done, we're done.

2     Thank you.  We will read and sign.

3              (Whereupon, at approximately 3:27

4              o'clock, p.m., the above deposition was

5              ended and signature was Not waived.)

6        *         *         *         *         *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

EXHIBIT 34 <sup>134</sup>
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

1                    E-R-R-A-T-A   S-H-E-E-T

2

3     IN RE:    BARBARA ALLIOTA, et al. vs. SHEILA C. BAIR,

4               Chairman, FDIC

5     DEPOSITION OF:  JAMES R. WIGAND

6     DATE OF DEPOSITION:  MONDAY, JANUARY 14, 2008

7     At the time the above-named deponent read and

8     signed this deposition, the deponent desired to

9     make the following changes:

10    PAGE: LINE: AS TRANSCRIBED:    CHANGE TO:    REASON:

11

12

13

14

15

16

17

18

19

20

21    DATED:            _____

22                              SIGNATURE OF DEPONENT

**EXHIBIT 34** 135
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
 1                CERTIFICATE OF THE DEPONENT

 2          I have read the foregoing pages 3 through 133

 3      inclusive, and find the answers to the questions

 4      therein contained to be true and correct, with the

 5      exception of changes, if any, as per the errata

 6      sheet following herewith.

 7                _____

 8                      JAMES R. WIGAND

 9                 DATED:_____

10

11      - - - - - - - - - - - - - - - - - - - - - - - -

12             CERTIFICATE OF THE NOTARY PUBLIC

13         SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

14      DAY OF _____, 2007

15

                     _____

16

                       (PRINT NAME OF NOTARY)

17

                     NOTARY PUBLIC IN AND FOR

18                        THE STATE OF

19                _____

20

21      MY COMMISSION EXPIRES:

22      _____
```

EXHIBIT 34    136
**ALIOTTA v. BAIR**
**No. 05-2325-RMU**

```
1              CERTIFICATE OF NOTARY PUBLIC

2          I, Ronnie C. Palmer, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that the foregoing transcript is a true and

5    correct record of the proceedings; that said

6    proceedings were taken by me stenographically and

7    thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to

10   this case and have no interest, financial or

11   otherwise, in its outcome.

12

13   My commission expires:

14   April 29, 2009

15

16

17   _____

18   NOTARY PUBLIC IN AND FOR THE

19   DISTRICT OF COLUMBIA

20

21

22
```