UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BARBARA ALIOTTA, et al and ) <br> Others similarly situated, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> SHEILA BAIR, CHAIRMAN, ) <br> FEDERAL DEPOSIT INSURANCE ) <br> CORPORATION, ) <br>   ) <br> Defendant. ) <br>   ) | Case Number 1: 05CV02325 <br> Class Action <br><br><br> Statement of Undisputed Facts |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
ON LIABILITY**

By and through counsel, the Plaintiff-class submits this statement of material facts as to which there are no genuine issues for trial (on libaility), pursuant to Local Rule 7(h).

1. On October 25, 2004, Chief Operating Officer and Deputy to the Chairman Bovenzi, acting for the FDIC, approved the third version of the formal Reorganization of Division of Resolutions and Receiverships ("DRR") proposed by Director Glassman of that Division.

2. On October 26, 2004, COO Bovenzi sent a memorandum to all FDIC employees stating that buy outs would be offered to most employees in DRR, the

Division of Insurance Management, the Division of Administration, the Legal Division, and the Division of Finance (the divisions which would be likely to be subject to Reductions in Force in 2005 and 2006) included a cash payment equal to 50% (one-half) of total salary and the ability to combine the buyout with either regular or early retirement, and other incentives.

3.  As of 2004 and 2005, the highest rank and the highest paid positions below Director in DRR were the six Executive Manager (EM) positions.

4.  The memorandum approved by the FDIC excluded from the reorganization of DRR so that the FDIC did not designate any of those positions as "surplus." As a consequence, not one of the six employees holding those positions was harmed by the reorganization and downsizing of the DRR in 2004 and 2005.

5.  The next highest rank and highest paid positions in DRR as of Jan. 1, 2005 were the sixteen 16 Corporate Manager (CM-2 and CM-1) positions in DRR, and did not declare any of those positions as "surplus."

6.  The fifty-two Plaintiffs are former or current employees who were born on or before September 30, 1955 were on that date at least 50 years old. Each of them was a full time employee of the FDIC on January 1, 2005.

7.  The FDIC terminated the employment of each of them other than Plaintiff Haag, effective on or before September 3, 2005.

8.  Plaintiff Haag continued to be an employee of the Defendant in 2004 and

2005, but he was demoted from his prior Grade 13 level, with supervisory responsibilities, to a Grade 12 financial institutions examiner without supervisory responsibilities.

9. On Jan. 1, 2005, the Defendant FDIC employed 4,726 employees who had "Career Appointments," that is, appointments in Appointment Codes 1 &2.

10. Of the 4,726 employees in the Defendant who held "Career Appointments"as of Jan. 1, 2005, 2,847 were under the age of 50, and 1,879 were over that age.

11. During 2005, the FDIC hired 214 additional employees in 2005, of whom 201 were under the age of 50, and thirteen (13) were over the age of 50.

12. At least 56 of those new employees hired in 2005 were assigned to DRR and held the position of Financial Institution Specialists at grades. Those positions were not classified by the FDIC as Career positions.

13. On Jan. 1, 2005, the FDIC employed 4,726 career employees, that is those with Appointment Codes 1 or 2. Seberhagen Report at Table 12.

14. Of those career employees employed on Jan. 1, 2005, 2,847 were under the age of 50 and 1,879 were over that age. Accordingly, about 60% of the career employees of FDIC were under the age of 50, and about 40% were over the age of 50.

15. On Dec. 31, 2005, the Defendant employed 4,138 employees who held

Career appointments, of whom 2,629, or about 64%, were under the age of 50, and 1,686, or about 36% were over that age.

16. On Jan. 1, 2005, the Defendant FDIC employed 487 employees in DRR had such Career Appointments.

17. Of the 487 such career employees of the Defendant FDIC in DRR as of Jan. 1, 2005, 170 were under the age of 50, or about 35%, and 317 were 50 or older, or about 65%.

18. In 2005, FDIC terminated the employment of 178 Career employees in DRR for RIF related separation codes, that is 392, 393, 394, 312, 317, and 356.

19. In 2005, of the 178 career employees whose employment was terminated for RIF related reasons, 46 or 26% were under the age of 50, and 185, or about 74% were over the age of 50.

20. In 2005, the FDIC terminated the employment of 132 employees in DRR who were age 50 or older, or about out of the 317 employees it had in DRR on Jan. 1, 2005, or about 42%, but terminated only 46 out of 170 younger employees in DRR, that is, those under 50, or about 28%.

21. The disparity between the older and younger employees as defined about amounts to more than three standard deviations, and therefore represents less than one chance in 100, or less than 1% chance of occurring by chance. Seberhagen Report at   And Table 10

22.   On Dec. 31, 2005, the Defendant FDIC employed 309 employees in DRR who held Career Appointments, of whom 124 were under the age of 50, or 40%, and 185 were 50 or older, or 60%..

23.   Of the 178 Career employees in DRR so terminated in 2005, 132 were over the age of 50, and 46 were under the age of 50.

24.   Of the 588 RIF related separations of career employees by FDIC, in 2005, 370 of those Career employees were over the age of 50, and 266 were under that age.

25.   Of the 178 RIF related separations of career employee in DRR by FDIC in 2005, 132 were over the age of 50, and 55 were not.

26.   A commissioned examiner of the FDIC is an employee designated to conduct examinations or inspections of Banks and other financial institutions on behalf of the Defendant FDIC.  The Comptroller of the Currency also employs bank examiners

26.   The Corporate Employee Program contemplates education and training and experience for a period of four years for new employees to complete and obtain a commission as an examiner. GAO Report of Feb. 14, 2006 at page 29.

27.   The Corporate Employee Program did not begin to train recently hired employees at any time before March, 2005.

28.   The Defendant engaged in extensive recruiting efforts at colleges and

universities after September 2, 2005 for candidates for employment and training as new employees in the Corporate Employee Program.

29. An employee of the FDIC or other financial regulatory Federal agencies cannot certify a financial institutions's examination report until after that employee has received c commission.

30. Director Glassman sent an e-mail to all DRR employees on Oct. 25, 2005, stating that "DRR employees will have the opportunity to apply for crossover opportunities at both grade 12 and grade 5/7/9 levels with the Division of Supervision and Consumer Protection.

31. Of the 503 permanent employees of the FDIC in DRR 73 transferred (crossed-over") to another Division

32. In March of 2005, the FDIC accepted applications for a crossover program for employees in DRR. to apply for in-service training in DOS

33. In 2005, 76 employees of Defendant in DRR, including Plaintiff Greg Haag, transferred from DRR to another Division or office of Defendant.

34. Of those 76 employees, 46, including Plaintiff Gregg Haag, were age 50 or above, when they transferred to the Division of Supervision, or to another Division or office of the Defendant.

35. In light of the fact that DSC was only accepting bids for Grade 12

positions and below,, at least 20 of the members of the class who transfer to DSC accepted a lower grade, that is a demotion. For example, Plaintiff Greg Haag, who was a Grade 13, bid for and accepted a grade 12 position.

36. Although the demotions by the Defendant of the 20 members of the class, did not result in an immediate reduction in pay, such a demotion reduces the responsibilities of the employee.

37. In addition, such a demotion results in lower future income for Haag and the other members of the class, by freezing [sometimes called "red circling" ]the annual base salary of the employee unless and until cost of living increases granted to Federal employees raise the salary or the lower grade to the amount of the salary which the employee was receiving when demoted to the lower grade.

38. In addition to 50 plaintiffs whose employment was terminated on or before Sept. 3, 2005, above, Plaintiff Bruce Brown was the 52d plaintiff to join this case. He was born on Jan. 26, 1951 so he attained age 54 on that date. In the Spring of 2005 had 21 years of experience, and was a E-2 Executive of the Defendant in the DRR.

39. Plaintiff Bruce Brown at that time held the position of Executive Director of DRR, and was in Grade E-2. He had served as an Executive in DRR both in the field and in Washington.

40. As of April 12, 2005, Plaintiff Bruce Brown he was assigned to the

"Virtual Bank Pilot" team and was a team leader. Pursuant to the directives of higher officials of the Defendant, that team was to develop and complete a training module to simulate the environment of an insured financial institution to allow employees in training to gain and practice skills needed for institutional examination and liquidation. [See, Mamo to COO Bovenzi from David C. Cooke, Chief Learning Officer, Corporate University, dated April 12, 2005].

41.     Mr. Brown's "knowledge...his excellent management skills and his ability to work with DRR staff in both Washington and Dallas" were "a tremendous asset in moving the have been the VB project forward." *Id.* pg. 1.

42. "Mr. Brown's assistance in completing the [VB] project is essential." *Id.* page two.

43.     For those reasons, and because "Mr. Brown's time and expenses" were to be "charged to CU, COO Bovenzi approved the request of Corporate U. to extend his time to remain employed. by the Agency. *Id.*

44.     Plaintiff Bruce Brown's employment with the FDIC ended April 1, 2006.

45.     The FDIC used a buy outs combined with the announcement of a Reduction in Force, sometimes referred to as a "carrot and stick" method reducing the size of its work force at least from 1995 through 2003.

46.     During his tenure as the Chairman and Chief Operating officer of the

FDIC, Chairman Donald Powell repeatedly advised groups of its employees that "We need to hire younger folks because they have the innovative ideas" or words to that effect.

                                                   David L. Rose
                                                   Joshua N. Rose
                                                   Dotie Joseph
                                                   ROSE & ROSE, P.C.
                                                   1320 19th Street, NW, Suite 601
                                                   Washington, D.C. 20036
                                                   (202) 331-8555
                                                   (202) 331-0996 fax

Dated: February 25, 2008                          Attorneys for Plaintiffs