# EXHIBIT 27-1

**(Reply Report of P. R. Jeanneret)**

United States District Court

District of Columbia

Reply Report in the Matter of

Barbara Aliotta, et al.

vs.

Sheila C. Bair, Chairman of the Federal Deposit Insurance
Corporation

CIV – 05 – 2325 (RMU)

Submitted by:

P.R. Jeanneret, Ph.D.

February 21, 2008

## INTRODUCTION

I have been retained by the Federal Deposit Insurance Corporation (FDIC) to provide a rebuttal report to initial, interim, and final reports (including various sets of tables describing counts of FDIC / DRR employees and adverse impact calculations) prepared by Lance Seberhagen, Ph.D.  Dr. Seberhagen has been retained by Mr. David Rose who is representing Plaintiffs in the matter of Barbara Aliotta, et al. vs. Sheila C. Bair, Chairman of the FDIC.  Incorporated by reference in this report are the entire contents of my initial report, as revised, dated August 15, 2007.[1]

In response to my report, Dr.Serberhagen prepared several documents as follows:

- Rebuttal to Dr. Jeanneret's Report and Adverse Impact Analysis; October 15, 2007
- Table labeled "Analysis of Jeanneret Data" – undated
- Tables 1 and 2 prepared by Lance Seberhagen; November 29, 2007
- Tables 1 and 2 prepared by Lance Seberhagen; December 17, 2007
- Rebuttal to Dr. Jeanneret's Report and Adverse Impact Analysis, Interim Report; January 15, 2008
- Rebuttal to Dr. Jeanneret's Report and Adverse Impact Analysis dated January 28, 2008

I have also relied upon Dr.Serberhagen's deposition testimony of January 16, 2008 and the Declaration of Lester Bodian, Ph.D. who is employed by the FDIC.

---

[1] I will not repeat the contents of my first report, but I do affirm that none of my findings, opinions or conclusions reached in that report have changed.

**REPLY TO DR. SEBERHAGEN'S DOCUMENTS AND TESTIMONY**

**<u>Initial Comments</u>**

From the outset, the nature of the interchange between experts has been confounded from my perspective. It is my understanding (and experience as well) that in cases of this nature, plaintiff's expert presents a report describing the basis for an opinion (or conclusion) that defendant has implemented a specific procedure or practice that has led to a differential rate of selection between a protected and non-protected group. Further, that expert typically presents a statistical analysis that is intended to support the alleged finding of adverse impact. In turn, defendant's expert would offer explanations as to why the organization's procedures were not of a discriminatory nature (and perhaps that they were job-related depending upon what procedure was criticized by plaintiff's expert), and why plaintiff's adverse impact analysis was incorrect.

Such an interchange has not taken place in this instance. Rather, acting in the capacity of the FDIC's expert, I filed a report in a timely manner that was focused on three primary topics: the history of the FDIC and its employment needs (including the need for several RIF's over the years); the average age of FDIC employees across time (2000 to 2005); and the nature of the initiatives followed to accomplish the 2005 downsizing in the Division of Resolutions and Receiverships (DRR). In my August 15, 2007 report I could not rebut any of Plaintiffs' assumptions or calculations related to adverse impact, because such analyses had not been completed, or at least had not been presented to the FDIC. Furthermore, I could not reply to any criticisms of the DRR downsizing because, none had been presented by Plaintiffs' expert (Dr. Seberhagen).

In summary, it seems to me that the expert reporting process in this matter has proceeded in reverse order. Hence, I find that I am now replying to Dr. Seberhagen's criticisms of my initial report, as well as his calculations of adverse impact. To keep some sense of order to my report, I will begin by replying to Dr. Seberhagen's criticisms that appear in any or all of his reports dated October 15, 2007, January 15, 2008, and January 28, 2008. Then I will discuss Dr. Seberhagen's adverse impact analyses. Finally, I will present my analyses which correctly identify individuals terminated by the RIF.

**Reply to Dr. Seberhagen's Critique of Dr. Jeanneret's Report**

Dr. Seberhagen acknowledges that I reviewed various documents and descriptive statistics, and interviewed four individuals whose relevance was not defined according to Dr. Seberhagen (see his January 15, 2008 report). In my report I identified the individuals as subject matter experts (SMEs) with knowledge of the reduction in staffing levels of DRR during the 2004 – 2005 timeframe. I made specific mention of my interviews with Director Glassman (Jeanneret report page 23), Mr. Seegers (Jeanneret report page 28), and the SMEs (Jeanneret report page 25). I also provided deposition testimony regarding my interviews with Ms. DeRousse and Mr. Seegers (Jeanneret deposition pages 8-11). Hence, I believe the relevance of the SME interviews is quite clear and how I used the interview information is discussed in both my report and deposition.

Dr. Seberhagen also expressed concern that I did not adequately describe or evaluate the method used to reduce the DRR workforce.[2] With respect to the downsizing initiative, my report devoted 5 pages to the overall process (Jeanneret report pages 22-26). With respect to the DRR reduction-in-force effort, it was described in my report on pages 25 and 26. My evaluation led to the conclusion that there was no evidence that this program supported or caused age discrimination, and that the DRR downsizing initiative was implemented using several management practices which were not designed to, (and did not) discriminate against employees age 50 or older.

Dr. Seberhagen also criticized the fact that I did not analyze "the ratings to see if they had an adverse impact on the basis of age…" (Seberhagen 10/15/07 and 1/15/08 reports, page 2).[2] He does not indicate what "ratings" are "these ratings". The only "ratings" associated with the FDIC's RIF policy are managed by the Agency's human resource staff (Jeanneret report page 25). It is my understanding that only if an employee had an unsatisfactory performance rating would it have any influence on the person's likelihood of being terminated by the RIF. According to SMEs, virtually all DRR employees had the same satisfactory performance rating; therefore, these ratings had absolutely no influence on any RIF outcomes. Accordingly, there was no basis to study the reliability or validity of the performance ratings.

---

[2]This criticism seems to have abated in Dr. Seberhagen's January 28, 2008 report.

Dr. Seberhagen's primary criticism of my report is that I failed to conduct an adverse impact analysis. As indicated previously, the usual chain of events is for plaintiff to submit an adverse impact analysis to support a claim of discrimination. I never considered it my responsibility to conduct an adverse impact analysis and plaintiffs certainly did not offer such analysis for my review and possible critique at the time I prepared my report. Accordingly, I find Dr. Seberhagen's criticism to be unfair and one without procedural support.

As my August report clearly documents, the DRR workforce declined in size from 477 employees (average age 49.84) on 12/31/2000 to 235 employees (average age 52.10) on 12/31/2005, a decrease of 50 percent. If DRR was targeting older employees with the level of staff reduction that occurred, one would expect the average age to decline (i.e. go below 49.84), not increase.

Even more telling is the percent of employees found in the under age 50, and the 50 and older categories across the years 2000 to 2005 (Jeanneret report Table 5). The percentage of 50 and older employees grew from 48.4 in 2000 to 61.3 in 2005. A graphic display of this dramatic growth in the age 50 and over category is presented in Exhibit 1. Mathematically, such a change in the percentage of 50 and older employees would be virtually impossible to achieve if the DRR downsizing effort was targeted toward this "older" category of employees.

Since the ADEA does not offer any specific guidance on what type of analysis can be used to evaluate the impact of an employment process, I believe my average age and percentage over age 50 analyses are particularly appropriate in this matter. However, in order to respond to Dr. Seberhagen's concern that I had not performed an adverse impact analysis, I will do so in a subsequent section of this report.

Dr. Seberhagen also stated that I did not define the sample of employees precisely enough to permit a replication of my analyses. I disagree. Dr. Seberhagen had the same database that was used to calculate the average ages, and the percentages of "younger" and "older" employees that were used in my report. The employee group is clearly labeled: "Total number of DRR permanent employees"; and the dates of the calculations were specified (i.e. 12/31/2000; 12/31/2005) in my report (Exhibits 4 through 6). For verification purposes, the actual numbers of employees were given for each calculation reported in my Exhibits. During his deposition Dr. Seberhagen was asked if he did, in fact, have sufficient information

to replicate my analysis; he confirmed that he did, and that he also could gather the 2004 data which was provided to Plaintiffs' counsel (Seberhagen deposition page 84).

In his most recent report, Dr. Seberhagen adds to his criticism that I did not analyze the ages of employees that left DRR.  This assertion is not true.  As stated on page 15 of my report, I calculated the average age of separated DRR employees to be 48.28 years.  If one examines the percentage of employees separated as a direct function of the RIF (N=63) by age category, 57 percent of the total were under the age of 50 and 43 percent were age 50 or older.  It is interesting to contrast this distribution with the initial DRR workforce of 503 employees.  In that group 64 percent were over the age of 50.  Thus, a much smaller proportion of "older" employees experienced RIF-related separations compared to the representation of "older" individuals in the base workforce (N=503).

Dr. Seberhagen also states that I defined the 2005 RIF as an event "limited" to DRR.  Actually, if one compares the data in Dr. Seberhagen's Tables 17 and 23, one will find that all RIF actions (codes 304, 312, and 356) were, in fact, limited to DRR, and the database indicates that the reductions took place from July 9, 2005 through September 3, 2005.

As an additional comment, I note that very frequently in both his reports and deposition Dr. Seberhagen stated that the assumptions he made when performing his analyses were directed by Mr. Rose (Plaintiffs' counsel).  To the contrary, the FDIC's attorneys did not direct any of the assumptions underlying my analyses.

Finally, Dr. Seberhagen's report of January 15, 2008 was critical of the fact that I did not calculate a test of statistical significance of the observed differences I found in the average ages.  Exhibit 6 of my August report presents a good example.  In this Exhibit, the average ages of all permanent DRR employees were calculated pre (51.96 years) and post (51.81 years) the RIF.  As Dr. Seberhagen admitted in his deposition, given the reported sample sizes and average ages it is probably unlikely that there is a statistically significant difference in the two values (Seberhagen deposition pages 85-86).  I agree and believe a statistical test of significance is not necessary.  Nevertheless, in response to Dr. Seberhagen's criticism I have conducted a significance test and found it to be non-significant ($z = 0.267$).[3]

---

[3] A z value of 2.0 to 3.0 standard deviations would be necessary to achieve statistical significance.

**Statistics and Adverse Impact Analysis in Age Discrimination Matters**

Any adverse impact analysis should properly model the employment process being studied. Further, any assumptions that are being made should be clarified, and the consequences understood if the adverse impact analysis is being used by an expert to draw a conclusion. In this section of my report I will identify a number of problems with Dr. Seberhagen's adverse impact analysis, and indicate why it is not appropriate to conclude from his analysis that there was adverse discriminatory impact for DRR employees age 50 and older.

Before directly addressing Dr. Seberhagen's work, I will briefly discuss the issue of applying statistics to age discrimination issues, especially if the matter is alleging adverse impact against a particular age group. Because age is a continuous variable (unlike gender or race which are categorical), the statistical comparisons may be unreliable. For example, an age 40 over / under analysis may unfairly benefit a 41 year old if the "real" age discrimination is focused on the 60 and older employees. Additionally, there is no clear guidance on how age categories should be formed. Should the "older" groups be categorized in intervals (i.e. 40-45, 46-50 etc.), and how do we know that people 50 to 55 are treated the same as those 45 to 49 or 56 to 60? Some argue that individual age comparisons are the only correct form of statistical analysis (see, for example Finkelstein and Levin (1994), Kutner (2004), and Zellner (1993) as cited by Paetzold and Willborn (2006) *The Statistics of Discrimination*, Thomson West).

Apart from the fact that Plaintiffs are age 50 or older in the current matter, Dr. Seberhagen has not presented any justification for using the age break of 50 years. Further, and perhaps most important to a statistical analysis, Dr. Seberhagen offers no reason for using any age breaks and can not independently justify the use of age 50. As stated by Paetzold and Willborn (2006), the *post hoc* selection of any age break point "may well invalidate the usual test of statistical significance" (page 7-8; also see page 7-33). Paetzold and Willborn (2006) further state:

> "In the absence of constraints on the types of grouping variable,
> the problems discussed earlier in the context of age-break
> analysis in disparate-treatment cases arise again here [i.e. in
> disparate-impact cases] including the problem of manipulating

6

age groupings to produce a desired result and the possibility of conflicting and paradoxical results with various age-grouping configurations. The courts have not yet addressed the important issue of constraints on age grouping in disparate impact cases" (page 7-33).

This statement was published in 2006 and I believe continues to remain true. In particular, with respect to this litigation, a person with a birth date of September 29, 1955 may be categorized as "over 50" if the demarcation date is September 30, 1955; however the person with a birth date of October 1, 1955 is considered "younger". One person is treated as a "positive" while the other is treated as a "negative", even though their age difference is only a couple of days.

A final note on the statistical analyses performed by Dr. Seberhagen. While he did not directly say so in his report, any statistical analysis performed in the manner as presented in his report is testing a hypothesis. In this instance, when considering the differences between two percentages for example, we were interested in whether the difference is real or a matter of chance variation. The hypothesis to be tested is known as the null hypothesis – it is a statement of no difference. Therefore, the general hypothesis to be tested is that there is no difference between the percentages of "younger" versus the percentage of "older" employees who were considered "departures" from the FDIC. If the null hypothesis is rejected, then Dr. Seberhagen concludes with some probability level (usually .05) that the difference between the "percentages" is not due to chance. If there were no discriminatory influences on departures, Dr. Seberhagen is still likely to find a difference in the percentages of "older" versus "younger" employees in the departure category. Older employees retire; younger ones do not. Thus, natural, non-discriminatory career progression and retirement would lead to Dr. Seberhagen's conclusion, and nothing more.

### Statistical Significance

For purposes of understanding the statistical issues in this matter I also believe it is important to discuss the matter of "statistical significance". The term "statistical significance" refers to the degree of deviation between actual and expected results that must occur before a statistician or social scientist would be willing to say that the actual and expected results are so different that they are unlikely to have occurred by chance. The degree of deviation required for such an inference is based on accepted conventions in statistics and social science. It is often measured in terms of a "standard deviation," an index of variability. Until

differences exceed two or three standard deviations, they are not considered statistically significant; i.e., they must be attributed to chance. In other words, when differences are not statistically significant, a social scientist cannot conclude that they are attributable to any operating factor or variable. Even when statistical significance is found, that alone will not permit a social scientist to attribute a cause to the difference, because correlation does not establish causation. Rather, the social scientist would conclude that the difference was not attributable to chance and, therefore, was potentially due to some variable that influenced the observed outcome.

Two examples in my report are illustrative. When I calculated the average ages of the DRR workforce before and after the RIF, I would ordinarily have performed a statistical test to see whether the difference was significant. I did not do so in this case because the averages were so close that I could tell from experience that the difference would not be statistically significant. Dr. Seberhagen criticized my initial report in that regard, and so I performed the appropriate statistical analysis and determined that the differences were separated by 0.267 standard deviations. Since this value is far short of the "two or three" standard deviations that are required for statistical significance, the only statistically permissible conclusion is that they are operationally the same; that is, that there was no meaningful decrease in average age incident to the RIF.

In contrast, I also did an analysis presented in this report (see Tables 4 and 5 on page 20 and 21 herein) comparing the average age of employees actually terminated during the RIF with the population from which they were drawn. Here there was a difference in favor of older employees, but as opposed to the situation described immediately above, I could not tell by inspection (that is, without a calculation) whether the difference would be statistically significant. Therefore, I performed the appropriate statistical test of the difference between two means, and the result was that the averages differed by 2.365 standard deviations. This is a significant (though borderline) difference, since it exceeds the "two" but not the "three" standard deviation threshold. I cannot, as discussed above, attribute a cause to this difference; I can only note that it exists and that it favors older employees.

### Dr. Seberhagen's Method and Reply to His Statistical Analyses

The Method section of Dr. Seberhagen's report sets forth the manner in which he coded and analyzed the FDIC database for potential adverse impact. While he provided definitions for the various employee groupings he created (i.e. age at 12/31/2005, in his January 15, 2008

report and age at September 30, 2005, in his January 28, 2005 report), he did not document the assumptions he was making when categorizing the DRR employees.  For example, for his last report he calculated the age of all DRR employees with birthdays between 1/1/05 and 9/30/05 as if they had the same birth date at the time they took some employment action (e.g. retired). It is noted that 32 DRR employees were born in 1955, and they may or may not have been age 50 or older when some personnel action took place.  The placement of this many employees into one age category verses another category alone could be sufficient to change the significance of a statistical adverse impact analysis from non-significant to significant, or vice versa.  More importantly, when he used 12/31/05, it was a date well beyond the effective date associated with the RIF, apart from the fact that Dr. Seberhagen incorrectly stated that "the RIF occurred during the entire year of 2005" (1/15/08 report #4, page 3). I note that he subsequently said in the same report that the RIF date was September 3, 2005 (1/15/08 report #6, page 3).

As indicated in the data file relied upon by Dr. Seberhagen (the PERHIS 2005 spread sheet, Seberhagen deposition, page 27), the last effective date for any RIF action was 9/3/2005. Moreover, effective dates for personnel actions began as early as 1/22/2005. Dr. Seberhagen did admit in his deposition that if a date selected to determine age was farther away from the relevant date it might affect the interpretation of the data (deposition, page 18).

Dr. Seberhagen stated that there was no personnel action code for RIF (although he knew the RIF effective date was 9/3/05 – see 1/15/08 report #6 page 3, and page 40 of his deposition), and he therefore identified a set of codes that he believed included DRR employees who were directly affected by the RIF.  The PERHIS system does not precisely use the term RIF; code 356 is labeled "Term – Involuntary".  If one would check the Operating Manual of the US Office of Personnel Management (OPM), the Guide to Personnel Data Standards indicates that code 356 is defined as "Separation – RIF".  However, Dr. Seberhagen decided to also include with the group of Term-involuntary (code 356) employees those who took the following action:  Retirement-voluntary (code 302); Retirement-special option (code 303); and Resignation (code 317).  In other words, for purposes of his statistical analyses, Dr. Seberhagen is assuming that DRR employees who voluntarily retired (an employee decision) are similarly situated to employees who were involuntarily terminated (an employer decision).  Dr. Seberhagen confirmed this assumption in his deposition (pages 37, 42, 47).  Under the circumstances of his analyses, the various

subgroups of employees are treated equivalently; thus, he assumes they were all equally qualified for whatever positions might be available; that is, they were fungible.

Even though he makes the "equality" assumption, Dr. Seberhagen acknowledges that, "Probably not every separation is that (*sic*) I'm calling a RIF-related separation. Some of the separations might have occurred even if there was no RIF." (deposition page 36). Thus, for example, he has counted employees over age 70 who voluntarily retired in 2005 as RIF-related separations. In fact, Dr. Seberhagen is assuming that no one, on their own volition, would retire from DRR from November 2004 when the RIF was announced until December 31, 2005 when Dr. Seberhagen says the RIF ended. In essence, using Dr. Seberhagen's coding assumptions an employee who was 65 and decided to retire from the FDIC during 2005 was discriminating against himself or laying the foundation for an ADEA claim against the Agency. Dr. Seberhagen identifies this lumping together of codes as a "reasonable approximation" (deposition, page 36). When he applies his coding and analytical method to the entire FDIC (Seberhagen January 28, 2008 report Tables 9, 13 and 14), a similar assumption is required.

As previously mentioned, Dr. Seberhagen also has failed to identify any specific employment-related process engaged in by DRR or the FDIC that would result in any adverse impact during the DRR downsizing. Simply organizing numbers in an unreasonable manner is not sufficient to reach a conclusion that DRR's downsizing actions are indicative of discriminatory adverse impact. What Dr. Seberhagen was really studying was the outcome of a complex set of processes. Without attempting to segregate key variables for analysis, it is my opinion that there are no valid conclusions to be drawn from Dr. Seberhagen's work.

Indeed, we know why Dr. Seberhagen was able to achieve what he calls discriminatory adverse impact. This was done mostly by combining the outcomes of different employee and employer decisions made under different circumstances. A substantial proportion of what Dr. Seberhagen labels as "RIF-related separations" are employee resignations or retirements that Dr. Seberhagen and I would likely agree are voluntary. A smaller, but still significant proportion of the departures are events that Dr. Seberhagen and I would agree are involuntary; and no doubt, there is a third subset of departures about which Dr. Seberhagen

and I might engage in a professional debate as to their actual circumstances.[4]   The point here is that a researcher cannot lump all these outcomes together and assess only the bottom line result.   In the parlance of experimental design, this is called confounding of variables.   Moreover, it is possible that employees over the age of 50 left DRR more frequently than employees under 50.   But one would find this to be true in any large workforce in the absence of discrimination.[5]   Presumably, one might expect this effect to be even more marked where an organization offered incentives like early retirement and buyouts.[6]   Thus, Dr. Seberhagen's analysis yields no reliable inferences about the process he was purporting to study.

When Dr. Seberhagen identified the codes that he did not believe were RIF-related, he listed codes that did not even appear in the database (e.g. 300- Retirement-mandatory; 250-Death; 385-Term during probation).   He also cited a couple of very infrequent codes (e.g. 301-Retirement disability (2 employees); and 330-Removal (1 employee)).   I would argue that just as retiring because of a disability is a personal decision, it is likely that other DRR employees decided to retire or take a buyout for similar and equally personal reasons (e.g. health of a spouse; relocate near family, etc.).   Of course, these are reasons that are most likely to influence decisions of individuals who are older (i.e. over age 50).

Dr. Seberhagen stated that "RIF-related" separations did not occur on one or two specific dates, but were likely to occur through out the year (1/15/08 report #8, page 4).   Actually, the actions did take place for the most part on two dates:   About 75 percent of what Dr. Seberhagen calls "RIF-related" separations occurred on May 14, 2005 or September 3, 2005. The balance took place for the most part in the Spring, before May 14, 2005.

---

[4] I consider DRR employee-generated decisions to be a matter of choice, and the fact that circumstances (i.e., the knowledge that DRR must reduce its workforce) may influence the decisions does not alter my opinion.   Based upon his deposition, I infer that Dr. Seberhagen either does not agree with this or, as he testified, was instructed by counsel to assume otherwise.

[5] Indeed, this phenomenon is reflected in much of Dr. Seberhagen's own data, where we see that in a number of the units of the FDIC where there was no impending RIF, the departure rate for age 50 and over employees was much greater than that of employees under 50.

[6] This is because most, if not all, employees eligible for early retirement would be in their 50s, and employees in the best position to voluntarily take advantage of a buyout incentive would be those nearing retirement or eligible for early retirement.

## JEANNERET ANALYSES

Because of the problems associated with the statistical analyses of age data, I have elected to rely more on descriptive indices (e.g. average age; percentages) to document the outcomes of the workforce reduction that took place at DRR in 2005.  In particular, it is my opinion that the examination of average age over time is actually a more stable indicator of the events, especially if one recognizes that the only way for an organization's average age to remain reasonably constant (or increase), is for employees as they get older to remain on board, especially during downsizing.  As noted in my original report, the average age of DRR employees did not change from 52.10 years on December 31, 2004 to December 31, 2005. This finding is in the opposite direction to what one would expect if there was age discrimination taking place during 2005.  That is, one would clearly expect the average age to decline.  I also previously reported that the percentage of age 50 and older DRR employees on December 31, 2004 was 59% and that value actually increased to 61% on December 31, 2005.  While this difference is not statistically significant, it is in the exact opposite direction of what would be expected under a practice of age discrimination against individuals age 50 and older.  Finally, in my first report I noted that the average age of DRR employees at the beginning of the RIF process (November 1, 2004) was 51.96 and at the end of the process (September 17, 2005) was 51.81.  There is no statistically significant difference in these averages ($z = 0.267$), but if age discrimination had taken place one would expect the average age to significantly decline by the end of the RIF process.

### DRR Workforce Separations and Age

In Table 1 of this reply report (p. 18), I document exactly what happened to the DRR work force from January 1, 2005 to December 31, 2005 as the downsizing took place. There were several categories of retirement (disability, voluntary, etc.) and the individuals deciding to retire were usually over the age of 50, no doubt because they typically had to reach that age in order to be eligible for retirement benefits.  Thus, the fact that the average age of the voluntary retirement group was 62.7 years is not at all surprising.

12

Perhaps the most important finding is that the average age of those who were separated by the RIF (code 356) was 46.85 years, and 62 percent of those RIF'd were under the age of 50. This is the exact opposite of the age categorization of the initial 503 employees, whereby about 41 percent were under age 50. Such a distribution of age for those who were terminated under the RIF (codes 304, 312, and 356) is not indicative of systemic age discrimination as alleged by Plaintiffs.

As I have stated previously, any statistical analysis should properly model the event it is attempting to analyze. Consider for this discussion the fact that there was a RIF in DRR, then regardless of what codes are labeled as "RIF-related" the staffing changes occurring within DRR had a defined history. One critical point is the actual size of the workforce. As stated in my August report, DRR management had a clear plan to decrease the size of the workforce from about 500 positions at the end of 2004 to about 235 positions in September, 2005. Dr. Seberhagen's analysis of DRR does not properly study the staffing of DRR. While 233 positions actually remained in September, 2005 after all the workforce changes, he incorrectly reports the DRR staffing to be 310 employees on 12/31/2005.

Another issue critical to the development of a correct model to guide any statistical analysis, is the proper accumulation of data across categories, if such an accumulation is even justified. In this matter, Nature of Action (NOA) codes were assigned to the employees included in the PERHIS data files provided to Plaintiffs. These codes identify individuals who were involuntarily terminated, who retired, who accepted a buyout, who resigned, etc. Furthermore, the date on which the event took place is recorded in the file. When it comes to actual RIF terminations (code 356), DRR needed to know what employees were on board and subject to potential RIF. For example, individuals who resigned (code 317) or retired (code 302) and did so before June, 2005 were not considered in the RIF process. Thus, when Dr. Seberhagen adds all these employees into one category he does not accurately model or evaluate the RIF termination process or the underlying decisions.

The actual RIF related separation activity is described in Table 2 of this reply report (p. 19), if we follow Dr. Seberhagen's method (i.e. use 503 as the base number of employees). Seven individuals age 50 and over retired in lieu of involuntary action (code 304); 3 individuals under age 50 resigned in lieu of involuntary action (code 312); 53 individuals (33 under age 50, and 20 age 50 and older) were separated by the RIF process (code 356). Thus, as reported in Table 2, a total of 63 DRR employees were RIF'd. While 64.2 percent of DRR employment

on January 1, 2005 was age 50 and older, only 42.9 percent of those RIF'd were age 50 and older.[7] The adverse impact analysis reported in Table 3 of this reply report (p. 19) indicates that individuals under age 50 were significantly impacted by the RIF process in DRR, the opposite of Plaintiffs' claim.

The 2005 RIF only occurred in DRR.  This is easily verified by comparing the total number (53 individuals) of involuntary terminations (code 356) reported in Dr. Seberhagen's Table 17 for permanent FDIC employees (codes 1, 2, 6 and 7) with the total number (53 individuals) reported in Seberhagen Table 23 for permanent employees in DRR.  No other FDIC division reports a value (i.e. one or more individuals) for involuntary termination (see Seberhagen Tables 18-22).  The same is true for retirements in lieu of involuntary action (code 304) and resignations in lieu of involuntary action (code 312).  There were 7 and 3 individuals respectively reported for these two codes for the entire FDIC (Seberhagen Table 17), and all occurred in DRR (Seberhagen Table 23).  However, for every other FDIC division for which Dr. Seberhagen reports separations for 2005, the data indicate that the percentage of departures is higher for those over age 50 (see Seberhagen Tables 18-22).

According to the data in Dr. Seberhagen's Table 17, 50 percent (354 of 713) of all FDIC separations in 2005 were for retirement purposes (codes 302, 303) and only 18 of the 354 retirees were under the age of 50.  No doubt most employees reach the age of 50 before they consider (or are eligible for) retirement.  On the other hand, 65 percent of those who resigned from the FDIC were under age 40.  If the FDIC was targeting older employees, why would not a larger proportion of older individuals be "forced" to resign?

According to the Declaration and accompanying Tables of Dr. Lester Bodian of the FDIC there were 312 permanent employees in DRR who were subject to the RIF.[8]  Table 4 of this reply report (p. 20) describes these employees by age category and reports their average ages.  As indicated, 56.1 percent of the DRR permanent employees subject to the RIF were over the age of 50; however, only 42.9 percent of those actually RIF'd were age 50 and over.  I conducted an adverse impact analysis of these data, and it is reported in Table 5 of this

---

[7] Age 50 and over was calculated using Dr. Seberhagen's age demarcation date of 9/30/05.

[8] These are the remaining employees subject to RIF after buyouts, retirements, and other voluntary actions.

reply report (p. 21). The results are statistically significant but show an adverse impact for those <u>under</u> the age of 50.

Dr. Seberhagen notes that while terminating some employees the FDIC was hiring others. He describes the hiring in Tables 14 and 15 of his last report.  I have made the following observations regarding these data:

a.   On January 1, 2005 the FDIC employed 5,195 people.  There were 713 departures for whatever reason and 214 hires during the year.  The net effect was a workforce reduction of 499 employees.  Of the 214 hires, only 20 were hired into career competitive (code 1) or excepted permanent (code 6) positions. The large majority were hired into excepted temporary (code 9) and excepted, limited (code 8) positions (see Seberhagen Table 14).

b.   As would be expected, the new employees were hired into lower salary grade assignments.  Only 53 individuals (25 percent of the new hires in 2005) were hired into a salary grade above CG-07 (Seberhagen Table 15).

c.   Dr. Seberhagen acknowledges in his first report (10/15/07) that the great majority of the FDIC's new hires were interns and trainees (see page 6).

d.   Table 16 of Dr. Seberhagen's January 28, 2008 report documents that only 4 of the FDIC new hires during 2005 were for positions in DRR.

The FDIC's reduction in force process is complex and laden with rules that limit discretion or discrimination opportunities to make unfair decisions with respect to who may or may not be terminated during a downsizing.  A RIF is governed by FDIC Circular 2100.4.  It includes two rounds of competition and provides "bump" and "retreat" rights to employees who might otherwise be terminated. Most importantly, the process favors employees with Agency seniority and job experience.   This translates to "older" employees and especially to individuals age 50 and older.

The RIF program also protects all employees subject to a reduction in workforce through the appeal process. Depending on the nature of the complaint and status of the employee, an appeal may be filed with the Merit Systems Protection Board (MSPB).  Allegations of age discrimination may be submitted as an MSPB appeal or as an individual EEO complaint.

15

**<u>Conclusion</u>**

In conclusion, from an organizational point of view it is very difficult to reconcile the data with a hypothesis of age discrimination.  The decision to conduct a RIF — and the decline in the population of DRR generally — is highly correlated with a concomitant decline in bank liquidations, receiverships and related functions which have been the focus of DRR over the years.  The procedures for the RIF itself were created by a different agency (the federal Office of Personnel Management), and under these procedures seniority with the FDIC was at least a plus factor or advantage for the employee.  The Agency set out to achieve as much of the downsizing as possible through employee choice rather than involuntary termination, and DRR was largely successful in doing so (63 involuntary terminations out of a total reduction of nearly 270 individuals).  The demographic results are inconsistent with any targeting of older employees.  Finally, the RIF'd population was statistically significantly younger than the population from which it was drawn.  Thus, it is impossible to reach the conclusion that the RIF targeted older employees (i.e. those age 50 and older).

# Exhibit 1

## Age Distribution by Year of DRR Permanent Employees (Years 2000 - 2005)



Source:  Jeanneret report dated 8/15/07, Exhibit 5

**Table I**

**Age Distribution and Average Age for the DRR Workforce as of 1/1/2005[a]**

| Age As of 9/30/2005 | Code 301 Retirement Disability | | Code 302 Retirement Voluntary | | Code 303 Retirement Spec. Option[b] | | Code 304 Retirement in Lieu of Invol. Action | | Code 312 Resignation in Lieu of Invol. Action | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % |
| Under Age 50 | 0 | 0 | 0 | 0 | 8 | 19.1 | 0 | 0 | 3 | 100 |
| Age 50 and Older | 2 | 100 | 71 | 100 | 34 | 80.9 | 7 | 100 | 0 | 0 |
| Total | 2 | 100 | 71 | 100 | 42 | 100 | 7 | 100 | 3 | 100 |
| Average Age | 56.5 | | 62.76 | | 53.07 | | 59.57 | | 38.33 | |

| Age As of 9/30/2005 | Transfer from DRR | | Code 317 Resignation | | Code 330 Removal | | Code 352 Termination – Appt. | | Code 356 Separation - RIF | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % |
| Under Age 50 | 31 | 42.5 | 7 | 58.3 | 0 | 0 | 4 | 66.7 | 33 | 62.3 |
| Age 50 and Older | 42 | 57.5 | 5 | 41.7 | 1 | 100 | 2 | 33.3 | 20 | 37.7 |
| Total | 73 | 100 | 12 | 100 | 1 | 100 | 6 | 100 | 53 | 100 |
| Average Age | 50.7 | | 43.75 | | 56.0 | | 46.17 | | 46.85 | |

[a] Does not include employees who remained in DRR after 9/30/05

[b] Early retirement

18

**Table 2**

**RIF Separations from DRR during 2005**

| Age as of 9/30/05 | Employment | | RIF Separations[a] | | Not RIF'd | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Under 50 | 180 | 35.8 | 36 | 57.1 | 144 | 32.7 |
| 50 and Older | 323 | 64.2 | 27 | 42.9 | 296 | 67.3 |
| Total | 503 | 100 | 63 | 100 | 440 | 100 |

**Table 3**

**Adverse Impact Analysis**

| Age as of 9/30/05 | Employment | RIF Separations[a] | | 125% Rule[b] | Std. Dev.[c] |
|---|---|---|---|---|---|
| | N | N | % | | |
| Under 50 | 180 | 36 | 20.0 | 0.42 | -3.63 |
| 50 and Older | 323 | 27 | 8.36 | | |
| Total | 503 | 63 | | | |

[a] Nature of Action codes 304, 312 and 356

[b] The rule of thumb comparable to the 80% rule when there are "negative selection decisions" (e.g. separation due to RIF).

[c] The standard deviation value is significant, but is negative indicating statistical significance with impact on those under 50 years of age.

19

**Table 4**

**Permanent DRR Employees**

**Subject to 2005 RIF**

| Age Category[a] | N | % | Average Age |
|---|---|---|---|
| Under 50 | 137 | 43.9 | 44.39 |
| 50 and Older | 175 | 56.1 | 55.32 |
| Total | 312 | 100 | 50.52 |

**Permanent DRR Employees**
**Actually RIF'd[b]**

| Age Category[a] | N | % | Average Age |
|---|---|---|---|
| Under 50 | 36 | 57.1 | 42.94 |
| 50 and Older | 27 | 42.9 | 54.41 |
| Total | 63 | 100 | 47.86 |

[a] Age as of 9/30/05

[b] Nature of Actions codes 304, 312 and 356

**Table 5**

**Adverse Impact Analysis for DRR**

| Age[a] | N | RIF'd[b] | Expected (N) | RIF'd Actual (%) | 125% Rule[c] | Std. Dev. | |
|---|---|---|---|---|---|---|---|
| Under 50 | 137 | 36 | 27.7 | 26.3 | .587 | -2.365 | |
| 50 and Older | 175 | 27 | 35.3 | 15.4 | | | |
| Total | 312 | 63 | | | | | |

---

[a] Age as of 9/30/05

[b] Nature of Actions codes 304, 312 and 356

[c] The rule of thumb comparable to the 80% rule when there are "negative selection decisions" (e.g. termination due to RIF).