**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
**BARBARA ALIOTTA, et al**                   )
)
    **Plaintiffs,**                              )
)
    **v.**                                      )     **Case No. 1:05-cv-02325-RMU**
)
**SHEILA C. BAIR,**                          )
**Chairman,**                                )
**Federal Deposit Insurance Corporation,**   )
)
    **Defendant.**                               )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT**
**OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR**
**PARTIAL SUMMARY JUDGMENT ON LIABILITY**

       Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 7(h), Defendant Shelia C. Bair, in her

official capacity as Chairman of the Federal Deposit Insurance Corporation ("FDIC"), hereby

respectfully submits the following responses to Plaintiffs' Statement of Undisputed Facts in

Support of its [sic] Motion for Summary Judgment on Liability.

**I.  Defendant's General Response to Plaintiffs' Statement of Undisputed Facts:**

       This Court's Local Rules provide, in pertinent part, that "[e]ach motion for summary

judgment shall be accompanied by a statement of material facts as to which the moving party

contends there is no genuine issue, _which shall include references to the parts of the record_

_relied on to support the statement_." LCvR 7(h) (emphasis added). Of the 47[1] statements of

undisputed fact submitted by Plaintiffs, only 7 statements (nos. 13, 21, 26, 40-43) are supported

_____

[1] Plaintiffs' Statement of Undisputed Facts ends at Statement No. 46, but there are two
statements numbered 26, which have been designated 26(1) and 26(2) herein.

by references to documents, and in 5 of those 7 statements (nos. 26, 40-43), the documents cited

have not been submitted as exhibits or otherwise made part of the summary judgment record.

Accordingly, in most instances in which Defendant disputes the "facts" asserted by Plaintiffs,

Plaintiffs' "facts" are not supported by any cited record evidence.

In addition, while the law is clear that "[t]he party seeking summary judgment bears the

burden of establishing that no genuine issue of material fact exists," *Mitchell v. DCX, Inc.*, 274

F. Supp.2d 33, 39 (D.D.C. 2003), many of the facts recited in Plaintiffs' Statement of Undisputed

Facts are not "material" to the dispositive issues in this case. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986) (only "facts that might affect the outcome of the suit under the

governing law" are material). Thus, even if those non-material facts are undisputed, they do not

entitle Plaintiffs to judgment. Conversely, although the Agency disputes a number of non-

material facts asserted by Plaintiffs, Defendant does not contend that there are any "material

facts" as to which there is a genuine issue necessary to be litigated. *See* LCvR 7(h).

## II. Defendant's Specific Responses to Plaintiffs' Statement of Undisputed Facts:[2]

**Plaintiffs' Statement No. 1**: On October 25, 2004, Chief Operating Officer and Deputy

to the Chairman Bovenzi, acting for the FDIC, approved the third version of the formal

Reorganization of Division of Resolutions and Receiverships ("DRR") proposed by

Director Glassman of that Division.

**Response No. 1:** Disputed in part. The proposed DRR reorganization plan dated October 25,

2004 (Ex. 5[3]) was approved by COO Bovenzi on November 16, 2004 (*see* Ex. 9). While DRR

---

[2] Each of Plaintiffs' statements of undisputed facts is repeated verbatim herein without alteration
for ease of reference.

[3] Except as otherwise indicated, all citations to exhibit numbers in Defendant's responses refer to
the exhibits previously filed in support of Defendant's Motion for Summary Judgment ("Agency
MSJ"). Additional exhibits filed with Defendant's Memorandum in Opposition to Plaintiffs'

Deputy Director Wigand testified that planning the details of the reorganization was an "iterative process" (Wigand Dep., Ex. 34 at 42), there is no record evidence that the October 25 submission to COO Bovenzi was the "third version" of the reorganization plan.

> **Plaintiffs' Statement No. 2:**  On October 26, 2004, COO Bovenzi sent a memorandum to all FDIC employees stating that buy outs would be offered to most employees in DRR, the Division of Insurance Management, the Division of Administration, the Legal Division, and the Division of Finance (the divisions which would be likely to be subject to Reductions in Force in 2005 and 2006) included a cash payment equal to 50% (one-half) of total salary and the ability to combine the buyout with either regular or early retirement, and other incentives.

**Response No. 2:**  Disputed in part.  While the 10/26/04 Bovenzi Memo (Ex. 6) stated that buyouts would be offered to most employees in DRR, DIRM (the Division of Information Resources Management, not the "Division of Insurance Management" as indicated), DOA, the Legal Division, and DOF, it also stated that a more limited buyout program would be extended to employees in DSC, DIR and all of the FDIC offices.  A total of 578 employees throughout all of the FDIC's divisions and offices elected to take the buyout.  *See* Crosser Decl. (Ex. 24) at ¶ 12.

> **Plaintiffs' Statement No. 3:**  As of 2004 and 2005, the highest rank and the highest paid positions below Director in DRR were the six Executive Manager (EM) positions.

**Response No. 3:**  Not disputed that in 2005, the highest rank and generally the highest paid positions in DRR were the six EM positions, which were the Director and two Deputy Directors

Motion for Partial Summary Judgment ("Agency Opposition") have been numbered consecutively from the last Agency MSJ exhibit, starting with no. 36.

in Washington, and a Deputy Director and two Assistant Directors in Dallas.  *See* Reorg. Memo

(Ex. 5), at Exhibit 3 (Dallas) and Exhibit 4 (Washington).

>    **Plaintiffs' Statement No. 4**:  The memorandum approved by the FDIC excluded from
>
>    the reorganization of DRR so that the FDIC did not designate any of those positions as
>
>    "surplus." As a consequence, not one of the six employees holding those positions was
>
>    harmed by the reorganization and downsizing of the DRR in 2004 and 2005.

**Response No. 4:**  Not disputed that none of the six EM positions were designated as "surplus,"

so the incumbents were not "harmed" by the reorganization and downsizing of DRR in 2004 and

2005, respectively.

>    **Plaintiffs' Statement No. 5:**  The next highest rank and highest paid positions in DRR as
>
>    of Jan. 1, 2005 were the sixteen 16 Corporate Manager (CM-2 and CM-1) positions in
>
>    DRR, and did not declare any of those positions as "surplus."

**Response No. 5:**  Not disputed that as of October 2004, the next highest rank and generally the

next highest paid positions in DRR were the CM-2 and CM-1 Corporate Manager positions.

Disputed that there were 16 CM-2 and CM-1 positions in DRR – there were 8 CM-2 and 8 CM-1

positions in Washington, and an additional 5 CM-2 and 36 CM-1 positions in Dallas.  *See* Reorg.

Memo (Ex. 5), at Exhibit 3 (Dallas) and Exhibit 4 (Washington).  Also disputed that none of

these were declared "surplus."  In the reorganization, 3 CM-2 positions in the Director's Office

(Washington) were eliminated, 3 CM-1 position in Franchise and Asset Marketing (Dallas) were

eliminated, 2 CM-2 and 5 CM-1 positions in Receivership Operations (Dallas) were eliminated,

and 2 CM-1 positions in Accounting Operations (Dallas) were eliminated. *See id.*

**Plaintiffs' Statement No. 6**:  The fifty-two Plaintiffs are former or current employees who were born on or before September 30, 1955 were on that date at least 50 years old. Each of them was a full time employee of the FDIC on January 1, 2005.

**Response No. 6**:  Disputed in part.  There are 51 named Plaintiffs in this case:  there were 19 named Plaintiffs in the original complaint filed on December 5, 2005; 30 more named Plaintiffs were added in the amended complaint filed on February 8, 2006; and 2 additional named Plaintiffs joined after the amended complaint was filed.  *See* Amended Complaint, ECF Document 4-1, at ¶ 1 ("Plaintiff BARBARA ALIOTTA and forty-eight other plaintiffs file this action . . . ."); Order entered 7/12/07 granting Consent Motion for Joinder of Bruce Brown as a plaintiff; Minute Order entered 8/14/07 granting Motion for Joinder of David L. Noffsinger as a plaintiff.  Not disputed that the 51 named Plaintiffs are former or current FDIC employees who were born on or before September 30, 1955, and therefore were each at least 50 years old no later than September 30, 2005.  Disputed that each of them was a full time employee on January 1, 2005 – for example, Plaintiff Peggy Henderson had taken the buyout and voluntarily retired from the FDIC prior to January 1, 2005.  *See* Ex. 8.

**Plaintiffs' Statement No. 7**:  The FDIC terminated the employment of each of them other than Plaintiff Haag, effective on or before September 3, 2005.

**Response No. 7**:  Disputed.  Fourteen (14) named Plaintiffs were involuntarily terminated on or before September 3, 2005 (Aliotta, Anderson, Avery, Bonner, Catapat, Elrod, Gray, Harootunian, Kebbeh, Keller, Lindsey, Moritz, Patterson and Wardell).  *See* Second Declaration of Lester Bodian ("2nd Bodian Decl."), attached as Exhibit 36 to Agency Opposition, at ¶ 13 and

Table A; Cross Reference - EMPAIDs[4] for Named Plaintiffs ("EMPAIDs X-Reference"),

attached as Exhibit 37 to Agency Opposition.  The remaining named Plaintiffs, other than

Plaintiff Haag (who transferred to DSC effective May 1, 2005) and Plaintiff Bruce Brown (who

retired with a buyout effective April 1, 2006), either voluntarily resigned or retired on or before

September 3, 2005.  *See* 2nd Bodian Decl. (Ex. 36) at Table A; EMPAIDs X-Reference.

> **Plaintiffs' Statement No. 8:**  Plaintiff Haag continued to be an employee of the
>
> Defendant in 2004 and 2005, but he was demoted from his prior Grade 13 level, with
>
> supervisory responsibilities, to a Grade 12 financial institutions examiner without
>
> supervisory responsibilities.

**Response No. 8:**  Disputed in part.  When he applied for the crossover program, Plaintiff Haag

was a grade 13 Resolutions & Receiverships Specialist in DRR who occupied a <u>non-supervisory</u>

position.  *See* Ex. 13, at ECF pp. 14-15[5] (description of Mr. Haag's position and job

responsibilities).  He voluntarily accepted a transfer to a grade 12 non-supervisory position as an

Associate Financial Institution Specialist in DSC effective May 1, 2005, with no reduction in his

$115,970 salary.  *See id*., at ECF pp. 33-34 (showing his DRR salary effective 1/9/05 and his

DSC salary effective 5/1/05, respectively).

---

[4] In the PERHIS (personnel history) data files produced to Plaintiffs and used by both parties and their experts as the source data for personnel information concerning FDIC employees, each FDIC employee was assigned a unique identifier ("EMPAID") for privacy reasons.  Exhibit 37 cross references and identifies the EMPAIDs for the named Plaintiffs.

[5] The header page numbers inserted by the ECF system are used for reference herein if an exhibit does not have numbered pages or if the original pagination would be ambiguous (*e.g.*, where multiple related documents have been filed as one exhibit).  Within Exhibit 8, Mr. Haag's crossover application form submitted on February 18, 2005 begins at "Page 14 of 72" of ECF Document 43-5.

**Plaintiffs' Statement No. 9**:  On Jan. 1, 2005, the Defendant FDIC employed 4,726 employees who had "Career Appointments," that is, appointments in Appointment Codes 1 &2.

**Response No. 9**:  Disputed as to the precise numbers.  On January 1, 2005, the FDIC employed 4,747 employees who had appointments under Appointment Codes 01 and 02.  2nd Bodian Decl. (Ex. 36) at ¶ 6.  In addition, on January 1, 2005, the FDIC employed 356 employees who had appointments under Appointment Codes 06 and 07, who were also permanent employees considered to have "career appointments."  *Id.*

**Plaintiffs' Statement No. 10**:  Of the 4,726 employees in the Defendant who held "Career Appointments" as of Jan. 1, 2005, 2,847 were under the age of 50, and 1,879 were over that age.

**Response No. 10**:  Disputed as to the precise numbers.  Of the 4,747 FDIC employees who were employed under Appointment Codes 01 and 02 on January 1, 2005, 1,745 were under the age of 50, and 3,002 were age 50 and older.  2nd Bodian Decl. (Ex. 36) at ¶ 6.  In addition, of the 356 FDIC employees who were employed under Appointment Codes 06 and 07 on January 1, 2005 (who were also permanent employees considered to have "career appointments"), 187 were under the age of 50, and 169 were age 50 and older.  *Id.*

**Plaintiffs' Statement No. 11**:  During 2005, the FDIC hired 214 additional employees in 2005, of whom 201 were under the age of 50, and thirteen (13) were over the age of 50.

**Response No. 11:**  Not disputed that during 2005, the FDIC hired an additional 214 employees (63 for permanent and 151 for non-permanent positions), of whom 201 were under age 50, and thirteen were age 50 and over.  *See* 2nd Bodian Decl. (Ex. 36) at ¶ 9.

**Plaintiffs' Statement No. 12:**  At least 56 of those new employees hired in 2005 were assigned to DRR and held the position of Financial Institution Specialists at grades. Those positions were not classified by the FDIC as Career positions.

**Response No. 12:**  Disputed.  Only four (non-permanent) employees were hired and assigned to DRR.  2nd Bodian Decl. (Ex. 36) at ¶ 10.  *See also* Seberhagen Rebuttal Report (Ex. 28-2), at Table 16 (showing only 4 new hires in DRR in 2005).

**Plaintiffs' Statement No. 13:**  On Jan. 1, 2005, the FDIC employed 4,726 career employees, that is those with Appointment Codes 1 or 2. Seberhagen Report at Table 12.

**Response No. 13:**  Disputed.  *See* Response No. 9 above.

**Plaintiffs' Statement No. 14:**  Of those career employees employed on Jan. 1, 2005, 2,847 were under the age of 50 and 1,879 were over that age. Accordingly, about 60% of the career employees of FDIC were under the age of 50, and about 40% were over the age of 50.

**Response No. 14:**  Disputed.  *See* Response No. 10 above.  The 1,745 employees under age 50 are about 37% of the 4,747 total (counting only Appt. codes 01 and 02), and the 3,002 age 50 and over are about 63% of this total.  The 187 employees under age 50 are about 53% of the 356 total (Appt. codes 06 and 07), and the 169 age 50 and over are about 47% of this total.

**Plaintiffs' Statement No. 15:**  On Dec. 31, 2005, the Defendant employed 4,138 employees who held Career appointments, of whom 2,629, or about 64%, were under the age of 50, and 1,686, or about 36% were over that age.

**Response No. 15:**  Disputed.  On December 31, 2005, the FDIC employed 4,167 employees who were employed under Appointment Codes 01 and 02, of whom 1,548, or about 37%, were under age 50, and 2,619, or about 63%, were age 50 or older.  2nd Bodian Decl. (Ex. 36) at ¶ 7.  In addition, on December  31, 2005, the FDIC employed 279 employees who were employed under Appointment Codes 06 and 07  (who were also permanent employees considered to have "career appointments"), of whom 179, or about 64%, were under the age of 50, and 100, or about 36%, were age 50 and older.  *Id.*

**Plaintiffs' Statement No. 16:**  On Jan. 1, 2005, the Defendant FDIC employed 487 employees in DRR had such Career Appointments.

**Response No. 16:**  Not disputed that on January 1, 2005, there were 487 DRR employees who had career appointments under Appointment Code 01 or 02.  *See* Table A attached to Bodian Decl. (Ex. 23).  In addition, there were 16 DRR employees who were employed under Appointment Codes 06 and 07 on January 1, 2005, who are also permanent employees considered to have "career appointments."  *See id.*

**Plaintiffs' Statement No. 17:**  Of the 487 such career employees of the Defendant FDIC in DRR as of Jan. 1, 2005, 170 were under the age of 50, or about 35%, and 317 were 50 or older, or about 65%.

**Response No. 17:**  Disputed.  Of the 487 DRR employees who were employed under Appointment Codes 01 and 02 as of January 1, 2005, 196, or 40%, were under the age of 50 (*i.e.*, their dates of birth were after 1/1/55), and 291, or 60%, were age 50 and older on January 1, 2005 (*i.e.*, their dates of birth were 1/1/55 or earlier).  *See* Table A attached to Bodian Decl. (Ex. 23).  In addition, of the 16 DRR employees who were employed under Appointment Codes 06 and 07 as of January 1, 2005 (who are also permanent employees considered to have "career appointments"), 10 were under the age of 50 (*i.e.*, their dates of birth were after 1/1/55), and 6 were age 50 and older (*i.e.*, their dates of birth were 1/1/55 or earlier).  *See id.*

> **Plaintiffs' Statement No. 18:**  In 2005, FDIC terminated the employment of 178 Career employees in DRR for RIF related separation codes, that is 392, 393, 394, 312, 317, and 356.

**Response No. 18:**  Disputed.  The RIF-related nature of action (NOA) codes are 304 (retirement after notice of involuntary separation), 312 (resignation after notice of involuntary separation), and 356 (involuntary separation due to RIF).  A total of 63 DRR employees were separated pursuant to these RIF-related action codes, as follows:

|  |  |
|---|---|
| NOA code 304 | 7 employees |
| NOA code 312 | 3 employees |
| NOA code 356 | 53 employees |

*See* Table A attached to Bodian Decl. (Ex. 23); *see also* Jeanneret Report (Ex. 27) at 14-15.  As for the other NOA codes listed as "RIF-related" in Plaintiffs' Statement No. 18, 12 DRR employees voluntarily resigned (as indicated by NOA code 317), but there were no separations pursuant to codes 392, 393 and 394.  *See* Table A attached to Bodian Decl. (Ex. 23).

**Plaintiffs' Statement No. 19**:  In 2005, of the 178 career employees whose employment was terminated for RIF related reasons, 46 or 26% were under the age of 50, and 185, or about 74% were over the age of 50.

**Response No. 19**:  Disputed.  *See* Response No. 18 above.  Of the 63 DRR employees who experienced RIF-related involuntary separations (i.e., "whose employment was terminated for RIF related reasons," as opposed to those who voluntarily resigned, retired or transferred from DRR), 36 (57%) were under age 50, and 27 (43%) were age 50 and older.  *See* Table A attached to Bodian Decl. (Ex. 23); *see also* Jeanneret Reply Report (Ex. 27-1), Tables 2 and 3.

**Plaintiffs' Statement No. 20**:  In 2005, the FDIC terminated the employment of 132 employees in DRR who were age 50 or older, or about out of the 317 employees it had in DRR on Jan. 1, 2005, or about 42%, but terminated only 46 out of 170 younger employees in DRR, that is, those under 50, or about 28%.

**Response No. 20**:  Disputed.  *See* Response Nos. 18-19 above.

**Plaintiffs' Statement No. 21**:  The disparity between the older and younger employees as defined about amounts to more than three standard deviations, and therefore represents less than one chance in 100, or less than 1% chance of occurring by chance. Seberhagen Report at And Table 10

**Response No. 21**:  Disputed.  *See* Response Nos. 18-20 above.  *See also* Jeanneret Reply Report (Ex. 27-1), at 13-15 and Tables 2 and 3 (the 63 RIF-related involuntary separations showed a statistically significant impact, but it was on DRR employees who were under 50 years of age).

**Plaintiffs' Statement No. 22:**  On Dec. 31, 2005, the Defendant FDIC employed 309 employees in DRR who held Career Appointments, of whom124 were under the age of 50, or 40%, and 185 were 50 or older, or 60%.

**Response No. 22:**  Disputed.  After completion of the 2005 downsizing, the FDIC employed 232 employees in DRR who held appointments under appt. codes 01 or 02 and 1 employee who held an appointment under appt. code 6.  *See* Table A attached to Bodian Decl. (Ex. 23).  In addition, 73 former DRR employees had transferred to other FDIC Divisions and Offices.  *See id.*  Of the 233 employees who remained in DRR, 92 (39%) were under age 50 on December 31, 2005 and 141 (61%) were 50 or older on December 31, 2005; of the 73 former DRR employees who had transferred to other FDIC Divisions and Offices, 29 (40%) were under age 50 on December 31, 2005 and 44 (60%) were 50 or older on December 31, 2005.  *See id.*

**Plaintiffs' Statement No. 23:**  Of the 178 Career employees in DRR so terminated in 2005, 132 were over the age of 50, and 46 were under the age of 50.

**Response No. 23:**  Disputed.  *See* Response Nos. 18-19 above.  In 2005, 63 DRR employees were "terminated" as a result of RIF-related involuntary separations, and one other employee was terminated for cause (NOA code 330) effective February 2, 2005.  *See* Table A attached to Bodian Decl. (Ex. 23).  Of the 63 employees who experienced RIF-related involuntary separations, 36 were under age 50, and 27 were age 50 and older.  *See* Table A attached to Bodian Decl. (Ex. 23); *see also* Jeanneret Reply Report (Ex. 27-1), Tables 2 and 3.

**Plaintiffs' Statement No. 24:**  Of the 588 RIF related separations of career employees by FDIC, in 2005, 370 of those Career employees were over the age of 50, and 266 were under that age.

**Response No. 24:**  Disputed.  The only RIF conducted by the FDIC in 2005 was in DRR, which resulted in 63 RIF-related involuntary separations.  *See* Response Nos. 18-19 above.  In addition to these RIF-related separations, 578 FDIC employees voluntarily elected to resign or retire with a buyout beginning in November 2004, when the 2004-2005 buyout program was first offered. *See* Crosser Decl. (Ex. 24) at ¶ 12.

**Plaintiffs' Statement No. 25:**  Of the 178 RIF related separations of career employee in DRR by FDIC in 2005, 132 were over the age of 50, and 55 were not.

**Response No. 25:**  Disputed.  *See* Response Nos. 18-19 and 23 above.

**Plaintiffs' Statement No. 26(1):**  A commissioned examiner of the FDIC is an employee designated to conduct examinations or inspections of Banks and other financial institutions on behalf of the Defendant FDIC. The Comptroller of the Currency also employs bank examiners

**Response No. 26(1):**  Not disputed.

**Plaintiffs' Statement No. 26(2):**  The Corporate Employee Program contemplates education and training and experience for a period of four years for new employees to complete and obtain a commission as an examiner. GAO Report of Feb. 14, 2006 at page 29.

**Response No. 26(2):**  Not disputed, but the GAO report that is apparently being referenced by Plaintiffs (GAO-07-255) was issued in February 2007.


    **Plaintiffs' Statement No. 27:**  The Corporate Employee Program did not begin to train recently hired employees at any time before March, 2005.

**Response No. 27:**  Not disputed.


    **Plaintiffs' Statement No. 28:**  The Defendant engaged in extensive recruiting efforts at colleges and universities after September 2, 2005 for candidates for employment and training as new employees in the Corporate Employee Program.

**Response No. 28:**  Not disputed that the FDIC has engaged in recruiting efforts at colleges and universities since at least 2002 in order to identify candidates for FDIC vacancies in all areas, which now include but are not limited to vacancies in the Corporate Employee Program.


    **Plaintiffs' Statement No. 29:**  An employee of the FDIC or other financial regulatory Federal agencies cannot certify a financial institution's examination report until after that employee has received c commission.

**Response No. 29:**  As to "[a]n employee of the FDIC," not disputed.  As to "[a]n employee of other financial regulatory Federal agencies," disputed in the absence of any record evidence supporting this statement.


    **Plaintiffs' Statement No. 30:**  Director Glassman sent an e-mail to all DRR employees on Oct. 25, 2005, stating that "DRR employees will have the opportunity to apply for

crossover opportunities at both grade 12 and grade 5/7/9 levels with the Division of

Supervision and Consumer Protection.

**Response No. 30:**  Disputed in part.  *See* 10/26/04 Glassman Memo (Ex. 7) sent to all DRR

employees on October 26, 2004, which stated, in pertinent part:  "DRR employees will have the

opportunity to apply for crossover opportunities at both the grade 12 and grade 5/7/9 levels with

the Division of Supervision and Consumer protection.  Further details about these crossover

opportunities will be provided as part of the Corporate Employee Program that is being

developed."

**Plaintiffs' Statement No. 31:**  Of the 503 permanent employees of the FDIC in DRR 73

transferred (crossed-over") to another Division

**Response No. 31:**  Disputed in part.  Of the 503 permanent employees in DRR as of January 1,

2005, 73 transferred to another FDIC division or office in 2005.  *See* Table A attached to Bodian

Decl. (Ex. 23).  A "crossover" specifically refers to an employee at grade 12 and above who

transferred to DSC from another FDIC Division or Office in order to become a CG-12 Financial

Institution Examiner.  *See* Crossover SOI (Ex. 12).

**Plaintiffs' Statement No. 32:**  In March of 2005, the FDIC accepted applications for a

crossover program for employees in DRR. to apply for in-service training in DOS

**Response No. 32:**  Disputed in part.  Applications from FDIC permanent employees grade 12

and above nationwide (including DRR employees) to apply for the in-service training

opportunity in DSC (Division of Supervision and Consumer Protection, the successor

organization to DOS, Division of Supervision) were due no later than February 28, 2005.  *See*

Crossover SOI (Ex. 12) at 5.


**Plaintiffs' Statement No. 33**:  In 2005, 76 employees of Defendant in DRR, including

Plaintiff Greg Haag, transferred from DRR to another Division or office of Defendant.

**Response No. 33**:  Disputed as to the precise number.  Of the 503 permanent employees in DRR

as of January 1, 2005, 73 employees, including Plaintiff Haag, transferred to another FDIC

division or office in 2005.  *See* Table A attached to Bodian Decl. (Ex. 23); *see also* Statement

No. 31 and Response No. 31 above.


**Plaintiffs' Statement No. 34**:  Of those 76 employees, 46, including Plaintiff Gregg

Haag, were age 50 or above, when they transferred to the Division of Supervision, or to

another Division or office of the Defendant.

**Response No. 34**:  Disputed in part.  Of the 73 permanent employees in DRR who transferred to

DSC or another FDIC division or office in 2005, 42 (including Plaintiff Haag) were age 50 or

older as of the effective date of their transfer.  *See* Table A attached to Bodian Decl. (Ex. 23); *see*

*also* Statement No. 31 and Response Nos. 31 and 33 above.


**Plaintiffs' Statement No. 35**:  In light of the fact that DSC was only accepting bids for

Grade 12 positions and below,, at least 20 of the members of the class who transfer to

DSC accepted a lower grade, that is a demotion. For example, Plaintiff Greg Haag, who

was a Grade 13, bid for and accepted a grade 12 position.

**Response No. 35**: Disputed.  In 2005, 25 DRR employees transferred to DSC at a lower grade level; of these 25, 17 were age 50 and over, while 8 were under age 50.  2nd Bodian Decl. (Ex. 36) at ¶ 12.  In 2005, 32 DRR employees also transferred to DSC at the same grade level; of these 32, 19 were age 50 and over, while 13 were under age 50. *Id.*

> **Plaintiffs' Statement No. 36**:  Although the demotions by the Defendant of the 20 members of the class, did not result in an immediate reduction in pay, such a demotion reduces the responsibilities of the employee.

**Response No. 36**:  Disputed in part.  The so-called "demotions," as defined by Plaintiffs in Statement No. 35 (*i.e.*, acceptance of a lower graded position in DSC), did not necessarily reduce the responsibilities of the "demoted" employees, in that obtaining and applying bank examination skills in DSC may have actually increased their responsibilities.  As to the number of "demoted" class members, *see* Response No. 35 above.

> **Plaintiffs' Statement No. 37**:  In addition, such a demotion results in lower future income for Haag and the other members of the class, by freezing [sometimes called "red circling"]the annual base salary of the employee unless and until cost of living increases granted to Federal employees raise the salary or the lower grade to the amount of the salary which the employee was receiving when demoted to the lower grade.

**Response No. 37**:  Not disputed that such "demotions," as defined by Plaintiffs in Statement No. 35 (*i.e.*, acceptance of a lower graded position in DSC), could possibly  result in lower future income even for employees entitled to "saved pay" (such as Plaintiff Haag), if the employee is never again promoted and the employee's saved pay level continues to exceed the maximum

range of the lower grade level and as a result, the employee receives smaller merit pay increases

than he or she would have received at their former, higher grade level.  Saved pay entitles an

employee to retain his current base pay if it is above the maximum for the new grade, and any

pay adjustment will be received as a 100% lump sum until the new grade range overtakes his

current base pay.  *See* Ex. 13, at ECF p. 34 ("Remarks" section of SF-50 documenting Plaintiff

Haag's change to lower grade without changing his $115,970 salary).

> **Plaintiffs' Statement No. 38**:  In addition to 50 plaintiffs whose employment was
>
> terminated on or before Sept. 3, 2005, above, Plaintiff Bruce Brown was the 52d plaintiff
>
> to join this case. He was born on Jan. 26, 1951 so he attained age 54 on that date. In the
>
> Spring of 2005 had 21 years of experience, and was a E-2 Executive of the Defendant in
>
> the DRR.

**Response No. 38**:  Disputed in part.  *See* Response No. 7 above identifying the 14 named

Plaintiffs who were involuntarily terminated on or before September 3, 2005, as opposed to the

remaining named Plaintiffs (other than Plaintiff Haag who transferred to DSC effective May 1,

2005 and Plaintiff Bruce Brown who retired with a buyout effective April 1, 2006), who either

voluntarily resigned or retired on or before September 3, 2005.

> **Plaintiffs' Statement No. 39**:  Plaintiff Bruce Brown at that time held the position of
>
> Executive Director of DRR, and was in Grade E-2. He had served as an Executive in
>
> DRR both in the field and in Washington.

**Response No. 39**:  Disputed in part.  In the spring of 2005, Plaintiff Bruce Brown held the

position of Executive Assistant at grade CM-2 in DRR.  *See* SF-50 documenting Bruce Brown's

reassignment from E-2 to CM-2 effective 4/17/05, attached as Exhibit 38 to Agency Opposition. Not disputed that he had previously served as an executive in DRR in the field and in Washington.

> **Plaintiffs' Statement No. 40**: As of April 12, 2005, Plaintiff Bruce Brown he was assigned to the "Virtual Bank Pilot" team and was a team leader. Pursuant to the directives of higher officials of the Defendant, that team was to develop and complete a training module to simulate the environment of an insured financial institution to allow employees in training to gain and practice skills needed for institutional examination and liquidation. [See, Memo to COO Bovenzi from David C. Cooke, Chief Learning Officer, Corporate University, dated April 12, 2005].

**Response No. 40**: Not disputed that these statements are contained in the referenced memo, which concerns a request to authorize a delayed departure for Plaintiff Bruce Brown after he voluntarily applied for and accepted the buyout.

> **Plaintiffs' Statement No. 41**: Mr. Brown's "knowledge...his excellent management skills and his ability to work with DRR staff in both Washington and Dallas" were "a tremendous asset in moving the have been the VB project forward." Id. pg. 1.

**Response No. 41**: Not disputed that Mr. Cooke's memo states that "[h]is knowledge of the overall operations of DRR, his excellent management skills and his ability to work with DRR staff in both Washington and Dallas have been a tremendous asset in moving the VB project forward."

**Plaintiffs' Statement No. 42**:  "Mr. Brown's assistance in completing the [VB] project is essential." Id. page two.

**Response No. 42**:  Not disputed that Mr. Cooke's memo states that "[a]ll of the role-plays are scheduled to be completed by year end 2005 and Mr. Brown's assistance in completing the project is essential."

**Plaintiffs' Statement No. 43**:  For those reasons, and because "Mr. Brown's time and expenses" were to be "charged to CU, COO Bovenzi approved the request of Corporate U. to extend his time to remain employed. by the Agency. Id.

**Response No. 43**:  Not disputed.

**Plaintiffs' Statement No. 44**:  Plaintiff Bruce Brown's employment with the FDIC ended April 1, 2006.

**Response No. 44**:  Not disputed.

**Plaintiffs' Statement No. 45**:  The FDIC used a buy outs combined with the announcement of a Reduction in Force, sometimes referred to as a "carrot and stick" method reducing the size of its work force at least from 1995 through 2003.

**Response No. 45**:  Not disputed that the FDIC used both buyouts and RIFs in reducing the size of its workforce from 1996 through 2003, and that the plaintiffs in *Armstrong v. Powell* referred to this as a "carrot and stick" in their unsuccessful effort to have a class certified in that case. *See Armstrong v. Powell*, 230 F.R.D. 661 (W.D. Okla. 2005) (denying class certification).

**Plaintiffs' Statement No. 46**: During his tenure as the Chairman and Chief Operating officer of the FDIC, Chairman Donald Powell repeatedly advised groups of its employees that "We need to hire younger folks because they have the innovative ideas" or words to that effect.

**Response No. 46**: Disputed. Plaintiffs cite no record evidence supporting this alleged statement by former Chairman Powell (who was never the Chief Operating Officer of the FDIC). However, in Plaintiffs' Memorandum in Support of its Motion for Partial Summary Judgment on Liability ("Pl's Br."), Plaintiffs purport to quote (Pl's Br. at 1) former Chairman Powell as testifying, *inter alia*, that he told a group of employees that "I want young people around me . . . they have all the innovative ideas . . . ." In this regard, Plaintiffs have seriously misrepresented the record. The offending phrases were contained in Plaintiffs' counsel's question and <u>not</u> in the witness's testimony, which consisted only of the innocuous statement that "I'm sure on occasions I have talked about the value of young people in an organization." *See* Deposition of Donald Powell, attached as Exhibit 39 to Agency Opposition, at p. 13, lines 16-21.

Respectfully submitted,

*/s/ William S. Jones*
_____
William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Stephen J. Kessler
D.C. Bar No. 382427
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226
(703) 562-2311
(703) 562-2482 (Fax)

Attorneys for Defendant

Dated: March 7, 2008