# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BARBARA ALIOTTA, et al and )
  Others similarly situated, )
                             )
        Plaintiffs, )     Case Number 1: 05CV02325
                             )     Class Action
        v. )
                             )
SHEILA BAIR, CHAIRMAN, )
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
                             )
        Defendant. )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT FDIC'S MOTION FOR SUMMARY JUDGMENT

David L. Rose
Joshua N. Rose
Dotie Joseph
ROSE & ROSE, P.C.
1320 19th Street, NW, Suite 601
Washington, D.C. 20036
(202) 331-8555
(202) 331-0996 fax
daver@roselawyers.com
josh@roselawyers.com
djoseph@roselawyers.com

Attorneys for the Plaintiff-
Class

Dated: March 10, 2008

# TABLE OF CONTENTS

Page No.

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I. INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. THE UNDERLYING FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. The Carrot and Stick Buy Out and Retirement Programs at the FDIC . . 2

    B. The 2005 RIF and Buyouts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1. Corporate University . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2. Reducing Headcount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. Defendant Considered Age in Designing the Downsizing  . . . . . . . . . . 7

    D. The RIF Plan of October 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E. Crossover Demotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F. The Effect of the Downsizing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    G. The Expert Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    H. Plaintiffs Took the Buyout For Fear of Termination . . . . . . . . . . . . . . 13

III. PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A. Plaintiffs Raise Substantial Evidence of Discrimination . . . . . . . . . . . 17

1.  Plaintiffs Have Substantial Evidence of Age Discrimination . . . 17

B. The 2005 Downsizing Was A Single Practice . . . . . . . . . . . . . . . . . . . 20

1.The Downsizing was a Single Practice for Adverse Impact Analysis Statistical Analysis Looks at All Employees Targeted by the Same Decisionmaker  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. All Plaintiffs Were Harmed by the 2005 Downsizing Program . . 23

C. The 2005 Downsizing Violated the ADEA  . . . . . . . . . . . . . . . . . . . . . 25

1. Direct Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. The 2005 Program Had a Significant Disparate Impact  . . . . . . . 28

i. EEOC Regulations Defining Terms Under the ADEA Are Binding on Federal Agency Employers . . . . . . . . . . . . . . . . . 30

ii. Reasonable Factor Other Than Age is an Affirmative Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

iii. Only A Showing of Business Necessity Can Justify a Significant Adverse Impact Against Older Federal Employees 32

iv. It is Well Established that ADEA Claims Against a Federal Agency are Cognizable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

v. Limits On Civil Service Protections Do Not Limit ADEA Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3. Disparate Treatment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

Page No.

**STATUTES AND REGULATIONS**

5 U.S.C.§§7702(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621
  *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C.§§ 626 (b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 U.S.C.§§ 626 (f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

29 U.S.C.§§ 626 (f)(1)(A-G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

29 U.S.C. §§ 636(f)(1)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

29 U.S.C. §§ 636 (f)(1)(H)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

29 C.F.R. §§ 22(d)(3) and 22(f)(iii)(B) and (C) and (iv)(3) . . . . . . . . . . . . . 20, 21

29 C.F.R §§ 1625.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

29 C.F.R. §§ 1625.22(d)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 C.F.R. §§ 1625.22(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 C.F.R. §§ 1625.22 (f)(3)(ii)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

29 C.F.R. §§ 1625.22 (f)(3)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 C.F.R. §§ 1625.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

29 C.F.R. §§ 1625.7(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

29 C.F.R. §§ 1625.7(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

29 C.F.R. §§ 1625.7(d) and (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

## CASES

*AARP v. Farmers Group, Inc.,*
        943 F.2d 996, 1000 n. 7 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Adams v. Ameritech Services, Inc.*
        231 F.3d 414, 433 (7th Cir 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Aka v. Washington Hosp. Ctr.,*
        156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc) . . . . . . . . . . . . . . . . . . . . . . 17

*Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 2002 (1986) . . . . . . . . 16

*Armstrong et al v. Powell, FDIC,*
        230 F.R.D. 661 at 666 (W.D. Okla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bender v. Hecht's Dept. Stores,*
        455 F.3d 612 (6th Cir. 2006), cert denied 127 Sct. 2100(2007) . . . . . . 21, 28

*Blair v. Henry Filters, Inc.,*
        505 F.3d 517, 530 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 32

*Bodnar v. Synpol,*
        843 F.2d 190 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

*Breen v. Peters*,
        474 F.Supp.2d 1, 7 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 33

*Burks v. Oklahoma Pub. Co.,*
        81 F.3d 975, *978 (C.A. 10 (Okl.) 1996), *cert denied* 519 US 931 (1996) 25

*Cameron v. U.S.P.S.,*
        EEOC Appeal No. 07A40130 (Sept. 20, 2005), *reh'g denied,*
        EEOC Request No. 05A60099 (Dec. 22, 2005) . . . . . . . . . . . . . . . . . . . . . 33

*Carpenter v. Fed. Nat'l Mortgage Ass'n,*
    165 F.3d 69, 72 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 34

*Castaneda v. Partida,*
    430 U.S. 482, 496 n. 17, 97 S. Ct. 1272, 51 L.Ed.2d 498 (1977) . . . . 29, 30

*Currier v. United Technologies Corp.,*
    393 F.3d 246, 254 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Enlow v. Salem-Keizer Yellow Cab Co., Inc.,*
    389 F.3d 802, 812 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Frank v. United Airlines, Inc.,*
    216 F.3d 845, 854 (C.A.9 (Cal.) 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*FTC v. Morton Salt Co.,*
    334 U. S. 37, 44-45 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*George v. Leavitt*
    407 F.3d 405, *413, 366 U.S. App. D.C. 11, **19 (C.A.D.C., 2005) . 19, 34

*Gerdom v. Continental Airlines,*
    692 F.2d 602, 608 (9th Cir. 1982) (en banc) . . . . . . . . . . . . . . . . . . . . . . 27

*Hazelwood Sch. Dist. v. United States,*
    433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) . . . . . 29, 30

*Henn v. Nat'l Geographic, Sco'y*
    819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct 454,
    98 L.Ed.2d 394 (987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24, 25

*Holcomb v. Powell,*
    433 F.3d 889, 895 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hopkins v. Price Waterhouse*
    920 F.2d 967, 972, 287 U.S.App.D.C. 173, 178 (1990) . . . . . . . . . . . . . . 26

*Ikossi v. Department of Navy,*
        2008 WL 540234, *3 __ F.3d ___, (D.C. Cir. 2008) . . . . . . . . . . . . . . . . 33

*McCullom, et al v. Dept. of Transportation,*
        EEOC Doc 07A60055 (Oct. 26, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*McDonnell Douglas Corp. v. Green,*
        411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . . . 27

*Meachum et al v. Knolls Atomic Power Lab.,*
        461 F.3d 134 (2d Cir. 2006), cert granted, 128 S.Ct. 1118 (2008),
        S. Ct. No. 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 32

*Mitchell v. Mobil Oil Corp.,*
        896 F.2d 463, *467 (C.A. 10 (Colo.) 1990) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mitchell v. Toledo Hosp.,*
        964 F.2d 577, 583 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Murray v. Gilmore,*
        406 F.3d 708, 713, 365 U.S.App.D.C. 372, 377 (D.C. Cir. 2005) . . . . . . . 34

*Palmer v. Schultz,*
        815 F.2d 84 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28, 29, 30

*Price Waterhouse v. Hopkins,*
        499 U.S. 228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Radabaugh v. Zip Feed Mills, Inc.,*
        997 F.2d 444, 449 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Reeves v. Sanderson Plumbing Products, Inc.,*
        530 U.S. 133 (U.S. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27, 28, 34

*Ridenour v. Lawson Co.,*
        791 F.2d 52, *57 (C.A.6 (Ohio) 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rowell v. BellSouth Corp.,*
    433 F.3d 794, *805 (C.A. 11 (Ala.) 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Schmid v. Frosch,*
    680 F.2d 248, 250 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 29

*Schuler v. Polaroid Corp.,*
    848 F.2d 276 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Schuler v. PwC,*
    2008WL 360923, Slip Op. at 26 (D.C. Cir. Feb. 12, 2008) . . . . . . . . . . 1, 21

*Shaffer ex rel. Schffer v. Weast*
    546 49, 57 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Smith et al v. City of Jackson,*
    544 U.S. 228, 125 S Ct. 1536, 1544 (2005) . . . . . . . . . . . . . . . . . . . *passim*

*Strawberry v. Albright,*
    111 F.3d, 943, 947 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Swierkiewicz v. Sorema, N.A.,*
    534 U.S. 506, 510-11, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) . . . . . . . . . . . 20

*Teamsters v. United States,*
    341 U.S. 324, 339 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Terban v. Dept. of Energy,*
    216 F.3d 1021 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111, 122 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tyler v. Union Oil Co. of California,*
    304 F.3d 379, *392 (C.A.5 (Tex.) 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Walton v. McDonnell Douglas, Corp.,*

167 F.3d 423, 426 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Watson v. Forth Worth Bank and Trust,*
    487 U.S. 977, 994 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Western Air Lines, Ind. v. Criswell,*
    472 U.S. 400, 416-417 & n. 24 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## I. INTRODUCTION

In implementing its 2005 Reduction in Force ("RIF") and Buyout program, the Defendant Federal Deposit Insurance Corporation ("FDIC" or "Agency") made employment decisions which terminated the employment of 402 of its 1,686 permanent employees who were over the age of 50, or 19.3%, but terminated the employment of 266 of its 3,002, or 8.9% of its younger employees. Ex. 1 (Declaration and Report of Dr. Seberhagen) at Table 13. Similarly, of the 323 career or permanent employees in its oldest Division, Division of Resolutions and Receiverships ("DRR"), the FDIC terminated the employment of 138, or 42.7% of individuals who were age 50 or older in 2005, and only 55, or 30.6% under age 50. Ex. 1, Table 11. In designing and implementing the 2005 RIF, the FDIC's actions had an "adverse" impact against its oldest employees in DRR and in the FDIC, and caused the termination of the employment of approximately 138 members of the class, including 51 of the 52 Plaintiffs. On that basis alone, the FDIC's motion for summary judgment should be denied. No more need be shown under the ADEA to make a *prima facie* case of a pattern or practice of age discrimination under the 2005 Program by the Defendant FDIC. *Smith v. City of Jackson*, 544 U. S. 228 (2005); *Schuler v. PwC*, ___F.3d ___, 2008 360923 (D.C.Cir. Feb 12, 2008) (NO. 06-7207); *Palmer v. Schultz*, 815 F.2d 84 (D.C. Cir. 1987).

## II. THE UNDERLYING FACTS

FDIC was established in 1933 and is an Agency of the United States. Its Chairman is appointed by the President of the United States, as is the Comptroller of the Currency, who is on the Board of the Defendant. After the savings and loan crises of the 1980's was resolved in the mid-1990's, the FDIC has engaged in downsizing in the 1990's and in 2000, 2002 and 2003. *See,*

Defendant's Motion for Summary Judgment and Memorandum in Support Thereof ("Def. Mtn),

pg. 4-5; Defendant's Statement of Material Facts (DSMF), #8, pg 3.   While plaintiffs' are not

directly challenging Defendant's actions from 1995 through 2003, the earlier downsizing provide

background on the defendant's standard operating procedures and its intent as manifest in a

series of layoffs that led to the 2004-05 downsizing at issue in this case.  While it is not entirely

impossible that a decreased workload may have played some part in the Agency's downsizing,

the facts reveal that could not have been the primary factor considering its admitted desire to

push out older workers and simultaneously hire younger workers.

### A. The Carrot and Stick Buy Out and Retirement Programs at the FDIC

The FDIC's approach to downsizing was rooted in the Agency's evaluations of how to

design and implement RIFs, beginning in the 1990s. *See*, Def. Mtn, 4-5. At a meeting on Aug. 8,

1995, the Board recognized that retirement-eligible people as those "who are the highest cost" to

the Corporation, and as "really where we have the excess," and successfully endeavored to create

a program "weighted toward the senior executives" who are "eligible for retirement." Ex. 2

(Board Transcript of Aug. 8, 1995).  As much as Mr. Squerrini tried to link severance pay to

"years of service," Director of the Division of Finance, Steven Selig made clear that the

determining factor was "age, –its age, –its age." Ex. 2 at 41.

As an additional justification for the RIFs, Dennis Geer, the FDIC's chief operating

officer, confirmed this concern with pushing out older workers. Ex. 3, (American Banker article,

noting the Agency's hope "that older employees will use the buyout to take early retirement").

Geer also described how the RIFs were specifically designed so as "to keep some of the youngest

and brightest people who are moving up in the rank." Ex. 3; *see also*, *Armstrong et al . v. Powell*,

*FDIC*, 230 F.R. D. 661 at 666 (W. D. Okla. 2005).

However, transcripts reveal that the Board felt that without effective deterrence or a "'stick," the buyouts would have low acceptance rates thus be ineffective.  Ex. 4 (Sept. 26, Board Transcript).  During the course of discussions, Jonathon Fletcher, Acting Director of the Office of Thrift Supervision did note his concerns about the discriminatory implications of what the Agency was trying to do:

> "...much of what we've been talking about is in a sense directed at encouraging the more senior executives, who pretty much by definition are the - - have the longer careers here, are older, when we're trying to incent those folks to leave, and I hope that's not illegal." Ex. 4, pg. 8.

Nonetheless, the board ultimately, voted to offer the buyout as a "carrot" to encourage voluntary attrition and make it less attractive to stay as a stock." Ex. 4, 30.

On Sept. 25, 1995, Dennis F. Geer, Deputy to the Chairman and Chief Operating Officer ("COO") and William A. Longbrake, Deputy to the Chairman and Chief financial Officer (CFO) issued a memorandum to the Board of Directors recommending they adopt a "Program to Reduce Permanent Staffing Levels." Ex. 5.  In accord with the carrot and stick recommendations that summer, the FDIC COO and CFO expressly noted one reason for their recommendation is that "the proposal *would effectively reduce staff that are more senior and closer to retirement*, which would achieve higher cost savings." Ex. 5, pg 2 (emphasis added).

The 1995 reduction in force included the highest level for Executives, of whom there were 29 executives who were eligible for retirement then, and an additional 80 who were "Early Retirement Eligible" that is at "least age 50 with a minimum of 20 years of service."  Ex. 6, at DOA BF 06260.  At the same time the offer was to be extended to 234 Optional Retirement

3

Eligibles in Grades 12-15 and 666 such employees who were eligible for "early retirement."

The FDIC's downsizing efforts continued in 1997 at least through 2003. *See*, Defendant's Statement of Undisputed Facts, para. 10, p. 4.

**B. The 2005 RIF and Buy-Outs**

While he was Chair of the Defendant, Chairman Powell repeatedly addressed groups of employees and asked them how long they had been worked at the Agency (including the part that came from the Office of Thrift Supervision") and stated his desire to have "young people near me, because they have all the innovative ideas." Ex. 10, Powell Dep. at 13.

As Chairman Powell's letters to Stakeholder's for the fourth quarter, 2004 shows, the Agency's budget for 2005 was similar in size to the 2004 budget, but the Agency planned further downsizing so that the agency could commence recruitment for new employees on the campuses of colleges and universities and community centers under the new Corporate Employee program. Ex. 9 (Powell Deposition). The 2005 downsizing was to be completed by September, 2005.

**1. Corporate University**

On September 2, 2005, the Associate Director, Division of Administration, Human Resources Branch, sent a global e-mail message to all FDIC employees to soliciting volunteers "to participate in college recruitment and national community outreach initiatives." Admission No. 115. Available data show that the average age of recent graduates of colleges and universities is well less than 35 years old. *See*, *Adams v. Ameritech*, 429 (based on statistics showing that only about 8% of student enrolled in higher education and 3.4% of undergraduates were 40 or over, the Seventh Circuit noted that a trier of fact could find that "a desire to hire from colleges" was a proxy for a preference to hire younger employees). Statistics for the year 2005, published

4

by the National Center for Education Statistics at the U.S. Department of Education indicate the percentage of student over the age of 40, and 50 like the current class is just as small in comparison to those under 40. Ex. 12.

### 2. Reducing Headcount

In the Spring of 2004, the DRR had set up a task force to study the size of the DRR in the future and to make a recommendation for its size in 2005. While that task force met several times in the Spring and early summer, it did not prepare any recommendation in the early summer.

The Buyout and RIF's program adopted on Oct. 25, 2004, like its predecessors, followed the carrot and stick approach.  In the summer of 2004, high level personnel in DRR prepared three documents concerning the size of DRR for fiscal 2005.  DSMF, #23-26, pg. 8-9.  The first memorandum of Aus. 8, 2004, COO Bovenzi advised Agency employees that the "FDIC of the future will be a smaller, more flexible agency. Ex. 1 to FDIC's Motion for S. J. and Facts Nos. 14 and 15.  The second memorandum dated Aug. 21, 2004 from Director Glassman of DRR to COO Bovenzi recommended that the Agency "keep the DRR staffing stable at about 501 permanent employees. Ex. 11 (Mergen Dep.), pg.  24, 26, and 28.

On September 6, 2004, the task force led by James Seegers, Dep. Director of DRR, who manages its Administrative Section, circulated for comment the executive summary of the task force's recommendations which stated that "A comprehensive analysis of the Division's business model ....reveals the need to address excess capacity within the Division..." and that "staffing levels within the Division can be reduced from 517 to 342...a 34% reduction in total staff [that] will save an estimated $21 million in annual salary costs." FDIC's Response to Plaintiffs' Request for Admission 44.   This was the second recommended proposed draft forwarded from

DRR in 2004 for 2005.

There is no evidence in the record to indicate how the task force arrived at these numbers or whether it considered the need for individual positions or the skill sets of existing employees in any way shape or form. On October 25, 2004, DRR leadership, under Mr. Glassman, made its third (3) memorandum to COO Bovenzi that proposed a reorganization that would reduce its permanent staff in Washington from 101 to 63, or by 38 persons, and its permanent staff in Dallas from 413 to 173, a reduction of 240 positions and employees. DSMF #25; Def. Mtn, Ex. 7. This recommendation was adopted. The record contains no evidence of any study showing a need, or even a rational business purpose for that level of staff cuts.

Bovenzi stated in his Memorandum to all Agency Employees of Oct. 26, 2004:

"it appears likely that the necessary staffing reductions cannot be accomplished entirely through voluntary departures...Accordingly we have begun active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in DOA, Legal and DOF in 2006 to "most employees By Memo. of Aus. 8, 2004, COO Bovenzi advised Agency employees that the "FDIC of the future will be a smaller, more flexible agency. Ex. 1 to FDIC's Motion for S. J. and Facts Nos. 14 and 15 in DRR, DIRM [later called DIT], DOA, Legal and DOF"
"and we estimate a reduction of between 500 to 600 from our current on- board workforce of nearly 5,300. These reductions will occur by year-end 2006, with most of the reductions occurring by year-end 2005."
Deft. Ex. 6, AL-Legal-00273.

Such a reduction would have reduced the FDIC workforce of 5,300 by 600 employees to 4,700 at most by year end 2006. DSMF #19, pg 7.

The Agency admits "that 565 FDIC employees had accepted the buy out", and had retired effective May 2005. Defendant's Response to Requests for Admissions. 104. The goal of an expanded headcount reduction of 500 to 600 by the end of 2006, had been met by "retirements or resignations" long before April, 2005 and were effective no later than May 14, 2005.

Although the agency had met not only the headcount reduction goal recommended by the Task Force, but also the additional cuts approved by Bovenzi in October 2004, it decided to go forward with involuntary terminations in the summer and fall of 2005. The record contains no evidence to indicate that the decision was motivated by a reasonable factor other than age or by business necessity.

### C. Defendant Considered Age in Designing the Downsizing

The records of the Agency show that Peggy Green, an employee in Personnel Administration in DRR in Dallas sent an e-mail message on October 26, 2004, 2.46 p.m. to, Leslie Plant.....Deputy Director DRR, subject "FRS MRA + 10" that states (Plns Ex. 3 to Bovenzi Dep., AL-DRR-00570:

> "FYI I have compiled the list of DRR-Dallas employees covered by FERS who have reached their MRA (or older) but have less than 20 years in FERS, Of the 118 people on the list, only 2 people.... have less than 10 years in FERS. So 116 will be separated with an immediate(but reduced"annuity."

The term "MRA" means minimum retirement age in that memorandum and where used elsewhere.

The same record page (Ex. 3) shows that on October 21, 2004, Ms. Plant forwarded the Green message to Seegers and Ivie stating (AL DRR-00570):

> "Here is a quick glance at the population of those individuals (Dallas) that reach MRA and have more than 10 but less than 20 years (FERS) as of 12/31/05. There are a number of anomalies but the number is close. This assumes separation at 12/31/05 and all 116 would not be affected."

The record does not identify the list sent by Ms. Green and forwarded by Plant. It does contain a list of employees in Dallas many of whom were in DRR. does contain a document with similar information in alphabetical order the employees in Dallas, mostly in DRR but also some

7

in "DOS/DSC and Legal. Plaintiffs' Ex. 2, Bovenzie Dep.

### D. The RIF Plan of October 2004

The Reorganization contains four pages of text, and a page of Issues noted in the 10/19/04 Proposed DRR Reorganization dated 10/19/04, as amended 11/02/04. AL DRR 002233. There is a separate page noting the Proposed Staffing Results shows the Current and Proposed employees in DRR and discloses that "17 New Hires not included in Proposed Numbers" and that the slots of 82 (91-9) current employees were transferred to Administration." AR DRR 00234

The Proposed Reorganization shows the difference in staff size by grade and by number of positions, for three "Management" grades, namely EM, CM2, and CM1, that is, in descending order. The chart shows that not one of the three current E positions were affected by the downsizing, and that there would continue to be 16 CM positions, but 3 of the CM2 positions were converted to CM1 Positions.

The Defendant admits that it employed "six CM-1 Closing & Resolution Managers in Dallas." Response to RFA 55. The Defendant does not state or suggest that it terminated the employment of any of them either as a part of the 2005 program or otherwise.

It is undisputed that the downsizing proposal was provided to employees as part of the information on the "voluntary" severance package.

### E. Crossover Demotions

The proposed reorganization did not expressly mention a cross over program.  However, the Agency conducted a cross-over program in which it allowed employees in grades 12, 13 and 14 in DRR to transfer to Grade 12, in order to become an employee in the newly established

Corporate Employee Program. DSMF #37, pg. 11. In its Response to RFA 115, the Agency

states that the Plaintiffs description of the program "is an incomplete description Program.

The Agency states that on Oct. 19, 2004, COO Bovenzi sent an e-mail to all FDIC

permanent employees" DSMF #34, pg. 11; Def Mtn, Ex. 4, and that on Feb. 1, 2005 he sent to an

e-mail to FDIC employees grade 12 and above "Nationwide, soliciting interest for Associate

Financial Institution Specialist In-Service Placement Opportunity" (aka the "Crossover

Program"), and that on March 14,2005, he sent an e-mail to FDIC employees "Implementation

of the Corporate Employee Program) and that on June 13, sent another on that subject. DSMF

#39, pg. 11-12; Def Mtn, Ex. 16. In its response to Requests for Admissions 110, 111, 112, 113,

116, and 118 the Agency declined to respond to respond to statements made in the Seberhagen

report, because of errors in interpreting the data provided by plaintiffs' counsel." The Agency

has however produced no data or other information showing inaccuracies or errors.

### F. The Effect of the Downsizing

The Declaration of Seberhagen dated Jan. 28, 2008, contains the same data that Dr.

Jeanneret used in his report. There was a difference of 16 employees because all of the plaintiffs

were career employees and as that title suggests had the greatest civil service protections against

discharge or demotion. Plaintiffs had not believed the distinction of 16 "permanent" employees a

significant one. However, Defendant did not address the difference until the deposition of Dr.

Seberhagen taken by the Defendant on Jan. 30, 2005.

In any event, the Agency did terminate the employment of about 16 "permanent"

employees as well as the 487 "career" employees, so Plaintiffs asked Dr. Seberhagen to prepare

a report, using the same methods as before, but reporting separately adverse impact of the 2005

"Buy Out and RIFs" program.  Dr. Seberhagen's Report is attached hereto Exhibit 1 in

opposition to the pending motion for summary judgment.  His findings are based upon two sets

of data, the data concerning the "career" employees under 50 versus those 50 and up. Ex. 1.

downsizing.  The FDIC now concedes that at least 17 older employees accepted a lower grade to

enroll in the Corporate University Program. *See,* Amended Response by the Defendant  to

Plaintiffs' Request for Admissions 62 and 112 (March 4, 2008).

     The conduct of the FDIC described above terminated the employment of at least 138

members of the class of Agency employees over the age of 50 in DRR, and the transfer and

reduction in grade and responsibilities of at least 20 additional class members.

     The FDIC has not offered evidence of any "reasonable factors other than age." 29 U. S. C.

626(f). Defendant FDIC filed its motion for summary judgment on Feb. 25, 2007, and Plaintiffs'

filed their motion for partial summary judgment on the same day. [1]  Unless this Court grants

summary judgment to Plaintiffs, it should  set this case for trial as soon as feasible.

     The Equal Employment Opportunity Commission (the "EEOC" or  the Commission") has

been the lead agency for executive branch Departments and Agencies of the United States in their

implementation of Federal equal employment opportunity laws and policies.  Executive Order

12106 (1979).  The Defendant FDIC is such an Agency and is obliged to obey the

"regulations...and instructions" of the Commission. E. O. 12106 at para. 4. In its argument in

support of its motion, as in its 2005 downsizing program, it ignored its obligations under the text

of the ADEA, and under E.O. 12106 and the lawful Regulations of the EEOC,.

---

[1] We are presenting a full statement of facts and discussion of the law here, because we
assume that this Court would wish to consider the FDIC's motion for summary judgment before
addressing what in substance was Plaintiffs' cross motion for summary judgment.

In addition, as a part of the same program, it induced at least 76 employees of the Agency in DRR to transfer to its largest Division, DSC, of whom 38, or 63% were age 55 or older in 2005. Of the 51 of Plaintiffs in this case, 35 were in the class of 112 were employees terminated by the Agency on or before May 14, 2005 after acceptance of a buy out; and an additional 16 of them were among the 28 oldest employees who were terminated; and an additional 38 employees over the age of 50 lost their employment in DRR and were obliged to transfer to another practice at least 16 of them, like Plaintiff Haag, were able to accept a lower grade and less important. Accordingly, Plaintiffs believe that at least 158 plaintiffs and other members of the class were harmed and treated adversely under the valid regulation of the EEOC and precluded.

The "Undisputed Facts" set forth in Our Memo. of Feb. 25, 2008 at 1-4 are undisputed, Plaintiffs believe them to be accurate. In particular the FDIC in implementing the downsizing of DRR in 2005 under the "Buyout and RIFs" program announced in October and November 2004, the FDIC terminated through RIF related procedures the employment of 178 "career" employees in DRR, of whom 132 were over the age of 50, and therefore were within the class certified by this Court, and only 46 were younger. Seberhagen Report Table 10. In so doing, it terminated the employment of 41.6% of its oldest employees in DRR, but only terminated the employment of 46 career employees in that Division, for a disparity of more than ten (10) standard deviations, and the different under the converse of the 80%. *Id.* The likelihood of such a disparity not being related to age is less than 2 out of a thousand. Such a disparity is much greater than 2 standard deviations (almost 2 of 100) and than 3 standard deviations And because the career employees have the greatest likelihood of retaining their employment under usual RIF rules, that is perhaps

11

the most appropriate comparison.[2]

### G. The Expert Reports

Dr. Seberhagen, analyzed the effect of the 2005 downsizing by including all employees shown as having RIF related separation codes during 2005. Ex. 1, para. 10. The analysis thus included both the "voluntary" severance buy-outs that were effective on or before May 2, 2005 and the involuntary terminations of September 2, 2005. Dr. Seberhagen found that, for career employees, the separation rate for those over 50 was 153.8% of the separation rate for those under 50. The difference is statistically significant at the 3.16 standard deviation level. Ex. 1, p. 6.

Dr. Seberhagen also included employees hired into "Corporate University" and other parts of the FDIC. Of 214 employees hired in 2005 as the RIF's continued, 201 (93.7%) were under 50. Ex. 1, p. 6. Fifty-six (56) of the new hires were hired into the "Corporate University" division as trainees. See Ex. 13.

Dr. Jeanneret examined the mean age of DRR employees at various times from 2000 to too5. He did not examine the effect of the 214 new hires made in 2005 on the average age of the agency as a whole. Instead, he looks solely at the age of the DRR which had only 4 new hires.

Dr. Jeanneret does not offer any analysis of the 2005 downsizing that includes the impact of the entire downsizing, including the buy-outs and cross over demotions and the new hiring

---

[2] The goal adopted by the FDIC for 2005 was to reduce the number of "permanent" positions in DRR from 503 by 54%, that by 272 such employees. FDIC terminated the employment of 193 under its buyout and RIF procedures, and transferred 76 person to the DSC, where many of them were obliged to take a lower grade. The remainder of three was accomplished through normal attrition in DRR.

12

that occurred between October 2004 and May 2005.

The reply report of Dr. Jeanneret states in footnote 4 that "I consider DRR employee generated decisions to be a matter of choice and the fact that circumstances (i.e., the knowledge that DRR must reduce its work force) may influence the decisions does not alter my opinion." p. 11 fn 4.  By doing so Dr. Jeanneret ignores the fact that the greatest adverse impact against employees over 50 was caused by the "voluntary" termination of at least 112 employees over the age of 50.

The "battle of the experts" thus amounts to a factual question whether the VESP and crossover demotions were part of the 2005 downsizing or whether the September 2, 2005 involuntary terminations should be analyzed without regard to the rest of the process.

**H**. **Plaintiffs Took the Buyout for Fear of Termination**

Plaintiffs submitted 23 declarations of class members in support of the Motion for Class Certification.  Exs B1-23 to Plaintiffs' Motion for Class Certification.  Almost all of the declarants aver that they accepted the severance package or the crossover demotions for fear of involuntary termination.  They took the buyout because they thought they would lose their jobs and felt it necessary to mitigate the harm.  The Declaration of Carole Mann is typical:

> When I learned that the FDIC was offering a buyout, I accepted it to avoid being terminated and losing the additional money offered by the buyout.  At the time I accepted the buyout, I knew that the number of positions in the Division of Resolutions and Receiverships was going to be reduced to less than half of its numbers and that almost all of the positions being eliminated were R&R Specialists and R&R Technicians

It is undisputed that plaintiff Haag took his cross-over demotion after he had already been advised that his position was "surplus." He took a demotion and moved to a different city because his job was eliminated, not because he volunteered.

13

## III. PROCEDURAL HISTORY

Plaintiffs gave notice to the EEOC and the Agency on October 31, 2005 of the intent of Barbara Aliotta and other former and current employees to file suit against the FDIC. Additionally letters were sent from October 31, 2005 thru February 21, 2006 adding other current and former employees as plaintiffs.

This suit was filed on December 5, 2005. Plaintiffs promptly filed a motion for class certification under Rule 23. After full briefing, the District Court granted the motion by Memorandum Opinion and Order of July 25, 2006.

In that ruling, the District Court noted that the Plaintiffs fall into two categories, those that accepted an offer or lower grade and those the FDIC terminated without regard to the buyout. Memorandum Op at 5. The Court concluded that "the plaintiffs and class members that accepted an offer... and who were terminated pursuant to the RIF presents sufficiently common questions regarding the FDIC's practices and downsizing; specifically whether the downsizing programs were implemented in a discriminatory fashion." Memorandum Op at 9. In addition the Court ruled that that factual issue "predominates because the evidence used will be common among the plaintiffs and potential class members." Memorandum Opinion 12 and 13.

After the notice of class certification, five members of the class opted out. In addition, three former employees of the FDIC joined this action as plaintiffs. Of the 52 plaintiffs, 16 of the plaintiffs were in the group of the 27 members of the class who were 50 and older. Greg Haag is a member of the class of the employees who accepted a reduction in grade. The remaining 35 plaintiffs are members of the class of 112 that accepted earlier retirement than intended because fo the downsizing program.

14

Discovery ended on January 25, 2008.  The cross motions for summary judgment were filed on February 25, 2008.  This memorandum in opposition is addressed to the Defendant's Motion for Summary Judgment.

## IV. ARGUMENT

Plaintiffs have produced direct and undisputed evidence that the 2005 downsizing was designed to achieve a cost savings by eliminating experienced workers so that money would be available to start a "Corporate University" program to train new workers.  Instead of creating opportunities for the older workers declared "surplus" as part of the downsizing, or halting the involuntary terminations after the "voluntary" buy outs had achieved the entire agency wide headcount reduction goal more than a year ahead of schedule, defendant made a deliberate choice to fire plaintiffs.   Almost all of the plaintiffs had long records of performing well, most of them in multiple roles, and many of them in the specific roles for which the new people are being trained.  All of them are over 50.  Not surprisingly, more than 90% of the 214 new employees hired in 2005, as the RIF's were proceeding, were under 50 years old.  None of the new trainees in Corporate University has finished the four year program necessary to prepare them for the functions many of the plaintiffs could have done right away.

The program of replacing older workers with younger ones  was approved and announced by Chairman Powell - a man who proudly proclaims that he prefers to surround himself with young people because they have all of the innovative ideas.  Stronger direct evidence of age discrimination is rare.

The direct evidence is supplemented by a strong statistical showing of adverse impact.  It is undisputed that the 2005 downsizing was designed in 2004 to achieve a reduction in headcount

by the end of 2005 through a combination of incentives (the carrot) and the threat and reality of involuntary terminations (the stick).   The program of offering buy-outs until May 2005 cannot be viewed in isolation as it was part of the same plan to cut the ranks at the oldest divisions of the Agency - the DRR and DIRM.   The involuntary terminations of September 2, 2005 and the "voluntary" severance program (VESP) were two parts of the same downsizing.  They must be analyzed as such.   Similarly, no analysis is complete without considering the fact that defendant hired 214 younger employees in 2005, even as it was downsizing the divisions with the oldest employees, and even after it had achieved its agency wide target headcount reduction by early 2005.

The pending cross motions for summary judgment raise two significant issues:

1) Whether the 2005 downsizing should be analyzed as a single plan to reduce headcount using both the "carrot" of buy-outs and the "stick" of RIF notices, limited cross-over opportunities and, ultimately, involuntary termination?

Defendant argues that employees who accepted the "voluntary" severance plan (VESP) offered from November 2004 through May 2005 or the opportunity for "crossover" demotions should not be considered in assessing the adverse impact of the 2005 downsizing even though it admits that the purpose of the VESP and crossover opportunities was the same as the purpose of the involuntary terminations - to eliminate employees from older divisions by the end of 2005 so that the budget for those positions could be used to hire trainees and staff for the "corporate university." Defendant admits that employees were provided specific[3] RIF plans with the

_____

[3] The plans called for all jobs to be declared "surplus" so that the incumbency advantages would be lost. They were specific enough to allow employees to see who they would be competing against for the newly created titles (doing their old jobs) and whether they would have

16

severance package in October 2004 and that the "voluntary" severance was available only if they resigned by May 2, 2004. Yet defendant argues that the decision to take the VESP or crossover opportunities was entirely voluntary. Defendant's expert limits his "average age" analysis to the population of the DRR and limits his examination of the 2005 downsizing to the events of a single day - September 2, 2005 - when the involuntary terminations became effective.

Defendant's argument is contrary to the established rule of law that an employee does not act voluntarily when he is given a choice between a severance package and the likelihood of involuntary termination without the severance benefit - "an offer he can't refuse." *See Adams v. Ameritech Services, Inc.* 231 F.3d 414, 433 (7th Cir 2000); *Henn v National Geographic*, 819 F.2d 824, 826 (7th Cir. 1987); *Bodnar v. Synpol, Inc.* 843 F.2d 190 (5th Cir. 1988). The rule applies in this Circuit to federal agency downsizing. The proper "practice" to analyze for either disparate impact or proof of pretext is the whole downsizing program - with the "carrot" and the "stick." It is error to look at a voluntary buy out program in isolation from a threat of involuntary RIF's that is designed to motivate employees to "volunteer" to leave. *See Schmid v. Frosch* 680 F.2d 248, 250 (D.C. Cir. 1982). As the 23 plaintiff declarations make clear, the decision to give up their jobs in exchange for half a year's severance pay and an early retirement package that was a small fraction of full retirement was made under explicit threat of termination with no severance. It was anything but voluntary.

2) Whether the defendant FDIC has met its burden of production to show that the adverse impact of the 2005 downsizing was the product of a "reasonable factor other than age." (RFOQ)? If defendant has met that burden, then the cross motions for summary judgment should be denied

---

a meaningful chance of competing for the jobs under the RIF rules.

and the case should go to a jury. If it has not, summary judgment for plaintiffs is required.

Defendant, as a federal employer, bears the burdens of production and persuasion to rebut plaintiffs showing of disparate impact by demonstrating the that downsizing was justified by a reasonable factor other than age. Defendant can establish the affirmative defense of RFOQ only if it produces evidence that meets the "business necessity standard." 29 CFR 1625.7(d). The RFOQ standard for federal employers under the ADEA is not the same as the standard for private employers that is presently before the Supreme Court. *Compare,* 29 C.F.R. 1625.7(d)(and (e), with, *Meachum et al v. Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118 (2008), S. Ct. No. 1505. Defendant has offered only the vaguest of reasons for: a) the recommendation of the Task Force; b) for deciding to increase the cuts in DRR recommended by the Task Force and; c) for deciding to go forward with involuntary terminations in DRR even after the agency had met its two year headcount reduction goal during the first few months of the downsizing program. There is at least a disputed issue for trial on this point.

### A. Plaintiffs Raise Substantial Evidence of Discrimination

#### 1. Plaintiffs Have Substantial Evidence of Age Discrimination

In order to defeat the present motion for summary judgment, plaintiffs must only raise a disputed issue of material fact. Plaintiffs contend that the undisputed facts of record are sufficient to prove that defendant, through its 2004-05 downsizing program terminated the employment of every member of the plaintiff class in violation of the ADEA. Plaintiffs have cross- moved for summary judgement accordingly. The evidence is more than sufficient to allow a reasonable juror to find for the plaintiffs.

Summary judgment may be granted only if the ""pleadings, depositions, answers to

18

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'" Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-

48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir.

2006).

> ""A fact is ''material'' if a dispute over it might affect the outcome of a suit under
> governing law; factual disputes that are ''irrelevant or unnecessary'' do not affect the
> summary judgment determination."" *Holcomb,* 433 F.3d at 895 (quoting *Liberty Lobby,*
> 477 U.S. at 248, 106 S.Ct. 2505). An issue is genuine if the evidence is such that a
> reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at
> 248, 106 S.Ct. 2505; *Holcomb,* 433 F.3d at 895.

*Breen v. Peters* 474 F.Supp.2d 1, 7 (D D.C. 2007).

Plaintiffs have produced substantial evidence that the 2005 downsizing had a disparate

impact. Both within the DRR and across the FDIC as a whole, workers over 50 were more likely

to be harmed by the downsizing than workers under 40. The disparity is statistically significant

at the 95%+ level - it cannot be explained by random selection. As explained below, defendant,

as a federal employer, bears a heavy burden to prove an affirmative defense of business necessity

to justify the RIF. The evidence it offers does not even meet the lighter burden of production on

a "reasonable factor other than age" that a private employer would have to meet in order to

present the issue to a jury under *Smith v City of Jackson,* 544 U.S. 228 (2005)*; Meachum et al v.

Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118 (2008), S.

Ct. No. 1505. It does not begin to meet the heavier burden imposed on federal employers.

Plaintiffs also offer substantial evidence of disparate treatment - that the 2005 downsizing

was motivated by and carried out with the intent to eliminate older workers and replace them

with younger ones. This is a "mixed case" involving both direct evidence of discriminatory

intent and strong evidence that the downsizing rationale was nothing more than a pretext to

eliminate older workers to make room for a new training program.

19

Plaintiffs have produced material direct evidence that Chairman Powell preferred to surround himself with young people due to his belief that they have all of the innovative ideas. Plaintiffs have produced material direct evidence that Chairman Powell approved and announced the 2005 downsizing for the purpose of using the cost savings to create a "Corporate University" and to hire trainees who would learn, after four years on the payroll, to do the jobs many of the plaintiffs had been doing for decades.

Apart from the direct evidence that the program was intended to replace older workers with younger ones, plaintiffs offer a statistical showing of adverse impact that is more than sufficient to support an inference of intentional discrimination under the "pretext" element of the *Reeves* burden shifting framework. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U. S. 133 (2000)

> Usually, proffering ""evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury."" *Carpenter v. Fed. Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir.1999) (citing *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284 (D.C.Cir.1998) (en banc)).

*George v. Leavitt* 407 F.3d 405, *413, 366 U.S.App.D.C. 11, **19 (C.A.D.C.,2005)

The evidence of intent is sufficient to raise a material issue of fact on the question of intent.

> Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ-a function traditionally left to the jury-summary judgment often will be an inappropriate means of resolving an issue of this character.

*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510-11, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Breen v. Peters* 474 F.Supp.2d 1, *8 (D.D.C.,2007).

### B. The 2005 Downsizing Was A Single Practice

As this Court noted, in ruling on class certification, there is a material factual question on the scope of the downsizing that should properly be analyzed for adverse impact. That the issue is material and in dispute is enough to defeat the present motion.

The parties fundamentally disagree regarding the discriminatory practice at issue in this action.  Plaintiffs contend that the undisputed facts of record establish that the 2005 downsizing was a single plan, developed in late 2004, that was intended to reduce the headcount of experienced employees throughout the FDIC - and most severely in the DRR and DIRM - so that the cost savings in the budget could be used to establish a new "Corporate University," to hire trainees to attend it and to hire younger employees throughout the agency - even as the involuntary terminations proceeded.  Defendant, while admitting that the VESP and the crossover opportunities were part of a plan to reduce headcount by the end of the year, argues that the involuntary component of the downsizing (the RIF) must be analyzed separately from the decision to undertake the downsizing, the decision to spend the money on new trainees and the VESP and crossover programs that were designed to and did encourage employees to "voluntarily" relinquish their jobs after being notified of the impending RIF.

To defeat the present motion, plaintiffs need only show that there is sufficient evidence in the record from which a finder of fact could conclude: 1) That the "carrot" of the VESP and crossovers was part of the same downsizing program as the "stick" of the RIF for disparate impact analysis; and 2) That the VESP and crossover plaintiffs were harmed by the decision to downsize and the consequent reality of an impending RIF.

### 1. The Downsizing was a Single Practice for Adverse Impact Analysis - Statistical Analysis Looks at All Employees Targeted by the Same Decisionmaker

The Court of Appeals for the DC Circuit has made it clear that it is improper to limit that analysis of the effects of a downsizing plan to the people who suffer involuntary terminations. Rather, the proper statistical analysis looks at all employees harmed by the RIF.  *Schmid v.*

*Frosch* 680 F.2d 248, 250 (D.C. Cir. 1982)[4].  Indeed, the Court of Appeals for the D.C. Circuit

has recently made it clear that a challenge to a single practice, carried out by related acts over

time, should not be fractured into multiple "discrete" acts of discrimination - even after the

rulings in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002) and

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S.Ct. 2162 (2007). *See Schuler v. PwC LLP,*

2008 WL 360923, Slip Op. at 26 (D.C.Cir. Feb 12, 2008).

The ruling in *Scmid* has been codified in EEOC regulations which, as discussed below,

are binding on federal agency employers like defendant.  29 C.F.R. 1625.22.  Those regulations

define an "exit incentive program" and "other employment termination programs" for purposes

of the waiver provisions of the 1990 amendments to the ADEA known as the OWBPA.  While

there is no contention in this action that any plaintiff signed a binding waiver[5] of his right to

bring this action, the definitions specify the information on adverse impact an older worker must

receive in order to make a waiver of his right to sue for age discrimination binding.  In other

_____

[4]The rule is the same in other Circuits.  *Currier v. United Technologies Corp.* 393 F.3d 246, 254 (1st Cir. 2004)(upholds Jury reliance on expert who analyzed effect of RIF on entire workforce of 183, not just the 44 positions ultimately selected as RIF targets); *Tyler v. Union Oil Co. of California* 304 F.3d 379, 392 (5th Cir. 2002)(proper to analyze all employees who received a "redeployment package" as harmed by a RIF); *cf, Blair v. Henry Filters, Inc.* 505 F.3d 517, *530 (C.A.6 (Mich.),2007)(analyzing pattern of terminations resulting in downsizing as a single practice for inferring intent).

[5] The evidence defendant offers does not come close to the statutory requirements for waiver of plaintiffs' right to challenge the action as non-voluntary. *See*, 29 USC 636(f)(1)(H); *Adams* at 430-431.  The Request for Personnel Action, Form 52, cited by Defendant at Ex. 8, does not support its proposition that "plaintiffs who acknowledged to take the buyout expressly acknowledged on their buyout application forms that they submitted their applications voluntarily." Def. Mtn. at 24-5.  While page 3 of the four page Exhibit does recite that the "Nature of Action" as "Retirement-Voluntary," that computer-generated seemingly standard language, not put there by any plaintiff, cannot be deemed an express acknowledgment that accepting a buy-out is in fact "voluntary," as much as the FDIC would like to classify it as such.

words, they define what constitutes sufficient notice of the adverse impact of a downsizing program to make a waiver binding. They are highly relevant to determining what constitutes a termination program in the context of this case.

The EEOC regulations resolve two of the key differences between the analysis offered by plaintiffs' expert, Dr. Seberhagen, and defendant's expert, Dr. Jeanneret:

1) Under the regulations, a "decisional unit" for an employer who analyzes operations at several facilities, or divisions, includes the entire workforce at all of the facilities considered. 29 C.F.R. 1625.22(f)(3)(ii)(E).   In this case, the decisional unit is the FDIC because the incentive for a buyout was offered to all or almost all of the employees of the FDIC were offered the incentive to leave the employment of the agency.   The agency-wide unit is also appropriate in light of the decision to hire new, younger employees in other divisions even as older employees were being fired from the DRR as "surplus." Similarly, all of the decisions made by the FDIC were made at its headquarters in the District of Columbia, so that the 2005 program had only one decisional unit. 29 C.F. R. 22(d)(3) and 22(f)(iii)(B) and (C) and (iv) (3).

2) Under the regulations, a downsizing program that takes place in increments over time, requires the employer to provide cumulative information to make later waivers binding.  29 C.F.R. 1625.22(f)(3)(vi).  Similarly, a single "program" can include both voluntary and involuntary components.  29 C. F. R. 1625.22(d)(3).  In other words," voluntary" exit incentives followed by involuntary terminations must be analyzed together when they are all part of a single program designed to achieve a force reduction goal.

Contrary to defendant's assertions, there is no rule of law requiring a change in the average age of some component of the employer's workforce in order to prove age

discrimination.[6]  The question is whether age played an impermissible role in the decision, not whether enough people were laid off or hired in a particular part of a unified program to change the average age of the workforce in a part of the impacted workforce.   Thus, in *Blair v. Henry Filters, Inc*. 505 F.3d 517, 530 (6th Cir.2007),  the court rejected both parties' assertions regarding the impact of a series of terminations on the average age of employees because neither one properly defined the groups for comparison.

It is the impact of the downsizing program and the intent of the decision maker in designing and implementing the program that is relevant to adverse impact analysis.  *Id.*  See also, Ex. 1.  The proper decisional unit and temporal unit is, therefore, defined by the facts of the case. Where the Chairman and leading executives of an agency decide to eliminate employees throughout the agency in order to achieve a specified numerical reduction by the end of the budget year, the proper decisional unit is the agency and the proper temporal unit is the budget year.  The question for analysis is the one Dr. Seberhagen addressed: Whether younger workers fared substantially better in the overall 2005 downsizing than their older peers.  The answer is unequivocally "Yes."

### 2. All Plaintiffs Were Harmed by the 2005 Downsizing Program

The ADEA prohibits discrimination in the terms and conditions of employment, not just in termination decisions.  When an employer forces its employees to choose between two options - both of which leave him in a worse position - the employee who chooses the lesser harm is still

---

[6] *Bender* contains no such rule.  Defendant's reliance on *Ridenour v. Lawson Co.* 791 F.2d 52, *57 (C.A.6 (Ohio),1986) is similarly misplaced.  There, the plaintiff did not proffer any statistical analysis so that the defendant's evidence that the RIF cause no adverse age impact stood unrebutted

a victim of age discrimination. Indeed, the employee is arguably obligated to mitigate his

damages by taking the lesser harm. The employee who accepts a demotion or a severance

package in order to avoid the likely prospect of involuntary termination without severance is

simply mitigating the harm he will suffer by reason of the downsizing program.

> Their decisions to accept demotions to lower paying and lower status jobs were taken in
> the face of this possibly discriminatory action. These plaintiffs were not faced with a truly
> voluntary choice: because they were already on the ""at risk"" lists, they knew that they
> sat between the Scylla of a better job but with low security, and the Charybdis of a lesser
> job but with high security. If the plaintiffs succeed in demonstrating that the RIF was
> infected with and motivated by age discrimination, then they should be allowed to
> proceed with their claim that their decisions to accept demotions were the result of the
> same discrimination.

*Adams v. Ameritech Services, Inc.* 231 F.3d 414, 433 (7th Cir 2000).

The undisputed evidence of the circumstances of the choice is more than sufficient to

raise a triable issue of fact whether the plaintiffs who took the VESP incentive or who took

crossover demotions were harmed by the downsizing. Most class members were faced with a

choice of "voluntary" early retirement; applying for a "voluntary" demotion; or competing for

positions that they had less than a 50% chance of obtaining. Plaintiffs who accept a buy out or

demotion under such circumstances are as much victims of the unlawful Buy Out and RIF

Program as the plaintiffs who refused the buy out and suffered involuntary terminations in

September 2004.

An employee "voluntarily" accepts a severance package when he is given the choice of

maintaining the status quo, or taking an additional benefit. An employee does not act voluntarily

when he is given a choice between a severance package and the likelihood of involuntary

termination without the severance benefit - "an offer he can't refuse." *Henn v National

Geographic*, 819 F.2d 824, 826 (7th Cir. 1987); *Adams*, supra. A severance offer violates the

ADEA where the employer "manipulated the options so that they were driven to early retirement not by its attractions but by the terror of the alternative. If the terms on which they would have remained at [their employer] were themselves violations of the ADEA, then taking the offer of early retirement was making the best of things, a form of minimization of damages." *Adams*, 432. The *Henn/ Adams* standard has been adopted by every opinion identified by either party to this case. *Rowell v. BellSouth Corp.* 433 F.3d 794, 805 (11th Cir. 2005); *Burks v. Oklahoma Pub. Co.* 81 F.3d 975, *978 (C.A.10 (Okl.),1996), *cert denied* 519 US 931 (1996); *Mitchell v. Mobil Oil Corp.* 896 F.2d 463, *467 (C.A.10 (Colo.),1990); *Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); *Schuler v. Polaroid Corp.,* 848 F.2d 276 (1st Cir.1988); *Bodnar v. Synpol, Inc.* 843 F.2d 190, *192 -193 (5th Cir. 1988)(opinion directs verdict for defendant).

In the present case, the "buy out" was involuntary because employees were faced with "an offer you can't refuse." They could take the early retirement or face a greater than 50% prospect of involuntary termination with no early retirement or incentive payment.

All plaintiffs were faced with the reality that the would lose their positions and that, unless they took "voluntary" alternatives, they would have to compete for newly re-named jobs in a game of musical chairs that less than half of the workforce would survive. Most of the plaintiffs were provided with charts and other information by which they could gauge their chances of surviving the game in light of veteran's preferences, the decision to keep all higher grade managers and the decision to limit cross-over opportunities. All plaintiffs were faced with the further knowledge that they would receive severance payments if the "voluntarily" resigned, but would receive no severance if they chose to compete for the available jobs.

### C. The 2005 Downsizing Violated the ADEA

Plaintiffs offer three parallel and cumulative kinds of evidence of unlawful discrimination:

26

First, the design of the 2005 downsizing and the admission by Chairman Powell that he prefers younger workers constitute powerful, direct evidence of discrimination. Such evidence supports a finding of age discrimination unless the defendant can show that it would have designed the same program even if it had not been trying to replace the older workers with younger ones. *Price Waterhouse v. Hopkins,* 499 U.S. 228 (1989); *Hopkins v. Price Waterhouse,* 920 F.2d 967, 972, 287 U.S.App.D.C. 173, 178 (1990). Such a showing would require extensive evidence of a business necessity for the downsizing which is entirely absent from the present record.

Second, it is not disputed that the overall effect of the 2005 downsizing was to eliminate older workers from the DRR and from the FDIC at a significantly higher rate than younger workers were eliminated. Such a showing of disparate impact is sufficient to prove unlawful age discrimination even without evidence that the discriminatory result was intended. *Smith v City of Jackson*, 544 U.S. 228, 239, 243 (2005). Once again, the defendant would have to make a strong showing that eliminating older worker head count in order to shift part of the budget to new employee training was required by a reasonable factor other than age that amounts to business necessity. It has made no such showing.

Finally, to the extent an inference of discrimination is required to defeat defendant's motion, the record supports such an inference and provides ample evidence of pretext. There is no question that older workers fared worse than younger workers in the downsizing. There is strong evidence that the downsizing was undertaken to make room for new trainees who will, presumably, perform duties plaintiffs could have performed, once they finish the training the plaintiffs completed many years before. The 2005 downsizing was motivated not by a need to

27

cut costs, but by a desire to shift budget priorities. Defendant has offered no study, analysis or other evidence to support the notion that a 50%+ cut in the DRR workforce was required for the efficiency of the agency operations. Indeed, the decision appears to have been made without any consideration of the functions of the jobs. Oddly, almost all of the younger, but more expensive management employees were retained while most of the senior, cross trained and less expensive workers were declared "surplus." The fact that defendant went forward with plans to fire more than 50 DRR employees even as it hired 214 new employees into other divisions, and even after the agency wide headcount reduction had been accomplished is difficult to explain by any reason other than age discrimination. Defendant has offered no explanation to account for that decision.

### 1. Direct Evidence

There is no need to infer age discrimination when there is direct evidence. The *McDonnell Douglas/ Reeves* burden-shifting analysis is, therefore, "inapplicable where the plaintiff presents direct evidence of discrimination." *See, e.g., Trans World Airlines, Inc. v Thurston,* 469 U.S. 111, 122 (1985); *accord, AARP v. Farmers Group, Inc.,* 943 F.2d 996, 1000 n. 7 (9th Cir.1991). Direct evidence, in the context of an ADEA claim, is defined as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the *fact finder* to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co., Inc*., 389 F.3d 802, 812 (9th Cir. 2004), citing, *Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 426 (8th Cir.1999) (alteration in original, emphasis added) (quoting *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993)); see also, *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (C.A.9 (Cal.),2000), citing, *Gerdom v.*

28

*Continental Airlines,* 692 F.2d 602, 608 (9th Cir.1982) (en banc).

### 2. The 2005 Program Had a Significant Disparate Impact

Whether an employer had a discriminatory intent is one for the finder of fact. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U. S. 133 (2000). However, plaintiffs no longer need to prove discriminatory intent in order to obtain relief. *Smith v. City of Jackson,* 544 U. S. 222 (2005). To establish a *prima facie* case of disparate impact, the petitioners must show that an agency practice or policy, while neutral on its face, disproportionately impacted members of the protected class through a presentation of statistical evidence that demonstrates a statistical disparity that is linked to the challenged practice or policy. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988). Specifically, the plaintiffs must 1) identify the policy or practice challenged; 2) show the statistical disparities, as shown in Dr. Seberhagen's reports, and 3) show that the disparity is linked to the challenged policy or practice.

A *prima facie* showing of adverse impact shifts the burden to the FDIC to show that the adverse impact was a attributable to a "reasonable factor other than age" *Smith,* 544 U.S. 228, 239, 243 (2005). Because the FDIC is a federal employer, the RFOQ is an affirmative defense whose proof is governed by the binding regulations of the EEOC. Those regulations require that practices with a significantly significant adverse impact on older workers must be justified by business necessity. *See infra.* Defendant has not even come close to such a showing on the present record. The motion for summary judgment should be denied.

"Statistical analyses have served and will continue proving an important to serve an important role in cases in which the existence of discrimination is a disputed issue.'"*Teamsters v. United Sates,* 431 U. S. 324, 339 (1977); *Palmer v. Schultz,* 815 F.2d 84 (D. C. Cir. 1987);

29

*Adams et al. v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000).

Statistical proof is highly probative of disparate impact. The Supreme Court has recognized that a disparity of more than two or three standard deviations in a large sample makes "suspect" the contention that the differential occurs randomly. *See, Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Palmer v Shultz*, 815 F.2d 84 (D.C. Cir. 1987). Just as proof of disparate impact creates a Title VII claim, so too, it creates a claim under the ADEA. *Smith et al. v. City of Jackson,* 544 U. S. 228 (2005).

The Court of Appeals for the DC Circuit has made it clear that it is improper to limit that analysis of the effects of a RIF to the people who suffer involuntary terminations. Rather, the proper statistical analysis looks at all employees harmed by the RIF. *Schmid v. Frosch* 680 F.2d 248, 250 (D.C. Cir. 1982).

The disparity Dr. Seberhagen, (Pl. Exh. 1), is more than sufficient to require defendant to explain how such a discriminatory result could have been caused by a reasonable factor other age. It has not done so. Plaintiffs have made a sufficient showing of disparate impact to support summary judgement.

Defense counsel, in attempting to justify its expert's analysis (p. 35), confuses several concepts relevant to statistical analysis.

Statistical significance does not measure the size of a difference in age. A difference in age of one month might be statistically significant across a large sample, even if it has little legal significance. Rather, statistical significance is a measure of the deviation of the observed result from the result predicted by an age neutral model. In 100 coin flips, a neutral model would

30

predict 50 heads and 50 tails, but random variation might lead to 30 heads and 70 tails. A result of 98 heads and 2 tails leads to a strong inference of non-random influence because it is so far from the expected distribution.

A disparity is "statistically significant" if the result is so far from the result predicted by random selection that chance can be ruled out at the 95% certainty level. In other words, the result is 95% likely to have been caused by a non-random influence. This typically occurs when the observed result is more than two "standard deviations" from the expected result. *See, Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Castaneda v. Partida, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Palmer v Shultz*, 815 F.2d 84 (D.C. Cir. 1987).

Failure to account for "statistical significance" as a way to rule out random variation as an explanation of an observed disparity in age detracts substantially from the probative value of a statistical analysis. *Bender v Hecht's Dept Stores*, 455 F.3d 612 (6th Cir. 2006), cert denied 127 SCt.2100 (2007). Similarly, a statistical analysis of a RIF selection process that relied on store sales and manager competence ratings, must account for those factors absent evidence that they were not reasonable factors other than age used in making the decision. *Id.* Failure to account for defendant's stated reasons eliminates any use of the analysis to show pretext. *Id.*

Plaintiffs have demonstrated that the difference between the RIF related termination rate for FDIC workers over 50 and the comparable rate for workers under 50 over the course of 2005 is statistically significant. Random variation does not account for the age bias. Defendant has offered no factor other than age discrimination that accounts for the observed difference.

### i. EEOC Regulations Defining Terms Under the ADEA Are Binding on

**Federal Agency Employers.**

Under Executive Order 12106 (1978) the EEOC is 'responsible for directing and furthering implementation of the Policy ....to provide equal opportunity in Federal employment for all employees...and to prohibit discrimination in employment because of ....age." See Sec. 3. That Order also directs the Commission "to issue such ...regulations...and instructions....", and states that "The head of each department or agency shall comply with the ...regulations ...and instructions..issued by" the Commission. E. O. 2106 at Sec. 3, 4, and 5. See also, Reorganization Plan No. 1 of 1978, 43 FR 19807.

### ii. Reasonable Factor Other Than Age is an Affirmative Defense

The Regulation of the EEOC states: "When the exception of a 'reasonable factor other than age is raised...the employer bears the burden of showing that the 'reasonable factor other than age' exists. 29 C. F.R. 1625.7(e). The regulation is consistent with the statute and is binding on defendant. Defendant bears the burdens of production and persuasion on RFOQ.

Under the ADEA, the "reasonable factor other than age' is an exception to the Act, 29 U. S. C. 626(b)(4); 29 C. F. R. 1625.7.

The burden of proving justification or exemption under a special exception to the prohibitions of a statute normally rests on the party who claims its benefits. *FTC v. Morton Salt Co.*, 334 U. S. 37, 44-45 (1948). Accord: *Shaffer ex rel. Schaffer v. Weast,* 546 49, 57 (2005).

Congress placed the "reasonable factor other than age exception" in 29 U. S. C. 626(f)(1), together with the " bone fide occupational qualification" or BFOQ, exception. *Id.* The BFOQ exception to the prohibition on age discrimination in the ADEA is an affirmative defense to the

employer who claims its benefits. *Western Air Lines, Ind.*, 472 U. S. 400, 416-417& n. 24 (1985). In that case, the Court noted that an EEOC regulation so provided, and was consistent with the legislative history of the ADEA. Id.

The normal construction of such placement is that Congress intended the same burden for the "reasonable factor other than age" exception. See cases cited above. In any event, the EEOC regulation should control, particularly with respect to Federal agencies, in light of E. O. 12016.

In this case, Defendant has not offered evidence to show a defense based upon "a reasonable factor other than age" Sec. 4(f)(1) of ADEA, 29 U. S. C. 626(f)(1); 29 C. F.R. 1625.7.

### iii. Only a Showing of Business Necessity Can Justify a Significant Adverse Impact Against Older Federal Employees

The ADEA Regulations of the EEOC provide that when an employment practice by an employer causes an "adverse impact" against "individuals within the protected age group, it can only be justified as a business necessity." 29 C.F.R. 1625.7(d), and (e).

In this case, the Defendant Agency offers no proof of the existence of any such factor, but contended itself with a vague statement that it had good business reasons for carrying out the program.

The Regulations of the EEOC expressly provide that "when,,,such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity." 29 C.F. R. 1625.7(d).    As Justice Scalia states in his concurring opinion, in *Smith et al. v City of Jackson*, 544 U. S. 228, 244 ( 2005), the regulation represents EEOC and Department of Labor policy going back to at least 1970, and should be accorded great deference even in the case of private employers for whom the interpretation is non-binding.    That the

standard applies to federal employers for whom the regulation is binding follows *a fortiori*.

The Supreme Court has accepted *certiorari* in a case raising the applicability of the business necessity concept to the RFOQ defense under the ADEA. *Meachum et al v. Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118 (2008), S. Ct. No. 1505. Argument is scheduled for April 23, 2008. The employer in that case is however not a Federal Department or Agency, so that the Regulation of the EEOC is not binding on the employer, as it is in this case.

### iv. It is well established that ADEA claims against a federal agency are cognizable

Contrary to Defendant's assertions, it is well settled that disparate impact claims against the government are cognizable. *See, e.g.*, *Smith, et al. V. City of Jackson*, 544 U.S. 228 (2005); *Breen v Peters*, 474 F.Supp.2d 1, 6-7 (D.DC 2007); *Cameron v. U.S.P.S.*, EEOC Appeal No. 07A40130 (Sept. 20 2005), *reh'g denied*, EEOC Request No. 05A60099 (Dec. 22, 2005); McCullom, et. al. v. Dept. of Transportation, EEOC Doc 07A60055 (Oct. 26, 2006); *but c.f.*, Def. Mtn (III.B.2.)

### v. Limits On Civil Service Protections Do Not Limit ADEA Remedies

Defendant relies on *Terban v Dept of Energy*, 216 F.3d 1021 (Fed. Cir. 2000) for the proposition that a retirement is "presumed voluntary." *Terban* did not make a claim of age discrimination under the ADEA and was not subject to the choice of taking a "voluntary" incentive or facing a high risk of involuntary termination under a RIF. The "presumed voluntary" retirement rule is well established in appeals from MSPB rulings. MSPB appeals are based on civil service rights under Title 5 of the United States Code. They proceed under an

34

"arbitrary and capricious" standard. The standards for an MSPB appeal are irrelevant to analysis

of the ADEA claim in this action. Federal employees enjoy parallel protections under Title 5 and

the ADEA. *See*, *Ikossi v. Department of Navy* 2008 WL 540234, *3 __ F.3d __, (D.C. Cir.

2008) (Error to limit ADEA or Title 5 rights under "mixed case" processing statute, 5 U.S.C. §§

7702(e)(1)); *Strawberry v. Albright* 111 F.3d 943, 947 (DC Cir. 1997)[7]

### 3. Disparate Treatment

The record also contains ample evidence from which a finder of fact could infer

discriminatory intent under the burden shifting frameworks of *Reeves v. Sanderson Plumbing*

*Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *Murray v. Gilmore* 406

F.3d 708, 713, 365 U.S.App.D.C. 372, 377 (D.C Cir. 2005);*Blair v. Henry Filters, Inc.* 505 F.3d

517, *530 (C.A.6 (Mich.),2007.

Plaintiffs offer both direct evidence of Chairman Powell's discriminatory motive and

strong evidence supporting an inference that the proffered explanation for declaring plaintiffs'

jobs "surplus" was a pretext for age discrimination.

> Usually, proffering ""evidence from which a jury could find that [the employer's] stated
> reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.""
> *Carpenter v. Fed. Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir.1999) (citing *Aka v.*
> *Wash. Hosp. Ctr.,* 156 F.3d 1284 (D.C.Cir.1998) (en banc)).

*George v. Leavitt* 407 F.3d 405, *413, 366 U.S.App.D.C. 11, **19 (C.A.D.C.,2005)

The fact that defendant continued to hire younger employees even as it fired older

---

[7] Holds that general provisions of the ADEA do not nullify specific mandatory retirement
age in the foreign service retirement act amended after the ADEA was passed.  ("the ADEA's
general prohibition of age discrimination does not prohibit enforcement of the mandatory
retirement provisions" of the foreign service retirement law.)  Thus, the general absence of rights
under Title V does not abrogate specific rights under the ADEA.

employees in the DRR is enough evidence of pretext to defeat the present motion.  The overall

design of the downsizing, the absence of any justification for the original goals set by the Task

Force; the absence of any rationale for the expanded goal imposed by Bovenzi in 2004; and the

irrationality of the decision to proceed with terminations in 2005 even after the severance

program had scared enough employees into leaving to meet the expanded goal, when taken with

the other facts of record, is more than enough to support a finding of pretext.

Defendant claims that it is "undisputed that the FDIC followed US OPM regulations in

conducting the RIF" Def. Mtn. 29 However, Defendant did not observe  "bump" rights, or other

preferences traditionally afforded to RIF victims.

Plaintiffs maintain that the  Defendant Agency placed the names of some of the plaintiffs

and other older employees on a Re-employment Priority List, but the Defendant Agency filled

any vacant positions with younger and less senior employees who were no better qualified than

plaintiffs and no better qualified than other older workers such as Mr. Keller. [8]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's

Motion for Summary Judgment.

-----

[8]Dennis Keller, who was on the FDIC's Re-employment Priority List as a separated
employee.  The FDIC rehired Mr. Keller in December 2006–not during the fall of 2006.
According to the remarks in the relevant Notification of Personnel Action, the "appointment
[was] processed retroactively to rectify administrative oversight in applying FDIC RPL policy."
See attached: 1) FORM 50-Notification of Personnel Action (noting a December 26, 2006
approval date, but an  effective date of September 3, 2006); 2) Mr. Keller's attached W-2s for
2005 and 2006; and 3) redacted letter from Mr. Keller dated April 20, 2007.
Dennis Keller passed away in July 2007, as FDIC's records should show.
Mr. Keller accepted the job offered in the winter/December 2006, which was not offered in
September 2006 in connection with the Reemployment Priority List.

**Respectfully Submitted,**

/s/ David L. Rose
David L. Rose
Joshua N. Rose
Dotie Joseph
ROSE & ROSE, P.C.
1320 19th Street, NW, Suite 601
Washington, D.C. 20036
(202) 331-8555
(202) 331-0996 fax
daver@roselawyers.com
josh@roselawyers.com
djoseph@roselawyers.com

Dated: March 10, 2008                    Attorneys for Plaintiffs

37