# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BARBARA ALIOTTA, et al and<br>Others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case Number 1: 05CV02325 |
| | ) | Class Action |
| v. | ) | |
| | ) | |
| SHEILA BAIR, CHAIRMAN, | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### Plaintiffs Reply Memorandum In Support of
### Plaintiffs Motion for Partial Summary Judgment

David L. Rose
Joshua N. Rose
Dotie Joseph
ROSE & ROSE, P.C.
1320 19th Street, NW, Suite 601
Washington, D.C. 20036
(202) 331-8555
(202) 331-0996 fax
daver@roselawyers.com
josh@roselawyers.com
djoseph@roselawyers.com

Dated: March 24, 2008                    Attorneys for the Plaintiff Class
As Corrected: March 26, 2008

# TABLE OF CONTENTS

Page No.

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Re-Organization Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.  The Headcount Reduction Goal is Unsupported by Rational
Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  The 2005 Downsizing Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3. The Buy Out Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4. The September 2005 Involuntary RIF . . . . . . . . . . . . . . . . . . . . 5

5. Corporate University Hires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6. Disparate  Impact - The Seeberhagen Report . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.  Plaintiffs Have Shown Adverse Impact  . . . . . . . . . . . . . . . . . . . . . . . 11

II.  The Buyouts Offers Are Actionable Age Discrimination . . . . . . . . . . 14

III.  Defendant Offers No Relevant Evidence of a Reasonable Factor
Other Than Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Statutes Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appendix, A-1,A-2

# TABLE OF AUTHORITIES

i

Page No.

**STATUTES AND REGULATIONS**

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621
    *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,15,A-1

29 U.S.C. §§ 623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 U.S.C.§§ 623(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, A-1

29 U.S.C. §§633a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,18, A-1,A-2

29 C.F.R §§ 1625(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

29 C.F.R. §§ 1625 (d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 C.F.R §§ 1625.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 C.F.R.§§ 1625.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 C.F.R. §§ 1625.7(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,18,20,A-2

29 C.F.R. §§ 1625.7 (d) and (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**CASES**

*Adams v. Ameritech Services, Inc.*,
    231 F.3d 414 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12, 15-17

*Arnold v. U.S. Postal Service,*
    863 F.2d 994, 999, 274 U.S.App.D.C. 305, 310 (D.C. Cir.1988) . . . . . 9, 12

*Barrett v FCC*,
    1984 WL 484622 (EEOC 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Blair v. Henry Filters, Inc.*,
    505 F.3d 517, 532 -533 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 9,11

*Bodnar v. Synpol, Inc.*,
    843 F.2d 190, 192 -193 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brite v Dept. Of the Navy*,
    1983 WL 411679 (EEOC 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Burks v. Oklahoma Pub. Co.*,
    81 F.3d 975, *978 (10th Cir.,1996), *cert denied* 519 US 931 (1996) . . . . . 16

*Burlington v White*,
    548 US 33 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Castaneda v. Partida*,
    430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) . . . . . . . . 11

*Connecticut v. Teal*,
    457 U.S. 440 102 S.Ct. 2525 (U.S.Conn.,1982) . . . . . . . . . . . . . . . . . . . . 12

*Currier v. United Technologies Corp.*,
    393 F.3d 246, 254 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dukes v. Wal-Mart, Inc.*,
    509 F.3d 1168, 1181 -1182 (C.A.9 (Cal.),2007) . . . . . . . . . . . . . . . . . . . . . 21

*Gloria Weinrauch v. Department of the Treasury*,
    1983 WL 500299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hazelwood Sch. Dist. v. United States*,
    433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) . . . . . . . . 11

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174, 1188 (9th Cr. 2002), *cert den.*537 US 1110 (2003) . . . . . . 21

*Henn v. Nat'l Geographic Soc'y*,
    819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98
    L.Ed.2d 394 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
 127 S.Ct. 2162 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Loeb v. Textron, Inc.*,
 600 F.2d 1003, 1011 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McClain v. Lufkin Industries, Inc.,*
 F3d. ____, 2008 WL 542165, 8 (5th Cir., 2008) . . . . . . . . . . . . . . . . . . . 9, 12

*Meachum et al v. Knolls Atomic Power Lab,*
 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118 (2008), S. Ct. No.
 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 19

*Mitchell v Mobil Oil,*
 896 F.2d 463, *467 (C.A.10 (Colo.),1990) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*National Railroad Passenger Corporation v. Morgan,*
 536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ottaviani v. State University of New York at New Paltz,*
 875 F.2d 365, 374 (C.A.2 (N.Y.),1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Palmer v Shultz,*
 815 F.2d 84 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Pippin v. Burlington Resources Oil And Gas Co.,*
 440 F.3d 1186, 1201 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rowell v. BellSouth Corp.,*
 433 F.3d 794 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Schmid v. Frosch,*
 680 F.2d 248, 250 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12

*Schuler v. PricewaterhouseCoopers, LLP,*
 514 F.3d 1365 (D.C. Cir. Feb 12, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith et al. v. City of Jackson,*

544 U. S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11,18-19

*Sobel v. Yeshiva University*
    839 F.2d 18, 36 (C.A.2 (N.Y.),1988), *cert denied* 490 US 1105 (1989) . . 22

*Teamsters v. United Sates*,
    431 U. S. 324, 339 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tyler v. Union Oil Co. of California,*
    304 F.3d 379, 392 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## FACTS

**The Re-Organization Plan**

### 1. The Headcount Reduction Goal is Unsupported by Rational Analysis

In October 24, 2004, the FDIC management, under Chairman Powell and Chief

Operating Officer Bovenzi announced and implemented a reorganization plan for DRR, a buyout

program, and an enhanced recruitment on college campuses and elsewhere and hiring program

by the Agency itself called, the Corporate Employee Program.  Ex. 6 to Def. Motion for

Summary Judgment (Doc. No. 43-4).  In the same period of time, the defendant renamed and

enlarged the training unit of DSC and called it Corporate University. The parties agree that the

2005 FDIC budget was "essentially unchanged from 2004" except for increases due to inflation,

although it did reduce "authorized staffing by 674 positions (12%) by year end-2005." [Ex. 9 in

Opp. to Def. Mo SJ].  The proposed reduction in staffing was suppose to occur in large part

because of the reduction of DRR by between 500 and 600 positions.

A task force was convened in the Spring of 2004 to study the size of the agency.  The

study was not motivated by any economic need as the FDIC personnel budget was substantially

over funded in both 2004 and 2005.  Defendant's personnel expenditures for 2005 were $30

million (4%) *below* budget for that year  "primarily due to positions that were budgeted, but

subsequently abolished due to buyout separations." Ex. 15 (CFO report for Q4, 2005), pp. 2, 6.[1]

Similar surpluses occurred in 2004.  Ex. 14.

On August 21, 2004,  Mr. Glassman, the Director of the Division of Resolutions and

---

[1] Indeed, the DRR used only 53% of its budgeted funds for 2005.  By contrast, Corporate University used 98% of its budget.  No budget shortfall occurred.  Ex. 1, p. 14.

Receiverships ("DRR") recommended that the DRR should have a 501 employee headcount for 2005.  Ex. 11 (**Mergen Dep.), pg.  24, 26, and 28.**  On September 6, 2004, the task force, led by Mr. Seegers, recommended that the DRR headcount be reduced from 517 to 342...a 34% reduction in total staff [that] will save an estimated $21 million in annual salary costs." FDIC's Response to Plaintiffs' Request for Admission 44.

On October 25, 2004, Mr. Glassman recommended that DRR headcount be reduced from 514 down to 236 - a 54% reduction.  DSMF #25; Def. Ex. 5.  Director Glassman attributes the need to cut staff in DRR to a "new business model" which relies on DSC personnel to do the work of DRR employees and relies on the Corporate Employee Program to provide such employees with the training necessary to perform the specialized functions previously performed in DRR. Def. Ex. 5.  By not designating any CM1, CM2 or EM positions as "surplus", Defendant's planned to preserve all of the higher paid management level DRR employees.  *Id.*

On October 26, Mr. Glassman announced a reduction in headcount from 515 to 240. Def. Mtn, Ex. 7.   In other words, 275 (53.4%) of jobs in the DRR were targeted for elimination.

The record contains no study or analysis of positions to support the October 25 recommendation, or Mr. Bovenzi's adoption of that recommendation as a downsizing requirement for 2005 in his October 26 memo to employees.  The record contains no study of the skill, potential for transfer, or retraining of plaintiffs or others harmed by the separation.  It is undisputed that individual employee characteristics were not considered in deciding which jobs or which incumbents would be eliminated.  The plan was simply to shift employee positions from the DRR to the Corporate Employee Program to be assigned to other divisions over the course of the ensuing years.

2

**2.  The 2005 Re-Organization Plan**

Instead of moving the DRR personnel to positions in DSC where they would be available to assist with DRR functions as the need would arise, the October 2004 Bovenzi memo calls for the elimination of 500-600 employees agency wide during the course of 2005-2006.  This represented about a 10% cut in the agency workforce. Pl. Ex 1 - Seeberhagen Report, p. 11 Table 13.

As noted above, the plan for 2005-06 specified that DRR would lose some53.4% of its budgeted positions.  Although DRR had about 10% of the FDIC workforce, the plan called for about 50% of the headcount reduction to come from that Division.  The only justification offered by defendant is that the banking industry was in an up cycle that year, resulting in a lack of work in DRR.  There is no evidence that nobody anticipated that the industry would suffer future downturns and increased in the need for DRR functions. DRR was the division with the highest number of employees over 50.  Some 64.2% of DRR employees were over 50 as compared to 30.3% for DSC (which was cut by only 5.7%).

It is undisputed that the October 26, 2004 memos advised DRR employees that some 54% of their jobs would be eliminated.  Director Glassman makes specific reference to outplacement assistance and to the "crossover" opportunities that would be available through the "Corporate Employee" (Corporate University) program. Def. Ex. 7.  Only 56 out of the 275 DRR employees were selected to be part of the program Corporate University trainees and 225 other employees targeted for elimination. Pl. Ex. 13.  Another 20 or so managed to find other transfer opportunities.  The remainder had to be eliminated according to the plan.

The downsizing program was also designed to eliminate the seniority rights on a

3

mandatory RIF. Instead of eliminating only the surplus jobs, the re-organization plan also re-named most of the remaining positions and forced all remaining employees to compete for jobs under new job titles, depriving them of normal rights to bump into titles they had previously held. Def. Ex. 5.

### 3. The Buy Out Program

The FDIC had offered a number of buyout programs as part of downsizing programs from 1995 through 2003. Employees remaining at the end of 2004 had, thus, decided to remain employed despite numerous more or less voluntary early retirement opportunities.

The October 26, 2004 Bovenzi memo, Def. Ex. 5, states that a buy-out program would be made available from November 2004 until May 2005, but that the agency anticipated a need to make involuntary cuts in staffing in DRR and other divisions during 2005. The Glassman memo of the same date, Def. Ex. 7, spells out the 53.4% cut in DRR staffing as the reason for the buyout offer and states that specific charts of targeted positions would be posted.

Plaintiffs have provided 23 declarations of individual class members who took the buy-out. Pl. Ex.s B1-B23 is support of their Motion for Class Certification. Every one of them avers, under penalty of perjury, that he or she reviewed the available options and felt compelled to take the buyout as the better alternative to involuntary separation. The buyout package was not financially attractive to most class members–especially in light of what they would have earned had they continued their employment, and in comparison to the compensation they could reasonably expect to earn at their age.[2] Plaintiffs offer information about selected Plaintiffs

---

[2] Under both the FERS and the CSRS retirement systems, federal employees qualify for retirement benefits based on a combination of age and years of service. For employees who have less than a combination of 55 years of age and 30 years of service, there is a strong incentive to

4

showing that they were qualified for positions for which more junior employees were retained. Ex. 27.  Defendant offers no contrary proof and has not even deposed the declarants.

The result of the buy out program was that, by May 2005, some 578 FDIC employees had accepted the buy-out.  Crosser Decl. para. 12.  Defendant had, thus, met the goal of a 500-600 person reduction in FDIC headcount during 2005-2006, at least a year ahead of schedule. As the COO report for Q4 2005 recites, the unexpectedly high response to the buyout resulted in a large personnel budget surplus for 2005. Ex 15 (Q4 2005 CFO Report).

### 4.  The September 2005 Involuntary RIF

The buy-out resulted in many vacancies in parts of the agency other than DRR that had not been targeted as surplus positions.  The buy-out program did not meet the force reduction goal for DRR.  Only 132 occupants of the targeted 275 "surplus" positions took the package.

Yet, defendant, for reasons that are wholly unexplained on the present record, did not make the excess vacancies in other divisions available to the DRR employees whose jobs were targeted for elimination.  Fewer than 75 transfer opportunities were made available in all of 2005.

Instead, defendant decided to go forward with the 63  involuntary separations of

---

keep working because each year of work brings both an additional base amount of retirement benefit and a smaller penalty for retiring before age 62. [**Ex   DCL of Haag**].  For example, plaintiff Haag had 18 years of credited federal service at the end of 2004.  His base benefit under FERS would thus have been 18% of his base salary of $106,000.  The early retirement penalty would have been 5% for each year he was short of 62 - a 35% reduction.  His retirement benefit would, thus, have been approximately $12,402, or 11.7% of his annual salary.  By working another 7 years, his retirement benefit would have more than doubled - to 25% of his annual pay.  Had he taken the offer of early retirement plus a buyout of 50% of annual pay, he would have had to replace more than 90% of the pay rate he had built up over 18 years of service with the FDIC within 6 months in order to avoid a loss. *Id; see also* Ex. 27.

September 3, 2005, Def. Ex. 4, despite having met the stated goal through 578 "voluntary" resignations and retirements.

### 5. Corporate University Hires

In late 2004, defendant began hiring staff for Corporate University. Ex. 1 Seeberhagen Report. On September 2, 2005, defendant began recruiting for students in that Division. It hired 56 of them before the end of 2005 Pl. Ex. 13.

Defendant has continued to hire trainees for the four year Corporate Employee program, which is similar to the former program for the training of bank examiners for DSC. Hiring in that unit for 2006 focused on experienced people like plaintiffs. The target enrollment for the 2007 and for 2006 freshman class at Corporate University was 120 individuals, which is the annual target. Ex. 26 (Crosser Dep.) at 19. On this record, the slots assigned to Corporate University will have replaced all of the employees of DRR and harmed by the 2005 downsizing by the end of 2009 - although less than 50% will be ready to work as commissioned examiners.

### 6. Disparate Impact- The Seeberhagen Report

Dr. Lance Seeberhagen examined the 2005 PERHIS data file produced by defendant. His report uses the following definitions: "Career" employees are those with codes 1 and 2 while "permanent" employees are those with codes 1, 2, 6 and 7; Employees "over 50" are those with birth dates more than 50 years before September 30, 2005. Ex. 1, pp. 2-4.

Dr. Seeberhagen examined all separations and movements of employees relating to the 2005 downsizing. He specifies the codes he used to define the RIF. Ex. 1, pp. 3-4. These include both the codes for involuntary separations of September 2 and 3, 2005, and the codes representing early retirement and buyouts occurring during the year 2005. *Id.* The analysis

6

includes individuals who accepted the buy out in late 2004 because those separations were not effective until May 2, 2005.  Finally, Dr. Seeberhagen included analysis of the older and younger employees in each Division impacted by the downsizing and in the FDIC as a whole.  Unlike defendant's analysis, the Seeberhagen report is not limited to the involuntary RIF's in the DRR that occurred on September 2-3, 1005.  Dr. Jennerett, by contrast looked at only two things - the September 2-3 RIF's in DRR and the average age of employees in DRR.  His report contains no analysis of the disparate impact of the rate of separations by age groups for the entire 2005 downsizing program.

Dr. Seeberhagen extracted data showing employees over and under 50 years old and who were employed in each division of the FDIC on January 1, 2005 compared to those employed as of December 31, 2005.  Those data show the following net effect of the downsizing as a whole - after accounting for all RIF related separations, all transfers and all new hires:

- The rate of RIF related separations during 2005, for all FDIC permanent employees over 50 was 19.3%.   By contrast, only 8.9% of those under 50 were coded as leaving as a result of the downsizing.  The separation rate for older workers was 217.3% of the separation rate for those under 50.  The difference is statistically significant at well over 4.7 standard deviations.  Ex. 1, Table 13.

- The adverse impact on employees over 50 obtains with almost equal force in DRR alone. There, the separation rate for workers over 50 was 140% of the rate for those under 50. Once again, the result is statistically significant above the 95% level.  Ex. 1, pp. 5-6 (describing Table 11).  This is the result that established adverse impact for the plaintiff class members.

• As of January 1, 2005, DRR was the division with the greatest proportion of employees over 50 (64.2% as compared to 41% for the FDIC as a whole and only 30.3% for the DSC). Ex. 1, Tables 7,8 & 9.

• DRR was the division that lost the most headcount during the 2005 downsizing (42.7% as compared to 13.1% for the agency as a whole and 5.7% for DSC). Ex. 1, Tables 7,8 & 9.

• Some 94% of the 214 new employees hired by the FDIC during the 2005 downsizing were under 50. While some of these were, undoubtedly, temporary summer help, more than 100 of them appear to be new hires and some 62 of them were given the same "08" classification as the 56 employees hired for the 4 year training course at Corporate University. Pl. Ex 13 to Def SJ Opp. In addition, 63 of the new hires competitive career and career conditions, and exempt permanent and conditional codes. Ex. 1, table 14. Stated otherwise, there were 59 new hires at the Grade 7 level given to trainees, 17 new hires at grade 9, and 36 hires above grade 36. Table 15. Consistent with defendant's decision to reduce staff in the DRR, none of the new hires was assigned to that division.

## ARGUMENT

Plaintiffs move for summary judgment on the limited question of whether the 2005 re-organization program had an unlawful, adverse impact against employees who were employed in defendant's Division of Resolutions and Receiverships ("DRR") as of October 16, 2004 and who were over 50 years old as of September 2005. Whether the argument is framed as an inference of intent from the statistics (disparate treatment) or as a showing that the downsizing had a disparate impact- regardless of intent - the evidence of adverse impact is substantial and

8

unrebutted.  This Court should enter summary judgment on the common, class wide question of liability for adverse impact because there appears to be no material disputes of fact concerning adverse impact. *See*, *Smith v. City of Jackson*, 522 U.S. 228 (2005).

Defendant raises no disputed issue of material fact on the question of adverse impact. Instead, it argues "as a matter of law" that plaintiffs are barred from challenging the adverse impact of the 2005 re-organization plan.  It argues that the consideration of adverse impact must be limited to analysis of one part of that plan: the September 3, 2005 involuntary terminations. No rule of law supports defendant's argument.  The well established rule of law under the disparate impact theory requires  multiple components of a selection process to be analyzed together in these circumstances. *Arnold v. U.S. Postal Service,* 863 F.2d 994, 998-999 (D.C. Cir.1988)( error to isolate one element of a multi-step program); *Schmid v. Frosch,* 680 F.2d 248, 250 (D.C. Cir. 1982)(error to isolate the effect of a buyout followed by RIF); *McClain v Luftkin Ind.* ___ F.3d__ ,2008 WL 542165, slip at 8 (5th Cir. 2008)(rejecting argument that elements of a selection process should have been separated for analysis).  Under the intentional discrimination theory, an inference can be drawn from the combined effects of multiple downsizing actions if the actions are all carried out by the same managers.  *Blair v. Henry Filters, Inc*. 505 F.3d 517, 532 -533 (6th Cir. 2007).  Accord: *Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000).

 It is not possible to separate the threat of involuntary RIF's that were announced with the buy-out program in October 2004 from the decisions by plaintiffs to take the buy-out because they reasonably believed that they would lose their jobs and would have no transfer opportunities if they failed to accept the buy-out.  The people who mitigated their damages by taking the

buyout or by taking the limited opportunities for demotions and transfers were harmed by the re-organization just as surely as those who remained in their positions but were terminated by the final involuntary RIF process. *See, Adams v. Ameritech Services, Inc.* and *Schmid v. Frosch, supra.*

Defendant raises no disputed issue of fact on the affirmative defense of "Reasonable Factor Other than Age" ("RFOA"). Instead, it argues that the decision to replace well trained, but older class members with younger trainees in "Corporate University" is justified "*ipso facto.*" Def. Brief, p. 6. Once again, defendant relies on a novel extension of the law to support its argument that anything management does is "*a fortiori*" reasonable. This is not the law. Even if the Supreme Court should announce such a standard when it decides the RFOA question for private employers in *Meachum et al v. Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118, S. Ct. No. 1505, that rule will not apply to federal employers like defendant.

Federal employers are expressly bound by the interpretive regulations of the EEOC. 29 U.S.C. 633a, Accord: 29 C.F.R. 1625.7. The relevant regulation states clearly that an employer has to show a RFOA consistent with the "business necessity" standard in order to prove the affirmative defense of RFOA. 29 C.F.R. 1625.7(d); *Cf. Smith v. City of Jackson*, 522 U.S. 228, 243 (2005)(Scalia concurrence).

Even if there is a need, the burden is on the Defendant to offer evidence. Defendant has shown no performance related reason why it had to eliminate well trained and high performing employees like plaintiffs in order to make room for a training program in another part of the agency whose graduates would not be ready to fill plaintiffs' shoes for at least 4 years. There was

10

no budgetary need and the Defendant FDIC does not dispute that the buyout program caused an agency wide personnel budget surplus. Indeed, there is no evidence that defendant even considered job functions or plaintiffs' skill sets before it decided to eliminate them in the re-organization plan.

### I. Plaintiffs Have Shown Adverse Impact

"Statistical analyses have served and will continue proving an important to serve an important role in cases in which the existence of discrimination is a disputed issue." *Teamsters v. United Sates*, 431 U. S. 324, 339 (1977); *Palmer v. Schultz*, 815 F.2d 84 (D. C. Cir. 1987); *Adams et al. v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000). The Supreme Court has recognized that a disparity of more than two or three standard deviations in a large sample makes "suspect" the contention that the differential occurs randomly. *See, Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n. 14 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (1977); *Palmer v Shultz*, 815 F.2d 84 (D.C. Cir. 1987). Evidence of disparate impact by itself is now recognized as sufficient to establish a presumption of liability under the ADEA. *Smith v. City of Jackson*, 522 U. S. 228 (2005); *accord Schmid v. Frosch, supra,* 680 F.2d at 250.

As Court of Appeals for the DC Circuit has made clear it is improper to limit that analysis of the effects of a downsizing plan to the people who suffer involuntary terminations. Rather, the proper statistical analysis looks at all employees harmed by the RIF. *Schmid v. Frosch, supra,* 680 F.2d at 250[3].

---

[3]The rule is the same in other Circuits. *Currier v. United Technologies Corp*. 393 F.3d 246, 254 (1st Cir. 2004)(upholds Jury reliance on expert who analyzed effect of RIF on entire workforce of 183, not just the 44 positions ultimately selected as RIF targets); *Tyler v. Union Oil Co. of California* 304 F.3d 379, 392 (5th Cir. 2002)(proper to analyze all employees who received a "redeployment package" as harmed by a RIF); *c.f., Blair v. Henry Filters, Inc*. 505

Indeed, in *Schuler v. PwC LLP*, 514 F.3d 1365 (D.C. Cir. 2008) the Court of Appeals for the D.C. Circuit has again made it clear that a challenge to a single practice, carried out by related acts over time, should not be fractured into multiple "discrete" acts of discrimination - even after the rulings in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002) and *Ledbetter v. Goodyear Tire & Rubber Co., Inc*., 127 S.Ct. 2162 (2007).

 Under the disparate impact theory, multiple components should be analyzed together if they are so interrelated that they are all part of a single program conceived and announced for a single purpose to select employees for promotion, termination or hire.[4] *Arnold v. U.S. Postal Service, Std.* 863 F.2d at 998-999 (error to isolate one element of a multi-step program); *Schmid v. Frosch, supra* 680, 250 (buyout followed by RIF); *McClain v Luftkin Ind.* ___ F.3d__ ,2008 WL 542165 (5th Cir. 2008).

Although defendant argues that the analysis must be limited to the involuntary terminations "as a matter of law" it offers no authority to support its position.  Precedent in this circuit is clear that the disparate impact of a downsizing is measured by examining the combined effects of a buyout and RIF.  *Schimd v. Frosch*, 682 F.2d 248, 250-2550-251 (D.C. Cir. 1982).  Plaintiffs who mitigate their damages by accepting a buyout or transfer are not barred from seeking relief for the underlying discriminatory targeting of their positions for elimination. *Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000).

_____

F.3d 517, 530 (6th Cir. 2007)(analyzing pattern of terminations resulting in downsizing as a single practice for inferring intent).

    [4] While a separable element of a multi-step selection process may be challenged even if it causes no "bottom line" adverse impact, *Connecticut v. Teal,* 457 U.S. 440 (1982), there is no converse rule that justifies a discriminatory "bottom line" result just because one element of the process does not have an adverse impact.

The ruling in *Schmid* has been codified in EEOC regulations which, as discussed below, are binding on federal agency employers like defendant. 29 C.F.R. 1625(d); see also 1625.2a. While defendant is quite right, as noted at pages 9-10 of its Opposition, that the 29 C.F.R. 1625.22 is binding only with regard to an OWBPA waiver issue that is not raised in this case, the definitions are, nonetheless, instructive in defining the decisional unit and temporal scope to be considered as part of a single downsizing process. *See*, plaintiffs' Memorandum in Support of this motion and plaintiffs opposition to defendant's cross motion.

In any event, Defendant fails to recognize that an earlier portion of that Regulation 29 C.F.R. 1625(d)(2) expressly states that a Plaintiffs rely on Dr. Seeberhagen's analysis which uses defendant's personnel records to show that older workers were disproportionately harmed by the 2005 downsizing. In both DRR and in the FDIC as a whole, employees who were present on January 1, 2005 and who turned 50 before September 2005 where far more likely to lose their jobs for re-organization related reasons than those who were under 50. The difference is statistically significant at a level well over the 95% elimination of random selection required by social scientists and the Courts. The bottom line is that members of the class - DRR employees over 50 - lost their jobs at a much higher rate than younger employees. That is age discrimination.

Defendant offers no contrary analysis of the whole program. It offers only the argument that there is no adverse impact if the analysis is limited to the effect of the September 3, 2005 terminations on the population of DRR employees who remained after the buyouts and transfers were finished. As noted above, that analysis is not consistent with the undisputed fact that the buy-outs and transfer demotions were taken under the threat of involuntary terminations that were

13

announced in October 2004.  Dr. Jeanerette analyzes only[5] the pool of employees remaining in

DRR in September - after most of the downsizing was complete.  Under those facts, it would be a

clear error of law to isolate the events of September 3, 2005 from the rest of the 2005 re-

organization program.

The statistical evidence is supplemented by direct evidence of age discrimination in the

form of comments made by FDIC Chairman Powell and evidence that the downsizing program

was designed to impact older workers disproportionately.  Most tellingly, it is undisputed that the

downsizing was not motivated by any need to save money.   Rather, the overall downsizing

program was designed to have and did in fact have the effect of disproportionately eliminating

highly trained and experienced older workers, so that defendant could replace them with trainees

who enrolled in "Corporate University." It is undisputed that 30 faculty and 56 members of the

"freshman class" (class of '09) were hired in 2005 as the downsizing proceeded, and that further

hiring was contemplated to train replacements in later years. The target for hiring trainees in 2007

was 120. Ex. 26.

## II.  The Buyout Offers Are Actionable Age Discrimination

In its memorandum in support of its cross motion for summary judgment, defendant cites

a number of opinions that suggest that plaintiffs cannot complain of age discrimination where

they are offered a choice between maintaining their jobs (the status quo) or taking an additional

benefit as part of a voluntary retirement package.  The cases are all factually distinct because the

---

[5] While Dr. Jenerette also makes some statements regarding the percentage of older and
younger employees at various times, he makes no effort to use those percentages to measure the
"adverse impact" which is the relative impact of the process on older workers as compared to
younger ones.

situation presented to plaintiffs in this case was not a choice between the status quo or an additional benefit. Rather, defendant advised plaintiffs that their positions were being eliminated and that only 50 or so transfer opportunities would be available to over 275 DRR employees who would be eliminated. They were faced with a choice between likely termination or accepting a buy-out and early retirement option. Presenting that choice was an adverse employment action sufficient to render the buy outs involuntary. See *Adams v. Ameritech Services, Inc.*, 231 F.3d 414 (7th Cir. 2000).

When an employer forces its employees to choose between two options - both of which leave him in a worse position - the employee who chooses the lesser harm is still a victim of age discrimination. Indeed, the employee is arguably obligated to mitigate his damages by taking the lesser harm. The employee who accepts a demotion or a severance package in order to avoid the likely prospect of involuntary termination without severance is simply mitigating the harm he will suffer by reason of the downsizing program.

> Their decisions to accept demotions to lower paying and lower status jobs were taken in the face of this possibly discriminatory action. These plaintiffs were not faced with a truly voluntary choice: because they were already on the ""at risk"" lists, they knew that they sat between the Scylla of a better job but with low security, and the Charybdis of a lesser job but with high security. If the plaintiffs succeed in demonstrating that the RIF was infected with and motivated by age discrimination, then they should be allowed to proceed with their claim that their decisions to accept demotions were the result of the same discrimination.

*Adams v. Ameritech Services, Inc*., *supra*, 231 at 433.

An employee "voluntarily" accepts a severance package when he is given the choice of maintaining the status quo, or taking an additional benefit. An employee does not act voluntarily when he is given a choice between a severance package and the likelihood of involuntary termination without the severance benefit - "an offer he can't refuse." *Henn v National*

15

*Geographic,* 819 F.2d 824, 826 (7th Cir. 1987); *Adams v. Ameritech Services, Inc*., *supra*, 231 F.2d at 432-433. A severance offer violates the ADEA where the employer:

> . . .manipulated the options so that they were driven to early retirement not by its attractions but by the terror of the alternative. If the terms on which they would have remained at [their employer] were themselves violations of the ADEA, then taking the offer of early retirement was making the best of things, a form of minimization of damages.

*Adams v. Ameritech Services, Inc*., *supra*, 231 at 432.

The cases where buyouts have been considered voluntary are factually different from this one. For example, in *Burks v. Oklahoma Pub. Co.* 81 F.3d 975, 978 (10th Cir.,1996), *cert denied* 519 US 931 (1996), there was no RIF, no evidence of disparate impact, and no stated threat to the plaintiff's job. In *Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987), there was no involuntary termination plan. Similarly, in *Bodnar v. Synpol, Inc*. 843 F.2d 190, 192 -193 (5th Cir. 1988), the employer had not announced any plan for involuntary headcount reductions. To the contrary, it had announced a plan to respond to lost orders by cutting employees by "normal retirement" with no threat of involuntary terminations.

In *Mitchell v Mobil Oil*, 896 F.2d 463, 467 (10th Cir. 1990), the court held that Mr. Mitchell made out a *prima facie* case of an age related harm when his employer's pension plan changed its rules so that he would have to retire early in order to obtain a richer pension benefit, but that he failed to prove that the proffered reasons for the plan change were a pretext for age discrimination. Clearly, plaintiffs' choice here between a 50% plus probability of termination or a buyout option was at least as onerous as Mr. Mitchell's choice between early retirement or a lesser pension benefit.

In *Rowell v. BellSouth Corp.* 433 F.3d 794 (11th Cir. 2005), the force reduction plan was similar to the one in *Adams*. The significant difference is that Mr Rowell does not appear to have introduced any evidence that the ranking procedure he challenged had any adverse impact based on age while the *Adams* plaintiffs made that showing. The appellate opinion affirms the grant of summary judgment for failure to make out a case of adverse impact, not for failure to establish the prima facie element of an adverse job action. To the extent that its discussion of "constructive discharge" is not dictum, it is inconsistent with *Adams* and *Henn* and should not be adopted by this Court. An employee who is faced with a choice of resigning or facing a high probability of involuntary termination is clearly harmed in the terms and conditions of his employment whether or not he is actually terminated. If he can demonstrate that the process that put him in that predicament was tainted by unlawful discrimination, he can recover under the ADEA.

In the present case, the "buy out" was involuntary because employees were faced with "an offer you can't refuse." They could take the early retirement or face a 53.4% or higher[6] prospect of involuntary termination with no early retirement or incentive payment.

All plaintiffs were faced with the reality that the would lose their positions and that, unless they took "voluntary" alternatives, they would have to compete for newly re-named jobs in a game of musical chairs that less than half of them would survive. The plaintiffs and other employees of DRR were provided with charts by which they could gauge their chances of surviving as employee in light of veteran's preferences and the decision to retain higher grade

---

[6] As indicated in the declarations, many employees were faced with a near certainty of termination with no viable transfer options. 53.4% is the average odds for all DRR employees. The 91 employees in Asset Marketing were competing for 9 jobs - less than a 10% survival rate. Def. Ex. 5, p. 06789.

managers including the number CM-2 and CM-1 and the decision to limit cross-over opportunities.  All plaintiffs were faced with the further knowledge that they would receive severance payments if they "voluntarily" accepted the buy out before May 2, 2005, but would receive no severance if they chose to compete for the available jobs.  The decisions to take the buy out were motivated by fear of the alternative, not by the value of the offer.  Giving employees such a choice is an "adverse" employment action that is subject to disparate impact analysis.

### III.  Defendant Offers No Material  Evidence of a Reasonable Factor Other than Age

Defendant has not produced sufficient evidence to create a disputed issue of material fact on its burden to prove the affirmative defense of Reasonable Factor Other than Age (RFOA) under the applicable business necessity standard.

Defendant relies on inapposite authorities to support its RFOA argument.  The RFOA issue before the Supreme Court in *Meachum et al v. Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert granted*, 128 S.Ct. 1118 (2008), S. Ct. No. 1505, concerns the standard for private employers subject to the prohibitions of 29 U.S.C. 623.  As a federal agency employer, defendant is subject to the broadest prohibitions against practices that cause an adverse impact on account of age.[7] 29 U.S.C. 633a.   Further, the regulations of the EEOC requiring a showing of business necessity to support an affirmative defense of Reasonable Factor Other than Age (RFOA), are

---

[7]  The distinction between the sub-parts "a" and "d" of 29 U.S.C. 623, as articulated for Title VII cases in *Burlington v White*, 548 US 33 (2006),  is inapposite to federal employers because 29 U.S.C. 633a contains only the broader prohibition on "discrimination" without the limiting language discussed in *White* which appears in 29 U.S.C. 623(a).  Discriminatory threats to terminate a position would thus be actionable, even without a constructive discharge theory or the kind of actual harm that occurred in this case.

binding on defendant.[8]  29 C.F.R. 1625.7(d); *Cf. Smith v. City of Jackson*, 522 U.S. 228, 243

(2005)(Scalia concurrence "employment criteria that are age-neutral on their face but which

nevertheless have a disparate impact on members of the protected age group must be justified as a

business necessity.").

Defendant literally asks this court to accept its stated reasons based on the inference that

the downsizing program was justified  "*a fortiori*" because the DRR is called the Division of

Resolutions and Receiverships.  Def. Opp. P. 4.  The argument is similar to the factual material

offered in defendant's moving brief and incorporated into its opposition.  Defendant offers no

factual support for the decision to announce  a 53.4% cut of jobs at DRR as a way to force

plaintiffs to accept the buy out alternative.  Defendant offers only vague references to a "business

model" that motivated it to propose large cuts in DRR so that its functions could be transferred to

new trainees who will start to graduate from Corporate University in 2008.  The "business model"

is not described and does not begin to reach the level of a job related validity analysis.

Defendant offers no justification at all for the increase in the DRR reduction target from

the 34% recommended by the task force in September to the reduction of 240 employees (54%)

announced by Bovenzi in October and November.

Similarly, the FDIC offers no business related reason for the decision to fire DRR

---

[8]Defendant, as a federal employer, bears the burdens of production and persuasion to
rebut plaintiffs showing of disparate impact by demonstrating the that downsizing was justified
by a reasonable factor other than age.  Defendant can establish the affirmative defense of RFOQ
only if it produces evidence that meets the "business necessity standard."  29 CFR 1625.7(d).
The RFOQ standard for federal employers under the ADEA is not the same as the standard for
private employers that is presently before the Supreme Court. *Compare,* 29 C.F.R. 1625.7(d)(and
(e),  with,  *Meachum et al v. Knolls Atomic Power Lab*, 461 F.3d 134 (2d Cir. 2006) *cert
granted*, 128 S.Ct. 1118 (2008), S. Ct. No. 1505

employees in September 2005 instead of making transfer opportunities available after employees

in other divisions, whose jobs were not targeted for elimination, took the voluntary buy out offer.

Most importantly, it offers no reason for the underlying decision to cut employees from

DRR in order to make room to hire new trainees at Corporate University who would not become

commissioned for five years without making any effort to determine whether the existing

employees had, or could learn, whatever "skill sets" were to be taught to the trainees.

Defendant's argument that the downsizing is "*ipso facto*" reasonable, def. Opp., p. 6, falls

short of any reasonable formulation of the RFOQ defense. It does not create a disputed issue of

material fact on the "business necessity" standard applicable to defendant under 29 CFR

1625.7(d).

Defendant erroneously contends that the EEOC, in its published decisions, has never

adopted the standard stated in its own regulations. To the contrary, where the regulation is

discussed, the Commission follows it:

> As noted above, the standard applicable under Title VII for proving a discriminatory
> adverse impact are also appropriate under the ADEA. Appellant must establish a prima
> facie case. The burden then shifts to the agency to show business necessity. When the
> agency fails to do so, the appellant prevails.

*Gloria Weinrauch v. Department of the Treasury,* 1983 WL 500299, 4.

Neither of the EEOC Opinions cited by defendant rejects the business necessity standard.

In *Brite v Dept. Of the Navy*, 1983 WL 411679 (EEOC 1983), the opinion recites that fact that the

plaintiff failed to demonstrate an adverse impact because 2/3 of those selected were, like him,

over 40. It does not address the standard for RFOQ. Similarly, *Barrett v FCC*, 1984 WL 484622

(EEOC 1984) does not discuss or reject the business necessity standard of 29 CFR 1625.7(d).

Instead, it holds that the decision to select a younger employee for a press operator job was

justified by the fact that the selectee had no history of ink allergies while the plaintiff had a long

history of medical problems arising from the basic job function of operating the press.  While the

opinion does not use the "business necessity" term, the clear link between job functions and the

decision meets the standard.

Nor is defendant's argument advanced by its reference to *Loeb v. Textron, Inc*. 600 F.2d

1003, 1011 (1st Cir. 1979), a disparate treatment case that involved no proof of adverse impact.

*Pippin v. Burlington Resources Oil And Gas Co.* 440 F.3d 1186, 1201 (10th Cir.  2006)[9],

while more recent than defendant's other proffered authorities, does not support its position.

There, the Court found that a RIF selection process by a private employer that targeted

individuals for elimination based on past performance and skill sets was a RFOQ.  Here, there

was no effort to determine whether plaintiffs' performance records and skill sets were consistent

with anticipated needs in other parts of the agency.  Instead, defendant made an arbitrary choice

to eliminate plaintiffs wholesale and to hire younger replacements.

In order to rebut a statistical showing of adverse impact, defendant must show not only

that non-discriminatory factors might account for some part of the selection procedure, but that

consideration of those factors obviates the showing of adverse impact:

---

[9] The adverse impact analysis that was rejected by the *Pippen* Court of Appeal in similar
to what defendant offers in this case.  There, the plaintiff argued that adverse impact was
established by the fact that more than 3/4 of the RIF'ed employees were over 40.  It offered no
analysis of the group from which the employees were selected, or the adverse impact of the
process on the group.  By contrast, plaintiffs here offer extensive evidence of the adverse impact
of the 2005 downsizing process on the DRR population that existed on January 1, 2005.

> . . . in most cases a defendant cannot rebut statistical evidence by mere conjectures or assertions, without introducing evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory selection criterion

*Palmer v. Shultz* 815 F.2d 84, 101 (D.C. Cir. 1987); Accord, *Dukes v. Wal-Mart, Inc*. 509 F.3d 1168, 1181 -1182 (9th Cir. 2007); *Hemmings v. Tidyman's Inc*. 285 F.3d 1174, 1188 (9th Cir.2002), *cert den.,* 537 US 1110 (2003) *Ottaviani v. State University of New York at New Paltz* 875 F.2d 365, 374 (2d Cir.1989) *Sobel v. Yeshiva University*, 839 F.2d 18, 34 (2d Cir. 1988), *cert. denied,* 490 U.S. 1105 (1988).

At best, Defendant FDIC has shown that one piece of the downsizing program - the September terminations - had no disparate impact if viewed in isolation. It makes no effort to show that the targeting of plaintiffs jobs for elimination without making transfers to other parts of the Agency without redaction in grade available was justified by any rational consideration.

Whether the standard is one of "business necessity" or some lesser standard, defendant offers nothing more than an "*ipso facto"* inference that the decision to fire plaintiffs instead of giving them opportunities expected to be available elsewhere in the agency to Corporate University graduates was non-pretextual. The bald statement that management decided to cut the older workers in order to make room in the budget for a new training program and for the hiring of faculty and trainees does not meet the standard of business necessity. Such a statement is not from a business or governmental employees.

**Conclusion**

For the foregoing reasons, this Court should grant plaintiffs motion and should enter partial summary judgment on the limited question of liability on the common class question of adverse impact.


**Respectfully Submitted,**

/s/ David  L. Rose

David L. Rose

Joshua N. Rose

Dotie Joseph

ROSE & ROSE, P.C.

1320 19th Street, NW, Suite 601

Washington, D.C. 20036

(202) 331-8555

(202) 331-0996 fax

daver@roselawyers.com

josh@roselawyers.com

djoseph@roselawyers.com


Dated: March 24, 2008                    Attorneys for Plaintiffs
As Corrected: March 26, 2008

23

## Statutory Appendix

The Age Discrimination in Employment Act ("ADEA"), contains a prohibition against discrimination by private employers, 29 U.S.C.. §§ 623(a).

The ADEA contains a separate prohibition against age discrimination by federal agency employers. 29 U.S.C.A. §§ 633a provides:

## § 633a. Nondiscrimination on account of age in Federal Government employment

(a) Federal agencies affected

All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . ., in executive agencies as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), . . . shall be made free from any discrimination based on age.

(b) Enforcement by Equal Employment Opportunity Commission . . .; remedies; rules, regulations, orders, and instructions of Commission: compliance by Federal agencies; powers and duties of Commission; notification of final action on complaint of discrimination; exemptions: bona fide occupational qualification

Except as otherwise provided in this subsection, the Equal Employment Opportunity Commission is authorized to enforce the provisions of subsection (a) of this section through appropriate remedies, including reinstatement or hiring of employees with or without backpay, as will effectuate the policies of this section. The Equal Employment Opportunity Commission shall issue such rules, regulations, orders, and instructions as it deems necessary and appropriate to carry out its responsibilities under this section. The Equal Employment Opportunity Commission shall–

> **(1)** be responsible for the review and evaluation of the operation of all agency programs designed to carry out the policy of this section, periodically obtaining and publishing (on at least a semiannual basis) progress reports from each department, agency, or unit referred to in subsection (a) of this section;
>
> **(2)** consult with and solicit the recommendations of interested individuals, groups, and organizations relating to nondiscrimination in employment on account of age; and
>
> **(3)** provide for the acceptance and processing of complaints of discrimination in Federal employment on account of age.

The head of each such department, agency, or unit shall comply with such rules, regulations, orders, and instructions of the Equal Employment Opportunity Commission which shall include a provision that an employee or applicant for employment shall be notified of any final action taken on any complaint of discrimination filed by him thereunder. Reasonable exemptions to the provisions of this section may be established by the Commission.

29 U.S.C.A. § 633a

Regulation involved:

29 C.F.R. 1625.7 (d)

(d) When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a "factor other than" age, and such a practice has an adverse impact on individuals with in the protected age group, it can only be justified as a business necessity.  Tests which are asserted as "reasonable factors other than age" will be scrutinized in accordance with the standards set forth as Part 1607 of this Title.

A-2