# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**BARBARA ALIOTTA, et al**              )
                                        )
    **Plaintiffs,**          )
                                        )
       **v.**       )    **Case No. 1:05-cv-02325-RMU**
                                        )
**SHEILA C. BAIR,**                     )
**Chairman,**                           )
**Federal Deposit Insurance Corporation,** )
                                        )
    **Defendant.**           )
_____)


## DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Stephen J. Kessler
D.C. Bar No. 382427
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6014)
Arlington, VA 22226
(703) 562-2311
(703) 562-2482 (Fax)

Attorneys for Defendant

March 27, 2008

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT AND AUTHORITIES ..........................................................................2

   A.    The FDIC's prior downsizing during the 1990's supports the entry of
         summary judgment for the Agency, despite Plaintiffs' implications
         to the contrary ........................................................................................................2

   B.    Appropriate statistical analysis supports summary judgment for the Agency.........4

      1.    Plaintiffs have not refuted Dr. Jeanneret's analysis.....................................4

      2.    Dr. Seberhagen's analysis is fundamentally flawed ....................................5

   C.    Employees who applied for and accepted buyouts prior to the RIF in
         DRR were not constructively discharged and suffered no adverse action .............9

   D.    Plaintiffs who suffered adverse employment actions as a result of
         the RIF cannot establish a *prima facie* case of age discrimination.......................14

      1.    Plaintiffs have not raised a triable issue to support their contention
            that age was a factor in the design or implementation of the RIF ............14

      2.    The appropriate disparate impact analysis demonstrates that the
            RIF process did not discriminate against older DRR employees .............15

   E.    The EEOC regulations cited by Plaintiffs are inapplicable to this case ...............17

   F.    The Agency has met its burdens under *City of Jackson*;
         Plaintiffs have not ................................................................................................19

      1.    Defendant's *City of Jackson* burden ........................................................19

      2.    Plaintiffs' *City of Jackson* burden...........................................................20

   G.    Plaintiffs' characterizations of Corporate University,
         the Corporate Employee Program and recruitment efforts
         are inaccurate and unsupported............................................................................21

III.  CONCLUSION............................................................................................................24

## TABLE OF ABBREVIATIONS

DAS          Division of Depositor and Asset Services

DIR          Division of Insurance and Research

DIRM         Division of Information Resources Management

DIT          Division of Information Technology

DOA          Division of Administration

DOF          Division of Finance

DOR          Division of Resolutions

DRR          Division of Resolutions and Receiverships

DSC          Division of Supervision and Consumer Protection

EEOC         Equal Employment Opportunity Commission

EOI          Expression of Interest

FDIC         Federal Deposit Insurance Corporation

Legal        Legal Division

ODEO         Office of Diversity and Economic Opportunity

OERM         Office of Enterprise Risk Management

OIG          Office of Inspector General

OLA          Office of Legislative Affairs

OO           Office of the Ombudsman

OPA          Office of Public Affairs

RIF          Reduction in Force

RTC          Resolution Trust Corporation

SOI          Solicitation of Interest

**COMPREHENSIVE TABLE OF EXHIBITS**

Defendant's Exhibit Nos. 1-35 were previously submitted in connection with the Agency's Motion for Summary Judgment and Memorandum in Support Thereof ("Agency MSJ"). Defendant's Exhibit Nos. 36-40 were submitted with the Agency's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and were numbered consecutively from the last Agency MSJ exhibit to avoid duplication; this practice is continued with respect to the supplemental rebuttal exhibits submitted with this reply brief.  Any such exhibit cited herein is identified as "Def. Ex. __."

| No. | Date | Description |
| --- | --- | --- |
| 1 | 8/6/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer John Bovenzi to all FDIC Employees concerning Workforce Planning for the Future ("8/6/04 Bovenzi Memo"). |
| 2 | 8/19/04 | E-mail Message from DRR Director Mitchell Glassman to DRR Employees concerning Workforce Planning for the Future ("8/19/04 Glassman Memo"). |
| 3 | 9/2/04 | E-mail messages from the General Counsel to Legal Division employees concerning workforce planning. |
| 4 | 10/19/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to all FDIC Employees concerning the Corporate Employee Program ("10/19/04 Bovenzi Memo"). |
| 5 | 10/25/04 | Proposed DRR reorganization. |
| 6 | 10/26/04 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to All Employees concerning Buyout Program and Reductions-in-Force ("10/26/04 Bovenzi Memo"). |
| 7 | 10/26/04 | E-mail message DRR Director Glassman to DRR Employees concerning DRR Workforce Planning for the Future ("10/26/04 Glassman Memo") |
| 8 | 11/8/04 | Buyout application materials for Plaintiff Peggy Henderson. |
| 9 | 11/16/04 | Approval of DRR reorganization by COO Bovenzi. |
| 10 | 11/23/04 | Intranet posting of DRR workforce planning and transition organization charts. |

| 11 | 1/24/05 | Global e-mail message to FDIC employees concerning Voluntary Early Retirement (VERA) for Buy-Out Eligible Employees. |
| 12 | 2/1/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to FDIC Permanent Employees Grade 12 & Above Nationwide concerning Nationwide Solicitation of Interest for Associate Financial Institution Specialist In-Service Placement Opportunity ("Crossover SOI"). |
| 13 | 2/18/05 | Application materials submitted by Plaintiff Gregory Haag for the crossover program and notification of personnel action. |
| 14 | 2/29/05 | Buyout application materials for Plaintiff Donald Lett. |
| 15 | 3/2/05 | Update regarding DRR vacancies and position descriptions. |
| 16 | 3/14/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to all FDIC Employees concerning Implementation of the Corporate Employee Program ("3/14/05 Bovenzi Memo"). |
| 17 | 4/5/05 | Informational Notice of Reduction in Force for DRR. |
| 18 | 4/5/05 | Informational Notice of Reduction in Force for DIT. |
| 19 | 5/18/05 | DIT post-buyout RIF planning update. |
| 20 | 6/13/05 | Memorandum from Deputy to the Chairman and Chief Operating Officer Bovenzi to FDIC Employees concerning Corporate Employee Program Update Phase One Implementation ("6/13/05 Bovenzi Memo"). |
| 21 | 6/30/05 | Specific RIF Notice for Ann Bonner. |
| 22 | 2/15/06 | DIT 2005 Corporate IT Accomplishments (indicating no DIT RIF due to success of buyout program). |

Declarations and Related Exhibits

| 23 | | Declaration of Lester Bodian. |
| 24 | | Declaration of Joy Crosser. |
| »24-1 | | Buyout notification e-mail to DRR employees. |
| »24-2 | | Buyout Fact Sheets for Divisions and Offices. |
| »24-3 | | 2004/2005 FDIC Buyout Handbook. |

| | | |
|---|---|---|
| 25 | | Declaration of Mitchell L. Glassman. |
| 26 | | Declaration of Pamela K. Mergen. |

Expert Reports

| | | |
|---|---|---|
| 27 | 8/15/07 | Expert report of P. R. Jeanneret, Ph.D., for defendant Agency. |
| »27-1 | | Reply report of P. R. Jeanneret, Ph.D., for defendant Agency. |
| 28 | 10/15/07 | Expert report of Lance Seberhagen, Ph.D., for Plaintiffs. |
| »28-1 | | Interim report of Lance Seberhagen, Ph.D., for Plaintiffs. |
| »28-2 | | Rebuttal report of Lance Seberhagen, Ph.D., for Plaintiffs. |

Deposition Testimony

| | |
|---|---|
| 29 | Deposition of Joy Crosser. |
| 30 | Deposition of Mitchell L. Glassman, Director, DRR. |
| 31 | Deposition of Pamela K. Mergen. |
| 32 | Deposition of Thomas E. Peddicord, III, Deputy Director, DOF. |
| 33 | Deposition of Lance W. Seberhagen, Ph.D. |
| 34 | Deposition of James R. Wigand, Deputy Director, DRR. |
| 35 | Deposition Errata Sheets. |

Additional Exhibits Submitted in Opposition to Plaintiffs' Motion for Partial Summary Judgment

| | |
|---|---|
| 36 | Second Declaration of Lester Bodian |
| 37 | Cross Reference – EMPAIDs for named Plaintiffs |
| 38 | SF-50 for Bruce Brown |
| 39 | Deposition of Donald E. Powell |
| 40 | Errata Sheet – Powell Deposition |

Supplemental Rebuttal Exhibits Submitted with Defendant's Reply Brief

| | | |
|---|---|---|
| 41 | 3/21/01 | *Smith v. Tanoue*, No. 1:98-CV-1011-MHS (N.D. Ga. 2001) (slip op.) |
| 42 | 10/20/04 | E-mails concerning "FERS MRA + 10" and related Bovenzi testimony |
| 43 | 3/29/02 | Corporate Recruitment Program Launched |

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*Adams v. Ameritech Serv. Inc.,*
    231 F.3d 414 (7th Cir. 2000) ...................................................................................11

*Armstrong v. Powell,*
    230 F.R.D. 661 (W.D. Okla. 2005)........................................................................2, 3

*Arnold v. U.S. Postal Service,*
    863 F.2d 994 (D.C. Cir. 1988) ..........................................................................12, 13

*Bodnar v. Synpol, Inc.,*
    843 F.2d 190 (5th Cir. 1988) ......................................................................10, 11, 12

*Furr v. Seagate Tech., Inc.,*
    82 F.3d 980 (10 Cir. 1996) ........................................................................17, 19, 24

*Girten v. McRentals, Inc.,*
    337 F.3d 979 (8th Cir. 2003) .................................................................................15

*Griggs v. Duke Power Co.,*
    401 U.S. 424 (1971)...............................................................................................18

*Henn v. Nat'l Geographic Soc'y,*
    819 F.2d 824 (7th Cir. 1987) ...................................................................................9

*James v. New York Racing Ass'n,*
    233 F.3d 149 (2nd Cir. 2000) .................................................................................24

*Lehman v. Nakshian,*
    453 U.S. 156 (1981).................................................................................................25

*Manning v. Chevron Chem. Co., LLC,*
    332 F.3d 874 (5th Cir. 2003) ..................................................................................15

*Meacham v. Knolls Atomic Power Lab,*
    461 F.3d 134 (2nd Cir. 2006), *cert. granted,*
    128 S.Ct. 1118 (2008).............................................................................................20

*New York City Transit Auth. v. Beazer,*
    440 U.S. 568 (1979).................................................................................................18

*Pippin v. Burlington Resources Oil & Gas Co.*,
      440 F.3d 1186 (10th Cir. 2006) ...................................................................19

*Price Waterhouse v. Hopkins*,
      490 U.S. 228 (1989)..............................................................................15

*Rowell v. BellSouth Corp.*,
      433 F.3d 794 (5th Cir. 2005) ...................................................................11

*Schmid v. Frosch*,
      680 F.2d 248 (D.C. Cir. 1982) ..................................................................5

*Smith v. City of Jackson*,
      544 U.S. 228 (2005)............................................................17, 18, 19, 21

*Smith v. Tanoue*,
      No. 1:98-CV-1011-MHS (N.D. Ga. Mar. 21, 2001), *aff'd*,
      275 F.3d 1088 (11th Cir. 2001) (Table)............................................3, 4

*Vega v. Kodak Caribbean, Ltd.*,
      3 F.3d 476 (1st Cir. 1993)........................................................................11

## **Rules and Regulations**

LCvR 7(h) .....................................................................................................1

Fed. R. Civ. R. 56 ..........................................................................................25

29 C.F.R. § 1625.7 ........................................................................................17

29 C.F.R. § 1625.7(d) ....................................................................................17

## **Internet Sources**

*FDIC: 2002 Annual Report*,
www.fdic.gov/about/strategic/report/2002annualreport/pg17.html . ...................................22

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **BARBARA ALIOTTA, et al** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | )    **Case No. 1:05-cv-02325-RMU** |
|  | ) |
| **SHEILA C. BAIR,** | ) |
| **Chairman,** | ) |
| **Federal Deposit Insurance Corporation,** | ) |
|  | ) |
| **Defendant.** | ) |

_____)

## DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

In 2005, the Federal Deposit Insurance Corporation ("FDIC" or "Agency") offered a voluntary buy-out program as part of a corporate-wide downsizing, in response to a declining workload resulting from the robust health of the financial institutions for which the Agency provides deposit insurance. The downsizing also included a reduction-in-force ("RIF") within the FDIC's Division of Resolutions and Receiverships ("DRR"), the organization responsible for resolving bank failures, which had been negligible for a number of years. Most of the workforce reduction was achieved through employee choice; the involuntary terminations favored more senior employees.

The record evidence[1] shows that no employee was compelled to accept a buyout as a result of the RIF. Rather, all employees who accepted a buyout did so voluntarily <u>before</u> the RIF

_____

[1] Because Plaintiffs have chosen not to file a statement of genuine issues, this Court may assume, in determining the pending motion(s) for summary judgment, that that the facts identified by the Agency in its statement of material facts are admitted. LCvR 7(h).

was actually conducted and <u>before</u> any employees received any specific RIF notices.  Moreover, the record evidence shows that age was not a factor in the FDIC's decisions to reorganize and downsize DRR, or in the design or implementation of the RIF.

## II.  ARGUMENT AND AUTHORITIES

**A.    The FDIC's prior downsizing during the 1990's supports the entry of summary judgment for the Agency, despite Plaintiffs' implications to the contrary.**

In its motion for summary judgment, the Agency explained the continuing need to downsize its workforce beginning in the 1990's because of a generally declining workload (and in particular, due to the dramatic reduction of failed bank assets in liquidation, for which DRR was responsible).  Agency MSJ at 4-6.  *See also* Jeanneret Report (Def. Ex. 27), at 10 and Exhibit 3 (showing almost perfect correlation between assets in liquidation and number of employees in DAS/DRR[2]); *Armstrong v. Powell*, 230 F.R.D. 661, 664-67 (W.D. Okla. 2005) (discussing FDIC's downsizing efforts during this time period in its opinion denying class certification in ADEA case).  While Plaintiffs state that they "are not directly challenging Defendant's actions from 1995 to 2003" in their Memorandum in Opposition ("Pl. Opp.," ECF Doc. 47), at 2, they then proceed to selectively quote from transcripts of FDIC Board of Directors minutes in 1995, in an apparent attempt to raise the specious implication that age discrimination has been the motivation behind the Agency's downsizing efforts since that time.

While Plaintiffs' citation to evidence of 1995 decision making is of dubious relevance in the context of the DRR RIF that occurred ten years later, it is notable that similar contentions of age discrimination have previously been rejected by other courts that have considered this same evidence.  In the context of denying class certification, the court in *Armstrong v. Powell* found

---

[2] DAS, the Division of Depositor and Asset Services, was merged with DOR, the Division of Resolutions, in 1996 and became the Division of Resolutions and Receiverships.  *See* Agency MSJ at 5 (quoting from 1996 Annual

that "an identifiable company-wide practice of [age] discrimination [was absent]," 230 F.R.D. at

680, after considering the same evidence cited by Plaintiffs here, *see id*. at 665 (Board meetings

of August 8 and September 26, 1995), 666 (Nov. 10, 1995, *Am. Banker* article).[3]

The Eleventh Circuit has also explicitly rejected the argument that the FDIC Board

transcripts in question evinced an intent to discriminate. *Smith v. Tanoue*, No. 1:98-CV-1011-

MHS (N.D. Ga. Mar. 21, 2001), *aff'd*, 275 F.3d 1088 (11th Cir. 2001) (Table).[4]  In *Smith*, the

plaintiff relied heavily on virtually the same excerpts of Board transcripts cited in this case to

support his individual age discrimination claim.  Magistrate Judge Brill recommended summary

judgment for the FDIC.  The District Court and the 11th Circuit agreed.

In reaching her decision, Judge Brill carefully analyzed the Board transcripts.  Her

Report recites lengthy quotations of the transcripts, which put the comments of various

executives and Board members into their proper context. In doing so, Judge Brill found:

> The vast majority of the statements relied on by plaintiff indicate that high-level
> FDIC officials wanted to reduce the number of senior employees not because of their
> age, but because the FDIC had more high-ranking employees than it needed, because
> these employees were more expensive to retain, and because some of the FDIC's
> more recent hires came with desirable credentials.

*Smith v. Tanoue*, slip op. at 29-30 (Final Report and Recommendation).  Judge Brill determined

that nothing in the transcripts supported a finding of intent to discriminate against older

employees, and noted that:

> [P]laintiff supports his claim primarily with evidence regarding statements made by
> Chairman Helfer and other high-level FDIC officials.  For reasons already provided,
> these statements are not direct evidence of a desire to rid the FDIC of older
> employees *because of their age*. They are also insufficient to support such an
> inference. Although, when taken out of context, some of the statements sound

Report); Jeanneret Report (Def. Ex. 27), at 10.
[3] Plaintiffs' Exhibits 2 and 4 are actually abridged copies of the exhibits filed by the plaintiffs in *Armstrong – see,
e.g.*, Pl. Ex. 2 (ECF Doc. 47-4), at header page 5 of 8, which clearly shows the filing header of the *Armstrong* exhibit
(Document 97-12 in Case 5:03-cv-00255-C) under the new ECF header for this case.
[4] *See* Def. Ex. 41 attached hereto (11th Circuit affirmance, District Judge's Order and Magistrate's Report & Rec.).

suspicious, their context demonstrates that no illegal motive was involved.

*Id*. at 38 (emphasis in original).  Here, as in *Smith*, Plaintiffs' attempt to draw an inference that

the FDIC's Board and upper management had a discriminatory animus against older employees

in the 1990's is belied by a consideration of the transcripts in their proper context.

**B.    Appropriate statistical analysis supports summary judgment for the Agency.**

1.    <u>Plaintiffs have not refuted Dr. Jeanneret's analysis</u>.  Plaintiffs' Opposition is notable for

its failure to substantively address Defendant's statistical submission;[5] therefore, the following

results remain undisputed:

> (1)    The average age of the DRR workforce subject to the RIF was approximately 52, compared with the average age of the actual RIF'd employees of around 48.  This difference is statistically significant in favor of older employees.[6]

> (2)    The percentage of "older" employees (as defined by Plaintiffs) in the DRR population subject to RIF was approximately 64%, compared with the percentage of older employees actually RIF'd of around 43%.  This difference was also statistically significant in favor of older employees.[7]

> (3)    There was no statistical decrease in average age from a time before the Agency embarked on the reduction in DRR (by RIF or otherwise) (511 employees on 11/1/04; average age = 51.96) and after the RIF (235 employees on 9/17/05; average age = 51.81).[8]

> (4)    The representation of the class (employees 50 or older) as a percentage of DRR reflects a dramatically increasing proportion of older employees throughout the 5-year period including the RIF.[9]

> Plaintiffs have not attempted to controvert these results either legally or factually.

Plaintiff's expert testified that he had no basis to dispute Dr. Jeanneret's data or calculations.

---

[5] Contrast Defendant's briefing which explains how Plaintiffs reached their result, and analyzes its validity or lack thereof both statistically and legally.  *See* section II.B.2 below; Agency MSJ at 30-32; Defendant's Response to Plaintiffs MSJ (ECF Doc. 46) at 8-11.
[6] *See* Jeanneret Reply Report (Def. Ex. 27-1) at 8; Agency MSJ at 38.
[7] *See* Jeanneret Reply Report (Def. Ex. 27-1) at 5, 13-14, and Tables 2-5.
[8] *Id.* at 5; Jeanneret Report (Def. Ex. 27) at 14-15, 18, and report Exhibit 6.
[9] *See* agency MSJ at 35; Jeanneret Reply Report (Def. Ex. 27-1) at 4, 17.  Indeed, the demographic results (numbers 3 and 4 above) include employees electing normal or early retirements to take advantage of the buyouts.  As

*See* Seberhagen Dep. (Def. Ex. 33) at 84:14-17.  Plaintiffs have not cited any authority in response to Defendant's RIF cases (Agency MSJ at 35-38) demonstrating that the above statistical results are inimical to a theory of systemic age discrimination.

Instead, Plaintiffs merely contend (Pl. Opp. at 23-24) that, "[T]here is no rule of law requiring a change in the average age of some components of the employer's workforce in order to prove age discrimination."  But Defendant has not argued such an inflexible rule.  Rather, the point is that where there is a large workforce reduction, various courts have observed that the absence of a substantial decrease in average age renders a theory of systemic age discrimination virtually untenable.[10]  One may assume that there could be rare situations in which despite dynamically favorable statistics like those set forth above, other factors might create a triable issue; however, Plaintiffs have not made any showing that the instant case would fall into that extraordinary category, and particularly where Plaintiffs rely so heavily on statistical evidence, this is compelling support for summary judgment.

2.      Dr. Seberhagen's analysis is fundamentally flawed.  Plaintiffs' entire case rests on one assumption:  that employees who, themselves, decided to leave DRR are statistically identical to employees who were involuntarily separated in the RIF. As demonstrated in section II.C below and Agency MSJ at 35-38, this assumption is inconsistent with applicable law[11], and at odds with common sense.  In addition, viewed through the lens of statistical science, employing such

---

discussed in section II.B.2 below, including these individuals skews the analysis unfairly against Defendant; yet the results are <u>still</u> inconsistent with age discrimination.

[10] Agency MSJ at 35-37.  Plaintiffs are correct (Pl. Opp. at 30) that a small difference in average age may be statistically significant if the populations being compared are large.  But that point makes Defendant's case, for here we have large populations (DRR before and after the RIF) and there is nevertheless no statistically significant difference.

[11] Plaintiffs cite (Pl. Opp. at 21, 30) *Schmid v. Frosch*, 680 F.2d 248, 250 (D.C. Cir. 1982), for the proposition that a statistical analysis should look at all employees harmed by a RIF.  The *Schmid* decision defined employees who were "hurt" by the RIF as those who received RIF notices and thereafter were either downgraded or separated in the RIF.  Employees who decided to take buyouts were not "hurt" in the DRR RIF, and *Schmid* does not teach otherwise.

an assumption renders the resulting analysis meaningless.

For a statistically established difference between two groups to have any meaningful consequence, one must be able to state with confidence that the two groups would not have been expected to show the difference in the absence of the operation of some differential effect or variable, such as discrimination.  This is just a scientific statement of the oft-repeated judicial wisdom that the two groups must have been "similarly situated," so that any resulting differences may potentially be due to disparate treatment in the absence of other explanation.  However, where the threshold condition of being similarly situated is not met, no conclusion may be drawn from differences between the groups.

This error permeates Dr. Seberhagen's work, because instead of comparing groups that could yield a valid conclusion about impact, Dr. Seberhagen combines involuntary terminations with voluntary departures.  In effect, Dr. Seberhagen reasons that if employees over and under 50 do not depart the organization at the same rate, there must be "discriminatory adverse impact."  That is absurd because the employees under study were clearly not similarly situated in terms of the outcomes to be expected.[12]  In terms of the present case, consider two groups of employees (group A and group B) about whom we know nothing except that those in group A applied for the buyout or took retirement before the RIF, while those in group B were involuntarily terminated during the RIF.  Whatever else may be said about these two groups, it is clear that they are different.  Some group A employees may have been intending to retire in the absence of a RIF; some may have thought that the buyout was too good an opportunity to pass up; some may claim (as Plaintiffs do) that the pressure of the impending RIF "compelled" them to take the

---

[12] *See* Jeanneret Reply Report (Def. Ex. 27-1) at 8-11.

6

buyout.  Group A as a whole is not comparable to group B, and a statistical analysis that assumes

otherwise proves nothing.

The fallacy in Dr. Seberhagen's methodology is made manifest when it is applied to the

Division of Insurance and Research (DIR), a division in which a RIF was never even

contemplated.[13]  According to Dr. Seberhagen's 1/28/08 report (attached to Plaintiffs' MSJ; also

filed as Def. Ex. 28-2), the effect of "RIF-related" separations (as Dr. Seberhagen defined

them[14]) on DIR were as follows:

Table 6
2005 Employment - Effect of RIF-Related Separations - Division of Insurance and Research (Org 53)

| Date | Age Under 40 9/30/05 | | Age 40-49 9/30/05 | | Age 50-up 9/30/05 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | N | Pct | N | Pct | N | Pct | N | Pct |
| Career employees only (Appointment Codes 1 & 2) | | | | | | | | |
| 1/1/2005 | 48 | 27.4% | 63 | 36.0% | 64 | 36.6% | 175 | 100.0% |
| 12/31/2005* | 47 | 29.6% | 61 | 38.4% | 51 | 32.1% | 159 | 100.0% |
| Permanent employees only (Appointment Codes 1, 2, 6, & 7) | | | | | | | | |
| 1/1/2005 | 48 | 27.3% | 64 | 36.4% | 64 | 36.4% | 176 | 100.0% |
| 12/31/2005* | 47 | 29.4% | 62 | 38.8% | 51 | 31.9% | 160 | 100.0% |

\*   1/1/05 employment total, minus employees with RIF-related separation codes during 2005.
    RIF-related separation codes = 302, 303, 304, 312, 317, 352, & 356.

1/28/08 Seberhagen Report (Def. Ex. 28-2), at Table 6 (p. 9).

Looking at the first two rows of Table 6, the data for what Dr. Seberhagen defines as

"career employees only" (although analysis of the larger group of "permanent" employees, the

last two rows of Table 6, would yield similar results), we see that on January 1, 2005, there were

175 DIR employees total, 64 of whom (37%) were age 50 and up, and 111 (63%) who were

under age 50.[15]  By December 31, 2005, there were 16 fewer DIR employees (for a total of 159),

---

[13] *See* 10/26/04 Bovenzi Memo (Def. Ex. 6) and Agency MSJ at 8-9.  (Although they may have confusingly similar acronyms, DIR should not be confused with DIR<u>M</u>, the Division of Information Resources Management, in which a RIF was anticipated in 2005.  *See id.*)

[14] Dr. Seberhagen's definition of "RIF-related" separations includes nature of action (NOA) codes 302 (retirement - voluntary), 303 (retirement - special option) and 317 (resignation).  *See* Seberhagen Table 6 above, note.  *See also* Dr. Seberhagen's compilation of "RIF-Related Separations in April-May 2005" (Pl. Ex. 19), which occurred <u>prior to</u> the RIF; USOPM Guide, explanation of NOA separation codes, in ECF Doc. 46-5 (Def. Ex. 37), at header p. 4 of 4; Jeanneret Reply Report (Def. Ex. 27-1), at 9-10.

[15] As of 1/1/05, the number of employees under age 50 = 48 + 63 = 111; 111/175 = .634 = 63%.

51 of whom (32%) were age 50 and up, and 108 (68%) who were under age 50.[16]  In other words, the number of "older" employees had decreased by 13 (representing a decrease as a percentage of total DIR employees from 37% to 32%), while the number of "younger" employees had decreased from 111 to 108 (resulting in an <u>increase</u> in employees under age 50 as a percentage of total DIR employees from 63% to 68%).  Using the same (flawed) methodology that he applied to <u>DRR</u> in his report, Dr. Seberhagen would find that there was a statistically significant adverse impact on <u>DIR</u> employees age 50 and older.[17]

But this is a patently absurd result, since DIR was not one of the divisions threatened with a RIF.[18]  For this reason, DIR actually had no "RIF-related separations."  DIR did, however, have 16 employees who elected to take the buyout in 2005.  *See* Crosser Decl. (Def. Ex. 24) at ¶ 12.  From Dr. Seberhagen's Table 6 above, we know that 13 of these 16 employees who departed from DIR were age 50 and over.  And we know from our common sense (as well as the discussion in Dr. Jeanneret's Reply Report (Def. Ex. 27-1), at 9-11) that it is likely that a greater proportion of employees age 50 and over would be in a position to voluntarily take a buyout and retire from the FDIC than employees under age 50.  That they did so <u>both</u> in DRR <u>and</u> in DIR (as well as in the FDIC as a whole, *see* Seberhagen Tables 12 and 13) does not show any discriminatory impact on "older" employees in either division.  In sum, Dr. Seberhagen's

---

[16] As of 12/31/05, the number of employees under age 50 = 47 + 61 = 108; 108/159 = .679 = 68%.

[17] *See, e.g.*, Dr. Seberhagen's impact analysis for DRR in his Table 10.  The corresponding figures for DIR would be as follows:

    Percent of "RIF-related" separations, employees age 50 and up = 13/175 = 7.4%

    Percent of "RIF-related" separations, employees under age 50 = 3/175 = 1.7%

    Comparison of separation rates = 7.4/1.7 = 4.35 = 435% (significant if greater than 125%)

[18] *See* 10/26/05 Bovenzi Memo (Def. Ex. 6), at 1:

    The first group includes divisions where staffing levels are not justified by current or projected workloads. . . . DRR, DIRM, DOA, Legal, and DOF are included in this group. . . . Accordingly, we have begun active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in DOA, Legal, and DOF in 2006.  The second group includes the remaining divisions and all of the offices.  Staffing levels in these organizations are for the most part justified by current workload.

    . . . There will not be a RIF in these organizations.

decision, at the request of counsel,[19] to include FDIC employees who voluntarily retired in his impact analysis has tainted his report's probity and robbed it of any evidentiary value.

A final hypothetical should suffice to show the absurdity of including employees voluntarily electing a buyout in a disparate impact analysis: according to Dr. Seberhagen's analysis, the greater the number of "older" employees who elected to take the buyout – even if there were no RIF planned and they were eager to retire – the greater the adverse impact there would allegedly be on this class of older employees – so if <u>all</u> the older employees took the buyout, the adverse impact would be absolute. Employers would be well advised never to offer employees voluntary incentives to retire if this were a correct statement of the law. But it is not. *See, e.g., Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828, 829 (7th Cir. 1987) (an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination, unless the terms on which recipient could have declined and remained employed were themselves violations of the ADEA – here, the *Aliotta* Plaintiffs had the choice of: taking the buyout; transferring to DSC; or submitting to age-neutral RIF procedures that statistically favored older employees[20]).

## C. Employees who applied for and accepted buyouts prior to the RIF in DRR were not constructively discharged and suffered no adverse action.

Most of the class members in this case voluntarily applied for and accepted the buyout, and were not even affected by the reduction-in-force because they left the Agency before the FDIC issued specific RIF notices in DRR on June 30, 2005. *See* Undisputed Def. Facts 50 (May 14, 2005 departure date under the buyout) and 55 (they were not considered for positions in RIF).

---

[19] As noted in Agency MSJ at 31, Dr. Seberhagen testified at his deposition that he combined and treated as equivalent employees who voluntarily chose to take the buyout with the employees who were involuntarily separated

As the authorities cited by Plaintiffs (and the Agency) make clear, none of these employees was constructively discharged, and none of them has any viable claim for age discrimination.[21]

Plaintiffs, however, insist on arguing a case that does not exist. Their basic premise is that when an employee is confronted with a choice between competing for a smaller universe of jobs incident to a RIF, or applying for and accepting a substantial buyout, the selection of the latter choice must be deemed "involuntary" and, at law, the same thing as a discharge.

Of course, that is not the law, and the cases cited in Plaintiffs' Opposition only serve to underscore this point. For example, Plaintiffs cite *Bodnar v. Synpol, Inc.*, 843 F.2d 190 (5th Cir. 1988) for the proposition that, "an employee does not act voluntarily when he is given a choice between a severance package and a likelihood of involuntary termination without the severance benefit . . . ." (Pl. Opp. at 17.) However, *Bodnar* is fatal to Plaintiffs' claims in this case, because the decision emphasizes the principle that it is only when both choices offered to an employee are worse than the status quo that a decision to accept one of them may be viewed as involuntary:

> An employer's "offer" of early retirement may create a prima facie case of age discrimination by constructive discharge if it sufficiently alters the status quo that each choice facing the employee makes him worse off.
> . . .
> <u>When one option makes the recipient better off, and the other is the status quo, then the offer is beneficial. That the benefits may overwhelm the recipient and dictate the choice can not be dispositive.</u>

843 F.2d at 193 (emphasis added, quotation in the original).

The underlined holding is precisely the circumstance in the case at bar. The buyout was

---

by the RIF because counsel for Plaintiffs instructed him to do so. Seberhagen Dep. (Def. Ex. 33) at 37-47, 91.

[20] *See* Jeanneret Reply Report (Def. Ex. 27-1) at 8, 13-15, and Table 5; and Agency MSJ at 38.

[21] While Plaintiffs assert that these employees were "terminated" by the FDIC, this is just one of the many mischaracterizations of fact found throughout Plaintiffs' Opposition. Appendix A attached hereto contains a non-exhaustive list of such "facts" asserted by Plaintiffs that are unsupported by any record evidence or that misstate and/or mischaracterize (or are flatly contradicted by) undisputed record evidence submitted by the Agency (or in

merely an alternative which each employee was free to accept or reject, and if the employee

chose to reject it, he was in no worse position than any of his colleagues. "[O]ne option [the

buyout] makes the recipient better off, and the other is the status quo" (*id*.), and therefore under

*Bodnar* the choice is voluntary.

Although the *Bodnar* plaintiffs had been told that there would be a reduction in the work

force[22] and the company's presentations concerning early retirement had allegedly been made in

a "threatening" manner, *id*. at 192, the Court of Appeals found that this was insufficient to create

a jury issue on constructive discharge. *Id*. at 194. The Court emphasized that employees who

rejected the incentive offered for resignation would have the same risk of termination in the

subsequent RIF as all remaining employees. *Id*. Again, that is also true in the case at bar. It is

undisputed that the buyout was offered to all DRR employees on the same terms, and the risk of

being RIF'd was shared equally by all. Of similar effect is *Adams v. Ameritech Serv., Inc.*, 231

F.3d 414 (7th Cir. 2000) (also cited in Pl. Opp., at 17) in which it was held that an offer of an

early retirement program in the context of a RIF could be discriminatory only "if those who took

the early retirement offer did not have a true choice in the matter." *Id*. at 432.[23]

These cases thus stand for the proposition that a resignation in a "quit or be fired"

situation[24] is the same thing as a discharge. That is, the employee must be faced with a

Hobson's choice: termination must be virtually assured if the employee declines to resign.[25]

---

some cases, by the Plaintiffs themselves).

[22] In their 3/24 reply brief (ECF Doc. 49, at 16) Plaintiffs attempt to distinguish *Bodnar* by stating that "the employer had not announced any plan for involuntary head count reductions. To the contrary, [there was] no threat of involuntary terminations." As shown in the specific quotations and citations above, Plaintiffs' description is totally at odds with the way the Court of Appeals described the case it was deciding.

[23] *Ameritech Services* is also markedly different from the case at bar in that (1) a decision maker testified that one of the RIF factors ("growth potential") was underlined expected to yield lower scores (and therefore a greater risk of termination) for older employees, *id*. at 419; (2) the statistical evidence reflected a far greater risk of involuntary termination for older employees, *id*. at 426; and (3) there was a "suspicious destruction of evidence" related to the RIF, *id*. at 429.

[24] *See Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993).

[25] *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (5th Cir. 2005) ("The fact that one of the possible outcomes is

For Plaintiffs' construction to survive even a threshold analysis, they would have to show that the *a priori* risk of termination for employees over 50 was substantially greater than the risk for employees under 50. But Plaintiffs proffer no evidence of such a differential for the very good reason that there was none. DRR employees over and under 50 were subject to the same RIF conditions. The buyout was offered equally regardless of age, and the fact that more employees over 50 than under 50 <u>chose</u> the buyout reflects just that: a choice.[26]

This is undoubtedly the reason Plaintiffs make no response to Defendant's argument (Agency MSJ at 24-28) that there was no constructive discharge as a matter of law. Given the standards for constructive discharge (an employer renders working conditions so intolerable that a reasonable person in the employee's shoes would be compelled to resign), Plaintiffs obviously cannot approach such a predicate. Constructive discharge is a proxy or substitute for actual discharge, of course; therefore, a failure to fulfill its requisites means that employees who resigned are simply not equivalent (or similarly situated) to those who are actually RIF'd.

Here, the FDIC offered an incentive to all employees on equal terms; apparently, it was relatively more attractive to older employees (perhaps because they could combine it with early or normal retirement, they were otherwise at a more flexible point of their lives, etc.) and so they tended to choose the option in greater numbers.[27] That is not discrimination under any viable legal theory.[28] *Bodnar*, 843 F.2d at 193 ("no individual employee or employee group may claim

---

[26] that he would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge because the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'").

[26] Similarly, more older (57.5%) than younger (42.5%) DRR employees availed themselves of transfer opportunities to other FDIC divisions, which were offered to all regardless of age. *See* Jeanneret Reply Report (Def. Ex. 27-1) at 18 (Table 1). Conversely, the younger employees bore a disproportionate share of code 356 RIF separations. *Id.*

[27] As discussed in section II.B.2 above, older employees are naturally going to depart any non-discriminatory organization in greater proportion, particularly where there is an early retirement option. That older employees were more likely to find the buyout attractive proves nothing of any moment to the case at bar. *See also* Jeanneret Reply Report (Def. Ex. 27-1) at p. 11 and fn. 5.

[28] Plaintiffs' citation (in their Reply in support of Plaintiffs' MSJ at 12) of *Arnold v. U. S. Postal Service*, 863 F. 2d.

constructive discharge where all employees are subject to the same working conditions").

Plaintiffs submit (Pl. Opp. at 13 and Pl. Ex. 8) a declaration by Carole Mann stating that she resigned to avoid "losing the additional money offered by the buyout" and also because, "I knew that the number of positions in [DRR] was going to be reduced to less than half . . . ." These circumstances are inherent in any substantial reduction in force, and they are a far cry from showing that the risk to older employees was any different than for younger employees or that termination was virtually assured for anyone. <u>Both</u> of those conditions are required for Plaintiffs' involuntariness argument, and <u>neither</u> of those conditions obtained in this case.[29]

As demonstrated in section II.B.2 above, Plaintiffs' statistical evidence is deficient, and a rational analysis of the data leads ineluctably to the conclusion that the only "impacts" of the RIF favored older, not younger, employees. But the point here is that Plaintiffs' attempt to paint the hundreds of resignations (by employees both over and under 50 to obtain the buyout) as the same statistical and legal event as the 63 actual terminations flies in the face of the facts.

The employees in DRR, regardless of age, were all made the same buyout offer, and, contrary to Plaintiffs' argument, it was not (in Plaintiffs' "Godfather" parlance – Pl. Opp. at 17) an "offer they could not refuse." We know this because many DRR employees did "refuse" (i.e., decline to take the buyout) and they suffered no negative consequence from that refusal, other than not receiving the incentive which was theirs for the asking. The great majority of DRR

994 (D.C. Cir. 1988) well illustrates this defect in their own case, because there the Court of Appeals held that where a voluntary component of an employer's program ameliorates the effect of an involuntary component, it was error to consider only the adverse effect of the involuntary component. But the obverse clearly does not follow from this principle, and that is what happened in this case. The involuntary component (actual RIFs) did not have an adverse impact and so a case cannot be built by adding the effect of voluntary employee choices. In *Arnold*, employees who did not "volunteer" were nevertheless guaranteed to experience the adverse act at issue (transfer to another city). *Id.* at 999. In contrast, DRR employees who did not take the buyout were not guaranteed to be terminated (and most of them were not).

[29] Plaintiffs state (Pl. Opp. at 13) that there are 22 other similar declarations. Indeed, it appears that all of these declarations followed a form and substance drafted by Plaintiffs' counsel. *See* ECF-17, Pl. Ex. B-1 – B-23 ("fill in the blank" form affidavits filed with Plaintiffs' Reply Brief in Support of Class Certification). None of these

employees who declined the buyout offer retained their employment at FDIC; and most devastating to Plaintiffs' claims, the relatively smaller group that was actually discharged in the RIF was significantly younger than the population from which they were drawn.[30]

**D.    Plaintiffs who suffered adverse employment actions as a result of the RIF cannot establish a *prima facie* case of age discrimination.**

1.    <u>Plaintiffs have not raised a triable issue to support their contention that age was a factor in the design and implementation of the RIF</u>.  Plaintiffs argue repeatedly that:

> The fact that defendant went forward with plans to fire more than 50 DRR employees . . . even after the agency wide head count reduction had been accomplished is difficult to explain by any reason other than age discrimination.

Pl. Opp. at 28.  *See also id*. at 7, 15, and 18.  This is an amazing argument because the "more than 50 DRR employees" who were so unfairly RIF'd (according to Plaintiffs) were substantially younger than the class and statistically significantly younger than the population from which the RIFs came.  See section II.B.1 above.  This alone would be dispositive, and it is reflective of the total meritlessness of Plaintiff's claims.[31]

Plaintiffs also claim that statements allegedly made by a former chairman of the FDIC constitute "material direct evidence" of age discrimination in this case.  Pl. Opp. at 4, 15, 20.  Plaintiffs purport to quote (Pl. Opp. at 4) former Chairman Powell as stating "his desire to have 'young people near me, because they have all the innovative ideas.'"  Plaintiffs, however, have seriously misrepresented the record.  The offending phrases were contained in Plaintiffs' counsel's question and not in the witness's testimony, which consisted only of the innocuous statement that "I'm sure on occasions I have talked about the value of young people in an

---

declarations are material or helpful to Plaintiffs' voluntariness argument for the reasons discussed herein.

[30] *See* Jeanneret Reply Report (Def. Ex. 27-1) at 8, 13-15, and Table 5; and Agency MSJ at 38.

[31] Note also that Plaintiffs' assertion that the Agency's head count reduction requirements had been achieved before the RIF is an argument, not a fact, and fails to address the fact that DRR's reduction in required staffing had not been achieved before the RIF.  But more importantly, the subsequent RIF incontrovertibly favored older employees.

organization." *See* Powell Dep. (Def. Ex. 39), at 13:16-21.

Even if this testimony, correctly quoted, were somehow construed as a negative statement about older employees (which clearly it is not), it would be a "stray remark" as that term is used in employment discrimination jurisprudence, and thus irrelevant and immaterial. For a remark of this type to be probative, it must be (1) made by a decision maker, (2) at a time reasonably proximate to the decision at issue, and (3) relate to the decision at issue.[32]  Plaintiffs have not attempted to make these showings, and in any event, the summary judgment evidence is to the contrary.  First, the statement was alleged by Plaintiffs to have been made "in 2001 or 2002," Powell Dep. (Def. Ex. 39) at 13:16-17, long before the 2005 RIF.  Second, Chairman Powell was not a decision maker with respect to the operational aspects of the RIF.[33]  Finally, Plaintiffs make no attempt to connect the alleged remark to the decisions at issue here, and have alleged no other facts supporting their contention that actual decision makers considered age as a factor in the design and implementation of the RIF.[34]

2.      The appropriate disparate impact analysis demonstrates that the RIF process did not discriminate against older DRR employees.  Plaintiffs state (Pl. Opp. at 29) that to establish a prima facie case of disparate impact, they "must (1) identify the policy or practice challenged; (2) show the statistical disparities, as shown in Dr. Seberhagen's reports, and (3) show that the

---

[32] *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 882 (5th Cir. 2003).  *See also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("[S]tray remarks in the workplace . . . unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden."); *Girten v. McRentals, Inc.*, 337 F.3d 979, 983 (8th Cir. 2003) (remark that plaintiffs were too old did not show pretext, because it was remote in time and may not have been made by a decision maker).

[33] A review of the very brief deposition of former Chairman Powell (Def. Ex. 39) underscores his lack of involvement in (or even knowledge of) how the RIF was implemented.

[34] Plaintiffs cite to two e-mails to support their contention that age was considered "in designing the downsizing," Pl. Opp. at 7, but did not make them part of the record.  In order to dissipate any sinister implications raised by Plaintiffs, the e-mails in question are attached hereto as Def. Ex. 42, together with Mr. Bovenzi's undisputed deposition testimony that the referenced list "would have been an analysis of how many people would have been expected to take buyouts so that one could assess what the overall cost would be in buyouts and how many people would leave at the minimum retirement age and factors like that can reflect those likelihoods." *Id.* at 33:13-18.

disparity is linked to the challenged policy or practice." Defendants could not agree more. But Plaintiffs have not isolated any specific policy or practice for analysis, and they have not shown that their alleged disparities are linked to any policy or practice, let alone one that they identify and challenge. *See* Agency MSJ at 30-32; Agency Response to Plaintiffs' MSJ at 7-11. Thus, there is no *prima facie* case.

Moreover, as discussed in section II.B.1 above, Plaintiffs have not refuted Dr. Jeanneret's disparate impact analysis as to those employees who remained in DRR on June 30, 2005, and therefore were actually subject to the RIF. As demonstrated in the Agency's motion for summary judgment, the relevant statistical evidence establishes beyond dispute that there was no disparate impact on older DRR employees – in fact, the RIF had a disproportionate effect on younger DRR employees. *See* Agency MSJ at 38. Also, the demographics of DRR before and after the RIF are inconsistent with any negative age effect on employees age 50 and older. *Id.* at 33-37.

The only way Plaintiffs have been able to conjure up something they can label (erroneously) as a disparate impact is to combine involuntary terminations incident to the RIF with voluntary retirements and/or acceptances of the buyout.  This analysis is statistically and legally invalid. *See* Agency MSJ at 30-31. As the FDIC's expert explained in his reply report, Dr. Seberhagen was able to achieve what he called a discriminatory adverse impact only "by combining the outcomes of different employee and employer decisions made under different circumstances," *i.e.*, combining employee resignations or retirements that were voluntary decisions with departures as a result of the RIF that were involuntary.[35] Dr. Jeanneret observed that it is inappropriate for a researcher to lump together those outcomes and assess them

---

[35] Jeanneret Reply Report (Def. Ex. 27-1), at 10.

16

together.[36]

**E.     The EEOC regulations cited by Plaintiffs are inapplicable to this case.**

Plaintiffs argue (Pl. Opp. at 33) that under the EEOC regulation codified at 29 C.F.R. § 1625.7(d), "When an employment practice . . . is claimed as a basis for different treatment of employees . . . on the grounds that it is a 'factor other than' age, and such practice has an adverse impact against individuals within the protected age group, it can only be justified by <u>business necessity</u>." (Emphasis added.)  This argument is untenable because the Supreme Court rejected the same business necessity test asserted by the plaintiffs in *Smith v. City of Jackson*, 544 U.S. 228, 239-41 (2005).  The Supreme Court's decision is dispositive on the plain meaning of the statute ("reasonable factors other than age").

Furthermore, in her concurring opinion (joined by Justices Kennedy and Thomas), Justice O'Connor expressly observed that the Court was rejecting the "business necessity" standard in favor of the standard of "reasonable factors other than age," and she went on to state that because the "business necessity" phrase of the EEOC regulation was so manifestly incorrect and inconsistent with the ADEA, she would not give any deference even to the <u>different</u> regulatory language cited by Justice Scalia and the plurality in 29 C.F.R. § 1625.7 for the very reason that the EEOC had erroneously used the "business necessity" language in another part of its regulation:

> As an interpretation of the RFOA provision, moreover, the EEOC regulation is both unreasonable on its face and directly at odds with the Court's holding in today's case.  It says that the RFOA exemption is available only if the employer's practice is justified by a "business necessity."  But the Court has rejected that reading of the RFOA provision, and rightly so:  There may be many "reasonable means by which an employer can advance its goals, and a given nonage factor can certainly be "reasonable" without being necessary.  [Citations omitted.]  Of course, it is

---

[36] Jeanneret Reply Report (Def. Ex. 27-1), at 11.  *See also Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) (plaintiffs' statistical evidence was flawed because it failed to compare similarly situated individuals).

> elementary that "no deference is due to agency interpretations at odds with the plain
> language of the statute itself." [Citation omitted.] The [EEOC] clearly misread the
> RFOA provision it was attempting to construe.

*Smith v. City of Jackson*, 544 U.S. at 266-67 (2005) (O'Connor, J., concurring).

In a separate concurrence, Justice Scalia agreed that the EEOC had erroneously used the "business necessity" language in its regulation. While in Justice Scalia's view the EEOC's general recognition of disparate impact claims under the ADEA was entitled to deference, he agreed with the Court that it was "unreasonable" for the EEOC's regulation to construe "reasonable factors other than age" as "business necessity." 544 U.S. at 247 (Scalia, J., concurring). Thus, Justice Scalia, too, recognized that the reference to "business necessity" in the EEOC regulation should <u>not</u> be given any legal effect, as Plaintiffs would give it in this case.[37]

In any event, as explained in the FDIC's brief in opposition to the Plaintiffs' motion (at 6-7), even a "business necessity" standard would be of no help to Plaintiffs in this case:

1. The Supreme Court has defined business necessity in this context to mean that an employment policy or practice "bears a manifest relationship to the employment in question." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 n. 31 (1979), *quoting Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971). Reducing the staff of a division whose function has been concomitantly reduced by conditions in the regulated industry is by its own terms "manifestly related to the employment in question."

2. Plaintiffs cannot attack the reasonableness of the RIF methodology since it (1) was agreed to by the union which represents Plaintiffs' interests, (2) was conducted in accordance

---

[37] Plaintiffs entirely miss this important point when they argue (Pl. Opp. at 33) that their incorrect interpretation of the EEOC regulation "should be accorded great deference."

with RIF regulations promulgated by the United States Office of Personnel Management[38] and

(3) is a process inherently weighted in favor of longer service employees. *See* Agency MSJ at

15-17; *see also* Reply Report of Dr. Jeanneret (Def. Ex. 27-1) at 15.

**F.    The Agency has met its burdens under *City of Jackson*; Plaintiffs have not.**

1.    <u>Defendant's *City of Jackson* burden.</u>  Plaintiffs' assertion (Pl. Opp. at 18) that "Defendant

has offered only the vaguest of reasons" for the staff reductions in DRR is belied by the record.

Defendant has introduced extensive evidence of the reasons for the staff reduction, its efforts to

achieve most of the reduction through the exercise of employee choices rather than involuntary

terminations, and the conduct of the RIF itself.  *See* Agency MSJ at 4-20 and accompanying

exhibits.  All of this material is in the nature of reasonable factors other than age.  Moreover,

while Plaintiffs have challenged the necessity of DRR's downsizing, "[t]he ADEA is not a

vehicle for reviewing the propriety of business decisions" such as a RIF.  *Seagate*, 82 F.3d at

986.

These principles are reinforced by analogous circumstances of key authorities construing

the RFOA defense.  For example, in *City of Jackson* itself, the Supreme Court went out of its

way to hold (in the unanimous portion of its opinion) that an employer's decision to provide

larger percentage pay increases to more junior employees to enhance its competitive position in

the marketplace could not, as a matter of law, be attacked as unreasonable, no matter what the

impact of such a policy might be on older employees.  544 U.S. at 242.  In  *Pippin v. Burlington

Resources Oil & Gas Co.*, 440 F.3d 1186, 1201 (10th Cir. 2006), the Court of Appeals held that

an employer's policy, in the context of a RIF, to "honor its prior commitment to new hires in

---

[38] Plaintiffs' statement that the FDIC "did not observe 'bump' rights, or other preferences traditionally afforded to RIF victims," Pl. Opp. at 36, is flatly contradicted by undisputed Def. Facts 58 and 74 (and the record evidence cited therein) that the RIF was conducted in accordance with US OPM regulations, including bump and retreat rights.

order to protect its hiring reputation at the schools involved is reasonable, as is the decision to keep new hires who have not yet been evaluated" (i.e., to not include the new hires in its RIF), was an RFOA as a matter of law.  And in *Meacham v. Knolls Atomic Power Lab*, 461 F.3d 134, 144-46 (2nd Cir. 2006), *cert. granted*, 128 S.Ct. 1118 (2008), the Court of Appeals held that even though the defendant's RIF criteria were "subjective and imprecise at best, the subjectivity disproportionately impacted older employees, [defendant] observed that the disproportion was gross and obvious, and [defendant] did nothing to audit or validate the results," the procedure nevertheless fulfilled the requisites of the RFOA defense.[39]

2.    <u>Plaintiffs' *City of Jackson* burden.</u>  In their response, Plaintiffs totally ignore the *prima facie* elements set forth in *City of Jackson, supra*.  That is, Plaintiffs do not even argue that they have isolated a specific policy or practice, as required by the Supreme Court.  *See* Agency MSJ at 30-32.  However, in their recently filed reply brief in support of their own MSJ (ECF Doc.49), Plaintiffs attempt to rationalize this failure by stating:

> "Under the disparate impact theory, multiple components should be analyzed together if they are so interrelated that they are all part of a single program . . . ."

*Id*. at 12.  This principle is directly lifted from the 1991 amendments to Title VII; specifically, 42 U.S.C. § 2000e-2 (k)(1)(B) which reads in relevant part as follows:

> With respect to demonstrating that a particular employment practice causes a disparate impact . . ., the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, <u>except that if the complaining party can demonstrate to the court that the elements of a respondent's decision-making process are not capable of separation for analysis, the decision-making process may be analyzed as one employment practice.</u>

---

[39] Contrast the FDIC's actual RIF in DRR, which did <u>not</u> have a disparate impact on older employees.  *See* Agency MSJ at 38.

*Id.* (emphasis added). The very articulation of this argument by Plaintiffs constitutes a strikingly powerful demonstration that their claims are not viable, because the Supreme Court has emphasized that the above quoted principle is not applicable to age cases.

In *City of Jackson*, 544 U.S. at 240, the Court, explaining its holding that "the scope of disparate-impact liability under ADEA is narrower than under Title VII," noted specifically that the 1991 amendments to Title VII, which were intended to overrule the Court's *Wards Cove* decision[40] were inapplicable to the ADEA. Therefore:

> As we held in *Wards Cove*, . . . the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.

*City of Jackson*, 544 U.S. at 241 (citations omitted, emphasis in the original). Since Plaintiffs have failed to make this *prima facie* showing (*See* Agency Response to Plaintiffs' MSJ at 7-11; Agency MSJ at 30-32), their theory of liability is not viable.[41]

## G.  Plaintiffs' characterizations of Corporate University, the Corporate Employee Program and recruitment efforts are inaccurate and unsupported.

In their Opposition, Plaintiffs make numerous misstatements regarding Corporate University (CU) in general and the Corporate Employee Program (CEP) in particular. Plaintiffs' new theory is that the FDIC chose to conduct a RIF in DRR so it could then create CU and CEP to hire "younger" workers who would do the same work as the separated DRR employees.[42]

---

[40] *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).

[41] Indeed, even if Plaintiffs' asserted principle were applicable to ADEA cases, their claims would still fail because it is clear that the <u>elements of the challenged practice are capable of separation for analysis</u>. Both Plaintiffs' and Defendant's experts' demonstrated how easy it was to distinguish (by action codes, among other things) between involuntary RIFs and applications for the buyout. It is just that Plaintiffs insisted on combining these apples and oranges. *See* Agency Response to Plaintiffs' MSJ at p. 11 and fn. 14, 15.

[42] This allegation is not raised in the Complaint or in the Amended Complaint filed by Plaintiffs. Further, this allegation was independently rejected by Plaintiffs' expert himself who observed in his initial report that, "[t]he great majority of these new hires were non-career appointments (e.g., interns and trainees) at Grade 7 or lower, assigned primarily to [divisions other than DRR]." *See* Defendants' Opp. to Plaintiffs' MSJ (ECF Doc. 46) at 14-15.

Such allegations are inaccurate, unfounded and noticeably without any record evidence.

Just as dispositively, there exists no mechanism by which the CU or CEP programs could have anything to do with the only issue in this case:  the RIF in DRR.  This is manifestly the case because (1) the CU/CEP programs were initiated long before the RIF; (2) the CU/CEP programs were not operationally connected to – nor did they reference – DRR specifically but applied to FDIC as a whole; (3) CU/CEP recruits did not replace senior DRR employees and could not even potentially do so for years; and most importantly, (4) DRR employees at risk for the RIF were given an opportunity to immediately transfer to jobs that CU/CEP employees could only aspire to after years of training.

First, the concept of a Corporate University was discussed in the 2002 FDIC Annual Report, well in advance of not only the 2005 RIF itself, but also in advance of the 2004 planning for the 2005 RIF.  The 2002 Report explained:

**Corporate University**
In another move to improve its long-term operational efficiency and effectiveness, the Corporation began developing a new Corporate University that will be modeled on the best practices of high-performing organizations in both the public and private sectors. The new Corporate University will provide an integrated framework for addressing future leadership development and skill requirements. It will include core training programs for the FDIC's three major business lines – insurance, supervision, and receivership management – and give employees the opportunity for cross-training and job rotation.

http://www.fdic.gov/about/strategic/report/2002annualreport/pg17.html.  Thus, Plaintiffs' statement that "Chairman Powell approved and announced the 2005 downsizing for the purpose of using the cost savings to create a 'Corporate University' and to hire trainees who would learn . . . to do the jobs many of the plaintiffs had been doing for decades" (Pl. Opp. at 20) is inaccurate.  CU was not funded by the DRR RIF which occurred years later, and CU is the training and development organization for all FDIC employees, not just DRR.

Plaintiffs' statement that the FDIC made "the decision to limit cross-over opportunities" (Pl. Opp. at 26) is wrong and not only unsupported by any record cite, but actually contrary to

the evidence in this case. *See* Crossover SOI (Def. Ex. 12). In fact, the evidence demonstrates

that 32 DRR employees crossed over to DSC at the same grade level. Second Bodian Decl.

(Def. Ex. 36), at ¶ 12. Moreover, Plaintiffs' statement that the FDIC "admits" that the purpose

of the crossover program was "to eliminate employees from older divisions by the end of 2005

so that the budget for those positions could be used to hire trainees and staff for the 'corporate

university'" (Pl. Opp. at 16) is once again not only false, but contrary to the record evidence.

Further, Plaintiffs assert that "the Agency planned further downsizing so that the agency

could commence recruitment for new employees on the campuses of colleges and universities

and community centers under the new Corporate Employee program" (Pl. Opp. at 4, citing Pl.

Ex. 9). This is not true. Exhibit 9 contains no such language or implication. In fact, the FDIC

launched its recruiting initiative in 2002, long before the 2005 RIF. *See* Def. Ex. 43 attached

hereto.

The argument that the FDIC's outreach efforts to colleges and communities are somehow

evidence of age discrimination based on the average age of college graduates (Pl. Opp. at 4-5) is

absurd. The college recruitment effort was not for DRR positions, nor for positions

encompassing work that DRR employees had formerly performed. Moreover, every Plaintiff

was given multiple opportunities – both before and after actual RIF notices were issued – to

apply to the CEP program or for other transfers in order to retain their employment with the

FDIC.[43] In fact, some of the Plaintiffs did just that. *See* Haag application and transfer to DSC

(Def. Ex. 13). The fact that numerous Plaintiffs made a voluntary decision not to apply to the

---

[43] Transfer activity out of DRR in the months prior to the RIF favored older employees. *See* Jeanneret Reply Report (Def. Ex. 27-1) at Table 1, which shows that while only 42.5% of such transfers were obtained by employees under 50, these "younger" employees suffered 62.3% of the involuntary terminations.

CEP program is not evidence of age discrimination by their employer, but rather, evidence of self-determination and choices made by these individuals as FDIC employees.

Finally, Plaintiffs suggest that the FDIC's hiring younger employees into the CEP Program _after_ the 2005 RIF is somehow evidence of age discrimination.  The law does not support this theory.  For example, in _James v. New York Racing Ass'n_, 233 F.3d 149, 152 (2nd Cir. 2000), the court found that hiring a substantially younger employee after a RIF was not evidence of age discrimination where the overall reorganization resulted in new employees assuming different groupings of responsibilities, for lower pay, than plaintiff, even though some of the new employee's responsibilities overlapped with those of the plaintiff.  Likewise, in _Seagate_ ADEA case, 82 F.3d at 986, the Court found that plaintiffs' evidence of Seagate's post-RIF hirings failed to show pretext because the new hires were not similarly situated to plaintiffs, as they were not hired into plaintiffs' positions or positions comparable to theirs.

Defendant has not been able to locate – and Plaintiffs have not cited – any case in which a court found tenable a plaintiff's argument that an employer was attempting to replace a group of RIF'd employees because of age discrimination where that same employer went out of its way to give the RIF'd employees a preference for the alleged replacement jobs.  Here, the FDIC allowed, and even encouraged, qualified crossovers from DRR to assume new FDIC careers as bank examiners despite the fact that the DRR employees would be much more expensive (in terms of salary and present value of increased retirement) than college recruits, and despite the fact that the DRR employees could only do these jobs after additional training in a new field.

## IV.  CONCLUSION

After full and ample discovery, Plaintiffs have marshaled no evidence to show that any of the actions taken by the Agency during the 2004-2005 downsizing and RIF in any way violated

their rights under the ADEA.  As demonstrated above and in the Agency MSJ and related filings

(as well as in the Agency's memorandum in opposition to Plaintiffs' MSJ), there is no genuine

issue to be determined by the trier of fact[44] as to any material fact on any of Plaintiffs' claims

and Defendant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  Defendant

therefore respectfully requests that this matter be dismissed with prejudice.

>Respectfully submitted,
>
>/s/ *William S. Jones*
>
>_____
>William S. Jones
>Georgia Bar No. 404288
>Counsel, Legal Division
>Federal Deposit Insurance Corporation
>3501 N. Fairfax Drive (VS-E6006)
>Arlington, VA 22226
>(703) 562-2362
>(703) 562-2482 (Fax)
>
>Stephen J. Kessler
>D.C. Bar No. 382427
>Counsel, Legal Division
>Federal Deposit Insurance Corporation
>3501 N. Fairfax Drive (VS-E6014)
>Arlington, VA 22226
>(703) 562-2311
>(703) 562-2482 (Fax)
>
>Attorneys for Defendant

Dated: March 27, 2008

---

[44] Despite Plaintiffs' reference to a "jury" (Pl. Opp. at 18), this is a non-jury case because their ADEA claims are asserted against a federal agency.  *See Lehman v. Nakshian*, 453 U.S. 156 (1981).  Unlike their original complaint, Plaintiffs' amended complaint contained no jury demand.

**APPENDIX**

<u>**Various Factual Misstatements/Mischaracterizations in Plaintiffs' Opposition**</u>:

(1)  Plaintiffs assert that in 2005, the FDIC "terminated" the employment of 138 permanent DRR employees over age 50 and 55 permanent DRR employees under age 50.  (Pl. Opp. at 1, 10; *see also* Pl. Opp. at 11, 12 n. 2, stating that various other numbers of employees were "terminated.")  **Contradicted by undisputed Def. Facts 54 ("132 DRR employees applied for and accepted the buyout."), 68 ("53 DRR employees were involuntarily separated (46 of whom received severance pay), 7 DRR employees retired in lieu of separation, and 3 other employees resigned after receiving a specific RIF notice."), and 75 ("The buyout and early retirement programs were completely voluntary.").**

(2)  Plaintiffs quote, out of context, excerpts of Board of Directors minutes from 1995. (Pl. Opp. at 2-4.)  **Implicitly mischaracterizes discussions of the FDIC's plans for voluntary downsizing at that time.  *See* discussion above at section II.A.**

(3)  Plaintiffs misquote statements attributed to former FDIC Chairman Powell.  (Pl. Opp. at 4, 15.)  **Unsupported by any record evidence other than Chairman Powell's deposition testimony, which has been seriously misstated and mischaracterized by Plaintiffs.  *See* discussion above at section II.D.1.**

(4)  Plaintiffs assert that the Agency planned further downsizing so that the cost savings could be used to recruit new employees under the Corporate University/Corporate Employee Program.  (Pl. Opp. at 4, 15, 21, 27-28.)  **Unsupported by the record evidence cited by Plaintiffs (Pl. Ex. 9) and contradicted by record evidence supplied by Defendant (Def. Exs. 38-39).  *See* discussion above at section II.G.**

(5)  Plaintiffs assert that a memorandum dated August 21, 2004, from DRR Director

Glassman to COO Bovenzi recommended keeping DRR staffing stable at 501 permanent employees. (Pl. Opp. at 5.) **Unsupported by the record evidence cited by Plaintiffs.**

(6) Plaintiffs assert that James Seegers and Leslie Plant are "Deputy Directors" of DRR. (Pl. Opp. at 5, 7.) **Unsupported by any record evidence (Mr. Seegers and Ms. Plant are the Managers of DRR's Administration Sections in Washington and Dallas, respectively).**

(7) Plaintiffs assert that "the downsizing proposal was provided to employees as part of the information on the 'voluntary' severance package." (Pl. Opp. at 8.) **Contradicted by undisputed Def. Facts 25 (information on the extent of DRR's proposed downsizing was communicated to DRR employees by DRR Director Glassman on 10/26/04) and 42 (e-mail outlining the buyout program was provided to <u>all</u> FDIC employees by COO Bovenzi on 10/26/04).**

(8) Plaintiffs assert that the Agency has produced no data or other information showing inaccuracies or errors in Dr. Seberhagen's report. (Pl. Opp. at 9.) **Contradicted by: Dr. Jeanneret's Reply Report (Def. Ex. 27-1); undisputed Def. Facts 84-89 (concerning applicable PERHIS data for DRR employees); and Defendant's Response to Plaintiffs' Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment on Liability (ECF Doc. 46-2), Response Nos. 9-10, 13-25, 31, 33-35 and record evidence cited therein (correcting inaccuracies in various numerical counts asserted by Plaintiffs).**

(9) Plaintiffs assert that the record contains no evidence of a need or rational business purpose for the level of staff cuts set forth in the DRR Reorganization Memo dated October 25, 2004 (Pl. Opp. at 6, 28), and that "[t]he FDIC has not offered evidence of any 'reasonable factors other than age'" (Pl. Opp. at 10). **Contradicted by undisputed Def. Facts 11-12 (declining workload due to industry consolidation and robust health of the financial industry), 13**

**("Staffing reductions were approved for the Division of Resolutions and Receiverships and the Legal Division following a lengthy analysis of current and projected future workload in the resolutions and receivership management area and reflect the smaller number of financial institution failures for the past several years."), 20-22 (three financial institutions failed in 2003 and four failed in 2004 – there were no bank failures at all in 2005 and 2006, illustrative of DRR's declining workload given its functional responsibilities), and 29-30 (resulting DRR staffing decisions).**

(10)  Plaintiffs assert that some DRR employees were "obliged to transfer" to another FDIC division.  (Pl. Opp. at 11.)  **Contradicted by undisputed Def. Fact 70:  "[E]mployees in DRR were presented with choices as to whether to: (i) accept the buyout offer and resign or retire; (ii) apply for other available positions in other Divisions of the FDIC; or (iii) participate in the RIF process and be considered for positions in DRR (either vacant or encumbered).  FDIC employees, not the FDIC, made those decisions."**

(11)  Plaintiffs assert that "[i]t is undisputed that plaintiff Haag took his cross-over demotion after he had already been advised that his position was "surplus."  (Pl. Opp. at 13.)  **Unsupported by any record evidence.**

(12)  Plaintiffs assert that DRR and DIRM were the "oldest divisions of the Agency." (Pl. Opp. at 16.)  **Unsupported by any record evidence.**

(13)  Plaintiffs assert that "[t]he [RIF] plans called for all jobs to be declared 'surplus' so that the incumbency advantages would be lost."  (Pl. Opp. at 16.)  **Unsupported by any record evidence.**

(14)  Plaintiffs assert that there was a "decision to limit cross-over opportunities."  (Pl. Opp. at 26.)  **Contradicted by undisputed Def. Facts 34-41 and exhibits cited therein.**

A-3