**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

Westlaw.

275 F.3d 1088 (Table)                                                      Page 1
275 F.3d 1088 (Table)
**(Cite as: 275 F.3d 1088)**

Briefs and Other Related Documents

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. The Eleventh Circuit provides by rule that unpublished opinions are not considered binding precedent. They may be cited as persuasive authority, provided that a copy of the unpublished opinion is attached to or incorporated within the brief, petition or motion. Eleventh Circuit Rules, Rule 36-2, 28 U.S.C.A.)

United States Court of Appeals,
Eleventh Circuit.

Michael R. **Smith**
v.
Donna **Tanoue** [FN*]

NO. 01-12234

October 25, 2001

Appeal From: N.D.Ga., No.9801011CVMHS1

Affirmed.

FN* Fed.R.App.P. 34(a); 11th Cir.R. 34-3.

275 F.3d 1088 (Table)

Briefs and Other Related Documents (Back to top)

• 2001 WL 34140637 (Appellate Brief) Reply Brief of Appellant (Aug. 23, 2001)Original Image of this Document (PDF)

• 2001 WL 34140618 (Appellate Brief) Answering Brief of Appellee Donna Tanoue in her capacity as Chairman of the Federal Deposit Insurance Corporation (Aug. 08, 2001)Original Image of this Document (PDF)

• 2001 WL 34140629 (Appellate Brief) Brief of

Appellant (Jun. 05, 2001)Original Image of this Document (PDF)

• 01-12234 (Docket)
(Apr. 26, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**
FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 2 1 2001

LUTHER ⌁ ⌁⌁⌁⌁, Clerk
By:
ℐ Reed ⌁⌁⌁⌁ Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL R. SMITH,                    :

      Plaintiff,                    :        CIVIL ACTION

v.                                   :        1:98-cv-1011-MHS

DONNA TANOUE, Chairman,              :
Federal Deposit Insurance
Corporation,                         :

      Defendant.                    :

**ORDER**

This employment discrimination action is before the Court on the Magistrate Judge's Report and Recommendation (R&R) recommending that the Court grant defendant's motion for summary judgment. Plaintiff objects to the R&R. After a _de novo_ review of the record, the Court concludes that the R&R is correct.

Background

Plaintiff, Michael R. Smith, a white male born on January 27, 1945, began working for the Federal Deposit Insurance Corporation ("FDIC") in 1967. In October 1996, the FDIC announced a comprehensive program to reduce its staff due to a decline in workload. The program included a reduction in force ("RIF"), "directed reassignments," and a "buyout/early out program." In May 1997, plaintiff applied for the position of Examination Specialist but his

1

EXHIBIT 41
ALIOTTA v. BAIR
NO. 05-2325-RMU

application was rejected.  Therefore, on August 1, 1997,
plaintiff accepted a buyout and retired.  Plaintiff filed
this action in April 1998 alleging that his separation from
employment with the FDIC resulted from age and sex
discrimination.

Discussion

     The R&R recommends that defendant's motion for summary
judgment be granted.  Specifically, the R&R concludes that
plaintiff has failed to present direct evidence of
discrimination by the FDIC.  Regarding circumstantial
evidence of discrimination, the R&R concludes that plaintiff
has failed to meet his burden of raising a genuine issue of
material fact as to whether defendant's justification for
the structure of the RIF was merely a pretext.

     Plaintiff objects to the R&R on the grounds that (1)
under the direct evidence standard adopted in a recently
decided Eleventh Circuit case, plaintiff has presented
direct evidence of discrimination; and (2) the Magistrate
Judge erred in concluding that plaintiff has failed to show
sufficient evidence of pretext in the design of the RIF.

     A.    Direct Evidence
     Initially, plaintiff contends that, after the
Magistrate Judge issued the R&R, the Eleventh Circuit

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

broadened the definition of "direct evidence" in the context of Title VII cases in <u>Bass v. Board of County Commissioners</u>, No. 99-10579, 2001 U.S. App. LEXIS 2442 (11th Cir. Feb. 21, 2001). Specifically, plaintiff contends that under <u>Bass</u>, "'direct evidence' can be provided by circumstantial evidence." According to plaintiff, he has presented direct evidence of discrimination in the form of (1) statements by decisionmakers that they did not want the program to reduce staff to adversely impact women and minorities, and (2) the FDIC's affirmative action policy.

The Court concludes that the <u>Bass</u> decision does not change the law in the way that plaintiff suggests. Specifically, although the court in <u>Bass</u> stated that the existence of direct evidence could be established with circumstantial evidence, the court did not change the definition of direct evidence. <u>Id.</u> at *41-42. In holding that circumstantial evidence can be used to prove the existence of direct evidence, the court did not change the requirement that the underlying evidence must still "prove the existence of [a] fact in issue without inference or presumption." <u>Id.</u> at *41.

As to the statements by decisionmakers, to conclude that plaintiff was discriminated against requires at least two inferences: (1) that the RIF in particular, as opposed

3

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

to the directed reassignments and the buyout program, was structured in such a way that the adverse impacts on women and minorities would be minimized; and (2) that this structure, in paying special attention to women and minorities, actually caused plaintiff to lose his job. Thus, the Court concludes that the Magistrate Judge was correct in determining that the statements by decisionmakers do not constitute direct evidence of discrimination against plaintiff.

With respect to whether affirmative action plans are direct evidence of discrimination, the court in Bass held that an affirmative action plan can constitute direct evidence of discrimination where plaintiff has put forth evidence that defendant acted pursuant to the plan. Id. at *46. Here, plaintiff has offered no evidence indicating that the FDIC's affirmative action policy affected the structure of the RIF. Therefore, the affirmative action policy does not constitute direct evidence of discrimination.

B.    Pretext

On the issue of pretext, plaintiff objects to the Magistrate Judge's conclusion that plaintiff failed to demonstrate that discriminatory motives affected the structure of the RIF. Plaintiff relies on several

4

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

statements by FDIC decisionmakers, including a statement by Chief Operating Officer Dennis Geer in which he indicated that the FDIC wanted to minimize impact on women and minorities.[1]

However, as the Magistrate Judge correctly points out, plaintiff has offered no additional evidence that the decisionmakers altered the structure of the RIF in response to concerns for women and minorities. Moreover, plaintiff has failed to proffer any evidence that concerns for women and minorities impacted the structure of the RIF with respect to plaintiff and plaintiff's office. Consequently, the Court concludes that the Magistrate Judge was correct in determining that plaintiff failed to link discriminatory motives with the structure of the RIF.

<u>Summary</u>

For the foregoing reasons, the Court ADOPTS the Magistrate Judge's Report and Recommendation [#58-1]; DENIES plaintiff's motion for reconsideration of the Magistrate Judge's Report and Recommendation [#59-1]; GRANTS

---

[1] Plaintiff also relies on statements by FDIC decisionmakers indicating that older employees were the target of the downsizing. However, as the R&R explains, the FDIC was not attempting to eliminate employees based on their age.

5

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

defendant's motion for summary judgment [#37-1]; and

DISMISSES this action.

IT IS SO ORDERED, this 20 day of March, 2001.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

ENTERED ON DOCKET

MAR 2 1 2001

L.D.T. CLERK

DEPUTY CLERK

6

AO 72A

EXHIBIT 41
ALIOTTA v. BAIR
NO. 05-2325-RMU

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL R. SMITH,                    :
                                     :    CIVIL ACTION
        Plaintiff,                   :
                                     :    NO. 1:98-CV-1011-MHS
             v.                      :
                                     :
DONNA TANOUE, Chairman, FDIC,        :
                                     :
        Defendant.                   :

## FINAL REPORT AND RECOMMENDATION

Plaintiff Michael R. Smith filed this employment discrimination action against his former employer[1] on April 7, 1998. He contends that his employer subjected him to age and sex discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, et seq. Specifically, he contends that his separation from employment in 1997 was the result of age and sex discrimination (Counts I and III) and that defendant's failure to select him for the position of Examination Specialist (Automation/Information) posted in May 1997 was the result of age discrimination (Count II).[2]

_____

[1]Andrew C. Hove, the former Acting Chairman of the Federal Deposit Insurance Corporation, was named as the defendant in plaintiff's original complaint. Pursuant to Fed.R.Civ.P. 25, Donna L. Tanoue was automatically substituted for Hove when she became the FDIC's Chairman.

[2]As discussed in this court's order of January 5, 2001, (Doc. 55), plaintiff did not make the exact nature of his claims

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

Pending before the court is defendant's Motion for Summary Judgment [Doc. 37]. For reasons discussed below, the undersigned **RECOMMENDS** that defendant's motion be **GRANTED** and that this action be **DISMISSED** with prejudice.

I.    <u>FACTS</u>[3]

    A.    <u>Plaintiff's Employment History with the FDIC</u>

Plaintiff, who is a white man born on January 27, 1945, began working for the Federal Deposit Insurance Corporation ("FDIC") in 1967. Plaintiff initially worked in the FDIC's Division of Supervision ("DOS") as a bank examiner. He was later promoted a number of times within DOS, with duty stations in Tennessee and Washington, D.C. In addition to work as a bank examiner, plaintiff's jobs included Review Examiner, Training Coordinator, and Chief of Financial and Automation Resources. (Doc. 43, Exh. 1 (Smith Aff.) ¶ 3). He also held various

---

clear in his amended complaint. Plaintiff also included a number of claims in that complaint that he has since abandoned. Plaintiff agrees that the claims listed here are those that remain in dispute and are correctly described by the court. (<u>See</u> Doc. 57 at 1).

[3]Unless otherwise indicated by citation to the record, this court draws the facts from the uncontested portions of defendant's Statement of Material Facts. (<u>Compare</u> Doc. 37, Attachment, <u>with</u> Doc. 43, Attachment). This court must accept as admitted those facts in the defendant's statement that have not been "specifically controverted" with citation to relevant portions of the record by the opposing party. Local Rule 56.1B(2),(3), N.D.Ga. Evidence regarding disputed facts is presented in a light most favorable to plaintiff.

2

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

positions involving liquidation of bank assets and investigation of failed banks and savings and loans. (Id.).

In 1988, plaintiff accepted a downgrade to the GG-14 level (he had previously been at the GG-15 level) and took a position as a senior investigator in the Division of Liquidation (later renamed the Division of Depositor and Asset Services ("DAS") and renamed a second time as the Division of Resolutions and Receiverships ("DRR"))[4] in Knoxville, Tennessee. Plaintiff took this downgrade so that he could return to Tennessee.

From 1989 through early 1992, plaintiff was on detail from the FDIC to the Resolution Trust Corporation ("RTC") as an investigator in the Knoxville field office. During his time at the RTC, plaintiff served in high-level management and supervisory positions. (Smith Aff. ¶ 4). In early 1992, plaintiff returned to the FDIC as a Department Head -- Investigations in DAS, with a duty station in Orlando, Florida. In this position, plaintiff supervised 27 employees charged with investigating eight failed banks. (Id. ¶ 5).

In 1995, plaintiff transferred to Atlanta, where he became the Department Head -- Congressional Inquiries and Public Information in DAS. Plaintiff remained in this position until August 1, 1997, when his employment with defendant ended.

---

[4]Throughout this Report and Recommendation, this division will be referred to as "DAS."

3

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

B.    Ombudsman Functions and Asset Support Unit are
      Separated from DAS

In the fall of 1995, DAS's ombudsman function was split
from DAS into a separate and independent Office of the
Ombudsman.    This reorganization, according to defendant, was
required by federal law.    See 12 U.S.C. § 4806.[5]    Seven DAS
employees -- not including plaintiff -- were selected to staff
the new office.    All of these employees were younger than 45 and
substantially younger than the employees remaining in
plaintiff's office.    (See Doc. 44, Exh. 13 at P00466; Doc. 43,
Exh. 1 (Smith Aff.) ¶ 9).    John Mullinix, who became head of the
new office, encouraged plaintiff to stay with DAS.    (Smith Dep.
at 31-32).    "[H]is reasoning was such that there would be no
government and public relations function in the new ombudsman
area," this function would remain at DAS, "and after all, that
was my job . . . ."    (Id. at 32).

In 1996, DAS's Asset Support Unit was moved from DAS to the
Division of Finance.    According to plaintiff, the unit was
staffed almost entirely with women.[6]

---

[5]Section 4806 of Title 12, which was passed in 1994,
requires "each Federal banking agency" to "appoint an ombudsman"
"[n]ot later than 180 days after September 23, 1994." 12 U.S.C.
§ 4806(d)(1).

[6]Neither the Office of the Ombudsman nor the Asset Support
Unit, in contrast to the Atlanta DAS office in which plaintiff
worked, was subject to the reduction in force (discussed in
detail below) that eventually led to plaintiff's departure from
the FDIC.

4

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

C.    <u>Plaintiff Receives Notification of Impending RIF</u>

On October 29, 1996, FDIC Chief Operating Officer Dennis Geer notified FDIC employees, via an e:mail memorandum, of plans for downsizing the number of employees at the FDIC. (<u>See</u> Doc. 37, Exh. 17; Geer Dep. at 112[7]). The memorandum, which was sent to all FDIC employees, announced "a comprehensive set of initiatives related to the staff reductions that must occur in 1997 and subsequent years due to the projected decline in our workload." (<u>Id</u>. at 1). The initiatives included, among other things, a reduction in force ("RIF"), "directed reassignments," and a "buyout/early out program." (<u>Id</u>.). The memorandum noted that DAS, the division in which plaintiff worked at the time, had 2,125 employees and that this number needed to be reduced to 1,072 by the end of 1997, and to 430 by the end of 2000. (<u>Id</u>. at 2).

To this end, the memorandum announced that several DAS field offices would be closed, including the Atlanta office in which plaintiff worked with an effective date of August 29, 1997. (<u>Id</u>. at 4). The memorandum added that all permanent executive, managerial, and professional employees in DAS (regardless of location) would be offered buyouts, and that those in locations scheduled for closure "who ha[d] not accepted

---

[7]The original of Dennis F. Geer's deposition, taken on November 3, 1999, was filed in case No. 1:98-CV-1242-ODE, <u>Rosenberg v. Tanoue</u>. A copy was filed in this case on December 19, 2000.

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

a buyout or been selected for another position within the Corporation w[ould] be separated by reduction-in-force (RIF) procedures on the dates specified for each location." (<u>Id</u>.). Finally, the memorandum advised employees that RIF "competitive areas" would be narrowly drawn to avoid disruption:

> The Corporation has determined that, in order to minimize the potential disruption of a RIF, each division and office at each of the Corporation's geographic locations will constitute a separate competitive area for RIF purposes. This means, for example, that a permanent DAS . . . employee assigned to . . . one of the . . . locations where current DAS . . . functions are scheduled to be discontinued will not be able to displace any employee in another division or office at the same location.

(<u>Id</u>. at 11).


    D.   <u>Plaintiff Makes a Discrimination Complaint</u>

    On December 12, 1996, plaintiff contacted an FDIC equal employment opportunity ("EEO") counselor and alleged discrimination in connection with the downsizing plan. As paraphrased by the counselor, plaintiff's specific allegations were as follows:

> Aggrieved alleges that he was discriminated against based on his race (white), sex (male), and age (DOB 1/27/45), when on or about November 29, 1996, he became aware of an October 29, 1996 memorandum from Dennis Geer, FDIC Chief Operating Officer. The aggrieved alleges that the memorandum, entitled "Planned Corporate Downsizing and Related Initiatives," announced a future reduction-in-force (RIF) which would affect

6

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

only certain units in the Atlanta FDIC
Office.

Aggrieved feels that in conjunction with
this announcement, there was a concerted
effort to isolate older, white, males in the
affected offices and to move minorities and
females out of these offices before the
planned RIF. This was done, Aggrieved
alleges, by limiting his ability to compete
or be considered for available openings,
restricting these positions to minorities
and females, or otherwise preventing the
Aggrieved from being considered. This
created, in effect, the Aggrieved alleges[,]
a targeted RIF.

(Doc. 37, Exh. 74 at 2).


E.    High-level FDIC Officials Make Comments Regarding The

      FDIC's Downsizing Plans

In several meetings held by members of the FDIC Board of

Directors and staff in 1995 and later, plans for the downsizing

of the FDIC were discussed.[8]    Plaintiff relies heavily on

comments made during these meetings, especially those of Ricki

Helfer (then Chairman of the FDIC), to support his

discrimination claim. These comments are presented here in

_____

     [8]Partial transcripts of these meetings accompany plaintiff's
response to defendant's motion for summary judgment. (See Doc.
44, Exh. 4). Although these transcripts, which are marked
"DRAFT," have not been authenticated, defendant does not object
to their consideration. Accordingly, for purposes of summary
judgment only, the court will assume that the transcripts
presented by plaintiff are in fact reasonably accurate
transcriptions of statements made at high-level FDIC meetings.

7

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

detail and largely in the form of lengthy quotations so that their context is revealed.

In meetings held in August and September 1995, Geer, the FDIC's Chief Operating Officer and source of the October 29, 1996 memorandum, discussed with Helfer and others various long-term options for reducing the number of employees at the FDIC. (See Doc. 44, Exhs. 4A, 4B, 4C, 4D).  On several occasions during these meetings, participants made comments regarding the need to reduce the number of "senior" employees at the FDIC. The contexts of these comments, however, demonstrate that meeting participants wanted to avoid "a very extensive bumping process," to reduce an imbalance in the number of high-level FDIC employees, and to retain valuable employees.  Thus, for example, during an August meeting, the following exchange occurred:

| | |
|---|---|
| Chairman Helfer: | "[B]ecause of the statutory requirements [a RIF] would lead to essentially giving preference for seniority [sic] which are the people who are the highest cost . . . who really are where we have the excess. |
| Mr. Longbrake: | It could lead to a very extensive bumping process. |
| Chairman Helfer: | It's [a] perverse effect. |
| | *   *   *   * |
| Director Fiechter: | [W]e've lost some really outstanding employees bounced by people who have had a history of |

8

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> poor performance ratings but
> they've got years with them.

Chairman Helfer:    Yeah.

(Doc. 44, Exh. 4A at 28).  Later in this conversation, Chairman Helfer again commented that "senior people" are the ones "who need to leave."  (Id. at 43).

At a subsequent meeting, while discussing a potential "buyout" of FDIC employees, Geer noted that the FDIC had a decreasing workload, had reduced its staff significantly since 1993, and had not hired any new employees "for the last couple of years" due to a hiring freeze.  (Doc. 44, Exh. 4B at 4). Geer also referred to "a horrendous imbalance" in the "permanent work force."  (Id. at 6).  He explained that, because almost all of the FDIC support staff were temporary, simply allowing their terms to expire without hiring replacements would result in "large vacancies with nobody to back fill them in [the] permanent workforce."  (Id.).  Geer further explained that the FDIC had "exceedingly high [pay] grades," with "a large cadre of . . . highly graded employees disproportionately placed throughout the corporation."  (Id. at 6-7).  More specifically, Geer noted that the FDIC had an excess of executives "across the board," and of employees in grades 13 though 15.  (Id.).  Some, but not all, divisions of the FDIC also had excess employees in grade 12.  (Id.).

9

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

Later in this meeting, Helfer asked Geer to describe the consequences of a RIF. (Doc. 44, Exh. 4B at 15). Geer stated that "it's not the most pleasurable experience." (<u>Id</u>.). Depending on the number of people affected, a RIF could be "a personnel director's nightmare because you must identify the excesses[,] you must then . . . have all your personnel paper work together [and] organized . . . and then it's a matter of the bumping and retreating . . . ." (<u>Id</u>. at 16). Geer stated that he knew of "people [in other government agencies] who were 14's and 15's that were now 9's and 10's and 11's." (<u>Id</u>.). On this topic, Geer also noted that the FDIC would have to negotiate with the employees' union regarding the "geographic areas" for the RIF. (<u>Id</u>.) "Clearly a union would like it [to] be nationwide . . . . We would like to restrict them to geographic areas so that they don't bounce around from all of [the] divisions. We would like to have them Division specific and we would like to have it geographically specific so we are not having people going all over the country and bouncing from division to division. . . . in essence what you have is the junior graded . . . individuals those with the least amount of experience and in most cases are those you'd like to retain are the one's who get riffed." (<u>Id</u>.).[9]

---

[9]At Geer's deposition, held more than four years later, he explained that, when a RIF occurs, "very specific guidelines prescribed by the Office of Personnel Management" must be followed. (Geer Dep. at 37). These guidelines are "weighted on

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

Helfer also expressed concern about losing well qualified employees who happened to have less seniority. She noted that, during the five years proceeding the hiring freeze, the FDIC had "hired people . . . very high [in] their class who had done very well. Those are unfortunately the bright examiners we really want to keep." (Doc. 44, Exh. 4B at 40).

Later in the meeting, Helfer and others responded to a question regarding RIF procedures and indicated that use of a RIF alone to achieve a reduction in force would not be satisfactory. (See Doc. 44, Exh. 4B at 45-46). During this exchange, Mr. Ludwig stated: "so the cost to do a reduction in force may actually end up being less out of pocket but not necessarily now getting rid of the right people (unclear)." (Id. at 46). Mr. Ludwig did not specifically state why those retained in an across-the-board RIF would not be "right";

---

tenure and seniority." (Id. at 37-38). He elaborated:

> If you conduct a reduction in force on a nationwide basis or in a large organization and you do not wipe out the whole entity or unit, you must follow the [RIF] rules. What happens . . . is people will bounce and retreat. That is, based on the criteria of their past performance and their seniority, a numerical score is given to them. They can bounce back to old positions or go back to grades lower than what they were originally assigned and can bump other people out of those jobs, based on that seniority or that ranking.

(Gerr Dep. at 38).

11

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

however, the context of his statement reveals that the higher cost of paying these employees' salaries was at least one factor. (See id. at 46 (mentioning "higher" costs); 47 (indicating that more senior employees allowed to take a lower-level job in a RIF can retain their higher-level salary for a year)).

Later, Helfer again indicated that employees who are "retirement eligible . . . are the people to be frank we really need to see go out the door." (Doc. 44, Exh. 4B at 61). She made clear, however, that "[w]e have to[o] many executives[;] we have to[o] many senior level staffs." (Id.). She added that "the imbalance in the workforce is extreme at the higher levels," partly because "[t]he FDIC has been an attractive place to work . . . ." (Id. at 62).

Still later in the conversation, Helfer referred to "the more senior people" as "the people we very much need . . . to see go out the door [because] [t]hey cost the Corporation an enormous amount of money." (Id. at 71). She also observed that a RIF alone would not be successful in achieving this goal. (Id.). In responding to a question as to why these "more senior employees" could not be reassigned, Helfer stated, "We have no place to put them." (Id. at 71-72).

At a meeting held on September 12, 1995, Helfer provided the following rationale for rejecting one proposed buyout option: "it's likely to attract medium level employees who are

12

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

not really actually the ones who we believe would be most beneficial to the corporation to attract. It is unlikely . . . the more senior employees who in the end are the ones that cost the corporation the most money [will be swayed by the incentive]." (Doc. 44, Exh. 4C at 42-43). In this same context, Helfer again stated that "we're targeting in particular the more senior employees." (Id. at 43-44; see also id. at 44-45).

Two weeks later, on September 26, 1995, Geer, Helfer, and others discussed the legality of an incentive that could have a disproportionate effect on older employees. (See Doc. 44, Exh. 4D). During this conversation, Director Fiechter expressed concern:

> You know to the extent that the basis of much of what we've been talking about is in a sense directed at encouraging the more senior executives who pretty much by definition are, have the longer careers here or older, when we're trying to incent those folks to leave and I hope that's not illegal.

(Id. at 18-19). In response, Chairman Helfer made a distinction between taking away benefits that differentially impact older employees and offering incentives. (Id. at 19). She added, "we can not legally go to people and say you've been here a long time you should leave, that we can not legally do. To the extent taking away a benefit that benefits more senior people more than more junior people has that effect. The question is

13

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

how would that be viewed by a court." (Id.). Helfer explained: "as I understand how the discrimination laws work it is whether there is an adverse, a disproportionate adverse impact that could not have been addressed in some other way to avoid the disproportionate adverse impact." (Id. at 20).

Much later, in April 1997, Mr. Ketcha commented on the absence of recent college graduates among the FDIC's ranks. (Doc. 44, Exh. 4H at 19). His remarks make reasonably clear that he was concerned about the shortage of entry-level employees at the FDIC, not necessarily about any preference for younger workers. He stated:

> Well, we are not getting the -- the right out of college type group and that's been a concern . . . . But [w]hat's a concern right now is that you know you get too far out in the pipeline. We really haven't hired other than in San Francisco in four years [in] most of the regions, so we'[r]e getting at the point there's no assistant examiners in . . . . a number of offices[;] that does create some problems not right now but longer term you have that gap that's created and we feel you know this year is probably the last time we want to --

(Doc. 44, Exh. 4H at 19). Significantly, in response to these comments, Helfer expressed some reservations about hiring inexperienced employees. (Id. at 19-20).

Relevant to plaintiff's sex discrimination claim, Chairman Helfer expressed concern about the impact a RIF would have on diversity at the FDIC:

14

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> So you end up having somebody that's been a
> manager for ten years going back into a job
> that he or she -- in this case it'll be he
> excuse me but it will be; he hasn't done for
> ten years and you lose the other huge
> problem [i]s you lose the diversity in your
> work force because the diversity gains have
> been made in the last 5, to 6, 7, years.
> They will be the first people out the door
> and that means all the diversity basically
> women minorities of all types it's . . .
> very serious --

(Doc. 44, Exh. 4B at 46). Helfer expressed a similar concern

during her deposition. There, she testified that the following

excerpt from a document, apparently prepared for her use when

answering questions regarding downsizing, contains "a reasonably

fair representation of what I said":

> The buyout may have helped diversity and
> certainly did not hurt it as people are
> given some choice and control over what
> happens. If there is a RIF scenario the
> potentially negative effect on diversity is
> beyond our control. RIF rules are set by
> statute and will tend to favor employees who
> have been around the longest, a group that
> is primarily white and male.

(Doc. 43, Deposition Excerpts, Exh. 1 at 66-67).[10]

Helfer explained that "the potentially negative effect on

diversity is beyond our control. That's because, of course, the

FDIC observed the law, and that's what the law required." (Id.

at 67). When specifically asked whether she had "a concern that

the RIF would impact diversity in the FDIC," Helfer stated: "I

---

[10]The original of Chairman Helfer's deposition was filed in
Rosenberg v. Tanoue, 1:98-CV-1242-ODE.

15

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

had such a concern, but I believed we needed to abide by the law." (Id. at 68). Helfer denied thinking that the FDIC needed to get rid of older white males to maintain diversity. (Id. at 26-27).

Finally when Helfer was asked about a purported quotation appearing in a magazine, she testified:

> I have no recollection of what I said to the reporter for this article.
>
> I can tell you that, one, layoffs are enormously disruptive because they limit the choices and because they are disruptive to the corporation.
>
> I can tell you, two, as I said previously to this deposition, that the federal rules for layoffs give preference to the people with seniority and to veterans, and that often women and minorities are not in those groups.
>
> I can also tell you that the FDIC had some very bright young people who were not going to be able to continue to work in the corporation because they didn't have sufficient seniority or were not in a preference category, and, therefore, would lose their jobs on a layoff. . . . It was one of many issues that the FDIC faced that disturbed me.

(Id. at 74-75).[11]

_____

[11]In plaintiff's Statement of Material Facts, he quotes directly from the magazine article. (Doc. 43, Attachment ¶ 11). The article itself, of course, constitutes inadmissible hearsay. Furthermore, unlike the quotation above, Helfer did not specifically affirm the accuracy of its content during her deposition. For this reason, the court relies only on Helfer's testimony.

16

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

During Geer's deposition, on which plaintiff also relies, he emphasized the disadvantages of RIFs, and described the FDIC's decisionmaking process and its desire to avoid those disadvantages:

> All the discussions that we dealt with in downsizing w[ere] done consensually with the consensus of the senior staff . . . . Those recommendations came up through them through me and we discussed those with the chairman and the board.
>
> In all cases the approach for downsizing a corporation was to minimize the impact on employees. The approach was always to try to minimize the amount of RIFing that would take place and bouncing and retreating that results from a reduction in force on a nationwide basis.
>
> *   *   *   *
>
> Our approach was to try to reduce and downsize the corporation and allow people to leave on a voluntary basis, to the extent that they could take buyouts and take other positions rather than have to conduct a nationwide RIF.
>
> *   *   *   *
>
> We consistently tried to eliminate bumping and retreating and reductions, as a whole. Now, obviously if you close an office, that's a reduction in force. In those cases that offices were closed. The whole office left. So, there wouldn't be bumping and retreating if you wiped out the whole entity.
>
> Our approach basically was -- when we negotiated with the union on conducting RIFs, our approach was to establish the area of consideration to be only within the division and not across divisions and offices because that also -- what

17

EXHIBIT 41
ALIOTTA v. BAIR
NO. 05-2325-RMU

> essentially happens with that is that if you
> have it where they can bounce within
> divisions in a given geographical area, you,
> then, incur a great deal of bumping and
> retreating all throughout the organization,
> and it is very disruptive.
>
> In our negotiations .with the union, we
> wanted the retention to be localized by
> region or city and within a division, and
> not outside those divisions or offices that
> were impacted. That's what the union agreed
> to.

(Geer Dep. at 36-40).

Geer also mentioned the adverse effect RIFs can have on minority and women employees because these employees generally have less seniority than other members of the workforce. (Geer Dep. at 38). Significantly, however, he flatly denied that one of the purposes of avoiding broader RIF areas was to decrease the impact on women and minorities; according to Geer, "[t]he business decision on reduction in force was to eliminate the disruption for the office." (Id. at 40).

Later in his deposition, Geer made the following comments:

Q.  Did you have a concern about the impact of
    the RIF on women and minorities?

A.  Absolutely.

Q.  Tell me, specifically, what your concern
    was.

A.  My concern was that the corporation, if you
    looked across the lines -- looked across the
    employee ranks of the corporation, both in
    the executive, as well as in the general
    work force, predominately a large portion of
    the population were white males. And in the
    latter hirings that the corporation had

18

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> . . . many of them were women and
> minorities. . . . So, if you are looking
> across the corporation -- and that's one of
> the reasons why **I had an equal concern that
> if we started doing massive reductions,
> those were the individuals who would leave
> the corporation first. So we wanted to try
> to minimize that. So, that conversation .
> . . happened with all the senior staff many
> times during the process of looking at how
> we were going to downsize.**

(Geer Dep. at 67-69)(emphasis added).[12]

F.    Plaintiff Applies for Examination Specialist Position

In May 1997, while plaintiff was still employed, he applied

for the position of Examination Specialist (Automation/

Information), GG-570-13/14, listed in vacancy announcement No.

97-SESC-044. The position's duties were described as follows:

> The incumbent is responsible for
> implementing and assisting in the
> development of information retrieval and
> delivery systems, and for coordinating the
> performance, direction and completion of all
> the Region's efforts related to development
> and ongoing enhancement of automated data
> processing and information gathering
> functions. Ensures that both field and
> regional office systems are in compliance
> with established divisional automated
> policies and procedures and that information
> systems are adequate to acquire and deliver

---

[12]Plaintiff also relies on several other statements made by
high-level officials that are not discussed herein. The
undersigned has reviewed these statements and finds that they
are cumulative. The statements discussed here are sufficient to
provide a sense of the type of comments on which plaintiff
relies.

19

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> needed information to senior division management in a timely manner.

(Doc. 37, Exh. 49 at 1). Notably, the position was in the Division of Supervision (DOS) as opposed to DAS, where plaintiff worked at the time.

In the Atlanta region, candidates for positions at the FDIC are considered by means of a structured interview and selection process. In this process, interview questions are written and approved by management prior to the interviews. Each eligible candidate is personally interviewed, and each is asked the same questions.

Each of the seven candidates for the Examination Specialist position, including plaintiff, was interviewed by Deryl R. Booth, the Assistant Regional Director of Administration for DOS, and Thomas Hamilton, a Case Manager in the DOS Atlanta Regional Office. After completing the interviews, Booth recommended Mark Burks for the position. (Doc. 37, Exh. 52 (Booth Aff.) ¶ 19). At the time, Burks was 35 years old. Nancy Hall, the Acting Regional Director, agreed with Booth's selection and also recommended that Burks be selected. (Id. ¶ 20). Final authority for the selection was given to Simona Frank, the Associate Director of DOS, in Washington, D.C. (Id.).

Burks' deposition testimony demonstrates that he functioned as a computer-support person throughout most of his career with

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

the FDIC, which began in 1986. (<u>See</u> Burks Dep. at 6-10, 12-14, 16-17, 20-22). Among other things, Burks had worked as an assistant for the previous Examination Specialist and had served as a project manager, overseeing development of "user requirements" for software designed to translate bank data regarding loans onto an FDIC form used by bank examiners. (<u>See</u> <u>id</u>. at 17, 20-22).

By a directive dated July 15, 1997, the FDIC adopted the FDIC Career Transition Assistance Plan ("CTAP"), which established a special selection priority for well-qualified, eligible, surplus or displaced, permanent FDIC employees at the GG-15 level or below who applied for FDIC vacancies in their local commuting areas. Under CTAP, employees who were about to be displaced could request priority for open positions if they applied for an open position and demonstrated that they were "well qualified" to perform the job's duties.

Booth and Hamilton had already interviewed candidates and made the selection of Burks when the CTAP policy went into effect. Before the selection became final, plaintiff claimed priority to the Examination Specialist position under CTAP. As a result, the selection was put on hold until a determination could be made of plaintiff's eligibility for priority treatment.

Plaintiff's application for CTAP eligibility was sent to Joseph Jennings, Chief of the DOS Automation Section in Washington, D.C., for evaluation. This was the first and only

21

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

CTAP evaluation Jennings had performed. In July 1997, he found that plaintiff was not "well qualified" for the Examination Specialist position and thus not eligible for priority consideration. Plaintiff contends that he was well qualified for the position and could have performed the duties of the job upon entry. On August 5, 1997, Frank approved the selection of Burks.

G.   Plaintiff Retires from the FDIC

On February 21, 1997, plaintiff executed a "Statement of Intent to Retire With a Buyout." (Smith Dep., Exh. 5). Upon his retirement, plaintiff received a buyout payment and a monthly annuity based upon thirty years of federal service. (Smith Dep. at 23). Plaintiff's office closed on August 1, 1997, and all positions at his competitive level were abolished, with remaining employees removed pursuant to federal RIF procedures.

Other relevant facts will be discussed in context below.

II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case."

22

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. at 2553. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson</u>, 477 U.S. at 252, 106 S.Ct. at 2512.

III. <u>TERMINATION CLAIMS (AGE AND SEX)</u>

An employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), or age over 40, 29 U.S.C. §§ 623, 631. To prevail, plaintiff must prove that his

23

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

termination resulted from actions taken by defendant with discriminatory intent. See, e.g., Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2105, 2111, 147 L.Ed.2d 105 (2000).

Generally, two types of evidence may be relied on to prove discriminatory intent -- circumstantial and direct. Although no important distinction between these two types of evidence is generally made in other contexts, in the Title VII and ADEA context "[w]hether evidence is characterized as 'direct' or 'circumstantial' dramatically affects the allocation of the evidentiary burdens." Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998). When direct evidence of discriminatory intent is presented, the McDonnell Douglas shifting-burden framework (described below) is not applicable and summary judgment must be denied. See, e.g., Carter, 132 F.3d at 641; Jones v. Bessemer Carraway Medical Center, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998); Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773-74 (11th Cir. 1982). Plaintiff contends that he has presented direct evidence of discriminatory intent, making a grant of summary judgment inappropriate. The court does not agree.

Although the term "direct evidence" (as it is used in the Title VII and ADEA context) is defined more broadly by some courts, in the Eleventh Circuit the term refers exclusively to evidence that, if believed, proves the existence of a fact in

24

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

issue without inference or presumption. <u>Merritt v. Dillard</u> <u>Paper Co.</u>, 120 F.3d 1181, 1189 (11th Cir. 1997). "[S]tray remarks in the workplace, . . . statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination. <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989)(O'Connor, J., concurring); <u>see also</u> <u>EEOC v. Alton Packaging Corp.</u>, 901 F.2d 920, 924 (11th Cir. 1990)(citing O'Connor's concurrence favorably); <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, for a decisionmaker's statement to constitute direct evidence, it must reflect "a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee." <u>Caban-Wheeler v. Elsea</u>, 904 F.2d 1549, 1555 (11th Cir. 1990). "Evidence that only suggests discrimination, or that is subject to more than one interpretation does not constitute direct evidence." <u>Merritt</u>, 120 F.3d at 1189 (citations omitted). In short, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate" qualify. <u>Carter v. Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989). This standard has aptly been described as "rigorous." <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1359 (11th Cir. 1999), <u>cert.</u> <u>denied</u>, ___ U.S. ___ 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000); <u>cf.</u> <u>Carter v. Three Springs</u> <u>Residential Treatment</u>, 132 F.3d at 642 (decisionmaker's

25

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

statement that she had a bias against African-Americans and that she had difficulty understanding and getting along with them was subject to more than one interpretation; she "could have been expressing a desire to get past such prejudices").

In spite of this controlling authority, plaintiff cites opinions from other Courts of Appeals in support of his contention that "'[d]irect evidence' can of course be provided by circumstantial evidence." (Doc. 43 at 7). To the extent opinions from these courts support plaintiff's position, they cannot be relied on by this court given the existence of Eleventh Circuit authority to the contrary. Plaintiff, however, also cites an Eleventh Circuit case, Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999), in support of his position.

In Wright, Judge Tjoflat differentiated between the "preponderance definition" of direct evidence and the "dictionary definition" of the term. See id. at 1294. Under the preponderance definition, direct evidence is "evidence from which a reasonable factfinder could find, by a preponderance of the evidence, a causal link between an adverse employment action and a protected personal characteristic." Id. The dictionary definition is the more traditional definition derived from the law of evidence: "evidence that, if believed, proves the existence of a fact in issue without inference or presumption." Id. Judge Tjoflat concluded that courts should employ the preponderance definition in the employment discrimination

26

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

context.  See id.  Plaintiff argues that the evidence he has presented satisfies this definition.

Plaintiff's reliance on Judge Tjoflat's opinion concerning the standard to be applied, however, is misplaced.  Judge Tjoflat was not joined in relevant part by either of the two remaining members of the panel, rendering his opinion non-binding authority.  See id. at 1306 (Cox, J., concurring in result only); id. (Hull, J., concurring in result only).  Moreover, in subsequent cases, the Court of Appeals for the Eleventh Circuit has continued to adhere to its narrow definition of "direct evidence."  See, e.g., Damon, 196 F.3d at 1358-59 (employing the traditional definition and finding a statement by the plaintiff's supervisor, made shortly after the plaintiff's termination, that "'what the company needed was aggressive young men like [the plaintiff's replacement] to be promoted'" was not direct evidence of discrimination because it required an inference that the supervisor was motivated by his "interest in promoting young men" when he terminated the plaintiff).  Accordingly, the court will rely on the dictionary definition to determine whether direct evidence is present in this case.[13]

---

[13]Although the court finds that it cannot rely on Judge Tjoflat's well-reasoned opinion, the undersigned agrees with much of it.  As Judge Tjoflat states, the law governing employment discrimination disputes has become needlessly complex, resulting -- in some instances -- in a lack of focus on the key factual question that should govern all employment

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

A.    <u>Statements made by high-level FDIC officials do not</u>

<u>constitute direct evidence of discriminatory intent</u>

As discussed above, plaintiff relies heavily on statements

made by several high-level FDIC officials to support his

discrimination claims.  Plaintiff contends that this evidence

constitutes direct evidence of discrimination.  The court does

not agree.

Significantly, this case is factually distinct from most

discrimination cases in which direct evidence is asserted.  In

the typical case, the plaintiff presents evidence that an

discrimination claims: whether the employer acted with
discrimination intent.  The distinction made between direct and
circumstantial evidence is just one example of this needless
complexity.  Rather than continuing to place undue emphasis on
the sometimes blurred distinction between these two types of
evidence, the better approach would be simply to confront the
ultimate question of fact head on.  <u>See</u> <u>Reeves</u>, 120 S.Ct. at
2109 ("we have reiterated that trial courts should not '"treat
discrimination differently from other ultimate questions of
fact"'").  The <u>McDonnell Douglas</u> shifting-burden analysis, which
is generally used when direct evidence is absent, was developed
not to provide employers with an easier method of defending
against discrimination claims, but to assist employees in
obtaining evidence of intent.  <u>See</u> <u>Wright</u>, 187 F.3d at 1293
("the <u>McDonnell Douglas</u> presumption is merely an evidence-
producing mechanism that can aid the plaintiff in his ultimate
task of proving illegal discrimination by a preponderance of the
evidence.").  For reasons that will be made clear below, the
undersigned finds that the plaintiff in this case has not
presented sufficient evidence regarding defendant's intent to
create a triable issue of fact.  Whether that evidence is
analyzed under "the traditional framework," <u>see</u> <u>Wright</u> at 1289;
the <u>McDonnell Douglas</u> formulation; or some other method, the
result is (and should be) the same.  "The long and short of it
is that the summary judgment rule applies in job discrimination
cases just as in other cases.  No thumb is to be placed on
either side of the scale."  <u>Chapman v. AI Transport</u>, 229 F.3d
1012, 1026 (11th Cir. 2000).

28

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

individual directly involved in the decision to hire or fire the particular plaintiff made a discriminatory statement linked to that decision. Thus, the evidence is directly probative of whether that particular plaintiff's termination was because of his protected trait. Here, in contrast, plaintiff presents evidence of statements that allegedly reveal an intent to *structure* the downsizing so that certain *groups* of people are favored or disfavored. Thus, the allegedly discriminatory statements, standing alone, cannot be relied on to show that *plaintiff, in particular*, lost his job because of his protected characteristics. To make this causal connection some additional evidence is needed. For example, a trier of fact would need to know in what way the downsizing was structured to protect younger and female employees, and if these structural changes made any difference with respect to this particular plaintiff.[14] Thus, even if plaintiff's evidence could be construed as direct evidence of an intent to *structure* the downsizing in a discriminatory manner, it does not constitute direct evidence that *plaintiff* lost his job because of that skewed structure.

Moreover, even if direct evidence of intent to structure the downsizing in a discriminatory manner were sufficient, plaintiff's evidence, for the most part, falls short. The vast

---

[14]Plaintiff does not dispute that massive downsizing was required at the FDIC.

29

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

majority of the statements relied on by plaintiff indicate that high-level FDIC officials wanted to reduce the number of senior employees not because of their age, but because the FDIC had more high-ranking employees than it needed, because these employees were more expensive to retain, and because some of the FDIC's more recent hires came with desirable credentials. Actions based on "a factor, such as an employee's pension status or seniority, that is empirically correlated with age" are not prohibited by the ADEA. Hazen Paper Company v. Biggins, 507 U.S. 604, 608, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993). "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes. . . . When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." Hazen Paper Co., 507 U.S. at 610-11, 113 S.Ct. at 1706-07. Thus, "it is incorrect to say that a decision based on years of service is necessarily 'age based.'" Id., 507 U.S. at 611, 113 S.Ct. at 1707. See also Broaddus v. Florida Power Corp., 145 F.3d 1283, 1287 (11th Cir. 1998)("The ADEA does not prohibit an employer from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for

30

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

medical expenses even though these characteristics are often correlated with an employee's age.").

Two statements presented by plaintiff regarding diversity fall closer to the direct-evidence line, but are still insufficient. At a meeting in which RIF procedures were discussed, Chairman Helfer expressed concern about the impact a RIF would have on diversity at the FDIC, stating that "the other huge problem [i]s you lose the diversity in your work force . . . . They will be the first people out the door and that means all the diversity basically women minorities of all types it's . . . very serious . . . ." (Doc. 44, Exh. 4B at 46). This statement of Chairman Helfer's does not indicate that she took any action with respect to the structuring of the downsizing to address this concern. Thus, an inference that she did so is required and the evidence cannot be considered direct.

The second statement was made by Geer during his deposition. There, he testified that "we wanted to try to minimize [the impact on women and minorities]" and that conversations about this desire "happened with all the senior staff many times during the process of looking at how we were going to downsize." (Geer Dep. at 68-69). This arguably constitutes direct evidence that the structure of the downsizing was adjusted to advantage women and minorities, although (like Helfer's statement) Geer does not specifically state that any changes were made to the structure as a result of their

31

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

conversations.  In any event, Geer also clearly testified that their concern about diversity had nothing to do with the decision to keep the RIF areas narrow, (Geer Dep. at 40), which is the aspect of the downsizing structure about which plaintiff complains, (see Doc. 57 at 6).  The narrowness of the RIF areas, according to Geer, was put in place solely to avoid disruption at the FDIC.  (Geer Dep. at 40).  Thus, plaintiff's evidence does not directly support a finding of a causal connection between the allegedly discriminatory structure of the downsizing and plaintiff's loss of a job.

Although the court finds that plaintiff has not presented direct evidence of discrimination, plaintiff is not precluded from relying on this evidence as circumstantial evidence supporting his discrimination claims.  See Jones, 151 F.3d at 1323 n.11 ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.").  Accordingly, plaintiff's evidence will be considered again below.

B.   Circumstantial Evidence

To aid plaintiffs in obtaining evidence needed to establish their claims when direct evidence of discriminatory intent is absent, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny provide a shifting-

32

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

burden framework for evaluating discrimination claims.    Under
that    framework,    plaintiffs    bear    the    initial    burden    of
establishing    a    prima    facie    case    of    discrimination.    See
McDonnell Douglas, 411 U.S. at 802-804, 93 S.Ct. at 1824; Combs
v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997),
cert. denied, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632
(1998).    If a prima facie case is established, a legal
presumption of unlawful discrimination arises and the burden of
production shifts to the defendant to articulate a legitimate,
nondiscriminatory reason for the challenged employment action.
Id. If the employer does so, the presumption is eliminated, and
the plaintiff must be given an opportunity to prove by a
preponderance of the evidence that the legitimate reason offered
by the defendant is a pretext for discrimination.    Id.    At all
times, plaintiff retains the ultimate burden of persuading the
finder of fact that the defendant acted with discriminatory
intent.    Texas Dep't of Community Affairs v. Burdine, 450 U.S.
248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).

    1.    Prima Facie Case

    "Where, as here, the employer produces evidence that it
discharged the plaintiff during a RIF, 'the plaintiff
establishes a *prima facie* case by demonstrating (1) that he was
in a protected . . . group and was adversely affected by an

33

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age [or sex] in reaching that decision.'" Watkins v. Sverdrup Technology, Inc., 153 F.3d 1308, 1314 (11th Cir. 1998) (quoting Williams v. Vitro Services Corp., 144 F.3d 1438, 1441 (11th Cir. 1998)).

In a supplemental brief,[15] defendant argues that plaintiff's separation from the FDIC was not an adverse employment action because (1) all employees in plaintiff's office were subject to the RIF, and (2) plaintiff had the option of remaining employed in a lower-level position. (Doc. 56 at 4-7). In particular, on January 15, 1997, plaintiff was offered the position of Bank Examiner (GG-12), which would have required him to accept a downgrade, a lower salary, and relocation to Knoxville, Tennessee. (See Doc. 56, Exh. B). Neither of defendant's arguments has merit.

First, because plaintiff is alleging that the overall structure of the RIF was established for discriminatory reasons,

---

[15]Having misconstrued plaintiff's claims, defendant initially argued that plaintiff cannot establish a prima facie case of age or sex discrimination because his receipt of the October 29, 1996 RIF notice and the 1995 realignment of the ombudsman's function were not adverse employment actions. (Doc. 37, Brief at 14, 15-16). These arguments miss the point and will not be discussed.

34

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

the fact that all the employees in his particular office were subject to dismissal is of little or no relevance; many other employees at the FDIC were retained.  Second, although the fact that plaintiff was offered a lower-paying job and declined it might be relevant to the issue of damages, it in no way changes the fact that plaintiff's only options -- termination, retirement, or acceptance of a lower-paying job -- all left him worse off than he had been before the allegedly discriminatory downsizing.  See Bodnar v. Synpol, Inc., 843 F.2d 190, 193 (5th Cir.)("An employer's 'offer' of early retirement may create a prima facie case of age discrimination by constructive discharge if it sufficiently alters the status quo that each choice facing the employee makes him worse off."), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); see also Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000)(stating that an adverse employment action "is an ultimate employment decision . . . or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'"), cert. denied, ___U.S. ___, 121 S.Ct. 772 (2001).

Defendant also argues that plaintiff cannot establish the third element of his prima facie case: evidence by which a finder of fact reasonably could conclude that the employer intended to discriminate on the basis of age or sex.  (Doc. 56

35

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

at 7-8). The precise nature of the evidence required to satisfy this element in RIF cases is not well established. Indeed, an argument could be made that it overlaps with the third prong of the McDonnell Douglas shifting-burden framework, which requires the plaintiff to show pretext. See, e.g., Oxman v. WLS-TV, 846 F.2d 448, 454 (7th Cir. 1988)(finding that "the modified RIF formulation, as a practical matter, transforms the burden-shifting method of proof into the more difficult direct method. By requiring the plaintiff to produce some evidence of discriminatory intent on the part of the employer to make out a prima facie case, the RIF formulation at the very least fuses the 'prima facie' and 'pretext' steps of the McDonnell Douglas method.").

In any event, for reasons discussed below, the court finds that plaintiff cannot establish that his termination was the result of discrimination. Accordingly, the court need not determine whether plaintiff's evidence is sufficient to establish a prima facie case. Suffice it to say that the evidence presented by plaintiff arguably "exude[s] that faint aroma of impropriety that is sufficient to justify requiring the [employer] to give reasons for its decision." Thornbrough v. Columbus and Greenville R. Co., 760 F.2d 633, 643-644 (5th Cir. 1985).[16]

---

[16]Indeed, because defendant has already provided reasons for plaintiff's termination, thereby eliminating the evidence-

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

2.    Rebuttal of Plaintiff's Prima Facie Case

To rebut plaintiff's prima facie case, defendant must articulate legitimate, non-discriminatory reasons for the adverse actions taken against plaintiff. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824.    Defendant's burden is "exceedingly light" and is "one of production, not proof." Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).    Defendant "need not persuade the court that it was actually motivated by the proffered reasons." Morrison v. Booth, 763 F.2d 1366, 1371 (11th Cir. 1985).

Defendant has satisfied this burden.    The record contains evidence that the methods used for downsizing the FDIC, and in particular establishment of the RIF areas, were established with legitimate business goals in mind, not with an intent to discriminate against older men.    Accordingly, "'the McDonnell Douglas framework -- with its presumptions and burdens' -- disappear[s], and the sole remaining issue [is] 'discrimination vel non.'"    Reeves, 120 S.Ct. at 2106 (citations omitted).

---

obtaining problem addressed by McDonnell Douglas, whether plaintiff established a prima facie case should no longer be a concern.    Cf. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1378, 1481, 75 L.Ed.2d 403 (1983)("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").

37

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

3.    Pretext

Given defendant's rebuttal, the burden shifts back to plaintiff to raise a genuine factual question as to whether defendant's proffered reasons are a mere pretext for discrimination. Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir. 1993). Plaintiff can prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

As discussed above, plaintiff supports his claim primarily with evidence regarding statements made by Chairman Helfer and other high-level FDIC officials. For reasons already provided, these statements are not direct evidence of a desire to rid the FDIC of older employees *because of their age*. They are also insufficient to support such an inference. Although, when taken out of context, some of the statements sound suspicious, their context demonstrates that no illegal motive was involved.

Plaintiff's evidence regarding possible gender discrimination is slightly stronger. During one planning meeting, Chairman Helfer expressed concern about the impact a RIF would have on diversity at the FDIC, and during his deposition Geer indicated that those involved in the planning process "wanted to try to minimize [the impact on women and

38

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

minorities]." (Geer Dep. at 68-69). This evidence provides some support for plaintiff's assertion that the *structure* of the downsizing was adjusted to advantage women. Plaintiff, however, has not provided any additional evidence demonstrating how the structure was adjusted or whether those adjustments, if any, had an impact on the decision to close plaintiff's office or to keep the RIF areas narrow. Geer emphatically stated at his deposition that the decision the keep the RIF areas narrow had nothing to do with a desire to retain diversity. (Geer Dep. at 40). This aspect of the downsizing plan was put in place solely to avoid disruption at the FDIC. (Id.). Geer's testimony is corroborated ʰy statements made by him and others during high-level planning meetings. Moreover, plaintiff has presented no evidence tending to show that this was not a legitimate concern.

If the structure of the downsizing was adjusted at all to benefit women and minorities, the evidence tends to point to the decision to offer buyouts and early retirement, rather than to rely exclusively on RIFs. Geer, for example, testified that an FDIC EEO official, who was concerned about the impact of the downsizing on women and minorities, suggested only that "voluntary RIFs" (buyouts and early retirement) be used as much as possible, as opposed to "involuntary RIFs." (Geer Dep. at 45-46, 50-51). The offer of a voluntary incentive to quit, even if motivated by a desire to retain women and minorities over

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

white men, would not constitute actionable conduct under Title VII, at least not where the employee has the option of continuing to work. Cf. Henn v. National Geographic Society, 819 F.2d 824, 826-29 (7th Cir.)(finding early retirement not an adverse employment action where the employee had the option of declining the offer and remaining employed under lawful conditions), cert. denied, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). If the option of continuing to work is available, no adverse employment action has occurred. In any event, plaintiff does not argue that the decision to offer buyouts and early retirement was discriminatory; instead, he focuses on the narrowness of the RIF areas. (See, e.g., Doc. 57 at 6).

Plaintiff also contends that the structure of his particular office was manipulated, before RIF plans were announced, so that only older male employees remained in vulnerable positions. (Doc. 43, Brief at 20-24). According to plaintiff, he "has presented evidence that the unit in which he worked in 1995 was split into two parts. The younger workers were placed in the ombudsman unit, which was not touched by the RIF, and the older workers for the most part were subject to a RIF." (Id. at 20).

This evidence does not save plaintiff's claim. Plaintiff has presented no evidence that John Mullinix, who became head of the new Office of the Ombudsman, was aware that the impending

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

RIF would have an impact on plaintiff or that he otherwise acted with discriminatory intent. Plaintiff testified that, in the fall of 1995, when the Office of the Ombudsman was created, there was no talk about a possible RIF. (Smith Dep. at 35). Plaintiff's evidence regarding transfer of the Asset Support Unit from DAS to the Division of Finance suffers from a similar defect. Plaintiff does not identify who made the decision regarding this transfer or whether that person had any reason to believe, at the time, that those left in DAS were likely to loose their jobs.

Finally, before leaving this topic, the court must briefly address evidence presented by plaintiff regarding an alleged affirmative action policy at the FDIC. Plaintiff outlines this evidence in his Statement of Material Facts. (Doc. 43, Statement of Material Facts ¶¶ 27-33). There, he contends that the FDIC, through its Equal Employment Opportunity Office, took steps to hire and promote women and minority employees, even in instances where these employees were not the best qualified. (See, generally, id.). For example, plaintiff states that "letters were routinely sent to selecting officials concerning the candidates they had selected. If a minority candidate was selected, the selecting official received a letter thanking them for diversifying the work place. If a white male candidate was selected, the selecting official received a letter reminding the electing official of the need to diversify." (Id. ¶ 31)

41

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

(citations omitted). Plaintiff adds that "affirmative action goals and objectives were in all supervisors and managers performance plans" and that "[m]anagers were eligible for awards for meeting these goals." (Id.).

This evidence provides little, if any, additional support for plaintiff's claim. Once again, plaintiff fails to connect this evidence to any particular decisions regarding the structure of the FDIC downsizing. For example, he points to no evidence that officials in the FDIC's EEO office played a role in determining that structure. Furthermore, although plaintiff's evidence as a whole permits a finding that the FDIC sometimes considered race and sex inappropriately, that evidence is not so overwhelming as to support a presumption that all, or even a significant number, of the FDIC's employment-related decisions were tainted with discriminatory intent. Cf. Holifield v. Reno, 115 F.3d 155, 1564 (11th Cir. 1997)(finding evidence insufficient to support finding of discrimination where evidence, at most, demonstrated that incidents of discrimination had occurred at the facility where the plaintiff worked).

For all of these reasons, the court finds that plaintiff has not presented sufficient evidence for a reasonable juror to find that he lost his job because of an element of the downsizing structure put in place with discriminatory intent.

42

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

IV.  NON-SELECTION CLAIM[17]

With respect to plaintiff's claim based on his failure to receive the position of Examination Specialist (Automation/Information), the parties do not dispute that plaintiff has established a prima facie case of age discrimination and that defendant has satisfied its burden of production with evidence that Burks was selected over plaintiff for legitimate, non-discriminatory reasons.  Thus, the only question remaining before the court is whether plaintiff's evidence of discriminatory intent is sufficient for a jury to find in his favor.

Plaintiff argues that both Jennings -- who made the decision regarding plaintiff's CTAP eligibility -- and Booth -- who selected Burks for the position -- provided pretextual reasons for their respective decisions.  (See Doc. 43 at 26-32). Plaintiff also argues that evidence regarding statements made by

---

[17]In addition to the arguments discussed in the main text, defendant argues that plaintiff failed to exhaust his administrative remedies with respect to his non-selection claim. (See Doc. 37, Brief at 6-13).  In a Report and Recommendation dated April 14, 1999, (Doc. 20), the undersigned found -- and the district judge agreed, (Doc. 23) -- that plaintiff had exhausted his administrative remedies with respect to this claim.  Although the Report and Recommendation left open the possibility of revisiting this issue on defendant's motion for summary judgment, (see id. at 12 n.4), the court will now assume, without finding, that the claim was exhausted.  Whether exhausted or not, defendant is entitled to summary judgment on the merit of plaintiff's claim.

43

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

high-level FDIC officials is sufficient to prove pretext.  (<u>Id</u>.
at 33-34).


    A.    <u>Jennings</u>

With respect to Jennings, plaintiff quibbles both with the
way in which Jennings approached the CTAP determination process,
and his finding that plaintiff was not "well qualified."  (<u>See</u>
Doc. 43 at 28-32).  Under FDIC guidelines given to Jennings, a
"well-qualified employee" is defined as an employee who:

> meets the qualification and eligibility
> requirements of the position[;] meets all
> selective factors (where applicable); meets
> the quality ranking factors above the
> minimum level; is physically qualified with
> reasonable accommodation to perform the
> essential duties of the position; meets any
> special qualifying U.S. OPM-approved
> conditions, AND is able to satisfactorily
> perform the duties of the position upon
> entry without additional training except for
> a brief orientation to the office.

(Jennings Dep., Exh. 2 at 4).  In conducting the evaluation,
Jennings relied on the following "Selective/Quality Ranking
Factors" listed in the Examination Specialist job announcement:

> 1.    Knowledge of examiner and analyst use of the
> DOS-related mainframe applications such as
> BITS, FOCUS and External Monitoring System
> (EMS) and all pertinent subsystems.
>
> 2.    Knowledge of software currently used by DOS
> such as Automated Report of Examination (C-
> ARE), Lotus, WordPerfect, and network data
> base management, and information retrieval
> programs such as Data Query and Forest and
> Trees.

44

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

     3.    Skill in project management techniques for
         system   requirements,   development,
         implementation and maintenance.

(Doc. 37, Exh. 49 at 2; see also Jennings Dep., Exhs. 4, 7).

Jennings also had access to definitions of the terms

"outstanding," "above average," and "average" (apparently

established by the FDIC's personnel department) with points

assigned to each term. (See Jennings Dep., Exh. 4; Hamilton

Dep. at 31-33).[18] With respect to each of these three factors,

Jennings determined that plaintiff was only "average" and thus

not "well qualified" for the position. (See Jennings Dep. at 28

& Exh. 7). Jennings summarized his findings in the cover letter

he sent to Booth: "While the applicant has had previous DOS

experience, it occurred prior to 1985 and DOS systems and

overall automation requirements have changed significantly since

then. Therefore an average rating is assigned to each of the

three categories." (Id., Exh. 7).

---

    [18]Hamilton explained that the selective/quality ranking
factors, which appear in a document entitled, "Crediting Plan:
Examination Specialist (Automation/Information)," "were the
device that was used for a panel of people to determine who are
the highest level of qualified people in the pool of applicants
to be interviewed." (Hamilton Dep. at 32). He further
explained that, after a job is posted, a panel of people with
expertise in a particular area will review the applications and
assign a ranking to each applicant after comparing that person's
qualifications and experience, as demonstrated by their
application materials, to the crediting plan. Only the top
ranked candidates would then be scheduled for an interview.
(Id. at 32-33; see also Booth Dep. at 43-45).

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

Plaintiff attempts to establish pretext by attacking the "average" ratings given by Jennings. (See Doc. 43 at 29-32). According to plaintiff, "Jennings determined that Plaintiff was not 'well-qualified' for the Examination Specialist position principally because he was not at that time working with all the software then used by DOS." (Id. at 29). This rationale, according to plaintiff, is "obviously pretextual" because "the software used by DOS was constantly changing." (Id. at 29-30). Moreover, plaintiff contends that his "substantial experience and facility with other software packages, mentioned in his application . . . . clearly indicated his ability to quickly become proficient with software, something which was more important in the changing environment of DOS than knowledge of the software *du jour*." (Id. at 30).

Importantly, federal anti-discrimination laws do "not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Jones v. Bessemer Carraway Medical Ctr., 137 F.3d 1306, 1311, modified on other grounds, 151 F.3d 1321 (11th Cir. 1998). "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal law] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466,

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

1470 (11th Cir. 1991). Thus, the question before this court is not whether plaintiff was in fact well qualified or above average with respect to a particular factor, but whether Jennings thought that he was so. See also Holifield, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.).

Plaintiff has not presented sufficient evidence to support a finding that Jennings' partial reliance on plaintiff's lack of familiarity with some of the DOS software and systems then in use was a mere pretext for discrimination. Jennings' approach was reasonable, especially in light of the fact that the definition of "well qualified" that he was provided included a requirement that the applicant be able to perform the duties of the job upon entry. In addition, knowledge of software currently in use by DOS was one of the selective/quality ranking factors for the job, factors that were established before plaintiff even applied.

Plaintiff also contends that Jennings' "bias" is "revealed in his rating of Mr. Smith's abilities in regards to project management." (Doc. 43 at 30). Jennings explained his reasoning with respect to this factor as follows:

> DOS has many unique systems that are used by examination staff in the regions and the field. In addition, connectivity with the field office laptops and desktops have been tailored to meet specialized requirements.

47

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> Each system and element of connectivity is
> new or significantly enhanced within last
> five years and incumbent of this position
> must have a least a working knowledge of
> these systems and links. Laptop
> configuration requirements are very
> specialized and considerable knowledge of
> the process is needed to keep them
> operational. A general knowledge of project
> management techniques in not sufficient
> knowledge for this position. An average
> score is assigned.

(Jennings Dep., Exh. 7).

   In attacking this assessment, plaintiff states -- and the
court accepts as true -- that he possesses strong project
management skills and has extensive experience using these
skills. (Doc. 43 at 30-31). Jennings, however, provided a
more-than-adequate explanation for his ranking of plaintiff as
"average" in this category. At his deposition, Jennings
responded to questioning as follows:

> Q.    . . . . Why did you feel that Mr. Smith did
> not have adequate knowledge in project
> management? He had been a manger for over
> 15 years.
>
> A.    . . . . What the subject here has to do with
> is the field office computers, which are
> laptop computers and the desk tops that are
> used by staff, and the connectivity relates
> to the examiners being able to dial into our
> network. That's what this part of the
> function is about being able to address the
> technical end, the systems that are used,
> and to make them either function, or change
> them in a way so they do function properly,
> and do any maintenance that is necessary.
>
> This is more than just overseeing the
> project. You are the person who makes this
> happen.

48

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

(Jennings Dep. at 40-41). Later in the deposition, Jennings acknowledged that plaintiff had extensive project management experience, but again noted that this experience was "[f]or other systems not related anything to the examination function. The position is much [more] hands-on or do it yourself than managing others to do the work. You're going to be doing the work in this position. This is a doer type position." (Id. at 74-75). Jennings' reasoning is rational and does not raise an inference of pretext. See Combs, 106 F.3d at 1543 ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.").

Plaintiff next attacks Jennings' findings by stating that "Jennings in no way linked [his] determination to the definition of well qualified [found in the FDIC document quoted above]." (Doc. 43 at 28). Although Jennings did not specifically testify (nor was he questioned) about how his evaluation could be linked to the definition of "well qualified" provided by the FDIC, his analysis clearly is compatible with that definition. The definition specifically states that a "well-qualified employee" is one, who among other things, "meets all selective factors . . . . [and] quality ranking factors above the minimum level . . . ." (Jennings Dep., Exh. 2 at 4). As discussed above, Jennings relied heavily on the selective/quality ranking factors

49

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

for the Examination Specialist position when making his determination.

The definition of "well qualified" also states that the employee should be "able to satisfactorily perform the duties of the position upon entry without additional training except for a brief orientation to the office." (Jennings Dep., Exh. 2 at 4). Jennings's written evaluation, in combination with his deposition testimony, demonstrate that he was concerned about plaintiff's lack of familiarity with the various programs and systems used by DOS staff, thus making plaintiff incapable of performing the duties of the position upon entry. (See Jennings Dep. at 32-33, 37-40). Among other things, Jennings stated that "it would take more than 60 days on these systems to know how they really function and operate to be able to lead them and to be able to apply them and use them on a daily basis. They're just too complex to learn in a very short period of time." (Id. at 38).

In short, although plaintiff may have been well qualified for the position by some standard, he has not presented sufficient evidence for a reasonable juror to conclude that Jennings in fact thought he was well qualified and that his statements to the contrary were a mere pretext for discrimination.

50

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

B.   Booth

Plaintiff contends that the decision made by Booth and others to ask Jennings to perform the CTAP evaluation is itself evidence of pretext. According to plaintiff, "[i]t is unclear how [the local officials] felt able to make a selection at all if they could not identify a well-qualified candidate. This rationale smacks of pretext." (Doc. 43 at 27-28).

At Booth's deposition, he testified that he and others in the Atlanta office did not feel they had the necessary expertise to determine whether plaintiff was well qualified under the CTAP guidelines. (Booth Dep. at 7, 14). When asked why, Booth stated: "Well, this was a new position here for the regional office and we just didn't feel like we had anyone in the office or, you know, in the field to make that decision other than the people that were probably posting for the position." (Id. at 15).

Booth's explanation hardly "smacks of pretext." Being unqualified or unwilling to determine whether a candidate is well qualified under the guidelines of a newly implemented program does not necessarily imply that Booth was not capable of determining which of several candidates he personally found better qualified for the job.

Plaintiff also contends that, "for the same reasons that Mr. Smith should have been determined well qualified, he also should have been selected in direct competition with the

51

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

selectee Mark Burks." (Doc. 43, Brief at 32). According to

Booth, Burkes was the better qualified candidate for the

position for the following reasons:

> In addition to being a commissioned bank
> examiner, he was an information specialist.
> He had intimate knowledge of the hardware
> and all the various software used by DOS in
> the examination process. Over the years, he
> had been involved in the ongoing development
> of some of the computer programs used by DOS
> for information retrieval and management
> reporting. He also had extensive experience
> dealing with our laptops and personal
> computers. He had been on detail to the
> Atlanta office, and had successfully
> performed most if not all of the duties of
> the position. He was also proficient in
> troubleshooting and quickly resolving
> technical computer problems. He
> communicated professionally and effectively
> and was skilled in training others in the
> use of computers and the computer programs
> used by DOS.

(Doc. 37, Exh. 52 (Booth Aff.) ¶ 29). Booth did not find

plaintiff as well qualified for the position. (_Id_. ¶ 31). He

explained:

> [Plaintiff] did not have the specific
> knowledge and hands-on experience with the
> development and use of computer software
> programs employed by DOS, and did not
> demonstrate the level of in-depth knowledge
> with the programs and systems possessed by
> Mr. Burks. Like Mr. Burks, Mr. Smith was a
> commissioned [bank] examiner, but he had
> been working in other areas of the
> Corporation for approximately ten years
> before applying for this position. During
> this time frame, from approximately the mid-
> 1980's to the mid-1990's, the use by DOS of
> computer applications to streamline its
> functions had increased dramatically. In
> fact, during that time frame, DOS had moved

52

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

> from a largely manual system, to a largely
> automated system of conducting its business.
> During this ten year period of development,
> Mr. Burks had been intimately involved not
> only in the evolution of the process, but
> also in the ongoing development revision of
> the programs and applications used by DOS
> examiners and management.  Mr. Smith was
> unable to demonstrate the same level of
> expertise and knowledge of information
> processing and retrieval functions as Mr.
> Burks possessed.

(_Id_.).  Booth denies that age was a factor in his decision to

select Burks, and states that his decision was not affected,

"either directly or indirectly, by instructions or pressure from

FDIC senior management." (_Id_. ¶¶ 33-34).

Nothing about the reasons given by Booth for the selection

of Burks could be relied on to establish pretext.  Absent

additional evidence of a discriminatory motive, a reasonable

juror could not find that Booth did not honestly believe Burks

to be the better candidate.


C.   Statements Made By High-Level Officials and Evidence

of an Affirmative Action Policy

Finally, plaintiff argues that the evidence he has

presented regarding allegedly biased statements made by FDIC

officials, even if not direct evidence of discriminatory intent,

provides circumstantial evidence of pretext with respect to the

decision not to hire plaintiff for the Examination Specialist

position. (Doc. 43 at 33-34). According to plaintiff, "[t]here

53

AO 72A
(Rev.8/82)

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

can be no clearer statement of discriminatory intent tha[n] the Chairman of the FDIC, Ricki Helfer, and her Chief Operating Officer, Denis Geer, stating that older employees are the 'target' during the downsizing." (Id. at 34).

The court does not find this evidence sufficient, either by itself or in combination with plaintiff's other evidence, to save plaintiff from summary judgment. First, for reasons discussed above, the statements relied on by plaintiff do not demonstrate age bias on the part of Helfer or Geer. Moreover, even if these statements could be construed as evidence of an underlying bias, plaintiff has presented absolutely nothing to connect that bias to the individuals who made the decision not to hire him for the Examination Specialist position. The relevant statements occurred largely in the context of policy-making meetings that involved only high-level officials. Plaintiff has pointed to nothing in the record indicating that these comments were disseminated to FDIC employees generally. In short, the record contains no evidence that Jennings or Booth had any reason to think that Helfer, Geer, or any other high-level FDIC official wanted to get rid of older employees simply because of their age or, for that matter, for any reason.

Plaintiff also relies on evidence that the FDIC had an affirmative action policy that it enforced in a discriminatory manner, and that supervisors in the field were aware of this. Whether true or not, this evidence is not probative of the

54

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

question at hand; plaintiff was not passed over for a woman or a member of a minority group, but rather for another white man. Thus, even if the FDIC did, as a general matter, favor employment of women and minorities, plaintiff has produced no evidence that this alleged favoritism played any role in the FDIC's failure to hire *him* for the Examination Specialist position.[19]

---

[19]In a footnote, plaintiff implies that the policy did have an indirect effect on him. He states "the selection of Mr. Burks promoted the FDIC policy of ridding itself of older white males. Mr. Burks was a permanent FDIC employee not subject to layoff. Thus denying Mr. Smith this position promoted the FDIC diversity goals by eliminating one more older white male while not adding another white male to the payroll, since Mr. Burks was already a permanent employee not subject to RIF." (Doc. 43 at 32-33 n.5). Nothing in the record supports a finding that Booth or anyone else involved in selecting the Examination Specialist had such a circuitous goal in mind.

55

**EXHIBIT 41**
**ALIOTTA v. BAIR**
**NO. 05-2325-RMU**

IV.   <u>CONCLUSION</u>

For the reasons stated, the undersigned **RECOMMENDS** that

defendant's Motion for Summary Judgment [Doc. 37] be **GRANTED** and

that this action be **DISMISSED** with prejudice.  The Clerk of the

Court is **DIRECTED** to terminate referral of this action to the

undersigned magistrate judge.

IT IS SO RECOMMENDED this _____ day of February, 2001.


GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE



56