# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| BARBARA ALIOTTA *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 05-02325 (RMU) |
| | : | | |
| v. | : | Document Nos.: | 43, 44 |
| | : | | |
| SHEILA C. BAIR, | : | | |
| In her official capacity as Chairman, | : | | |
| Federal Deposit Insurance Corporation, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This case comes before the court on the defendant's motion for summary judgment and the plaintiffs' motion for partial summary judgment on the issue of liability. The plaintiffs, former and current employees of the Division of Resolutions and Receiverships of the Federal Deposit Insurance Corporation ("FDIC" or "the defendant" or "the Agency"), bring a class action suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, alleging age discriminatory employment practices. The plaintiffs move for partial summary judgment on the grounds that the defendant's 2005 downsizing effort, which included buyouts, transfers and a reduction in force ("RIF"), had an adverse impact on employees over the age of 50. The defendant in turn moves for summary judgment, contending that the plaintiffs have failed to establish a case of disparate impact or disparate treatment caused by the RIF itself, which they maintain is the only adverse employment action contemplated in the downsizing.

Because the plaintiffs have not demonstrated that the buyouts or transfers were involuntary, and because the plaintiffs have not established that the RIF, independently considered, had a discriminatory effect on older employees, the court grants the defendant's motion for summary judgment and denies the plaintiffs' motion for partial summary judgment on the issue of liability.

## II.  BACKGROUND

### A.  Factual History

The following facts are undisputed.  The FDIC is an independent federal agency that insures deposits in almost all U.S. banks, regulates state-chartered banks that are outside the Federal Reserve System and receives and manages the assets of failed banks.  Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 3.  The FDIC's workload fluctuates with the nature of the banking industry; it peaked during the savings and loan and bank crises of the late 1980s and early 1990s and ebbed as the number of bank failures declined in the mid-1990s.  *Id.* at 4; Am. Compl. ¶ 56. In the fourteen-year period between 1980 and 1994, 1600 FDIC-insured institutions failed or received financial assistance; as the crisis abated, the number of failures decreased, and only one FDIC-insured bank failed in 1997.  Def.'s Mot. at 4-5.  FDIC used both buyouts and reductions in force to diminish its workforce between 1995 and 2003.  Pls.' Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Reply") at 4.

The FDIC's Division of Resolutions and Receiverships ("DRR") manages assets from failed banking institutions.  Def.'s Mot. at 9.  On August 19, 2004, DRR Director Mitchell Glassman sent a memorandum to all DRR employees stating, "it is apparent that fewer problem institutions and our adoption of more efficient business processes have led to a declining

workload and excess staff." Def.'s Mot., Ex. 2.  In October 2004, Glassman informed DRR employees that management planned to reduce DRR staff from 515 positions to approximately 240 positions, a reduction of 53%.  Am. Compl. ¶ 68.  Glassman stated that the Agency hoped to attain these staffing levels through a buyout program and opportunities for DRR employees to cross-over to the Division of Supervision and Consumer Protection ("DSC"), but that management also projected a need for an involuntary RIF by the end of 2005.  Def.'s Mot., Ex. 7 ("Glassman Memo").

On October 26, 2004, John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer of the FDIC, sent an e-mail to all Agency employees describing a buyout program and an RIF that would be implemented in the following months.  Def.'s Mot., Ex. 6 ("Bovenzi Memo"). Bovenzi stated that five Agency divisions, including DRR, had workforce levels unjustified by current workload and would be targeted for downsizing in 2005.  *Id.*  The e-mail said that the Agency would offer buyouts to most employees in those divisions and that limited buyout offers would be extended to employees in non-targeted divisions as well.  *Id.*  An intranet posting in November 2004 explained the reorganized staffing structure and described some new positions that would be created within the post-RIF DRR structure.  Def.'s Mot., Ex. 10 ("DRR Posting").

The buyouts described in Bovenzi's e-mail of October 26, 2004, offered to most employees in DRR and, on a more limited basis, to employees throughout the Agency, included a cash payment equal to 50% of annual salary, the ability to combine the buyout with early or regular retirement agreements, no restriction on re-employment in another federal agency and other incentives.  Bovenzi Memo.  The buyout period lasted from November 2004 to May 2, 2005; management retained discretion to determine employees' departure dates based on

workload factors.  *Id.*  In DRR, 132 employees accepted the buyout offer; the Agency no longer considered those employees who accepted a buyout for positions remaining in the post-RIF, restructured DRR.  Def.'s Mot. at 15.  In total, 578 FDIC employees accepted a buyout package.  Pls.' Reply at 4.  Additionally, 73 DRR employees transferred to other FDIC divisions prior to the distribution of any RIF notices.  Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") ¶ 31.

The Agency proceeded with the RIF in 2005 in negotiation with the National Treasury Employees Union, the collective bargaining group of FDIC employees.  Def.'s Mot. at 15-16.  In total, 73 DRR employees transferred to other FDIC divisions prior to the distribution of any RIF notices.  Def.'s Resp. to Pls.' Statement of Undisputed Facts ("Def.'s Resp.") ¶ 31.  On June 30, 2005, the Agency notified 63 DRR employees that they had been selected for RIF terminations; their employment terminated September 3, 2005.  Def.'s Statement ¶ 63.  The RIF notifications described the factors considered in selecting employees for involuntary termination: veteran's preference, civil service tenure, length of federal service and performance ratings.  Def.'s Mot., Ex. 21 ("RIF Notice").  The FDIC terminated 53 employees, 7 retired in lieu of separation and 3 resigned in lieu of separation; after the RIF, 233 DRR employees remained.  Def.'s Resp. ¶¶ 67-68.

Analyzing only the 53 involuntary separations, 7 retirements in lieu of involuntarily separation and 3 resignations in lieu of involuntarily separation (63 total), the defendant's expert, industrial and organizational psychologist Dr. P.R. Jeanneret, Ph.D., found that the average age of employees affected by the 2005 RIF was 48.28 years.  Def.'s Mot., Ex. 27 ("Jeanneret Report") at 6.  Of those 63 employees, 57.1% were younger than 50 and 42.9% were over age 50.  *Id.* at 19.  DRR employees averaged 51.96 years of age on November 1, 2004, and 51.81 on

4

September 17, 2005.  *Id.* at 16.  On November 1, 2004, 58.3% of DRR employees were over the age of 50; employees under the age of 50 made up 41.7% of DRR workforce.  *Id.* at 17.  On September 17, 2005, 59.6% of DRR employees were over age 50; 40.4% were younger.  *Id.*

In contrast, the plaintiffs' expert, Dr. Lance Seberhagen, Ph.D., found that the 2005 downsizing had an adverse impact on employees over age 50 by examining all departures from DRR in 2005.  Def.'s Mot., Ex. 28 (Seberhagen Report) at 3.  Seberhagen determined that 34.9% of DRR employees on January 1, 2005, were under age 50 and 65.1% were over 50.  *Id.* at 8.  Seberhagen calculated "RIF-related" impact based on departure codes assigned to voluntary retirements, early retirements, retirements in lieu of involuntary separation, resignations in lieu of involuntary separation, resignations, terminations of FDIC appointment and involuntary terminations.[1]  *Id.* at 17.  Using those separation categories, Seberhagen determined that, of all DRR employees who left the Agency in 2005, 24.3% were under age 50 and 75.7% were over 50.  *Id.*

### B.  Procedural History

The original 19 plaintiffs filed notice of intent to sue with the Equal Employment Opportunity Commission ("EEOC") on October 31, 2005.  Am. Compl. ¶ 4.  Additional plaintiffs filed similar notices with the EEOC on November 10, 2005, and December 5, 15 and 22, 2005, and January 3 and 20, 2006.  *Id.*  All the plaintiffs served the FDIC with a copy of the notice of intent to sue on the same day they filed with the EEOC.  *Id.*  The plaintiffs also notified

---

[1]     Seberhagen objects to Jeanneret's use of the average age of DRR employees to show a lack of adverse impact.  Jeanneret objects to Seberhagen's categorization of all employee departures in 2005 as "RIF-related." *Compare* Def.'s Opp'n at 11 *and* Pls.' Mot. at 3.  Rather than a dispute over numbers, the primary difference between the parties' experts' reports is the classification of "harmed" employees.  *See* Pls.' Opp'n at 13.

the EEOC and the FDIC of their intent to file a class action suit.  *Id.*  The original plaintiffs filed their complaint with this court on December 5, 2005, and amended it to include additional plaintiffs on February 8, 2006.  On July 25, 2006, the court certified the plaintiffs as a class of "Former or present employees of FDIC's Division of Resolution and Receiverships who were born on a date on or before September 30, 1955, and who, as a result of the 2005 RIF, either accepted a buyout or reduction in grade, or were terminated from their positions in the DRR." *Aliotta v. Gruenberg*, 237 F.R.D. 4, 13 (D.D.C. 2006).[2]

The plaintiffs filed a motion for partial summary judgment for the issue of liability on February 25, 2008, on the grounds that the Agency's 2005 downsizing had an adverse impact on DRR employees over the age of 50.  The same day, the defendant filed a motion for summary judgment claiming that the plaintiffs failed to show that the 2005 RIF was motivated by a discriminatory purpose or that it had a disparate impact on older DRR employees.

## III.  ANALYSIS

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[2]     The original complaint was brought against Martin Gruenberg, Acting Chairman of the FDIC, in his official capacity.  Shelia C. Bair, sworn in as Chairman on June 26, 2006, automatically substitutes Mr. Gruenberg as the defendant, in her official capacity, pursuant to Federal Rule of Civil Procedure 25(d).

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

### B.  Legal Standard for Age Discrimination

Generally, to prevail on a claim of discrimination under the ADEA, a plaintiff must follow a three-part burden-shifting analysis generally known as the *McDonnell Douglas* framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" . . .  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . .  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of age discrimination under the ADEA, the plaintiff must demonstrate "facts sufficient to create a reasonable inference that age discrimination was a determining factor in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C. Cir. 1982); *Miller v. Lyng*, 660 F. Supp. 1375, 1377 (D.D.C. 1987).  The plaintiff creates such an inference if he shows (1) he belongs to the statutorily protected age group; (2) he was qualified for his position and was performing his job well enough to meet his employer's legitimate

expectations; (3) he suffered an adverse employment action despite his qualifications and

performance; and (4) he was disadvantaged in favor of similarly situated younger employees.

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Hall v. Giant Food, Inc.*, 175

F.3d 1074, 1077 (D.C. Cir. 1999); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C.

Cir. 1997) (citing *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C. Cir. 1983)).

"The burden of establishing a prima facie case of disparate treatment is not onerous."

*Burdine*, 450 U.S. at 253.  If the plaintiff establishes a prima facie case, a presumption then arises

that the employer unlawfully discriminated against the employee.  *Id.* at 254.  To rebut this

presumption, the employer must articulate a legitimate, non-discriminatory reason for its action.

*Id.*  The employer "need not persuade the court that it was actually motivated by the proffered

reasons."  *Id.*  Rather, "[t]he defendant must clearly set forth, through the introduction of

admissible evidence, reasons for its actions which, if believed by the trier of fact, would support

a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's

Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its

actions, "the McDonnell Douglas framework – with its presumptions and burdens – disappears,

and the sole remaining issue is discrimination *vel non*."  *Lathram*, 336 F.3d at 1088 (internal

citations omitted); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520

F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary

sideshow").  The district court need resolve only one question: "Has the employee produced

sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against the

employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494

(D.C. Cir. 2008). The court must consider whether the jury could infer discrimination from (1)

the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's

proffered explanation, and (3) any further evidence of discrimination that may be available to the

plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting

*Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in

order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the

plaintiff's challenge to the employer's explanation in light of the total circumstances of the case.

*Id.* at 1291.

### C.  Because the Voluntary Buyout Program is not an Adverse Employment Action, It Cannot be Considered as Part of the Plaintiffs' Prima Facie Discrimination Case

Before turning to the *Brady* analysis of the defendant's nondiscriminatory justification,

the court must consider whether all or only part of the downsizing constituted an adverse

employment action sufficient to sustain a disparate treatment or disparate impact claim. The

plaintiffs argue that the buyouts and RIF were a complete program that adversely affected older

employees. Thus, the plaintiffs' statistical evidence considers all "RIF-related" separations to

find that older employees fared worse in 2005 than their younger counterparts. Pls.' Opp'n at 20.

The defendant argues that the buyouts were separate from the RIF; and, if one only considers the

RIF separations (and excludes the voluntary buyouts), the RIF actually advantaged older

employees. Def.'s Mot. at 24. In short, while the downsizing impacted the entire class of

plaintiffs, the parties dispute whether all of the plaintiffs were harmed. Some of the plaintiffs

accepted buyout incentives combined with normal or early retirement packages, others received

10

specific RIF notices and were involuntarily separated or retired or resigned in lieu of involuntary separation, and some remain employed by the FDIC in a lower pay grade.  Am. Compl. ¶¶ 6, 9, 28.

The D.C. Circuit defines adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).  The voluntariness of a choice between early retirement and continued employment "turns on such things as: did the person receive information about what would happen in response to the choice? was the choice free from fraud or other misconduct? did the person have an opportunity to say no?"  *Henn*, 819 F.2d at 828.  Retirements or resignations from government employment are presumptively voluntary.  *Staats v. U.S. Postal Serv.*, 99 F.3d 1120, 1123 (Fed. Cir. 1996); *Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004) (stating "a retirement request initiated by an employee is presumed to be a voluntary act") (quoting *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)).  A plaintiff can only overcome that presumption by showing that misinformation or coercion prompted the choice.  *Staats*, 99 F.3d at 1124.  A short period of time in which to make a complicated decision might also indicate that a choice was involuntary.  *Henn*, 819 F.2d at 828-29.

In light of the above, the court agrees with the defendant that the buyout program was not an adverse employment action.  Those plaintiffs who accepted a buyout and left the FDIC certainly faced a "significant change in employment status," i.e., they left their employment, but the plaintiffs' change in status was not a management decision.  It was their own.  All the employees who accepted a buyout combined with retirement or resignation signed a "Statement

11

of Intent" that included the clause: "My decision to resign is entirely voluntary and has not been coerced." Def.'s Mot., Ex. 14. Indeed, courts have generally found early retirements beneficial to employees and insufficient grounds for a claim of age discrimination. *See Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987) (describing an offer of early retirement as a "boon" to the employee).

The plaintiffs insist that the buyouts were involuntary because they were faced with an impossible choice between accepting a severance package or "face a greater than 50% prospect of involuntary termination with no early retirement or incentive payment." Pls.' Opp'n at 26. The court recognizes that "[a]n employer's 'offer' of early retirement may create a prima facie case of age discrimination by constructive discharge if it sufficiently alters the status quo that each choice facing the employee makes him worse off." *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 193 (5th Cir. 1988). But, while a decision motivated by "terror of the alternative" is not voluntary, *Henn*, 819 F.2d at 829, a decision between early retirement and the risk of termination in a downsizing or reorganization is not sufficiently terrorizing to make acceptance of the early retirement incentive categorically involuntary. *Bodnar*, 843 F.2d at 194; *see also Coburn*, 711 F.2d at 344 (stating that, in a downsizing, "early retirement is a common corporate practice utilized to prevent individual hardship" and the practice is "well accepted by both employers and employees, and is purely voluntary").

In an RIF, "the risk inhered in eligible employees' failure to accept [early retirement], the risk that their jobs might be eliminated because of economic pressure on the company, is . . . insufficient to suggest age discrimination . . . . [The] risk would be shared by all remaining employees." *Bodnar*, 843 F.2d at 194. The option of early retirement can be beneficial to

eligible employees because, while the risk in a RIF is shared by the entire workforce, the availability of an early retirement option affords eligible employees (like the plaintiffs) "a means to mitigate that risk which was not available to other employees." *Id.* Indeed, courts have called early retirement programs "in many situations, the fairest alternative available to a company," *id.* at 192, and "a humane practice," *Coburn*, 711 F.2d at 344. A voluntary buyout program combined with early or normal retirement or resignation is not an adverse employment practice.

Here, the FDIC offered buyouts to most employees in DRR and throughout the Agency. Bovenzi Memo. FDIC notified employees of the pending RIF and of the number of positions that would remain. *See* Glassman Memo; DRR Posting. Further, the FDIC notified all eligible employees of the parameters of the buyout program and allowed them five months to consider and accept. Bovenzi Memo. The plaintiffs present no evidence of fraud or misconduct by the FDIC, except to generally state, without support, that the Agency failed to respect "bump" and "retreat" rights as mandated by federal RIF regulations. Pls.' Opp'n at 36. However, that vague allegation is irrelevant to the issue of FDIC's method of conducting the buyout program because "bump" and "retreat" rights only come into play when a RIF is actually implemented. 5 C.F.R. Part 351. The court, therefore, concludes that those plaintiffs who accepted a buyout and normal or early retirement did not face an adverse employment action because they voluntarily participated in the incentive program.

Nor were the buyouts otherwise adverse. Although the plaintiffs do not claim they were constructively discharged, their inclusion of the voluntary buyout packages with the mandatory RIF involuntary terminations depends on such an argument to establish the existence of an adverse employment practice. *See Johnson v. Runyon*, 137 F.3d 1081, 1082-83 (8th Cir. 1998).

An actionable constructive discharge claim requires showing that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment. *Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 110 (D.D.C. 2001) (citing *Clark v. Marsh*, 665 F.2d 1168, 1173-74 (D.C. Cir. 1981)); *see Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (holding that a plaintiff alleging constructive discharge must show that the "employer deliberately made working conditions intolerable and drove the employee out" of the position).

"To transform an offer of early retirement into a constructive discharge, a plaintiff must show that the offer was nothing more than a charade, that is, a subterfuge disguised to purge plaintiff from the ranks because of his age." *Vega v. Kodak Caribbean*, 3 F.3d 476, 480 (1st Cir. 1993). An offer of early retirement or continued employment with the risk of termination in a pending RIF is a constructive discharge only if there is really no choice or if the employees' power to choose work over retirement is eliminated. *Id.* Here, the plaintiffs' claim depends on considering both the buyout program and the RIF terminations as adverse employment actions. Pls.' Opp'n at 13. Those employees involuntarily separated and those who retired or resigned in lieu of involuntary separation certainly faced an adverse employment action. However, those employees who accepted voluntary buyouts combined with retirement or resignation were not adversely affected by the RIF. Certainly, those employees faced a difficult decision between leaving the FDIC unexpectedly early and risking termination in the announced RIF in DRR, but none of the employees who accepted the buyout incentives knew they would be specifically targeted for termination. *Vega*, 3 F.3d at 480. Indeed, the Agency did not know how many

14

employees would receive RIF notices until after concluding the buyout program throughout the

FDIC, including DRR and most other divisions.  *See* Glassman Memo.

A choice between retirement or continued, if risky, employment is not a constructive

discharge when the particular employees offered the choice are not facing certain termination if

they remain with the downsizing employer.  *Id.*  "Broad-based subjugation to the risk of future

termination is common fare in a depressed economic climate.  It, alone, is insufficient to

constitute constructive discharge."  *Id.* at 481; *see also Terban v. Dep't of Energy*, 216 F.3d

1021, 1026 (Fed. Cir. 2000) (noting "a choice is not involuntary simply because an employee is

faced with an inherently unpleasant situation or his choice is limited to two unpleasant

alternatives"); *Keyes*, 372 F.3d at 440 (holding that a choice between retirement or retaining

employment while fighting charges of inadequate job performance "may have been difficult,

[but] it was a voluntary decision nonetheless"); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806

(11th Cir. 2005) (holding that a choice between a severance benefit and possibly retaining

employment was not a "take-it-or-leave-it situation" and that "an employee who accepts the

severance package rather than wait to see if he can remain employed cannot claim that he was

constructively discharged").

The plaintiffs claim that they felt pressured to accept the buyouts and believed they had

no choice but to accept the incentives and leave the FDIC after the Agency announced a drastic

reduction in the DRR workforce.  Pls.' Opp'n at 13.  However, "an employee's perceptions

cannot govern a claim of constructive discharge if, and to the extent that, the perceptions are

unreasonable."  *Vega*, 3 F.3d at 481.  Objectively, the plaintiffs did not face a choice between

buyout and discharge.  An employer does not constructively discharge employees when it

announces that if a sufficient number of employees accept a buyout the planned RIF will be unnecessary, when it does not indicate which specific employees' positions would be eliminated in the RIF, and when it does not threaten to treat harshly those employees ultimately selected for termination. *Id.* at 480-81. When all employees face the same working conditions, or the same risks of a RIF, no employee group can claim constructive discharge. *See Bodnar*, 843 F.2d at 193.

Those plaintiffs who accepted a buyout incentive had a choice between early or normal retirement and the chance of continued employment with the Agency. In fact, 233 of their co-workers, including many over the age of 50, remained with DRR, 73 transferred within the FDIC and 6 transferred to another federal agency. Def.'s Mot. Ex. 23 at 1-14. Additionally, the plaintiffs do not allege that the Agency ever threatened to treat badly or unfairly those employees ultimately selected for the RIF. The majority of employees who received RIF notices collected severance pay and had access to career counseling resources.[3]

The plaintiffs have also failed to show that older employees faced a higher risk of termination than younger employees in the pending RIF. After the buyout period closed, all 312 remaining DRR employees faced the same risk of termination. And older employees fared better in the RIF.[4] Those plaintiffs who accepted the offered incentives avoided the risk of involuntary

---

[3]    46 of the 53 DRR employees involuntarily separated by the RIF received severance pay. Def.'s Mot., Ex. 23 ¶ 7.

[4]    Of the 312 DRR employees subject to the RIF conducted September 3, 2005, 137 or 43.9% were under 50 and 175 or 56.1% were over 50. Of the 63 DRR employees actually terminated, 36 or 57.1% were under 50 and 27 or 42.9% were over 50. Def.'s Mot., Ex. 27-1 at 20. In December 2004 59.1% of DRR employees were over 50 and by December 2005, after the completion of the RIF, 61.3% of DRR employees were over age 50. Def.'s Mot., Ex. 23 at 26. Even while employees over age 50 were the majority in DRR in 2005, the majority of terminated employees were under 50.

termination and cannot claim the pre-RIF voluntary buyout offers were adverse employment actions.

The plaintiffs rely on *Schmid v. Frosch* to claim that "it is improper to limit the analysis of the effects of a downsizing plan to the people who suffer involuntary terminations. Rather, the proper statistical analysis looks at all employees harmed by the RIF." Pls.' Opp'n at 21 (citing *Schmid v. Frosch*, 680 F.2d 248, 250 (D.C. Cir. 1982)). While the D.C. Circuit in *Schmid* did allow the plaintiff in that case to statistically consider more employees than were separated as a result of a RIF, the court only allowed analysis of those employees who were "harmed," defining "harmed" employees as those who received RIF notices and were either separated or downgraded as a result. 680 F.2d at 250. Here, the plaintiffs' statistical evidence of the RIF in DRR includes those employees who were involuntarily separated or downgraded *and* those that left before any RIF notices were issued. Seberhagen Report at 3; Pls.' Reply at 7. The plaintiffs, thus, overextend the holding of *Schmid* to include DRR employees who accepted buyouts between November 2004 and May 2005. This is incompatible with the court's holding today that no plaintiffs suffered an adverse employment action by being offered and accepting voluntary buyouts.

In conclusion, because the voluntary buyouts are not adverse employment actions, they cannot comprise any part of the plaintiffs' prima facie case of discrimination. The RIFs themselves, however, were adverse employment actions. The court, therefore, now considers whether the plaintiffs have sufficiently supported their claims based on the RIF's to survive summary judgment by rebutting the defendant's proffered nondiscriminatory reasons.

**D.  The Plaintiffs' Disparate Treatment Claim Fails because the Plaintiffs have not Adequately Rebutted the Defendant's Proffered Nondiscriminatory Reason**

In an effort to discredit the defendant's proffered nondiscriminatory reason for the 2005 RIF or, alternatively, to show direct evidence of discriminatory intent, the plaintiffs allege then-Chairman Powell made discriminatory statements regarding the benefits of youth in the Agency. *See* Pls.' Mot. at 4.  This court in *Evans v. Atwood* denied summary judgment to a federal employer, USAID, when the plaintiffs presented evidence that the Administrator of the agency told *The Washington Post* that he intended to "move out" senior employees to fill their positions with "younger people."  38 F. Supp. 2d 25, 36 (D.D.C. 1999).  The plaintiffs in that case also presented evidence that an internal management memorandum stated, "the lack of young professionals in the ranks . . . has an impact beyond replacement.  The infusion of new ideas and different approaches to problem solving are mandatory for a development agency."  *Id.* at 35. The court denied the defendant's summary judgment motion because the statements raised a reasonable inference that management's sentiment could "trickle down" to create a culture of stigmatizing stereotypes within the agency.  *Id.* at 36.  The court concluded that comments by the head of the agency "could very well carry great weight in terms of molding the agency's culture and beliefs."  *Id.* (citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)).

In contradistinction, the plaintiffs' allegations regarding Chairman Powell's statements fall far short of raising a reasonable inference of age discrimination in the 2005 RIF.  The plaintiffs claim that Chairman Powell said in 2001 and 2002 that young people "have all the innovative ideas" and, in summer 2002, said it was time for older employees to "give the younger employees a chance."  *Id.* ¶¶ 58-59.  Yet plaintiffs do not present evidence to support their claim

18

that Chairman Powell actually made the remarks.  In fact, in his deposition, Chairman Powell

only stated that he had probably talked about the benefits of youth within the organization; he

also stated he talked about the benefits of experience.  Pls.' Opp'n, Ex. 10 at 3.[5]  Despite

extensive discovery, the plaintiffs do not provide a statement by any witness to Chairman

Powell's alleged comments, nor any internal documents to give credence to their claim that

upper-level FDIC management sought to reduce the ranks of older employees within the agency

in 2005.

The plaintiffs also do not provide evidence to rebut the Agency's claim that the RIF

targeted DRR because of the division's reduced workload caused by the health of the banking

industry.  The plaintiffs claim that the Agency targeted DRR because it was significantly older

than the other divisions by average age of its workforce.  Am. Compl. ¶ 89.  Plaintiffs fail to

provide evidence comparing DRR's average age to that of any other division in the FDIC.  The

defendant, in fact, provided evidence that DRR's workforce was older on average than the total

FDIC workforce.  Def.'s Mot. Ex. 23 at 27; Jeanneret Report at 16.  In 2000, the average age of

all FDIC career employees was 44.63; the average age in DRR was 49.84.  *Id.*  On November 1,

---

[5]     At Powell's deposition, the only specific reference to the alleged comments of age bias came
from the plaintiffs' attorney.  The transcript reads:
Q: Do you remember any remark made in 2001 or 2002 to a group of employees stating "I want
young people around me that, pause [sic], they have all the innovative ideas" or any words to that
effect?
A:  I'm sure on occasions I have talked about the value of young people in an organization.
Q:  Did you sometime in the summer of 2002 ask to see the hands of employees who had been
with FDIC for more than 20 years?
A:  I would do that often.  I would ask how many people had been here less than six years, how
many people had been here more than ten years, and I would say what's changed, what benefits
do we have of the more experienced people, and of the younger people what do you see going on.
There's wisdom, and experience, and there's lots of energy in youth.  Pls.' Opp'n, Ex. 10 at 3-4.

2004, just before the Agency offered buyouts, the average age throughout the FDIC was 46.63 and the average age in DRR was 51.96, *id.*, but the plaintiffs do not demonstrate that any manager or officer at FDIC knew that DRR was an "old division" or otherwise considered age in targeting the division to downsize, evidence that could show the defendant's proffered nondiscriminatory reason for the RIF was a pretext.[6]

Additionally, the average age of the FDIC and DRR increased between 2000 and 2005, evidence that discredits the plaintiffs' claim of age discrimination by design or effect. Def.'s Mot. Ex. 23 at 27; Jeanneret Report. Courts have held that in the case of a RIF, a statistically insignificant decrease in average age does not provide evidence of age discrimination. *See Stidham v. Minn. Mining and Mfg.*, 399 F.3d 935, 938 (8th Cir. 2005) (finding a half-year increase in the average age of the defendant-employer's workforce after a RIF insignificant). A slight difference in age between the group of eliminated employees and the age of the group of employees subject to the RIF is also insignificant. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 622 (6th Cir. 2006) (noting that when the terminated employees were 1.7 years older on average than the body of employees subject to the RIF there was no evidence of disparity). Here, the statistical evidence belies the plaintiffs' argument. Between December 2004 and December 2005, a period encompassing the RIF, the average age of DRR employees remained 52.10 years of age. Jeanneret Report at 16. The average age of the entire FDIC workforce increased slightly

---

[6]     The Sixth Circuit has adopted a bright-line rule that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 339 (6th Cir. 2003). This Circuit has settled on seven years. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d at 767 (D.C. Cir. 2002) (holding an age difference of seven years insignificant without further evidence showing age was a determining factor). If there is no showing age was a determining factor, then a slight difference in age between the targeted division and the Agency as a whole cannot raise a reasonable inference of discriminatory intent.

from 46.63 years in December 2004 to 46.69 years in December 2005.  Def.'s Mot., Ex. 23 at 16.

Moreover, the average age of the 312 DRR employees subject to the RIF in September 2005 was

50.52 years, and the average age of the RIF-terminated employees was 47.86 years.  *Id.*, Ex. 27-1

at 20.  The statistical evidence does not support the plaintiffs' claim of age discrimination

through disparate treatment.

### E.  The Plaintiffs' Disparate Impact Claim Fails because they Fail to Rebut the Defendant's Nondiscriminatory Justifications

Employment discrimination disparate impact claims "involve employment practices that

are facially neutral in their treatment of different groups but that in fact fall more harshly on one

group than another and cannot be justified by business necessity."  *Hazen Paper*, 507 U.S. at

609.  As opposed to a disparate treatment claim, a disparate impact claim does not require proof

of discriminatory intent.  *Id.*  By applying interpretations of similar language found in Title VII's

prohibition against discriminatory employment practices based on race or gender, the Court in

*Smith v. City of Jackson* allowed a disparate impact claim under the ADEA.  544 U.S. 228, 240

(2005).  The Court acknowledged, however, that the scope of ADEA disparate impact claims is

narrower than that of such claims brought under Title VII because age is occasionally relevant in

determining certain workplace capabilities.  *Id.*  For this reason, Congress excepted otherwise-

prohibited employment actions that adversely impact the protected group, if justified by a

reasonable factor other than age ("RFOA").  *Id.*  The employer bears both the burden of

production and the burden of persuasion when advancing an RFOA defense.  *Meacham v. Knolls*

*Atomic Power Lab., Inc.*, 128 S. Ct. 2395, 2401 (2008).  Thus, certain employment criteria that

have an adverse impact on older employees may be reasonable, as long as the employer

discriminates because of an employee's capacity to perform rather than his age as merely a number. *City of Jackson*, 544 U.S. at 240-41. The reasonableness standard for age-based disparate impact claims demands less than a "business necessity test" and does not require proof that there are no alternative employment practices that would have a lesser disparate impact on the protected group. *Id.* at 243.

Assuming *arguendo* that a disparate impact claim is legally cognizable against a federal employer,[7] the plaintiffs have not met the standard for bringing such a claim. To prove a disparate impact claim, a plaintiff must show that a specific employment practice resulted in a greater injury to older employees when compared to younger employees. *See Breen v. Mineta*, 2005 WL 3276163, at *7 (D.D.C. Sept. 30, 2005) (citing *City of Jackson*, 544 U.S. at 241). A claim that a facially neutral employment practice disproportionately imposed an injury on older employees may raise a rebuttable inference of disparate impact, but it is not enough to prevail. *Breen*, 2005 WL 3276163, at *7 n.6. Plaintiffs are required to identify a specific employment

---

[7] Neither the D.C. Circuit nor the Supreme Court has addressed whether ADEA disparate impact cases are legally cognizable against federal employers. *See Hazen Paper*, 507 U.S. at 610; *Koger v. Reno*, 98 F.3d 631, 639 n.2 (D.C. Cir. 1996) (declining to decide whether such a claim was cognizable because the plaintiff failed to establish a prima facie case). The court in *City of Jackson* applied the Title VII interpretation to 29 U.S.C. § 623, a section that does not apply to federal employers, and there is "good reason to doubt that [federal employee] plaintiffs have a cognizable ADEA disparate impact claim." *Breen v. Mineta*, 2005 WL 3276163, at *7 (D.D.C. Sept. 30, 2005). Members of the D.C. District Court remain divided on the issue. In *Breen v. Peters*, the court concluded that 29 U.S.C. § 633(a), the section prohibiting age discrimination in federal employment, did not preserve sovereign immunity against disparate impact claims because the text of the section prohibits discrimination, not intentional discrimination. 474 F. Supp. 2d 1, 6 (D.D.C. 2005). "The text of § 633(a) does not explicitly or implicitly require a plaintiff to prove that the federal employer was motivated by animus or intended to discriminate in violation of the law. In short, the plain language of § 633(a) does not support the distinction between disparate treatment and disparate impact." *Id.* In contrast, in *Silver v. Leavitt*, the court relied on "the significant question of sovereign immunity, and the Supreme Court's acknowledgment that the nature of the ADEA differs markedly from that of Title VII" to conclude that a disparate impact claim was not legally cognizable against a federal employer. 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006).

practice, and the defendant has the opportunity to show that the alleged adverse impact was attributable to an RFOA. *Meacham*, 128 S. Ct. at 2405-06 (citing *City of Jackson*, 544 U.S. at 241); *see also Silver v. Leavitt*, 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006).

First, the plaintiffs have failed to identify a specific employment practice that resulted in an adverse impact on older employees. Their argument hinges on analyzing as a single program the RIF involuntary terminations (and retirements and resignations in lieu of termination) that occurred in September 2005 and the voluntary buyouts offered between November 2004 and May 2005. *See* Pls.' Mot. at 12. Yet, in a disparate impact claim, "the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities," such as a test, requirement or practice within a pay plan. *City of Jackson*, 544 U.S. at 241. The plaintiffs have failed to show that a specific adverse employment practice within the 2005 downsizing resulted in a disparate impact on employees over 50.

Additionally, the plaintiffs cannot show that the RIF adversely impacted older employees. In fact, the RIF actually adversely affected younger employees disproportionately because the FDIC followed federal regulations in considering experience and seniority, factors that frequently correlate with higher ages, when terminating employees. *See* Def.'s Mot., Ex. 21; *see also Hazen Paper*, 507 U.S. at 611 (observing that years of service often correlate with age, but that an employer may consider the former without necessarily basing a decision on the latter because they are "analytically distinct"). Of the 312 DRR employees subject to the RIF conducted September 3, 2005, 137 (43.9%) were under 50 and 175 (56.1%) were over 50. Def.'s Mot., Ex.

27-1 at 20.  Of the 63 DRR employees terminated, 36 (57.1%) were under 50 and 27 (42.9%) were over 50.  *Id.*

The 2005 downsizing also did not result in a significantly younger DRR workforce. Between 2000 and 2005, the average age of DRR employees increased from 49.84 in December 2000 to 52.10 years in December 2005.  Jeanneret Report at 16.  More specifically, between November 1, 2004, around the time the downsizing was announced but before any buyouts became effective, and September 17, 2005, just after the RIF was completed, the average age of DRR employees decreased insignificantly from 51.96 years to 51.81 years.  *Id.*

Further, the defendant has produced evidence indicating that the 2005 downsizing throughout the FDIC in general and the RIF in DRR in particular were based on a reasonable factor other than age – a reduced workload.  The defendant contends that the reduced workload resulted from the robust banking industry's decline in receiverships, which is the primary focus of DRR's responsibilities and functions.  Def.'s Mot. at 28.  Accordingly, even if the DRR was the oldest division in the FDIC, the Agency has shown that the division was not targeted because of age but because of a drastic reduction in workload.

In rebuttal, the plaintiffs assert that "the Agency planned further downsizing so that [it] could commence recruitment for new employees on the campuses of colleges and universities and community centers under the new Corporate Employee program."  Pls.' Opp'n at 4.  But the plaintiffs' argument of pretext collapses on inspection.  The FDIC launched its recruiting initiative in 2002, 3 years before the downsizing.  Def.'s Reply, Ex. 43.  It offered DRR employees opportunities to apply to the Corporate Employee program through a transfer. Jeanneret Report at 23-27.  And although the FDIC hired 206 employees in 2005 and the

24

majority of these hires were under 40 years of age, the bulk of the hires were non-career appointments assigned primarily to divisions other than DRR.  Saberhagen Report at 6, 10 (indicating that only 28 out of 189 new hires under age 50 were for career positions).  DRR only hired 5 new employees (2 over 50 years of age) during 2005, while it reduced its workforce from over 500 to less than 240.  *Id.* at 11.  In other words, the new positions were for workers assuming different responsibilities for lower pay in different departments than the plaintiffs. Clearly, the two groups are not so similarly situated as to support the proposition that the FDIC conducted the voluntary buyout, transfers and RIF as an elaborate ruse to flush the agency of senior staff.  *See James v. New York Racing Ass'n*, 233 F.3d 149, 152 (2d Cir. 2000) (holding that hiring of a younger employee after a RIF is not evidence of age discrimination when reorganization resulted in new employees assuming different responsibilities for lower pay than the plaintiff); *cf. Murray v. Gilmore*, 406 F.3d 708, 711 (D.C. Cir. 2005) (concluding that a reasonable jury could find an employer's RIF defense pretextual when employer created a new position functionally equivalent to the plaintiff's position soon after the latter's termination). The court, therefore, holds that the plaintiffs' evidence does not rebut the defendant's proffered legitimate, nondiscriminatory reason for the 2005 downsizing.

**IV.  CONCLUSION**

For the foregoing reasons, the court grants the defendant's motion for summary judgment and denies the plaintiffs' motion for partial summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 18th day of September, 2008.


RICARDO M. URBINA
United States District Judge